UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 20-cr-10111-RWZ |
| | ) | |
| v. | ) | Violations: |
| | ) | |
| CHARLES LIEBER, | ) | Counts One and Two: |
| | ) | False Statements |
| Defendant | ) | (18 U.S.C. § 1001(a)(2)) |
| | ) | |
| | ) | Counts Three and Four: |
| | ) | Filing False Tax Returns |
| | ) | (26 U.S.C. § 7206(1)) |
| | ) | |
| | ) | Counts Five and Six: |
| | ) | Failure to File Reports of Foreign |
| | ) | Bank and Financial Account |
| | ) | (31 U.S.C. §§ 5312 and 5322(a)) |
| | ) | |

FIRST SUPERSEDING INDICTMENT

At all times relevant to this First Superseding Indictment:

General Allegations

A.    The Defendant

1.    CHARLES M. LIEBER ("LIEBER") was a United States citizen and a professor in the Department of Chemistry and Chemical Biology (the "Department") at Harvard University in Cambridge, Massachusetts ("Harvard"). Between approximately 2015 and 2019, LIEBER served as Chair of the Department. In his career, LIEBER has published over 400 papers in peer-reviewed journals concerning nanoscience and other scientific disciplines, and he is the principal inventor on more than 50 patents.

2.    In addition to being a member of Harvard's faculty, LIEBER also served as the Principal Investigator of the Lieber Research Group at Harvard. In addition to LIEBER, the Lieber

Research Group was staffed by Harvard graduate students and various postdoctoral researchers. According to its website, the Lieber Research Group was "focused broadly on science and technology at the nanoscale, harnessing the unique physical properties of novel nanomaterials to push scientific boundaries in biology and medicine."

B.      The Lieber Research Group Receives Federal Grant Funding

3.      The National Institutes of Health ("NIH") was a component of the U.S. Department of Health and Human Services. It was the primary agency of the U.S. government responsible for biomedical and public health research.

4.      In addition to conducting scientific research through its Intramural Research Program, NIH was the largest public funder of biomedical research in the world. Through its Office of Extramural Research, NIH awarded more than $32 billion annually to private research institutions, including colleges and universities like Harvard.

5.      In order to receive NIH funding, private research institutions and their principal investigators were required to submit a detailed application that described, among other things, the purpose and scope of the proposed research, the amount of funding requested, and how the funding would be used. NIH also required applicants and grant awardees to disclose all forms of research support and financial interests, including support from foreign governments or other foreign entities. Similarly, applicants and grant awardees were required to report to NIH all domestic and foreign affiliations, including affiliations with foreign governments, foreign academic institutions, and foreign research institutions. According to NIH, these reporting requirements were primarily designed to prevent the "diversion of intellectual property in grant applications or produced by NIH-supported biomedical research to other entities, including other countries;" the "[s]haring of confidential information on grant applications by NIH peer reviewers with others, including

2

foreign entities, or otherwise attempting to influence funding decisions; and the "distort[ion of] decisions about the appropriate use of NIH funds."

6.      The U.S. Department of Defense is an agency of the Executive Branch of the U.S. government.  The Department of Defense provided grant funding to private entities through a number of its components, including the Air Force Office of Scientific Research ("AFOSR") and Office of Naval Research ("ONR") (referred to collectively herein as "DOD").

7.      The Lieber Research Group was funded in large part by research grants from U.S. government agencies, including NIH and various components of DOD.  In fact, since 2008, through Harvard, the Lieber Research Group received more than $15,000,000 in NIH and DOD grant funding.

C.      Lieber's Undisclosed Affiliations with the People's Republic of China and its Thousand Talents Plan

8.      Wuhan University of Technology ("WUT") was a university located in Wuhan, China.  According to its website, "WUT is one of the leading Chinese universities under the direct administration of the [Chinese] Ministry of Education and one of the universities in … [China's] construction plan of world-class universities and first-class disciplines."

9.      "WUT Professor" was a professor of "Materials Science" at WUT.  According to his biography on WUT's website, WUT Professor was an "Advanced Research Scholar" at Harvard under LIEBER's supervision between approximately 2008 and 2011.

