**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 20-cr-10111-RWZ |
| | ) | |
| CHARLES LIEBER, | ) | |
| | ) | |
| Defendant. | ) | |

---

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO SUPPRESS POST-ARREST STATEMENTS**

Marc L. Mukasey (*pro hac admitted*)
Torrey K. Young (BBO# 682550)
Catherine Deist

MUKASEY FRENCHMAN LLP
140 E. 45th Street, 17th Floor
New York, New York 10017
(212) 466-6400

*Attorneys for Charles Lieber*

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ....................................................................................1

II. FACTUAL AND PROCEDURAL BACKGROUND...............................................1
    A.    The Charges .....................................................................................................2
    B.    The Arrest .........................................................................................................2
    C.    The Interrogation ..............................................................................................3
    C.    Professor Lieber's Physical Condition ............................................................5

III.  RELEVANT LAW
    A.    Legal Standard .................................................................................................5
    B.    Right to Counsel...............................................................................................6
            i.  Unequivocal Request ............................................................................6
            ii. Re-initiation of Communication After Request for Counsel....................7
    C.    Voluntariness of Statement ..............................................................................7

IV. INTERROGATORS IMPROPERLY DENIED PROFESSOR LIEBER'S UNEQUIVOCAL
    REQUEST FOR COUNSEL .............................................................................9

V.  PROFESSOR LIEBER DID NOT RE-INITIATE COMMUNICATION WITH
    INTERROGATORS .........................................................................................12

VI. PROFESSOR LIEBER'S POST-ARREST STATEMENTS RESULTED FROM
    IMPROPER COERCION AND TRICKERY ....................................................13

VII. RELIEF REQUESTED .......................................................................................16

i

## I.   PRELIMINARY STATEMENT

Defendant Charles Lieber respectfully submits this Memorandum of Law in support of

his Motion To Suppress Post-Arrest Statements that were obtained in violation of his rights

under the U.S. Constitution.  On January 28, 2020, two special agents (collectively, "Agents") of

the Federal Bureau of Investigation ("FBI") took Professor Lieber into custody and read him his

*Miranda* rights. Professor Lieber requested legal counsel.  The Agents understood Professor

Lieber's request, but ignored it.  Instead, the Agents unlawfully employed tactics of trickery and

coerced involuntary statements from Professor Lieber.  Accordingly, all the statements Professor

Lieber made after he unequivocally invoked his right to legal counsel, and all evidence derived

therefrom, should be suppressed, along with the videotape.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Professor Lieber is a United States citizen and professor in the Department of Chemistry

and Chemical Biology at Harvard University.  (Dkt. No. 35 at ¶ 1).  He is one of the world's

foremost authorities and scholars in the field of nanoscience, the study of structures and

materials on a microscopic scale.  At the time of his arrest, he was the Chair of the Department

of Chemistry and Chemical Biology, and in the course of his distinguished career, he had

published over 400 papers in peer-reviewed journals, and was the principal inventor on more

than 50 patents.  *See id.*  He also served as the Principal Investigator of the Lieber Research

Group at Harvard.  The National Institutes of Health ("NIH") and the Department of Defense

("DOD") funded the Lieber Research Group through research grants awarded to Harvard

University.  *See id.* at ¶ ¶ 2-7.

At the time of Professor Lieber's arrest, he was 60 years old, battling follicular lymphoma, a blood cancer for which there is no cure.  That struggle continues today.

## A.    The Charges

On January 28, 2020, Professor Lieber was arrested upon a criminal complaint and charged in two counts with violations of 18 U.S.C. § 1001.  (Dkt. No. 1).

On June 9, 2020, a grand jury in the District of Massachusetts returned a two-count indictment charging Professor Lieber with violating 18 U.S.C. § 1001.  (Dkt. No. 26).  Count One alleges that in 2018, Professor Lieber made a false statement to the DOD's Defense Criminal Investigative Service ("DCIS"), in that his statement contradicted a document that he allegedly signed in 2012, *six years* prior to his statement.  Count Two alleges that in 2019, Professor Lieber caused Harvard to make a false statement to the NIH, in that his statement contradicted the same document that he allegedly made in 2012, *seven years* prior to his statement.

