UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>    v.                                              )<br>)                Criminal No. 20-cr-10111-RWZ<br>CHARLES LIEBER,                      )<br>)<br>    Defendant.                             )<br> | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO SUPPRESS HIS POST-ARREST STATEMENTS**

The United States of America respectfully opposes defendant Charles Lieber's motion to suppress his post-arrest statements. The defendant never invoked his right to counsel during his post-arrest interview. And while the defendant was battling cancer at the time, the video of the interview demonstrates that his statements were voluntary and not the product of law enforcement "coercion and trickery."

The facts surrounding the defendant's interview are not in dispute. The defendant was arrested during the early-morning hours of January 28, 2020 at his laboratory on the campus of Harvard University. He was transported to the Harvard University Police Department, booked, and placed in an interview room. Two FBI special agents then interviewed him for approximately three hours. The entire interaction between the defendant and the special agents was audio and video recorded. At the outset of the interview, the agents offered him something to drink — he declined — and advised him of his *Miranda* rights using a written waiver form. The defendant acknowledged that he understood his rights and said, "… I'm willing to sign this [waiver form] but I guess I think probably I should have, ah, an attorney." Because the defendant's statement was ambiguous and equivocal, the agents did precisely as courts — the U.S. Supreme Court, the

First Circuit Court of Appeals, and many others — suggest: they told the defendant that they could not continue the interview if he wished to speak with an attorney and they repeated his *Miranda* rights. The defendant then agreed to waive his rights, he initialed and signed the written waiver form, and he spoke with the agents. Simply put, the defendant did not unequivocally ask for counsel and there was no Fifth Amendment violation.

The interview was cordial throughout. The recording of the interview reflects no tawdry or coercive tactics. To the contrary, the agents were professional, straightforward, and respectful. They offered the defendant food and drink at least four times. The defendant appeared comfortable, albeit nervous, and he never expressed any physical discomfort. The defendant smiled and laughed on several occasions during the interview. The recording clearly shows that the defendant — who had been working in his laboratory at Harvard University immediately prior to the interview — made voluntary statements throughout.

An evidentiary hearing consisting of witness testimony is not necessary to resolve the defendant's motion. The interview recording, an unofficial draft transcript of the interview, and the defendant's signed *Miranda* waiver are all available to the Court.[1] Any facts extrinsic to the interview that might be considered material — the circumstances of the defendant's arrest or his cancer diagnosis, for example — are not in dispute. Accordingly, testimony from the interviewing agents will not aid the Court in determining, under the required objective standards, whether the

---

[1] The recording of the defendant's interview was attached (under seal) to one of the affidavits submitted in support of his motion to suppress. *See* Docket No. 171. For continuity and ease of reference, the government hereby attaches (under seal) an unofficial draft transcript of the interview and the defendant's signed *Miranda* waiver as **Exhibits 3 and 4**, respectively. The unofficial draft transcript, which was prepared shortly after the interview took place in early 2020, appears to be generally accurate. However, as discussed below, the unofficial draft transcript appears to contain at least a handful of errors, which are obvious when listening to the interview recording. The government respectfully submits that the video of the interview serves as the best evidence for purposes of evaluating the defendant's motion.

defendant unambiguously invoked his right to counsel or whether his will was overborne. The defendant's motion can, and should, be denied on the record presently before the Court.

## Relevant Facts

For purposes of this opposition, the Government accepts the "factual and procedural background" set forth in pages one through five of the defendant's memorandum in support of his motion. *See* ECF No. 173 (hereinafter "Def. Mot."). In addition, the government notes the following relevant facts, all of which are reflected in the recorded interview:

(1) The agents' first act during the interview was to offer the defendant water or coffee; and they subsequently offered him water and/or food three more times during the interview, one time even offering him food that would accommodate any special dietary needs he might have due to his medical condition. Ex. 3 at 2, 18, 44, 66-67; Ex. 2 at 0:05, 36:40; 1:33:30, 2:23:10. The agents similarly offered to obtain any medication he might need. Ex. 3 at 66-67; Ex. 2 at 2:23:10. The defendant declined in every instance, telling the agents at one point, "I can go a day without eating" and "I'm fine." *Id.*

