UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                  )
UNITED STATES OF AMERICA,         )
                                  )
         Plaintiff,               )
                                  )   Criminal Action
v.                                )   No. 1:20-cr-10111-RWZ-1
                                  )
CHARLES LIEBER,                   )
                                  )
         Defendant.               )
                                  )
```

BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT JUDGE

MOTION HEARING

September 2, 2021
8:59 a.m.

John J. Moakley United States Courthouse
Courtroom No. 12
One Courthouse Way
Boston, Massachusetts 02210

Linda Walsh, RPR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way, Room 5205
Boston, Massachusetts 02210
lwalshsteno@gmail.com

```
1    APPEARANCES:

2    On Behalf of the Government:

3         UNITED STATES ATTORNEY'S OFFICE
          By: AUSA James R. Drabick
4             AUSA Jason A. Casey
          1 Courthouse Way, Suite 9200
5         Boston, Massachusetts 02210
          617-748-3498
6         james.drabick@usdoj.gov

7
     On Behalf of the Defendant:
8
          MUKASEY FRENCHMAN LLP
9         By: Marc L. Mukasey, Esq.
              Torrey K. Young, Esq.
10            Catherine Deist, Esq.
          570 Lexington Avenue, Suite 3500
11        New York, New York 10022
          212-466-6400
12        marc.mukasey@mfsllp.com

