UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 1:20-CR-10111-RWZ

UNITED STATES OF AMERICA

v.

CHARLES LIEBER

MEMORANDUM & ORDER

October 13, 2021

ZOBEL, S.D.J.

Defendant Charles Lieber is accused in a six-count superseding indictment of making false statements to the government of the United States in violation of 18 U.S.C. § 1001(a)(2), filing a false tax return in violation of 26 U.S.C. § 7206(1), and failing to report a foreign bank and financial account in violation of 31 U.S.C. §§ 5314 and 5322. He moves to suppress his post-arrest statements on the ground that they were obtained in violation of his rights under the Fifth Amendment of the U.S. Constitution. Docket ##170, 173. Following a hearing and arguments of counsel, the motion is denied.

I.    **Factual Background**

The parties do not dispute the factual circumstances surrounding the statements at issue in defendant's motion to suppress.[1]

---

[1] The government accepts for purposes of disposing of the motion defendant's recitation of facts set forth in his memorandum in support thereof.  Docket #177 at 3 (citing Docket #173 at 1-5).

1

At the time of the events in issue, defendant was a professor in the Department of Chemistry and Chemical Biology at Harvard University. He had a distinguished career in the field of nanoscience, having published over 400 papers in peer-reviewed journals and received more than 50 patents as the principal inventor. Defendant also served as the Principal Investigator of the Lieber Research Group, which was funded by the National Institutes of Health ("NIH") and U.S. Department of Defense ("DOD") through research grants awarded to Harvard University. Defendant had been diagnosed with a serious cancer, from which he continues to suffer.

On January 28, 2020, defendant was arrested on a criminal complaint that charged him with two counts of making false statements in violation of 18 U.S.C. § 1001(a)(2). On June 9, 2020, a grand jury returned a two-count indictment charging the same. Count one alleges that in 2018 defendant made a false statement to the DOD's Defense Criminal Investigative Service. Count two asserts that in 2019 he caused Harvard to make a false statement to the NIH.

On July 28, 2020, a grand jury returned a superseding indictment that added four counts: counts three and four charge defendant with filing a false tax return for tax years 2013 and 2014, in violation of 26 U.S.C. § 7206(1); and each of counts five and six charges him with failing to file a report of a foreign bank and financial account with the U.S. government, in violation of 31 U.S.C. §§ 5314 and 5322. Defendant has pleaded not guilty to all charges.

Counts three through six are based on information the government obtained from the post-arrest interrogation at issue in the pending motion to suppress. Two FBI agents, Special Agents Robert Plumb ("Plumb") and Kara Spice ("Spice") (collectively,

2

the "Agents"), arrested defendant at approximately 6:38 a.m. on January 28, 2020 at his

Harvard office and laboratory.  They then transported him to the Harvard University

Police Department headquarters where they interrogated him.

At the start of the interrogation, Plumb read defendant his <u>Miranda</u> rights,

including that he had the right to an attorney, and presented him with a written waiver

form to sign if he so chose.  Plumb ultimately informed defendant of his rights a second

time.  The full exchange, as relevant to this motion, proceeded as follows:

> **[Plumb]**: Before we ask you many questions you must understand your rights.  You have the right to remain silent.  Anything you say can be used against you in court.  You have the right to talk to a lawyer for advice before we ask you any questions.  You have the right to have a lawyer with you during the questioning.  If you cannot afford a lawyer one will be appointed for you before any questioning if you wish.   If you decide to answer questions now without a lawyer present you have the right to stop answering at any time.  And what I'm going to ask you Dr. Leiber is to read this statement right here and sign it if you wish.  In order for you to, in order for us to talk to you about the information we—we have to make sure that you understand your rights and take your time too.

> **[Defendant]**: No, I understand my rights I guess.  Um, yeah I'm willing to sign this but I guess I think probably I should have ah, an attorney.

> **[Plumb]**: Well I want to…

> **[Defendant]**: That's why if anything I say is going to …

> **[Plumb]:** So I understand what you are saying.  Ah and I want to be very open with you, we don't—we don't play ah tricks or anything like that. Ah, we would appreciate the opportunity to talk with you but because, if you request an attorney because of that privilege we are not able to continue the conversation with you. So ah, what I—what I have to do again um just because you said that is I have to review the form again with you to make sure you understand the rights and as we go through it I want you to understand. You can stop—you can stop answering at any time.

> **[Defendant]**: Sure, I understand that. Um, ok I'll ah sign it and then we can start talking and if I feel like I need some …

> **[Plumb]**: Sure and like I said, Dr. Lieber I hope you ah learn to trust me. We are going to treat you with respect during this process. I want to be as open and transparent as possible with you and I hope to—to learn from you what's going on. That's part of the reason why we are here. Ok?

3

[Defendant]: Yes.

