UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>  )<br>v.   )   Case No. 1:20-cr-10111-RWZ<br>  )<br>CHARLES LIEBER )<br>  )<br>Defendant.  )<br>  ) | |

## GOVERNMENT'S TRIAL BRIEF

The United States of America (the "government") submits this brief summarizing the government's case-in-chief, the elements of the offenses charged in the Superseding Indictment, and certain anticipated legal issues.

### Case Summary and Indictment

**I.   Summary of the Government's Case**

The defendant, Charles Lieber ("Lieber"), is charged in a six-count Superseding Indictment with making false statements in violation of 18 U.S.C. § 1001(a)(2) (Counts One and Two), subscribing to materially false federal income tax returns in violation of 26 U.S.C. § 7206(1) (Counts Three and Four) and failing to file Reports of Foreign Bank and Financial Accounts in violation of 31 U.S.C. § 5301 (Counts Five and Six).  All of these charges stem from the defendant's relationship with a university in China called the Wuhan University of Technology ("WUT") and, through WUT, his involvement with a Chinese talent recruitment program called the Thousand Talents Program (or "TTP").[1]  The government does not claim, nor could it, that the

---

[1] Evidence will show that the Thousand Talents Program was created by the Chinese Government in approximately 2008 to bring high technology to China through the recruitment of prominent scientists and researchers in the United States and elsewhere.

defendant's relationship with WUT and the Thousand Talents Program were themselves unlawful. They were not. Rather, the crimes alleged in this case arise from the defendant's false statements and material omissions to three federal agencies — the Department of Defense, the National Institutes of Health, and the Internal Revenue Service — about the nature and extent of his relationship with WUT and TTP.

Lieber is a tenured faculty member and researcher at Harvard University ("Harvard"). His area of research is nanoscience and nanomaterials. Throughout his career, Lieber's research has been funded by numerous federal grants from the Department of Defense, the National Institutes of Health, and other federal agencies. As of 2018, Lieber was the Principal Investigator associated with at least four such grants: two from the Department of Defense ("DOD") and two from the National Institutes of Health ("NIH"). These grants funded research being conducted by Lieber and others (graduate students and post-doctoral researchers) in his laboratory at Harvard.

In April 2018, acting on open-source information provided by the Federal Bureau of Investigation, Defense Criminal Investigative Service ("DCIS") agents Benjamin Hochberger and Amy Mousseau interviewed Lieber on Harvard's campus. Two Harvard administrators were also present during the interview. The purpose of the interview was to determine whether Lieber had any undisclosed foreign funding and/or foreign sources of support that might affect his then-existing DOD grants. (The open-source information available to the agents before the interview suggested that he may have a formal relationship with WUT and involvement with Chinese talent recruitment programs.) During the interview, among other things, Agents Hochberger and Mousseau asked Lieber if he'd ever been solicited to be a member of the Thousand Talents Program, a prominent Chinese recruitment program about which he professed to be familiar. In response, Lieber denied ever being explicitly asked to be a member. He also claimed *not* to know how China characterized him with respect to the Thousand Talents Program (in other words, that

China might have falsely claimed, without Lieber's knowledge, that he was a participant in the Thousand Talents Program). Based on Lieber's responses, which did not suggest any past or present foreign collaboration or research support that might impact his DOD grants, the DCIS agents declined to open a substantive investigation of Lieber.

Several months later, in a November 2018 letter to Harvard, NIH initiated a similar compliance review of Harvard and Lieber centered on Lieber's possible ties to WUT and TTP. The purpose of NIH's inquiry was to determine whether Harvard and Lieber were following NIH funding requirements, or whether material information bearing on Lieber's NIH award had not been appropriately disclosed. In order to respond to NIH's compliance review, two Harvard administrators, Jennifer Ponting and Matthew Fox, interviewed Lieber. Lieber told them that he was not and has never been a participant in the Thousand Talents Program. Harvard, in turn, put Lieber's statements in a letter, allowed Lieber to review the letter, and then sent the letter containing Lieber's statement (and other information obtained from and about Lieber) to NIH. Relying on the information in Harvard's response — which, like Lieber's statements to the DCIS agents, did not suggest a meaningful connection to WUT or *any* ties whatsoever to the Thousand Talents Program — NIH concluded its compliance review without further action.

