

U.S. Department of Justice

*Nathaniel R. Mendell*
*Acting United States Attorney*
*District of Massachusetts*

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

November 1, 2021

<u>**VIA ELECTRONIC MAIL**</u>

Marc Mukasey, Esq.
Torrey Young, Esq.
Catherine Deist, Esq.
Mukasey Frenchman, LLP
570 Lexington Avenue, Suite 3500
New York, NY 10022

      RE:    <u>United States v. Charles Lieber</u>
               Case No. 19-cr-10111-RWZ

Dear Counsel,

      Pursuant to Fed. R. Crim. P. 16(a)(1)(G), the government hereby provides you with a summary of the expert testimony that it may elicit during its case-in-chief in the above-referenced matter. As noted below, the government does not believe that *all* of this testimony constitutes expert testimony within the meaning of the Federal Rules of Criminal Procedure. However, to avoid unnecessary disputes and trial delays, the government discloses the following summaries out of an abundance of caution. Please note that the potential witnesses identified herein have not reviewed or adopted these disclosures.

1. **Christopher Beckstrom – Federal Bureau of Investigation:** Mr. Becktrom is a Forensic Examiner at the FBI's New England Regional Computer Forensics Laboratory, Computer Analysis Response Team. His experience and qualifications are described in detail in the attached *curriculum vitae*. *See* USAO_010366.

    If called as a witness, Mr. Beckstrom will testify about the preservation, extraction, and forensic analysis of various electronic devices seized during the government's investigation of the defendant, including devices seized from the defendant's residence and his office at Harvard University on January 28, 2020 (identified in our discovery letter to you dated July 27, 2020). Mr. Beckstrom's testimony will be based on his professional training and experience, including his familiarity with forensic computer

software and tools.  Mr. Beckstrom's testimony will also be based on his review computer files found on the defendant's electronic devices.

2. **Dr. Barry Naughton – University of California, San Diego:**  Dr. Naughton is a chair professor of economics at the School of Global Policy and Strategy at the University of California, San Diego.  He academic specialization for nearly forty years has been the economy of the People's Republic of China ("PRC").  He has published extensively on this topic.  A copy of Dr. Naughton's *curriculum vitae*, which includes a list of his relevant publications, is attached hereto.  *See* USAO_010388 – 402.

If called as a witness, Dr. Naughton will testify about the PRC government's efforts to obtain foreign technology and technological know-how, including through the use of the Thousand Talents Program and related local talent programs. Dr. Naughton will testify that, from 1978 through 2010, China's economy grew rapidly, but mainly because market reforms triggered the expansion of low-skill, labor-intensive sectors, manned by migrant workers from the countryside.  By 2006, China was beginning to run out of unlimited cheap labor; wages were rising rapidly; and China was in danger of losing competitiveness. Recognizing that its own industries were technologically simple and far behind those in advanced countries, China looked for new technology to fuel more sophisticated industries that would serve as "new growth drivers." As a result, the Chinese effort to acquire advanced technology was stepped up dramatically after 2006, when China put technology acquisition at the center of its economic development strategy.

Dr. Naughton will testify that during this time, China took steps to upgrade and expand key industrial and technological and sectors, including the area of materials science.  In December 2008, for example, China adopted a plan for attracting overseas scientists and engineers to China, which became known as the "Thousand Talents Program" ("TTP"), since it called for the central government to attract one thousand top level, primarily Chinese American, scientists.  Beginning in 2010, these programs began to be incorporated into China's Five-Year Plans (a national plan, widely publicized in China every five years, that covers the country's general economic, social, environmental and technological development strategy).  In 2015, the "Made in China 2025" policy outlined a program of industrial upgrading. These programs were extensively publicized in the Chinese press at the time, and all are available as official documents.  However, after 2016, when these programs elicited international controversy, most detailed plans, as well as references to the "Thousand Talents" program, were removed from the internet.

It is Dr. Naughton's opinion that that the TTP is an important component in the overall Chinese government technology acquisition program. Building on a few pilot programs, the first full-fledged central government TTP was launched in December 2008. In the beginning, the objective of TTP was to bring to China "high level" talent, which for this "top tier" program was defined as senior scholars, under 55, tenured at prestigious universities, with distinguished publication records and international reputations. These exceptional scholars were expected to build "long-run" research programs. It was designed to counteract the tendency for the most successful Chinese

students in the US to remain and pursue their professional careers here. The initial objective was to bring 1,000 such individuals over the course of ten years. The program immediately conferred enormous prestige and visibility on recipients, and was known by everybody in the Chinese science, technology, and social science academic communities. The TTP subsequently expanded at both the central and local levels — many provinces and large cities have, under the direction of the central government, implemented their own TTPs — with short-term programs complementing the basic long-term program. The TTP's objectives also expanded to include less ambitious types of technology transfer and human resource improvement. While most TTP grantees are Chinese or Chinese American, a small number of TTP participants are non-Chinese.

The TTP confers very substantial benefits on its grantees. The original program provided for an initial 1 million RMB payment (about $150,000 USD at 2020 exchange rates). The headline payment was just part of the benefits. Grantees received high salaries agreed by their employers as well as generous research support (contractually specified in advance and typically 3 to 5 times the initial bonus). Grantees also received supplements to pensions, as well as insurance, housing allowances, and other benefits. Junior and short-term versions of the TTP receive proportionate, but smaller, benefits.

Dr. Naughton will testify that the contract emailed to Charles Lieber at various points in 2012 entitled "'One Thousand Talent' High Level Fortign [sic] Expert" (*see, e.g.*, USAO_000200) is entirely consistent with the TTP. Specifically, Dr. Naughton will testify that the stated duration of the contract, Dr. Lieber's obligations under the contract, and Wuhan University of Technology's ("WUT") obligations under the contract (including its payment obligations) are all consistent with the structure, goals and aims of the TTP. It is Dr. Naughton's opinion that Dr. Lieber, in particular, was a highly attractive TTP candidate because of his area of expertise (nanoscience), his prominence in his field, and his affiliation with a top-ranked American university. It is Dr. Naughton's opinion that Dr. Lieber's association with WUT — a mid-tier Chinese university — would have benefitted the school greatly by, among other things, raising WUT's national ranking and increasing the likelihood that WUT received funding from China's national government.

Dr. Naughton's testimony will be based on his education, his review of publicly-available materials concerning the TTP, conversations with TTP grantees, his review of USAO_000200 (and/or other iterations of this document found elsewhere in discovery), and more than 20 years of research on China's science, technology and industry policies (to include China's technology acquisition efforts of the last 20 years).

Additionally, the government expects that one or more Chinese linguists employed by the Federal Bureau of Investigation will testify about documents and other materials found on the defendant's electronic devices, as well as Chinese language documents found at the defendant's residence. Such documents include, but are not limited to, USAO_000200 (and other iterations of this document found elsewhere in discovery) and USAO_002047. The government does not believe that such testimony constitutes expert testimony and is disclosing it here out of an abundance of caution. The government will provide final translations of any Chinese language

documents that it intends to use at trial sufficiently in advance of the trial, but no later than the agreed-upon deadline for disclosing trial exhibits.  The government will disclose the identity of its translators at that time.

Please contact the undersigned Assistant U.S. Attorneys if you have any questions.

Very truly yours,

NATHANIEL R.  MENDELL
Acting United States Attorney

By:    /s/ Jason A. Casey
       Jason A. Casey
       James R. Drabick
       Assistant U.S.  Attorneys

Enclosure