<pre>
 1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2

 3
                                      )
 4   UNITED STATES OF AMERICA,         )
                                      )
 5          Plaintiff,                 )
                                      )   Criminal Action
 6   v.                                )   No. 1:20-cr-10111-RWZ-1
                                      )
 7   CHARLES LIEBER,                   )
                                      )
 8          Defendant.                 )
                                      )
 9


10


11               BEFORE THE HONORABLE RYA W. ZOBEL
                   UNITED STATES DISTRICT JUDGE
12


13                          JURY TRIAL
                             DAY 2
14


15                      December 15, 2021
                          9:00 a.m.
16


17           John J. Moakley United States Courthouse
                      Courtroom No. 12
18                    One Courthouse Way
                  Boston, Massachusetts 02210
19


20


21


22             Linda Walsh, RPR, CRR
                 Official Court Reporter
23       John J. Moakley United States Courthouse
             One Courthouse Way, Room 5205
24            Boston, Massachusetts 02210
                lwalshsteno@gmail.com
25
</pre>

1    APPEARANCES:

2    On Behalf of the Government:

3         UNITED STATES ATTORNEY'S OFFICE
          By: AUSA James R. Drabick
4             AUSA Jason A. Casey
          1 Courthouse Way, Suite 9200
5         Boston, Massachusetts 02210
          617-748-3498
6         james.drabick@usdoj.gov

7

8    On Behalf of the Defendant:

9         MUKASEY FRENCHMAN
          By: Marc L. Mukasey, Esq.
10            Torrey K. Young, Esq.
              Catherine M. Deist, Esq.
              Stephanie Guaba, Esq.
11        570 Lexington Avenue, Suite 3500
          New York, New York 10022
12        212-466-6400
          marc.mukasey@mfsllp.com

13

14

15

16                  Proceedings reported and produced
                     by computer-aided stenography.
17

18

19

20

21

22

23

24

25

```
 1                              INDEX

 2   WITNESS                    DIRECT   CROSS  REDIRECT  RECROSS

 3   JENNIFER PONTING

 4       By Mr. Casey             2-52           2-125
         By Ms. Young                    2-109            2-127
 5
     JEREMY BLOXHAM
 6
         By Mr. Casey            2-130           2-155
 7       By Ms. Deist                   2-153

 8   RENEE DONLON

 9       By Mr. Drabick          2-156

10                         E X H I B I T S

11                          DESCRIPTION              RECEIVED

12   GOVERNMENT EXHIBITS

13      2      ...........................................   2-56

14      61     ...........................................   2-140

15      63     ...........................................   2-144

16      65     ...........................................   2-148

17      104    ...........................................   2-67

18      108    ...........................................   2-76

19                          DESCRIPTION              RECEIVED

20   DEFENDANT EXHIBITS

21      JT     ...........................................   2-122

22      JS     ...........................................   2-119

23                                                       PAGE

24   Government Opening Statement By Mr. Drabick.............   2-27

25   Defendant Opening Statement By Mr. Mukasey..............   2-42
```

```
 1                    P R O C E E D I N G S
 2              (Jury is not present for the following)
 3              THE CLERK:  All rise, please.
 4              THE COURT:  Good morning.  Please be seated.
 5              Counsel for the defense asked for a meeting pertaining
 6    to a motion that was filed sometime in the middle of the night.
 7              MS. YOUNG:  Yes, Your Honor.
 8              THE COURT:  And you're, Ms. Deist?
 9              MS. YOUNG:  Ms. Young.
10              THE COURT:  I'm sorry?
11              MS. YOUNG:  Young.
12              THE COURT:  Sorry.  And you are going to argue it?
13              MS. YOUNG:  Yes, Your Honor.
14              THE COURT:  What's the government's view?
15              MR. DRABICK:  Your Honor, well, on the motion itself
16    there is a -- they proposed to introduce notes that were not
17    taken by the -- one of the witnesses we will call this morning.
18    We anticipate calling Jennifer Ponting to testify about the
19    defendant's interview regarding the Thousand Talents Program
20    and his affiliation with WUT.  Ms. Ponting did not take notes
21    during that interview; however, a colleague of hers did.
22              THE COURT:  This is the interview on the day of his
23    arrest?
24              MR. DRABICK:  No.  This is an interview that took
25    place in late 2019 after NIH had sent a letter to Harvard.
```

```
1              THE COURT:  Before the long interview?

2              MR. DRABICK:  Before the long arrest interview, yes,

3    Your Honor.

4              And it is during that interview that the defendant

5    told Harvard University that he did not and had never

6    participated in the Thousand Talents Program, and we anticipate

7    Ms. Ponting will testify about that interview.

8              A colleague of hers took notes during that interview.

9    We understand the defense intends to attempt to offer into

10   evidence the notes of her colleague.  We object, Your Honor.

11   They're hearsay.  They are not the defendant's own statement,

12   and there is no admissible basis.  We understand the defendant

13   will argue that they are impeachment by contradiction but, Your

14   Honor, they remain hearsay, and they're not the defendant's

15   statements and are not admissible for that purpose.

16             THE COURT:  Okay.  I'll hear you, Ms. Young.

17             MS. YOUNG:  Thank you, Your Honor.

18             First, this is not being offered for the truth of the

19   matter asserted.  They are not hearsay.  They are being offered

20   to demonstrate a contradiction, a contradiction between the

21   statement as alleged in Count 2 and the existence of those

22   words having come out of Professor Lieber's mouth.  That is a

23   contradiction.  It's not for the truth of the matter.

24             And then, second, as far as whether it's being

25   introduced as impeachment, it's not for impeachment for
```

1  credibility under 608(b) but rather it's impeachment of

2  contradiction which is a common law doctrine.

3          THE COURT:  Impeachment for contradiction of what?

4          MS. YOUNG:  Yes.  It's a common law doctrine.  We have

5  case law cited from the First Circuit, US v. Perez, 72 F3d. 224

6  which recognizes this doctrine.  It allows you to bring in

7  extrinsic evidence for the purpose of demonstrating a

8  contradiction that goes to a material element.

9          Here, since he's charged with a false statement, this

10 goes squarely to at least one, if not two or three, elements.

11 One, the statement --

12         THE COURT:  Excuse me one moment.  Why are we dealing

13 with this now?  I mean, I have no context in which --

14 concerning -- wait a minute.

15         I have no context to decide this because I've heard no

16 evidence yet.

17         MS. YOUNG:  Yes, Your Honor.  We wanted to raise it

18 now because it's going to come up with the very first witness,

19 and we -- on cross-examination, and so we wanted to at least

20 foreshadow it for you rather than in front of a jury.

21         THE COURT:  Who's the first witness?

22         MS. YOUNG:  Jennifer Ponting, I understand.

23         MR. DRABICK:  Yes, Your Honor.  The first witness will

24 be a Jennifer Ponting, a former Harvard University employee.

25 She will be testifying, among other things, about the interview

1    she conducted of the defendant in which the defendant denied

2    participating in the Thousand Talents Plan which made its way

3    into Harvard's letter to the National Institutes of Health.

4              THE COURT:  Why shouldn't I hear and then based on

5    their testimony decide whether this document that you want to

6    offer comes in?  I mean, I have no context at the moment to

7    deal with it.

8              MS. YOUNG:  Understood, Your Honor.

9              THE COURT:  Okay.  So that -- everybody agrees.  Well,

10   that's very nice.  So I don't know if all the jurors are here

11   yet.

12             THE CLERK:  They're not.  We are down two.

13             THE COURT:  We are still missing two jurors.  We have

14   ten more minutes.  Is there anything else we can do right now

15   or should we just simply recess for ten minutes?

16             MR. DRABICK:  Your Honor, one other issue that we

17   understand -- the defense previewed in their motion, at the end

18   of their motion they noted that they wanted to raise with the

19   Court certain 404(b) evidentiary issues.

20             THE COURT:  Which also come up for the first witness?

21             MR. DRABICK:  There will be some in the first witness,

22   Your Honor.  That witness, Jennifer Ponting, will testify about

23   the interview she conducted with the defendant.  Among the

24   things that she asked the defendant about was generally his

25   affiliation with Wuhan University of Technology.

1          The defendant moves in limine to exclude statements

2     made by the defendant about his affiliation and compensation

3     from Wuhan University and only essentially sought to permit

4     testimony specifically about the Thousand Talents Program.

5     Your Honor denied that motion in Your Honor's order on Monday

6     subject to the actual testimony.

7          We understand that the defense will object when that

8     testimony is raised today.  We reiterate that those additional

9     statements regarding Wuhan are part and parcel of the charged

10    conduct here because the defendant's alleged participation in

11    the Thousand Talents Program was through Wuhan University of

12    Technology, and he was paid for that participation by Wuhan

13    University of Technology.  And so the defendant's statements to

14    Harvard denying that affiliation and denying that payment are

15    part and parcel of the false statements alleged in this case.

16    And, in any event, even if they were not, they go to the

17    defendant's motive and his intent and are admissible under

18    404(b) for that purpose.

19         THE COURT:  The false statements are not just

20    statements to a governmental entity?

21         MR. DRABICK:  The false statements with regard to NIH

22    were caused by the defendant.  Harvard University wrote a

23    letter to NIH that stated the defendant had never and did not

24    participate in the Thousand Talents Program.  That statement

25    was caused by the defendant based on his interview with

1    Ms. Ponting.

2         MR. MUKASEY:  I realize, Judge, that we all have been

3    deeply immersed in this for two years, and it might sound --

4    pardon the pun -- like Chinese to you at this point.

5         I think the issue is this:  The defendant was somehow

6    accused within Harvard and within the government community of

7    participating in this Thousand Talents Program.  This happened

8    sometime in 2018.  He was then interviewed by a number of

9    people.  He was interviewed by the Department of Defense, and

10   that forms the basis of Count 1.

11        Instead of being interviewed by the NIH, which is the

12   basis for Count 2, he was interviewed by a Harvard

13   representative --

14        THE COURT:  Excuse me.  Would people in the back

15   please just either sit down or leave.  It's very distracting to

16   have you wandering around.  So sorry.  Go ahead.

17        MR. MUKASEY:  Yeah, sure.  So Count 1 is a direct

18   statement to the government, to the Department of Defense.

19   Count 2 is a statement that ultimately made its way from

20   Dr. Lieber to NIH but through Harvard as a conduit.

21        Harvard, if you will, did the interview and passed the

22   information to NIH.  The first witness the government is going

23   to call is this Harvard -- former Harvard employee who

24   interviewed Dr. Lieber, together with one of her colleagues,

25   and then wrote up a letter to NIH and said this is what Lieber

1    says and it's false.  We of course contend that it's not false.

2         So the first witness is a conduit from Dr. Lieber's

3    statements to Harvard to NIH.  She took no notes at this

4    meeting that she had with Dr. Lieber.  Her colleague took

5    notes.  The notes that ultimately formed the basis of the

6    allegedly false statement that went to NIH don't contain the

7    allegations that are in the indictment.  In other words, he

8    said the light was green, according to the indictment.  The

9    notes don't say anything about the color of the light.  I'm

10   being allegorical, obviously.

11        So it's our position that if people were taking notes

12   at that meeting and the notes do not reflect what ultimately is

13   alleged against him in the indictment, those notes have to come

14   in.

15        THE COURT:  But are you suggesting it goes to

16   admissibility or to the value of that document?

17        MR. MUKASEY:  I'm suggesting two things.  Number one,

18   there's no hearsay issue because we are not offering those

19   notes for the truth.  We are offering them to show they don't

20   say anything and the indictment does say something.  Forget

21   about the truth, just the difference.  The reason --

22        THE COURT:  And it is clear from the indictment that

23   it refers to this particular conversation?

24        MR. MUKASEY:  Yes, it is.

25        THE COURT:  Okay.

1              MR. MUKASEY:  That's how it was charged.

2              THE COURT:  I'll get to you.

3              MR. MUKASEY:  That's why we get over the hearsay

4    issue.  We do not allege that we are offering these notes for

5    the truth of the matter asserted.  We are actually offering

6    them to show that they don't say what's in the indictment.

7              Secondly, you might ask, well, how can we impeach a

8    witness with extrinsic evidence, the notes?  608(b) would

9    prevent us, if the witness says I don't recall that, from

10   impeaching her as a liar.  That's extrinsic evidence.  Nobody

11   wants to go down that rabbit hole.

12             But several First Circuit cases, one is called Perez,

13   the other one is called Mullineli, recent cases say that you

14   can impeach with extrinsic evidence, i.e., the notes, when it

15   goes to a material element of the crime.  We're not saying the

16   witness is a liar.  What we're saying is the notes don't match

17   what's in the indictment.  It goes directly to a material

18   substantive element.  That's why the notes have to come in,

19   because they've made an allegation that he said something in an

20   interview, and the notes do not reflect that anywhere.

21             THE COURT:  So does the government object to evidence

22   that the notes don't say anything or do -- I mean, do the notes

23   come in?  Does the defense agree that the notes can come in,

24   that they are in evidence?

25             MR. MUKASEY:  We believe the notes, to the extent

1    that --

2            THE COURT:  I mean, the notes as they exist, are they

3    properly in evidence?  Can they come in?

4            MR. MUKASEY:  Well, I think the government would say

5    they're hearsay.  We say we're not offering them for the truth,

6    and there's another reason they can come in which is this

7    impeachment by contradiction concept that the First Circuit has

8    blessed.

9            MR. DRABICK:  Your Honor, if I may, the government

10   respectfully disagrees with Mr. Mukasey's characterization of

11   the notes as not including the false statement.  The notes are

12   notes.  They're in shorthand.  They describe the discussion and

13   they state very clearly that the defendant did not participate

14   in the Thousand Talents Program; stating that if he had done

15   it, he would have done it with a different university than

16   Wuhan University of Technology.

17           More importantly, the notes are hearsay.  The

18   defendant is seeking to introduce the notes to put in evidence

19   what he said and didn't say during the hearing.  The defendant

20   cannot put in his own hearsay statements.  There's no exception

21   for them, and they're not the witness's notes.  They're the

22   notes of somebody else.

23           If the defendant would like to cross-examine

24   Ms. Ponting about what was said and ask good-faith basis

25   questions about what was said, he is obviously more than free

1    to do that.

2              THE COURT:  Whose notes are they?

3              MR. DRABICK:  They are the notes of Ms. Ponting's

4    colleague, Matthew Fox.

5              THE COURT:  Is he going to be a witness?

6              MR. DRABICK:  We do not anticipate calling Mr. Fox as

7    a witness.  Ms. Ponting has a recollection of what Professor

8    Lieber said and can testify to what he said.  That is the

9    evidence that will undergird the false statements allegation

10   and specifically the false statement allegation --

11             THE COURT:  This is the first witness?

12             MR. DRABICK:  This is the first witness.

13             THE COURT:  Not the author of the document?

14             MR. DRABICK:  Not the author of the document.

15             The defendant is seeking to introduce notes that were

16   not offered by the witness, and they are --

17             THE COURT:  And the government is not offering that

18   other witness or the notes?

19             MR. DRABICK:  We are not offering the notes, and we do

20   not anticipate calling the other witness.  The witness who

21   conducted the interview, who heard what Professor Lieber said

22   and helped draft the letter that Professor Lieber -- and I

23   believe this is an important point, Your Honor.  Professor

24   Lieber --

25             THE COURT:  The government is calling a witness who

```
 1    did not take -- who did not produce the notes that are at
 2    issue; correct?
 3              MR. DRABICK:  Correct.
 4              THE COURT:  And it is not offering the person who did
 5    author the notes that are at issue?
 6              MR. DRABICK:  Correct.
 7              THE COURT:  Whom it does not intend to call?
 8              MR. DRABICK:  Correct, Your Honor.  Because the
 9    notes -- the notes are not an element of the crime.  The crime
10    is what the defendant said, and we will have --
11              THE COURT:  Exactly.  But the notes purport to say
12    what the witness, who wrote the notes, heard theoretically.
13              MR. DRABICK:  The notes are the notes from another
14    person in the room, yes, memorializing what he heard and what
15    also Ms. Ponting heard during the interview.
16              Your Honor, the notes -- we object, because as a
17    technical matter of evidence, these notes are not admissible.
18    But in any event, they are consistent with the government's
19    allegations and they are consistent with the crime that is
20    alleged here.
21              And, Your Honor, one final point on this, the false
22    statement is the statement in the letter ultimately that is
23    charged, the statement that resulted from this interview, and a
24    statement that the defendant reviewed in that letter and did
25    not correct, did not change at all, and authorized to go out to
```

1    the National Institutes of Health.  That is ultimately the

2    false statement at issue in this case.  It was informed by the

3    interview with Ms. Ponting, and she will testify as to what the

4    defendant said.  But the notes from a second person that were

5    not authorized by the witness are hearsay and are inadmissible.

6              MR. MUKASEY:  If I may, what's going --

7              THE COURT:  You may.

8              MR. MUKASEY:  Thank you.  What's going on here is they

9    charge him with a specific false statement.  They have a guy

10   who has notes that are different than that false statement.  So

11   they don't want to call him.  They don't want to call him

12   because --

13             THE COURT:  They don't have to call him.

14             MR. MUKASEY:  Of course they don't have to call him.

15             THE COURT:  You can call him.

16             MR. MUKASEY:  But those notes go directly to the

17   allegation against Dr. Lieber.  They are not being offered for

18   the truth of the matter asserted.  They are being offered for

19   the fact that they don't say what's in the indictment.  They're

20   not being offered to impeach this witness, the non-notetaker.

21             THE COURT:  But if the government doesn't offer them

22   through a witness who did not produce them, how do they come in

23   in the course of that witness's testimony?

24             MR. MUKASEY:  I think they come in because they go to

25   a direct element of the crime, that is, what he said.  Now, she

1   may say she's never read the notes --

2         THE COURT:  But the person who did the -- who prepared

3   these notes had apparently a different view of what the

4   defendant said from what the witness who's going to be on the

5   stand tell us.

6         MR. MUKASEY:  Correct.

7         THE COURT:  So how exactly do the notes come in

8   through the witness -- through the first witness in the case?

9         MR. MUKASEY:  It may be that they come in in a

10  different form.  We may mark them and show them to her and see

11  if she recognizes them, and if she doesn't, we may offer them

12  on our own case.

13        THE COURT:  Okay.  So I don't have to deal with the

14  content of the notes right now because at the moment --

15        MR. MUKASEY:  Unless she says she's seen them.

16        THE COURT:  -- they are not being offered for what's

17  in them?

18        MR. MUKASEY:  Correct.  They are actually being

19  offered for what's not in them.

20        THE COURT:  Okay.

21        MR. MUKASEY:  And what's in them and what's not in the

22  indictment.

23        THE COURT:  I think there is somewhat of a problem is

24  offering the document through a witness who did not produce it.

25  And in any event, I will deal with it depending on what the

1    testimony is.  But I think it doesn't come in right now.

2          MR. MUKASEY:  I think you're right, of course.  I

3    think there's a bigger problem with having notes in the

4    government's possession that don't match what they've charged

5    him with and hiding the witness --

6          THE COURT:  At the moment I can't deal with that

7    because I don't have that evidence yet.

8          MR. MUKASEY:  Okay.  When it arises --

9          THE COURT:  But I appreciate your having raised it so

10   that I can be alerted to it.

11         MR. MUKASEY:  Thank you, Judge.

12         THE COURT:  Thank you.  Is there anything else we

13   should do before the jury comes?  Are they here?

14         THE CLERK:  Yes.

15         MR. DRABICK:  Your Honor, just as a matter of

16   logistics, it might make sense for us to set up the podium now

17   because right after opening statements I understand we will be

18   moving right into evidence.

19         THE COURT:  The defendant has said you are not opening

20   now; right?  You are opening later?

21         MR. MUKASEY:  No, Judge.  We are planning to open

22   right after they do.

23         THE COURT:  So I think we have a fair amount of time

24   before we need to get the courtroom ready for the testimony,

25   and it doesn't take very long to do that, does it?

```
1              MR. CASEY:  We just want to make sure --

2              THE COURT:  I must tell you, I want very much to start

3    with the jury on time because I want them to be here on time.

4    So we're already late, so let's bring them down.

5              (Jury is present in the courtroom.)

6              THE CLERK:  Could I just ask all the jurors to please

7    raise your right hand.

8              You and each of you do solemnly swear or affirm that

9    you will render a true verdict according to evidence given to

10   you?

11             THE COURT:  And the law, too.

12             THE CLERK:  Evidence and law given to you.  I'm sorry.

13             THE JURORS:  Yes.

14             THE CLERK:  Thank you.  You can be seated.  I have

15   your notebooks to take notes, and after you're done, you can

16   leave them on your chairs.  Okay.

17             THE COURT:  Members of the jury, let me very briefly

18   outline to you what a trial looks like.  First of all, with

19   respect to the notes, those of you who want to take notes -- in

20   fact, every one of you who's going to use the notebook in any

21   way, please put on the outside of the book your name.

22             THE CLERK:  I'm sorry.  I put all their numbers on for

23   them.

24             THE COURT:  You did?

25             THE CLERK:  Yes, last night when I set them out.
```

```
1              THE COURT:  Ms. Urso is so efficient.
2              And at the end of the day and during the recess please
3    just leave the notebooks on your seat.  We promise not to check
4    on them overnight, but we would just like to keep them all
5    together.  At the end of the trial you will be free to take
6    them home with you.
7              And those of you who take notes, I do have one
8    request.  When you deliberate on your verdict, you will rely on
9    your memory of what the witnesses said, you will likely also
10   want to look at the notebooks for those of you who took the
11   notes, and sometimes there is a difference between what a
12   person remembers and what another person wrote down.  Just
13   because it's written down does not necessarily mean that the
14   memory is -- should be overridden by what's written down.
15   Sometimes our memory is better than what somebody else wrote
16   down, which requires some little bit of interpretation in any
17   event.  So that's just a caution when you come to deliberate on
18   your verdict, but you're welcome to take notes from now until
19   the end of the trial.  Although, I must tell you, my experience
20   is that while jurors take more notes on the first day, by day
21   three or four it's a whole lot less.  So that's another reason
22   to rely on your memory, perhaps even more.
23             A trial in a criminal case starts by the defendant
24   being told that we're about to go to trial.  The government has
25   the burden of proof.  It has to offer evidence to show that
```

each of the -- claims that each of the charges that it has
lodged against the defendant -- there are three of them in this
case -- is supported by that evidence.  So the government will
call witnesses.  It will offer evidence.  With respect to each
witness, the defendant has an opportunity to question that
witness, in addition to the government's questioning the
witness, in order to show that the witness either doesn't know
what he or she purports to know or that they are lying or for
any number of other reasons, enlightening, broadening whatever
the witness said before.

        Both the government's questions and the defendant's
questions are very important to you in ultimately judging
whether you believe what the witness said.  That's your main
job when you come to deliberate on the verdict, is to determine
what the evidence in the case is, and you do that by reviewing
the testimony and by reviewing the exhibits and making your
judgment about how much you believe of what any of that
evidence purports to show.  So that's your judgment and
ultimately will result in your verdict in this case.