10.     In or about November 2011, while employed as a full-time faculty member at Harvard, LIEBER traveled to Wuhan, China, ostensibly to speak at a "Nano-Energy Materials Forum" hosted by WUT.  On or about November 9, 2011, several days before LIEBER traveled to WUT, the WUT Professor emailed LIEBER a "Contract for Strategic Scientist's Appointment" (the "Strategic Scientist Contract").  The contract, which was between LIEBER and WUT,

3

appointed LIEBER a Strategic Scientist at WUT for five years, beginning on or about November 15, 2011.

11.     In exchange for a salary of up to $50,000 per month, and round-trip, business-class airfare to and from WUT, the Strategic Scientist Contract required LIEBER to: (i) "[m]ake strategic, visionary and creative research proposals to guide the advancement of disciplines or scientific research institutes to become first class disciplines or scientific research institutes in China or the world, especially in frontier areas;" (ii) "supervise young teachers or receive them as visiting scholars;" (iii) "jointly publish[] academic papers in top international journals (in the name of WUT, and WUT faculty or students as the first author);" (iv) "[c]onduct national important (key) projects or internal cooperation projects that meet China's national strategic development requirements or state at the forefront of internal science and technology...;" and (v) "[c]arry out international exchanges and cooperation, and host or jointly host prominent international academic conferences in the name of WUT."  The Strategic Scientist Contract also required LIEBER to "ensure working hours in WUT," which the contract noted "c[ould] be negotiable when significant contributions are made by [LIEBER] ... for the construction and development" of WUT.

12.     In an email dated on or about November 11, 2011, LIEBER and the WUT Professor agreed that LIEBER would sign the Strategic Scientist Contract on November 15, 2011, when LIEBER was at WUT.  According to his travel records, Lieber did, in fact, travel to the People's Republic of China ("PRC") on or about November 12, 2011.

13.     LIEBER returned to Massachusetts from WUT on or about November 17, 2011. The next day, in an email to the WUT Professor, LIEBER wrote, "I very much appreciate the effort that you put into making my visit a good one. I also agree that it would [be] productive, and hope

4

that we can push forward as per discussions to build up the joint laboratory to a truly world-level facility."

14.     Approximately one month later, on or about December 19, 2011, the WUT Professor emailed portions of a proposed website for the "WUT-Harvard Joint Nano Key Laboratory," which, according to the website, was established in 2009. The website prominently featured LIEBER's name, photograph and biographical information, and identified LIEBER as the "Laboratory Director." In his email to LIEBER about the website, the WUT Professor noted that "the Chinese version [of the website] will be made after your approval for [sic] the English version."

15.     On or about April 3, 2012, approximately five months after LIEBER signed the Strategic Scientist Contract, the WUT Professor emailed LIEBER to inform him that LIEBER had been selected to participate in PRC's Thousand Talents Plan. Specifically, the WUT Professor wrote:

> I am very happy to let you know that, in the **World** Recruitment Plan of **renowned** experts in China (also called as one thousand plan of foreign experts), you have been approved and awarded as invited strategic foreign expert by Chinese government because of your **world-leading** achievements, the **good collaboration basis** between you and WUT, and your great **contribution** to national academic exchange between China and USA. You are provided with personal benefit of one million RMB (~158,800 USD), a research funding of 5 million RMB (~794,000 USD) for development of WUT-Harvard joint nano key lab and collaboration research  This plan is the highest plan/program for famous foreign scientists in Chinese scientific field and only 40 famous experts from the world were awarded.

16.     The "Chinese Talent Programs" were a collection of plans designed by the PRC Government to attract, recruit, and cultivate high-level scientific talent in furtherance of PRC's scientific development, economic prosperity, and national security. The "Thousand Talents Plan"

was one of the most prominent PRC Talent Plans designed by the PRC government to incentivize individuals engaged in research and development in the United States and elsewhere to transmit (sometimes through illicit means) their knowledge, research and intellectual property to the PRC in exchange for salaries, research funding, laboratory space, honorary titles, and other incentives. The so-called "World Recruitment Plan of Renowned Experts in China" was part of the Thousand Talents Plan.