On July 28, 2020, the grand jury returned a superseding indictment, which added four additional counts (the "Superseding Indictment").  (Dkt. No. 35).  Counts Three and Four charge Professor Lieber with Filing a False Tax Return in violation of Title 26 United States Code Section 7206(1).  *See id.*  Counts Five and Six charge a Failure to File Report of Foreign Bank and Financial Accounts in violation of Title 31 United States Code Sections 5314 and 5322.  *See id.*  Counts Three through Six were cobbled together from statements that Professor Lieber made to the FBI during his post-arrest interview.

Professor Lieber pleaded Not Guilty to all charges.  (Dkt. No. 38).

## B.    The Arrest

On January 28, 2020, at approximately 6:38 AM, FBI agents and Harvard University police entered Professor Lieber's office and lab at Harvard University: Office 008, Mallinckrodt

Chemistry Lab, Harvard University, 12 Oxford Street, Cambridge, Massachusetts 02138.
Attorney Young Declaration Ex. 1 ("Ex. 1") at USAO 001869.  The agents arrested Professor
Lieber upon a criminal complaint and warrant issued in the District of Massachusetts and seized
his mobile phone.  *Id.*

Around 7:00AM, law enforcement officers transported Professor Lieber from his office
to the Harvard University Police Department station while his hands were handcuffed behind his
back.  *Id.* at USAO 001868.  Although Professor Lieber's office and the Harvard police station
are less than a mile apart, it took approximately 10 minutes for officers to travel by squad car to
the police station.  Upon arrival at the station, Harvard University police processed Professor
Lieber and issued an arrest report.  *Id.*  Harvard University police did not document that they
read Professor Lieber his rights; the "rights" section on the arrest report is blank.  *Id.*  After
processing, Professor Lieber, still in custody, was taken upstairs to a small room for
interrogation, which was videotaped.  According to the time stamp on the videotape, Special
Agents Robert Plumb ("RP") and Kara Spice ("KS") began questioning Professor Lieber ("CL")
approximately 40 minutes later, at or around 7:49 am.  They interrogated him for over three
hours.

## C.     The Interrogation

Once Professor Lieber was taken to the interrogation room, Agent Plumb read him his
Constitutional rights and warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  In
response, Professor Lieber requested an attorney:

> **CL** No, I understand my rights I guess. Um, yeah I'm willing to sign
> this but I guess I think probably I should have ah, an attorney.
>
> **RP** Well I want to…
>
> **CL** That's why if anything I say is going to…

**RP** So I understand what you are saying. Ah and I want to be very open with you, we don't—we don't play ah tricks or anything like that. Ah, we would appreciate the opportunity to talk with you but because, if you request an attorney because of that privilege we are not able to continue the conversation with you. So ah, what I—what I have to do again um just because you said that is I have to review the form again with you to make sure you understand the rights and as we go through it I want you to understand. You can stop—you can stop answering at any time.

**CL** Sure, I understand that. Um, ok I'll ah sign it and then we can start talking and if I feel like I need some,

**RP** Sure and like I said, Dr. Lieber I hope you ah learn to trust me. We are going to treat you with respect during this process. I want to be as open and transparent as possible with you and I hope to—to learn from you what's going on. That's part of the reason why we are here. Ok?

**CL** Yes.

**RP** So I'll—I'll read this again and you will be able to sign it. Before we ask you any questions you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during the questioning. If you cannot afford a lawyer one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present you have the right to stop answering at any time. And ah, this part right here says

**CL** I have read and I understand, ok.

Attorney Young Decl. Ex. 2 ("Ex. 2")[1] at 00:02:50 – 00:04:57.

---

[1] The government provided the videotape of the interrogation in two separate video files.  All references hereinafter to Exhibit 2 or "Ex. 2" are to filename: HARVARD-202021281254-284G_BS_3223669.mp4.