(2) Approximately 36 minutes into the interview, at the defendant's first mention of having any digestive issues, the agents offered him a break. Ex. 3 at 18; Ex. 2 at 36:40. The defendant declined to stop the interview. *Id.*

(3) After telling the defendant that they had a warrant for his arrest, the agents disclosed to him early in the interview that the defendant's research grants and funding were their focus. Ex. 3 at 3, 5, 7, 9-10; Ex. 2 at 0:53; 5:50, 11:31, 16:40. Thereafter, approximately 27 minutes into the interview — and well before any discussion of the Thousand Talents Program and related matters — the defendant correctly

assumed that the agents intended to ask him about the National Institutes of Health's (NIH) 2017 inquiry regarding his undisclosed ties to China. Specifically, the defendant stated, "After NIH sent a letter to Harvard saying they had some concerns about I think it was things with-with China of course and that's probably you know ultimately the details of what you want to talk about, ah." Ex. 3 at 13; Ex. 2 at 27:02.

(4) The defendant and the agents laughed and joked during the interview. Approximately an hour into the interview, while discussing the defendant's receipt of free flights, the agents and the defendant laughed together about the luxury of first-class international flights while the defendant gestured with his arms to describe having a "little isolated pod." Ex. 3 at 26; Ex. 2 at 55:15. Later, during a short break following questions about the defendant's participation in China's Thousand Talents Program and related matters, the defendant joked about his clothing. While referencing his sweatshirt, the defendant said, "So we have a joke in my house. I get hand me ups. … From my son. This is my son's. … He's much more fashion conscious than me." Ex. 3 at 67; Ex. 2 at 2:26:01. Minutes earlier, the defendant shook the agents' hands and stated, "nice meeting you." Ex. 2 at 2:25:01.[2]

---

[2] This statement – "nice meeting you" – was not captured in the draft transcript but can clearly be heard in the interview video.

**Legal Argument**

I. **The Special Agents Did Not Violate the Defendant's Fifth Amendment Right to Counsel Because He Did Not Invoke His Right to an Attorney**

It is well established that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination requires that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and to the presence of an attorney. *Edwards v. Arizona*, 451 U.S. 477, 481-82 (1981); *Miranda v. Arizona,* 384 U.S. 436, 479 (1966). A person who expresses a "desire to deal with the police only through counsel … is not subject to further interrogation until counsel has been made available to him" unless the person "himself initiates further communication, exchanges or conversations with the police." *Edwards*, 451 U.S. at 484-85. This is a prophylactic rule, designed to prevent those in custody from being "badgered" into waiving their rights. *Id.* at 482.

It is equally well established that "[i]nvocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis v. United States*, 512 U.S. 452, 459 (1994) (*quoting McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). If a person "makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, … [Supreme Court] precedents do not require the cessation of questioning." *Id.* "Rather, a suspect must unambiguously request counsel." *Davis*, 512 U.S. at 459; *see United States v. Carpentino*, 948 F.3d 10, 25 (1st Cir. 2020) (providing that a suspect must "unequivocally demand assistance, request the lawyer's presence, or otherwise clearly indicate an unwillingness to make a statement absent presence of an attorney") (internal quotations omitted); *United States v. Oquendo-Rivas*, 750 F.3d 12, 18-19 (1st Cir. 2014) (same). "A statement either is … an [unambiguous] assertion

of the right to counsel or it is not." *Smith v. Illinois*, 469 U.S. 91, 97-98 (1984) (internal quotations omitted). Whether or not a statement is an unambiguous assertion of the right to counsel is "an objective inquiry." *Davis*, 512 U.S. at 458-59; *Obershaw v. Lanman*, 453 F.3d 56, 64-65 (1st Cir. 2006).