13   ALSO PRESENT:  Sal Chan, Operations and Senior Analyst

14

15

16

17                   Proceedings reported and produced
                      by computer-aided stenography.
18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  All rise, please.
 3            THE COURT:  Good morning.  Please be seated.
 4            THE CLERK:  This is the United States versus Charles
 5     Lieber, and it's Criminal 20-10111.
 6            Could I ask counsel please to identify themselves for
 7     the record, please.
 8            MR. CASEY:  Good morning, Your Honor.  Jason Casey for
 9     the United States.
10            THE COURT:  Hold it one second, please.
11            Okay.  For the Government?
12            MR. CASEY:  Jason Casey for the United States, Your
13     Honor.  Good morning.
14            THE COURT:  I'm sorry.  I cannot understand you with
15     the mask.
16            THE CLERK:  Can you talk without them?
17            THE COURT:  If it's okay with counsel, do take off
18     your mask, especially when you're speaking.
19            MR. CASEY:  Sure.  It's okay with us, Your Honor.
20            THE COURT:  Okay.  So I'm sorry.  Give me your name
21     again, please.
22            MR. CASEY:  Jason Casey, Your Honor.  Good morning.
23            THE COURT:  Mr. Casey.
24            MR. CASEY:  Yes.
25            MR. DRABICK:  Good morning, Your Honor.  JR Drabick
```

1    for the United States.

2          THE COURT:  Okay.  And for the defendant?

3          MR. MUKASEY:  Good morning, Judge.  I'm Marc Mukasey

4    for the defendant, Charles Lieber, who's seated to my right,

5    and my partner Torrey Young is with us, and our colleagues

6    Catherine Deist and Sal Chan.

7          THE COURT:  Catherine Deist and?

8          MR. MUKASEY:  Sal Chan.

9          THE COURT:  I don't see him on the list.

10         MR. MUKASEY:  Sal is our analyst paralegal.  That's

11   why he's not on the list.

12         THE COURT:  Okay.  Thank you.

13         Well, this is the defendant's motion to suppress I

14   guess essentially -- well, to suppress the entire issue

15   concerning his statement about what he did; right?

16         MR. MUKASEY:  Correct.

17         THE COURT:  I will hear you.

18         And I have read the statements.  I have seen at least

19   portions of the interview; that is, the interview that the FBI

20   conducted.

21         MR. MUKASEY:  Thank you, Your Honor.  I'm going to

22   remove the mask, if that's okay with everybody.

23         THE COURT:  Thank you.

24         MR. MUKASEY:  Judge, I'm not going to tell you that

25   this is a --

1          THE COURT:  Slam dunk.

2          MR. MUKASEY:  -- a novel area of the law is what I was

3  going to say.  The law in this area, obviously, of Miranda and

4  coercion of statements and voluntariness is quite well

5  established, and I don't think there's any disagreement between

6  the Government and the defense about the applicable law.

7          There are three simple points that I would like to

8  make with regard to suppression of the post-arrest statement in

9  violation of Miranda and then I'll get to the coercion issue.

10          Here are the three points.

11          Number one, Professor Lieber requested a lawyer.  He

12  requested a lawyer in a clear-enough way to at least warrant

13  stoppage of the questioning or clarification.  I understand the

14  ambiguity standard.  His request for a lawyer was enough to at

15  least warrant stoppage of the questioning or some

16  clarification.

17          Number two --

18          THE COURT:  Hold it one second.  I want to find out

19  what -- I'm trying to get the transcript, I think.

20          MR. MUKASEY:  I have a copy if the Court needs it.

21          THE COURT:  I have ample copies of things, many copies

22  of things.  My volumes have the transcript attached to the

23  Government's opposition.  What page was this?

24          MR. MUKASEY:  It starts on the bottom of page 3, which

25  is Bates stamped USAO1874.

1              THE COURT:  Yeah.  Well, Mr. Lieber announced

2    initially in response that he was -- even earlier.  I'm looking

3    at page 3 of the transcript.

4              MR. MUKASEY:  What I'm directing my comments to,

5    Judge, is Judge Lieber's -- I'm sorry -- Professor Lieber's

6    statement, "I understand my rights" --

7              THE COURT:  On what page are you?

8              MR. MUKASEY:  Sorry?

9              THE COURT:  I have the entire transcript.

10             MR. MUKASEY:  I'm on the bottom of page 3.

11             THE COURT:  I'm sorry?

12             MR. MUKASEY:  I'm on the bottom of page 3.

13             THE COURT:  Where he says he understands his rights,

14   he's willing, "but I guess I think probably I should have an

15   attorney"?

16             MR. MUKASEY:  Correct.

17             THE COURT:  That's the essence of this motion?

18             MR. MUKASEY:  Well, that's the beginning of the

19   motion.  I'm not sure I would say it's the essence, but it's

20   certainly the beginning.  And it's our first main point, which

21   is that Professor Lieber requested a lawyer.

22             As I say, I understand the --

23             THE COURT:  That requires interpretation of what he

24   says; right?

25             MR. MUKASEY:  Well, I'm about to do that.

1          THE COURT:  Okay.

2          MR. MUKASEY:  Obviously, there's an ambiguity

3     equivocation standard here, and I'm not going to take issue

4     with the fact that the Government says that it's ambiguous.  It

5     is clear enough, however, that at least the agent should have

6     stopped the questioning or asked him more about his desire for

7     a lawyer.  That's what Justice O'Connor counseled in *Davis*

8     *versus United States*.  It is a good practice when the mention

9     of a lawyer is arguably equivocal, arguably ambiguous, at least

10    you should stop the questioning and probe a little more.

11    That's not what happened here, not even by a long shot.

12          Which brings me to my second point, which is that the

13    agent that was conducting the interview understood clearly that

14    Professor Lieber requested a lawyer, and he actually said he

15    understood that Professor Lieber requested a lawyer.

16          And now I'm going to go to page 4 of the transcript.

17    At the top of the page where the agent says, "I understand what

18    you were saying.  I understand what you're saying," there is no

19    ambiguity in what the agent understood.  He wanted a lawyer.

20          But before you even get to the agent, Judge, I want to

21    go back to the bottom of page 3.

22          After --

23          THE COURT:  Well, I'm not so sure.  He says, "if you

24    request an attorney" in that particular --

25          MR. MUKASEY:  Let me see if I can take it in

1    step-by-step order.  If we go back to the bottom of page 3 --

2         THE COURT:  I mean, the real question I think for me

3    is whether the statement by Dr. Lieber -- and I'll agree with

4    you to give him his title -- I guess -- "No, I understand my

5    rights I guess.  Um, yeah, I'm willing to sign this but I guess

6    I probably I should have ah, an attorney."

7         MR. MUKASEY:  Interruption.

8         THE COURT:  Whether that is an unequivocal request for

9    an attorney?

10        MR. MUKASEY:  I don't think you have to stop there in

11   the analysis.  Look at what happens next.

12        RP, that's the special agent.  He says, "Well I want

13   to," and Professor Lieber says, "That's why if I say anything."

14   In other words, why I want an attorney.  The reason I want an

15   attorney is because if anything I say is going to hurt me;

16   right?  He's heard the Miranda warnings once.  He says, I

17   probably should have an attorney.  The agent interrupts, "Well,

18   I want to," but then Professor Lieber follows through and says,

19   "That's why if anything I say is going to" -- in other words,

20   if anything I say is going to hurt me, I probably need a

21   lawyer.

22        THE COURT:  Yeah, but that -- the agent ends by saying

23   you can stop.  You can stop answering at any time.

24        MR. MUKASEY:  Well, I'm --

25        THE COURT:  And Dr. Lieber says, sure, I understand

1   that.

2         MR. MUKASEY:  I'm taking this in bite-size pieces.

3         So if you look at the top of page 4, the agent says, I

4   understand what you're saying.  I understand you want a lawyer.