[Plumb]: I'll—I'll read this again and you will be able to sign it. Before we ask you any questions you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during the questioning. If you cannot afford a lawyer one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present you have the right to stop answering at any time. And ah, this part right here says ...

[Defendant]: I have read and I understand, ok.

Ex. 3 at 3-4; Ex. 2 at 0:01:51-0:05:06.[2] Defendant then signed the waiver and the parties proceeded to the interrogation.

The questioning lasted approximately three hours. Early on during the interrogation, Plumb informed defendant that the interview was intended, at least in part, to learn more about defendant's government research grants. E.g., Ex. 3 at 5 ("Um, one of the things that we've been looking at ah concerns your use of grants and that's— that's what we want to ah learn to ah, understand how that–how that works and what I want to do is ah, get a sense of what your background is and how you got to where you are today and then—then learn what your research involves now and who you do it with, where you do it and that sort of thing."), 7 ("Ah, what—what I want to get into is some of ah, some of the government grants.... Because that's what brought us here."), 9-10 ("I want to learn more about how that research is funded. Because that's ultimately why we're here."); Ex. 2 at 06:02-06:35, 11:47-54, 16:44-50. The Agents offered defendant drink and/or food at least four different times during the interview, including

---

[2] Exhibit 3 is an unofficial draft transcript of defendant's post-arrest interrogation. For clarity, the initials of the individuals speaking in the transcript have been replaced herein with the following: "CL" has been replaced with "Defendant" and "RP" has been replaced with "Plumb." Exhibit 2 is the audio and video recording of the interrogation.

food that would meet defendant's strict dietary restrictions due to his illness. Ex. 3 at 2, 18, 44, 66-67; Ex. 2 at 0:05-20, 36:40-55,1:33:35-39, 2:23:15-2:24:34.  Defendant declined each offer.  Ex. 3 at 2, 18, 44, 66-67; Ex. 2 at 0:05-20, 36:40-55,1:33:35-39, 2:23:15-2:24:34.  The Agents also offered to retrieve any medications defendant might need for his illness, which defendant also declined.  Ex. 3 at 66; Ex. 2 at 2:23:15-37. When defendant first informed the Agents of having digestive issues due to his treatment, the Agents offered him a break, which he declined.  Ex. 3 at 18; Ex. 2 at 36:40-55.

## II.    Discussion

Defendant does not dispute that the post-arrest interview was a custodial interrogation and that he was informed of his right to request an attorney before the interrogation began, as the law requires.  See Edwards v. Arizona, 451 U.S. 477, 481-82 (1981); Miranda v. Arizona, 34 U.S. 436, 479 (1966); United States v. Carpentino, 948 F.3d 10, 20 (1st Cir. 2020).  He now moves to suppress all statements made during the interrogation on the grounds that (1) the Agents ignored the invocation of his right to an attorney by proceeding with the questioning after he requested an attorney, and (2) the statements were not voluntary in any event.

### A.    Invocation and Waiver of the Right to Counsel

If a suspect in custody invokes his right to counsel at any point during an interrogation, officers must cease all questioning until an attorney is present or until the suspect initiates further communication.  Edwards, 451 U.S. at 484-85; Carpentino, 948 F.3d at 20.  This is a prophylactic rule "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights."  Davis v. United States, 512 U.S. 452, 458 (1994) (citation omitted).  A suspect's invocation of his right to have

5

an attorney present must be clearly stated so that a reasonable officer may understand that the right is being invoked. See Davis, 512 U.S. at 459 ("[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning."); Carpentino, 948 F.3d at 23-24. A suspect may waive his right to counsel if the waiver is both "knowing and voluntary." Carpentino, 948 F.3d at 26. "[T]he government bears the burden of showing the validity of the waiver by a preponderance of the evidence." Id. Here, the government has satisfied its burden of proof.

Defendant contends that his statement in response to the Agents' initial recitation of his Miranda rights and request for waiver—i.e., "I'm willing to sign this [waiver] but I guess I think probably I should have ah, an attorney"—was the unequivocal request for an attorney that invoked his right to counsel. Docket #173 at 10. Defendant further contends that the Agents ignored this invocation and improperly continued to question him, thereby rendering his signed waiver inoperative. Id. at 13. Defendant's statement, however, was not sufficiently unambiguous to constitute an invocation of his right to counsel.[3] At most, the hedging language in the statement would cause a reasonable officer to understand that defendant "might be invoking [his] right to counsel," not that he actually did invoke the right. See Davis, 512 U.S. at 459. Defendant's statement that "[he] think[s] probably [he] should have ah, an attorney" is similar to the "maybe I should