At trial, the government expects to prove that Lieber's statements to DCIS and NIH about his participation in the Thousand Talents Program through WUT were materially and intentionally false. The true nature and extent of Lieber's relationship with WUT and the Thousand Talents Program is laid bare in the defendant's own emails. In general, these emails and other evidence will establish that Lieber first agreed in 2011 to serve as a "strategic scientist" for WUT at the request of a WUT professor ("WUT Professor"), who was also a former post-doc in Lieber's lab at Harvard. Lieber's strategic scientist appointment expressly stated that Lieber would "gain[] a Chinese government-sponsored position through successful application for various Chinese talent-

related projects." Less than six months later, the WUT Professor told Lieber that he had been selected to participate in China's Thousand Talents Program. In or about July 2012, after a period of some negotiation between Lieber and WUT, Lieber agreed to a three-year Thousand Talents Contract with WUT titled "Employment Contract of 'One Thousand Talent' High Level Fortign [sic] Expert." In exchange for salary and other benefits, the contract obligated Lieber to complete various tasks for and with WUT, including advising WUT students and researchers (who were working at the Harvard-WUT Joint Key Nano Laboratory[2]), reviewing manuscripts, and publishing scientific papers that acknowledged WUT. Other evidence will establish that Lieber, in fact, engaged in many of these tasks in the months and years that followed.

Additional evidence, including the defendant's own post-arrest admissions, will establish that WUT paid Lieber throughout the duration of the Thousand Talents Contract. The evidence will prove that, at the defendant's suggestion, WUT made cash payments to Lieber when he visited WUT (once in late 2012, twice in 2013, and once in 2014). Lieber also established a bank account at the Wuhan branch of the Industrial and Commercial Bank of China ("ICBC") in November 2012, into which WUT continuously deposited the remainder of Lieber's salary. (The evidence will show that Lieber also possessed a debit card and account opening forms from ICBC dated November 2012.) Lieber's failure to report his WUT salary and declare his Chinese bank account in his 2013 and 2014 federal income tax returns provides the basis for Counts Three and Four of the Superseding Indictment. Lieber's failure in 2014 and 2015 to file Reports of Foreign Bank and Financial Accounts with the IRS — required by the Bank Secrecy Act whenever someone has

---

[2] The evidence will show that the lab was opened in 2012, and that Lieber permitted WUT to use Harvard's name on the lab without consulting anyone at Harvard in violation of Harvard policy.

an interest in a foreign bank account with a balance of greater than $10,000 at any point during the calendar year — provides the basis for Indictment Counts Five and Six.

**II.     The Government's Evidence of Motive**

Simply put, the government will prove that Lieber deliberately made false statements to DCIS and NIH about his participation in the Thousand Talents Program through WUT in order to protect his reputation and career at Harvard University (including by preserving his ability to receive federal research funding).

The evidence will show that in 2015, Harvard administrators learned for the first time of the Harvard-WUT Joint Key Nano Lab, including the fact that Lieber was serving as lab director according to its Chinese website. When confronted about the lab and what appeared to be the unsanctioned use of Harvard's name by WUT, Lieber claimed ignorance. According to Harvard's former Dean of Science, Jeremy Bloxham, and Lieber's own emails, Lieber told Harvard that WUT's use of Harvard's name in connection with their nano lab was not sanctioned or agreed to by him. In the process, Lieber deliberately mislead Harvard about the nature and extent of his relationship with WUT by intentionally failing to disclose that he had agreed to a Thousand Talents Contract with WUT (a formal employment contract by its express terms), that he had committed Harvard to a formal academic exchange with WUT in furtherance of his TTP participation, and that his formal arrangement with WUT entitled him to significant salary and other benefits. Soon thereafter, Lieber became the Chair of the Chemistry and Chemical Biology Department at Harvard.

The evidence will show that, having deliberately misled Harvard in 2015, Lieber chose to perpetuate the same falsehoods — that is, to intentionally conceal the true extent of his relationship with WUT, which included his involvement in the Thousand Talents Program — to DCIS and NIH in 2018 and 2019. Had he told the truth to DCIS and NIH, Lieber almost certainly would

have caused significant damage to his reputation at Harvard, risked losing his position as the chair of his department, possibly forfeited his ability to conduct federally funded research, or worse. The defendant's contemporaneous emails support this view.

The government will also argue that Lieber lied to conceal the fact that he'd received income from WUT under the Thousand Talents Contract that he *knew* had not been reported in his tax returns submitted to the IRS. Stated differently, Lieber intentionally made false statements about WUT to avoid repercussions from the IRS or other tax authorities.