        The way the trial will proceed is that the government
will offer a series of witnesses.  It will question them in
what we call a direct examination.  The defense has an
opportunity to cross-examine to try to show that the witness
either doesn't know what they purported to know, that
they -- their memory isn't very good, that they're lying, any

1    number of things.  It's the job of the defense to --
2    sometimes they use the government's witnesses to enhance their
3    own -- their own positions in the case.
4         We will have two rounds.  The government will call a
5    witness, defense cross-examines, the government can have a
6    redirect examination, and then there would be a recross, and
7    that's it.  Then we stop and go to the next witness.
8         When the government finishes presenting to you all the
9    evidence that it has, all the witnesses and all of the
10   exhibits, which may be documents of various kinds and sometimes
11   other kinds of things, then it is for the defense to decide
12   whether they want to offer evidence.
13        In this regard it is very important for you to
14   remember that when a person has been accused by the government
15   of having committed a crime, that person does not have to do
16   anything at all to try to show that they're innocent.  It is
17   entirely up to the government to prove that person guilty
18   beyond a reasonable doubt.  That is the burden of the
19   government.
20        And the defendant can say to the government, You
21   accused me.  You prove it.  I'm not going to do anything else.
22   I'm not going to offer any evidence because I don't have to.
23   And then you would have to judge whether the evidence of the
24   government is sufficient to prove to you beyond a reasonable
25   doubt that the defendant is guilty of whatever offense --

1    whatever count in the indictment you're looking at at that

2    moment.

3           The defendant of course does have an opportunity, if

4    he wishes, to offer evidence in support of his position in this

5    case.  And this is a reasonably complicated bunch of things

6    that happen.  So you need to listen carefully to what the

7    government offers and equally carefully both to the

8    cross-examination of the witnesses of the government but to any

9    witnesses that the defense may offer.  I don't know now whether

10   that will be the case, whether they will offer any, but just to

11   prime you, they don't have to.  The government is -- it's

12   entirely the government's burden to prove guilt.

13          Now, the -- and we do that in a way in which I just

14   described.  For purposes of your sort of, I guess, comfort, we

15   will probably stop about every half hour, 45 minutes and just

16   stretch.  We don't go anywhere.  We will have a recess at about

17   11:00, sort of halfway through the morning.

18          And, Ms. Urso, who is incredibly efficient, despite

19   the fact that our cafeteria is only operating at half speed at

20   the moment, has organized to get some refreshments and coffee

21   while we take a recess, which will take about 15 minutes, and

22   then we come back refreshed for the rest of the day.  We will

23   quit promptly at 1:00, just as we start promptly at 9:00.  I

24   did have to have a meeting with counsel earlier about some

25   evidentiary issues and failed to look at the clock.  So I

1    apologize for that.  But we will try very much to be absolutely

2    on time.  So that's how the trial will proceed.

3            After all the evidence has been presented, then I meet

4    with counsel to tell them what I will tell you about the law.

5    And when -- after the evidence is finished and I have met with

6    counsel and decided finally what I will tell you the law is,

7    then counsel will address you, first the government and then

8    the defendant, to remind you of what the evidence is and to

9    urge you to find for each of them.

10           I will then give you what I understand to be the law,

11   and then you will get a verdict form that will say for

12   each -- there are six counts, but there are three separate

13   kinds of counts -- what the law is as to them, and you will

14   then have to check either that you find guilty or not guilty.

15   And that will be your verdict in this case.

16           We will reassemble in the courtroom for you to give us

17   this -- to present to us your verdict, and that will then be

18   the end of the case.

19           So are there any questions about the process that we

20   are going to adhere to now and follow?

21           (No response.)

22           THE COURT:  So, very briefly, there are three separate

23   crimes charged in this case.

24           Counts 1 and 2 say that the defendant, Dr. Lieber --

25   he has a title, Dr. Lieber.  I'm sorry if I say Mister.  It is

1   sort of my democratic views that everybody is the same that

2   makes me do that, and I apologize -- that he made false

3   statements to the Department of Defense, United States

4   Department of Defense, particularly that he was never asked to

5   participate in China's Thousand Talents Program.

6          I think there is probably not much dispute about the

7   fact that he had an arrangement with some Chinese -- I don't

8   know whether it was a governmental group or whatever, whatever

9   the evidence is -- he had an interest in some work in China,

10  that he pursued in China for which he got paid.  But the

11  details of it, you will need to listen very carefully to the

12  evidence because I honestly do not know what they are and nor

13  would I gain to tell you what they are because that is for you

14  ultimately to determine.

15         And -- so Count 1 is that he made these false

16  statements to the Department of Defense.  And you will have a

17  copy of the indictment at various times.  Does the defense

18  object to each juror having a copy of the indictment?

19         MR. MUKASEY:  May we consider that as we move on,

20  Judge?

21         THE COURT:  Think about it.

22         MR. MUKASEY:  Thank you.

23         THE COURT:  And alternatively we need to have some

24  kind of a document because it is reasonably complicated.

25         MR. MUKASEY:  Sure, of course.

1          THE COURT:  Thank you.

2          So we will get you a document that outlines -- at

3    least outlines what the charges are.  And there are six

4    separate ones and each one is called a count.

5          So Count 1 says the defendant made false statements to

6    the Department of Defense concerning that he was never asked to

7    be a member of the group that China had formed called the

8    Thousand Talents Program.  That's the essence of that.  And the

9    government says that is a crime under the federal criminal law.

10         Count 2 says that he caused Harvard, who was his

11   employer during this period of time, to falsely state to the

12   National Institutes of Health that he was not and has never

13   participated in that program, Thousand Talents Program.

14         Harvard -- Dr. Lieber apparently also got -- and this

15   is not in the indictment but from what I have learned about the

16   case -- he also received money from the United States

17   government as -- for the work that he was doing, but that money

18   had to be funneled through Harvard.  If Harvard asked for it,

19   it would have to file statements about -- concerning what

20   Dr. Lieber was doing and that he was not getting any foreign

21   money.  And so Harvard told the Federal Government that he

22   wasn't getting foreign money because it was, according to the

23   indictment, misled by him.  So that's the second count, making

24   false statements.

25         Counts 3 and 4 pertain to statements that he made

1   to -- his failure to include certain monies that he received

2   from the Chinese government in his tax returns to the U.S.

3   government.  And Count 3 pertains to the report for tax year

4   2013, and Count 4 tax year 2014.

5           Counts 5 and 6 charge him with the failure to provide

6   a report to the U.S. government that he had certain

7   financial -- bank accounts and financial accounts in China as a

8   result of the payments that were being made.

9           And counts -- these were again for -- counts -- for

10  the years 2014 and 2015 he failed to let the U.S. government

11  know that he had bank accounts in China that each exceeded

12  $10,000 during this period of time.

13          That's the essence of the accusations against him.

14  And the government, as I said before, will have to prove each

15  and every element of those, which I will not outline to you

16  right now because it gets too complicated at the beginning of

17  the trial to try to tell you about the elements of this.  I may

18  in the course of the trial, if I deem it appropriate, outline a

19  little bit more of the details of these, but you will have, as

20  soon as we can produce them, a copy of the entire indictment

21  and you can read it and you can see.  It doesn't outline the

22  elements either, but you will certainly begin to understand

23  what this case is about as soon as the evidence begins.

24          But before the evidence begins, we will hear from, as

25  I said, first from the government as to what its case is all

1    about and then from the defense as to what the defense is all

2    about.

3              So unless there is anything that counsel has objected

4    to what I said or want me to add anything, I think we're ready

5    to go with counsel.

6              MR. DRABICK:  Yes, Your Honor.  Thank you.  Your

7    Honor, may we ask the jurors in the back row that they can --

8              THE COURT:  Did I introduce all counsel?

9              THE CLERK:  Yes.

10             MR. DRABICK:  For the screens.

11             THE CLERK:  For the screens?

12             MR. DRABICK:  Yes.  Thank you, Ms. Urso.

13             Ms. Urso, the screens in the front, if they can raise

14   them, they also can.

15             THE COURT:  You may proceed.

16             MR. DRABICK:  Thank you, Your Honor.

17                     GOVERNMENT OPENING STATEMENT

18   BY MR. DRABICK:

19        Ladies and gentlemen, this case is about false statements,

20   false tax returns, and an unreported bank account in China.

21        In April of 2018, the defendant, chemistry professor

22   Charles Lieber was interviewed by criminal investigators from

23   the Department of Defense who wanted to find out if the

24   defendant had an affiliation with China's Thousand Talents

25   Program, a program they understood paid scientists to bring

1   overseas scientific and technological knowledge to China, and a

2   program that threatened the integrity of the research grants

3   that the Department of Defense had awarded to universities.

4   The defendant did not tell them the truth during that

5   interview.

6       Seven months later, another federal funding agency, the

7   National Institutes of Health, sent a letter to the defendant's

8   employer similarly asking about the defendant's affiliation

9   with China's Thousand Talents Program.  In an interview, the

10  defendant again did not tell the truth.

11      Instead, during those interviews, the defendant variously

12  stated that he was never explicitly asked to participate in the

13  program, that he never did participate in the program, and that

14  he wasn't sure how China categorized him.

15      The evidence in this case, including videotaped statements

16  of the defendant, is going to prove that he was asked to

17  participate, that he did participate, and that he definitely

18  knew how China categorized him, namely, as a member of the

19  Thousand Talents Program.

20      And because those statements were important to the

21  Department of Defense and the National Institutes of Health,

22  they were also crimes.

23      Now, in connection with his participation in the Thousand

24  Talents Program, the defendant was also paid tens of thousands

25  of dollars.  And you will hear him say in those videotaped

1    statements that he brought back a portion of that money in cash
2    to the United States and that a portion was deposited into a
3    bank account in China opened for him.  But he did not report
4    any of that money on his taxes, and he did not report that bank
5    account to the Federal Government as he was required to do.
6    Those were also crimes.
7        Good morning.  My name is J.R. Drabick.  My co-counsel,
8    Jason Casey, and I are the prosecutors representing the United
9    States in this case.  At government table with us is Paul
10   Bruemmer from our office, and he is going to be helping present
11   exhibits on our screens.  This our opportunity to preview for
12   you the evidence we anticipate offering in this case.
13       So let me introduce some of the other names you're going
14   to hear.  The first is the defendant, Charles Lieber.  He's a
15   professor at Harvard University, and he ran something called
16   the Lieber Research Group where he supervised and advised a
17   group of students engaged in nanoscience research.
18       You're also going to hear about the Department of Defense
19   and the National Institutes of Health, both are U.S. federal
20   government agencies, and together they provide billions of
21   dollars in research grants to institutions in the United
22   States.  And you're going to hear that during the relevant time
23   frame of this case, they also provided millions of dollars to
24   fund the defendant's research.
25       You're also going to hear about a university in Wuhan,

1    China, called the Wuhan University of Technology, also known as

2    WUT for purposes of this trial.  WUT and the defendant had a

3    close relationship from 2011 through 2015, a relationship that

4    ultimately took the form of the defendant's participation in

5    China's Thousand Talents Program.

6        Now, you're going to hear that in 2018, the Department of

7    Defense and the National Institutes of Health were concerned

8    about the Thousand Talents Program, which they understood to be

9    a program that China had adopted to attract overseas scientists

10   to China, to help China obtain foreign technology and know-how

11   for the benefit of China's economy.

12       You'll hear that the Department of Defense and National

13   Institutes of Health understood that to attract members to this

14   program, such as prominent professors, the Thousand Talents

15   Program paid its participants and funded their research.

16       Now, participating in the Thousand Talents Program is not

17   itself a crime, but the Department of Defense and NIH were

18   concerned that the program was affecting the integrity of the

19   grants they had awarded to research institutions.  For example,

20   they were concerned about whether researchers were being paid

21   twice for the same research.  And they were concerned whether

22   researchers were sharing information without permission.

23       Now, this case can be broken into two distinct time

24   frames.  The first is 2011 through 2015, the period that the

25   defendant was a participant in the Thousand Talents Program.

1    And the second is 2018 into early 2019 when he was asked about

2    that participation by the Department of Defense and NIH.

3         Let's start with the first time frame.  A key figure in

4    this time frame is going to be an individual name Liquiang Mai,

5    who was a professor at WUT and who had also done research in

6    the defendant's lab.  Between 2011 and 2015 Professor Mai and

7    the defendant had a close working relationship.

8         A FBI agent is going to take the stand and walk you

9    through dozens of email exchanges between them reflecting that

10   relationship, emails showing how they worked to advance each

11   other's goals.  And the key to that relationship for their

12   mutual benefit was the defendant's participation in the

13   Thousand Talents Program.

14        You're going to see that the defendant was first advised

15   of his acceptance into the program in April of 2012.  Professor

16   Mai sent him a congratulatory email on behalf of the president

17   of WUT advising him that he had been, quote, approved and

18   awarded into the one thousand plan of foreign experts.  And

19   you're going to see the defendant's response expressing his

20   sincere thanks to the president of WUT.

21        And then the defendant and WUT negotiated a contract, and

22   you're going to see that contract, which will be evidence of

23   the defendant's state of mind, his knowledge, and his intent

24   when he was later questioned by DoD and NIH.  An employment

25   contract of one thousand talents high-level foreign experts

2-32

1    between Wuhan University of Technology and the defendant,

2    Charles Lieber.  It was a contract that had a three-year term

3    that set forth certain employment tasks for the defendant,

4    including mentoring WUT students and helping them publish

5    articles in internationally renowned journals and publishing

6    high-level articles in journals himself in the name of WUT, all

7    with the goal of making WUT itself a renowned university.

8        The contract further called for the defendant to work from

9    WUT for not less than nine months per year, but the defendant

10   negotiated language allowing him the flexibility to perform his

11   work primarily from the United States.

12       The contract also called for WUT to conduct regular

13   evaluations of his performance.  And in exchange for all of

14   this, the defendant was to get paid, to get paid up to $50,000

15   per month based on the actual amount of work performed.

16       In 2012, the defendant put in plan a motion -- put in

17   motion a plan to sign that agreement.  You'll see that he

18   specifically wrote to Professor Liquiang Mai, I apologize for

19   the delay in responding on the one thousand plan agreement.  I

20   think this revised version which addresses the previous

21   concerns we discussed at Harvard is good.  How should we

22   proceed with completing (signing).  Best regards, Charlie.

23       Now, ultimately the plan for signing that agreement

24   involved sending physical signed copies to China.  So while you

25   will not see a signed contract in this trial, you will see that

1    the defendant and WUT then did what the contract called for,

2    and that consistent with the contract, the defendant visited

3    Wuhan periodically while doing the bulk of his work from the

4    United States.

5         An FBI agent will show you across many emails between 2012

6    and 2015 that the defendant reviewed and advised on papers by

7    WUT students and faculty, that he took in and mentored WUT

8    students in his own lab, and that he allowed himself to be

9    identified as associated with WUT in his own published papers.

10        The emails will also show time and again that WUT referred

11   to the defendant as a member of the Thousand Talents Program in

12   their emails.  And you will see that when Professor Mai asked

13   the defendant to do things specifically for his Thousand

14   Talents Program evaluations, the defendant did them.  Things as

15   simple as providing an image of his passport to Professor Mai

16   and WUT, to the more significant, such as adding Chinese grants

17   to the acknowledgments in one of his published papers.

18        The evidence is also going to show that the defendant was

19   paid tens of thousands of dollars for his work.  In October

20   2012, just as his participation was beginning, you will see

21   that the defendant told WUT exactly how he wanted to be paid.

22   He wanted half his money in cash when he visited Wuhan and half

23   deposited into a bank account at the Industrial and Commercial

24   Bank of China, or ICBC, that was set up for him.  And as his

25   work continued over the next two years, you will see him

1    reiterate that that was his preferred arrangement.

2         For example, in 2014, as he was preparing to visit Wuhan,

3    he told Professor Mai, I am writing to touch base on several

4    items prior to my visit near the end of February.  Number 4,

5    salary.  I would like to receive one half of salary for current

6    period in U.S. dollars with remainder deposited into the bank

7    account that was set up.  Best regards, Charlie.

8         Evidence of that bank account was found in the defendant's

9    home, specifically account opening documents for an account at

10   ICBC in the defendant's name.  The defendant also had a debit

11   card from that same bank, which he referred to as his Chinese

12   bank card when discussing it with the staff of the Lieber

13   Research Group.

14        The defendant also had a motive for participating in the

15   Thousand Talents Program beyond the money.  The defendant had a

16   goal, enhanced recognition and ultimately a Nobel prize.  He

17   sought WUT's assistance with a nomination toward that goal,

18   which he described as, quote, very important to him, and,

19   quote, one of the most important things.

20        Now, WUT also got some things out of the deal.  The

21   defendant is a world-leading chemist and a pioneer in the field

22   of nanotechnology.  And WUT got to use the defendant's name to

23   promote itself and receive the benefit of his advice and

24   mentorship throughout the relevant time period.  WUT even

25   continued to use his name after their contract ended.  You'll

1    see that that work ended in 2015.

2        Harvard administrators discovered that WUT was using

3    Harvard's name on a lab called the WUT - Harvard Joint Nano Key

4    Laboratory.  Because Harvard did not authorize its name to be

5    used, a Harvard dean asked the defendant about it.  The

6    defendant led the dean to believe that he and Professor Mai --

7        MR. MUKASEY:  Objection.  Objection pursuant to some

8    of the 404(b) that we identified early before the trial

9    started.

10       THE COURT:  I'll allow it to stand.  You may proceed.

11       MR. DRABICK:  Thank you, Your Honor.

12   BY MR. DRABICK:

13       The defendant led the dean to believe that he and

14   Professor Mai had only an informal collaboration, and that

15   Professor Mai, when he named the lab, had gone beyond what the

16   defendant had agreed to.  You will see this is not true.  Not

17   only did the defendant have an employment arrangement with WUT,

18   he allowed WUT to use Harvard's name, even affiliating himself

19   with the WUT - Harvard Joint Lab in his own publications.

20       Instead of sharing the truth with the dean, the defendant

21   emailed Professor Mai telling WUT to stop using Harvard's name.

22   In other words, the defendant locked in a false story, a story

23   that misrepresented to Harvard his relationship with WUT, which

24   brings us to 2018.

25       Two investigators from the Department of Defense will tell

1    you that in April of 2018 they received information suggesting

2    the defendant had an affiliation with WUT and the Thousand

3    Talents Program.  Because the defendant had active grants with

4    the Department of Defense at the time, they set up an interview

5    to ask him about it.  Their goal was to find out if the

6    defendant was then or ever had been a participant in the

7    Thousand Talents Program.  This was important information to

8    the Department of Defense because it could affect the integrity

9    of the grants that the department had awarded to fund the

10   defendant's research.

11       In his email, the defendant stated he was worried about

12   the interview, and the defendant also knew, as you will hear in

13   his videotaped statements, that funding from the Thousand

14   Talents Program was a big no no.  The defendant knew he had to

15   tell the truth or face criminal consequences because he had

16   acknowledged as much when he applied for DoD and NIH grants.

17       The defendant, however, had already misled Harvard and two

18   Harvard representatives were in the interview with him.  And so

19   you will see in the evidence that he chose again to not tell

20   the truth.  Instead, he told the Department of Defense

21   investigators that he had never been explicitly asked to be a

22   Thousand Talents Program member and added that he wasn't sure

23   how China categorized him.

24       But all the emails you will see reflecting his contract,

25   reflecting his work, and reflecting WUT's repeated

1    identification of him as a Thousand Talents Program member will

2    prove that both of these statements were false.  And they were

3    false statements that had an impact because based on his

4    answers, the Department of Defense closed down their inquiry.

5        Seven months later, in November of 2018, a different

6    federal agency came knocking, this time the National Institutes

7    of Health.  Dr. Michael Lauer, the deputy director for

8    extramural research at NIH, will tell you that the defendant

9    had a prestigious Pioneer award that was funding the

10   defendant's research.

11       Similar to the Department of Defense, NIH had received

12   information suggesting the defendant had an affiliation with

13   WUT and the Thousand Talents Program.  Dr. Lauer emailed

14   Harvard in late November 2018 identifying the defendant's

15   suspected affiliations and noting that they may have caused

16   Harvard to fail to comply with NIH's policies regarding foreign

17   support.

18       The Harvard employee who took the lead role in drafting

19   Harvard's response will tell you that she interviewed the

20   defendant about NIH's allegations.  In that interview, the

21   defendant provided a different story than the one he had told

22   the Department of Defense investigators only months earlier.

23   The defendant told Harvard that he had been asked to

24   participate in the Thousand Talents Program, something he had

25   denied to the Department of Defense investigators.  The

1    defendant, however, also told Harvard that he had declined

2    those invitations and never participated in the Thousand

3    Talents Program.

4        Based on this denial, Harvard in turn prepared a letter to

5    NIH.  In that letter Harvard denied the defendant's

6    participation in the Thousand Talents Program, writing,

7    Dr. Lieber has represented that he is not and has never been a

8    participant in China's Thousand People Plan, which you will

9    hear meant the Thousand Talents Program.  The defendant closely

10   reviewed this letter before it went out and did not correct

11   that statement.  As with the statements -- the defendant's

12   statements to the Department of Defense, this statement was

13   false.  And Dr. Lauer is going to tell you that this false

14   statement was important to NIH, that after he received this

15   letter and based on that denial, he closed NIH's review.

16       A year later, however, two FBI agents interviewed the

17   defendant.  We are going to play exchanges from that interview

18   for you where the defendant admits many key facts in this case.

19   For example, you will hear the defendant state that he was

20   asked to participate in the program, that WUT, quote, claimed

21   they were going to pay him and, quote, probably I did, quote,

22   sign a Thousand Talents Program document at Wuhan.  You will

23   hear him explain that he did so when he was younger and stupid

24   and that really the reason at that time was because he, quote,

25   wanted to be recognized, quote, for what he had done for

1   science, that he wanted a Nobel prize.

2       He will also explain that he believed he was targeted for

3   the Thousand Talents Program, quote, because of his name.  And

4   he will admit that he, quote, helped WUT raise the level of

5   their university really significantly in China.

6       When asked about being paid, you will hear him say that he

7   received in cash, quote, maybe $10,000 or $20,000 each time he

8   visited.  And that in total, quote, it could be more than

9   $50,000.  He will describe being given hundred dollar bills and

10  tell you that he gave the cash to his wife and that the money

11  was spent on living expenses.  When asked to confirm that he

12  didn't pay taxes on the money, you will hear him acknowledge

13  that, quote, that's obviously illegal.

14      You will also hear him talk about the bank account in

15  China.  He will confirm that WUT set it up.  He will tell you

16  that he recalls checking the balance in 2014 and believing it

17  had approximately $200,000 in it.  And he will tell you that he

18  and his wife tried to check the account in 2017 when they were

19  concerned about his health.  You will also hear him talk about

20  his conduct overall stating, quote, I shouldn't have had an

21  agreement and accepted money.

22      And when he was asked about whether he had purposely

23  evaded the Department of Defense investigators, you will hear

24  him say, You are right, and yes.

25      For his conduct the defendant is charged with six crimes.

1    Counts 1 and 2 charge the defendant with false statements; that

2    is, that the defendant knowingly and willfully made or caused

3    to be made material false statements to the Department of

4    Defense and National Institutes of Health.  I anticipate that

5    Judge Zobel will instruct you that a false statement is

6    material if it was capable of influencing a decision-maker.  In

7    this case, decision-makers are the Department of Defense and

8    NIH.  You will meet them, and they will tell you his false

9    statements are important because they were trying to protect

10   the integrity of their taxpayer grants.

11       Counts 3 and 4 charges the defendant with filing false tax

12   returns.  You are going to see the defendant's tax returns.

13   And the evidence will show that the defendant failed to report

14   any of his income from China in either 2013 and -- or 2014 on

15   those tax returns, which he signed under the penalties of

16   perjury.