17.     On or about June 27, 2012, vthe WUT Professor emailed LIEBER a contract titled, "Employment Contract of 'One Thousand Talent' High Level Foreign Expert" (the "Thousand Talents Contract"). The WUT Professor asked for LIEBER's "ideas/comments/suggestions" within "one week when your schedule allows (of course, the sooner the better)."

18.     By its terms, the Thousand Talents Contract was effective for three years "from the date of signature." Among other things, the contract obligated LIEBER to: (i) conduct scientific research; (ii) "publish high-level articles in the renowned and important international academic journals in the name of Wuhan University of Technology;" (iii) assemble a research team with "strong ability of [sic] research and innovation" in LIEBER's field of expertise; (iv) "guide 1-2 distinguished young scholars and 3-4 doctoral students ... and help them publish systematic articles in the international renowned journals;" (v) "organize 1-2 predominant influencing international conferences in his field in the name of Wuhan University of Technology;" and (vi) "invite 1-3 international top scientists to work in the lab as visiting scholars." The contract also required LIEBER to work at or for WUT "not less than nine months a year" by "declaring international cooperation projects, cultivating young teachers and Ph.D. students, organizing international conference[s], applying for patents and publishing articles in the name of" WUT.

19.     In exchange for his work for and on behalf of WUT, WUT agreed to pay LIEBER

a salary of up to $50,000 per month and living expenses of up to 1,000,000 Chinese Yuan (based

on 2012 exchange rates, approximately $158,000 U.S. dollars), to be paid over the three-year term

of the contract. The contract also allocated 11,000,000 Chinese Yuan (or roughly $1.74 million

U.S. dollars based on 2012 exchange rates) for the joint Harvard-WUT Nano Key Lab and related

research.

20.     Duplicate copies of the Thousand Talents Contract—signed by WUT's President—

were mailed to LIEBER in Massachusetts on or about July 10, 2012. In turn, LIEBER signed the

Thousand Talents Contract on or about July 21, 2012. LIEBER subsequently mailed and caused

to be mailed signed copies of the Thousand Talents Contract to WUT. Neither LIEBER, nor

anyone acting on LIEBER's behalf, notified Harvard, NIH or DOD of LIEBER's contractual

participation in the Thousand Talents Plan.

21.     After signing the Thousand Talents Contract, LIEBER traveled to WUT in or about

November 2012. Before LIEBER's trip, on or about October 26, 2012, an employee of WUT (the

"WUT Employee") emailed LIEBER to ask how he preferred to be paid under the Thousand

Talents Contract. The WUT Employee wrote:

> Before your visit, I would like to talk about one detail in the
> implementation of the contract of "one thousand talent" high level
> foreign expert between you and our university. According to the
> article concerning the payment and living conditions, I want to know
> the way you prefer to be paid so that everything can be prepared
> before your coming. I would like to provide two options for you to
> choose if you do not mind. Option one. I help you open a new bank
> account in the Chinese Bank named … ["Chinese Bank"]. The
> payment will be put into your account and you can get the payment
> from the branch of … ["Chinese Bank"] in your country. Option
> Two. I can prepare the payment in cash.

22.     "Chinese Bank" is a state-owned bank headquartered in the PRC.  Chinese Bank has two U.S. locations in New York, New York.

23.     On or about November 12, 2012, while visiting WUT and with the assistance of at least one WUT employee, LIEBER opened an account at the Chinese Bank in the PRC.

24.     On or about January 10, 2013, the WUT Professor emailed LIEBER an agreement titled "Academic Cooperative Agreement between Harvard University, USA and Wuhan University of Technology, P.R. China" (the "Academic Cooperative Agreement").  The stated purpose of the agreement, which had a five-year effective term, was to "carry out advanced research and development of nanowire-based lithium ion batteries with high performance for electric vehicles."  Apart from its stated objective, the agreement provided for a "cooperative research program" whereby researchers from WUT would "visit Department of Chemistry and Chemical Biology of Harvard University for two months each year."  Without consulting anyone at Harvard, LIEBER signed the agreement on Harvard's behalf and returned the executed copies to the WUT Professor on or about January 11, 2013.