D.      **Professor Lieber's Physical Condition**

At the time of the custodial statements, Professor Lieber was in physical pain, which

impacted the voluntariness of his statement.  Lieber Decl.[2]

In 2013, Professor Lieber was diagnosed with stage 2 follicular lymphoma in multiple

regions of his body.  *Id.*  Follicular lymphoma is a slow-spreading cancer that affects white blood

cells.  Currently available treatments only slow the progression of his cancer.  By 2016,

Professor Lieber's cancer spread throughout his abdomen, to his chest, and skeleton.  *Id.*  By

February 2017, Professor Lieber's cancer spread throughout his lymph nodes from his neck,

through his chest and abdomen to his groin, spleen, throughout his skeleton, including his spine,

ribs, and hips.  *Id.*  His follicular lymphoma had relapsed and worsened to grade 3A.  *Id.*  In

2018, Professor Lieber's lymphoma continued to progress, and his bone pain and fatigue

increased.  *Id*.  This time, he experienced such severe side effects from treatment that he had to

stop after only a few months, as he developed colitis and hepatitis.  *Id.*  Colitis is a debilitating

inflammatory bowel disease and hepatitis is a devastating liver disease.  By 2019, Professor

Lieber had to adhere to strict dietary restrictions due to his failing health.  *Id*.

At the time of the arrest, Professor Lieber suffered not only from the cancer and pain

associated with the progression of the tumors, but also from the severe sequalae of treatment.  *Id*.

### III.      RELEVANT LAW

A.      **Legal Standard**

"[T]he burden of showing admissibility rests, of course, on the prosecution."  *Brown v.*

---

[2]  With respect to the Lieber Declaration, "[i]t has been well settled for over twenty years that testimony given to meet standing requirements cannot be used as direct evidence against the defendant at trial on the question of guilt or innocence." *United States v. Morales-Torres*, 14-251 (GAG), 2017 WL 1373329 (D.P.R. Mar. 14, 2017) (citing *United States v. García-Rosa*, 876 F.2d 209, 219 (1st Cir. 1989) and *Simmons v. United States*, 390 U.S. 377, 390(1968)).

*Illinois*, 422 U.S. 590, 604 (1975).  The prosecution bears the burden of proving, at least by a preponderance of the evidence, the *Miranda* waiver, *Colorado* v. *Connelly*, 479 U.S. 157, 169 (1986), and the voluntariness of the confession, *Lego* v. *Twomey*, 404 U.S. 477, 489 (1972).

**B.      Right to Counsel**

      **i.      Unequivocal Request**

It is well established that "*Miranda* and its progeny require that law enforcement officers provide warnings concerning certain Fifth Amendment rights — including the right to remain silent and the right to consult an attorney — before interrogating a suspect in a custodial setting." *United States v. Carpentino*, 948 F.3d 10, 20 (1st Cir. 2020).  Absent an exception, a custodial statement obtained without a *Miranda* warning is generally inadmissible at trial.  *Id.*  "Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'"  *United States v. Davis*, 512 U.S. 452, 459 (1994) (*quoting McNeil v. Wisconsin*, 501 U.S. 171, 178, (1991)).  "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," however, the cessation of questioning is not required.  *Id.* (emphasis added).

In a custodial setting, "[t]o invoke the right to counsel in such a situation, a suspect must . . . "unequivocally demand assistance, request the lawyer's presence, or otherwise clearly indicate an unwillingness to make a statement absent presence of an attorney."  *Id.* at 24 (*quoting United States v. Oquendo-Rivas*, 750 F.3d 12, 19 (1st Cir. 2014)).  Despite this, "[w]hen a suspect makes a request for a lawyer and that request is ambiguous as to purpose, officers may — but are

not required to — attempt to clarify whether the suspect wants a lawyer to assist with the custodial interrogation or for some other reason."  *Id.*

      **ii.**      **Re-initiation of Communication After Request for Counsel**

      Although an individual may initially waive his *Miranda* rights, "[i]f the suspect invokes his right to counsel at any point during the interrogation, all questioning must cease either until an attorney is present or until the suspect initiates further communication with the officers." *Davis*, 512 U.S. at 459.  "Once a suspect invokes his right to have counsel present during custodial interrogation, the fact that he responds to later interrogation by the police does not, in itself, establish that he validly waived that right."  *Obershaw v. Lanman*, 453 F.3d 56, 64 (1st Cir. 2006) (*quoting Edwards v. Arizona*, 451 U.S. 477, 484-85, (1981)).  In *Edwards*, the defendant invoked his right to counsel, which caused police officers to halt questioning until the following day when detectives returned, unprompted.  *Id*. at 487.  The defendant reiterated that he did not want to speak to detectives, but they brought him in for questioning anyway, advised him of his rights for a second time, and interrogated him.  *Id*.  Although the defendant waived his rights and answered the detectives' questions, the Court ruled that his second waiver was not valid because the defendant was never given access to counsel after he had clearly requested it the previous day, and the defendant did not re-initiate communication with the detectives; rather, detectives interrogated him after he expressed his desire not to speak with them.  *Id*.