"When a suspect makes a request for a lawyer and that request is ambiguous as to purpose, officers may — but are not required to — attempt to clarify whether the suspect wants a lawyer to assist with the custodial interrogation or for some other reason." *Carpentino*, 948 F.3d at 25; *see also Oguendo-Rivas*, 750 F.3d at 19 (noting that, when faced with an ambiguous statement, it is often "good police practice" to clarify whether a suspect actually wants an attorney). Indeed, the Supreme Court has expressly declined to "adopt a rule requiring officers to ask clarifying questions" about a suspect's ambiguous assertion of the right to counsel. *Davis*, 459 U.S. at 461. This is because the "primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves." *Id.* "Full comprehension of the rights to remain silent and request an attorney is sufficient to dispel whatever coercion is inherent in the interrogation process." *Id.* (internal quotations and brackets omitted).

Here, after offering the defendant something to drink and telling him that there was a warrant for his arrest, Special Agent Plumb read the defendant his *Miranda* rights with the aid of a written waiver form:

> RP    Before we ask you many questions you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during the questioning. If you cannot afford a lawyer one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present you have the right to stop answering at any time. And what I'm going to ask you Dr. Leiber is to read this statement right here and sign it if you wish. In order for you to, in order for us to talk to you about the information we—we have to make sure that you understand your rights and take your time too.

| | |
|---|---|
| CL | No, I understand my rights I guess. Um, yeah I'm willing to sign this but I guess I think probably I should have ah, an attorney. |
| RP | Well I want to… |
| CL | That's why if anything I say is going to… |
| RP | So I understand what you are saying. Ah and I want to be very open with you, we don't—we don't play ah tricks or anything like that. Ah, we would appreciate the opportunity to talk with you but because, if you request an attorney because of that privilege we are not able to continue the conversation with you. So ah, what I—what I have to do again um just because you said that is I have to review the form again with you to make sure you understand the rights and as we go through it I want you to understand. You can stop—you can stop answering at any time. |
| CL | Sure, I understand that. Um, ok I'll ah sign it and then we can start talking and if I feel like I need some, |
| RP | Sure and like I said, Dr. Leiber I hope you ah learn to trust me. We are going to treat you with respect during this process. I want to be as open and transparent as possible with you and I hope to—to learn from you what's going on. That's part of the reason why we are here. Ok? |
| CL | Yes. |
| RP | So I'll—I'll read this again and you will be able to sign it. Before we ask you any questions you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during the questioning. If you cannot afford a lawyer one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present you have the right to stop answering at any time. And ah, this part right here says… |
| CL | I have read and I understand, ok. |
| RP | Thank you. I'm going to note the time is 7:53. |
| KS | 7:59 sorry. |

*See* Ex. 3 at 2-4.

At no point during this exchange, or at any other time during the interview, did the defendant invoke his right to counsel. The defendant's statement about an attorney at the outset

Page 7

of the interview — "I guess, I think probably I should have ah, an attorney" — was replete with ambiguous and hedging language that could not reasonably be construed as a clear request for an attorney. Indeed, the Supreme Court in *Davis* found that a similar statement made by the defendant during a custodial interrogation — "Maybe I should talk to a lawyer" — was "not a request for counsel." *Davis*, 512 U.S. at 462. Other courts have reached the same conclusion when faced with similarly vague language. *See, e.g.*, *Obershaw*, 453 F.3d at 58 (holding that "Can I talk to a lawyer first?" was not an assertion of defendant's right to counsel); *United States v. Hunter,* 708 F.3d 938, 943–44 (7th Cir. 2013) (concluding that "Can you call my attorney?" was not sufficiently clear to invoke defendant's right to counsel); *United States v. Havlik*, 710 F.3d 818, 822 (8th Cir. 2013) (finding that "I guess you better get me a lawyer" did not qualify as an "unequivocal or unambiguous request for counsel"); *Henness v. Bagley*, 644 F.3d 308, 319-20 (6th Cir. 2011) (holding that "I think I need a lawyer" was ambiguous and did not adequately invoke right to counsel); *Luna v. Lamarque*, 400 Fed. App'x 169, 172 (9th Cir. 2010) (affirming that defendant's statement, "I should probably get a lawyer, I guess," was an "unsuccessful invocation[] of his right to counsel"); *Sechrest v. Ignacio*, 549 F.3d 789, 807 (9th Cir. 2008) ("We have also held that the statements, 'I think I would like to talk to a lawyer,' and, 'maybe [I] ought to see an attorney' were not clear and unambiguous requests for counsel."); *Burket v. Angelone*, 208 F.3d 172, 197–98 (4th Cir. 2000) (concluding that "I think I need a lawyer" is not an unequivocal request for counsel); *United States v. Cowette*, 406 F. Supp. 3d 129, 135–38 (D. Me. 2019) (finding that "I guess I should probably wait until I have a lawyer, that sounds like the best idea, I don't – I've never been in Court, never been in trouble, I don't – ... I guess not, I guess I'll wait until I have a lawyer" was ambiguous). These and other cases make clear that where, as here, "statements regarding the assistance or presence of counsel include one or more conditional or hedging terms,