5   I understand you think you don't want your statements to be

6   used against you.  I understand what you're saying and I want

7   to be open with you and I don't want to play tricks.  But since

8   you requested an attorney -- these are his words -- "if you

9   request an attorney, we are not able to continue the

10   conversation with you."  Well, first of all, that's a lie.

11   That's not true.  He can always continue the conversation even

12   if he has an attorney.

13         THE COURT:  Well, they can't continue at that point.

14         MR. MUKASEY:  That's true, but that doesn't mean that

15   he's cut off ultimately from talking to the Government.  But

16   what the agent says is what I have to do again just because you

17   said that, because you made a noise about an attorney, just

18   because you said that, I have to review the form again.  That's

19   a lie.  That's a misstatement of law.  There is nothing in the

20   FBI manual or the Constitution or the case law that says if a

21   suspect makes a noise about an attorney, he can be spun away

22   from that or redirected by reading the Miranda forms again.

23   That's not the law.

24         What he's saying to Dr. Lieber is a misstatement of

25   law.  Because you have spoken about an attorney, because you've

1    mentioned the word "attorney," because you might maybe want an
2    attorney, now I have to read the Miranda warning to you again;
3    that's false.  That's a legal misstatement.

4         THE COURT:  But he ends by saying you can stop.  You
5    can stop answering at any time.  That's the end of that
6    statement.

7         MR. MUKASEY:  That is true.  However, he has already
8    planted in Dr. Lieber's mind that if he wants an attorney,
9    we're going to have to read the Miranda rights again.

10        THE COURT:  So?

11        MR. MUKASEY:  He's not going to get an attorney.  And
12   then if he wants an attorney after he hears the Miranda rights
13   again, we're going to have to read them again.  It's sort of
14   this endless loop of if you mention "attorney," I'm going to
15   have to read the Miranda rights.  That's false.

16        THE COURT:  I don't think the statement -- I mean, the
17   FBI agent's questioning was -- well, it certainly doesn't
18   suggest that he would go over and over the same thing again and
19   again.

20        MR. MUKASEY:  Well, what he says is --

21        THE COURT:  He certainly says that if you insist I'll
22   read it again, but what he would be reading is that he had a
23   right.  I mean, to confirm the right.

24        MR. MUKASEY:  Right.  But Dr. Lieber under the case
25   law should not have to wrestle to get to a lawyer.  He

1    shouldn't have to endure --

2          THE COURT:  He never did say he wanted to stop.  He

3    never did say I want a lawyer before I answer any more

4    questions.

5          MR. MUKASEY:  Well, that's because he was interrupted,

6    cut off, and redirected.

7          THE COURT:  Okay.

8          MR. MUKASEY:  That's because he was told, well, now

9    I'm going to have to stop hearing about what you're talking

10   about a lawyer, and I'm going to have to read you the rights

11   again.  And the agent was successful in spinning Dr. Lieber

12   away from persisting in his request for an attorney, and he did

13   so by misstating the law.  You can't do that.  I mean,

14   everybody understands -- excuse me -- everybody understands

15   there can be a little bit of trickery and a little bit of

16   misdirection and a little bit of -- I don't know.  You can call

17   it lying, you can call it manipulation, everybody understands

18   that that's par for the course in an FBI interview.

19          What you can't do, what you may not do is say, well,

20   if you want a lawyer, I'm going to have to read the Miranda

21   rights to you again.  That's just false.  That's just not true.

22   And that's what led Dr. Lieber to say fine.  Forget it.  If I'm

23   going to have to listen to these Miranda warnings in this

24   endless loop, I'm not going to get a lawyer.  I'm going to have

25   to just endure this.  That's what happens here.

1          The third point, Judge, I would make on the Miranda

2     issue is that the better practice, according to Justice

3     O'Connor, would have been to say, well, what do you mean?  Do

4     you really want a lawyer right now?  Or can you clarify what

5     you mean?  I understand, as I've said at the bottom of page 2,

6     that if I say anything, it's going to be used against me.  He's

7     made those noises.  The agent should have clarified.  That

8     would have been the much, much better practice.

9          The agent did not do --

10     THE COURT:  But the real issue is whether what

11     Dr. Lieber said was sufficient to stop the proceedings to go

12     forward.

13          MR. MUKASEY:  I'm going to take a little bit of issue

14     with that, respectfully.  I don't think the real issue is

15     whether what Dr. Lieber said was sufficient to stop the

16     proceedings.  Under *Davis* what Dr. Lieber said was sufficient

17     to at least warrant a clarification, and that didn't happen.

18          THE COURT:  And the clarification would be what?

19          MR. MUKASEY:  You've mentioned an attorney.  You don't

20     want anything to be used against you.  You think you probably

21     should have an attorney.  Would you like an attorney,

22     Dr. Lieber?  Would you like to continue?  Do you want an

23     attorney?  He made enough noise, enough momentum in the

24     direction of a clear statement for an attorney that questioning

25     of if it shouldn't have stopped it, at least it should have

1    been clarified.  That's what Justice O'Connor says.

2              THE COURT:  And he ended that, you can stop.  You can

3    stop answering at any time.

4              MR. MUKASEY:  I understand that the agent after he

5    spun Dr. Lieber around offered that platitude.  I mean, he

6    offered that sort of cliche; right?  But what he's already

7    done --

8              THE COURT:  Cliche?

9              MR. MUKASEY:  Well, what he's already done is say

10   listen --

11             THE COURT:  You wanted him to tell him again he had a

12   right to the lawyer.  I mean, that's part of your argument.

13             MR. MUKASEY:  I wanted him to clarify what Dr. Lieber

14   said.  Instead, he swept it aside, and he said if you make any

15   noise about a lawyer, I have to read the Miranda warnings

16   again.  He did not clarify.  In other words, clarification as

17   contemplated by *Davis* is -- you're talking about a lawyer.  Do

18   you really want a lawyer?  Can I get you a lawyer?  Are you

19   sure you want a lawyer?  We have to stop the questioning if you

20   want a lawyer.  That's not what happened here.  There were no

21   questions directed to Dr. Lieber after he mentioned a lawyer.

22   Nothing clarifying was directed to him.

23             Instead, the agent bulldozed him.  The agent said,

24   well, if you're going to make a noise about a lawyer, I'm going

25   to have to read you Miranda again.  That's not true, and that's

1    what pushed Dr. Lieber off the idea of getting a lawyer, and

2    that's improper.

3         I think my point is made.  If the Court has any

4    further questions, I'm happy to elaborate.  We have a couple of

5    still photographs that we've offered to your clerk that are --

6         THE CLERK:  I didn't know if you wanted to see them

7    now.

8         MR. MUKASEY:  They're my segue into the next part of

9    the argument.

10        THE CLERK:  I can hold them.

11        THE COURT:  This is part of the video?

12        THE CLERK:  He just did still photos.

13        MR. MUKASEY:  Correct.  We took some still photos.

14   They are my segue into the next part of the argument.

15        THE CLERK:  I can hold them.

16        MR. MUKASEY:  There should be six photos there, Judge.

17        THE COURT:  Is there more than one copy of each of

18   these or are they different?

19        MR. MUKASEY:  Each of the ones I gave you are

20   different, and we have several copies if you need more.

21        THE COURT:  Oh, I see.  Yes, the hand does move from

22   the middle of the head to the side of the forehead.

23        MR. MUKASEY:  Correct.

24        THE COURT:  And back to the middle.

25        MR. MUKASEY:  I guess the second prong of our