---

[3] Defendant submits an affidavit along with his motion in which he attests to the following: "Once the government agent read me my rights, I wanted a lawyer. I requested a lawyer. I understood the agent's interruption of my request for a lawyer as a denial of my request." Docket #172 ¶ 13. However, as noted earlier, the question is whether defendant's actual statements can be considered an invocation of his right to counsel, not what he said he intended at the time as stated in his *post hoc* affidavit.

talk to a lawyer" language the Supreme Court affirmed in <u>Davis</u> as insufficiently unambiguous to constitute an invocation of the right to counsel. <u>See</u> 512 U.S. at 462; <u>see also</u> Docket #177 at 8 (collecting cases addressing similarly ambiguous requests for counsel). As <u>Davis</u> made clear, the possibility that defendant in this case was requesting a lawyer is not enough to trigger a cessation of the interrogation or to render his signed waiver inoperative. <u>See Davis</u>, 512 U.S. at 462.

Defendant attempts to cure the ambiguity in his statement by pointing to Plumb's response that he "underst[ood] what [defendant was] saying," as an acknowledgement that Plumb understood defendant to be asking for a lawyer, and that his second recitation of defendant's <u>Miranda</u> rights was an attempt to "redirect [him] until he obtained the waiver he was pressing for." Docket #173 at 11. The argument, however, stretches the words used. First, Plumb's statement that he "underst[ood] what [defendant was] saying" does not clearly indicate that Plumb understood that defendant was actually requesting to have an attorney present. Indeed, Plumb's later statements indicate that he was not sure whether defendant was requesting an attorney and wanted to seek clarification:

> Ah, we would appreciate the opportunity to talk with you but because, if you request an attorney because of that privilege we are not able to continue the conversation with you. So ah, what I—what I have to do again um just because you said that is I have to review the form again with you to make sure you understand the rights and as we go through it I want you to understand. You can stop—you can stop answering at any time.

Ex. 3 at 4; Ex. 2 at 03:06-50. In any event, the inquiry as to whether defendant invoked his right to counsel is an objective one; it is therefore irrelevant what Plumb's subjective understanding was at the time. <u>See Davis</u>, 512 U.S. at 459.

7

Second, Plumb's subsequent recitation of defendant's <u>Miranda</u> rights was not an attempt to "redirect" the defendant into waiving his rights or a "misstatement" of the law that would make a "reasonable person" in defendant's position believe that a request for counsel "would result in a ceaseless cycle [of <u>Miranda</u> recitations] until he surrendered to an interview." Docket #173 at 10-12; Docket #184 at 3-4.  I find that Plumb merely took steps to ensure that defendant understood his rights and the consequences of waiving those rights, the type of "good police practice" encouraged by <u>Davis</u>. <u>See</u> 512 U.S. at 461.  Defendant does not identify any case law that prohibits a subsequent recitation of the <u>Miranda</u> rights or supports the contention that the repetition is in any way coercive or improper.  That is because such a prohibition would undermine the very purpose of  <u>Miranda</u>, which is to ensure that suspects know about and understand their rights under the law.  <u>See</u> <u>Miranda</u> 384 U.S. at 467 ("[i]n order to combat these [coercive] pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights").  After the second recitation by Plumb, defendant stated that he read and understood his rights and proceeded to sign the waiver form and answer questions.

### B.    Voluntariness

Notwithstanding his valid waiver of the right to counsel, defendant contends that his statements were involuntarily given in any event and should therefore be suppressed on that ground.  Similar to the waiver inquiry, the government bears the burden of proving by a preponderance of the evidence that under the "totality of the circumstances" a defendant's statements were voluntarily given; that the free will of the defendant was not overborne by government coercion.  <u>Haynes v. Washington</u>, 373 U.S. 503, 513-14 (1963); <u>United States v. Jacques</u>, 744 F.3d 804, 809 (1st Cir. 2014).

Among the circumstances to consider are the length and location of the interrogation; the maturity, education, physical condition, and mental health of the defendant; the conduct of the interrogators; and the defendant's prior experience with the criminal justice system. See Withrow v. Williams, 507 U.S. 680, 693-94 (1993); Jacques, 744 F.3d at 809. The mental condition of the suspect is particularly significant where the police use "subtle forms of psychological persuasion" in order to induce a confession. Colorado v. Connelly, 479 U.S. 157, 164 (1986). Here the government has satisfied its burden of proof.