### Elements of the Offenses

**I.    Counts One and Two— Making false statements in violation of 18 U.S.C. § 1001(a)(2).**

In order for the jury to convict on Counts One and Two, the government must prove the following elements beyond a reasonable doubt:

> *First*, that the defendant knowingly and willfully made, or caused to be made, a material false statement;
>
> *Second*, that the defendant made the statement, or caused the statement to be made, voluntarily and intentionally; and
>
> *Third*, that the defendant made the statement, or caused the statement to be made, in a matter within the jurisdiction of a government agency.

FIRST CIRCUIT PATTERN JURY INSTRUCTION 4.18.1001. A statement is "material" if it has the natural tendency to influence or to be capable on influencing the decision of the decisionmaker to which was addressed, regardless of whether the agency actually relied upon it. *Id.*; *see also United States v. Sebaggala*, 256 F.3d 59, 65 (1st Cir. 2001).

As to Count One, the government intends to prove that Lieber falsely told DCIS agents Benjamin Hochberger and Amy Mousseau during an interview on April 24, 2018 that he was never asked to participate in the Thousand Talents Program, or words to that effect. *See* Superseding Indictment ¶¶ 32, 43. The government will also prove that Lieber falsely said he was not sure how

China categorized him with respect to the Thousand Talents Program. *Id.* Agents Hochberger and Mousseau will testify about the purpose of their interview of Lieber, about Lieber's statements during the interview, and about their reliance on Lieber's statements about the Thousand Talents Program. The government will prove that Lieber knew that it was improper to provide false or misleading information to the agents.

As to Count Two, the government will prove that Harvard University administrators, including Jennifer Ponting and Matthew Fox, questioned Lieber about his relationship with WUT and the Thousand Talents Program in December 2019. The purpose of Harvard's inquiry was to gather information responsive to a compliance review initiated by NIH one month earlier in November 2019. In order to respond to NIH's compliance inquiry, Ponting and Fox interviewed Lieber in his lab at Harvard, even sharing with him their questions in advance. The evidence will establish that Lieber told Harvard during the interview that he was not and had never been a participant in the Thousand Talents Program. *See* Superseding Indictment ¶¶ 34, 45. Harvard, in turn, compiled Lieber's statements and other information about Lieber into a letter to NIH, gave Lieber an opportunity to confirm the letter's accuracy (which he did), and then sent the letter to NIH on January 10, 2019. NIH's Deputy Director of Extramural Research, Dr. Michael Lauer, will testify that he received Harvard's letter response and reviewed it. He will confirm that NIH relied on Lieber's representations in the letter in deciding to close NIH's compliance review without any administrative action. Once again, the government will show that Lieber knew that it was improper to provide false or misleading information to NIH.

II. **Counts Three and Four— Subscribing to false income tax returns in violation of 26 U.S.C. § 7206(1).**

In order for the jury to convict on Counts Three and Four, the government must prove the following elements beyond a reasonable doubt:

*First*, that the defendant made or caused to be made, a federal income tax return for the year in question that he verified to be true;

*Second*, that the tax return was false as to a material matter;

*Third*, that the defendant signed the return willfully and knowing it was false; and

*Fourth*, that the return contained a written declaration that it was made under the penalty of perjury.

First Circuit Pattern Jury Instruction 4.26.7206; *see also United States v. Boulerice*, 325 F.3d 75 (1st Cir. 2003). "A material matter is one that is likely to affect the calculation of tax due and payable, or to affect or influence the IRS in carrying out the functions committed to it by law, such as monitoring and verifying tax liability. A return that omits material items necessary to the computation of taxable income is not true and correct." Pattern Jury Instruction 4.26.7206; *see also Boulerice*, 325 F.3d at 81 n.3; *Sivaro v. United States*, 377 F.2d 469, 472 (1st Cir. 1967). However, the First Circuit has also said that false items on a tax return are "material" even in the absence of a tax deficiency. *Silverstein v. United States*, 377 F.2d 269-270 (1st Cir. 1967).