17       And, finally, Counts 5 and 6 charge the defendant with

18   failing to file reports of foreign bank and financial accounts,

19   also known as FBARs, F-B-A-R.  These are reports that must be

20   filed with the Federal Government when an individual has a bank

21   account in a foreign country with more than $10,000 in it.  The

22   evidence will show that the defendant never reported his ICBC

23   bank account to the Federal Government as he was required to do

24   and as he knew he was required to do.  These intentional

25   failures were crimes.

1      Ladies and gentlemen, this trial is going to last

2  approximately a week but is going to cover conduct stretching

3  from 2011 through 2019.  Witnesses from Harvard and various

4  federal agencies are going to testify, and you are going to see

5  dozens of emails, some of them straightforward about things

6  like salary, some of them more complex about academic research.

7      Through it all, I ask you to use your common sense as you

8  evaluate the evidence, evidence that is going to prove beyond a

9  reasonable doubt that the defendant was asked to participate

10  and did participate in the Thousand Talents Program, that the

11  defendant knowingly and willfully and falsely said the opposite

12  to the Department of Defense and NIH, that the defendant

13  received salary that he failed to report on his taxes, and that

14  the defendant had a bank account in China with over $10,000 in

15  it that he failed to report to the Federal Government.

16      Because the evidence will prove these things, we will

17  return to you at the end of the trial and ask you to return the

18  verdict consistent with the evidence, the only verdict

19  consistent with the evidence, guilty on all counts.

20      Thank you.

21          THE COURT:  Members of the jury, this is a good time

22  to stretch.

23          (Stretch break.)

24          THE COURT:  Are you ready?

25          MR. MUKASEY:  Yes, Judge.

1           THE COURT:  Okay.  You may proceed.

2                  DEFENDANT OPENING STATEMENT

3      BY MR. MUKASEY:

4           This case is not about Charlie in China.  This case is

5      about careless conduct in Cambridge.  You see, ladies and

6      gentlemen, if you're going to blow into somebody's office at

7      6:30 in the morning, handcuff them behind the back, send 25

8      agents to their house and bring the full force of the U.S.

9      government down on them because you think they made false

10     statements, well, you'd damn better well have those statements.

11     Let me say it again.  You'd better have those statements, you'd

12     better have the interview statement, you'd better have the

13     written statement, you'd better have the bank statement, you'd

14     better have the tax statement, you'd better have the income

15     statement, you'd better have intentional false statements or

16     you have no case.  And the government doesn't have any of it.

17          What the government does have is a heaping pile of eight-,

18     nine-, ten-year-old emails.  They have a bunch of phantom

19     witnesses in China, and they have a hot mess of documents from

20     China.  And none of it even matters to this case because even

21     if you believe all the old emails from China, even if you

22     believe the invisible witnesses in China, and even if you

23     believe that Charlie was somehow in this Thousand Talents

24     Program in China, Charlie's charged with making false

25     statements over in Cambridge, and the government will not be

1    able to prove in this case those charged false statements.  And

2    with no false statements, there are no crimes.  That's why

3    Charlie Lieber pleaded not guilty.  That's him saying I am

4    innocent.  I am not, I am not guilty.

5        If I could take a moment to reintroduce myself.  My name

6    is Marc Mukasey.  The smart people on our team is Torrey Young,

7    Catherine Deist, Stephanie Guaba, and Sal Chan.  Together it's

8    our privilege and our responsibility to represent Charlie

9    Lieber in this case.

10       I ask Charlie to stand up and take off your mask for a

11   quick second so you can see him.

12       Thank you very much.

13       Let me tell you what the evidence is going to show in this

14   case.  You probably know by now, Charlie's 62 years old.  He

15   has not been in the best of health for the past ten years.

16   He's fighting a devastating illness, but he's not here asking

17   for anybody's sympathy.  It's enough for Charlie if you keep an

18   open mind, if you apply the law, and you make the government

19   prove its case beyond a reasonable doubt.

20       Now, you heard that Charlie was a professor at Harvard.

21   And just to be clear, he wasn't one of those kinds of

22   professors who stands in front of a big lecture hall teaching

23   Chemistry 101.  He did that for a while but not recently.

24       Charlie was a research scientist.  He did research in a

25   laboratory with a group of very advanced, like super genius

1    kind of students, and they were doing some really serious

2    cutting-edge research.  What they were doing is using tiny

3    structures called nanowires to help improve the way people

4    fight brain diseases and addiction and brain injuries, and they

5    were making pretty incredible progress.

6         Now, it was super important work, but it wasn't top

7    secret.  It wasn't classified.  It wasn't confidential.  In

8    fact, Charlie published all his findings in scientific

9    journals.  All of his work was available on Google and meant to

10   be shared with the world.

11        Now, another thing you have to know about Charlie is that

12   he was a complete workaholic.  He was very tough on himself.

13   Sometimes he was tough on the students and staff that he worked

14   with because he held himself to extremely high standards.

15   Charlie was in the lab six days a week, 12 hours a day.  He

16   loved the science and he loved the research.  And Charlie's

17   other great love was his students.  He had a passion for

18   training the next generation of scientists.

19        Charlie is not one of those guys that we all probably know

20   who climbs up the ladder of success and then yanks it up with

21   him so no one else can come with him.  Charlie extended the

22   ladder to his students so they could climb up and build their

23   own incredibly successful careers.

24        And like almost every professor at Harvard and elsewhere,

25   Charlie visited other schools around the U.S. and around the

1    world, and he gave lectures and he mentored students and he

2    gave advice and he traveled all over the place.  He never

3    really stayed for more than three or four days at a time, but

4    he traveled to Israel and he traveled to Korea and he traveled

5    to Canada and, as you heard, he traveled to China.  And it was

6    the trips to China that caused the raid on his home, that

7    caused the raid on his office, and that brought this case down

8    on him.

9         Now, let's be clear about the following:

10        The proof is going to show in this case there is nothing

11   illegal about China.  There's nothing illegal about giving

12   advice to students in China.  There's nothing illegal about

13   giving a lecture in China.  There's nothing illegal about

14   getting an award in China.  There's nothing illegal about being

15   paid in China.  There's nothing illegal about being elected to

16   the Academy of Science in China.  And there's not even anything

17   illegal with being in the Thousand Talents Program in China.

18        But China caught the government's attention in this case,

19   and they wanted to know if Charlie had some secret arrangement

20   with this Thousand Talents Program.  So Charlie sat down for

21   interviews voluntarily with all sorts of people, anybody and

22   everybody who wanted to talk to him, even after he was

23   arrested.  He was interviewed by a whole bunch of people across

24   the river in Cambridge.  He spoke with people from the

25   government.  He spoke with people from Harvard.  He spoke with

1   people who threw questions at him about things that happened

2   ten years ago.  He spoke with people who are really looking out

3   for themselves and not for Charlie.  He spoke with people who

4   didn't even understand the topics they were asking about.  He

5   spoke with people who heard what they wanted to hear.  He spoke

6   with people who didn't write down the questions that they asked

7   or the answers that Charlie gave.  Let me say that again slowly

8   and clearly.  People who the government will call as witnesses

9   in this case didn't even write down the statements that Charlie

10  is on trial for.  That's why we say this case is not about

11  Charlie and China.  It's about careless conduct in Cambridge.

12       Now, in all these interviews that he gave, Charlie tried

13  to be as clear and honest and complete and truthful as you

14  could possibly be when you're asked about an email from eight

15  years ago or a document you barely remember or a bank account

16  you never even used.  But at one point the questions became so

17  confused and so muddled and so out of left field that Charlie

18  actually told one of the interviewers that he might have done

19  something wrong or illegal.  Well, the proof is going to show

20  that he didn't.

21       That was just Charlie being overly tough on himself.  In

22  the lab and in life, Charlie is his own toughest critic.  He

23  beats himself up pretty good in the lab, and he beats himself

24  up pretty good in life even when he's really done nothing

25  wrong.

1          The bottom line, ladies and gentlemen, is that you will

2     see no proof that Charlie made intentionally false statements

3     to interviewers, that he made no intentionally false statements

4     to the IRS, to banks, or to anybody else.  You will see no

5     proof of specific dates, specific payments, specific amounts,

6     specific receipts or specific records.  You will see no proof

7     that anybody lost money.  You will see no proof that anybody

8     lost research and no proof that anybody got ripped off.  You

9     will see no villains in this case, and you will see no victims

10    in this case.

11         What you will see is that on every charge in this case, on

12    every statement, the government's proof is mangled or made up

13    or meddled with or mishandled or misguided or mistaken or just

14    plain missing.

15         That day a year or so ago, almost two years ago, when the

16    FBI raided Charlie's home and office, they turned off one of

17    the leading lights in the world of science.  But today in this

18    courtroom there's a light that still shines because today in

19    this courtroom Charlie Lieber is presumed innocent, and that

20    presumption of innocence is the brightest light we have in the

21    justice system.  It's the north star of the criminal law.  And

22    it means that Charlie Lieber is presumed innocent as this trial

23    begins.  He's presumed innocent all the way through the

24    evidence, and he's presumed innocent even when you go back to

25    start your deliberations in this jury room.  Only if the

 1    government can prove their case beyond a reasonable doubt can
 2    that presumption of innocence be overcome.
 3         Now, beyond a reasonable doubt, as Judge Zobel is --
 4         THE COURT:  I will explain it.
 5    BY MR. MUKASEY:
 6         She will explain it.  It's the highest standard we have in
 7    the law, and that's because this is the most serious kind of
 8    case we have in the law.  It requires that the government
 9    deliver proof on each count of the intentional false statement
10    that is charged.
11         THE COURT:  -- to the defendant's evidence.
12    BY MR. MUKASEY:
13         The government simply doesn't have it.  If there was a
14    Nobel prize for inventing something out of nothing, the
15    government's case would win it.  At the end of this trial, the
16    evidence will prove that Charlie Lieber did not make any
17    criminal false statements and he is not guilty.
18         THE COURT:  Thank you.
19         MR. MUKASEY:  Thank you.
20         THE COURT:  Members of the jury, I think the important
21    thing for me to remind you about is that when you deliberate on
22    your verdict, it will have to be based on the evidence.  The
23    evidence is not what you heard from counsel just now.  It is
24    what you will hear from witnesses and what you will see from
25    exhibits that have been offered, documents of various kinds,

1    and I don't know what else there is, but that is the evidence

2    in the case.  It is on that on which you have to base your

3    verdict in the end.  I will continue to remind you about that

4    because it's not an easy concept.  There will be a lot of

5    talking to you, but in the end it is what the witnesses tell

6    you, what the documents tell you, or any other exhibits tell

7    you that will have to be the basis of your verdict.

8              Let us take another stretch while counsel get

9    organized to call the first witness.

10             (Stretch break.)

11             THE COURT:  Members of the jury, before I ask counsel

12   to offer the first witness, let me introduce the court staff.

13   Ms. Urso, is called the courtroom deputy, and her job is to

14   take care of scheduling all of my court -- well, all hearings,

15   all decisions having to do with anything -- any cases assigned

16   to me.  There are a number of judges in this court, and the

17   computer assigns cases to each judge.  And most cases have a

18   fair amount of work to do in them, and they have lots of papers

19   in them, and now on the computer, but it is she who goes

20   through it all.  And when something comes in I need to deal

21   with, it comes straight up to my office and I deal with it.

22       Ms. Walsh is the court reporter.  She has probably the

23   most difficult job in the courtroom, more difficult even than

24   counsel, because she has to take everything down and ultimately

25   be able to transcribe it into a form that we can read, too.

1    Hers is all, you know, sort of funny reduced words that she

2    understands, but we certainly would not.  But without her we

3    don't have a real trial because we always need to look back or

4    may have to look back to what the trial was all about.  If

5    somebody doesn't remember something, she's able to look it up.

6         The two women at the other end are my law clerks.  Amy

7    Pearlman and Kate Bergin are lawyers who come -- traditionally,

8    judges here hire law students; that is, people who have just

9    graduated from law school.  I stopped doing that a while ago

10   because I found that people who had done some practice of the

11   law are far better equipped to help me and far better able to

12   learn themselves than somebody who has just graduated from law

13   school.  So both of them are lawyers who practiced law and are

14   now spending a year here learning from everything that goes on,

15   and this is their first trial.

16        I must say, I think it's my first trial in about a

17   year and a half or so also.  We just were unable to do anything

18   during the misgivings of the pandemic.  So we're catching up

19   and hopefully remembering what we need to to remember and doing

20   it right.

21        So we will now start the evidence in the case.  What

22   you just heard in the opening statement is not evidence, and

23   you must not render your verdict based on what counsel said.

24   You will need to base it on what the witnesses say and what you

25   see and perceive from any exhibits that are offered and entered

1    into the case.  So who's your first witness?

2            MR. CASEY:  The Government is calling

3    Jennifer Ponting.

4            THE COURT:  Is she in the Courtroom?

5            MR. CASEY:  She is.

6            THE COURT:  Would you please come over here and step

7    into the witness box.  Try not to be totally hidden by that big

8    fat book.

9            THE WITNESS:  I'll do my best.

10           THE COURT:  Remain standing for the moment to take the

11   oath.

12           THE CLERK:  Please raise your right hand.

13           (Witness sworn.)

14           THE WITNESS:  I do.

15           THE CLERK:  Could you please state your name, please,

16   spelling your last name for the record, please.

17           THE WITNESS:  Jennifer Ponting, P, as in Peter,

18   o-n-t-i-n-g.

19           THE CLERK:  Thank you.

20           THE COURT:  Please be seated.

21           THE WITNESS:  Thank you.

22           THE COURT:  You may proceed.

23           MR. CASEY:  Thank you, Your Honor.

24           JENNIFER PONTING, having been duly sworn by the Clerk,

25   was examined and testified as follows:

```
 1                      DIRECT EXAMINATION

 2    BY MR. CASEY:

 3    Q.   Good morning.

 4    A.   Good morning.

 5    Q.   Just make sure you pull the microphone close and keep your

 6    voice up, okay?

 7    A.   Will do.

 8    Q.   Ms. Ponting, where do you work?

 9    A.   I currently work at the University of Chicago.

10    Q.   And how long have you worked there?

11    A.   About two years.

12    Q.   And where did you work before the University of Chicago?

13    A.   I worked at Harvard University.

14    Q.   And how long did you work at Harvard?

15    A.   Just under ten years.

16    Q.   Okay.

17              THE COURT:  How long?

18              THE WITNESS:  Ten.

19    Q.   Ten years?

20    A.   Ten years, correct.

21    Q.   And approximately when did you leave Harvard?

22    A.   I left in August of 2019.

23    Q.   And what was your title at Harvard when you left in August

24    of 2019?

25    A.   I was the Director of Pre-Award Services in the Office of
```

 1   Sponsored Programs.

 2   Q.   How long did you hold that position?

 3   A.   About four years.

 4   Q.   Before becoming Director of Pre-Award Services in the

 5   Office of Sponsored Programs, did you hold other positions in

 6   the Office of Sponsored Programs?

 7   A.   Yes.   I was always an OSP, but I had two previous

 8   positions, one grant contractor negotiator position, and I had

 9   an assistant director title as well.

10   Q.   What is the Office of Sponsored Programs?

11   A.   The Office of Sponsored Programs, or OSP as we call it, is

12   actually the central administration office that's responsible

13   for research administration at Harvard.   What that really means

14   is Harvard gets hundreds of millions of dollars for research,

15   and we have a big office that assists the University and the

16   researchers and the staff manage, achieve and get research

17   dollars.

18   Q.   You said you were the Director of Pre-Award services.

19   What is Pre-Award Services?

20   A.   Right.   So Pre-Award is basically anything that happens

21   pre the award, except when it's not.   So that means reviewing

22   proposals that are submitted to research organizations, people

23   that give Harvard money; and then also negotiating the contract

24   or the agreement that comes to the University so that we can

25   get the money; and then assisting in the facilitation of that

1    project on the administrative side, so contracts and approvals,

2    et cetera.

3    Q.   Are you familiar with an individual named Charles Lieber?

4    A.   I am.

5    Q.   And how are you familiar with him?

6    A.   Dr. Lieber was a faculty member at Harvard when I was also

7    there.

8    Q.   Did he work in a particular department?

9    A.   Yes, he worked at Chemistry and Chemical Biology.

10   Q.   Have you ever met Dr. Lieber in person?

11   A.   I have not.

12   Q.   While you were at Harvard, did you exchange emails with

13   Dr. Lieber?

14   A.   I did.

15   Q.   Do you see Dr. Lieber in the Courtroom today?

16   A.   I do.

17   Q.   Could you just point to him and identify him by an article

18   of clothing, please?

19   A.   Sure.  He's the gentleman in the dark suit sitting in the

20   middle of the --

21              THE COURT:  He's one of many people wearing a suit.

22              THE WITNESS:  Yes.

23              MR. CASEY:  Well, hopefully, Your Honor, the record

24   will reflect that the witness has identified the Defendant.

25              MR. MUKASEY:  We stipulate that this is Dr. Lieber.

 1              MR. CASEY:  Thank you.

 2   BY MR. CASEY:

 3   Q.   I'm going to focus your attention on November 30th of

 4   2019.  Did a particular matter concerning Dr. Lieber come to

 5   your attention on that date --

 6   A.   Yes.

 7   Q.   -- or around that date?

 8   A.   Yes.

 9   Q.   Okay.  And what was it that came to your attention?

10   A.   The University received a letter from the National

11   Institutes of Health suggesting that the University could be in

12   a position to have noncompliance related to research grants and

13   identified Dr. Lieber in that letter.

14   Q.   Okay.  Was another Harvard faculty member mentioned in the

15   letter as well?

16   A.   There was another faculty member, yes.

17   Q.   And how did that letter come to your attention?

18   A.   The letter was sent to one of our school offices for the

19   Faculty of Arts and Sciences, and it was sent over to me

20   because of my role in the Office of Sponsored Programs.

21   Q.   Sent via email?

22   A.   Yes.

23   Q.   And did you review the email and the letter when you

24   received it?

25   A.   I did.

```
1               MR. CASEY:  Mr. Bruemmer, could I please have

2      Exhibit 2, not in evidence, just for counsel and the witness,

3      please, and the Judge.

4               THE COURT:  Is there objection to the admissibility of

5      that, so we can skip this?

6               THE CLERK:  Okay.

7               MR. CASEY:  Thank you.  Permission to publish,

8      Your Honor.

9               (Government Exhibit 2 received in evidence.)

10              THE COURT:  Members of the jury, the usual drill is

11     that counsel offers a document or whatever it is into evidence,

12     there may be objection to it, and then I have to rule on it;

13     and until it is in evidence, you should not see it because you

14     may not see it in the end if it doesn't ever get into evidence.

15     But this document is agreed to be appropriate and in evidence,

16     so we might as well skip some of the unnecessary baggage.

17     Q.   Ms. Ponting, do you see Exhibit 2 on the monitor in front

18     you?

19     A.   I do.

20     Q.   And I'll point out as well, you have a binder with

21     exhibits.  If you're more comfortable with the hard-copy

22     exhibits, you can turn to the tab.

23     A.   We'll see how this goes.

24              MR. CASEY:  Thank you.

25              THE COURT:  Excuse me.  Do all of the jurors see it on
```

1    their screen?

2            THE JURORS:  Yes.

3            THE COURT:  If you ever have a problem, raise your

4    hand, and we'll try to fix it.

5    Q.   What is Exhibit 2?

6    A.   Exhibit 2 is an email from Dr. Michael Lauer to a

7    colleague of mine at Harvard, Nuala McGowan.

8    Q.   And is this the email that you just referred to having

9    received on or about November 30th, 2019, concerning

10   Dr. Lieber?

11   A.   It is.

12           MR. CASEY:  Okay.  And Mr. Bruemmer, if you could just

13   highlight for the jury and the witness the "To, From" and "Re"

14   subject lines, please.

15   BY MR. CASEY:

16   Q.   Ms. Ponting, could you just read who this email is from,

17   please?

18   A.   It's from Michael Lauer, MD, the NIH Deputy Director for

19   Extramural Research, and that's the -- that's the same.

20   Q.   Can you read the subject line as well?

21   A.   Sure.  "Failure to Disclose Outside Research Support

22   Relevant Affiliations or Foreign Component."

23           MR. CASEY:  Thank you.

24           And Mr. Bruemmer, could you just highlight the first

25   full sentence under, "Dear Ms. McGowan."

1    Q.   Ms. Ponting, could you read that sentence for the jury,

2    please?

3    A.   "It has come to our attention that there are issues of

4    potential noncompliance with NIH policies regarding disclosure

5    of outside research support and relevant affiliations or

6    foreign components at Harvard University."

7              MR. CASEY:  Okay.  Thank you.

8              And Mr. Bruemmer, could you highlight the very bottom

9    of the exhibit, beginning with "NIH has"?

10   Q.   And Ms. Ponting, could you read that for the jury as well,

11   please?

12   A.   "NIH has become aware that applications submitted to the

13   NIH for investigators named below may have failed to comply

14   with the above policies regarding other support, disclosing

15   foreign financial interests and/or obtaining NIH prior approval

16   for the use of foreign components on NIH awards."

17             MS. YOUNG:  Objection.  404(b).

18             THE COURT:  I'm sorry?

19             MS. YOUNG:  404(b).

20             THE COURT:  The document is in evidence.  What's the

21   objection?

22             MS. YOUNG:  404(b) discussion from earlier,

23   Your Honor.

24             THE COURT:  I don't understand that.  Sorry.  The

25   objection is overruled.

1    Q.   And could you begin reading the first bullet point, and

2    then we'll go to the next page?

3    A.   "Dr. Charles M. Lieber, Professor and Chair of the

4    Department of Chemistry and Chemical Biology at Harvard

5    University served as principal investigator on two active NIH

6    awards."

7            MR. CASEY:  Mr. Bruemmer, could you go to the next

8    page, please.

9    Q.   And before we highlight anything, do you see this

10   redaction here on Page 2 of Exhibit 2?

11   A.   Yes.

12   Q.   And was that redaction present when you received this

13   email from Dr. Lauer back in November, 2019?

14   A.   No, it was not.

15   Q.   And just generally, speaking what was in place of that

16   redaction?

17   A.   That redaction is pertaining to the other faculty member

18   that was identified in this letter.

19           MR. CASEY:  Thank you.

20           And Mr. Bruemmer, could you just highlight the top

21   portion there?

22   Q.   And Ms. Ponting, can you read that portion of Dr. Lauer's

23   email?

24   A.   Sure.  It starts with numbers affiliated with his awards,

25   and then it says, "Dr. Lieber also holds an affiliation at

1    Wuhan University of Technology in China.  Dr. Lieber was

2    selected as a foreign expert for China's Thousand People Plan,

3    which may have included a stipend from the Chinese government,

4    along with the position at Wuhan University of Technology.

5    Several of Dr. Lieber's NIH-supported publications were also

6    supported by foreign awards, suggesting a collaboration.

7    Harvard University may have failed to fully disclose

8    Dr. Lieber's affiliation with Wuhan University of Technology

9    and the foreign performance of the awarded projects in

10   applications and progress reports, which designated Dr. Lieber

11   as the principal investigator or key personnel."

12            MR. CASEY:  Thank you.

13            And Mr. Bruemmer, if you could just now highlight the

14   last two paragraph there, please.

15   BY MR. CASEY:

16   Q.   Ms. Ponting, could you just go ahead and read the first

17   two sentences there, please?

18   A.   "Please review these issues and confirm that these

19   investigators and Harvard University complied with the policy

20   cited above.  If any instances of noncompliance are identified

21   or suspected, please also provide a detailed description of the

22   issue and corrective actions taken."