25.     On or about January 18, 2014, seemingly in accordance with the Academic Cooperative Agreement, LIEBER agreed with the WUT Professor to accept a WUT graduate student as a long-term "WUT-HU joint Ph.D student."  LIEBER's willingness to accept the WUT graduate student was conditioned on WUT agreeing to "support all of [the WUT graduate student's] salary and research costs while working in my lab."  In the same communication, LIEBER discussed an upcoming visit to WUT and made specific demands regarding the payment of his salary:

> I would like to receive ~1/2 of salary (for the current period) in US dollars, with the remainder deposited into the bank account that was set-up.  The ~00 that I promised to pay for the party following ... [student's] Ph.D. defense in April, can be deduced from either 1/2.

8

26.    In or about June 2014, LIEBER continued to discuss his compensation under the Thousand Talents Contract with WUT. In an email to the WUT Employee dated on or about June 16, 2014, LIEBER asked to maintain his account at the Chinese Bank "the way it has been for now," and he reiterated his earlier request that half of his salary be deposited into his account at the Chinese Bank, while the other half be paid to him in cash when he next visited WUT. In the same email, LIEBER stated, "I think this is close to what [we] have done in [the] past."

27.    In late January 2015, LIEBER outlined his ongoing relationship with WUT in an email to the WUT Professor, confirming that he intended to visit WUT "several" times per year or "perhaps slightly more in the next couple years as we try to build up the nano-bio part of the lab."

28.    In or about January 2015, independent of LIEBER, Harvard learned for the first time of the WUT-Harvard Joint Nano Key Laboratory at WUT, including the fact that LIEBER was the director of the lab. Harvard officials confronted LIEBER about the joint lab, and informed him that the use of Harvard's name and logo by WUT and LIEBER without Harvard's knowledge or consent violated university policy. In response, LIEBER falsely told Harvard that he was involved in collaborative research with WUT for "mutual scientific interaction," but that WUT was using Harvard's name and logo without his knowledge or permission.

29.    In an email dated on or about February 20, 2015, LIEBER discussed with the WUT professor a manuscript written by WUT researchers. In the same email, LIEBER also said that he "may be in touch with regards to several issues relating to my appointment/salary/funding @ WUT...."

30.    Thereafter, WUT continued to pay LIEBER his salary. In an email dated on or about November 26, 2015, the WUT Professor thanked LIEBER "for all you have done for our

9

university and me" and told LIEBER that WUT "put your salary in your ... [bank] card and we will help you change the cash for you when you come to Wuhan."

D.     LIEBER's False Statements to DOD

31.     Since in or about 2009, LIEBER has been the principal investigator associated with at least six research grants funded by various DOD entities, including ONR and AFOSR. The total value of these grants exceeded $8 million. As of April 2018, LIEBER was the principal investigator associated with three active DOD grants.

32.     On or about April 24, 2018, DOD investigators interviewed LIEBER about his active grants and whether LIEBER and his employer, Harvard, had properly disclosed foreign collaboration and/or affiliations to DOD in grant applications and other grant-related submissions. The interview took place at LIEBER's office on the Harvard campus. During the interview, among other things, LIEBER falsely told the DOD investigators that he had never been asked to participate in China's Thousand Talents Plan, but that he "wasn't sure" how China categorized him.

E.     LIEBER's False Statements to NIH

33.     LIEBER was the principal investigator associated with at least three NIH-funded research grants – with a total value of over $10 million – awarded to Harvard since in or about 2008. Two of those grants were being actively funded by NIH as of November 2018.