**C.**    **Voluntariness**

      The voluntariness of a statement depends on "whether the will of the defendant [was] overborne so that the statement was not his free and voluntary act, and that question [is] to be resolved in light of the totality of the circumstances."  *Bryant v. Vose*, 785 F.2d 364, 367-68 (1st Cir. 1986) (*quoting Procunier v. Atchley*, 400 U.S. 446, 453 (1971)).  Historically, the

requirement that admissible confessions be 'voluntary' reflected a variety of values; these included deterring coercion, assuring reliability of confessions, and protecting the suspect's free choice whether to confess. *United States v. Byram*, 145 F.3d 405, 407 (1st Cir. 1998).

In 1986, the Supreme Court ruled that only confessions procured by coercive official tactics should be excluded as involuntary. *Colorado v. Connelly*, 479 U.S. 157 (1986). However, "[j]udging whether improper police coercion occurred depends on the circumstances." *Byram*, 145 F.3d at 408. This requires a court to balance the officers' tactics with the unique background of each individual suspect. *United States v. Hughes*, 640 F.3d, 428, 438 (1st Cir. 2011). "The lynchpin of [the] analysis is whether the government's conduct overtook the will of the defendant." *United States v. Hufstetler*, 782 F.3d 19, 22 (1st Cir. 2015).

Since *Connelly*, courts have expanded the meaning of 'coercion' to include tactics that are akin or similar to coercion. *Id*. at 408. For instance, a court may consider the quasi-coercive nature of an agent's tactics in deciding whether a confession was given voluntarily. *United States v. Boskic*, 545 F.3d 69, 80 (1st Cir. 2008). Specifically, the *Boskic* court considered the following factors as they weighed against voluntariness: (1) the agents' decision not to inform the defendant of the nature of the offenses that they suspected he had committed; (2) the absence of counsel during the interview; and (3) the defendant's nervousness and hesitancy at the outset of the interview. *Id*. at 80. Courts may evaluate the length and nature of the questioning, the existence of any explicit or implicit threats, and any deprivation of a suspect's essential needs. *Hufstetler*, 782 F.3d at 24. A promise or threat need not be explicit, but can also result from "[s]ubtle psychological coercion." *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981).

In some situations, courts have held that threats involving family members rise to a level of trickery that is akin to coercion. One cluster of cases implies that the use of a family member

uniquely tugs at a suspect's emotions and thus can have an undue impact.  In *Lynnumn v. Illinois*,
officers informed a defendant that her failure to cooperate would result in her losing financial aid
for, and custody of, her children.  372 U.S. 528, 534 (1963).  The Court noted that the defendant
had no reason to question the officers' capacity to carry out those threats.  *Id*.  Accordingly, the
Court deemed the tactics improper and ordered the confession suppressed.  In *Haynes v.
Washington*, 373 U.S. 503, 513 (1963), officers repeatedly told a suspect that he would be unable
to call or see his wife until he wrote out a confession.  *Id*. at 507.  Those threats occurred over a
number of days and the defendant "gave in only after consistent denials of his requests to call his
wife, and the conditioning of such outside contact upon his accession to police demands."  *Id*.  In
summary, "courts closely examine the specific manner in which the officer discussed the relative
and weigh such references against the defendant's susceptibility to coercion."  *Hufstetler*, 782
F.3d at 24.

## IV.    THE INTERROGATORS IMPROPERLY IGNORED PROFESSOR LIEBER'S UNEQUIVOCAL REQUEST FOR COUNSEL IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS

There is no dispute that Professor Lieber was subjected to a custodial interrogation by
Agents Plumb and Spice.  Almost immediately after they entered the interrogation room, Agent
Plumb read Professor Lieber his *Miranda* rights and asked him if he would sign an
acknowledgment and waiver, to which Professor Lieber, still confused and disoriented by the
morning's events, responded:

> **CL** No, I understand my rights I guess. Um, yeah I'm willing to sign this but I guess I think probably I should have ah, an attorney. (Ex. 2 at 00:02:51).

Agent Plumb ignored that statement and tried to misdirect Professor Lieber:

> **RP** Well I want to…  (Ex. 2 at 00:03:00).