such as if, should, probably, or maybe, courts generally have deemed them ambiguous or equivocal." *State v. Purcell*, 331 Conn. 318, 335–39, 203 A.3d 542, 552–54 (2019) (collecting cases). The defendant here used not just one or two conditional terms, but <u>four</u>: "I guess," "I think," "probably," and "I should."

Against the weight of this overwhelming authority, the defendant makes several unavailing arguments. First, he tries to distinguish *Davis* and the First Circuit's decision in *Obershaw* by noting that law enforcement officers in those cases either attempted to clarify the defendant's statement or "offer[ed] him an opportunity to call a lawyer." Def. Mot. 10-11. This argument stands Fifth Amendment jurisprudence on its head. It is black letter law that "officers have no obligation to stop questioning [a suspect]" absent an "unambiguous or unequivocal request for counsel." *Davis*, 512 U.S. at 461-62; *see also Carpentino*, 948 F.3d at 23–24 ("If a suspect makes no more than an ambiguous reference to an attorney, the interrogation may continue."). It is equally well established that law enforcement officers have no obligation to ask clarifying questions about a defendant's ambiguous request for counsel. *Id.* at 460-61. Indeed, the *Miranda* warnings themselves — not an officer's clarifying remarks — are the "primary protection afforded suspects subject to custodial interrogation." *Id.* at 460-61.

But more to the point, the agents here *did* seek to clarify whether the defendant was asserting his right to counsel before asking him any substantive questions. In response to the defendant's ambiguous statement about an attorney, Special Agent Plumb candidly told the defendant that he "would appreciate the opportunity talk with [him]" and he correctly explained that "if you request an attorney, because of that privilege, we are not able to continue the conversation with you." *Cf. Carpentino*, 948 F.3d at 25 (noting that interviewing troopers "prudently explained to the defendant that they could not talk with him if he wished to speak to

his lawyer" before concluding that defendant did not unambiguously invoke his right to counsel). Special Agent Plumb also stressed the importance of the defendant understanding his rights before reading the defendant his *Miranda* rights a second time. The defendant, in turn, acknowledged that he understood his rights, signed the waiver form, and began answering questions. This sequence makes clear that the agents "did not ignore … [the defendant's] answer and forge ahead with questions." *Oguendo-Rivas*, 750 F.3d at 19 (internal quotations omitted). Instead, they "sought clarification and continued questioning only after … [the defendant] made clear that he was willing to proceed without an attorney." *Id.* Despite the defendant's claims to the contrary, this is precisely the type of "good police practice" lauded by courts designed to "protect the rights of the suspect by ensuring that he gets an attorney if he wants one." *See Davis*, 512 U.S. at 461; *Oguendo-Rivas*, 750 F.3d at 18-19.