```
 1   argument, Judge, is that the post-arrest statements were
 2   involuntary and coerced.  I'm not going to belabor the health
 3   situation here.  It speaks for itself.  The health situation
 4   was volatile then; it's volatile now.  It makes me question
 5   what the Government is really after in this case, but that's
 6   probably an extrajudicial discussion.
 7           But the health situation was a very, very, very
 8   sad --
 9           THE COURT:  Was that known to the FBI?
10           MR. MUKASEY:  It's a very interesting question because
11   there are pieces in the video -- there are points in the video
12   where the FBI sort of alludes to the notion that they have some
13   inkling that there is a health situation.  And at one point
14   Dr. Lieber mentions -- more than one point, his health
15   situation, and the agent says, well, you look healthy to me.
16   And I can actually direct you to that portion of the
17   transcript.  That's at page 19.
18           THE COURT:  This is the same interview or different?
19           MR. MUKASEY:  Same interview.
20           THE COURT:  Page 19?
21           MR. MUKASEY:  Page 19.
22           THE COURT:  Okay.
23           MR. MUKASEY:  It's about six lines down from the top.
24   Professor Lieber says, "I have, you know, health problems.  You
25   know, I may look healthy but," and then the agent says, "You do
```

1    look healthy."  And Professor Lieber is a strong person and
2    endured this, but there's no question that while on the surface
3    he looked like a suspect, perhaps an average suspect,
4    internally he was anything but.  Internally he was riddled with
5    an incurable cancer.

6            Judge, obviously the coercion/voluntariness issue is a
7    totality of the circumstances issue.  I'm following the First
8    Circuit's guidance in *Jackson,* which is 608 F.3d 100.  It's our
9    position that there was coercion here sufficient to render
10   Dr. Lieber's statements inadmissible.  And obviously, we're not
11   talking about physical coercion.  We're talking about --
12   although I have to say, there probably was internal physical
13   pressure on Dr. Lieber, but we're not talking about, you know,
14   physical tactics by the agent.  What we're talking about are
15   statements that I'm going to read in just a moment.

16           But to set the scene for those statements, obviously
17   there was an awareness that Dr. Lieber was not well.  He was
18   taken by surprise.  It was 6:30, 7:00 o'clock in the morning.
19   He was handcuffed.  This is the chairman of a department of
20   Harvard being handcuffed behind his back in his office.
21   Suffice to say it was startling.

22           He was not informed of the charges against him in this
23   video.  I don't know what happened outside the video, but if
24   you watch the video, all three hours of it, he's never informed
25   of the charges.  He obviously doesn't have a lawyer.  I'm going

1    to submit to the Court that he was grossly misled about what

2    the charges were or if there were charges.  He had no ally, and

3    this went on for three and a half hours.

4         If I may, I would like to read to the Court a few of

5    the quotes that I think are unusually manipulative and

6    coercive, all of which come from the transcript.

7         THE COURT:  If you will identify the source of those,

8    then I can make notes in the transcript.

9         MR. MUKASEY:  I shall.  Thank you, Judge.

10         At page 7, early in the interview, Dr. Lieber says,

11    "I'm not" --

12         THE COURT:  Hold it.  Hold it.  I have to find it.

13    There are no numbers on lines here.  So where is it on page 7?

14    Or read me the language, and I'll find it.

15         MR. MUKASEY:  It's the third attribution from the

16    bottom.  "I'm not sure how or what I did wrong."

17         THE COURT:  Okay.

18         MR. MUKASEY:  I'm going to go to page 29 now, last

19    attribution where the agent says, "I'm not even saying you did

20    something wrong," 29, last attribution.

21         THE COURT:  And then going over onto page 30; right?

22         MR. MUKASEY:  Correct.  So this is Lieber saying I'm

23    not sure what I did wrong, and the agent saying I'm not sure

24    you did anything wrong.  Now, mind you, this is an agent who's

25    already sworn out a criminal complaint against Dr. Lieber.

1           On page 36 Dr. Lieber is sitting there with no lawyer,

2     and in the middle of the page, RP, Robert Plumb, the agent,

3     starting with "Dr. Lieber" says "what we want to do is we want

4     to advocate for you and what we're doing, what you're doing, we

5     can be your advocate."  That noise you made about a lawyer,

6     don't worry.  I'll be your lawyer.  That's what the agent is

7     telling him.  I'll be your lawyer.  That's grossly misleading.

8     That's coercive with a capital C.

9           I'll take you to the next designation.  Page 41, the

10    middle of the page, the fifth attribution down.  Again, last

11    sentence, fifth attribution.  The agent tells Dr. Lieber, "And

12    I'm not saying anything is wrong."  He's already sworn out a

13    criminal complaint.  I'm not saying anything is wrong here.

14    I'll be your lawyer.  I'll be your advocate.

15          Page 45, fifth from the bottom, "Dr. Lieber, if we

16    didn't want the best for you, we wouldn't be bringing this up."

17    I mean, this is a man who's been a scientist at Harvard for

18    20-some-odd years and Columbia before that, and he's speaking

19    to an FBI agent who he's supposed to theoretically trust.  And

20    the guy is basically lying through his teeth after dissuading

21    him from getting a lawyer while he's in a physically and

22    obviously emotionally uncomfortable position.

23          And, Judge, I'm just going to add the icing to the

24    cake, on page 66, the second attribution, that's from the

25    agent.

1          THE COURT:  Actually giving advice.

2          MR. MUKASEY:  I'm sorry?

3          THE COURT:  Actually giving advice.

4          MR. MUKASEY:  Well, one person's advice is the other

5    person's misdirection.

6          But the bottom portion of that attribution, "Like I

7    said in the beginning, if you're honest with us and you're

8    talking with us, we can be your advocate."  That's just grossly