Although defendant apparently had no prior experience with the criminal justice system, he is a mature, sophisticated academic and researcher, with advanced degrees and a tenured position at a prestigious university. At the time of the interrogation, he knew he was under arrest and that the focus of the interview was defendant's government research grants. E.g., Ex. 3 at 5 ("one of the things that we've been looking at ah concerns your use of grants ..."), 7 ("what I want to get into is some of ah, some of the government grants"); Ex. 2 at 06:02-06:35, 11:47-54. The interview lasted approximately three hours, not an unreasonable length of time from which to infer coerciveness. See, e.g., Carpentino, 948 F.3d at 28-29 (concluding six-hour detention and questions was "insufficiently lengthy or numerous to raise an inference that the defendant's will was overborne"). The Agents offered defendant drink and/or food at least four times during the interview, including an offer to provide him food that would meet his specific dietary restrictions, which defendant declined. Ex. 3 at 2, 18, 44, 66-67; Ex. 2 at 0:05-20, 36:40-55,1:33:35-39, 2:23:15-2:24:34. Defendant also declined to take a break when offered by the Agents after defendant informed them of his digestive

problems related to his cancer treatment.  Ex. 3 at 18; Ex. 2 at 36:40-55.  The Agents informed defendant of his <u>Miranda</u> rights twice, which defendant knowingly and voluntarily waived.  These facts all support the conclusion that defendant gave his statements voluntarily.

Defendant contends that the "coercion and trickery" that crossed the line into impermissible conduct and rendered his statements involuntary include the Agents' failure to inform him of the charges against him and their "misrepresent[ion]" of the focus of their investigation.  Docket #173 at 13-15.  The recording of the interrogation, however, shows that the Agents' conduct did not cross that line.  First, although defendant may have been caught by surprise when he was arrested and was initially unaware of the reason for his arrest, Plumb informed him at the start of the interview that at least one of the purposes of the interview was to get more information about defendant's "government [research] grants."  Ex. 3 at 5, 7, 9-10; Ex. 2 at 06:02-06:35, 11:47-54, 16:44-50.  Later during the interview, defendant, without being prompted by the Agents, brought up specific details of the foreign funding program at issue in the investigation and stated that "that's probably, you know, ultimately the details of what you want to talk about …."  Ex. 3 at 13; Ex. 2 at 27:02-18.  I am therefore persuaded that defendant had at least a general understanding of what the interview was about.

Second, the recording reveals that the Agents did not misrepresent the focus of their investigation, contrary to defendant's assertions.  The recording makes clear that the statement defendant offers as proof of the misrepresentation made by Plumb—"I'm very concerned about protecting *you as an interest*"—was transcribed incorrectly in the

transcript cited and was actually a statement that Plumb was "very concerned about protecting **U.S. interests**."[4]  Ex. 2 at 1:01:25-34, 1:11:13-22.

Defendant also contends that defendant's illness and the "pain, fatigue, and nausea" it causes him exacerbated his vulnerability to the Agents' purported "coercion and trickery."  Docket #173 at 15.  Although defendant's condition was serious at the time of the interview and he may have been experiencing discomfort throughout, there is no indication that it impacted the voluntariness of his statements.[5]  The video and audio recording shows defendant engaging with the Agents in a calm manner without any obvious demonstration of physical discomfort.  At no point did defendant express any physical pain or request any accommodations.  To the contrary, he actually declined each offer of drink, food, medication, and a break, including offers of drink and/or food that would comply with his dietary restrictions.  Ex. 3 at 2, 18, 44, 66-67; Ex. 2 at 0:05-20, 36:40-55,1:33:35-39, 2:23:15-2:24:34.  I am therefore not persuaded that defendant's physical health was in such a weakened state that it would undercut the voluntariness of his statements.

Considered in their totality, the circumstances of defendant's post-arrest interrogation demonstrate that defendant's statements were given voluntarily.  See, e.g., United States v. Boskic, 545 F.3d 69, 80-81 (1st Cir. 2008) (concluding that defendant's statements were voluntarily given even where the government interrogators failed to

---

[4] The incorrect transcription is found in Exhibit 3 at 30, 34.

[5] In his affidavit, defendant attests that during the interview "[he] was disoriented and the whole event exacerbated [his] feelings of weakness," that "[his] physical state made [him] vulnerable and easily intimidated," and that "[b]ecause of [his] physical condition that day, [he] did not have the strength or stamina to reiterate any more forcefully than [he] did [his] request for counsel."  Docket #172 ¶¶ 11, 13. Notwithstanding defendant's *post hoc* assertions, at no point during the interview did he make the Agents aware of his discomfort or pain, and there is no indication in the audio and video recording that defendant was experiencing anything other than what might be understood as the typical nervousness one would expect of a suspect being interrogated.

inform the defendant of the nature of all of the committed offenses, he did not have counsel present during the interrogation, and exhibited nervousness and hesitance because he was informed of his <u>Miranda</u> rights, the interview was not too lengthy, he was offered food and drink, he was not subjected to physical discomfort, and the defendant was well-educated, mature adult who "had a general familiarity with the American legal system").

**III.   Conclusion**

Accordingly, the motion to suppress (Docket #170) is DENIED.

October 13, 2021
DATE

RYA W. ZOBEL
UNITED STATES DISTRICT JUDGE