Through Lieber's emails, his post-arrest statements, and some physical evidence, the government intends to show that WUT made salary payments to Lieber in 2013 and 2014 both in cash (when Lieber visited WUT) and through periodic deposits into Lieber's bank account at ICBC. Lieber's tax preparer, Carl Goodman, and an IRS Revenue Agent, Colleen Ranahan, will both testify that Lieber's 2013 and 2014 federal income tax returns (IRS Forms 1040) and their accompanying Schedules do not report any income from WUT or any other Chinese Source. *See* Superseding Indictment ¶¶ 40, 47, 49. Moreover, for both tax years, Goodman and Revenue Agent Ranahan will also testify that Lieber answered "no" to the question (in Schedule B) of whether he had a financial interest in, or signature authority over, a financial account located in a foreign country. *Id.* The evidence will show that Lieber signed his 2013 and 2014 returns under the pains and penalties of perjury, knowing that they omitted material information about income he received

from WUT and his ICBC bank account. Revenue Agent Ranahan will testify that these omissions affected the IRS's ability to accurately calculate Lieber's tax liability in 2013 and 2014.

**III.   Counts Five and Six— Failing to file Reports of Foreign Bank Account Reports in violation of 31 U.S.C. § 5322.**

In order for the jury to convict on Counts Five and Six, the government must prove the following elements beyond a reasonable doubt:

*First*, that the defendant was a United States person during the calendar year specified in the count;

*Second*, that the defendant had a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country during the calendar year specified in the count;

*Third*, the aggregate value of the defendant's foreign bank, securities, or other financial account exceeded $10,000 at any time during the calendar year specified in the count; and

*Fourth*, that the defendant willfully failed to file an FBAR on or before the due date following the calendar year specified in the count.

31 U.S.C. §§ 5314; 31 C.F.R. §§ 1010.350, 1010.306(c); *United States v. Clines*, 958 F.2d 578 (4th Cir. 1992); *United States v. Sturman*, 951 F.2d 1466, 1476 (6th Cir. 1991), cert. denied, 504 U.S. 985 (1992).

Revenue Agent Ranahan will testify about the requirement under the Bank Secrecy Act to disclose foreign financial accounts to the IRS in a FinCEN Form 114 (or "FBAR") where the balance in the account exceeds $10,000 at any time during the calendar year. Through emails and the defendant's own statements, the government expects to prove that the defendant had a financial interest in, and signature authority over, a bank account at ICBC in China in at least 2014 and 2015, and that the balance in that account exceed $10,000 both years. Superseding Indictment ¶¶ 41, 51. The evidence (or possibly a fact stipulation agreed to by the parties) will also show that Lieber did not file an FBAR for either year. The government will prove Lieber's knowledge of

the FBAR filing requirement using Lieber's own tax returns as well as documents provided to Lieber by his tax preparer, Carl Goodman.

## Anticipated Legal Issues

The following is a non-exhaustive list of legal issues that may arise during the trial. Some of these issues have been separately briefed in the defendant's Motions *in Limine* (ECF Nos. 196 and 201), the government's Motion *in Limine* (ECF No. 200), and the oppositions thereto. The government does not belabor here the issues presented in those motions.

I.  **The Admissibility of Email Communications to and From the Defendant at His Harvard Email Address.**

As noted above, many of the government's proposed exhibits will consist of email communications to or from Lieber at his Harvard email address. These communications were found either on Harvard's computer servers or on the defendant's electronic devices (seized on the day of his arrest pursuant to search warrants). The parties are likely to stipulate that the email communications are true and correct copies of documents maintained either by Harvard or on Lieber's devices. Still, disputes may arise as to the relevance and admissibility of some of these emails. To aid the Court, the following is a breakdown of some of the various categories of emails that the government expects to offer during the trial, along with a description of the government's theory of admissibility.

    a.    *Emails Authored by the Defendant about WUT, Acts Performed by Him Under the Thousand Talents Program, and other Relevant Matters.*

The government intends to offer numerous emails authored by the defendant as his admissions, admissible under Fed. R. Evid. 801(d)(2). These emails essentially fall into one of two categories: emails concerning the defendant's relationship with WUT and the Thousand Talents Program dated between approximately 2011 and 2016, and emails to various Harvard staff and administrators concerning the DOD and NIH dated between approximately April 2018 and