23   Q.   Ms. Ponting what, if anything, were you asked to do in

24   response to this letter, Exhibit 2?

25   A.   So, obviously, we had an obligation to respond to the

1    Government after we received this letter, and so I was asked to
2    lead the inquiry and figure out all the information that we
3    needed to respond and then to respond.
4    Q.   Why do you say you had an obligation to respond to NIH's
5    inquiry?
6    A.   Well, the letter requires a written response within
7    30 days.  We're the recipient of a lot of Federal funding, and
8    that comes with obligations to do that.
9    Q.   Okay.  You said you gathered some information in response
10   to this letter; correct?
11   A.   We did, yes.
12   Q.   What sources of information did you look to?
13   A.   We first started at all of the information in our
14   grants-management system.  That's the system that we use to
15   manage all of our awards.  We then looked at information in our
16   financial conflict of interest system, as well as information
17   in what's called faculty-activity reporting, so sources of
18   information that we at the University that might have been
19   relevant to respond to this inquiry.
20   Q.   Was anyone else at Harvard assigned to help you with this?
21   A.   Yes.  So I worked very closely with the Office of the
22   Vice-Provost for Research.  It's a team approach.
23   Q.   Okay.  And were any specific individuals from that Office
24   assigned to help you?
25   A.   Yes.  So I worked with two of the Compliance Officers in

1    that group, and that was Matthew Fox and Rachel Tarantino.

2    Q.   Aside from the Office of the Vice-Provost for Research,

3    were any other offices or departments at Harvard involved in

4    preparing a response to Exhibit 2?

5    A.   We also consulted the Office of General Counsel, and of

6    course we were working with the departments and the faculty

7    members on these issues as well.

8    Q.   What is the Office of General Counsel?

9    A.   It's the legal office for Harvard University.

10   Q.   Is that OGC for short?

11   A.   It is.

12   Q.   And why was OGC involved in preparing this response?

13   A.   So, as you can see in the letter, the University's

14   compliance and obligations as the recipient of Federal awards

15   was being questioned, so any questions of law or interpretation

16   of regulation, we always consult our legal counsel.

17   Q.   So it's fair to say the first thing you did was consult

18   the various records that you described a few moments ago?

19   A.   Yeah, that's where we started.  We also had a pretty tight

20   timeline.

21   Q.   Fair enough.  Was there a particular time period that you

22   were focused on in terms of the records that you were looking

23   to obtain and review?

24   A.   Yeah, we were going back about six years, so at the time

25   that would have been 2012, 2011.  We were trying to cast as

1   wide a net as possible.

2   Q.   So approximately 2012 to the present, which at that point

3   was 2018?

4   A.   Yes.

5   Q.   All right.  And, again, can you describe what the purpose

6   of seeking and obtaining and reviewing those records were, what

7   it was you were trying to do?

8   A.   Sure.  There was three very clear issues that were

9   identified in the letter, and so what we wanted to do was make

10  sure that we understood maybe why they were identifying these

11  issues and what information we had to either respond positively

12  or negatively to the letter.  When we reviewed the letter from

13  NIH, these were the sources of information that we knew we had,

14  and so we knew that they were going to be relevant to the

15  response.

16  Q.   Okay.  Did you receive any emails from Dr. Lieber that

17  were relevant to generating your response?

18  A.   We did.  So Dr. Lieber was notified, and then we started a

19  dialogue to make sure that we had all the information.

20  Q.   Did you receive any emails from prior points in time,

21  prior to 2018, that were authored by Dr. Lieber?

22  A.   Oh, yes, we did.

23  Q.   Okay.  And can you just describe generally what those

24  emails were?

25  A.   We received an email about a previous --

1          MR. MUKASEY:  Objection.

2          THE COURT:  What's the objection?

3          MS. YOUNG:  This is going to be the 404(b), again,

4     from the emails from earlier.

5          THE COURT:  You're not objecting to the summary;

6     you're objecting to the fact that she's talking about it at

7     all?

8          MS. YOUNG:  Yes, Your Honor.

9          THE COURT:  The objection is overruled.

10    Q.   Would you like me to repeat the question?

11    A.   Sure.

12    Q.   Just generally, the emails you received about or from

13    Dr. Lieber, what did those concern?

14    A.   One of the things that we received was I received back-up

15    documentation, including emails from Dr. Lieber, about a matter

16    that we thought was related from April, 2018.  It involved a

17    discussion that we had with the Department of Defense.

18          THE COURT:  Excuse me.  Is the Government planning to

19    offer all of these documents?

20          MR. CASEY:  Momentarily, yes.

21          THE COURT:  Okay.

22    BY MR. CASEY:

23    Q.   Did you also set up an interview with Dr. Lieber?

24          THE COURT:  Excuse me one moment.

25          Members of the jury, when we're talking about the

1    document and the contents of the documents, it is appropriate

2    for the witness to give us the summary because she dealt with

3    it, and she's talking about what she did it with as well as the

4    document itself.

5              But, to the extent that the contents of the document

6    is important to you in deciding the verdict, you need to rely

7    on the document itself and not on her interpretation of it.

8    But her interpretation of it to explain what she did is

9    entirely appropriate because what she did is also important to

10   your verdict.

11             MR. CASEY:  Thank you, Your Honor.

12   MR. CASEY:

13   Q.   Did you also set up an interview with Dr. Lieber?

14   A.   Yes, we did.

15   Q.   And how did you go about setting up that meeting with

16   Dr. Lieber?

17   A.   Like I set up all my meetings, I sent him an email.

18   Q.   And do you recall how he reacted to your email?

19   A.   He was very frustrated when I initially sent the email.

20   Q.   Did he ultimately agree to meet you, however?

21   A.   He did, of course.

22   Q.   Before the interview, did you or Mr. Fox or anyone that

23   you were working with prepare anything for Dr. Lieber to

24   review?

25   A.   We did.  We prepared a series of questions that we wanted

1    to make sure we went over during the interview, and we sent him

2    a copy of those questions in advance of our meeting.

3              MR. CASEY:  Mr. Bruemmer, could I please have

4    Exhibit 104?  This is not in evidence.  Take it down.

5              Exhibit 104, Mr. Bruemmer, please.

6    Q.   Do you recognize Exhibit 104, Ms. Ponting?

7              THE CLERK:  Wait a minute.  I'm sorry.  One sec.

8              THE COURT:  It says "104."

9              THE CLERK:  Is that --

10             THE WITNESS:  Yes.

11             THE CLERK:  Oh, I'm sorry.

12   MR. CASEY:

13   Q.   Do you recognize this exhibit?

14   A.   Yes.

15   Q.   And what is it?

16   A.   This is an -- it looks to be an email chain based

17   on -- from Dr. Lieber and me and some others setting up the

18   time to meet to talk about the letter.

19   Q.   Now, do you see the email at the bottom of Page 1 of

20   Exhibit 104?

21   A.   Yes.

22   Q.   You might find it helpful to open your binder to

23   Exhibit 104, if you don't mind.

24   A.   Yep.

25   Q.   Do you have it in front of you?

1    A.    Yes.

2    Q.    So the email on the bottom of Page 1 of Exhibit 104 that

3    goes on to Page 2, is that the list of questions that were

4    provided to Dr. Lieber that you just referenced?

5    A.    It is.

6    Q.    Okay.  And are you copied on that email?

7    A.    I am.

8    Q.    Okay.  And then the top email in the chain, is that an

9    email that you sent to Dr. Lieber and others?

10   A.    It is.

11   Q.    Okay.  Does this appear to be a true and correct copy of

12   your email exchange with Dr. Lieber and others?

13   A.    It is.

14            MR. CASEY:  Your Honor, I offer Exhibit 104.

15            THE COURT:  No objection?

16            Okay, it's in evidence.

17            MR. CASEY:  Thank you.

18            (Government Exhibit 104 received in evidence.)

19   BY MR. CASEY:

20   Q.    So let's go, actually, all the way to the third to last

21   page, I believe Page 6.

22            Do you see the email chain -- or the email, rather,

23   from Michael Lauer at the bottom of Page 6 of Exhibit 104?

24   A.    Yes.

25   Q.    Okay.  Is that the email from Dr. Lauer we just reviewed

1    in Exhibit 2?

2    A.   It is.  It's the same -- it's a copy of that sent to

3    Dr. Lieber.

4    Q.   And if we could go to Page 5, please.

5         Do you see the email at the bottom here of that page

6    of Exhibit 106 -- or 104, rather?

7    A.   Yes.

8    Q.   And what is that email?

9    A.   This is an email from Denise Moody letting Dr. Lieber know

10   that we received this and asking him for some information that

11   we needed to kind of start our response.

12   Q.   And then the email above that, do you recognize that

13   email?

14   A.   Yes.  That's an email I wrote.

15        MR. CASEY:  Mr. Bruemmer, could you just highlight

16   the text of the email, please.

17   Q.   Ms. Ponting, could you just read your message to

18   Dr. Lieber here?

19   A.   Sure.  "Dear Professor Lieber, pursuant to the request

20   below, we would like to set up a meeting with you to discuss

21   questions related to the notice from NIH, failure to disclose

22   outside research support, relevant affiliations or foreign

23   components.  This meeting will be with me and Rachel Tarantino

24   and Matthew Fox, Compliance Officers in OVPR, so we can get

25   more information around the substantive issues raised by NIH

1    and provide a response prior to the deadline of 12/30/18.

2    Unfortunately, we did not receive an extension, so we will need

3    to have this meeting prior to the holiday."

4            MR. CASEY:  Mr. Bruemmer, could I have page 4, please?

5            Thank you.

6    Q.   And do you see a response from Dr. Lieber to your email on

7    this page?

8    A.   Yes.

9            MR. CASEY:  Mr. Bruemmer, could you highlight the

10   email in the middle there?  Thank you.

11   Q.   Can you read the first paragraph of Dr. Lieber's email?

12   A.   "Dear Jennifer, I believe we already promptly provided all

13   relevant information to Denise Moody that should address this

14   issue, and honestly I am a bit disappointed in the delay to

15   hear a response that sounds like starting at the beginning

16   again.  I have stressed that I would like this resolved,

17   response sent ASAP and see no reason to delay, given the

18   facts."

19   Q.   Did you understand what he was referring to when he says

20   he's already provided relevant information to Denise Moody?

21   A.   Yes.  So he had provided information to Denise in response

22   to her email previous.  I think it was about a week or so in

23   between.

24           MR. CASEY:  Okay.  And if you could highlight the

25   email at the top of Page 4 of Exhibit 104, please.

1

2  Q.   Is this your email in response to the email you just read

3  from Dr. Lieber?

4  A.   It is.

5  Q.   And could you read that for the jury, please?

6  A.   "Dear Professor Lieber, my apologies for not being more

7  explicit.  This is hopefully the final step in this process.

8  We have all the information from Denise's office, our records

9  in OSP about your portfolio and also from OGC.  The goal of

10  this meeting will be to clarify a few final points/questions,

11  and I will be happy to send them in advance.  The structure of

12  the request from NIH was very specific, and we want to ensure

13  that we address their points in totality so this does not

14  escalate any further.  Let me circle back with you on a time

15  this afternoon."

16  Q.   Why is that you wanted to share the questions with

17  Dr. Lieber in advance?

18  A.   As I said, we were trying to be very responsive to the

19  specific questions that were being asked by NIH, and the

20  benefit of the meeting was to kind of make sure that we wrapped

21  everything up, that we had all of the information.  Providing

22  the information in advance was beneficial to all of us to have

23  a really useful discussion, and also we were trying to be most

24  efficient with everyone's time and especially with our faculty

25  member.

1             MR. CASEY:  Okay.  Mr. Bruemmer, if you could put up

2     Page 1, and could you just highlight the email at the bottom

3     from Mr. Fox.

4     Q.   Do you recognize this email?

5     A.   Yes.  This is the email that my colleague Matthew Fox sent

6     to Dr. Lieber with our questions, as I mentioned to him in the

7     previous email.

8             MR. CASEY:  And Mr. Bruemmer, could you put up Page 2,

9     please.  And could you highlight where it says, "Wuhan

10    University" down to the bottom, please.

11    Q.   And are these the questions that Mr. Fox sent to

12    Dr. Lieber?

13    A.   Yes.

14    Q.   Could you read the first section where it says, "Wuhan

15    University" at the top?

16    A.   "We have talked with OGC about the efforts you have

17    undertaken to get Wuhan University to stop using your name and

18    Harvard's name on their laboratory, and we understand from

19    that, that you've had no connection with that institution since

20    2015."

21             Apologies.

22    Q.   And what appears below that?

23    A.   Then there's the follow-up questions.

24    Q.   Okay.  Can you read the questions for the jury, please?

25    A.   Sure.  "In 2015 and before, did you receive any

1    compensation for your efforts in helping your former postdoc

2    set up the lab?  If so, can you explain why it is not listed on

3    your FCOI disclosures?  Did you have any official appointment

4    or position there?  Please describe what you did with them

5    while you were working with them."

6    Q.   Could you also read Section 2 below that in the

7    corresponding bullet points?

8    A.   Sure.  "Other progressional activities.  We have reviewed

9    your faculty-activity reports and prepared a list of

10   progressional activities outside the U.S., including talks,

11   advisory board memberships, editorial board memberships and

12   conferences you helped organize.  For each of these, did you

13   receive any compensation, including travel, honorary or

14   otherwise?  If so, can you explain why it was not listed on

15   your FCOI disclosures?"

16        MR. MUKASEY:  I'm sorry, Your Honor.  I don't want to

17   interrupt, but we are really getting away from the charged

18   conduct and very much into the 404(b) that we have identified

19   over and over again.

20        THE COURT:  Well, this is the examination of this

21   witness.  This is what she's describing how she got to where we

22   are or I guess where she got to.

23        MR. MUKASEY:  I think we may ask for an instruction

24   about how this should really be appreciated.

25        THE COURT:  Members of the jury, I am as unschooled in

1   the evidence of this case as you are.  I haven't heard it

2   before either.  What the Defendant is objecting to is that this

3   is going beyond the scope of what the indictment charges.  But

4   I will allow the evidence in, and I will allow the Government

5   to continue briefly because it sets the stage for what

6   ultimately happens, and the background is sometimes as

7   important as the main course itself, so briefly.

8              MR. CASEY:  Thank you.  I will be brief, Your Honor.

9              THE COURT:  My interpretation of briefly, not yours.

10             MR. CASEY:  Fair enough.  I think I understand your

11   interpretation.

12             THE COURT:  Thank you.

13   MR. CASEY:

14   Q.   I think you were about to read, Ms. Ponting, the second

15   bullet point in the middle of this highlight here under -- in

16   Subsection II.  Could you read that second bullet point,

17   please?

18   A.   "Have you participated in the Chinese government's

19   Thousand Talents Program?  If so, please describe your

20   participation.  Did it result in any compensation of any kind?"

21             MR. CASEY:  And Mr. Bruemmer, if you could go to

22   Page 1 again, please.

23   Q.   Did Dr. Lieber respond to that email?

24   A.   He did.

25             MR. CASEY:  Could you highlight the email in the

1    middle, please.

2    Q.    Is that Dr. Lieber's response?

3    A.    It is.

4    Q.    And does he note here that he made written notes to all of

5    the questions that we just read?

6    A.    He does.

7    Q.    Did you ask Dr. Lieber to send you his written responses

8    to the questions?

9    A.    I did not.

10   Q.    And why not?

11   A.    The point of the meeting was truly to have a discussion

12   about it and to make sure that he was prepared to have that

13   discussion.  I did not think it was relevant at the time or at

14   all in these kind of situations to have someone spend a lot of

15   time preparing things that we were then going to talk about.

16   Q.    Did you subsequently meet with Dr. Lieber?

17   A.    We did.

18   Q.    And do you recall when that meeting took place?

19   A.    Sometime after that email was sent.

20   Q.    Shortly after?

21   A.    Shortly after.  I think it was the next day, actually.

22   Q.    All right.  And where did the meeting take place?

23   A.    We went to Dr. Lieber's office on campus.

24   Q.    And do you recall who was in attendance during that

25   meeting?

```
 1    A.    Yes.  It was me and Matthew Fox and also of course
 2    Dr. Lieber and Kathleen Ledyard who worked for Dr. Lieber.
 3    Q.    Do you recall how long the meeting lasted?
 4    A.    It was no more than an hour.
 5    Q.    Okay.  And did you ask Dr. Lieber the questions that we
 6    just saw or that you just read in Exhibit 104?
 7    A.    We did.
 8    Q.    And did Dr. Lieber provide verbal responses to those
 9    questions?
10    A.    He did.
11    Q.    What did you do with the information that Dr. Lieber
12    provided you during that meeting?
13    A.    We had taken notes on the meeting, and we used that to
14    prepare the -- to prepare our response and other documentation
15    for our response back to the Government.
16    Q.    Did you take notes?
17    A.    I didn't, actually.
18    Q.    Okay.  You said you used the information to generate a
19    response to the Government.  Did you mean to NIH?
20    A.    Correct.
21    Q.    Okay.  And do you know if a draft of that response was
22    shared with Dr. Lieber?
23    A.    It was.
24          MR. CASEY:  Could I have Exhibit 108, not in evidence?
25    Q.    Do you see Exhibit 108 in front of you?
```

1    A.   I do.

2    Q.   Do you recognize that?

3    A.   Yes.

4    Q.   And what is it?

5    A.   This is also an email chain.  It appears to be

6    Dr. Lieber's response back to Diane Lopez after reviewing the

7    draft response that was sent out.

8    Q.   And is there any attachment to Dr. Lieber's email in

9    Exhibit 108?

10   A.   Yes, there is.

11            MR. CASEY:  Okay.

12            Could you just go to the second page, Mr. Bruemmer.

13   Q.   And what is the attachment?

14   A.   So this is our draft response that we sent him with his

15   comments.

16            MR. CASEY:  Your Honor, I offer Exhibit 108.

17            THE COURT:  No objection?

18            MS. YOUNG:  No, Your Honor.

19            MR. CASEY:  Permission to publish?  Thank you.

20            (Government Exhibit 108 received in evidence.)

21            MR. CASEY:  If you could go to page one, Mr. Bruemmer.

22   BY MR. CASEY:

23   Q.   And can you just describe what's happening in the bottom

24   email here on Exhibit 108?

25   A.   So this letter was sent to Dr. Lieber by, as I said,

1    Diane Lopez, who was the Deputy General Counsel at this time,

2    and basically asking -- telling him where we were in the

3    process and asking him if he wanted to provide any comments.

4            MR. CASEY:  And Mr. Bruemmer, could you highlight the

5    email at the top of the chain?

6    MR. CASEY:

7    Q.   Is this an email from Dr. Lieber?

8    A.   It is.

9    Q.   And are you copied on this as well?

10   A.   I am.

11   Q.   And could you just read Dr. Lieber's email, please?

12   A.   "Dear Diane, I have reviewed the letter.  Overall, I think

13   it is good, but I think there are a few places that should be

14   revised.  I have made comments and revised text using TRK.

15   Please feel free to contact me by email if you have any

16   questions or require further clarifications.  I have also

17   copied my Lab Manager, Dr. Kathleen Ledyard, as she has some

18   key records, i.e. -- e.g., China travel, and has assisted

19   Jennifer in this process when I've been unavailable.  Thank you

20   for very much in advance for addressing these additional

21   clients.  Best regards."

22           MR. CASEY:  If we could put up Page 2, Mr. Bruemmer.

23   MR. CASEY:

24   Q.   And this is the draft that we sent to Dr. Lieber?

25   A.   It is.

1          MR. CASEY:  Okay.  Mr. Bruemmer, if you could

2    highlight the second full paragraph under "Dr. Lieber" and the

3    comment as well on the right.

4    Q.   Could you read that for the jury, please, Ms. Ponting?

5    A.   The paragraph or the --

6    Q.   Just the paragraph -- the text on the left, please.

7    A.   "Your letter makes three specific allegations of

8    noncompliance regarding Dr. Charles M. Lieber, Ph.D.:  One,

9    that he holds an affiliation at the Wuhan University of

10   Technology, WUT, in Beijing, China; two, that he was selected

11   for the Foreign Experts for China's Thousand People Program,

12   which may have included a stipend from the Chinese government

13   in addition to the appointment at WUT; and, three, that several

14   of his NIH-supported publications were also supported by

15   foreign awards, suggesting the possibility of collaboration and

16   foreign components that may not have been fully disclosed.  Our

17   inquiry leads us to conclude that each of these allegations

18   rests on a misunderstanding of the facts, and we will respond

19   in detail to each."

20   Q.   Did Dr. Lieber make any comments to that paragraph?

21   A.   Yes, he correctly identified that we had placed Wuhan

22   University of Technology in Beijing and not Wuhan.

23          MR. CASEY:  Okay.  And Mr. Bruemmer, could you

24   highlight the next paragraph under issue one, as well as issue

25   one, that text?  I'm sorry.  Just this paragraph at the top,

1    please.

2            I'm sorry.  I need the comment as well.  There you go.

3    Thank you very much.

4    BY MR. CASEY:

5    Q.   Can you read the heading to this paragraph and the

6    paragraph that follows it, please?

7    A.   Issue number one:  "Affiliation with Wuhan University of

8    Technology in Wuhan.  Harvard University has no reason to

9    believe that Dr. Lieber has or had an appointment or

10   affiliation of any kind with WUT in recent years.  Dr. Lieber

11   has denied any such association.  In 2012, Dr. Lieber did

12   report to Harvard in his conflict of interest report for that

13   year that he had a visiting scientist appointment at Wuhan

14   University of Technology.  He mistakenly identified the school

15   as Wuhan Institute of Technology in the form.  Dr. Lieber

16   disclosed his visiting appointment as involving a significant

17   financial interest for 2012, the threshold for reporting being

18   $5,000 or greater in a year.  The appointment was not

19   identified by Harvard as preventing a conflict of interest that

20   required further action at that time."

21           Keep going.

22   Q.   Can you read the next sentence as well?

23   A.   "In response to our inquiry, Dr. Lieber reported that he

24   had no formal association with WUT after that time but that WUT

25   continued to falsely exaggerate his involvement with that

1    institution in subsequent years."

2    Q.   Now, what's the source -- that last sentence you just

3    read, what is the source of that information?

4    A.   That was the email communication that we received from the

5    inquiry in April, 2018, with the DoD.

6    Q.   Well, did Dr. Lieber also say that during your meeting

7    with him in December?

8    A.   He did.  It was confirmed.

9          MR. CASEY:  All right.

10          If you could highlight the next paragraph -- or I

11   should ask, actually.

12   Q.   Did Dr. Lieber make any substantive comments to that

13   paragraph or any comments whatsoever to that paragraph?

14   A.   In the document here?

15   Q.   Correct.

16   A.   No.  He just confirmed -- he, again, reconfirmed that we

17   had made an error and a typo.

18          MR. CASEY:  Okay.  If you could highlight the next

19   paragraph at the bottom, please.

20   Q.   And could you read that paragraph, please?

21   A.   "More specifically, Dr. Lieber explained that, when a

22   former postdoctoral fellow from his group, Dr. Liqiang Mai,

23   accepted a position at WUT and began establishing a laboratory

24   there in 2012, Dr. Lieber offered informal advice to him about

25   the equipment to buy to conduct the type of work that he had

1    done before with Dr. Lieber.  After Dr. Lieber offered this

2    assistance to his former postdoctoral fellow, WUT proceeded to

3    use Dr. Lieber's name and Harvard's name without authorization.