34.     On or about November 15, 2018, NIH inquired of Harvard about whether LIEBER and/or Harvard had failed to disclose LIEBER's then-suspected relationship with WUT and the PRC's Thousand Talents Program. In order to respond to NIH's inquiry, Harvard questioned LIEBER about his foreign affiliations generally, and any connection he might have had to WUT. Based upon the information it received from LIEBER, Harvard submitted a written response to

10

NIH on or about January 10, 2019. In its response, among other things, Harvard wrote, "Dr. Lieber has represented that he is not and has never been a participant" in PRC's Thousand Talents Plan.

F.      LIEBER Failed to Report to the IRS Income Earned from WUT and His Interest in a Chinese Bank Account

### *Relevant Tax and Financial Reporting Requirements*

35.     The Internal Revenue Service ("IRS") was an agency of the United States Department of the Treasury responsible for administering the tax laws of the United States and collecting taxes owed to the United States.

36.     All citizens of the United States were obligated to report all income earned, regardless of where they earned it, on a U.S. Individual Income Tax Return, IRS Form 1040 ("Form 1040"), each year, and they were required to pay the tax due on that income.

37.     Citizens of the United States were also obligated to report to the IRS each year whether they had an interest in, or signature authority over, a financial account in a foreign country for that year by checking "Yes" or "No" in the appropriate box on Schedule B of the Form 1040, and identifying the country where the account was maintained.

38.     Each year, citizens of the United States with an interest in, or signature authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during the prior year were required to file with the Commissioner of Internal Revenue a Report of Foreign Bank and Financial Accounts ("FBAR") using FinCEN Form 114. In the FBAR, the taxpayer was required to identify, among other things, the name of the financial institution at which the account was held, the account number, and the maximum value of the account during the prior calendar year. The FBAR for the applicable year was due by June 30 of the following year.

### *LIEBER's FBAR and Tax Filing History*

39.     On or about the dates listed below, LIEBER made and subscribed Forms 1040 for

the tax years listed below, which were filed with the IRS and which contained a written declaration

that they were made under the penalties of perjury.

| DATE | TAX YEAR |
|------|----------|
| April 15, 2014 | 2013 |
| September 29, 2015 | 2014 |

In each of these tax years, LIEBER earned income from WUT in the form of salary and other

payments made to him pursuant to the Strategic Scientist and Thousand Talents Contracts that was

not reported on the appropriate Form 1040.

40.     On Schedules B of his 2013 and 2014 Forms 1040, LIEBER answered "No" in

response to the question, "[a]t any time during [the year] did you have a financial interest in, or

signature authority over, a financial account (such as a bank account, securities account, or

brokerage account) located in a foreign country?"  In fact, during each of these years, LIEBER

had an interest in, and signature authority over, a bank account at the Chinese Bank located in the

PRC.

41.     LIEBER also did not file an FBAR or FinCEN Form 114 for the years 2014 and

2015 declaring his interest in the Chinese Bank account, despite that account having an aggregate

value of more than $10,000 in each year.

COUNT ONE
False Statements
(18 U.S.C. § 1001(a)(2))

The Grand Jury charges:

42.     The allegations set forth in paragraphs 1 through 41 are re-alleged and incorporated by reference as if set forth fully herein.

43.     On or about April 24, 2018, in the District of Massachusetts, the defendant,

CHARLES LIEBER,

knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, which LIEBER then knew to be false, that is, LIEBER told investigators from DOD's Defense Criminal Investigative Service, that he was never asked to participate in China's Thousand Talents Program, and that he "wasn't sure" how China categorized him, when, in fact, LIEBER had previously been asked by representatives of Wuhan University of Technology ("WUT") in China to participate in China's Thousand Talents Program and, in or about July 2012, signed a three-year contract with WUT entitled "Employment Contract of 'One Thousand Talent' High Level Foreign Expert."

All in violation of Title 18, United States Code, Section 1001(a)(2).

13

COUNT TWO
False Statements
(18 U.S.C. § 1001(a)(2))

The Grand Jury further charges:

44.     The allegations set forth in paragraphs 1 through 41 are re-alleged and incorporated
by reference as if set forth fully herein.