9

Anxious and uneasy, Professor Lieber continued to express his desire for counsel:

> **CL** That's why if anything I say is going to…  (Ex. 2 at 00:03:02).

Recognizing that Professor Lieber wanted counsel, Agent Plumb cut off Professor Lieber and said, "So I understand what you are saying…" (Ex. 2 at 00:03:06).  Agent Plumb then simply disregarded Professor Lieber's invocation, and instead re-*Mirandized* Professor Lieber until he acquiesced and waived his rights.

> **RP** So I understand what you are saying. Ah and I want to be very open with you, we don't—we don't play ah tricks or anything like that. Ah, we would appreciate the opportunity to talk with you but because, if you request an attorney because of that privilege we are not able to continue the conversation with you. So ah, what I—what I have to do again um just because you said that is I have to review the form again with you to make sure you understand the rights and as we go through it I want you to understand. You can stop—you can stop answering at any time.

(Ex. 2 at 00:03:06 – 00:03:51).

While ambiguous requests do not amount to unequivocal requests for counsel, Professor Lieber's request was undoubtedly understood by Agent Plumb ("So I understand what you are saying," *i.e.* that you want counsel).  *See contra United States v. Davis*, 512 U.S. 452, 462 (1994).  It is important to note that in *Davis*, a case in which, "maybe I should talk to a lawyer," was not sufficiently unequivocal, the defendant's statement still prompted Naval Criminal Investigative Service agents to halt their questioning.  The agents then asked Davis to clarify whether he wanted an attorney or whether he was just "making a comment about a lawyer." *Davis*, 512 U.S. at 368.  The defendant definitively responded, "No I don't want a lawyer." *Id*. at 368.

Similarly, in *Obershaw v. Lanman*, the First Circuit determined that the defendant had not made an unequivocal request for counsel when he asked, "Can I talk to a lawyer first?"  453 F.3d at 64-65.  However, the significance here, again, is that the Nahant, Massachusetts police

officers in *Obershaw* halted questioning, and they offered the defendant an opportunity to call a lawyer, to which he responded that he did not want to call a lawyer, but that he actually just wanted to "spend time outside with his dogs" (which agents permitted him to do before the defendant himself re-initiated conversation). *Id*. at 58.

Professor Lieber's statement, "I guess I think I want a lawyer," and Agent Plumb's reaction and response, are distinguishable from the defendants' statements and the agents' responses in *Davis* and *Obershaw*. Here, Agent Plumb failed to halt questioning despite clearly understanding Professor Lieber's request for counsel. Agent Plumb did not ask Professor Lieber to clarify his statement (as in *Davis*) or offer him the opportunity to call a lawyer (as in *Obershaw*). Agent Plumb's reply to Professor Lieber's statement was, in fact, a complete *non sequitur*. He interrupted Professor Lieber's request with, "I understand," followed quickly by a second reading of the *Miranda* rights before Professor Lieber could complete his thought. Agent Plumb employed tactics of interruption and confusion to redirect Professor Lieber until he obtained the waiver he was pressing for. Notably, Professor Lieber did not make an unequivocal statement *rejecting* his previous request for a lawyer, as did the defendants in both *Davis* and *Obershaw*.

Under the circumstances, Professor Lieber's words, "I guess I think," (Ex. 2 at 00:02:56) should not be read as equivocation. The halting language signified nothing more than a disoriented layman's search for the right words to offer cautious respect to the Agents while he requested counsel. And they cannot be analyzed in a vacuum. Justice Souter aptly notes that a defendant "need not speak with the discrimination of an Oxford don," (*Davis*, 512 U.S. at 476, concurring), though "the defendant must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be

11

a request for an attorney." *Id*. at 459.  The mere utterance of a word is as important as the *way* in which it is uttered; an utterance is part and parcel to the circumstances surrounding the utterance itself.  Here, such circumstances are illustrated in the audio and video recording of Professor Lieber's interview: a nervous, confused first-time arrestee, attempting to calmly explain himself and his thought process as he requests an attorney, only to be interrupted by Agent Plumb precisely because, as he acknowledged, he understood that Lieber wanted a lawyer.