The defendant also suggests that Special Agent Plumb's response to his ambiguous statement about an attorney — "I understand" — is somehow evidence that the defendant's statement was clear invocation of his right to counsel. Def. Mot. 10 ("… Lieber's request was undoubtedly understood by Agent Plumb [as a request for counsel] …."). But whether a statement is an unambiguous assertion of the right to counsel is "an objective inquiry," not a subjective one. *Davis*, 512 U.S. at 458-59. The question, therefore, is not how Special Agent Plumb interpreted the defendant's statement, but how "a reasonable officer in light of the circumstances" would have understood it.[3] *Id.*; *see also Obershaw*, 453 F.3d at 64-65 ("The test is an objective one: whether

---

[3] To be sure, the interview recording demonstrates that Special Agent Plumb neither interrupted the defendant nor viewed the defendant's statement as a clear expression of his desire for an attorney. Special Agent Plumb's response to the defendant's ambiguous statement was to say "we would appreciate the opportunity to talk with you but because, **if** you request an attorney because of that privilege we are not able to continue the conversation with you" (emphasis added). The fact that Special Agent Plumb used the word "if" in response to the defendant's statement about an attorney strongly suggests that he did not view the request as unequivocal. Thus, even if Special Agent Plumb's interpretation of the defendant's statement were relevant—it is not—it would not support the defendant's suppression argument.

the suspect has articulated his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (internal quotations and brackets omitted)).  Given the words the defendant used — "I guess I think probably I should…" — no reasonable police officer in the same circumstances would have interpreted the defendant's statement as anything but ambiguous.

The defendant essentially asks the Court to ignore his words, arguing that they constitute a "disoriented laymen's search for the right words to offer cautious respect to the Agents" and not an equivocation.  Def. Mot. 11.  Again, this argument misses the mark.  The relevant inquiry "focuses not on the suspect's subjective intent but, rather, on the objective reasonableness of the officer's interpretation of the suspect's statements."  *Carpentino*, 948 F.3d at 22 (noting that, although it was possible the defendant "subjectively wanted" to talk with his lawyer, the defendant's statements did not objectively convey a desire to speak with an attorney).  To that end, the defendant's words should be "understood as ordinary people would understand them." *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987).  The words "I guess I think probably I should" are classically and objectively ambiguous.  *See Cowett*, 406 F. Supp. 3d at 136 ("But to relegate the equivocation 'I guess' to the lowly status of a meaningless throat clearer and polite introduction to an otherwise clear declaration is a lexicographical bridge too far."); *Purcell*, 331 Conn. at 335-39 (describing words "if, should, probably, or maybe" as "conditional or hedging" terms).  "Even acknowledging that the time of arrest is a deeply stressful event," *United States v. Hatch*, 2004 WL 769314, at *1 (D. Mass. Apr. 12, 2004), any reasonable agent would have interpreted these words as ambiguous as to purpose.  The defendant's Fifth Amendment right to counsel was not violated.

## II. The Defendant's Statements Were Voluntary

The Fifth Amendment right against self-incrimination prohibits courts from admitting into evidence a defendant's involuntary confession. *See Dickerson v. United States*, 530 U.S. 428, 433 (2000); *United States v. Jacques*, 744 F.3d 804, 809 (1st Cir. 2014). "In assessing whether a confession is voluntary, courts must inquire whether the will of the defendant had been overborne so that the statement was not his free and voluntary act." *Jacques*, 744 F.3d at 809 (internal quotations omitted). To make this determination, courts must consider "the totality of the circumstances, including both the nature of the police activity and the defendant's situation." *Id.* (internal quotations omitted). Relevant considerations, therefore, include "the length and nature of the questioning, promises or threats made by investigators, any deprivation of the suspect's essential needs," the defendant's "personal circumstances, including his age, education, intelligence, and mental condition," *id.*, as well as his "prior experience with the criminal justice system," *United States v. Jackson*, 608 F.3d 100, 103, (1st Cir. 2010). "A defendant's calm demeanor and the lucidity of his statements weigh in favor of finding his confession voluntary." *Jacques*, 744 F.3d at 811-12. Ultimately, though, "the lynchpin of … [the court's] analysis is whether the government's conduct overtook the will of the defendant." *United States v. Hufstetler*, 782 F.3d 19, 21-22 (1st Cir. 2015).