9    misleading and manipulative.  And I think in the totality of

10   the circumstances, when you talk about somebody who's

11   physically weak and emotionally nervous and unaware of the

12   charges against him and being told that the agent isn't even

13   aware of what he did wrong, which is false, and the lack of a

14   lawyer, and no experience in custody, and a three-and-a-half-

15   hour --

16         THE COURT:  Well, he was not in custody at the time,

17   was he?

18         MR. MUKASEY:  He was 100 percent in custody.

19         THE COURT:  I'm sorry?

20         MR. MUKASEY:  He was 100 percent in custody.  There is

21   no dispute between the Government and the defense --

22         THE COURT:  If he had said I don't want to talk you

23   anymore, would they have held him?

24         MR. MUKASEY:  Yes, he was under arrest.

25         THE COURT:  Could they hold him?

1          MR. MUKASEY:  He was under arrest.

2          THE COURT:  He did tell him he was under arrest?

3          MR. MUKASEY:  He had been handcuffed.  He knew he was

4     under arrest.

5          MR. CASEY:  He had been arrested before that.

6          THE COURT:  Okay.

7          MR. MUKASEY:  There is no dispute this is a custodial

8     interrogation.  We all agree this was a custodial

9     interrogation.  He was not free to leave.  He was not free to

10    leave.

11         THE COURT:  Okay.  But free to stop talking?

12         MR. MUKASEY:  Unless you believe what the agent was

13    saying, which is if he wanted to get a lawyer, he would have to

14    be read the Miranda rights again.  And we'd enter into an

15    endless loop where he would never get a lawyer and he would

16    just keep having the Miranda rights read to him.

17         THE COURT:  Was Dr. Lieber held after this interview

18    was concluded?

19         MR. MUKASEY:  He was transferred from the Harvard

20    Police Station, which was where he was brought by the FBI and

21    this interview occurred, to the courthouse where he was

22    presented later in the afternoon and released on bail later in

23    the afternoon.

24         FROM THE GALLERY:  No.

25         MR. MUKASEY:  One night?  I'm sorry.  Two nights.

1            I'm sorry.  Two nights.

2            My apologies.  I wasn't the lawyer at the time.

3            THE COURT:  He was actually in jail for two nights?

4            MR. MUKASEY:  Two nights.  Judge, I guess the last

5    point I want to make --

6            THE COURT:  Excuse me.  I don't quite understand this

7    sequence.  So he came here.  Did he appear before a magistrate

8    judge?

9            MR. MUKASEY:  Two days later, apparently; right?

10           MR. CASEY:  No.  He had his initial appearance that

11   day, Your Honor.  The Government moved for detention.  He was

12   held for two days and then released on conditions.

13           THE COURT:  And who decided that he should be

14   detained, other than the Government?

15           MR. CASEY:  He had his initial appearance the day of

16   the arrest.  So the magistrate judge did.

17           THE COURT:  But the magistrate judge didn't get to do

18   this until after he had spent two nights in jail?

19           MR. CASEY:  No.  He had his initial appearance before

20   the magistrate judge on the day of his arrest.  During that

21   initial appearance, the Government moved to detain Dr. Lieber,

22   and so he was detained pending a detention hearing for two

23   days.  And at the end of that period he was released on

24   conditions.

25           THE COURT:  Okay.

1          MR. MUKASEY:  I think I've made the Miranda argument

2     and the coercion argument.

3          The last thing I'll say, Judge, is that -- is a case

4     that I've -- I've been boning up on my First Circuit law,

5     having arrived here from the Second Circuit, and the First

6     Circuit --

7          THE COURT:  Are we that different?

8          MR. MUKASEY:  Well, like the Yankees and the Red Sox

9     are different, I guess.

10         One of the cases that I focused on is a case called

11    *U.S. versus Boskic* -- that's B-o-s-k-i-c -- which quotes a

12    couple of Supreme Court cases that point out that the behavior

13    of the agent in this case, in my view, quote, "Distorts the

14    suspect's rational choice and impairs free choice."  I think

15    that's true with respect to spinning Dr. Lieber away from his

16    request for a lawyer by pretending you have to read the Miranda

17    rights again, and I think that's also true with respect to the

18    totality of the circumstances and the coercive nature and

19    really what I think is grossly misleading conduct by the agent

20    during the interview that we've cited.

21         Thank you, Judge.

22         THE COURT:  Thank you.

23         MR. CASEY:  Thank you, Your Honor.

24         Regarding whether or not Mr. Lieber invoked his right

25    to counsel, what I hear counsel saying is that they're

conceding that the statement was ambiguous.  And if they're

conceding ambiguity, then it's game over.  I think the Court

sort of hit this issue square on the head.  That's the

threshold question, really the only question, that the Court

has to answer.

THE COURT:  I'm sorry.  Repeat the questions, please.

MR. CASEY:  What I heard counsel say during their

argument is that they're conceding that Dr. Lieber's statement

about an attorney was ambiguous, and if it was ambiguous, then

that's game over.  That means he did not invoke his right to

counsel and that means that there was no Fifth Amendment

violation.

And the reason that's true -- well, in order to

understand why that's true, I think we have to understand the

legal principles that govern this.  And Mr. Mukasey said

they're clear and they're not disputed, and the Government

agrees they are very clear.  But I think the defense tries to

confuse them quite a bit in their papers because the standard

is once a suspect is read Miranda, it's up to the suspect to

invoke his right to counsel.

A statement is either an invocation of the right to

counsel or it is not.  There is no in between.  If he invokes

his right to counsel, then the interview has to stop.  If he

doesn't, then the interview can continue on.  That means if he

makes an ambiguous statement about a lawyer, the agents have no