February 2019. The former category of emails contains the defendant's admissions about the origins and scope of his relationship with WUT and the TTP, the defendant's various acts in furtherance of his TTP Contract, the defendant's receipt of salary from WUT pursuant to his TTP Contract, and ultimately the end of the defendant's affiliation with the TTP. In the latter category of emails, the defendant makes several statements that are relevant to his state-of-mind, his intent, and his willfulness during both the DOD and NIH inquiries. In one such email, the defendant emailed a close contact in China two days after the DOD interview asking about a Chinese website linking him to WUT. (The evidence will show that the defendant later asked another contact in China to delete this reference from the website.) In the email, the defendant says that he will be "careful about what I discuss with Harvard University, and none of this will be shared with the government investigators at this time." This email, in particular, will be offered by the government to prove that the defendant willfully made false statements during the DOD interview.

      b.     *Emails Authored by Third Parties*

The government intends to offer several emails sent by third parties, including the WUT Professor, to the defendant between 2011 and 2016. Many of these emails will not be offered for the truth of the matters asserted in the emails, but rather to prove the defendant's state of mind (*i.e.*, to show what the defendant knew and understood, regardless of the truth of what's asserted in the email), to show the nature of his relationship with WUT (*i.e.*, to show the fact that certain conversations took place and the nature of such communications, regardless of their truth), and for other non-hearsay purposes. *United States v. Murphy*, 193 F.3d 1, 5–6 (1st Cir. 1999) ("So long as out-of-court statements are not offered for their truth, they are not hearsay…."). Indeed, it is well established that an out of court statement offered to show that a statement was made, *United States v. Kohan*, 806 F.2d 18, 22 (2d Cir.1986), to demonstrate the statement's effect on the listener, *United*

11

States v. Puzzo, 928 F.2d 1356, 1365 (2d Cir.1991), or to show the circumstances under which subsequent events occurred, United States v. Pedroza, 750 F.2d 187, 200 (2d Cir.1984), is not hearsay.

One significant category of third-party emails relates to Count One. In that count, among other things, the defendant is charged with falsely telling DCIS Agents Hochberger and Mousseau that he was "not sure" how China categorized him with respect to the Thousand Talents Program. The government expects to offer numerous emails from the WUT Professor to the defendant in which the WUT Professor describes the defendant as a "One Thousand Talent," a "One Thousand Talent High Level Foreign Expert," and words to that effect. These emails tend to show that the defendant knew that the WUT Professor (and perhaps others in China) categorized him as a participant in the Thousand Talents Program. Stated differently, regardless of whether the WUT Professor's assertions of fact are true, these emails are admissible to show that the defendant understood and knew how the WUT Professor and others in China were characterizing him in relation to the Thousand Talents Program. Cf. United States v. Dupre, 462 F.3d 131, 137 (2d Cir. 2006) (emails from investors to defendant making accusations of fraud not hearsay when offered to show defendant's knowledge of fraud); United States v. Hanjuan Jin, 833 F. Supp. 2d 957, 969 (N.D. Ill. 2011) (email from Chinese business to defendant about Chinese business' customer admissible to show that defendant "was on notice" that Chinese business "performed work for … a unit of the Chinese military"); MCCORMICK ON EVIDENCE § 249 ("A statement that D made a statement to X is not subject to attack as hearsay when its purpose is to establish the state of mind thereby induced in X, such as receiving notice or having knowledge[.]").

    c.    *Adoptive Admissions*

The government will offer select third-party emails as adoptive admissions of the defendant under Fed. R. Evid. 801(d)(2)(B). See United States v. Miller, 478 F.3d 48 (1st Cir. 2007) (noting that a "party's agreement with a fact stated by another may be inferred from … silence" when "(i)

12

a statement is made in a party's presence, (ii) the nature of the statement is such that it normally would induce the party to respond, and (iii) the party nonetheless fails to take exception"). The adoptive emails that the government is likely to introduce consist generally of emails by third parties describing the defendant as a Thousand Talents participant. In one of these emails — sent *after* the defendant was made aware of NIH's compliance review — the defendant is silent in response to a direct assertion that he participated in the Thousand Talents Program. In another email, the defendant reviewed and approved a speech about him to be given by a representative of WUT at an award ceremony in China that expressly describes him as a Thousand Talents participant. These two emails and possibly others will be offered as the defendant's admissions, *see* Fed. R. Evid. 801(d)(2)(B), to prove that the defendant participated in TTP.

      d.    *Verbal Acts*

The government will likely seek to admit several emails exhibits as verbal acts. A verbal act is an utterance of an operative fact that gives rise to legal consequences. *See United States v. Diaz*, 597 F.3d 56, 65 (1st Cir. 2010); *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 567, n.50 (D. Md. 2007) ("Verbal acts … are not hearsay, because the statement is admitted merely to show that it was actually made, not to prove the truth of what was asserted in it."). "A contract … is a form of verbal act to which the law attaches duties and liabilities and therefore is not hearsay." *Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992); *Murphy*, 193 F.3d at 6 (noting that "the 'I accept' that shows that an agreement has been formed" is an example of a verbal act). Thus, "the hearsay rule does not exclude relevant evidence as to what the contracting parties said or wrote with respect to the making or the terms of an agreement." *Lorraine,* 241 F.R.D. at 567, n.50.