4    When Harvard became aware of this unauthorized use of names,

5    Dr. Lieber was asked to direct WUT to stop the use, and he

6    promptly did so, demanding that WUT cease and desist."

7              Then we reference an exhibit.

8              MR. CASEY:  Correct.  Could you go to the next page,

9    please.  Just the top portion, the very top.  Thank you.

10   Q.   And could you just continue reading where it says,

11   "Accordingly"?

12   A.   "Accordingly, Dr. Lieber terminated this relationship with

13   his former postdoc and again demanded that WUT immediately

14   cease and desist from any use of his or Harvard's name."

15             And do you want me to keep going?

16             MR. CASEY:  No.  That's fine for now.

17             Why don't we go to the -- could you highlight the

18   entire issue number two in the middle of the page there and the

19   corresponding comments?

20   Q.   Do you see the highlighted portion here of Exhibit 108?

21   A.   Yes.

22   Q.   Could you read the heading at the very top, please?

23   A.   "Issue number two, Selection as a foreign expert for the

24   Thousand People Plan; and Issue three, Publication Support."

25   Q.   And could you read the next sentence below that?

1   A.    "Dr. Lieber has represented that he is not and has never

2   been a participant in China's Thousand People Plan."

3   Q.    And did you ask Dr. Lieber, during your meeting in

4   December, whether he participated in the Thousand Talents

5   Program?

6   A.    We did.

7   Q.    And by the way, when you say Thousand People's Plan, were

8   you referring to the Thousand Talents Program?

9   A.    Yes.  We were using terminology that was in the original

10  NIH letter, but we made the assumption that they were all the

11  same.

12  Q.    Okay.  And in fact, did you put a footnote on here saying

13  as much?

14  A.    We did, yeah.

15  Q.    And so you asked him that during your meeting; correct?

16  A.    We did.

17  Q.    And what did he tell you?

18  A.    He said that he was not.

19  Q.    Did he elaborate?

20  A.    He did.  He actually explained that the reason -- he had

21  been asked by many institutions to join, and he never agreed to

22  join or participate because they required him being in China

23  for long periods of time, and he was never willing to do that.

24  Q.    Okay.  Did he say during the interview that he ever signed

25  a Thousand Talents agreement of any sort?

1   A.    No.

2   Q.    Did he say whether he had orally agreed to any Thousand

3   Talents agreement?

4   A.    No.  He was very clear that he was -- he had never said

5   yes to that plan.

6   Q.    Okay.  Did Dr. Lieber make any comments to the first

7   sentence on issue number two?

8           MR. MUKASEY:  Judge, can we avoid the leading a little

9   bit, please?

10          MR. CASEY:  My apologies, Your Honor.

11          THE COURT:  Excuse me.  Members of the jury, a leading

12  question is a question that suggests the answer.  I mean, I

13  could ask you, for example, Now, you got up at 7:00 this

14  morning?  That's a leading question.  If I said, What time did

15  you get up, it's not a leading question.  When counsel

16  conducted the direct examination what we call the very first

17  round normally, they are not allowed to ask leading questions.

18          On cross-examine, you will hear a lot of leading

19  questions, usually without objection.  And then there are other

20  reasons why a leading question might be appropriate, but none

21  of them are appropriate right now.

22          MR. CASEY:  Thank you.

23  Q.    Did Dr. Lieber make any comments to the first sentence

24  under issue two?

25  A.    He did.

1  Q.   Do you see that comment here?

2  A.   I do.

3  Q.   Could you read it, please?

4  A.   "Can you make clear that I only visited China for several

5  days to one week each year, as a normal scientific visit,

6  typically presenting scientific talks.  I believe, as I have

7  said previously, that this is an important point.  You do have

8  my travel records, and it hardly constitutes a serious

9  appointment anywhere, as I have 'represented.'"

10  Q.   Why did you use the word "represented" in that first

11  sentence?

12  A.   We used that word because it was based on the fact that

13  Dr. Lieber told us this.

14       MR. MUKASEY:  Objection.  I apologize.  I don't mean

15  to be obstructive.  The question is, Why did you do this?  And

16  the answer is, We did this.  I think she should be asked about

17  what she did, not about what the royal we did.

18       THE COURT:  Okay.  The objection is sustained.

19  MR. CASEY:

20  Q.   Did you draft and/or participate in drafting this first

21  sentence under issue two?

22  A.   I did.

23  Q.   Okay.  And why did you use the word "represented"?

24  A.   I used the word "represented" because Dr. Lieber was the

25  source of this information that we were stating in this letter.

1    Q.    Okay.  Were any of Dr. Lieber's comments to Exhibit 108

2    incorporated into any sort of final draft?

3    A.    They were.

4    Q.    Do you recall which ones?

5    A.    So, we obviously corrected the error about Beijing versus

6    Wuhan, and we did make clarifications and stylistic changes in

7    the language between this draft and the letter that were based

8    and informed on the review of the letter and his comments.

9            MR. CASEY:  Okay.  Could I have Exhibit 133, please?

10           THE COURT:  Is there any possibility that counsel can

11   get through this little phase of admissibility during the

12   recess so that we don't have to stop and then go?

13           MR. CASEY:  We can certainly try.

14           THE COURT:  Well, that would be good.  Thank you.

15   MR. CASEY:

16   Q.    Do you see Exhibit 133 in front of you?

17   A.    Yes.

18   Q.    Do you recognize it?

19   A.    Yes.

20   Q.    And what is it?

21   A.    This is the email that I sent to Michael Lauer at the NIH

22   with the response to the letter of November 30th.

23           MR. CASEY:  Okay.  Your Honor, I move to admit.

24           MR. MUKASEY:  No objection.

25           THE COURT:  My question, members of the jury, had to

1   do with just that.  Counsel are entitled to object if there are

2   reasons to object, and they're very good about not doing it if

3   there are no reasons.  So the Government is very correct in

4   going through all the process of making sure that there is no

5   objection and we can just go forward.  But it's interrupting

6   the flow of things, so during the recess, they will work it out

7   so we eliminate a couple of questions.

8   MR. CASEY:

9   Q.   Ms. Ponting, could you just read -- tell us who this email

10  is to and just read the text, please?

11  A.   This email is to Dr. Michael Lauer at NIH, and it reads,

12  "Dear Mike, thank you again for granting us the extension last

13  month.  Please find attached Harvard's response.  Do not

14  hesitate to reach out with any further questions or concerns."

15          MR. CASEY:  Okay.  If I could have Page 2.

16  MR. CASEY:

17  Q.   What is this?

18  A.   This is the letter that I sent.

19  Q.   And do you see those redactions on Page 2 of Exhibit 133?

20  A.   I do.

21  Q.   And were those redactions present in the original letter

22  response that you sent to Dr. Lauer?

23  A.   No, I did not send a redacted letter.

24  Q.   And what do those redactions pertain to?

25  A.   They pertain to the other faculty member.

1    Q.   All right.  And underneath where it says, "Dr. Lieber," is

2    that, in some and substance, what we just reviewed in the

3    draft?

4    A.   It is.

5              MR. CASEY:  Okay.  And if we could go to the next

6    page, and if you could highlight Section 2 and the first

7    paragraph below that.

8    MR. CASEY:

9    Q.   Again, if you could just read the section heading and the

10   first sentence, please?

11   A.   Sure.  "Selection as a foreign expert for the Thousand

12   People Plan and publication support.  Dr. Lieber has

13   represented that he has not and has never been a participant in

14   China's 'Thousand People Plan.'  During our inquiry, Dr. Lieber

15   informed us that, from June 26, 2007, to January 31st, 2013,

16   Dr." -- I apologize, I will not pronounce this correctly --

17   "Dr. Xiaojie Duan was a postdoctoral fellow of Dr. Lieber's

18   laboratory.  It is Harvard's and Dr. Lieber's understanding

19   that Dr. Duan was fully supported by Dr. Lieber and Harvard

20   during that time and that she drew no funding from the Chinese

21   government.  Upon completion of her postdoctoral fellowship,

22   Dr. Duan accepted an appointment as an assistant professor at

23   Peking University and apparently received a 'national thousand

24   talent and award from China.'"

25   Q.   And, again, is there a footnote associated with that first

1    sentence?

2    A.    There is.

3         MR. CASEY:  Mr. Bruemmer, can you just highlight the

4    footnote at the bottom of the page, please?

5    Q.    And can you read that, please, just the -- well, actually,

6    just read the whole thing, please.

7    A.    "Harvard is not familiar with the 'Thousand People Plan'

8    by that name.  Accounts in the press and documents we have

9    reviewed in preparing to respond to this letter have referred

10   to a 'Thousand Talents Plan.'  So, in the belief that these are

11   simply alternate titles for the same Chinese government program

12   and to be consistent with the documentation we have found, we

13   will use the latter phrasing for the duration of the letter."

14        MR. CASEY:  Thank you.  And if we could go and

15   highlight the first full paragraph on the page as well the

16   proceed preceding three lines of the paragraph above that,

17   beginning where it says, "In response to our inquiry"?

18        Right there.  Thank you.

19   MR. CASEY:

20   Q.    Could you just begin reading where it says, "In response

21   to our inquiry," please, just read that fist sentence?

22   A.    "In response to our inquiry, Dr. Lieber reported that he

23   had no formal association with WUT after that time but that WUT

24   continued to falsely exaggerate his involvement with that

25   institution in subsequent years."

1    Q.   And does the next paragraph explain more specifically what

2    that meant?

3    A.   It does.

4    Q.   And does it reference any exhibits?

5    A.   Yes, it references three exhibits.

6    Q.   Okay.  And are the exhibits attached to this letter that

7    you sent?

8    A.   They were.

9         MR. CASEY:  Okay.  If I could have Page 7,

10   Mr. Bruemmer?

11   BY MR. CASEY:

12   Q.   What is this document?

13   A.   This is Exhibit 1.  This is an email that Dr. Lieber sent

14   in 2015 to a colleague at WUT basically telling them not to use

15   the Harvard name.

16        MR. CASEY:  If you could go to Page 2, Mr. Bruemmer.

17   And could you highlight the bottom email there, please?

18        MR. DRABICK:  Judge, may I have one moment?

19        (Counsel confer)

20        MR. CASEY:  Can you just highlight that bottom email,

21   Mr. Bruemmer?

22   Q.   And what is this email?

23   A.   This is an email from Dr. Lieber to his colleague at WUT.

24   Q.   And what's the colleague's name?

25   A.   Liqaing.

1   Q.   And are you able to determine the date of this email?  I

2   refer you to the upper left-hand corner.  This is 133, if

3   you're looking for it in the binder.

4   A.   It looks like it's February 3rd.

5   Q.   Of what year?

6   A.   Of 2015.

7   Q.   And could you just read the first two sentences of

8   Dr. Lieber's email to Liqiang?

9   A.   "I'm writing to bring up a point that I made previously

10  about our research collaboration and what is/is not appropriate

11  with respect to Harvard University."

12  Q.   And can you continue, please, and read the first bullet?

13  A.   "In short, my point remains as follows:  Our agreement for

14  research collaboration is between you, Wuhan University of

15  Technology, WUT, and me and does not constitute an agreement

16  with Harvard University."

17  Q.   Can you read the next item?

18  A.   "I am happy to continue this collaboration within the time

19  constraints of my position at Harvard and previously spelled

20  out in our discussions, including help with advising the

21  laboratory at WUT."

22  Q.   And please read the third item.

23  A.   "However, this will require that Harvard's name not be

24  used inappropriately.  While I am not sure of all the legal

25  issues, our collaboration cannot be termed 'WUT/Harvard Joint

1    Nano Key Laboratory' because this implies a relationship and

2    agreement with Harvard University.  The name must be changed to

3    remove Harvard.  For example, you could call it WUT Joint Nano

4    Key Laboratory or WUT International Joint Nano Key Laboratory,

5    et cetera.  This change also includes our work at the

6    laboratory or our collaboration, as referred to in publications

7    or other efforts that you are involved.  Remember, the

8    agreement is between WUT, you and me and is not an agreement

9    with Harvard University."

10             MR. CASEY:  All right.  And if you could go --

11             THE COURT:  Is this a new document?

12             MR. CASEY:  This is an attachment -- I'm sorry.  I'm

13   just going to go to a different page of this document very

14   briefly.

15             If you could go to Page 6, please -- oh, I'm sorry.

16   Page -- Page 8.  I'm sorry.  Page 7.  Let me try again.  Third

17   time's a charm.

18   Q.   And the email at the bottom here, do you recognize that?

19   A.   Yes.

20   Q.   And what is that?

21   A.   This is still Exhibit 1.

22   Q.   Exhibit 1 to the NIH letter?

23   A.   Correct.

24   Q.   Is that an email from Liqiang to Charles Lieber?

25   A.   It is.

1    Q.   And is anyone copied on that email?

2    A.   Jeremy Bloxham is copied.

3    Q.   Do you know who Jeremy Bloxham is?

4    A.   He was the Dean at the Faculty of Arts and Sciences at

5    Harvard University.

6    Q.   And is this Mr. Mai's response to Dr. Lieber's email that

7    you just read?

8    A.   It is, yes.

9    Q.   And in substance, what is this individual, Liqiang Mai,

10   telling Dr. Lieber?

11        MR. MUKASEY:  I'm going to object to this.

12        THE COURT:  Objection is sustained.

13        MR. CASEY:  Fair enough.

14   MR. CASEY:

15   Q.   Could you just read the first sentence in item number one

16   of Professor Mai's email?

17        MR. MUKASEY:  I'm going to object to this on the same

18   404(b) grounds that hopefully we can cover at a break.

19        THE COURT:  But she can read it.

20        MR. MUKASEY:  We may just ask for a limiting

21   instruction later.

22        THE COURT:  I'm sorry?

23        MR. MUKASEY:  We may ask for a limiting instruction as

24   to the use of this evidence.

25        THE COURT:  Okay.

1  Q.  Again, just read the first two sentences in item number

2  one.

3  A.  "I understand that our agreement for research

4  collaboration is between me, Wuhan University of Technology,

5  WUT, and you and does not constitute an agreement with Harvard

6  University."

7  Q.  And could you just read item number two?

8  A.  "I am very glad to know that you are happy to continue

9  this collaboration within the time constraints of your position

10  at Harvard, including help with advising the laboratory WUT.

11  I/WUT are happy/honored to continue this research

12  collaboration."

13          MR. CASEY:  If we could just go back to Page No. 2 of

14  Exhibit 133?

15          THE COURT:  Is this a different exhibit?

16          MR. CASEY:  Same exhibit.

17  Q.  Do you know if Dr. Lieber was copied on the January 10th,

18  2019, letter to Dr. Lauer?

19  A.  He was.

20  Q.  Okay.  And did he ever speak with you at all about the

21  letter after it was sent?

22  A.  About the letter specifically?  No.

23  Q.  No.  Did he ever email you about it?

24  A.  No.

25          THE COURT:  I'm looking for a space for a recess.

```
 1            MR. CASEY:  I have two questions.
 2   MR. CASEY:
 3   Q.   When did you leave Harvard, again?
 4   A.   I left in August, 2019.
 5   Q.   Between January 10th, 2019, when this letter was sent and
 6   when you left in August of 2019, did you hear anything from NIH
 7   in response to this letter?
 8   A.   I did not.
 9            MR. CASEY:  Okay.
10            May I have a moment, Judge?
11            (Counsel confer.)
12            MR. CASEY:  No further questions.  Thank you.
13            THE COURT:  This is a good time to take the morning
14   recess.
15            THE CLERK:  Yes.
16            THE COURT:  Oh, you have refreshments.  We will take a
17   recess, ten, 20 minutes and then resume.
18            THE CLERK:  All rise, please.
19            (Recess taken from 11:04 to 11:33 a.m.)
20            (Jury is not present for the following)
21            THE CLERK:  All rise, please.
22            THE COURT:  Please be seated.  I understand that I
23   need to deal with a question without the jury present,
24   documents that the defense wants to offer; is that correct?
25            MR. CASEY:  Well, I don't want to speak --
```

1           THE COURT:  Whose documents are they?  Yours?

2           Who wants to offer them?

3           MR. CASEY:  Well, I'll let defense speak.

4           MS. YOUNG:  The defense proposes to offer those

5      exhibits on cross.

6           THE COURT:  For what purpose?

7           MS. YOUNG:  For the purpose of demonstrating the

8      evolution of the statements, which are material to Count 2.

9           THE COURT:  Whose statement?  Whose statement is being

10     attacked by these documents?

11          MS. YOUNG:  Ms. Ponting wrote in a memo, and then

12     there are notes that purport --

13          THE COURT:  But they're not her notes?

14          MS. YOUNG:  Well, there's, I believe, three different

15     exhibits.  One is an exhibit that is an internal memo --

16          THE COURT:  I have JT -- no.  S, T, U, and V.

17          MS. YOUNG:  Yes, Your Honor.  So JT is an internal

18     memo purportedly authored by the witness.

19          THE COURT:  By General Counsel -- no.  To General

20     Counsel?

21          MS. YOUNG:  No.

22          THE COURT:  Among others, Ms. Ponting?

23          MS. YOUNG:  Correct.

24          THE COURT:  So, we don't know that she wrote this,

25     though?

```
 1              MS. YOUNG:  We'd like to ask her that.
 2              THE COURT:  And this is being offered for what
 3      purpose, to dispute what she had said on direct?
 4              MS. YOUNG:  To dispute the actual statement that ends
 5      up in the letter to NIH.
 6              MR. MUKASEY:  Judge, if I may --
 7              THE COURT:  Wait a minute.  I only can hear one of you
 8      on each side.  So are you going to take over?
 9              MR. MUKASEY:  I'm going to try to make it a little
10      more clear.  Our view is that the statement that went from
11      Professor Lieber's mouth to Ms. Ponting to an internal memo to
12      the final statement to NIH was like the children's game of
13      Telephones.  I say something to him, he says something to me,
14      we say something to her, he writes it in a memo; and by the
15      time it gets to NIH, it's a completely different statement than
16      what came out of Dr. Lieber's mouth.
17              MR. CASEY:  Marc, do you want to excuse the witness?
18              MR. MUKASEY:  Well, we're going to attack her on it
19      one way or the other.  It's up to you.  If you want to step
20      out, that's fine.
21              THE WITNESS:  No, it's -- I'm fine.
22              MR. MUKASEY:  But the evolution of the statement and
23      the changing nature of it is what we're trying to go after,
24      Judge.
25              MR. CASEY:  Your Honor, if I could just respond.  The
```

1    evolution of the statement is irrelevant.

2          THE COURT:  I need to understand the statement first

3    before I can hear why it's objectionable.

4          MR. CASEY:  Can I just make one point?  The

5    false -- the charged false statement in Count 2 is in the

6    January 10th letter to Michael Lauer that we just saw in

7    Exhibit 2.

8          In Exhibit 108, we saw that the Defendant reviewed

9    that letter and approved it before it went out.  And so what

10   led up to that can hardly be relevant to what the Defendant

11   subsequently approved in a draft letter to NIH that ultimately

12   went out the door.  So, you know, this game of Telephone is

13   sort of mythical because the Defendant was confronted with the

14   statement, Here it is, here's what we're going to tell at NIH.

15   Are you okay with this?  And he says, I'd like you to add some

16   things, but that statement's fine, go ahead.

17         And so, you know, these internal memos, which are

18   hearsay, are scarcely relevant to what ended up in the

19   January 10th letter to NIH, which is the basis for Count 2.

20         THE COURT:  But I don't see much of the Defendant in

21   here anyhow.

22         MR. CASEY:  There are statements attributed to him,

23   which of course they can't offer, they're hearsay; but, again,

24   the evolution of the statement is not relevant to any issue.

25         THE COURT:  I'll hear you.

1          MR. MUKASEY:  Let me take a step back.  Harvard made a

2    statement to NIH.  It concerned two doctors, two professors at

3    Harvard, Dr. Lieber and another one.  Harvard was trying to

4    protect its own grants funding, so they wrote to NIH saying

5    something about this other professor, which has been redacted,

6    and saying everything is good with respect to Dr. Lieber.

7          What Harvard knew is different than what Harvard put

8    in the letter.  Dr. Lieber made rather extensive statements to

9    Ms. Ponting, which she just testified about.  Part of what he

10   said was dropped from an internal memo that the Harvard GC and

11   a whole bunch of people tinkered with.  More of it was dropped

12   when it went to the letter -- to the final form to NIH.

13         What we're saying is he didn't cause Harvard to make

14   misstatements.  He made statements to Ms. Ponting.  They were

15   then butchered and doctored and put in a memo and then further

16   butchered and doctored and sent to NIH.  So what we want to

17   explore on cross-examination is the evolution of the statement

18   that went from his mouth to her to 26 other people to NIH.

19         THE COURT:  Why is that not admissible?

20         MR. CASEY:  Well, he can certainly ask the witness

21   what Dr. Lieber said to her during the interview.  But these as

22   admissible exhibits?  There's absolutely no basis for it.

23         MR. MUKASEY:  Yes, there is.  We're offering them not

24   to show the truth, but to show the difference between what he

25   said, what she heard, what she wrote down --

1          THE COURT:  There's nobody telling us that these are

2     genuine letters and who authored them, who heard it.

3          MR. CASEY:  It's not only that, Your Honor.  They want

4     to use, for example, notes not authored by the witness to

5     impeach the witness.  It's not her statement and certainly not

6     admissible as a document in evidence.

7          MR. MUKASEY:  We believe that, under 608(b) and the

8     common law rule of impeachment by contradiction, when a

9     difference between a document and the charged statement is

10    material --

11         THE COURT:  But here we have two different speakers.

12    We have the witness, and we have other people saying different

13    things who are not sworn, who are not testifying.  So how can

14    we just disagree with the witness who has been sworn and who is

15    testifying with a document that just comes out of thin air?

16         MR. MUKASEY:  Well, she was part of the team that put

17    together the document.

18         THE COURT:  Well, if you can establish that, then it's

19    partly her document, and then you can use it to disagree with

20    her.  But I don't see that in the document so far.