45.     On or about January 10, 2019, in the District of Massachusetts, the defendant,

CHARLES LIEBER,

knowingly and willfully made and caused to be made a materially false, fictitious, and fraudulent
statement and representation in a matter within the jurisdiction of the executive branch of the
Government of the United States, which LIEBER then knew to be false, that is, LIEBER caused
Harvard University to tell the NIH that LIEBER "[wa]s not and has never been a participant in"
China's Thousand Talents Program, when, in fact, LIEBER had signed a three-year Thousand
Talents Agreement with WUT entitled "Employment Contract of 'One Thousand Talent' High
Level Foreign Expert" in or about July 2012.

All in violation of Title 18, United States Code, Section 1001(a)(2).

COUNT THREE
Filing a False Tax Return
(26 U.S.C. § 7206(1))

The Grand Jury further charges:

46.     The allegations set forth in paragraphs 1 through 41 are re-alleged and incorporated by reference as if set forth fully herein.

47.     On or about April 15, 2014, in the District of Massachusetts and elsewhere, the defendant,

CHARLES LIEBER,

did willfully make and subscribe a U.S. Individual Tax Return, for the tax year 2013, which was verified by a written declaration that it was made under the penalties of perjury, and which was filed with the Director, Internal Revenue Service, and which return the defendant did not believe to be true and correct as to every material matter, in that: (1) LIEBER underreported and failed to report income from WUT; and (2) LIEBER failed to report that he had an interest in, or signature authority over, bank, securities, and other financial accounts located in the People's Republic of China.

All in violation of Title 26, United States Code, Section 7206(1).

15

COUNT FOUR
Filing a False Tax Return
(26 U.S.C. § 7206(1))

The Grand Jury further charges:

48.     The allegations set forth in paragraphs 1 through 41 are re-alleged and incorporated by reference as if set forth fully herein.

49.     On or about September 29, 2015, in the District of Massachusetts and elsewhere, the defendant,

CHARLES LIEBER,

did willfully make and subscribe a U.S. individual Tax return, for the tax year 2014, which was verified by a written declaration that it was made under the penalties of perjury, and which was filed with the Director, Internal Revenue Service, and which return the defendant did not believe to be true and correct as to every material matter, in that: (1) LIEBER underreported and failed to report income from WUT; and (2) LIEBER failed to report that he had an interest in, or signature authority over, bank, securities, and other financial accounts located in the PRC.

All in violation of Title 26, United States Code, Section 7206(1).

## COUNTS FIVE AND SIX
Failure to File Report of Foreign Bank and Financial Accounts
(31 U.S.C. §§ 5314 and 5322)

The Grand Jury further charges:

50.     The allegations set forth in paragraphs 1 through 41 are re-alleged and incorporated by reference as if set forth fully herein.

51.     On or before the due dates listed below, in the District of Massachusetts and elsewhere, the defendant,

## CHARLES LIEBER,

did willfully fail to file with the Commissioner of the Internal Revenue Service, U.S. Department of the Treasury, a Report of Foreign Bank and Financial Accounts ("FBAR") disclosing that he had an interest in, and signature and other authority over, a bank, securities, and other financial account in a foreign country, to wit, at least one bank account located in the People's Republic of China at the Industrial and Commercial Bank of China, which had an aggregate value of more than $10,000 at any time during the years listed below, as follows:

| Count | Calendar Year | Due Date of FBAR |
|-------|---------------|------------------|
| Five  | 2014          | June 30, 2015    |
| Six   | 2015          | June 30, 2016    |

All in violation of Title 31, United States Code, Sections 5314 & 5322(a); and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c)-(d), and 1010.840(b) (formerly Title 31 Code of Federal Regulations, Sections 103.24, 103.27(c)-(d) and 103.59(b)).

17

A TRUE BILL.

FOREPERSON

Jason A. Casey
Assistant U.S. Attorney

District of Massachusetts: July 28, 2020
Returned into the District Court by the Grand Jurors and filed.

/s/ Noreen A. Russo

DEPUTY CLERK

7/28/20 at 4:15 PM

Date and Time

18