The circumstances surrounding Professor Lieber's statement are also gleaned from interrogators' reactions and responses to it.  Agent Plumb's effectiveness as a federal agent depends on his ability to read situations and individuals, taking into careful consideration the surrounding circumstances and context of each situation and communication.  Presumably, Agent Plumb, "a reasonable officer," fully assessed the circumstances and context within which Professor Lieber made his request for legal counsel.  *See Davis*, 512 U.S. at 459, *supra*.  His initial reaction, which was to interrupt Professor Lieber by saying, "I understand," obviates that Professor Lieber's invocation was, in fact, understood as unequivocal.  In fact, Agent Plumb immediately re-read the *Miranda* warnings precisely because he understood that Professor Lieber requested counsel after the first reading.

## V.   PROFESSOR LIEBER DID NOT RE-INITIATE COMMUNICATION WITH INTERROGATORS

The order of the interactions between Professor Lieber and Agent Plumb was as follows: (a) Agent Plumb read Professor Lieber his *Miranda* rights (Ex. 2 at 00:01:53 – 00:02:23); (b) Professor Lieber asked for a lawyer (Ex. 2 at 00:02:55); (c) Agent Plumb acknowledged and interrupted Professor Lieber, rejecting his request (Ex. 2 at 00:03:06 – 00:03:51); (d) Agent Plumb re-read Professor Lieber his *Miranda* rights (Ex. 2 at 00:04:21 – 00:04:51); (e) Agent Plumb thereafter interrogated Professor Lieber.  When Professor Lieber requested a lawyer after

12

Agent Plumb's first reading of the *Miranda* rights, Agent Plumb was required to halt all questioning, *until and unless* Professor Lieber initiated it himself.  *See Edwards*, 451 U.S. at 487 (emphasis added).  In accordance with *Edwards* (discussed *supra*. at III(B)(ii)), Professor Lieber's eventual *Miranda* waiver was ineffective because he had unequivocally asserted his right to counsel just minutes prior.  Professor Lieber's request for counsel did not magically disappear just because Agent Plumb chose to ignore it, and instead, press a second attempt at waiver.

The right to counsel is not a stand-alone Constitutional right.  The right to counsel is a right that was created, through caselaw, to protect an individual's right against self-incrimination, which *is* a Constitutional right.  In *Davis*, the Court succinctly stated:

> We held in *Miranda* that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance.  We held in *Edwards* that if the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is present.

*Davis*, 512 U.S. at 462.

Viewed through this lens, Agent Plumb's tactic is wholly repugnant to the holdings of *Miranda* and *Edwards*: to wit, the unyielding repetition of the *Miranda* rights to a noncompliant suspect until he acquiesced.  Such an end-run around *Miranda* in order to obtain statements from an individual who asserted his right to counsel requires suppression of those statements.

## VI.   PROFESSOR LIEBER'S POST-ARREST STATEMENTS RESULTED FROM IMPROPER COERCION AND TRICKERY

Even assuming, *arguendo*, that Professor Lieber effectively waived his right to counsel, his statements to Agent Plumb and Agent Spice were the result of coercion and trickery in light of the circumstances surrounding the interrogation.  On the morning of January 28, 2020, Professor Lieber arrived at his office at sunrise only to be blindsided by federal agents who

13

ransacked his office, arrested him, and hauled him off for questioning.  He knew nothing of the investigation.  When Professor Lieber was taken into the interrogation room, Agent Plumb immediately acknowledged that his arrest that morning must have been "probably an unexpected [ ] surprise."  Ex. 2 at 00:00:32.  He did not attempt to explain the reason for Professor Lieber's arrest, or what crime Professor Lieber was suspected to have committed, other than to simply inform him that they had a warrant for his arrest.  *Id.*  Agent Plumb stated first and foremost that he just wanted to "learn what's going on."  *Id.* at 00:04:10.

Once Agent Plumb began his interrogation, he asked Professor Lieber – again – if he had "any inclination" as to why they were there, to which Professor Lieber responded, "Not exactly." *Id.* at 00:05:42.  Agent Plumb explained that they just wanted to "understand" how the use of grants works in the scientific community, and get a sense of Professor Lieber's background and research.  *Id.* at 00:06:15.  Agent Plumb then proceeded to ask general questions amounting to nothing more than 'a day in the life' of Professor Lieber: the nature of his work and experience, how he runs his lab, who he works with, who he mentors, and how grants are used by Harvard University to facilitate research.  Agent Plumb stated that he was concerned with "protecting [Professor Lieber] as an interest" (*Id.* at 01:01:31) and implied that Professor Lieber was the victim of exploitation by Chinese government officials.  He later repeated the same sentiment: "*I'm very concerned about protecting you* as an interest and making sure other people don't be put [sic] in the same position as you."  *Id.* at 01:10:16 (emphasis added).