The relevant facts and circumstances here firmly establish that the defendant's statements were voluntary. To begin with, the interviewing agents twice advised the defendant of his *Miranda* rights. The tone of the interview was cordial, its length reasonable, and the defendant was not deprived of any essentials. To the contrary, the defendant was offered drink and/or food no fewer than four times during the approximately three-hour interview. Ex. 3 at 2, 18, 44 and 66-67; Ex. 2 at 0:05, 36:40; 1:33:30, 2:23:10. At one point, aware from earlier in the interview that the

defendant had certain "dietary problems," Special Agent Spice asked the defendant if there was "a specific diet or anything or medication that we can get for you?"  Ex. 3 at 66; Ex. 2 at 2:23:10.  The defendant declined, saying he "can go a day without eating."  *Id.*  Seconds later he said, "I'm fine."  *Id.*  Many of the defendant's personal characteristics likewise support a finding of voluntariness.  Although he had no remarkable prior experience with law enforcement — to be sure, many suspects do not — he was mature, he had an advanced education (from Stanford University and the California Institute of Technology), and he worked in an advanced field at one of the most prestigious educational and research institutions in the world.  These are all indicia of a lack of coercion.  *Cf. United States v. Hughes*, 640 F.3d 428, 438-39 (1st Cir. 2011) (finding defendant's interview was voluntary despite defendant suffering a panic attack during the interview where the defendant was mature, had taken some college courses, had a respectable employment history, and where interviewing officers offered him food and drink when the panic attack occurred).

        The defendant nonetheless argues that the interviewing agents employed tactics of "coercion and trickery" to get him to talk.  Def. Mot. 14.  This claim lacks any support.  To begin with, the defendant was aware from the very beginning of the interview that he was under arrest.  *See* Ex. 3 at 3 ("[T]he reason why we are here today is we, you know, like I said we have a warrant for your arrest…."); Ex. 2 at 0:53.  Special Agent Plumb also told the defendant early on that the interview's focus was the defendant's "government [research] grants."  Ex. 3 at 5, 7, 9-10; Ex. 2 at 5:50, 11:31, 16:40.  The defendant, for his part, appears to have understood the intended focus of the interview.  Without being prompted by the agents, for example, the defendant mentioned NIH's 2017 inquiry of the defendant's then-suspected ties to China's Thousand Talents Program,

saying "that's probably, you know, ultimately the details of what you want to talk about…."[4]  Ex. 3 at 13; Ex. 2 at 27:02.  It can hardly be said, therefore, that the defendant was wholly unaware of the reason for his arrest or the purpose of the interview before he responded to the agents' questions.

The defendant attempts to bootstrap his argument by claiming that Special Agent Plumb tricked him by purportedly expressing concerns about "protecting you [Lieber] as an interest." Def. Mot. 14.  Special Agent Plumb, however, said no such thing.  As the interview recording clearly shows, Special Agent Plumb said several times that he was concerned about protecting "U.S. interests," as in "United States' interests."[5] *Compare* Ex. 2 at 1:01:05, *with* Ex. 3 at 29-30; *compare* Ex. 2 at 1:11:03, *with* Ex. 3 at 34; *compare* Ex. 2 at 2:10:30, *with* Ex. 3 at 60.  This was an unremarkable comment that merely encapsulated relevant risks associated with Chinese talent recruitment programs.  *See* Superseding Indictment ¶ 16.  To the extent this comment could be construed as a law enforcement "trick" — it is not clear to the government what exactly the "trick" is — it did not render the defendant's statement involuntary.  "Law enforcement officers often must fight fire with fire, and some degree of deception on their part during the questioning of a suspect is permissible." *Hughes*, 640 F.3d 439 (citing cases).  Although "trickery can sink to the level of coercion, ... this is a relatively rare phenomenon." *See United States v. Flemmi,* 225 F.3d 78, 91 n. 5 (1st Cir. 2000) (noting that "confessions procured by deceits have been held voluntary in a number of situations").  This is not one of those rare cases.

---

[4] The defendant, not coincidentally, was right.  His false statement in response to that NIH inquiry is the subject of Count Two of the Superseding Indictment.

[5] The transcript of the interview incorrectly quotes Special Agent Plumb as saying he is interested in protecting "you as interests." *See* Exhibit 3 at 30, 34, 60.  Again, the audio recording makes clear that this is an error.