1   obligation to stop the interview.  That's not a clear

2   invocation of the right to counsel.  They can continue on.

3   They are not required to even ask clarifying questions or

4   attempt to clarify the statement in any way if they do not want

5   to.  Now courts have said that's not the best practice.  The

6   best practice is to clarify, which the agents did here.

7           THE COURT:  Does an agent's smarminess have anything

8   to do with this?

9           MR. CASEY:  I'm not sure I understand the question.

10          THE COURT:  If an agent is, oh, I'm going to help you.

11  I'm going to do this for you, does that change the picture?

12          MR. CASEY:  Well, that allegedly did not happen until

13  later in the interview after it was made clear that he didn't

14  want a lawyer.

15          THE COURT:  When I saw the video, the agent was sort

16  of constantly saying I'm your help.

17          MR. CASEY:  So I think your question goes to whether

18  or not his statements were voluntary.  And, again, the quotes

19  that --

20          THE COURT:  But the issue here is how precise he was

21  in asking.  I mean, did he really ask for a lawyer as the law

22  requires him to do in order to stop any interrogation.  But in

23  this instance the agent just -- you know, he tried to be his

24  friend or said he was his friend.

25          MR. CASEY:  Well --

1          THE COURT:  And does that have an impact on how this

2     proceeds?  I don't know.

3          MR. CASEY:  Well, it could not have an impact on the

4     Miranda question, the Fifth Amendment question, because

5     everything that Mr. Mukasey just read to you occurred much

6     later on in the interview after the defendant had signed the

7     Miranda form.  So all the things that he just read to you, they

8     occurred much later on in the interview.

9          THE COURT:  But the signing of the form twice had in

10    large part to do with the agent's insinuating himself with him,

11    with the defendant.

12         MR. CASEY:  I would respectfully disagree, Judge.  If

13    you watch the video and read the transcript --

14         THE COURT:  Well, you're right because I saw it on the

15    video only, and it's --

16         MR. CASEY:  Right out of the gate they're reading him

17    his Miranda rights, right out of the gate.

18         THE COURT:  Why does he have to repeat and sign it

19    twice?

20         MR. CASEY:  Because the defendant was ambiguous.  He

21    was unclear.  There's no blueprint as far as how to go about

22    clarifying an ambiguous statement.  I understand the defense

23    would have liked it to have been done a particular way, but the

24    law does not require it be done that way.  The Government finds

25    it hard to believe that the FBI agents could have tricked the

1    defendant about his right to an attorney by telling him again

2    that he had a right to an attorney.  It's hard to misdirect

3    somebody away --

4          THE COURT:  Well, he said he wants to help him and how

5    he wants to be his friend.

6          MR. CASEY:  Some of those things occurred later on in

7    the interview, and there's absolutely nothing wrong with that.

8    I think the case law is very clear, and Mr. Mukasey himself

9    recognized that FBI interviews always involve some level of

10   deception by agents -- there's no question -- and by suspects,

11   by defendants.  They are often very deceptive.  You have to be

12   able to fight fire with fire.

13         And I'm not even saying that what the agents here did

14   was fire.  I mean, it's true they did not tell him what he was

15   charged with.  They did not come right out and say we want to

16   ask you about this.  They sought to build rapport.  They asked

17   him about some background questions.  They asked him about his

18   research and the funding for his research, and then they built

19   into more substantive impressive questions.

20         The quotes that you have sort of alluded to about the

21   agent sort of saying that he would advocate for Professor

22   Lieber, again, there's nothing wrong with that.  I think it's

23   pretty common knowledge that an FBI agent can talk to a

24   prosecutor and say, hey, this defendant was extremely helpful

25   and truthful and cooperative and he owned up to everything, and

1   you should take that into consideration.  So there's nothing

2   wrong with the agent telling Dr. Lieber that during the course

3   of the interview.

4          THE COURT:  To what extent can I take into account

5   Dr. Lieber's obvious distress as shown on his face and his

6   actions during this interview?

7          MR. CASEY:  I would disagree that he displayed any

8   obvious distress.  Again, I would --

9          THE COURT:  Well, his distress.

10          MR. CASEY:  I'm sorry?

11          THE COURT:  His distress.

12          MR. CASEY:  I think he was certainly distressed at

13   times because he was shocked to be presented with documents

14   that he signed and some of the evidence in the case.  I

15   certainly think he was distressed at those points of the

16   interview.

17          THE COURT:  Does that have any relevance?

18          MR. CASEY:  Well, to the extent, you know, the defense

19   is showing the still photos, I think that's probably the

20   distress you're seeing.  You're seeing the distress of a person

21   who was just arrested.

22          THE COURT:  Exactly.  Right.

23          MR. CASEY:  You are not seeing the distress of

24   somebody who is in such physical pain and discomfort that they

25   can't give a voluntary --

1              THE COURT:  I'm not talking about his health

2      situation.  I'm talking about the way -- I mean, he behaved in

3      a peculiar way as somebody who doesn't know what else to do.

4              MR. CASEY:  I think what you're seeing from him during

5      the interview, Your Honor, is somebody who was a professor at

6      Harvard University who was just arrested.  That is a

7      distressing moment in someone's life.  But not everyone in that

8      circumstance isn't capable of giving a voluntary statement.

9      That's the Government's position.

10             THE COURT:  Okay.

11             MR. CASEY:  I'm happy to answer other questions.

12     Otherwise, we're content with the arguments.