As the government described in its opposition to the defendant's motion *in limine* seeking to exclude the Thousand Talents Contract, *see* ECF Nos. 196 (defendant's motion) and 200 (government's opposition), the government is likely to seek to admit a series of communications

13

between WUT and the defendant in which the contract is offered, discussed, negotiated, and agreed to. These communications have independent legal significance and are, therefore, admissible as verbal acts to show what the parties agreed to, the terms of the TTP contract, etc. *See* ECF No. 200 at 5-8.

## II.     The Defendant's Health

The defendant was diagnosed with cancer nearly ten years ago. The government understands from the defense that he is currently undergoing treatment. In some of the government's proposed exhibits, and during the defendant's post-arrest interview, there are superficial references to the defendant's diagnosis. The subject of the defendant's cancer, therefore, will necessarily be before the jury, if only superficially.

In preparation for trial, the government conferred with the defense about whether they planned to present the jury with evidence concerning the defendant's condition and, if so, for what purpose. While the defense has assured the government it will *not* seek to use the defendant's health for an improper purpose, such as to generate sympathy for the defendant or for jury nullification, the government nonetheless felt it is necessary to highlight this issue for the Court in light of the defendant's proposed exhibit list. That list contains at least **forty-two exhibits** related to the defendant's health. Many of these are emails between the defendant and his doctors from the Spring of 2019, months after the conduct described in the Superseding Indictment. Not only do these emails appear to be inadmissible hearsay, but they serve no apparent purpose other than to inflame the jury.

Certainly, there will be passing references to the defendant's health in the exhibits offered by the government during the trial. Still, the defense must not be permitted to delve into the defendant's health status for reasons that are untethered to the elements of the alleged crimes, his supposed good faith, or another issue that the jury will be asked to decide. Indeed, even if this sort

14

of evidence has some scant relevance such that it surmounts Fed. R. Evid. 401's low relevance threshold — it is not clear to the government that is does — it is distracting and confusing and should be excluded under Fed. R. Evid. 403.  *Cf. United States v. Martinez*, 923 F.3d 806, 815–16 (10th Cir. 2019) (admitting "some humanizing evidence" concerning the defendant, but excluding health-related evidence because it was "just an effort to elicit sympathy" from the jury); *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990) (Evidence regarding the defendant's health "presents an inherent danger that it will distract the jury[ ] from focusing on the actual presence or absence of mens rea, and ... may easily slide into wider usage that opens up the jury to theories of defense more akin to justification." (internal quotation marks omitted)). Certainly, at a minimum, the defense should not be permitted to put forth forty-two separate exhibits describing the defendant's diagnosis and treatment.

### III.   The Defendant's Post Arrest Statements

Earlier in this case, the Court denied the defendant's motion to suppress his post-arrest admissions to FBI agents.  *See* ECF No. 192 (Memorandum and Order denying defendant's motion to suppress).  The government, therefore, will seek to admit portions of the defendant's three-hour, post arrest interview during the trial.

The government identified for the defense the portions of the interview that it intends to show the jury, so that the defense could decide if additional interview segments were necessary, in their judgment, under the so-called rule of completeness, Fed. R. Evid. 106.  Indeed, the defense did seek to add several small portions of the interview, and the government agreed to several of the defendant's requests for context reasons.[3]  As of the date of this filing, however, some disputes remain.