21         MR. MUKASEY:  We think we're entitled to explore with

22    her whether she saw or reviewed that -- one of the iterations

23    of his statement.  If she says no --

24         THE COURT:  Well, then maybe that iteration can come

25    in, but not the whole works.

```
1              MR. MUKASEY:  Well, I think that, if you look at some
2       of the cases that we cited, maybe it doesn't come in through
3       this witness, but I think it does come in because it is
4       material to the charge.  If that's a piece of what Dr. Lieber
5       said, whether she wrote it or not, it goes -- it's not
6       impeaching a witness; it is almost intrinsic to the charge.
7              There's First Circuit case law called Mulinelli and
8       another one called Perez that says, If there's a bunch of
9       different versions of the statement and none of them are the
10      indictment --
11             THE COURT:  So, how do you want to proceed with these
12      documents?
13             MR. MUKASEY:  I think we're going to show her whatever
14      we can show her, find out what she knows, find out what she
15      doesn't know, and we may have to offer some of them on our own
16      case.
17             MR. CASEY:  If I could just make one last point:  To
18      the extent he's offering this memo --
19             THE COURT:  "This memo" is which one?
20             MR. CASEY:  For example, JV.
21             THE COURT:  JT?
22             MR. CASEY:  JV, V as in Victor.  -- for purposes of
23      impeachment by contradiction --
24             THE COURT:  This is the one from the General -- or to
25      the General Counsel?
```

1          MR. CASEY:  Correct.  Let me make sure I have it.  So,
2    I have -- so, JT, T as in Tom, if you go to one, two, three,
3    the fourth page --
4          THE COURT:  The first page that is not fully --
5          MR. CASEY:  Yes, this long page here.  -- they're
6    offering it, supposedly, for the purposes of impeachment by
7    contradiction, which would assume that the document doesn't
8    contain something that, you know, her subsequent letter
9    contains, except it does contain that very statement.  It says,
10   "Dr. Lieber informed us that he is not and has never been a
11   participant in the Thousand Talents Program."
12         So how is that contradictory?  It's utterly
13   consistent.
14         MR. MUKASEY:  No.  There's actually much more in this
15   document that reflects Dr. Lieber's statement, more than what
16   she said, and that was left out of the letter that ultimately
17   went to NIH.
18         MR. CASEY:  Right, which is why they want to offer it,
19   to get in self-serving hearsay.  That's why they --
20         MR. MUKASEY:  We're not offering it for the truth.
21   It's not hearsay.  We're offering it to show that the Harvard
22   recollection of what he said is inconsistent with what Harvard
23   told NIH.  I don't care which version is true.  What I'm
24   pointing out is they had more information that they documented
25   from Lieber, and they left it out of the letter to NIH.

```
 1              THE COURT:  Now, this is a letter to Harvard's General
 2     Counsel.  It's an internal document; right?
 3              MR. MUKASEY:  It's an internal document that this
 4     witness was part of creating that purported to summarize what
 5     she had learned during her investigation.
 6              THE COURT:  Now, which part of the letter are you
 7     specifically referring to?  What page?
 8              MR. MUKASEY:  Page -- it's got "12" on the bottom
 9     right-hand corner.
10              THE COURT:  There is one underscored or highlighted
11     sentence here.
12              MR. MUKASEY:  Yeah.  Don't worry about that.  It's
13     really the second paragraph that begins, "Dr. Lieber informed
14     us," and it's the first one, two, three, four lines.
15              THE COURT:  That's the only -- that's the only reason
16     why you're offering the entire document?
17              MR. MUKASEY:  All we need to offer are those four
18     lines.
19              MR. CASEY:  They can ask the question, Was there
20     anything else that he said?
21              THE COURT:  Exactly.  I mean, why can't you present
22     the witness with a question?  She was a recipient of that.
23              MR. CASEY:  Which, by the way --
24              THE COURT:  But she can't tell us whether this is --
25     whether it's true or not, but you can ask her.
```

1             MR. CASEY:  Which I did ask her on direct, Your Honor.

2     I said, Did he elaborate?  And she explained.

3             THE COURT:  Hold it.

4             MR. MUKASEY:  I think we can present this to her, see

5     what she says, and take it from there.

6             THE COURT:  Okay.  Now, that's one.  This is document

7     JT.  Are there others that are similar that we need to review

8     to see just exactly -- to me, they came as something that you

9     were going to offer into evidence, and I have some difficulty

10     with that.

11             MR. MUKASEY:  Again, we think there's a theory -- it

12     may not be through this witness.  We think there's a theory

13     under which it comes in.

14             THE COURT:  Well, if you have a theory and another

15     witness that can get it into the courtroom, fine.  But in the

16     meantime, as I understand it, JT is available for purposes of

17     cross-examining the witness who is on the stand and

18     specifically with Page 12 and specifically with the item

19     highlighted on Page 12; is that correct?

20             MS. YOUNG:  Yes, Your Honor.

21             THE COURT:  So you're going to do this?

22             MS. YOUNG:  Yes, Your Honor.

23             THE COURT:  Okay.  Now, what about the others?  They

24     have nothing to do with cross-examining this witness?

25             MS. YOUNG:  They all have to do with cross-examining

1    this witness.

2           THE COURT:  With the same -- I mean, are there pieces

3    of them?  I don't see how they come into evidence at this

4    point.

5           MS. YOUNG:  So, similar to JT, JS, the paragraph

6    starting, "Thousand Talents," the similar purpose, there's

7    additional information --

8           THE COURT:  But who's the author of this?  Who wrote

9    this document?  Hold it.

10          MS. YOUNG:  This document is not written by this

11   witness.  Again, it's not for the purpose of the truth but for

12   the evolution of the statement.

13          MR. MUKASEY:  See, what's happening here -- I'm sorry

14   to double-team -- what's happening here is the people who wrote

15   the documents with the different versions of the statement

16   they're keeping off the witness stand.  They don't want the 12

17   different versions of the statement to come out; they want just

18   the final version.

19          The truth of the matter is they doctored and meddled

20   with the statement that came out of his mouth.

21          THE COURT:  Are you going to have evidence of that?

22          MR. MUKASEY:  We think we have evidence of it in these

23   various memos written by people that they're not calling.

24          THE COURT:  So is the purpose of asking this witness

25   questions about these documents to show this evolution?

```
 1            MR. MUKASEY:  In part, yes, in large part.
 2            MR. CASEY:  We're not going to call three witnesses to
 3    say the same thing when we have the witness who drafted the
 4    letter to Dr. Lauer charged in Count 2 right here on the
 5    witness stand.  She drafted the letter.  She was on the email
 6    chain where the letter was sent to the Defendant where he was
 7    asked to comment on it and approved it and it went out the
 8    door.
 9            That's the relevant piece here.  You know, calling --
10    going through every iteration of the document up to the point
11    where Charlie Lieber approved it, I don't see how it's
12    relevant.  They can ask the questions, you know, How did it
13    change, whatever, but --
14            THE COURT:  So they can ask the question.
15            MR. MUKASEY:  Knowing Harvard the way you do, you know
16    there are many cooks in the kitchen before a letter goes out.
17            THE COURT:  It seems to be true here, too.
18            MR. MUKASEY:  That is exactly what's true here too.
19    There are many --
20            THE COURT:  I'm not talking about the case.  I'm
21    talking about the evidence in the case.
22            MR. MUKASEY:  There are many cooks in the kitchen and
23    many ingredients that went into baking this letter that went to
24    NIH.  I understand they only want to show the final product,
25    the one that is most categorically denying being a member of
```

1    Thousand Talents; but the truth is they need to show the

2    ingredients, how they got to that final letter.

3             THE COURT:  Why?

4             MR. MUKASEY:  Because the final letter is a

5    categorical denial, when Dr. Lieber really gave a much more

6    nuanced answer than that.

7             In addition, the letter that Harvard wrote was

8    defending Harvard; right?  Harvard's grant money was under

9    scrutiny, not just because of Lieber, but because of another

10   doctor that was under investigation.  Harvard wrote that letter

11   to protect Harvard.

12            THE COURT:  Well, that may be.

13            MR. MUKASEY:  And we --

14            THE COURT:  It wasn't offered to protect the

15   Defendant.

16            MR. MUKASEY:  I'm not so sure about that.  I think

17   that, if it had -- if they had truthfully wanted to convey

18   Dr. Lieber's full statements to Ms. Ponting and others, they

19   would have done so.  Instead, they wrote a letter that was a

20   categorical denial, and it was not what he said.  So we're

21   entitled to know how it went from his mouth to some other

22   version that Harvard sent to NIH.

23            THE COURT:  Well, I think they're entitled to tell us

24   a little bit about the history of whatever the answer is, and I

25   don't have a problem with that.  I do have a problem with the

1    admissibility of all of these letters.

2         MR. MUKASEY:  I think there's going to be snippets of

3    them --

4         THE COURT:  You can certainly ask the witness about

5    them, and we can mark them for identification; but I don't

6    think they go to the jury.

7         MR. MUKASEY:  Snippets of them we will try to get in,

8    if we can lay the proper foundation; otherwise, we'll have --

9         THE COURT:  But at the moment, that isn't -- we don't

10   have that.

11        MR. MUKASEY:  I hear you.

12        THE COURT:  Lisa, here are the documents.  And let's

13   bring the jury down.

14        MR. MUKASEY:  I'm sorry for jumping up all the time.

15   I can't control myself.

16        THE COURT:  You needed the exercise, too.

17        How long will you be on cross?

18        MS. YOUNG:  30 minutes, Your Honor.

19        THE COURT:  The Government hadn't quite rested yet,

20   had you, with this witness?

21        MR. CASEY:  We were thinking about it after listening

22   to Mr. Mukasey.

23        THE COURT:  So are you finished with her now?

24        MR. CASEY:  Oh, yeah, we're done.

25        THE COURT:  Oh, the only other thing that I wanted to

```
 1   ask:  As I understand it, the documents that are on the
 2   computer and that are shown to the jury have already been
 3   approved by both parties to be shown to the jury, or not?
 4            MR. CASEY:  That is not true.  In fact, I'm not sure
 5   we've come to an agreement on any of the exhibits.
 6            THE COURT:  It would be nice if you could just go to
 7   them without stopping -- without changing the views.
 8            MR. CASEY:  Yeah.  No.  Fair enough.  I think we'll
 9   endeavor, after Court today, to share with them exhibits that
10   will come in through the next few witnesses and see where the
11   objections lie.
12            THE COURT:  All right.
13            THE CLERK:  Judge, are we good?
14            THE COURT:  Yeah.
15            THE CLERK:  All rise, please.
16            THE COURT:  Please be seated.
17            (Jury is present for the following)
18            THE COURT:  I apologize for the too long pause here.
19   I needed to talk to counsel about an evidentiary issue, and it
20   just took longer than I thought it would because I, frankly,
21   didn't understand it.  But now I understand it, and I think we
22   go forward.
23            All right.  You may cross-examine.
24
25
```

```
1                       CROSS EXAMINATION
2    BY MS. YOUNG:
3    Q.   Ms. Ponting, nice to meet you.
4    A.   Nice to meet you.
5    Q.   We haven't met before; right?
6    A.   We have not.
7    Q.   Although you met with the prosecutors, Mr. Casey and
8    Mr. Drabick, before testifying today?
9    A.   I did.
10   Q.   And you're aware Professor Lieber's counsel also requested
11   to meet with you?
12   A.   I am.
13   Q.   And you declined?
14   A.   I did.
15   Q.   And Harvard's paying for your lawyer; correct?
16   A.   They are.
17   Q.   You worked at Harvard for about ten years?
18   A.   I did.
19   Q.   And from April, 2015, until August, 2019, your title was
20   Director of Pre-Award Services, Office for Sponsored Programs,
21   at Harvard University; right?
22   A.   Yes.
23   Q.   Now, Harvard's a massive institution; right?
24   A.   It is.
25   Q.   Hundreds of offices?
```

```
 1    A.    Sure.

 2    Q.    Tons of different departments?

 3    A.    Definitely.

 4    Q.    Thousands of people?

 5    A.    Yep.

 6    Q.    And all sorts of different committees?

 7    A.    Yes.

 8    Q.    Teams?

 9    A.    Yep.

10    Q.    So, an ecosystem, is that a word you've used?

11    A.    A perfect word.  I over-use it.

12    Q.    And it's decentralized, meaning doesn't all funnel up to

13    one place; right?

14    A.    Not how normal places do, no.

15    Q.    And now, your office, Office for Sponsored Programs,

16    exists because Harvard receives the research grant money;

17    right?

18    A.    Yep, that is how it is set up.

19    Q.    So, Harvard receives the money, not any individual

20    researcher; correct?

21    A.    Absolutely.

22    Q.    And the Office for Sponsored Programs is different from

23    the Office of General Counsel?

24    A.    It is.

25    Q.    And that's the lawyers for Harvard; right?
```

1    A.    Correct.

2    Q.    And the Office for Sponsored Programs is also different

3    from the research compliance office?

4    A.    Yes.  There are various research compliance offices.

5    Q.    And that's also different from the Research Finance

6    Administration?

7    A.    I actually don't know which office you're talking about.

8    There's too many.

9    Q.    Sure.

10   A.    Okay.

11   Q.    So that's at least four different offices involved in

12   research at Harvard?

13   A.    Yes.

14   Q.    Safe to say a lot of cooks in the kitchen when it comes to

15   research at Harvard?

16   A.    Yep.

17   Q.    Okay.  You testified earlier today about receiving an

18   email from the NIH; correct?

19   A.    Yes.

20   Q.    It was an unusual email?

21   A.    It was unusual.

22   Q.    It was the first time you were responding to this type of

23   inquiry from the NIH?

24   A.    Yes.

25   Q.    And the email was not just about Professor Lieber; right?

1   A.   It was not.

2   Q.   There was more than one professor named in the email;

3   correct?

4   A.   There was two.

5   Q.   And the email referred to two of Professor Lieber's

6   grants; correct?

7   A.   It did.

8   Q.   Were those all of his grants from six years before?

9   A.   No.

10  Q.   Those were just his present grants at the time that the

11  letter was sent?

12  A.   I believe that is true, yes.

13  Q.   And the letter had a tight timeline to respond; correct?

14  A.   It did.

15  Q.   30 days?

16  A.   Yes.

17  Q.   And that was not a lot of time because of the holidays;

18  correct?

19  A.   It was not a lot of time in any time period but

20  specifically tight because of the holiday.

21  Q.   Now, the email from NIH referenced Thousand Talent Plan or

22  Thousand People Plan?

23  A.   Yes.

24  Q.   At the time, you thought Thousand Talent Plan was like the

25  National Academy of Sciences here in the United States?

1    A.    Yeah, I think that's a fair assessment of how we thought

2    about the talent program.

3    Q.    Which is a normal professor activity; right?

4    A.    Yes.

5    Q.    At the time you received the email, you did not know why

6    NIH raised Thousand Talent Plan, then; correct?

7    A.    No.  No.

8    Q.    And at the time, you did not know if NIH prohibited

9    Thousand Talent Plan; correct?

10   A.    No, we didn't think there was a prohibition whatsoever.

11   Q.    And you do not know Harvard's position regarding Thousand

12   Talent Plan?

13   A.    We didn't have one.

14   Q.    But you scheduled a meeting to ask Professor Lieber about

15   Thousand Talent Plan?

16   A.    I did, because it was specifically addressed in the email

17   from NIH.

18   Q.    So NIH sent a letter of concern?

19   A.    Correct.

20   Q.    NIH did not require an interview to respond; right?

21   A.    No.

22   Q.    And NIH did not give specific questions to ask in an

23   interview then?

24   A.    No, they did not.

25   Q.    So those questions were Harvard's questions to ask

1    Professor Lieber?

2    A.   Yes, they were drafted in order to make sure that we could

3    respond to all the issues proposed in the -- or set forth in

4    the email from NIH.  They were -- yeah, they were very clearly

5    set out, the questions, to respond to that letter.

6    Q.   But the letter itself did not have the questions you sent

7    Professor Lieber; correct?

8    A.   No.

9    Q.   And Professor Lieber offered to send written responses to

10   those questions?

11   A.   Yes.

12   Q.   And you told him not to send those notes in advance of the

13   meeting; correct?

14   A.   I did.  I did.

15   Q.   So, now, let's talk about that meeting.  You understand

16   that Professor Lieber is now charged with a crime for something

17   he said during that meeting?

18          MR. CASEY:   Objection.

19          THE COURT:   Sustained.

20   BY MS. YOUNG:

21   Q.   Something Professor Lieber said, you then wrote in a

22   letter to NIH; correct?

23   A.   Yes.

24   Q.   Was it just you that wrote that letter?

25   A.   No.  I worked on it with Matthew Fox and Rachel Talantino.

```
1   Q.   So at least two other people?

2   A.   Yes.

3   Q.   Okay.  We'll come back to that.

4            Do you have a photographic memory, Ms. Ponting?

5   A.   No.  I wish I did.

6   Q.   So you can't remember the exact words from a meeting from

7   more than three years ago?

8   A.   No.

9            THE COURT:  Is this letter in evidence?

10           MS. YOUNG:  Yes, Your Honor.

11           MR. CASEY:  Exhibit 2.

12           THE COURT:  What's the number?

13           MR. CASEY:  Oh, I'm sorry.  Exhibit 133.

14           THE COURT:  Thank you.

15  Q.   So at this meeting with Professor Lieber, you asked him

16  questions; correct?

17  A.   I did.

18  Q.   And Professor Lieber answered?

19  A.   Yep.

20  Q.   Do you remember Professor Lieber's exact words?

21  A.   No, I do not.

22  Q.   And when you sat down with Professor Lieber, did you take

23  notes on a notepad?

24  A.   I did not take notes.

25  Q.   Did you bring a laptop?
```

1    A.    I did not bring a laptop.

2    Q.    Dictaphone?

3    A.    Nope.

4    Q.    Post-it?

5    A.    Nope.

6    Q.    Back of an envelope?

7    A.    Nope.

8    Q.    Nothing?  Were you instructed not to take notes?

9    A.    No.  I'm a really bad note-taker.

10   Q.    You're a lawyer; right?

11   A.    I am.  I skipped that class.

12   Q.    So you would agree that words matter; right?

13   A.    They absolutely do.

14   Q.    Now, you were not acting as Professor Lieber's lawyer at

15   the meeting on December 14th, 2018, were you?

16   A.    I was not.  I don't act as a lawyer for anyone currently

17   or back then either.

18   Q.    Did you tell Professor Lieber that you were not his

19   lawyer?

20   A.    I did not.  I'm not a lawyer for Harvard at the time.

21   Q.    Did you have JD next to your name in your signature block

22   for your Harvard emails?

23   A.    I do.  I did.

24   Q.    Including the emails that you sent to Professor Lieber

25   when you set up the meeting?

1    A.    Yes.

2    Q.    The meeting was set up as an informal conversation;

3    correct?

4    A.    It was.

5    Q.    It lasted less than an hour; right?

6    A.    Yes.

7    Q.    You wanted to keep the meeting short; correct?

8    A.    I did.

9    Q.    Be efficient with Professor Lieber's time; right?

10   A.    That was the goal.

11   Q.    And you knew he was busy with his research?

12   A.    Correct.

13   Q.    And Professor Lieber was in fact eager to meet with you?

14   A.    He was.

15   Q.    Because weeks had passed since the NIH had sent the letter

16   to Harvard?

17   A.    Yes, I believe it was about two weeks.

18   Q.    And you knew that, at the time, Professor Lieber had

19   health issues impacting his availability?

20   A.    I did, yes.

21   Q.    Now, Matthew Fox you've referenced, he was your Harvard

22   colleague; correct?

23   A.    He was.

24   Q.    From the Office of Research Compliance?

25   A.    He works for the Office of the Vice-Provost for Research.

1   Q.   And he was also at the meeting with Professor Lieber?

2   A.   He was.

3   Q.   Did he bring a laptop to the meeting?

4   A.   He did.

5   Q.   And so he took notes at the meeting?

6   A.   He did.

7        MS. YOUNG:  Sal, could we please show Ms. Ponting only

8   what has been marked as JS for identification.

9   Q.   Could you please review this to yourself and review the

10  topics that are covered in this document.

11  A.   (Witness reviews document)

12  Q.   Do these cover the topics of your meeting with

13  Professor Lieber?

14  A.   They do.

15  Q.   Do you recognize this document?

16  A.   I do.

17  Q.   Do you identify this document as Matthew Fox's notes from

18  the meeting with Professor Lieber?

19  A.   That is what they look like, yes.

20        MS. YOUNG:  Your Honor, I'm offering what has been

21  identified as defense Exhibit JS into evidence.

22        MR. CASEY:  We object, Your Honor, for the reasons

23  previously stated.

24        THE COURT:  Who produced this document?

25        MS. YOUNG:  Well, the Government to the defense.

1           THE COURT:  Do we know?  What is the witness's role in

2    this document?

3           MS. YOUNG:  Her role was witnessing the author of this

4    document type it during the meeting.

5           THE COURT:  Well, let's -- I didn't hear her say that.

6    BY MS. YOUNG:

7    Q.   Did Mr. Fox type notes during the meeting?

8    A.   He did.

9    Q.   And you recognize these to be his notes from the meeting?

10   A.   I do.

11          THE COURT:  So these are notes that were made

12   contemporaneously with the meeting?

13          THE WITNESS:  They were, Your Honor.

14          MR. CASEY:  We object.  They're not her notes.

15   Hearsay.

16          THE COURT:  Well, it's not necessarily being offered

17   for the truth of it; it's offered for what happened at that

18   meeting, and for that it's admissible, just for what happened

19   at the meeting.  I don't know what the document number is.

20          THE CLERK:  It's JS.  I was just going to write

21   "admitted" on that.  Let me just -- hold on.  There we go.

22          Do you want to look at this?

23          THE COURT:  No.

24          THE CLERK:  Okay.

25          (Defendant Exhibit JS received in evidence.)

```
 1   BY MS. YOUNG:
 2   Q.   So, Ms. Ponting, I would like to direct your attention to
 3   the paragraph that says, "Thousand Talents."
 4            MS. YOUNG:  Sal, perhaps you could blow that up.
 5   BY MS. YOUNG:
 6   Q.   Could you please read the last sentence.
 7   A.   The last sentence?
 8   Q.   Yes, Ms. Ponting.
 9   A.   "If he'd done it, would have gone to a higher profile
10   university like Peking or Tsinghua, but Wuhan may have claimed
11   that all the same."
12            MS. YOUNG:  Thank you.
13            Sal, we can take that down.
14   Q.   So now I want to talk about after the meeting.
15            You wrote two different documents after the meeting?
16   A.   We did -- I did.
17   Q.   You wrote an internal memo within Harvard; correct?
18   A.   Yes, I did.
19   Q.   And then you wrote a letter to the NIH; correct?
20   A.   We used the memo to draft the letter to the NIH, yes.
21   Q.   Is the language that you just read in either of those
22   documents?
23   A.   No, it's not.
24   Q.   And when you wrote the memo, the internal Harvard memo,
25   did other people review it?
```

```
 1    A.    Yes, of course.

 2    Q.    Make edits to it?

 3              MR. CASEY:  Just objection on relevance grounds.

 4              THE COURT:  I'm sorry?

 5              MR. CASEY:  Objection to the relevance.

 6              THE COURT:  Well, I'm not exactly sure where we're

 7    going, so for the moment, we'll continue.

 8              MS. YOUNG:  Sal, could we please pull up for the

 9    witness only what's identified as DX JT?  And let's go to

10    page -- what's Bates-labeled 12, go to Page 4.

11    BY MS. YOUNG:

12    Q.    Do you recognize this document, Ms. Ponting?

13    A.    Yes.  It's the memo that you were just referring to.

14              THE COURT:  It is what?

15              THE WITNESS:  That I wrote.  It's the memo that I

16    wrote, the internal memo.

17              MS. YOUNG:  Your Honor, I would like to offer into

18    evidence what has been identified as DX JT.

19              THE COURT:  The entire document?

20              MS. YOUNG:  No.  Page 4, which is Bates-labeled --

21    last number is 12.

22              MR. CASEY:  Your Honor, if we're going to let it in, I

23    think we need the whole document for context, quite frankly.

24              THE COURT:  I don't see how I can just sort of take it

25    apart and offer a piece of it.
```

```
 1                MS. YOUNG:  We can offer the entire document.
 2                THE COURT:  The Government doesn't object to the
 3     entire document?  So it's in evidence.
 4                MS. YOUNG:  Thank you.
 5                (Defendant Exhibit JT received in evidence.)
 6     BY MS. YOUNG:
 7     Q.   Now, in the paragraph that begins, "Dr. Lieber informed us
 8     that" --
 9                THE COURT:  What is the date of this document,
10     Ms. Ponting?
11                THE WITNESS:  It's December 21st, 2018.
12                THE COURT:  1918?
13                THE WITNESS:  2018.
14                THE COURT:  2018.  Sorry.
15     Q.   So that's one week after your meeting with Professor
16     Lieber; correct?
17     A.   Yes, because I believe that meeting was on the 14th.  So
18     that's about a week, yep.
19     Q.   You drafted this document a week after the meetings;
20     correct?
21     A.   It was sent to counsel a week after the meeting.
22     Q.   And this document does not contain Professor Lieber's full
23     statement to you from that meeting, as reflected in the notes
24     we just reviewed?
25     A.   It does not reference Peking or Tsinghua, correct.
```

1    Q.   Or the fact that Wuhan may have claimed him just the same?

2    A.   No.  That's true.

3              MS. YOUNG:  Take that down, thank you, Sal.

4    BY MS. YOUNG:

5    Q.   So then, after this memo, the internal Harvard memo was

6    drafted, then you drafted the letter to NIH; correct?