Like the officers in *Boskic* (*supra*.), Agent Plumb and Agent Spice failed to inform Professor Lieber of the nature of the offenses that they suspected he had committed, and they twice acknowledged that his arrest was a total surprise.  *Id.* at 00:00:32, 00:05:42.  More egregious is the fact that they misrepresented their focus, citing their supposed national security

concerns about China.  Ex. 2 at 01:01:33, 01:10:16.  Indeed, the Agents portrayed Professor

Lieber as a victim of the Chinese, and they expressed their concern for his safety (*see e.g.*, Ex. 2

at 01:10:33).  After Agent Plumb ignored Professor Lieber's request for counsel during the

interview, he took advantage of the fact that Professor Lieber was disoriented, nervous, and

confused that he was being questioned about names and events from *eight years* prior.  Then he

capitalized on Professor Lieber's confusion and created a ruse that they were concerned about

national security and protecting Professor Lieber from aggressive Chinese intelligence practices.

To compound Professor Lieber's vulnerability, he was battling – and is still battling –

cancer.  Lieber Decl.  The barrage of treatments he had endured for almost seven years brought

on new diseases (colitis and hepatitis), and a constant plague of fatigue and frailty.  *Id*.  He had

not eaten or had anything to drink yet that day – despite being arrested at approximately 6:30 am,

held in custody, and interviewed until approximately noon.  *Id*.  While the Agents offered, he

was concerned about his ability to eat anything that would not exacerbate his colitis.  *Id*.  He was

weak from his treatments and in physical pain from the cancer in his skeleton.  *Id.; see also* Ex. 2

at 00:36:44, 00:38:54, 00:54:49, 02:23:26.  On the day of Professor Lieber's arrest, he did not

believe he was free to leave.  *Id*.  When the government Agent read him his rights, he wanted –

and requested – a lawyer, but was summarily denied.  *Id*.  He had never been arrested before, and

when the Agent interrupted his request to read his rights yet again, Professor Lieber believed he

had no choice but to answer the Agent's questions.  *Id*.  His physical pain, fatigue, and nausea

made him more vulnerable, and he did not have the strength or stamina to reiterate his request for

an attorney more forcefully than he previously had.  *Id*.

The Agents' interrogation of Professor Lieber satisfies the *Boskic* factors (cited *supra*. at

III(C)) in that Professor Lieber's statements were *not* voluntary: (1) Agents repeatedly

acknowledged that Professor Lieber likely had no idea why he was being questioned, and instead expressed their concern for national security; (2) counsel for Professor Lieber was not present; and (3) the audio and video of the interrogation clearly shows a nervous, hesitant individual (described *supra*.). This Court should also consider Agent Plumb's interruption and quick rejection of Professor Lieber's request for counsel in light of the "subtle psychological coercion" discussed in *United States v. Tingle*, 658 F.2d at 1335. Finally, this Court must consider Professor Lieber's weak and unstable health and lack of sustenance, in the lens of *United States v. Hufstetler*, 782 at 22 ("deprivation of a suspect's essential needs"). Taken as a whole (*Byram*, 145 F.3d at 408), and considering Professor Lieber's unique background (*Hughes*, 640 F.3d at 438), this Court can only draw one conclusion: Professor Lieber's statements were not voluntary and must be suppressed.

## VII.   REQUEST FOR RELIEF

For the reasons stated herein, this Court should grant Professor Lieber's Motion to Suppress post-arrest statements made to interrogators on January 28, 2020 and all evidence derived therefrom.

Respectfully submitted,

/s/ Torrey K. Young
Torrey K. Young (BBO# 682550)
Marc L. Mukasey (*pro hac admitted*)
Catherine Deist

MUKASEY FRENCHMAN, LLP
140 E. 45th Street, 17th Floor
New York, New York 10017
(212) 466-6400

Counsel for Defendant Charles Lieber

Dated: July 12, 2021

## CERTIFICATION OF SERVICE

I, Torrey K. Young, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on July 12, 2021.

/s/ Torrey K. Young
Torrey K. Young