Page 14

With the conduct of the interviewers and the personal characteristics of the defendant tilting heavily in favor of a finding of voluntariness, the defendant's argument reduces to little more than reliance on his cancer diagnosis. While the defendant's diagnosis was and is serious, it did not have any impact on the voluntariness of his statements. For starters, the defendant does not appear from the video recording to be in pain or discomfort during the interview, nor did he ever tell the interviewing agents that he was uncomfortable. Rather, he appeared calm and lucid throughout. Although the agents were at least generally aware of the defendant's diagnosis — it came up twice during the interview — there is no evidence that the agents "attempted to exploit this vulnerability." *See Hughes*, 640 F.3d at 439 (rejecting defendant's claim that his mental health disorders rendered his statement involuntary). Quite the opposite, the agents were considerate of the defendant's diagnosis and condition, offering him water, coffee, food (including food that would comply with his strict dietary requirements) and medication, if he needed it. The defendant declined all these things. Although the government does not dispute the defendant's diagnosis or even that he might have been experiencing some adverse symptoms during the interview, the undisputed record compels the conclusion that the defendant's statements were voluntary.[6]

### III. The Defendant is Not Entitled to an Evidentiary Hearing Involving Witness Testimony

Criminal defendants have "no presumptive right to an evidentiary hearing on a motion to suppress" and a hearing "is required only if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper

---

[6] Two other things are worth noting. First, the defendant was working in his laboratory at Harvard University immediately prior the interview. It is hard to imagine how the defendant's condition could have prevented him from giving a voluntary interview on the one hand while almost simultaneously allowing him to perform as a world-class scientist and researcher on the other. Second, the defendant admitted during the interview that he was healthy enough to travel – and did travel – to China in December 2019, approximately one month before the interview. Exhibit 3 at 18; Ex. 2 at 37:49. Considered together, these facts undermine the defendant's claim that his cancer prevented him from speaking voluntarily.

record." *United States v. Cintron*, 724 F.3d 32, 36 (1st Cir. 2013). "Most importantly, the defendant must show that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief." *Id*.

Given the issues presented by the defendant's motion, there are no disputed material facts that would be resolved through a full-blown evidentiary hearing consisting of witness testimony. The questions presented by the defendant's motion — whether the defendant invoked his right to counsel during the interview, and whether his statements were voluntary — are purely objective inquiries. *See Davis*, 512 U.S. at 458-59 (whether or not a statement is an unambiguous assertion of the right to counsel is "an objective inquiry"); *Jacques*, 744 F.3d at 809 (setting forth the "totality of the circumstances" approach to determining whether a statement was voluntary). These inquiries can and should be resolved on the record before the Court, which consists of the parties' respective papers, the defendant's arrest report (Ex. 1), the audio and video recorded interview (Ex. 2), the unofficial interview transcript (Ex. 3), and the defendant's signed *Miranda* waiver (Ex. 4). The testimony of witnesses, including but not limited to the interviewing agents, will do nothing to aid the court in resolving any material disputed facts. *See United states v. Francois*, 715 F.3d 21 (1st Cir. 2013) (testimony of agents not necessary to resolve objective question of whether defendant was in custody for *Miranda* purposes). Indeed, there *are* no material disputed facts concerning the defendant's interview. Defendant's request to call the interviewing agents at an evidentiary hearing, therefore, should be denied.

**Conclusion**

The government respectfully asks the Court to deny the defendant's motion without an evidentiary hearing.

Respectfully submitted,

NATHANIEL R. MENDELL
ACTING UNITED STATES ATTORNEY

By:   */s/ Jason A. Casey*
JASON A. CASEY
JAMES R. DRABICK
Assistant United States Attorneys

Dated: August 6, 2021

CERTIFICATE OF SERVICE

I hereby certify that this document was filed on August 6, 2021 through the ECF system, which will provide electronic notice to counsel as identified on the Notice of Electronic Filing.

*/s/ Jason A. Casey*
Jason A. Casey
Assistant United States Attorney