13             THE COURT:  I don't have any other questions.  Any

14     rebuttal or further argument, Mr. Casey -- I'm sorry --

15     Mr. Mukasey?

16             MR. MUKASEY:  The only thing that I would add is that

17     if the agent was going to be his advocate and the agent was

18     going to represent his best interest as the agent said he

19     would, ending up in prison for --

20             THE COURT:  What's the legal -- what's the legal

21     consequence of that?

22             MR. MUKASEY:  Well, I think it falls under coercion,

23     which the Supreme Court has recognized --

24             THE COURT:  It does?

25             MR. MUKASEY:  -- doesn't need to be physical coercion.

1    It can be a -- there's a certain level of trickery or

2    manipulation that's permitted when questioning a suspect, and

3    there's a certain level that goes out of bounds.  I think it's

4    inextricably intertwined with you want a lawyer, I'm going to

5    just read you your Miranda rights again and ignore your request

6    for a lawyer, and later on, I'll be your lawyer.  I'll be your

7    advocate.  And I guess the point that I'm going to make is if

8    the special agent is his advocate, right, and he ended up in

9    prison for two nights, that really puts the lie to what

10   happened.

11           THE COURT:  To what extent do I take into account that

12   Dr. Lieber is hardly illiterate?  He's a sophisticated person.

13           MR. MUKASEY:  Dr. Lieber is illiterate.  Let me say

14   that again.  He is illiterate in the ways of criminal law,

15   custody.

16           THE COURT:  Not so illiterate that he doesn't allude

17   to the fact that he's entitled to a lawyer.

18           MR. MUKASEY:  Fourth, Fifth, and Sixth Amendment

19   rights.  He was told -- and I think what happened is testament

20   to the fact that he's illiterate in the ways of the law because

21   he said maybe I think I should get a lawyer here.  And the

22   agent said, well, if that's going to happen I'm going to have

23   to read you your Miranda rights again.

24           An experienced literate criminal would have said he

25   wants to read me my rights, I'm getting a lawyer.  Stop it.

1    Instead, the agent took advantage and said, well, if you want a

2    lawyer, I'm going to have to read you your rights again.  And

3    not having any experience with this, Dr. Lieber said, all

4    right, fine.  If you are going to read me my rights again,

5    fine, I'm just going to cave.  You twisted my arm.  So in this

6    setting he is illiterate, and that is something that should be

7    considered when considering the voluntariness of his statement.

8              THE COURT:  Okay.  Anything else, Mr. Casey?

9              MR. CASEY:  No argument, Your Honor.  Just a

10   housekeeping matter, what the parties did before we got started

11   today was mark the four exhibits that were attached to our

12   papers.  We marked those as exhibits for purposes of this

13   hearing so you have them in front of you.  They have been

14   marked as Exhibits 1 through 4.  That's the arrest report, the

15   interview recording, the draft transcript of the interview, and

16   the signed Miranda waiver.

17             And just a note about the transcript, it's the

18   Government's position that the video, the audio-video interview

19   controls.  That's the evidence in the case.  The transcript was

20   submitted to help Your Honor and to help the parties sort of

21   discuss what was said during the interview and to clarify a

22   couple of misquotes I think that the defense made in their

23   papers that were based on the transcript.

24             THE COURT:  I have a fat set of documents, but I don't

25   see -- the advice of rights is here, Exhibit 4.  I see.  The

1  exhibit at the end of it?

2          MR. CASEY:  Correct, yes.

3          THE CLERK:  And then also -- these, also.  These

4  are -- that they did them ahead of time, too.

5          THE COURT:  These are the new ones.

6          THE CLERK:  Well, they were attached to his --

7          THE COURT:  I see.

8          THE CLERK:  Yes.

9          THE COURT:  -- Harvard thing.

10         MR. CASEY:  Correct.  I just wanted to make that clear

11  for the record.

12         THE CLERK:  It is an excerpt that they attached to it.

13  And the video is also in there.  Did you see the DVD?

14         THE COURT:  I've seen enough of it.

15         THE CLERK:  Okay.

16         MR. CASEY:  Also, just one final note, the exhibits

17  were filed under seal due to the protective order in this case,

18  so we just want to ensure that to the extent those exhibits

19  have been marked --

20         THE COURT:  Why are they under seal?

21         MR. CASEY:  Well, there's a protective order in the

22  case that limits the parties' ability to use discovery in any

23  way that would publicly disclose it.  Really, from the

24  Government's perspective, it's to protect the defendant's

25  rights.  We want to make sure the interview and the contents of

1    the interview remain --

2         THE COURT:  So are they under seal under agreement by

3    both parties?

4         MR. CASEY:  Correct.  Yes.  And I believe --

5         THE COURT:  That extends to the transcript as well as

6    the documents you are just referring to now?

7         MR. CASEY:  Yes, Your Honor.

8         THE COURT:  Everything is under seal?

9         MR. CASEY:  Correct, Your Honor.

10        THE COURT:  I don't think it shows it on the docket

11   sheet.  Yes, it does.  It does show it on the docket sheet.

12        MR. CASEY:  Yes.  Thank you.

13        THE COURT:  Well, I will take the papers.

14        Anything else?

15        MR. MUKASEY:  Judge, Your Honor had inquired as to

16   possible trial dates.

17        THE COURT:  Yes.

18        MR. MUKASEY:  I don't want to put the cart before the

19   horse, but we've been discussing with the Government potential

20   dates that would work for everybody.  Unfortunately, because of

21   Dr. Lieber's health situation --

22        THE COURT:  Well, we'll have a tentative date that

23   counsel can agree on, and then we'll have to work around --

24        MR. MUKASEY:  I'm sure there is a tentative date

25   counsel can agree on.  Even though I think we have quite an