---

[3] It is worth noting that, unlike the government, the defendant may not offer or elicit defendant's prior statements at trial because those statements are hearsay.  *United States v. Rivera-Hernandez,* 497 F.3d 71,

15

The government has prepared a draft transcript of the interview. While the government will not be showing this draft transcript to the jury — the jury will be shown the audio-video recording of the interview — it has highlighted portions of the transcript that correspond to the segments of the audio-video recorded interview that it will seek to admit during the trial. The government has also noted, on the transcript, those portions of the interview about which the defense still objects. To the extent disputes amongst the parties persist beyond the date of this filing, the government respectfully suggests that the Court take up this issue during the final pretrial conference on December 8, 2021, or at some other time in advance of the trial.[4]

## IV. Expert Testimony by Dr. Barry Naughton Concerning the Thousand Talents Program

During the trial, the government intends to call as a witness Dr. Barry Naughton, a Professor of Economics at the University of California whose primary area of research is the Chinese Economy. Dr. Naughton will give important expert testimony concerning the origins,

---

80 (1st Cir. 2007) (citing Fed. R. Evid. 801, 802). The defendant is not permitted to circumvent this rule by eliciting defendant's statements through the cross-examination of other witnesses. *United States v. Bauzo-Santiago*, 49 F. Supp. 3d 155, 157 (D.P.R. 2014) (prohibiting defendant from eliciting defendant's "out-of-court statement during cross-examination of government witnesses to impeach the witnesses") (citing *Bemis v. Edwards*, 45 F.3d 1369, 1372 (9th Cir. 1995) and *United States v. Hudson*, 970 F.2d 948, 956 (1st Cir. 1992)). Further, even if the government presents only a subset of defendant's out-of-court statements, the defendant is not entitled to present her other statements absent a need to avoid "misunderstanding or distortion." *United States v. Simonelli*, 237 F.3d 19, 28 (1st Cir. 2001) (rule of completeness "does not permit the admission of otherwise inadmissible evidence simply because one party has referred to a portion of such evidence, . . . rather, it operates to ensure fairness where a misunderstanding or distortion created by the other party can only be averted by the introduction of the full text of the out-of-court statement").

[4] During the trial, the government will be offering into evidence several DVDs containing portions of the interview. If admitted, the government will then play those DVDs for the jury. As a practical matter, therefore, it may be difficult for the Court to assess in real time during the trial exactly what portions of the interview – that is, which questions and answers – appear on each DVD. It may be easier for the Court and, quite frankly, the parties to discuss the interview by referencing the draft transcript during the final pretrial conference. This approach will also allow the government enough time to create DVD exhibits that contain the portions of the interview that the Court has said are admissible. This will reduce delays during the trial.

purpose and scope of China's Thousand Talents Program, a Chinese government program that most (if not all) jurors will be hearing about for the first time during this trial.

The defendant has moved to exclude Dr. Naughton's testimony and the government has objected. *See* ECF Nos. 196 (defendant's objection) and 200 (government's opposition). The government expects Dr. Naughton's direct testimony to be brief, uncontroverted (*i.e.*, based largely on information made public in China) and tailored to the issues presented by the defendant's conduct with WUT and TTP. *See* ECF No. 200 at 9-12. Dr. Naughton's testimony will not be unfairly prejudicial, confusing, or a waste of time.

V.      **Statute of Limitations**

In his proposed jury instructions, the defendant requested a statute of limitations instruction. Presumably this proposed instruction is aimed at Count Three (subscribing to a materially false income tax return on April 15, 2014) and Count Five (failing to file an FBAR for the 2014 calendar year). Count Three has a six-year statute of limitations. 26 U.S.C. § 6531. However, the "time during which the person committing any of the various offenses arising under the internal revenue laws is outside the United States or is a fugitive from justice within the meaning of section 3290 of Title 18 of the United States Code, shall not be taken as any part of the time limited by law for the commencement of such proceedings." *Id.* Count Five has a five-year statute of limitations.

Should the defense raise a statute of limitations defense as to Count Three or Count Five, the government will rely on two things: *first*, a tolling agreement reached by the parties on February 24, 2020, which excluded the time from February 21, 2020 until June 1, 2020 from the limitations period; and *second*, Lieber's international travel (which, by the government's calculation, included at least twenty-five days out of the country) between April 15, 2014 and the present. The government intends to ask the Court to take judicial notice of the party's tolling

agreement. Combined with the defendant's international travel, the government will prove that none of the indictment counts are time barred.

## Conclusion

The government welcomes further discussion about any of the points raised in this brief during the final pretrial conference on December 8, 2021.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By:  */s/ Jason A. Casey*
 Jason A. Casey
 James R. Drabick
 Assistant United States Attorneys

Dated: December 7, 2021

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed of December 7, 2021, through the ECF system, which will provide electronic notice to counsel as identified on the notice of Electronic Filing.

 */s/ Jason A. Casey*
 Jason A. Casey
 Assistant United States Attorney