7    A.   Yes.

8    Q.   And you drafted that with Mr. Fox from Research

9    Compliance?

10   A.   Yes.

11   Q.   And you drafted that with Ms. Talantino from the Office of

12   Vice-Provost of Research?

13   A.   They were both from that office, yes.

14   Q.   And Ms. Lopez from the Office of General Counsel?

15   A.   She did review it, yes.

16   Q.   And did they all have access to the document in a shared

17   server or document space?

18   A.   We tried to do the shared server, but most of it was

19   email.

20   Q.   And did Professor Lieber have access to this shared

21   server?

22   A.   He did not.

23   Q.   And how many versions of the letter do you think you

24   drafted?

25   A.   I have no idea.

1    Q.   More than one?

2    A.   Yes.

3    Q.   More than two?

4    A.   Yes.

5    Q.   Five, maybe?

6    A.   There was a lot of edits going on.

7    Q.   And then Professor Lieber got the document on January 8th?

8    A.   He did.

9    Q.   The day before it was due to NIH?

10   A.   I believe it was dated the 10th.

11   Q.   And Professor Lieber provided comments to you on that

12   letter; correct?

13   A.   He did.

14   Q.   And you did not incorporate all of his comments?

15   A.   We didn't -- we did not incorporate all of his comments,

16   that is correct.

17             MS. YOUNG:  Okay.

18             (Counsel confer)

19   Q.   One final question:  The redacted portions of the letter

20   to NIH that we've reviewed, those all pertained to the other

21   professor; is that correct?

22   A.   Yes.

23             MS. YOUNG:  Nothing further.

24             THE COURT:  Any cross?

25             MR. CASEY:  Redirect, very briefly, Your Honor.

```
 1              THE COURT:  Is this redirect?  So it is.
 2              MR. CASEY:  I'm happy to cross.
 3              MR. CASEY:  Could I have Exhibit JS, please?
 4              Sal, I appreciate your help.  Thank you.
 5              THE CLERK:  It's in evidence.
 6              MR. CASEY:  It's in evidence, yes.
 7              Thank you.
 8                        REDIRECT EXAMINATION
 9    BY MR. CASEY:
10    Q.   Ms. Ponting, do you see Exhibit JS in front of you?
11    A.   Yes.
12    Q.   Okay.  You recall you were asked to read a single sentence
13    from the paragraph in the middle beginning with "Thousand
14    Talents"?
15    A.   Uh-huh.
16    Q.   Could you read the whole paragraph for us, please.
17    A.   Sure.  "Thousand Talents, has been asked by several
18    institutions, including Wuhan, to participate in this.  He's
19    always told them he wouldn't spend more than seven days a year
20    in China, knowing that this program required at least a month
21    per year.  If he had done it, would have gone to a higher
22    profile university like Peking or Tsinghua, but Wuhan may have
23    claimed him all the same."
24    Q.   Is this consistent with your memory that Dr. Lieber having
25    told you that he did not agree to participate in the Thousand
```

1    Talents Program?

2    A.   It is.

3              MR. CASEY:   Could you pull up Exhibit JT.   And could

4    we go to Page 4, please.

5    Q.   And, again, this is -- this is a memo that you and other

6    individuals prepared to the General Counsel's Office at Harvard

7    after your interview with Dr. Lieber?

8    A.   Yes.

9    Q.   Okay.  And do you see the paragraph in the middle here

10   beginning with "Dr. Lieber informed us"?

11   A.   Yes.

12   Q.   Could you please read the full paragraph.

13   A.   Full paragraph, got it.  "Dr. Lieber informed us that he

14   is not and has never been a participant in the Thousand Talents

15   Program either, although he was invited to participate by

16   several Chinese universities.  Among other reasons, he was

17   never willing to spend more than one week per year in China,

18   and his understanding is that the Thousand Talent Program

19   requires at least one month of residency per year.  The NIH's

20   belief that he may be a participant appears to arise from

21   confusion over the acknowledgment section of two literature

22   review papers that Dr. Lieber co-wrote with Xiaojie Duan, a

23   former postdoctoral fellow, who is now a professor at Peking

24   University in China.  Dr. Duan is a member of the Thousand

25   Talent Program, and the paper did not explicitly designate

1    which of the two co-authors are supported by which program,

2    so" --

3              MR. CASEY:  Thank you.  I think that's enough.  Thank

4    you.  I appreciate you reading that.

5              And lastly, Paul, could you pull up for us --

6    actually, let's do it this way, before I have you pull up

7    anything.

8    Q.   You testified on direct exam about the draft letter that

9    was sent to Charles Lieber; correct?

10   A.   Yes.

11   Q.   Okay.  And that was Exhibit 108?

12   A.   Yes.

13   Q.   And this statement, "Dr. Lieber informed us that he has

14   never been a participant in the Thousand Talents Program," was

15   that in the letter that you sent to Dr. Lieber?

16   A.   It was.

17   Q.   And did Dr. Lieber tell you that, that was wrong?

18   A.   No.

19             MR. CASEY:  Just one moment, Your Honor.

20             (Counsel confer.)

21             MR. CASEY:  Nothing further.  Thank you.

22             THE COURT:  Any recross?

23             MS. YOUNG:  Just one question, Your Honor.

24                        RECROSS-EXAMINATION

25   BY MS. YOUNG:

1    Q.    You never gave Professor Lieber a chance to review the

2    internal Harvard memo; correct?

3    A.    No, the internal memo was not reviewed by Dr. Lieber.

4            THE COURT:  Thank you, Ms. Ponting.  You're excused.

5            Who is next?

6            MR. CASEY:  The Government calls Jeremy Bloxham.

7            MS. DEIST:  Your Honor, actually, the defense objects

8    to Jeremy Bloxham's entire testimony.  To the extent that, that

9    might require a proffer of testimony before the Court for you

10   to make your ruling, may -- I hate to do this, but argue this

11   outside the presence of the jury.  It won't take long.

12           THE COURT:  No, no, we're not going to excuse the

13   jury --

14           MS. DEIST:  Okay.

15           THE COURT:  -- just for this.

16           MS. DEIST:  Your Honor, we object to --

17           THE COURT:  Hold it one second.  Let us stretch while

18   we can.

19           (Stretch break.)

20           THE COURT:  Now, who is the witness who's going to

21   testify, and where is the witness?

22           MR. CASEY:  I believe he's outside, but we can go grab

23   him.

24           MS. DEIST:  Your Honor, I would like to make my

25   argument for why we're objecting to the whole of his testimony.

```
 1              THE COURT:  Who is the witness, Mr. Casey?
 2              MR. CASEY:  Jeremy Bloxham who's the former Dean of
 3   Science at Harvard University, and in fact his name was
 4   referenced in some of the email attachments to Exhibit 2, which
 5   were already read into evidence this morning.
 6              THE COURT:  How long will you be with him?
 7              MR. CASEY:  I don't think any longer than 20 minutes,
 8   Your Honor.
 9              THE COURT:  And what's the objection?
10              MS. DEIST:  Your Honor, as you heard from Mr. Casey,
11   he -- it was in our 404(b) papers as well, but this is kind of
12   a continuation of that -- as you heard from Mr. Casey, he's
13   actually going to have Mr. Bloxham -- or Professor Bloxham talk
14   about emails that were already read into evidence by
15   Ms. Ponting.  He's, at this point, not relevant; and his
16   testimony is cumulative.  He has nothing to offer except for
17   some more information about testimony --
18              THE COURT:  How can I know that unless I hear him?
19              MS. DEIST:  What?
20              THE COURT:  You can certainly stop him in the middle,
21   but until I hear something he has to say, I can't judge whether
22   it's appropriate or not.
23              MS. DEIST:  I understand, Your Honor.  I'm just
24   alerting you because I think I may make an objection right
25   after the first question.
```

```
 1              THE COURT:  Okay.  If you need to object, you will
 2    object.
 3              MS. DEIST:  All right.  Thank you.
 4              THE COURT:  And we'll all frown that it may be
 5    sustained.
 6              THE CLERK:  You can step right into the box, sir, and
 7    remain standing for a brief moment.  Can I swear you in, sir,
 8    please.
 9              (Witness sworn.)
10              THE WITNESS:  I do.
11              THE CLERK:  Sir, when you speak, could you please take
12    down your mask.
13              Could you just state for the record and spell your
14    last name, please.
15              THE WITNESS:  Jeremy Bloxham, B-l-o-x-h-a-m.
16              THE COURT:  Please, do be seated.  Thank you.
17              You may proceed.  And you told us you would be ten
18    minutes?
19              MR. CASEY:  I think I said 20, but I'll try for ten.
20              Thank you.
21              JEREMY BLOXHAM, having been duly sworn by the Clerk,
22    was examined and testified as follows:
23                          DIRECT EXAMINATION
24    BY MR. CASEY:
25    Q.   Good afternoon, Mr. Bloxham.
```

1          Can you tell the jury where you work, please?

2    A.   I work at Harvard University.  I've been a faculty member

3    there for 34 of the 36 years I've worked there.

4          THE COURT:  Excuse me.  Can the jury hear him?

5          MR. CASEY:  Just make sure you pull the microphone

6    closer to you and keep your voice up, okay?

7    Q.   Can you just give us a very general overview of the

8    various positions that you've held at Harvard since you started

9    there?

10   A.   So I started in Harvard in 1985 as a postdoc, held that

11   position for two years, and then I had the opportunity to join

12   the faculty as an assistant professor.  I was an assistant

13   professor for -- oh, and then an associate professor, for six

14   years in total, became a full professor in 1993.

15          In 2000, I became Chair of my Department, the

16   Department of Earth and Planetary Sciences.  Then, in 2006, I

17   became Dean of Science, a position I held until 2018.

18   Q.   And so you were the Dean of Science for approximately

19   12 years?

20   A.   That's correct.

21   Q.   And in general, what were your duties and responsibilities

22   as Dean of Science?

23   A.   I think the chief responsibility was to oversee the ten

24   science departments within the division.  That included meeting

25   on a regular basis with the department chairs, assisting with

1    the recruitment, promotion and retention of faculty.

2    Q.   Was the Chemistry and Chemical Biology Department one of

3    the science departments which you essentially oversaw?

4    A.   Yes, it was.

5    Q.   Is that CCB for short?

6    A.   Yes.

7    Q.   Do you know an individual named Charles Lieber?

8    A.   Yes, I do.

9    Q.   And how do you know him?

10   A.   He is a faculty member in CCB.

11   Q.   Did he ever hold any leadership positions within CCB?

12   A.   Yes, he served as Chair of the Department.

13   Q.   Do you see Mr. Lieber in the Courtroom today?

14   A.   Yes, I do.

15   Q.   Could you just point him out and identify him?

16   A.   He's sitting right here.

17   Q.   Thank you.

18          I'm going to focus your attention on November of

19   2014.  You were Dean of Science at that time?

20   A.   Yes, I was.

21   Q.   And did a particular issue concerning --

22          MS. DEIST:  Objection.  Your Honor, again, this is

23   actually going to testimony.  We object on relevance and 403

24   and that it's just cumulative to what Ms. Ponting just

25   testified about.

```
 1          THE COURT:  I'm not sure I understand that.  But until
 2   I hear the question, I don't know whether it's good or not
 3   good.
 4   Q.   Mr. Bloxham, in November of 2014, did a particular issue
 5   concerning Dr. Lieber come to your attention?
 6   A.   Yes, it did.
 7   Q.   And what was it that came to your attention?
 8   A.   A photograph of a laboratory at Wuhan University of
 9   Technology that had Harvard's name prominently displayed.
10          MS. DEIST:  And, Your Honor, I'll renew my objection
11   for 401 and 403 and that it's cumulative.
12          THE COURT:  Your objection is noted but overruled.
13   BY MR. CASEY:
14   Q.   Was there any individual associated with Harvard
15   identified in that photo that you saw?
16   A.   Yes, there was a plaque on the building with
17   Professor Lieber's name on it.
18   Q.   Had you ever heard of Wuhan University of Technology
19   before that?
20   A.   I hadn't, no.
21   Q.   Had you ever heard of the Wuhan WUT - Harvard Joint Nano
22   Lab before?
23   A.   No, I hadn't.
24   Q.   What was your response when you saw that photo?
25   A.   I was surprised, that Harvard has a process that one has
```

1    to go through to enable us a joint institute with another

2    organization, and I was surprised that I wasn't aware of such a

3    relationship.

4    Q.   Can you describe what that process would be?

5    A.   Ultimately, it would require -- if it's -- either approval

6    at the level of the Dean of the Faculty of Arts or Sciences or

7    at the Provost's Office if it involved an international

8    collaboration.

9    Q.   Okay.  What did you do after you saw that photo?

10   A.   Well, my first action was to contact the Office of the

11   Vice-Provost for International Affairs because there was always

12   the possibility that this was an agreement with another

13   institution that I simply hadn't been made aware of.

14   Q.   Did you consult anyone else?

15   A.   I didn't directly at that point.

16   Q.   Okay.  What did you -- what were you able to determine

17   based upon your consultation with the Provost's Office?

18   A.   So the Provost's Office informed me by email that they --

19           MS. DEIST:  Objection; hearsay.

20           THE COURT:  I'm sorry?

21           MS. DEIST:  Sorry, Your Honor.  Objection; hearsay.

22           THE COURT:  It's not being offered for the truth of

23   it, as I understand it.

24           MR. CASEY:  Correct.

25           THE COURT:  The objection is overruled.

1    Q.   Would you like me to repeat the question?

2    A.   Yes, please.

3    Q.   What, if anything, were you able to determine after

4    consulting with the Provost's Office?

5    A.   So the Provost's Office informed me that they were unaware

6    of a relationship with Wuhan University of Technology, and they

7    referred it -- the matter to the Harvard Trademark Office.

8    Q.   Okay.  And were you able to determine anything after the

9    Trademark Office took a look at it?

10   A.   So they looked at it and essentially said they were

11   equally unaware of any licensing of our trademark to --

12            MS. DEIST:  Objection.

13            THE COURT:  The objection to that is sustained.

14            MR. CASEY:  Fair enough.

15   Q.   Did you make any arrangements to speak with Dr. Lieber?

16   A.   Yes, I did.

17   Q.   And how did you meet with him?

18   A.   We met in my office.

19   Q.   Why did you want to speak with him?

20   A.   I wanted to find out from him why -- the nature of this

21   relationship with Wuhan University of Technology.

22   Q.   What were your concerns at that time?

23   A.   Well, I was concerned that there was an arrangement with

24   another institution that the relevant offices at Harvard were

25   unaware of.

1    Q.    Do you recall when that meeting took place?

2    A.    I believe it was in mid-to-late January.

3    Q.    Okay.  Was there a reason why there was such a delay

4    between when you found out about -- when you saw that photo and

5    when you met with Dr. Lieber?

6    A.    Well, when I saw that photograph was fairly close to

7    Thanksgiving, so there was the holiday week for Thanksgiving;

8    then I was in San Francisco for a week at a conference; and

9    then I traveled back to the United Kingdom with my family for

10   the holiday period.  So there was -- it was a busy time of

11   year.

12   Q.    During the meeting, did you ask Dr. Lieber about the WUT -

13   Harvard Joint Nano Lab?

14   A.    Yes, I did.

15   Q.    What was his response?

16   A.    He expressed surprise that there would be --

17            MS. DEIST:  Objection; 404(b).  As we stated in our

18   papers, this goes directly towards that, Your Honor.

19            THE COURT:  You can tell us what he said, rather than

20   characterizing his state of mind.

21            THE WITNESS:  Yeah.

22            THE COURT:  Thank you.

23   A.    He expressed surprise that Harvard's name was on this

24   building and characterized it as the action of a former member

25   of his lab who had acted beyond Dr. Lieber's understanding of

1    the relationship.

2    Q.   Did he describe to you what the relationship was?

3    A.   That it was a collaboration with a former member of his

4    lab at Harvard.

5    Q.   Did he characterize the collaboration?

6    A.   I don't recall him characterizing it directly, but --

7              MS. DEIST:  Your Honor, may we approach the bench very

8    briefly?

9              THE COURT:  I'm sorry?

10             MS. DEIST:  May we approach very briefly?

11             THE COURT:  No.

12   Q.   I'm sorry.  You can continue your answer.

13   A.   I don't recall him sort of characterizing the relationship

14   in detail.

15   Q.   Okay.  Did Dr. Lieber follow up with you at all in any

16   sort of communication after your meeting with him?

17   A.   Yes, I received a follow-up exchange of emails.

18             MR. CASEY:  Okay.

19             Mr. Bruemmer, could I have --

20             THE COURT:  I'm sorry.  You received emails from him,

21   and you responded?

22             THE WITNESS:  No.  I received an email from Dr. Lieber

23   and a reply to an email that he had sent to someone at WUT.

24             THE COURT:  Okay, thank you.

25             MR. CASEY:  Mr. Bruemmer, could I have Exhibit 61,

1    please?

2              THE CLERK:  Let me pull this.

3              MR. CASEY:  Not in evidence.

4              THE CLERK:  Yep.  Is that the one?

5              MR. CASEY:  That's the one, yes.  Thank you.

6    Q.   Do you recognize Exhibit 61, Dr. Bloxham?

7              THE COURT:  It should be on your screen, also.

8              THE WITNESS:  The monitor is blank at the moment.  Now

9    it's on.

10   Q.   Do you recognize Exhibit 61?

11   A.   Yes, I do.

12   Q.   And what is this?

13   A.   That is an email that Dr. Lieber sent me as a follow-up to

14   our meeting.

15             MR. CASEY:  Your Honor, I offer Exhibit 61.

16             MS. DEIST:  Your Honor, we object to this, at least to

17   Paragraphs 1 and 3, on the grounds of relevance.  They just

18   don't have anything to do with this testimony, and this

19   testimony is actually not related to the charged conduct, so

20   it's very far.  1 and 3, we ask that it be redacted, or at

21   least just be considered for not being the truth of the matter.

22   We ask that it's redacted.

23             THE COURT:  Well, number 3 says, One thing related to

24   number 2, Paragraph 2.

25             MS. DEIST:  Your Honor, it's discussing a different

1    request, though.

2            THE COURT:  I mean, are you saying 3 has nothing to do

3    with 2?

4            MS. DEIST:  Based on all of the information we

5    received and the Government has received, it is in fact a very

6    different --

7            THE COURT:  You're offering this for Paragraph 2

8    primarily or only?

9            MR. CASEY:  Paragraphs 2 and 3, Your Honor.

10   Paragraph 3, as Dr. Lieber wrote, is related to number 2.

11           THE COURT:  So, at some point, you will fix it so that

12   only the relevant paragraphs are there if the other one is

13   prejudicial, which I can't really tell.

14           MR. CASEY:  Paragraph 1, Your Honor, I'll make the

15   statement to you, is also relevant, and I can link it up.

16           THE COURT:  So, at the moment, we can talk about

17   Paragraph 2 and -- which is the one you asked about; correct?

18           MR. CASEY:  Well, I haven't asked about any specific

19   paragraph, but I'm happy to before we offer it, if you'd like.

20           MS. DEIST:  Your Honor, I'm objecting to 1 and 3, to

21   be clear, not 2.  2 is relevant.

22           THE COURT:  Well, at the moment, I will allow it all

23   to come in because I can't tell whether it's relevant or not.

24           THE CLERK:  Might I show?

25           THE COURT:  Yes.

```
1              THE CLERK:  I'm so sorry.  That's 61?

2              MR. CASEY:  61, yes.

3              (Government Exhibit 61 received in evidence.)

4    BY MR. CASEY:

5    Q.   Dr. Bloxham, I think you said this.  Is this an email from

6    Charles Lieber to you dated January 29th, 2015?

7    A.   Yes, it is.

8    Q.   Okay.  And during your meeting with Dr. Lieber that

9    preceded this, did you speak about other matters other than the

10   Lab?

11   A.   I don't recall exactly what other things we may have

12   talked about during -- in that meeting.

13   Q.   Okay, fair enough.

14           Do you see item number 1 here?

15   A.   Yes, I do.

16   Q.   Do you have a memory of what he's referring to there?

17   A.   This is referring to the possibility of sponsorship of

18   Dr. Lieber's research by Samsung.

19   Q.   And was that something he was pursuing at Harvard

20   University?

21   A.   Yes, it was.

22   Q.   Was he seeking approval from anyone to do that?

23   A.   Yes, he was.

24   Q.   Who was he seeking approval from?

25   A.   He -- we -- as I recall, we had had conversations
```

1    regarding Harvard's rules about accepting corporate money if it

2    involved corporate naming of a chair.

3              MR. CASEY:  Fair enough, okay.

4              And Mr. Bruemmer, could you highlight number 2,

5    please?

6    Q.   Dr. Bloxham, could you just read that, please?

7    A.   "With regards to Wuhan University of Technology, if you or

8    someone in appropriate Harvard office could let me know what I

9    should say -- I should also say to at least my former postdoc

10   who is now professor there with regards to what is not and is

11   appropriate way to refer to collaboration, it would be helpful

12   to know.  I want to reiterate that I spend no more than two to

13   three days per year at their university and do this for mutual

14   scientific interaction."

15   Q.   That last sentence, was that more or less consistent with

16   what he told you when you met with him?

17   A.   Yes.

18   Q.   Does that -- did that last sentence raise any concerns to

19   you, as Dean of Science?

20   A.   No.  For a member of our faculty to spend a few days a

21   year at another institution in order to collaborate with a

22   colleague there is perfectly normal.

23              MR. CASEY:  Mr. Bruemmer, could you highlight number 3

24   for us, please.

25   BY MR. CASEY:

1    Q.   Dr. Bloxham, could you read the first sentence of item

2    number 3 in Exhibit 61?

3    A.   "One thing related to number 2, which I wanted to discuss

4    from a more departmental standpoint sometime, is what is

5    protocol for making an agreement between, say, CCB [Harvard]

6    and a department school in another country."

7    Q.   Did you know at that time whether Dr. Lieber had any sort

8    of agreement between Harvard and any school or department in

9    another country?

10   A.   I didn't know of such an agreement.

11            MR. CASEY:  Okay.

12            Thank you, Mr. Bruemmer.

13   BY MR. CASEY:

14   Q.   After you received that email, Exhibit 61, did you talk

15   with Dr. Lieber at all about how he might respond to his former

16   postdoc?

17   A.   I don't recall a specific conversation on that matter.

18   Q.   Did you subsequently receive any emails?

19   A.   Yes, I did.

20   Q.   Okay.  And who do you recall that email was from and to?

21   A.   It was an exchange between Dr. Lieber and his colleague,

22   former lab group member at Wuhan University of Technology.

23            MR. CASEY:  Mr. Bruemmer, could I have Exhibit 63, not

24   in evidence?