```
 1    amicable relationship with the Government, we are going to be

 2    asking, if it pleases the Court, for a trial date in December.

 3               THE COURT:  In December?

 4               MR. MUKASEY:  December, perhaps December 13, which is

 5    the middle of the month.

 6               THE COURT:  How long will the case take to try,

 7    Mr. Casey?

 8               MR. CASEY:  The Government's case, a week or so.  It

 9    could bleed into a second week.

10               THE COURT:  How long?

11               MR. CASEY:  A week, give or take.

12               THE COURT:  A whole week?

13               MR. CASEY:  Perhaps less, perhaps more, but I think a

14    week is the best estimate we can give at this time.

15               THE COURT:  I don't think so.

16               MR. MUKASEY:  The Government overtries every case.

17               THE COURT:  Of course.

18               MR. MUKASEY:  But December 13th is the date that we

19    would propose.  I understand they want a date in January.

20               MR. DRABICK:  Yes, Your Honor.  We're proposing a date

21    of January 10th, which would be just after the holidays.  The

22    primary reason for that, of course, we're very sensitive to

23    Dr. Lieber's health situation and --

24               THE COURT:  How is it going to improve from December

25    to January?
```

1          MR. DRABICK:  From the Government's perspective?

2          THE COURT:  Well, from his perspective.  If you're

3     worried about his health.

4          MR. DRABICK:  Of course, Your Honor.  And I'll let

5     Mr. Mukasey speak specifically to that.  The reason for the

6     Government's request for January 10th is simply because AUSA

7     Casey, who is the lead AUSA who investigated and charged this

8     case, has a month-long trial beginning November 1st, and so he

9     will be in trial through the beginning of December.  So a

10    mid-December trial date effectively renders AUSA Casey unable

11    to effectively participate in the trial preparation, and we

12    believe, for continuity of counsel, that an early January,

13    January 10th trial date is reasonable under the circumstances,

14    Your Honor.

15         THE COURT:  Do you seriously object to January?  The

16    only problem is that the further we go into winter, the more

17    likely we have a snowstorm and we get snowed out.

18         MR. MUKASEY:  Judge, if I may, continuity of counsel

19    with respect to the Government is a nonsense argument.  I don't

20    want to get into petty fights about scheduling, but I guarantee

21    you there are 100 young enthusiastic Assistant U.S. Attorneys

22    who would be happy to try this case.  It's a one thousand and

23    one case.  It's not complicated.  They have a thousand people

24    who can try this case, and Dr. Lieber's health shouldn't be

25    compromised for Mr. Casey's schedule.  We all have busy

1  schedules.

2      THE COURT:  How is he harmed by doing this in January,

3  other than the fact that December has Christmas in the middle

4  of it?

5      MR. MUKASEY:  I just can't predict -- I can write to

6  the Court with a more accurate assessment of Dr. Lieber's

7  treatments and the effects thereof.  And --

8      THE COURT:  If he has a schedule of treatments, does

9  the Government know about that schedule?

10     MR. MUKASEY:  We have discussed some of the treatments

11 with him.  The treatments that he's either -- currently on are

12 likely to dissipate and wane in their effectiveness very

13 shortly, and there could be a significant difference between

14 early- to mid-December and January.

15     THE COURT:  Well, maybe we should try it in October or

16 November.

17     MR. MUKASEY:  We're open to a speedy trial.  It's our

18 right, and we're going to take advantage of it.  I don't want

19 to bicker about a couple of weeks.  But why don't you let us

20 talk to Dr. Lieber and his doctors.  There is going to be a

21 change in his condition, unfortunately, because the

22 effectiveness, the efficacy of the current treatments is going

23 to wane.

24     THE COURT:  This is not an ongoing treatment?  It's

25 going to finish now?

1          MR. MUKASEY:  It's ongoing.

2          THE COURT:  Well, in that case, why would it have a

3     different -- be a different result in January from December?

4          MR. MUKASEY:  I did not know there was going to be

5     science on this test so I'm going to turn this over to my

6     partner.

7          MS. TORREY:  Your Honor, if I may, his treatment is --

8     has kind of standard efficacy, which usually is about six to

9     seven months.  He's been on this treatment, and at some point

10    the treatment will likely no longer keep the cancer at bay.

11    And he's on already --

12         THE COURT:  When does the treatment end?

13         MS. TORREY:  When it stops keeping the cancer at bay.

14         THE COURT:  I'm sorry.  When?

15         MS. TORREY:  When the cancer no longer responds to the

16    treatment.

17         THE COURT:  When is that anticipated?

18         MS. TORREY:  Six to seven months, and he's already

19    over five months into the treatment.

20         THE COURT:  Well, in that case, we've already passed

21    the time with the December date.

22         MS. TORREY:  I think December is when we expect the

23    treatment to likely stop being effective.

24         THE COURT:  So December is really no better than

25    January except that he may have an additional two or three or

1    four weeks of getting worse; is that right?

2           MS. TORREY:  Yes, Your Honor.

3           THE COURT:  I mean, that's where we are.  Everybody

4    agrees that there's a treatment that helps.  The help runs out

5    after a period of time.  It is, according to the dates that you

6    have given me that the treatment works before it goes away,

7    December would be past that date in any event.

8           MS. TORREY:  So the treatment currently has only

9    partially worked, and it's hard to predict.  Those numbers of

10   six to seven months are based off of trials.  We don't know his

11   particular responsiveness at any point in time.

12          THE COURT:  Is there another course of treatment

13   projected if that happens?

14          MS. TORREY:  Not one that we're aware of at this

15   point.

16          THE COURT:  When is your other trial?

17          MR. CASEY:  November 1st, Your Honor.  The case is

18   United States versus Yu.  It's before Judge Young.  It's a

19   theft of intellectual property case, amongst other charges.

20          THE COURT:  It's a civil case?

21          MR. CASEY:  It's a criminal case.  Theft of

22   intellectual property, money laundering, wire fraud,

23   immigration fraud.

24          THE COURT:  How long is that going to last?

25          MR. CASEY:  We expect it will take the entire month.

1           THE COURT:  How many?

2           MR. CASEY:  We expect it will last the entire month of

3    November.

4           THE COURT:  Are you counting into your calculus that

5    Judge Young is a very fast trial judge?

6           MR. CASEY:  We are taking that into account, Your

7    Honor.

8           THE COURT:  He's faster than I am.

9           MR. CASEY:  Unfortunately, defense counsel is not

10   quite as fast as we'd like.  I'll blame it on them.

11          THE COURT:  You project that case will finish when?

12          MR. CASEY:  We hope it will finish before December 1,

13   but it's quite possible that it could bleed into December.  But

14   our best guess at this point is it will last the entire month

15   of November.

16          THE COURT:  And when is it supposed to start?

17          MR. CASEY:  November 1st.  And I'll note, Your Honor,

18   the trial has been continued two times already.  Judge Young

19   has indicated he's not inclined to continue again.  It's a case

20   that was charged before this case, so that's where we are at

21   with it.

22          THE COURT:  I understand that, and I certainly

23   wouldn't want to interfere with his trial.  But there will be

24   other Assistant U.S. Attorneys who can do this case.

25          MR. CASEY:  Fair enough.  Fair enough, but you have

1    the Government's position.

2            THE COURT:  Let me suggest that counsel try to figure

3    out a date that works for them.  We will try to accommodate a

4    jointly fixed date.  And if not, I'll simply make a decision as

5    to when we will do this, having in mind your various

6    obligations and Dr. Lieber's condition.  I mean, that certainly

7    is highly relevant to when the case should go to trial.

8            So I will take the papers, and I will let you know a

9    trial date when we figure out when that might happen.  If you

10   have any additional thoughts about either the motion or the

11   trial date, please let Ms. Urso know, and we'll try to

12   accommodate them as well.

13           Thank you all very much.

14           MR. MUKASEY:  Thank you, Your Honor.

15           MR. CASEY:  Thank you, Your Honor.

16           THE COURT:  Court is in recess until 2:00, I think.

17           THE CLERK:  Yes, Judge.

18           (Adjourned at 9:51 a.m.)

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Linda Walsh, Registered Professional Reporter

4   and Certified Realtime Reporter, in and for the United States

5   District Court for the District of Massachusetts, do hereby

6   certify that the foregoing transcript is a true and correct

7   transcript of the stenographically reported proceedings held in

8   the above-entitled matter, to the best of my skill and ability.

9          Dated this 9th day of September, 2021.

10

11

12          /s/ Linda Walsh

13          Linda Walsh, RPR, CRR

14          Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25