25   BY MR. CASEY:

1    Q.   Do you recognize Exhibit 63, Dr. Bloxham?

2    A.   Yes, I do.

3    Q.   And what is it?

4    A.   It is a cc to me of an email that Dr. Lieber sent to his

5    colleague at Wuhan University of Technology.

6    Q.   And what's this colleague's name?

7    A.   His initials are MLQ.  I think it's Dr. Mai.

8    Q.   Do you see, at the very top, a "Dear" name?

9    A.   Yes.

10   Q.   "Dear Liqiang"?

11   A.   Yes, I do.

12   Q.   Okay, That's who he wrote it to.

13        MR. CASEY:  Your Honor, I offer Exhibit 63.

14        THE COURT:  Are you objecting?

15        MS. DEIST:  I'm only objecting to the extent that it

16   is cumulative to the exhibit that Ms. Ponting read from, just

17   to note that for the record regarding that 404(b) conduct that

18   we referred to earlier.  But we don't object to --

19        THE COURT:  I don't understand.  Are you objecting to

20   the introduction of this document?

21        MS. DEIST:  I'm objecting to the document.  I realize

22   that it is -- it meets the foundational requirements.  I'm

23   objecting to the extent that it goes into, again, this 404(b)

24   conduct and that it was already talked about with Ms. Ponting.

25   It's the same exact email.

```
 1              THE COURT:  Okay.  The objection is overruled but
 2    noted.
 3              (Government Exhibit 63 received in evidence.)
 4    BY MR. CASEY:
 5    Q.    And before I get into the email, would it be fair to say
 6    that you, in your time at Harvard, have exchanged emails with
 7    Dr. Lieber?
 8    A.    Yes, I have.
 9    Q.    Okay.  And are you aware of any other individual at any
10    point in time at Harvard University named Charles Lieber?
11    A.    No, I am not.
12    Q.    Okay.  Other than the Defendant?
13    A.    Yes.
14    Q.    Okay.  And do you recall receiving this email?
15    A.    Yes, I do.
16    Q.    Okay.  And could you just read the very top portion for
17    us, please, underneath where it says, "Dear Liqiang"?
18    A.    "I am writing to bring up a point that I made previously
19    about our research collaboration and what is/is not appropriate
20    with respect to Harvard University.  In short, my point was and
21    remains as follows."
22    Q.    And could you just read the first two points below that?
23    A.    "Our agreement for research collaboration is between you,
24    Wuhan University of Technology (WUT), and me and does not
25    constitute an agreement with Harvard University.
```

 1              "Two, I am happy to continue this collaboration

 2      within the time constraints of my position at Harvard and

 3      previously spelled out in our discussions, including help with

 4      advising the laboratory WUT."

 5      Q.   And was that consistent with what he told you when you met

 6      with him in January 2015?

 7      A.   Yes, broadly speaking.

 8              MR. CASEY:  Okay.  Could I have Exhibit 65,

 9      Mr. Bruemmer.

10      BY MR. CASEY:

11      Q.   Do you recognize Exhibit 65?

12      A.   Yes, I do.

13      Q.   And what is this?

14      A.   It is an email, which was cc'd to me from Dr. Lieber to

15      Professor Liqiang Mai.

16      Q.   If we go to the second page, is that the email we just saw

17      in Exhibit 63?

18      A.   Yes, it is.

19      Q.   Okay.  And if we go to Page 1, what is -- the bottom

20      email, what does that appear to you to be?

21      A.   A reply to Dr. Lieber from Professor Mai at Wuhan

22      University of Technology, cc'd to me.

23              MR. CASEY:  Your Honor, I move to admit Exhibit 65.

24              MS. DEIST:  Your Honor, no objection, except for I

25      note that the top email -- I'm sorry -- the middle email from a

1   Professor Mai is a person who is not available and just so

2   that, that portion --

3          THE COURT:  What is it being offered for?

4          MR. CASEY:  Well, it's the Defendant's statement at

5   the top.

6          MS. DEIST:  And that statement underneath it is just

7   hearsay from someone who is not available.

8          MR. CASEY:  It's not offered for the truth.

9          THE COURT:  I don't see how I can possibly rule on

10  this without reading the whole thing.  Is there any way in

11  which we can get over this before the jury gets to see it?

12         MR. CASEY:  We did try and confer, Your Honor.

13         MR. MUKASEY:  Judge, much of this is the subject of

14  the 404(b) motion that I think Your Honor properly deferred on.

15  I think that maybe at the end of the testimony, because we

16  certainly don't want to waste the jury's time, we can discuss a

17  limiting instruction that might be helpful to both allow the

18  Government --

19         THE COURT:  That would be good.

20         In the meantime, which paragraph are you referring to

21  specifically?

22         MR. CASEY:  I'm going to offer the whole email, Judge,

23  under rule --

24         THE COURT:  No, but which part are you going to

25  inquire about?

```
1              MR. CASEY:  Right now, the bottom -- both emails on
2    the first page, and we're offering them under rule 404(b) as
3    evidence.
4              THE COURT:  All numbers, 1 through 3?
5              MR. CASEY:  I'm not going to have him read the whole
6    email, Judge; I'm just going to ask him to read the top.
7              THE COURT:  Well, go ahead, and we'll come up with
8    some limiting instruction when we do that.
9              MR. MUKASEY:  Yeah, because he's offering it
10   specifically under 404(b), so that would be appreciated.
11             THE COURT:  Is this your witness or -- is it
12   Ms. Young?  No.  Ms. Deist.
13             MS. DEIST:  Ms. Deist.  I think I've been objecting
14   quite a bit, but I also --
15             THE COURT:  But being double-teamed by such incredibly
16   good advocates is terribly difficult, so I would prefer to have
17   one of you do that.
18             MR. MUKASEY:  I will shut up.
19             THE COURT:  I'm not saying you should shut up.
20             So in any event, we are now talking about the entire
21   document?
22             MR. CASEY:  That's right, Your Honor.
23             THE CLERK:  I'm sorry, Judge.  Is it in?
24             THE COURT:  I don't know.  I haven't read it.  I have
25   no idea.  The objection to that is hearsay or what?
```

```
 1              MS. DEIST:  The objection, actually, I think Mr. Casey

 2    just asked about an email from a person who is not available

 3    and not Professor Bloxham is hearsay.  That's our objection for

 4    that bottom email.

 5              THE COURT:  Well, it's hearsay if it's being offered

 6    for the truth of it, not if it's offered for some other reason.

 7              MS. DEIST:  I don't think Mr. Casey articulated

 8    exactly what exceptions.

 9              MR. CASEY:  I'm happy to do that, Your Honor.  We're

10    not offering the bottom email for the truth of the matter; it's

11    coming in context because Dr. Lieber responds to it, and so we

12    need to know what he's responding to.

13              THE COURT:  I'll allow it for that purpose only, not

14    for the truth of what's in it.

15              MR. CASEY:  Thank you.

16              THE CLERK:  So it's in?

17              THE COURT:  It's in.

18              THE CLERK:  Okay.

19              (Government Exhibit 65 received in evidence.)

20    BY MR. CASEY:

21    Q.   Dr. Bloxham, do you see Exhibit 65 in front of you?

22    A.   Yes, I do.

23    Q.   Okay.  And we just talked about this, but on Page 2,

24    just to orient the jury, is that the email that Dr. Lieber

25    sent to Liqiang concerning the joint lab that we just saw in
```

1    Exhibit 63?

2    A.   Yes, it is.

3    Q.   Okay.  And then, if we go to Page 1, the bottom email, is

4    that an email from Professor Liqiang Mai to Charles Lieber,

5    copying you in response to the email we just looked at on

6    Page 2?

7    A.   Yes, it is.

8    Q.   And could you just read just the top two points there,

9    please?

10   A.   "Thank you for your kind note.  I confirm that I

11   understand these constraints and that we will work

12   expeditiously to make appropriate changes.  I am sorry to

13   trouble you in this.  My detailed responses are as follows."

14   Q.   And then he makes three points?

15   A.   Yes.

16   Q.   Okay.  And then the email above that, what is that?

17   A.   That is an email from Dr. Lieber to Professor Mai.

18   Q.   And are you copied on that email?

19   A.   Yes, I am.

20   Q.   Do you see below where your name is there's some letters,

21   BCC; do you see that?

22   A.   Yes, I do.

23   Q.   Do you know what BCC is?

24   A.   That's blind copy.

25   Q.   And do you recognize at all the email address that's

1    listed in the BCC field?

2    A.   I recognize the domain name.

3    Q.   Okay.  Do you know what person is associated with that --

4         THE COURT:  I'm not sure what we're talking about.  I

5    have a very pale paragraph.

6         MR. CASEY:  I'm talking about the "To, CC, BCC" and

7    "From" fields at the very top of the document.

8         MS. DEIST:  And I object to that on the lack of

9    personal knowledge.

10        THE COURT:  We don't have the text of that, do we?

11        MR. CASEY:  The text is below that, but you can see --

12   I'm only asking him about the "To, From, CC, BCC" fields, which

13   are highlighted here.

14        MS. DEIST:  I believe Mr. Casey's asking if he knows

15   who the BCC is, and Professor Bloxham just doesn't have that

16   personal knowledge.  It's speculation.

17        MR. CASEY:  I just asked him if he knew, and he said,

18   "No."

19        THE COURT:  Go ahead.

20        MR. CASEY:  Okay.

21   Q.   You do not know which individual is associated with this

22   email address in the BCC field?

23   A.   No, I don't.

24   Q.   Did you say earlier -- and correct me if I'm wrong -- that

25   you recognized the domain associated with that email?

```
 1   A.    Yes, I do.

 2   Q.    And how do you recognize that domain?

 3   A.    PKU is Peking University --

 4         THE COURT:  Is what?

 5   A.    -- and CN is China.

 6         MS. DEIST:  Again, I'm going to object to personal

 7   knowledge on that.  He can only speculate that that's what he

 8   believes that domain name to be.

 9         THE COURT:  He's already answered.  I'm not going to

10   strike it.

11   Q.    And how is it that you know that?

12   A.    If I may draw an analogy, knowing that PKU.edu is Peking

13   University would be analogous to knowing MIT.edu is

14   Massachusetts Institute of Technology.

15   Q.    Fair enough.

16         If we could just highlight just the first sentence of

17   Dr. Lieber's response, please.

18   A.    "Thank you for your response.  I am glad that you will

19   address these issues with respect to inappropriate use of

20   Harvard name with respect to our scientific collaboration."

21   Q.    After you received these emails, did you take any further

22   action with respect to the WT/Harvard Joint Nano Lab?

23   A.    I communicated back to the Vice-Provost for International

24   Affairs, and I believe I communicated with the Office for

25   Faculty Affairs in the Faculty of Arts and Sciences.
```

1    Q.    Did you take any action with respect to Dr. Lieber at all?

2    A.    No.  At that point, I considered this matter was

3    satisfactorily addressed.

4    Q.    Did you have any concerns at all, after this exchange of

5    emails, about Dr. Lieber's -- or I should say the nature and

6    extent of Dr. Lieber's relationship with Wuhan University of

7    Technology?

8              MS. DEIST:  Objection.

9              THE COURT:  He may tell us what his concerns are.

10             What's the objection?

11             MS. DEIST:  Oh, my objection is relevance to this and,

12   again, 404(b) and mostly relevance in 2015 regarding now these

13   counts that have occurred in 20 -- that are in 2018 and 2019.

14             THE COURT:  The history is part of what happened in

15   2014, so you may answer.  Were you concerned at that time?

16   Q.    Sure.  Did you have any concerns, after this exchange of

17   emails, about the nature and extent of Dr. Lieber's

18   relationship with Wuhan University of Technology?

19   A.    No.  This exchange of emails addressed any concerns I may

20   have had.

21   Q.    Earlier you mentioned that Dr. Lieber at some point became

22   Chair of the Chemistry and Chemical Biology Department; is that

23   right?

24   A.    Yes, he did.

25   Q.    Relative to Exhibit 65, do you recall when it was that

1    Dr. Lieber became Chair of the Department?

2    A.   He would have assumed responsibility as Chair July 1st of

3    that year.

4    Q.   What was the state of the Chair position in the Chemistry

5    and Chemical Biology Department as of February, 2015?

6    A.   The Department was aware that the Chairmanship was

7    becoming vacant, and so there were conversations regarding who

8    should be the next Chair of the Department.

9           MR. CASEY:   Okay.   Just one moment, Your Honor.

10          (Counsel confer)

11          MR. CASEY:   Nothing further.   Thank you.

12          THE COURT:   Ms. Deist, do you have any questions?

13          MS. DEIST:   I do have just a couple of questions,

14   Your Honor.

15                       CROSS EXAMINATION

16   BY MS. DEIST:

17   Q.   Good morning -- actually, yeah.   Good afternoon,

18   Professor Bloxham.

19           We have not met before, have we?

20   A.   No, we haven't.

21   Q.   We have not.   But you have met, of course, with the two

22   gentlemen sitting here at the Government's table?

23   A.   Yes, I have.

24   Q.   And Harvard also is paying for your lawyer, too; right?

25   A.   I hope so.

1    Q.   Fair enough.

2         We've talked a lot about it today, but just to

3    clarify, collaborations with professors and universities in

4    China is fine -- collaborations are permitted, I should say, by

5    Harvard?

6    A.   Absolutely.

7    Q.   And this particular issue that Mr. Casey asked you a lot

8    of questions about occurred at the end of 2014 and the

9    beginning of 2015; right?

10   A.   That's correct.

11   Q.   A relatively short time frame, just that maybe, like, a

12   month or two?

13   A.   Yes.

14   Q.   And that was primarily a trademark issue?

15   A.   Yes, it was.

16   Q.   And during that time, you never asked him any questions

17   specifically about the Thousand Talents Program?

18   A.   No, I didn't.

19   Q.   It never came up?

20   A.   No, it didn't.

21        MS. DEIST:  All right.  Thank you.  I told you I'd be

22   short, Your Honor.

23        THE COURT:  Any redirect?

24        MR. CASEY:  Just one question.

25                          REDIRECT EXAMINATION

```
 1    BY MR. CASEY:
 2    Q.   When you met with Dr. Lieber, did he say anything to you
 3    about the Thousand Talents Program?
 4    A.   No, he didn't.
 5              MR. CASEY:  Thank you.
 6              THE COURT:  Thank you, Mr. Bloxham.  You're excused.
 7              Who's next?
 8              MR. DRABICK:  Your Honor, the Government will be
 9    calling Renee Donlon.
10              THE COURT:  Is Renee Donlon here?
11              MR. DRABICK:  She is.  I believe she is outside.  It
12    may extend past our 1:00 end today, of course.
13              THE COURT:  Well, we might as well start.
14              MR. DRABICK:  Very good.
15              THE COURT:  But until she gets here, we'll stretch.
16              Are we missing a witness?
17              MR. DRABICK:  I believe she's coming in, Your Honor.
18              THE COURT:  Could you please just get your way over to
19    this seat over there?  Can you manage it?
20              THE WITNESS:  Yes, thank you.
21              THE COURT:  Thank you.  And remain standing until
22    you've been sworn.  Is that okay?
23              THE WITNESS:  Yes.
24              THE CLERK:  Okay.
25              THE COURT:  We won't make you raise your right hand.
```

```
 1              (Witness sworn.)
 2              THE WITNESS:  Yes.
 3              THE CLERK:  Okay.  May I ask you just to put down your
 4    mask, please, when you sit.
 5              And could you just state your name, spelling your last
 6    name for the record, please.
 7              THE WITNESS:  My name is Renee Donlon, R-e-n-e-e,
 8    D-o-n-l-o-n.
 9              THE CLERK:  Thank you.
10              THE COURT:  You may proceed.  R-e-n-e-e, D-o-n-l-o-n.
11              MR. DRABICK:  Thank you, Your Honor.
12              RENEE DONLON, having been duly sworn by the Clerk, was
13    examined and testified as follows:
14                        DIRECT EXAMINATION
15    BY MR. DRABICK:
16    Q.   Good afternoon, Ms. Donlon.
17    A.   Good afternoon.
18    Q.   Ms. Donlon, if you could just please move the microphone
19    close to you and speak loudly.
20              Where do you live?
21    A.   I currently live in London.
22    Q.   Did you grow up in London?
23    A.   No.  I grew up around Boston.
24    Q.   How long have you been in London?
25    A.   For the last just over four years.
```

1    Q.    Did you live in the United States before that?

2    A.    Yes, I did.

3    Q.    And what do you do for a living in London?

4    A.    I work as an Administrator at the London University of the

5    Arts.

6    Q.    And did you recently undergo some surgery?

7    A.    I did.

8    Q.    Does that explain the crutches coming in today?

9    A.    Yes.

10   Q.    Are you familiar with Charles Lieber?

11   A.    Yes, I am.

12   Q.    How do you know him?

13   A.    He was my boss for five years while I worked at the Lieber

14   Lab at Harvard.

15   Q.    And what was the exact timeframe that you worked there?

16   A.    I started at the end of October, 2012; and I left in the

17   summer of 2017.

18   Q.    And what was your title?

19   A.    Administrative Coordinator.

20   Q.    And what were your responsibilities?

21   A.    A lot of admin for the research group and for Professor

22   Lieber, I booked travel for Professor Lieber, I answered his

23   phone, I helped manage his calendar, general office management,

24   ordering supplies, ordering any scientific or research supplies

25   that the researchers -- that they needed.

1    Q.    Did you act in any way as a gatekeeper for

2    Professor Lieber?

3    A.    I would say so.  I screened his calls.

4    Q.    And you mentioned the Lieber Group.  Is that how you

5    referred to where you worked?

6    A.    Yes, Lieber Group or Lieber Lab interchangeably.

7    Q.    And approximately how many people were there in the Lieber

8    Group?

9    A.    Approximately, I would say, 22 to 25.

10   Q.    And what was the makeup?  What did the other folks do?

11   A.    It was mainly graduate students and postdocs, postdoctoral

12   researchers.

13   Q.    I was going to ask, what is a postdoc?

14   A.    Postdoc, to my understanding, is someone who's finished

15   their Ph.D. and is now doing postdoctoral research.

16   Q.    How often did you interact with Professor Lieber?

17   A.    Every day by email.

18   Q.    Did you speak to him on the phone?

19   A.    Yes.

20   Q.    How often?

21   A.    Several times a week.

22   Q.    And did you interact with him in person about work-related

23   matters?

24   A.    Very rarely in person.

25   Q.    Any particular reason for that?

1    A.   My office was downstairs in the basement, and I think

2    Professor Lieber seemed to prefer not to have to, like, come

3    talk to people when it wasn't absolutely necessary.

4         MS. GUABA:  Objection.  Your Honor, the witness is

5    speculating as to Dr. Lieber's state of mind.

6         THE COURT:  Oh, come on.

7         MR. DRABICK:  No further questions on that topic,

8    Your Honor.

9    Q.   Do you see Dr. Lieber in the Courtroom today?

10   A.   Yes, I do.

11   Q.   And could you please just point him out for us?

12   A.   (Indicates)

13   Q.   Are you familiar with the name "Kathleen Ledyard"?

14   A.   Yes, I am.

15   Q.   And who is Ms. Ledyard?

16   A.   She was the Lab Manager of the Lieber Lab while I was

17   there.

18   Q.   And are you familiar with the name "Elizabeth Lenox"?

19   A.   Yes.

20   Q.   And who's Ms. Lenox?

21   A.   She was the -- I believe her title was Director of

22   Laboratories.  She was the, I would say, nonscientific head of

23   the Department.

24   Q.   And are you familiar with the name "Jennifer Lieber"?

25   A.   Yes.

```
1    Q.   And who is Jennifer Lieber?

2    A.   Professor Lieber's wife.

3    Q.   Was Professor Lieber a busy person?

4    A.   Yes.

5    Q.   Did you observe him to have a lot of free time?

6    A.   No.

7    Q.   Did you observe him to be generous with his time toward

8    others?

9    A.   No.

10   Q.   How would you describe his work schedule?

11   A.   Very full, very busy, long.

12   Q.   Did he work long hours?

13   A.   He did, yes.

14   Q.   What time would he get to work?

15   A.   Usually before me.

16   Q.   And what time did you arrive?

17   A.   I believe I worked 9:00 to 5:30.

18   Q.   And would he be there when you left?

19   A.   Yeah, I think he would usually leave after me.

20   Q.   Was that true for the entire duration that you worked for

21   him?

22   A.   Yes.

23   Q.   Were there any periods when he worked less than average?

24   A.   There might have been a few weeks here or there.  I

25   believe he was ill maybe, and he worked slightly less than his
```

1    usual but I'd say still more than full time, more than average,

2    I'd say.

3    Q.   Did you handle his mail?

4    A.   I did, yes.

5    Q.   And how did that work?

6    A.   Every day, or pretty much every day, I'd go upstairs to

7    the mailroom, I'd collect the mail for him, I'd bring it back

8    downstairs, I'd open it, throw away and, you know, junk mail

9    and put the mail into his in box.

10   Q.   Have you been in his office?

11   A.   I have.

12   Q.   Approximately how many times?

13   A.   Oh, in the five years that I worked there, about a half

14   dozen times, maybe.

15   Q.   Would you at times see Professor Lieber's email

16   correspondence?

17   A.   Yes.

18   Q.   And how would that come about?

19   A.   Sometimes he would cc me into email correspondence.

20   Sometimes he would forward me emails that he had received.

21   Q.   Any particular types of emails that he would include you

22   in?

23   A.   Yeah.  I mean, usually they involved either me writing a

24   recommendation letter or drafting a recommendation letter for

25   someone or planning a trip.

1          THE COURT:  Is this as good a time as any to suspend?

2          MR. DRABICK:  Yes, Your Honor.

3          THE COURT:  So, members of the jury, we will suspend

4    this until tomorrow morning at 9:00.  We will start again

5    tomorrow morning at 9:00 promptly.  And I'm so sorry to ask you

6    to come back, but it is a nice building.

7          THE WITNESS:  It is.

8          THE COURT:  So please do not think about the case,

9    don't talk about the case and the evidence that you've heard.

10   Keep it to yourself until such time that you're talking to each

11   other in the jury room after all of the evidence has been

12   presented.  You have only heard a very small portion of the

13   case, and it's important that you hear the whole thing, as well

14   as the arguments and the instructions on the law.

15         THE CLERK:  I'm so sorry.  I just wanted them to leave

16   their books.

17         THE COURT:  Yes, leave your books behind on your seat,

18   and we will return them to you tomorrow.  And you're now

19   excused.

20         THE CLERK:  All rise, please.

21         THE COURT:  Court is in recess until 2:00.

22         MR. MUKASEY:  Your Honor, may I be heard?

23         THE COURT:  It depends.  We are in recess, and the

24   audiences may stay or leave, as you wish.  What am I to hear?

25         MR. MUKASEY:  We were very reluctant to object during

1    Professor Bloxham's testimony and apologize for disrupting the

2    flow.  Because it does cover a 404(b) issue, I think what we'd

3    like to do, if it's okay with the Court, is draft a limiting

4    instruction for what we believe pertains to the charges.

5              THE COURT:  I'm happy to receive that.

6              MR. MUKASEY:  So we're going to do that tonight, if it

7    please the Court.

8              THE COURT:  Okay.

9              MR. MUKASEY:  Thank you.

10             THE COURT:  You are more than welcome.

11             (Adjourned, 1:00 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Linda Walsh, Registered Professional Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter, to the best of my skill and ability.

9              Dated this 15th day of December, 2021.

10

11

12              /s/ Linda Walsh
                _____

13              Linda Walsh, RPR, CRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25