1              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
2

3
                                    )
4    UNITED STATES OF AMERICA,       )
                                    )
5           Plaintiff,               )
                                    )   Criminal Action
6    v.                              )   No. 1:20-cr-10111-RWZ-1
                                    )
7    CHARLES LIEBER,                 )
                                    )
8           Defendant.               )
                                    )
9

10

11            BEFORE THE HONORABLE RYA W. ZOBEL
               UNITED STATES DISTRICT JUDGE
12

13                      JURY TRIAL
                         DAY 3
14

15                  December 16, 2021
                     8:42 a.m.
16

17        John J. Moakley United States Courthouse
                   Courtroom No. 12
18                 One Courthouse Way
               Boston, Massachusetts 02210
19

20

21

22            Linda Walsh, RPR, CRR
                Official Court Reporter
23    John J. Moakley United States Courthouse
            One Courthouse Way, Room 5205
24          Boston, Massachusetts 02210
               lwalshsteno@gmail.com
25

1    APPEARANCES:

2    On Behalf of the Government:

3         UNITED STATES ATTORNEY'S OFFICE
          By: AUSA James R. Drabick
4             AUSA Jason A. Casey
          1 Courthouse Way, Suite 9200
5         Boston, Massachusetts 02210
          617-748-3498
6         james.drabick@usdoj.gov

7    On Behalf of the Defendant:

8         MUKASEY FRENCHMAN LLP
          By: Marc L. Mukasey, Esq.
9             Torrey K. Young, Esq.
              Catherine M. Deist, Esq.
10            Stephanie Guaba, Esq.
          570 Lexington Avenue, Suite 3500
11        New York, New York 10022
          212-466-6400
12        marc.mukasey@mfsllp.com

13

14

15                 Proceedings reported and produced
                    by computer-aided stenography.
16

17

18

19

20

21

22

23

24

25

```
1                              INDEX

2    WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS

3    RENEE DONLON

4        By Mr. Drabick          3-21              3-63
         By Ms. Guaba                     3-56
5
     KARA SPICE
6
         By Mr. Casey            3-65
7

8                          E X H I B I T S

9
                           DESCRIPTION              RECEIVED
10
     GOVERNMENT EXHIBITS
11
        12       ...........................................   3-78
12
        13       ...........................................   3-86
13
        14       ...........................................   3-88
14
        17A      ...........................................   3-91
15
        18       ...........................................   3-102
16
        21       ...........................................   3-104
17
        22       ...........................................   3-107
18
        24       ...........................................   3-123
19
        25       ...........................................   3-127
20
        26       ...........................................   3-128
21
        33       ...........................................   3-23
22
        34       ...........................................   3-149
23
        40       ...........................................   3-49
24

25
```

```
 1                          EXHIBITS (continued)

 2

 3        41      ...........................................   3-174

 4        45      ...........................................    3-42

 5        46      ...........................................    3-41

 6        53      ...........................................    3-46

 7       150      ...........................................   3-135

 8       151      ...........................................   3-137

 9       153      ...........................................   3-152

10       154      ...........................................   3-155

11       155      ...........................................   3-161

12       156      ...........................................   3-162

13       157      ...........................................   3-163

14       158      ...........................................   3-164

15       159      ...........................................   3-175

16       178      ...........................................    3-44

17       200      ...........................................    3-32

18       230      ...........................................    3-52

19

20                                                             PAGE

21     Stipulation..........................................    3-52

22     Stipulation..........................................    3-73

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  All rise, please.
 3            THE COURT:  Good morning.  Please be seated.  I'm
 4    sorry we are a little early, but -- you only asked for
 5    15 minutes, but you need more.  You always go over.
 6            THE CLERK:  Okay.  So this is the stipulation that
 7    they agreed upon, and I'm not sure -- Mr. Mukasey gave me this,
 8    but I'm sure he can tell you what it is.  I don't really
 9    understand it.
10            MR. MUKASEY:  May I, Judge?
11            THE COURT:  Please do.
12            MR. MUKASEY:  Good morning.
13            THE COURT:  Good morning.
14            MR. MUKASEY:  I actually hate to say this, but we have
15    been working very cooperatively and very nicely --
16            THE COURT:  Well, I'm happy to hear that.
17            MR. MUKASEY:  -- with the prosecutors --
18            THE COURT:  See, now this really did work.
19            MR. MUKASEY:  -- to try to narrow down the number of
20    disputes that we have about evidence.  We obviously have a
21    fundamental dispute about the scope of the case.
22            THE COURT:  About?
23            MR. MUKASEY:  The scope of the case.  We think that
24    the case should be about the false statements that were made
25    about the Thousand Talents Program, and they would like to
```

1    bring in a lot of other activity surrounding Professor Lieber.

2            But putting that aside for the moment, after the

3    current witness, Ms. Donlon, is finished testifying on direct,

4    which I anticipate is a half hour or so, Ms. Guaba from our

5    team will do a brief cross.  Then I anticipate that the

6    Government is going to call an FBI agent to the stand.  Using

7    that FBI agent as a narrator essentially, they're going to put

8    in somewhere around 50-something emails --

9            MR. CASEY:  Ish, yes.

10           MR. MUKASEY:  -- something around 50 emails that were

11   sent by this Dr. Mai in China to Professor Lieber.  We have

12   tried to work out with the Government the issues of

13   authenticity and the issues of admissibility.  I gave you a

14   chart.  It's probably the last thing you want to look at right

15   now, but it does anticipate --

16           THE COURT:  This document that was just given to me --

17           MR. MUKASEY:  I'll get to that in a moment.  I gave

18   you something that looks like a chart.

19           THE COURT:  I don't think I have it.  Oh, this

20   document?

21           MR. MUKASEY:  There you go.

22           THE COURT:  Okay.

23           MR. MUKASEY:  And that tries to summarize the emails

24   that the Government wants to put in and our objection.  I think

25   that they're going to go with this sort of typical prosecutor's

1   play book, which is to say they're offering --

2          THE COURT:  How do you know?  Oh, you did it once?

3          MR. MUKASEY:  I did it for nine years.  I was very

4   poor.  I'm much richer now.

5          I think they're going to try to bring them in using

6   state of mind and context and, We're not offering it for the

7   truth, and we're going to dispute some of that.  And I don't

8   want to make a scene in front of the jury where we're popping

9   up every five minutes.

10         So we gave you what we hope is a guide to some of the

11  critical objections.  Many of these emails are -- again, this

12  is from a person that we cannot cross-examine.

13         THE COURT:  When will I have to rule on these?

14         MR. MUKASEY:  I'm sorry?

15         THE COURT:  When will I have to rule on these?

16         MR. MUKASEY:  Probably in the middle of the

17  Government's direct of the witness.

18         THE COURT:  Of the current witness?

19         MR. MUKASEY:  The next one.

20         THE COURT:  I mean, when am I supposed to study this

21  and make a decision about it?

22         MR. MUKASEY:  I think that some of them may be a

23  game-time decision, and if the Court wanted to look at some of

24  them maybe at the break, maybe that's the best way to do it.

25  But generally I think that we -- I mean --

 1          THE COURT:  Is this document, the chart, a list of all
 2    of the issues, all of the disputed emails?
 3          MR. MUKASEY:  I think it is, yes.
 4          THE COURT:  So that only disputed emails, not all
 5    emails?
 6          MR. MUKASEY:  We may list some there where there's no
 7    objection, but those --
 8          MR. CASEY:  There are 72, I believe, exhibits that we
 9    will attempt to admit into evidence through the next witness,
10    the FBI agent.  I think 22-ish are agreed to.
11          MS. DEIST:  I think we are about at --
12          THE COURT:  Excuse me.  I really prefer to hear one
13    lawyer for each side, as opposed to two at the same time.
14          MR. MUKASEY:  Go ahead.
15          THE COURT:  No.  I mean, the Government.
16          MR. MUKASEY:  Understood.
17          THE COURT:  As I understood it, Mr. Mukasey was
18    talking for the Defendant.
19          MR. CASEY:  Yeah.  So, it may be more than 22 are
20    agreed to now, but somewhere between, let's just say, 20 and 30
21    of the 70-ish emails and other documents that we're going to
22    offer through the next witness.
23          THE COURT:  When will I know what the disputed ones
24    are?
25          MR. CASEY:  So I think there are a list of disputes

1    that are on the chart in front of you.

2              THE COURT:  This one?

3              MR. CASEY:  Correct.  And I think it might be helpful

4    to provide the Court some context and understanding --

5              THE COURT:  Well, wait a minute.  Had Mr. Mukasey

6    finished?

7              MR. MUKASEY:  I guess the only thing left I need to

8    say, Judge, is that we will not be able to cross-examine the

9    author of many of these emails because he's in China, and so

10   we're going to be hypersensitive to how they're coming in and

11   for what purpose and whether they are really being offered for

12   the truth of the matter asserted but with some other cloak.

13   And that's what we wanted to note.

14             THE COURT:  Well, if they have a cloak, is there any

15   reason why they can't come in, even though there may be a side

16   issue, or it may be the main issue?

17             MR. MUKASEY:  Well, if they can articulate a

18   non-hearsay and relevant reason, I'd be a fool to object.  I

19   don't think that, so far, we've agreed that there's a

20   non-hearsay relevant reason yet on about 40 of these.

21             THE COURT:  All of these are coming in through the

22   witness who is now on the stand?

23             MR. MUKASEY:  The next one, the next witness.

24             THE COURT:  I'm sorry?

25             MR. MUKASEY:  The next witness that we are going to

1    call.

2          THE COURT:  The next witness, okay.  So I have a

3    little time in between to at least look at this.

4          MR. MUKASEY:  Yes, you do.

5          THE COURT:  Well, that's a help.

6          MR. MUKASEY:  Anything I can do.

7          THE COURT:  Thank you.

8          MR. CASEY:  So, Your Honor, just so you'll have some

9    context, a lot of this is outlined in our trial brief that we

10   submitted; but, in general, the emails that will be offered

11   through the next witness are going to encompass conduct --

12         THE JUDGE:  Who's the next witness?

13         MR. CASEY:  Kara Spice.  She's the Special Agent from

14   the FBI.

15         THE COURT:  She's the one who was at the interview?

16         MR. CASEY:  Correct.  She's going to authenticate the

17   interview later, but first we're going to get to the emails.

18   And the emails are going to encompass conduct from 2011 to, in

19   the first instance, 2015.

20         THE COURT:  What is she going to tell us about these

21   emails?

22         MR. CASEY:  She's going to say, This is an email that

23   was produced by Harvard University between the Defendant and

24   Liqiang Mai, I see a reference to the Thousand Talents Plan in

25   there.  We'll offer it, and then we'll point out the relevant

1    parts.

2            THE COURT:  But where do they come from?  These are

3    emails between the Defendant and Harvard or Defendant and --

4            MR. CASEY:  The Defendant -- well, the Defendant and

5    numerous people but, most notably, folks associated with the

6    Wuhan University of Technology, which through who the Defendant

7    participated in the Thousand Talents Program.  So he has this

8    relationship with Wuhan, it starts with a strategic scientist

9    contract that specifically mentions Chinese talent plans, it's

10   sort of like the prelude to his Thousand Talents Plan

11   agreement; and then, right after that, you see he's offered

12   this Thousand Talents Plan agreement, they negotiate it, they

13   agree to it, and --

14           THE COURT:  What does she know about all of that?

15           MR. CASEY:  She's just the person who's going to admit

16   the emails, and we're going to have her read portions of them.

17   But these are emails that were produced by Harvard University

18   and found on the Defendant's electronic devices and that the

19   parties have stipulated are true and correct copies of emails

20   from Harvard or the devices.

21           So we don't have to call, for example, the forensic

22   person who pulled the emails off the devices; we're sort of

23   stipulating to that aspect of it.

24           THE COURT:  Well, I gather there are still objections

25   to their admissibility?

1           MR. MUKASEY:  Correct.

2           THE COURT:  All of them?

3           MR. MUKASEY:  No.  About 40 something out of 70,

4    thereabouts.

5           THE COURT:  And what is the objection?

6           MR. MUKASEY:  Well, a lot of them are being

7    offered -- remember, the sender of these emails is in China.

8           THE COURT:  The former student of the Defendant?

9           MR. MUKASEY:  Correct, in China.  So we can't

10   cross-examine him, and --

11          THE COURT:  Well, what would you cross-examine him

12   about?

13          MR. MUKASEY:  Well, we would cross-examine him about a

14   lot of things, including his own --

15          THE COURT:  Well, the parts, I mean, concerning the

16   emails.

17          MR. MUKASEY:  The way the emails are going to come in,

18   we think that Dr. Lieber's portion -- right? -- are admissions;

19   but, in certain instances, for example, the Government wants to

20   put in the email from China to show context or to show

21   background or to show some sort of verbal act or to show some

22   sort of non-hearsay purpose.  And we dispute those non-hearsay

23   purposes; not all of them, but a lot of them.

24          THE COURT:  And this chart tells me which ones you

25   object to?

1            MR. MUKASEY:  And the basis.

2            THE COURT:  And the basis for the objection?

3            MR. MUKASEY:  Yes, it does.

4            THE COURT:  I must say, I wish I had this somewhat

5       earlier than the time when it's about to be offered.

6            MR. MUKASEY:  Well, we were trying hard to negotiate

7       as few disputes as possible.

8            THE COURT:  Well, I'm only complaining a little

9       because I'm not exactly sure when I can do this.

10           MR. CASEY:  Well, just for Your Honor's awareness, a

11      lot of the emails, for example, from the individual in China to

12      Dr. Lieber, some of which the Defendant responds to, others

13      that he doesn't, are going to be offered primarily as proof of

14      the Defendant's state of mind.

15           We have to prove that he knew he participated in the

16      Thousand Talents Plan for Count 2, and for Count 1 we have to

17      prove that he knew how they were categorizing him with respect

18      to that program.  So there are a whole host of emails that are

19      going to -- we're going to offer where Professor Mai in China

20      is saying, Pursuant to your One Thousand Talents Plan; or, you

21      know, In order for us to do the evaluation on your One Thousand

22      Talents Plan, we have to --

23           THE COURT:  Is this part of an ongoing conversation by

24      email between these people?

25           MR. CASEY:  Absolutely.  Between 2011 and 2015,

```
 1    they're communicating about the Thousand Talents Plan and what

 2    the Defendant can do in order to satisfy the agreement that he

 3    agreed to.  And so all of these communications -- a lot of them

 4    are going to come in for his state of mind.

 5             THE COURT:  Excuse me.  Are all of these in context so

 6    that when -- if they come in and the jury looks at them, it can

 7    understand that this is part of a continuum and what that

 8    continuum is?

 9             MR. CASEY:  We're going to walk the jury through these

10    emails chronologically, starting with the first mention of

11    Chinese talent-related projects through the negotiation of his

12    agreement, through his participation in the Thousand Talents

13    Plan pursuant to that agreement, and then the end of the

14    agreement and why it ended.

15             We're going to walk the jury through all of that

16    through these emails, and some of the emails will come in

17    admissions; a lot of them are going to come in, regardless of

18    their truth, to show the Defendant's state of mind, what he

19    knew about what China was saying about him, what he knew about

20    how they viewed his participation, his state of mind.

21             We proposed a general limiting instruction that the

22    Court can give the jury --

23             THE COURT:  So this includes statements by him, emails

24    by the Defendant?

25             MR. CASEY:  There are many emails by him.
```

```
 1          THE COURT:  And those you don't object to; you object
 2    to the emails by the former student?
 3          MR. MUKASEY:  We may have some relevance emails --
 4    objections to some of the Defendant's emails.  Let me respond
 5    to --
 6          THE COURT:  Excuse me one second.  How do you want me
 7    to use this chart?
 8          MR. MUKASEY:  I think we just wanted to have it as a
 9    little bit of a primer.  I think it lays out in almost the
10    exact order they're going to introduce the emails what our
11    objections are, and it's just a little bit of maybe a cheat
12    sheet so that Your Honor knows that we are --
13          THE COURT:  What's coming.
14          MR. MUKASEY:  Yeah, that we're going to object.
15          Let me make two points quickly:  One is I find it
16    dubious that the emails from China are somehow going to reflect
17    on Dr. Lieber's state of mind.  I get a million emails every
18    day --
19          THE COURT:  Well, only to the extent he responded to
20    them or initiated them.
21          MR. MUKASEY:  If he responded to them, they may be
22    admissible; they may face other hurdles.
23          The second point is -- and Your Honor asked Mr. Casey,
24    Is this an ongoing relationship?  There is no ongoing scheme or
25    plan or conspiracy charge in this case.  The counts to which
```

1   these relate occurred on discrete dates.  April 24, 2018, is

2   the first false -- allegedly false statement; and January 10th,

3   2019, is the second false statement.

4          These emails go back a decade.  They don't bear on

5   Dr. Lieber's discussions with the Government agents or with

6   Harvard on the discrete days that are charged in Counts 1 and

7   2.  This is not an ongoing scheme or plan case.

8          MR. CASEY:  Your Honor, we have to prove that his

9   statements were false.  He said he did not participate in

10  Thousand Talents Program.  We will prove through these emails

11  that that statement was false because they reflect the fact

12  that he did participate in the Thousand Talents Program, that

13  he knew he participated in the Thousand Talents Program, that

14  he was asked to participate in the Thousand Talents Program,

15  that he knew he had been asked, that he was aware of how they

16  were categorizing him.

17         All of that goes to the core of Counts 1 and 2,

18  proving that the Defendant's statements were in fact false,

19  which is an element of the crimes and proving that the

20  Defendant knew they were false --

21         THE COURT:  Excuse me.  What exactly is before me

22  right now to decide?

23         MR. CASEY:  I think we're just trying to get

24  Your Honor prepared to rule on objections as they come as best

25  as possible through the Agent who's going to testify next.

1          THE COURT:  Oh, okay.

2          MR. CASEY:  So I think that's --

3          THE COURT:  Well, I really do want to start on time

4   with the jury.  We have three minutes left before the jury

5   comes.

6          MR. CASEY:  Could we just hand up our proposed

7   limiting instruction regarding a lot of the exhibits that will

8   come in?

9          THE COURT:  Have you seen that?

10          MR. MUKASEY:  I've seen it, and it doesn't mean that I

11   agree that these emails are admissible.

12          MR. CASEY:  And, again, we think the limiting

13   instruction is going to account for the fact that some of these

14   emails are coming in for the truth and the jury can consider

15   them --

16          THE COURT:  Hold it one second.

17          MR. CASEY:  Sure.

18          THE COURT:  I may need three.

19          MR. CASEY:  Fair enough.

20          THE COURT:  I don't think the jurors will understand

21   what you're telling me to tell them.  I mean, this is a pretty

22   sophisticated way of explaining the use of a document.

23          MR. CASEY:  Well, I think it reflects the fact -- the

24   well-established fact that documents can come in for

25   non-hearsay purposes.

1          THE COURT:  Well, that may be well known to you, but

2     when -- it's not well known to a juror who may have never heard

3     of such a thing.

4          Are you objecting to this?

5          MR. MUKASEY:  I don't love it.  I think the -- what my

6     real worry is, is that these emails are going to be understood

7     for the truth of the matter asserted, and they're not relevant

8     for that purpose.  I don't even think the Government is

9     pretending that they are.

10          And, Judge, I'm not ready to agree to that limiting

11     instruction because I feel like that's going to provide a

12     pathway for letting all these things in and then giving them

13     this limiting instruction that's, as you note, rather obtuse.

14          Let me make one more point, and then I promise we'll

15     get the jury in here on time:  If I send you, if I bombard you

16     with emails that say, Congratulations, Judge Zobel, you've won

17     the Publishers Clearing House Sweepstakes ---

18          THE COURT:  Well, they keep calling me.

19          MR. MUKASEY:  I know.  And this guy in China kept

20     calling Dr. Lieber.  So just because you get bombarded with

21     emails that say, Congratulations, you've won the Publishers

22     Clearing House where you get a $100 free gift certificate at

23     Amazon, that doesn't go to your state of mind.  In today's

24     world, you can get bombarded with emails and not pay attention

25     to them.

1          THE COURT:  But this is not exactly like that; this is

2     an exchange of emails and information of people who are in fact

3     working together, and I don't think the Defendant --

4          MR. MUKASEY:  We dispute they're working together.

5     They are communicating, and I'm not saying this is a

6     wholesale --

7          THE COURT:  This was his student, as I understand it.

8          MR. MUKASEY:  So, back in 2008, '09, '10, thereabouts,

9     this Mai -- Dr. Mai was a student at Harvard.  He then went to

10    Wuhan University.

11         THE COURT:  I understood that.

12         MR. MUKASEY:  Okay.  And I'm not saying that we have

13    an objection to every one of these emails.  We're going to be

14    fair about it, but we have an objection to a bunch of them.

15         THE COURT:  Okay.  So I'm fully primed on the fact

16    that there may be disputes about the evidence, and I thank you

17    for alerting me to that.

18         Now, the witness who is on the stand right now -- I

19    lost my paper.

20         MR. DRABICK:  Ms. Donlon, Your Honor, and I will go

21    get her.

22         THE COURT:  Okay.  We'll get the jury right now.

23         Is the witness here?

24         MR. DRABICK:  She's coming in right now, Your Honor.

25         She's right here, Your Honor.

```
 1              THE COURT:  You walk much better today than you did
 2     yesterday.  It's earlier in the day, and you are less tired.
 3              THE WITNESS:  Yes, exactly.
 4              THE COURT:  Yes, I understand the feeling.
 5              Do be seated, and you needn't get up when the jury
 6     comes.
 7              THE WITNESS:  Thank you.
 8              MR. MUKASEY:  Judge, Ms. Guaba right there is going to
 9     be doing our short cross-examination after the direct is over.
10              THE COURT:  How do you spell your last name?
11              MS. GUABA:  G-u-a-b-a, Judge.  G-u-a-b-a.
12              THE COURT:  J-u-a-b-a?
13              MS. GUABA:  G-u-a-b-a.
14              THE CLERK:  All rise, please.
15              (Jury is present for the following)
16              THE COURT:  Good morning.  Please be seated.  The rest
17     of you may be seated as well.
18              And you understand that you are still under oath even
19     though we will not again swear you today?
20              THE WITNESS:  Yes.
21              THE COURT:  You may proceed.
22              MR. DRABICK:  Thank you, Your Honor.
23              RENEE DONLON, having been previously duly sworn by the
24     Clerk, was examined and testified as follows:
25                          CONTINUED DIRECT EXAMINATION
```

BY MR. DRABICK:

Q.    Good morning, Ms. Donlon.

A.    Good morning.

Q.    And just a reminder, please have that mic close and speak loudly.

A.    Okay.

Q.    Could you please remind the jury the timeframe that you worked for Professor Lieber?

A.    I worked there from the end of October, 2012, to the summer of 2017.

Q.    And during the time that you worked for Professor Lieber, did you become familiar with the Wuhan University of Technology?

A.    Yes.

Q.    And how did you become familiar?

A.    I saw it on various documents and in various emails.

Q.    And what would those emails concern?

A.    Usually they would concern travel that Professor Lieber was going to take to the lab at Wuhan.

Q.    Did you observe him take trips to China?

A.    Yes, in that -- I didn't go on the plane with him; but, yes, I arranged them.

Q.    Did you observe him leave the office after you had arranged a trip?

A.    Yes.

1    Q.   And did you help him arrange any trips to Wuhan, China?

2    A.   Yes, I did.

3    Q.   Are you familiar with the graduate students and postdocs

4    that were in Professor Lieber's lab?

5    A.   Yes.

6    Q.   Did any of them have any connections to the Wuhan

7    University of Technology?

8    A.   Yes.

9    Q.   Approximately how many?

10   A.   Two that I can recall.

11   Q.   And those particular students, how long were they in the

12   lab, approximately?

13   A.   Approximately between one and three years, I think.

14   Q.   Are you familiar with the name "Lin Xu"?

15   A.   Yes.

16   Q.   And how are you familiar with that name?

17   A.   He was a researcher in the lab.

18   Q.   And what, if any, connection did he have to the Wuhan

19   University of Technology?

20   A.   He had come from Wuhan and was in our lab, in the Lieber

21   lab, and then went back to Wuhan.

22   Q.   And just for clarity, is his name spelled L-i-n, space,

23   X-u?

24   A.   Yes.

25   Q.   And are you familiar with the name "Yunlong Zhao,"

1   Y-u-n-l-o-n-g, space, Z-h-a-o?

2   A.   Yes.

3   Q.   And who is that individual?

4   A.   He was another researcher in the Lieber lab.

5   Q.   And what, if any, connection did he have to the Wuhan

6   University of Technology?

7   A.   He came from Wuhan and then went back to Wuhan after

8   working in our lab.

9        MR. DRABICK:   Could we please bring up Exhibit 33,

10  which I understand -- to which I understand there is no

11  objection, and I would offer it into evidence.

12       (Government Exhibit 33 received in evidence.)

13  Q.   Do you recognize this document, Ms. Donlon?

14  A.   Yes, I do.

15  Q.   And what is it?

16  A.   It's an email exchange between me and Professor Lieber.

17  Q.   And what does it regard?

18  A.   It regards a publication of one of his scientific papers.

19  Q.   And who's sending the email?

20  A.   I am.

21       MR. DRABICK:   And could you please highlight

22  the -- thank you very much.

23  Q.   And who are you sending it to?

24  A.   I'm sending it to Professor Lieber.

25  Q.   Do you recognize that email address?

```
 1   A.    Yes.

 2   Q.    And whose email address is that?

 3   A.    That's Professor Lieber's email address.

 4   Q.    And what are you sending Professor Lieber?

 5   A.    I'm sending him two attachments, one of his CV, and one of

 6   a PDF of the published paper.

 7   Q.    Could you please just read your email to the jury?

 8   A.    Sure.  "Dear Charlie, the nanoletter paper, "Design and

 9   Synthesis of Diverse Functional Kinked Nanowire Structures for

10   Nanoelectronic Bioprobes," appeared online in ASAP status.  The

11   PDF is attached.  I am updating the website and will post in

12   the hall and office.  I've updated your CV, also attached.

13   There was also an update to your H index.  Best, Renee."

14   Q.    What is ASAP status?

15   A.    ASAP is when the paper, the article, has been published.

16   It appears online right before it appears in print in the

17   actual journal/magazine.

18   Q.    Have you seen the article published online?

19   A.    Yes.

20   Q.    And what is a CV?

21   A.    A CV is a resume.

22         MR. DRABICK:  Could we please turn to Page 34 of this

23   document.

24   BY MR. DRABICK:

25   Q.    Do you recognize this page?
```

1    A.   I do.

2    Q.   Is this the article you attached to your email?

3    A.   Yes.

4         MR. DRABICK:  Mr. Bruemmer, could you please highlight

5    the top portion, the title.  There you go, perfect.

6    Q.   And what are we looking at in this portion of the article,

7    Ms. Donlon?

8    A.   This is the title of the article, the authors of the

9    article and their affiliations.

10   Q.   Is that the same title that we saw in your email?

11   A.   Yes.

12   Q.   And do you recognize the names -- well, are the authors of

13   the article listed?

14   A.   Yes, they are.

15   Q.   And do you recognize any of those names?

16   A.   Yes, I do.

17   Q.   And which ones do you recognize?

18   A.   I recognize Lin Xu, I recognize Professor Charles Lieber.

19   Q.   And the first name, Lin Xu, is that the individual you

20   were referencing being a postdoc in the lab from Wuhan?

21   A.   Yes.

22   Q.   And are there affiliations identified for the various

23   authors?

24   A.   Yes, there are.

25   Q.   And are there affiliations for Mr. Xu, for example?

1  A.   Yes.

2  Q.   Okay.  And how does that work?  How are the affiliations

3  noted?

4  A.   Just after and above the name of the author is a little

5  symbol, kind of similar to an asterisk, and that symbol appears

6  below and is the key to identifying what the affiliation is for

7  that author.

8  Q.   Are you able to identify the affiliations for Lin Xu?

9  A.   Yes.

10 Q.   And what affiliations are listed for him?

11 A.   "WUT-Harvard Joint Nano Key Laboratory at Wuhan University

12 of Technology" and also, "Department of Chemistry and Chemical

13 Biology, Harvard."

14 Q.   And is that the Department in which Professor Lieber's lab

15 was?

16 A.   Yes.

17 Q.   And are there any affiliations for Professor Lieber?

18 A.   Yes, there are.

19 Q.   And what affiliations are listed for Professor Lieber?

20 A.   They are "WUT-Harvard Joint Nano Key Laboratory at Wuhan

21 University of Technology," also, "Department of Chemistry and

22 Chemical Biology and the School of Engineering and Applied

23 Sciences," both at Harvard University.

24 Q.   So, in this published paper, Professor Lieber has listed

25 his Harvard affiliations?

1  A.   He has, yes.

2  Q.   And also an affiliation with the WUT-Harvard Joint Nano

3  Key Laboratory?

4  A.   Yes.

5       MR. DRABICK:  We can take that down.  Thank you.

6  BY MR. DRABICK:

7  Q.   I believe you mentioned, Ms. Donlon, that you worked on

8  Professor Lieber's travel arrangements?

9  A.   Yes.

10  Q.   And could you describe at a high level what you would do?

11  A.   I would arrange the logistics of the travel for any trips

12  that he was going to take, work trips.

13  Q.   And how would you -- how would that process start?

14  A.   It would start by him letting me know that he was going on

15  a trip, and that would be either him leaving me a physical

16  document, usually an invitation from the host of the event in

17  his out box for me; or it would be him forwarding me an email

18  or cc'ing me into an email chain where he had been invited to

19  attend an event.

20  Q.   Fair to say you didn't on your own initiate his travel?

21  A.   No.

22  Q.   It would be initiated because he provided you some form of

23  invitation or communication about it?

24  A.   Correct.

25  Q.   And what would you do next?

1    A.    I would then work with or liaise with the organizers of

2    the event, of the conference, of the institution where he was

3    visiting to work out the logistics.

4    Q.    And would you take any action to actually book his travel?

5    A.    I would.   In most cases, I would book flights for

6    Professor Lieber.   I would often book hotel, ground

7    transportation, and I would compile an itinerary for his trip.

8    Q.    Did you create any particular documents?

9    A.    Yes.

10   Q.    What would you create?

11   A.    So, this kind of itinerary information packet for his

12   travel we would call a trip summary.

13   Q.    And what would be included in the trip summary?

14   A.    The trip summary included the name of the event, the dates

15   when he was traveling, the names and information of contact

16   details of the people he would be meeting with, flight

17   information, hotel information, ground travel information, and

18   a rough day-by-day itinerary of what he was going to be doing

19   and who he was going to be meeting with.

20   Q.    Would you include any invitation he had received if he had

21   provided you one?

22   A.    Yes.

23   Q.    And did you create these trip summaries at or near the

24   time you were arranging the travel?

25   A.    Yes.

1   Q.   And were they kept in the regular course of your work for

2   Professor Lieber?

3   A.   Yes.

4   Q.   And did you create them as part of your regular duties?

5   A.   Yes.

6   Q.   Who, if anyone, would you provide them to?

7   A.   To Professor Lieber.

8   Q.   And did you have a sense of whether Professor Lieber

9   reviewed them?

10  A.   I did, yes.

11  Q.   And what gave you that sense?

12  A.   I would send him a PDF of it, and he would review it and

13  reply back to me, and very often he had comments about the

14  details of the travel plans.

15  Q.   Were there any particular challenges you experienced

16  working with Professor Lieber on his travel?

17  A.   Yes.

18  Q.   And could you describe those?

19  A.   He was very particular about how he wanted things, certain

20  seats on the airplane that he would --

21         MS. GUABA:  Objection.  Relevance.

22         MR. DRABICK:  Your Honor, it's going to go to the

23  communications in his review of the trip summaries, his close

24  review of them.

25         THE COURT:  You're objecting to the answer?

1          MS. GUABA:  Yes.  I don't see how it's relevant what

2     seats Professor Lieber needed on the planes that he traveled

3     on.

4          THE COURT:  He talked to her, they talked to each

5     other.  That's, I think, what she told us.

6          You may proceed.

7          THE WITNESS:  Thank you.

8     A.   Yes, he was quite -- he was specific about the kinds of

9     hotels he wanted to stay in, where he would travel on the

10    plane, which airports he would use, certain times that he would

11    want to meet with people or not want to meet with people; but

12    the kind of challenging bit was, on some days, you would do

13    some -- I would do something and it would be fine, and then I

14    would do the same thing at a later date, and it would not be

15    fine with Professor Lieber; it would be --

16         THE COURT:  Well, I think now we're getting a bit

17    afar.

18         MR. DRABICK:  Fair enough, Your Honor.

19         THE COURT:  Members of the jury, she can tell us about

20    her conversations with Dr. Lieber because she was doing the

21    management of these affair -- of these trips, but it's really

22    sort of -- it's not irrelevant, but it's not a major topic of

23    this case.

24         MR. DRABICK:  Thank you, Your Honor.

25    BY MR. DRABICK:

1   Q.   Did Professor Lieber receive a lot of invitations?

2   A.   Yes.

3   Q.   For what sorts of events?

4   A.   Conferences, to give talks, to give lectures, to attend

5   events, to receive prizes.

6   Q.   And how do you know he received those?

7   A.   He would usually forward me the invitation with a little

8   note saying to decline it on his behalf or to accept it on his

9   behalf.

10   Q.   Was he selective in -- about which invitations he would

11   accept?

12   A.   Yes, he was.

13   Q.   What percentage, if you can estimate, of the invitations

14   he received did he accept?

15   A.   A low percentage.  I would say 10 to 15 percent, maybe.

16   Q.   Did you observe him to receive invitations from the Wuhan

17   University of Technology?

18   A.   Yes.

19   Q.   And did you observe him to turn those down?

20   A.   No.

21   Q.   Ever?

22   A.   Not that I can recall.

23   Q.   How often did he travel per year?

24   A.   Several times per year, maybe --

25               THE COURT:  Travel where?

```
 1              MR. DRABICK:  Thank you, Your Honor.
 2    Q.    Travel overseas.
 3    A.    Travel overseas?  Maybe four times a year.
 4    Q.    And those are for trips that you arranged --
 5    A.    Yes.
 6    Q.    -- that you're knowledgeable about?
 7    A.    Yes.
 8              THE COURT:  These are all trips to China?
 9    Q.    Are these all trips to China, Ms. Donlon?
10    A.    Not always, but usually.
11              MR. DRABICK:  Your Honor, at this time, I'd ask that
12    we introduce Exhibit 200.  It's a multipage document,
13    Your Honor.  I understand the defense does not object to the
14    document, except for the last page; and so I propose that we
15    admit at least all of it, except the last page, and then I will
16    attempt to lay a foundation for the last page as well.
17              THE COURT:  Okay.  200 is admitted, with exception of
18    the last page of 200.
19              MR. DRABICK:  Thank you, Your Honor.
20              (Government Exhibit 200 received in evidence.)
21    BY MR. DRABICK:
22    Q.    Do you recognize this document, Ms. Donlon?
23    A.    Yes, I do.
24    Q.    And what is it?
25    A.    This is an email exchange between me and Professor Lieber.
```

1   Q.   And just at a high level, what does it concern?

2   A.   A trip to Wuhan, China.

3         MR. DRABICK:  Could you please, Mr. Bruemmer, go to

4   Page 2 and highlight the bottom email.

5   Q.   What are we looking at now, Ms. Donlon?

6   A.   This is an email from Professor Lieber to me.

7   Q.   Dated when?

8   A.   February 19th, 2014.

9   Q.   And it -- could you read Professor Lieber's email?

10  A.   Sure.  "Dear Renee:  Please try to get me the draft trip

11  summary for China by tomorrow AM.  Thanks, Charlie."

12  Q.   And do you understand him to be referring to the trip

13  summaries you've been describing?

14  A.   Yes.

15        MR. DRABICK:  And could we please see the next email

16  in the chain?

17  Q.   Is this your reply?

18  A.   Yes, it is.

19  Q.   And when do you send it?

20  A.   February 20th, 2014.

21  Q.   Is that the next morning?

22  A.   Correct.

23  Q.   And could you please read your reply?

24  A.   "Dear Charlie:  Attached please find the draft of the trip

25  summary for your China trip.  I am still waiting on the

1    information highlighted in green, the hotel in Wuhan and

2    Professor Xu's cell phone number.  Best, Renee."

3    Q.   Was this a draft of the trip summary at this point?

4    A.   Yes.

5    Q.   Did Professor Lieber respond?

6    A.   Yes, he did.

7            MR. DRABICK:  Could you please go to the next email

8    in the chain, Mr. Bruemmer.

9    Q.   Is this Professor Lieber's response?

10   A.   Yes.

11   Q.   Could you please read his response?

12   A.   "Dear Renee:  There is something that is unacceptable to

13   me on this and immediately striking.  I will not go to one

14   hotel on Wednesday and then another on Thursday/Friday in

15   Beijing.  That is ridiculous and something you should have

16   addressed as soon as it was proposed by the people in Beijing.

17   I do not want to move around and want to be put in a single

18   nice hotel for the entire stay (not move around).  I am happy

19   to cancel the trip tomorrow if this is not addressed in a

20   suitable manner.  It is ridiculous and unacceptable -- it is a

21   ridiculous and unacceptable way to treat me when I am traveling

22   such long distances, and at least someone should have said

23   something at the outset to get my opinion.  To be honest, I am

24   really mad to find this myself without it being brought to my

25   attention at the outset.  It is total B.S.  CML."

1   Q.   Ms. Donlon, in your five years working for

2   Professor Lieber, did you receive a lot of emails with him?

3   A.   Yes, I did.

4   Q.   Did you become familiar with how he would sign off on

5   emails?

6   A.   Yes.

7   Q.   Did he always sign it the exact same way?

8   A.   No.

9   Q.   Could you describe the various ways he would sign off on

10  emails?

11  A.   Usually, if he approved of something and was happy with

12  the work, he would sign off, "Best regards, Charlie."  If he

13  was a bit neutral about it, he would sign off, "Best, Charlie."

14  And if he was upset about something or displeased with the

15  work, he would usually just put his initials, CML.

16  Q.   Did you respond to Professor Lieber's email?

17  A.   Yes.

18          MR. DRABICK:  Could we go to Page 1, Mr. Bruemmer,

19  and highlight the email in the middle.

20  Q.   Is this your response?

21  A.   Yes, it is.

22  Q.   And what are you explaining to Professor Lieber in this

23  email?

24  A.   I'm explaining -- I'm explaining that there is actually

25  only one hotel per city and that the things that I had

1    highlighted in green were placeholders.

2    Q.   The items in the trip summary in green were still to be

3    determined?

4    A.   Yes, exactly.

5    Q.   Did you attach a trip summary to this email back to

6    Professor Lieber?

7    A.   Yes.

8    Q.   Okay.  And is that attached to this email chain?

9    A.   Yes.

10         MR. DRABICK:  Could we please go to Page 3?

11   Q.   What do we see on Page 3?

12   A.   This is a trip summary.

13   Q.   And could you just walk us through at a high level the

14   different types of information on this particular trip summary?

15   A.   Sure.  It gives the information about where he's going and

16   when, who he will be meeting with and their contact

17   information, flight information.

18         Would you like me to move to the next page or just

19   this page?

20   Q.   Before we move on, the top of the trip summary, does that

21   reflect the dates of the anticipated trip?

22   A.   Yes, it does.

23   Q.   And do you recall whether Professor Lieber left for this

24   trip?

25   A.   As far as I know, he did, yes.

1   Q.   Yeah, the next page, please, Page 4.

2          And, again, at a high level, just what's being

3   provided?

4   A.   Sure.  Continuation of the flight information, information

5   about how he'll get around on the ground, hotel information,

6   reservations.

7   Q.   And the next page, please.

8   A.   The next page is information about the talk that he's

9   going to give and a brief day-by-day itinerary of what he'll be

10  doing and who he'll be meeting with while he's traveling

11  around.

12  Q.   And does that itinerary include the portion of the trip in

13  Wuhan?

14  A.   Yes, it does.

15  Q.   At the top of the agenda?

16  A.   Yes.

17  Q.   And the next page, please.

18          And just at a high level, what was this portion?

19  A.   Confirmation of his flight reservations.

20  Q.   If you could just look in your binder, Ms. Donlon, to the

21  last page of this exhibit.

22          MR. DRABICK:  And if we could take it down from the

23  jury, Ms. Urso --

24          THE CLERK:  Yes.

25          MR. DRABICK:  -- and show Ms. Donlon and the Court

1    the last page.

2            That will be Page 9, Mr. Bruemmer.  One more.

3    Q.   At a high level, what is this document, Ms. Donlon?

4    A.   This is an invitation to Professor Lieber.

5    Q.   And where did you receive this document from?

6    A.   I received it from Professor Lieber.

7            MS. GUABA:  Objection, Your Honor.

8            MR. MUKASEY:  Not yet.

9            MR. DRABICK:  Your Honor, this hasn't been admitted;

10   this is for foundation to admit.

11           THE COURT:  What's the objection?

12           MS. GUABA:  Hearsay.  The letter comes from a third

13   party.

14           THE COURT:  Well, we don't know that.

15           MS. GUABA:  It was not sent to the witness.

16           THE COURT:  The question is where she got it from.

17   She can tell us where she got it from.

18           MS. GUABA:  Very well.

19   Q.   Where did this document come from, Ms. Donlon?

20   A.   From Professor Lieber.

21   Q.   Did you draft this document?

22   A.   No.

23   Q.   It was provided to you by Professor Lieber?

24   A.   Yes.

25   Q.   And is this the type of information you would include in

1    trip summaries when provided to you?

2    A.    Yes.

3    Q.    Is this an invitation that kicked off this creation of the

4    trip summary?

5    A.    Yes.

6    Q.    And does it reference any affiliations for Dr. Lieber?

7    A.    Yes, it does.

8          MR. DRABICK:  Your Honor, the Government moves to

9    admit the final page of this exhibit for Dr. Lieber's state of

10   mind and as an active --

11         THE COURT:  Well, it's certainly admissible to show

12   that there was an invitation.

13         MR. DRABICK:  Yes, Your Honor.  There's also relevant

14   information in the nature -- in the text of the invitation.

15         THE COURT:  It certainly comes in for the ground that

16   I just mentioned.  Beyond that, we'll have to see.

17         MR. DRABICK:  Move to admit the final page of

18   Exhibit 200.

19         THE COURT:  It's in evidence.

20         THE CLERK:  Okay.

21         MR. DRABICK:  Mr. Bruemmer, could you please highlight

22   the -- to whom this invitation is being sent at the top of the

23   page.  And, actually, if you could highlight the logo at the

24   top as well.

25         THE COURT:  Well, the jury can look at it.  The jury

1    has it now.

2              MR. DRABICK:  Yes, Your Honor.  I'm just blowing it up

3    so that we can identify the specifics.

4              THE COURT:  Okay.

5    Q.    Who is this -- where does this invitation state that it's

6    from?

7    A.    Wuhan University of Technology.

8    Q.    And to whom is it addressed?

9    A.    Professor Charles Lieber.

10             MR. DRABICK:  And can we please highlight the first

11   and second paragraphs.

12   Q.    Could you please read those for the jury.

13             THE COURT:  I think the jury can read them.  It's in

14   evidence, the document is in evidence.  Can you all read it?

15   Would you please read it.

16             Raise your hand when you're done.

17             Okay?

18             MR. MUKASEY:  Your Honor, we may ask for a limiting

19   instruction at the appropriate time, since this document was

20   authored by a third party.

21             THE COURT:  Well, this is not the appropriate time;

22   and I understood that Ms. Guaba is the one that's counsel with

23   respect to this witness.

24             MR. MUKASEY:  Understood.

25             THE COURT:  So please don't double-team me.  I can't

1    manage it.

2              MR. MUKASEY:  I think you can, but I won't do it.

3              MR. DRABICK:  Thank you, Your Honor.  We can take down

4    that exhibit.

5              And could we please see Exhibit 46, to which I

6    understand there is no objection.  And if we could highlight

7    the email chain, Mr. Bruemmer.

8              (Government Exhibit 46 received in evidence.)

9    Q.    Ms. Donlon, what is this?

10   A.    This is an email exchange between me and Professor Lieber.

11   Q.    And are you sending Professor Lieber anything?

12   A.    I am, yes.

13   Q.    What are you sending?

14   A.    I am sending the finalized version of the trip summary for

15   the trip we were just discussing.

16   Q.    And had you added anything to the trip summary?

17   A.    Yes.  I had confirmation of the hotel in Wuhan, I had

18   Professor Xu's cell phone number, and I had an itinerary that I

19   had received from Wuhan University for Professor Lieber.

20   Q.    And any indication that Professor Lieber reviewed the

21   updated trip summary?

22   A.    Yes.

23   Q.    And what's that indication?

24   A.    He says, "Thank you," and he says, "Everything looks

25   okay."

```
 1              MR. DRABICK:  Could we please see Exhibit 45, to which
 2     I understand there is no objection, Your Honor.
 3              (Government Exhibit 45 received in evidence.)
 4     Q.    Ms. Donlon, do you recognize the email at the bottom of
 5     this exhibit?
 6     A.    I do.
 7     Q.    And is that the same email that you had sent
 8     Professor Lieber with the updated trip summary?
 9     A.    Yes, it is.
10     Q.    And what is the top email?
11     A.    The top email is the email from Professor Lieber to
12     Jennifer Lieber, his wife.
13     Q.    Does he appear to be forwarding anything?
14     A.    Yes.
15     Q.    What does he appear to be forwarding?
16     A.    A PDF titled "Trip Summary, Beijing, Wuhan."
17     Q.    Is that the trip summary that you created?
18     A.    Yes.
19              MR. DRABICK:  And if we could please see Page 2.
20     Q.    Is this the beginning of the updated trip summary?
21     A.    Yes, it is.
22              MR. DRABICK:  And Page 10, please.
23     Q.    Are you able to recognize this document, Ms. Donlon?
24     A.    Yes.
25     Q.    Is this the same invitation we saw in Exhibit 200?
```

1    A.   Yes, it is.

2         MR. DRABICK:  And Page 8, please.  And if we could

3    blow up the table.

4    Q.   What are we looking at on Page 8?

5    A.   This the itinerary that was provided to me for

6    Professor Lieber for his time at Wuhan.

7    Q.   Is this a new document that you've added to the trip

8    summary?

9    A.   Yes, it is.

10   Q.   Could you please read the entry for 9:00?

11   A.   "Liqiang Mai briefly introduces the research on

12   construction progress of the WUT-Harvard Joint Key Lab."

13   Q.   And the 9:30 entry, please?

14   A.   "Yunlong Zhao reports his research work finding -- his

15   research works, finished in U" -- sorry -- "WUT and discuss his

16   joint training or research plan under your

17   comments/suggestions/supervisions."

18   Q.   You can stop there.  Thank you.

19        And, finally, the 1300 entry?

20   A.   "Pay one half of salary in U.S. dollars, with remainder

21   deposited into bank."

22        MR. DRABICK:  You can take that down.  Thank you,

23   Mr. Bruemmer.

24        If we could please see Exhibit 178, 178, to which I

25   understand there is no objection.

1          (Government Exhibit 178 received in evidence.)

2   Q.   Do you recognize this document, Ms. Donlon?

3   A.   Yes, I do.

4   Q.   And what is it?

5   A.   This is another exchange between me and Professor Lieber,

6   email exchange.

7          MR. DRABICK:  Okay.  And could we please highlight,

8   and could you please read the first email exchange at the

9   bottom, or the middle of the screen, Mr. Bruemmer.

10  Q.   Is this an email from Professor Lieber to you?

11  A.   Yes.

12  Q.   And could you please read it?

13  A.   "Dear Renee:  If possible, can you send me as close to

14  complete trip summary for the trip to China (leaving next

15  Friday) sometime tomorrow/Friday, 12 April.  Thanks, Charlie."

16  Q.   And the trip summary we saw for the trip -- well, the trip

17  summary we saw in the previous exhibits, was that for February

18  into early March of 2014?

19  A.   Yes.

20  Q.   And this is for a trip in April of 2013?

21  A.   Yes.

22  Q.   Did you provide a trip summary?

23  A.   Yes.

24          MR. DRABICK:  Could we please see the top email.

25  Q.   Are you sending Professor Lieber the trip summary in this

1    email?

2    A.   I am, yes.

3    Q.   And is it attached to this email chain?

4    A.   Yes.

5           MR. DRABICK:  Could we please see the fourth page --

6    excuse me.  The third page.

7    Q.   Is this the first page of the trip summary?

8    A.   Yes.

9    Q.   Does it reflect the general timeframe of the trip and his

10   flights?

11   A.   Yes.

12   Q.   Did you book these flights for him?

13   A.   I believe so.

14   Q.   And do you recall whether he left for this trip?

15   A.   As far as I know, he did.

16          MR. DRABICK:  If we could go to Page 4.  And just the

17   top two rows highlighted, please.

18   Q.   Does this reflect flights booked for a trip to Wuhan,

19   China?

20   A.   Yes.

21          MR. DRABICK:  And if we go to Page 5, please.  And

22   highlight the agenda at the bottom, please.

23   Q.   Does this reflect the anticipated agenda in Wuhan, China?

24   A.   Yes.

25   Q.   And could you please read the entry for Sunday, April 21,

1    in the morning?

2    A.   "Morning, 8:30 to 10:30 a.m., Lin Xu's oral exam of Ph.D.

3    thesis."

4              MR. DRABICK:  We can take that down, Mr. Bruemmer.

5              And Exhibit 53 I'd offer into evidence.  I understand

6    there is no objection.

7              (Government Exhibit 53 received in evidence.)

8              MR. DRABICK:  And if we could highlight the email.

9    Q.   Do you -- what is -- do you see this email, Ms. Donlon?

10   A.   Yes.

11   Q.   And is there an attachment to this email?

12   A.   Yes, there is.

13   Q.   And what is the attachment?

14   A.   It's a PDF of a trip summary.

15             MR. DRABICK:  And if we could go to Page 2.

16   Q.   Is this the first page of the trip summary?

17   A.   Yes, it is.

18   Q.   Did you create this trip summary?

19   A.   I did.

20   Q.   And was this for a trip in November of 2014?

21   A.   Yes.

22             MR. DRABICK:  And if we could just briefly go back to

23   Page 1.

24   Q.   Who are the sender and recipients of this email?

25   A.   It is being sent from Professor Lieber to Jennifer Lieber.

1    Q.   And what's the subject line?

2    A.   "Final Trip Summary."

3              MR. DRABICK:  And back to Page 2, Mr. Bruemmer, to

4    the bottom flight information.

5    Q.   Does this portion reflect flights being booked to Wuhan,

6    China?

7    A.   Yes.

8              MR. DRABICK:  And if we could go to Page 4.  One more

9    page.  Sorry.  Perhaps I miscounted.  5.  And could you

10   highlight the top portion or the agenda, please.

11   Q.   Could you please read the agenda for Thursday, the 13th of

12   November?

13   A.   "8:00 a.m. to 8:30 a.m., Professor Mai will meet you at

14   the hotel for breakfast, then bring you to WUT; morning,

15   progress reports on Joint Key Laboratory.  11:30 a.m. to

16   1:30 p.m., lunch with Professor Mai; afternoon, progress" --

17   sorry -- "progress reports on Joint Key Laboratory, visit

18   industrialization base; 6:00 p.m. to 7:30 p.m., banquet,

19   President Zhang."

20             MR. DRABICK:  And Page 8, please.

21   Q.   Is this a draft schedule for the trip in Wuhan,

22   Ms. Donlon?

23   A.   Yes.

24   Q.   Could you please read the 9:00 entry?

25             THE COURT:  On what date?

```
 1          MR. DRABICK:  Oh, I'm sorry.  Thank you, Your Honor.
 2   Q.    On November 12th.
 3          THE COURT:  I don't think there is one.  Oh, yes.
 4   A.    Sorry.  I don't see it for November 12th.
 5   Q.    So, it's highlighted on your screen, Ms. Donlon.  It
 6   should be an entry about a third of the way down on the page
 7   for 9:00.
 8   A.    Oh, for the 13th.
 9          MR. DRABICK:  You're right, November 13th.  I
10   apologize, everybody.
11   A.    "9:00 a.m. to 10:30 a.m., Liqiang Mai's report on research
12   progress of WUT-Harvard Joint Key Lab and discuss the
13   arrangement for the talents of our joint lab.  Mengyu Yan
14   reports recent work and to be interviewed."
15          MR. DRABICK:  And, Mr. Bruemmer, if you could please
16   highlight the 1500 entry.
17   Q.    And could you please read the 1500 entry, Ms. Donlon?
18   A.    "1500 to 1400" -- sorry -- "1500 to 1600, the leader of
19   state administration of foreign experts affairs visit you and
20   our joint lab."
21          MR. DRABICK:  You can take that down.  Thank you,
22   Mr. Bruemmer.
23   Q.    Now, in connection with your work for Professor Lieber's
24   travel, do you recall whether they ever handed you any sort of
25   payment card?
```

1    A.    Yes.

2    Q.    What do you recall?

3    A.    I recall that one time I was arranging a trip for him to

4    China.  He wanted to change the dates of one of the flights.  I

5    tried to do so.  There was a fee to make the change.  I tried

6    to pay for the fee using the corporate means of -- the Harvard

7    corporate card and the Harvard means of payment.  I was unable

8    to do so.  I reported this to Professor Lieber, and he

9    suggested I use his bank card.

10   Q.    Any particular type of bank card?

11   A.    He said his Chinese bank card.

12   Q.    And did he provide you anything?

13   A.    He did.

14   Q.    What did he provide you?

15   A.    He handed me the Chinese bank card.

16   Q.    And what did you do with it?

17   A.    I called the travel agent and tried to use it to pay for

18   the fee in order to change the flights, but I was told that it

19   didn't work.

20   Q.    Were you provided a reason why it didn't work?

21   A.    I was told it didn't work because it was not a credit

22   card.

23          MR. DRABICK:  Can we please see Exhibit 40, to which

24   I understand there is no objection.  And I move to admit.

25          (Government Exhibit 40 received in evidence.)

1  Q.  Do you recognize this email chain, Ms. Donlon?

2  A.  Yes, I do.

3  Q.  And what does it relate to?

4  A.  It relates to a trip to China that Professor Lieber is

5  taking.

6  Q.  Is it the same trip you were just discussing?  Well, I

7  can --

8  A.  I believe so.

9       MR. DRABICK:  Let's turn to page 3, Mr. Bruemmer, and

10  let's highlight the email in the middle of the page.

11  Q.  Do you recognize this email?

12  A.  Yes, I do.

13  Q.  And who's it from?

14  A.  From me.

15  Q.  Okay.  And what are you communicating in this email?

16  A.  I'm communicating that -- to the organizers of this event

17  or travel that Professor Lieber is going to take, I'm telling

18  them that he needs to change the day of his flight, and it

19  requires a Chinese credit card to do this, and is it possible

20  to make that change.

21       MR. DRABICK:  And can we go to the next email in the

22  chain at the top of the page.

23  Q.  Is this an email you sent?

24  A.  Yes.

25  Q.  And who did you send it to?

1    A.    To Professor Lieber with cc to Kathleen Ledyard.

2    Q.    Just a reminder, who's Kathleen Ledyard?

3    A.    She's the Lab Manager of the Lieber Group.

4    Q.    And could you please read your email to Professor Lieber.

5    A.    "Dear Charlie:  I tried everything I could to make the

6    change myself (online, calling, trying to have the ticket

7    converted from CYN," Chinese currency, "to $, et cetera), but a

8    Chinese credit card is needed.  I am sorry.  I did not know

9    they would need a Chinese credit card.  I have emailed Dr." --

10   Q.    Stop there, Ms. Donlon.  Thank you.

11         Did Professor Lieber respond to you?

12   A.    Yes, he did.

13         MR. DRABICK:  Could we turn to Page 2 and highlight

14   the bottom email.

15   Q.    Is this Professor Lieber's response?

16   A.    Yes.

17   Q.    And could you please read that to the jury.

18   A.    "Dear Renee:  Let me know if my Chinese bank card works

19   when you have a chance (also, I should get that back before you

20   leave today).  I will be in group meeting from 2:00 until about

21   3:30 p.m., but you can get me if there is a question that comes

22   up since I really hope to solve this today.  Thanks, Charlie."

23   Q.    Did you return the card to Dr. Lieber?

24   A.    Yes, I did.

25         MR. DRABICK:  Could we please bring up Exhibit 230, to

1    which I understand there is no objection.

2                (Government Exhibit 230 received in evidence.)

3                MR. DRABICK:  Your Honor, at this time, I propose

4    reading a stipulation among the parties to the jury.

5                THE COURT:  Go ahead.

6                MR. DRABICK:  "In lieu of live testimony" --

7                THE COURT:  Excuse me.

8                Members of the jury, when counsel make a stipulation,

9    it means they agree as to certain facts contained in that

10   stipulation, so that is why this is being read to you now.  You

11   don't have to find it; it's agreed that that is, whatever is in

12   there, is a true fact.

13                              STIPULATION

14                MR. DRABICK:  "In lieu of live testimony and for

15   purposes of trial, counsel for the United States and counsel

16   for the Defendant have stipulated and agreed to the following:

17   Government Exhibit 230 is a true and correct copy of a card

18   that was in Charles M. Lieber's possession as of December 14th,

19   2020."

20   Q.   Ms. Donlon, do you recognize what's depicted in

21   Exhibit 230?

22   A.   I do.

23   Q.   And what do you recognize it to be?

24   A.   This is the Chinese bank card that Professor Lieber gave

25   me to try to use.

1              MR. DRABICK:  And could we please highlight the top

2      image.

3      Q.   Do you see any English-language letters on this card,

4      Ms. Donlon?

5      A.   I do, yes.

6      Q.   Could you please read those?

7      A.   "ICBC;" also, "Quick Pass;" also, "Union Pay;" also,

8      "Valid through month/year 02/2020" -- I'm sorry -- "2022."

9              MR. DRABICK:  And could we zoom back out and

10     highlight the bottom portion, as is.

11     Q.   Ms. Donlon, in your work for Professor Lieber, did you

12     have occasion to see Professor Lieber's signature?

13     A.   I did.

14     Q.   And in what context would you see his signature?

15     A.   I would see it when he would sign letters of

16     recommendation that I had drafted for him and he had approved.

17     He would -- I would often need him to sign forms.

18     Q.   And would you see his physical signed signature?

19     A.   Yes.

20     Q.   Approximately how many times would you estimate you would

21     see it on a regular basis?

22     A.   I would say probably at least once every week or two.

23     Q.   And was that for the duration you worked there?

24     A.   Yes, for the five years that I worked there.

25     Q.   Do you see a signature on Exhibit 230 in front of you?

1    A.    I do.

2    Q.    Do you recognize that signature?

3    A.    Yes.

4    Q.    Whose do you recognize it to be?

5    A.    Professor Lieber's.

6    Q.    Is there any particular aspect of his signature that

7    identifies it for you?

8    A.    Yes.  I always recognized his -- the L at the beginning of

9    his last name.  It reminded me of a Z.

10            MR. DRABICK:  And Mr. Bruemmer, could we please flip

11   this image around.  And zoom back in.

12   Q.    Do you see any English-language words on the card?

13   A.    I do.

14   Q.    Could you please read those.

15   A.    "Authorized signature.  UP cash.  This card is the

16   property of ICBC.  It is not transferable.  If found, please

17   return to ICBC.  The cardholder should abide by the terms and

18   conditions of ICBC debit card."

19            MR. DRABICK:  Thank you.

20            You can take that down, Mr. Bruemmer.

21            At this time, Your Honor, I'd ask to show only

22   Ms. Donlon Exhibit 212.

23            And if you could go to Page 3, Mr. Bruemmer, and

24   highlight the bottom quarter.

25   Q.    Do you see a signature on this document, Ms. Donlon?

1    A.   I do.

2    Q.   And do you recognize it?

3    A.   Yes.

4    Q.   Whose do you recognize it to be?

5    A.   Professor Lieber's.

6            MR. DRABICK:  Mr. Bruemmer, could we please show

7    Ms. Donlon only Exhibit 126.  And if you could please highlight

8    the bottom portion.

9    Q.   Do you see a signature on this document, Ms. Donlon?

10   A.   Yes.

11   Q.   And whose do you recognize it to be?

12   A.   Professor Lieber's.

13           MR. DRABICK:  If we could go to Exhibit 177 for

14   Ms. Donlon.  And highlight the bottom third.

15   Q.   Can you see a signature on this document?

16   A.   I can, yes.

17   Q.   And whose do you recognize it to be?

18   A.   Professor Lieber's.

19           MR. DRABICK:  And Exhibit 248, Mr. Bruemmer.

20   Q.   Do you see a signature on this document?

21   A.   I do.

22   Q.   And whose do you recognize it to be?

23   A.   Professor Lieber's.

24           MR. DRABICK:  And, finally, Mr. Bruemmer,

25   Exhibit 153, the second page.

1    Q.    Do you see a signature on this document, Ms. Donlon?

2    A.    Yes.

3    Q.    And whose do you recognize it to be?

4    A.    Professor Lieber's.

5              MR. DRABICK:  No further questions, Your Honor.

6              THE COURT:  Let us stretch.

7              (Stretch break.)

8              THE COURT:  How long will you be?

9              MS. GUABA:  No more than 15 minutes, Your Honor.

10             THE COURT:  Thank you.  You may proceed.

11                          CROSS EXAMINATION

12   BY MS. GUABA:

13   Q.    Good morning, Ms. Donlon.

14   A.    Good morning.

15   Q.    I have a few questions about the trip summaries you

16   prepared for Professor Lieber.

17             THE COURT:  Excuse me.  Have we introduced you to the

18   jury?

19             MS. GUABA:  Yes.

20             THE COURT:  Okay.

21             MS. GUABA:  But I represent Dr. Lieber as well.

22             THE COURT:  No.  But your name.

23             MS. GUABA:  Yes.  My name is Stephanie Guaba, just in

24   case they forgot.

25             THE COURT:  Okay, thank you.

1            MS. GUABA:  Sal, can you please display previously

2    admitted Government Exhibit 178, Pages 3 and 4, for Ms. Donlon.

3            THE CLERK:  Are we going to use the Government's or

4    yours?  Are you on HDM-1?

5            MR. CHAN:  Yes.

6            THE CLERK:  Okay.  I'm sorry.  There you go; right?

7    Okay.

8    Q.   And Ms. Donlon, Professor Lieber was scheduled to land in

9    Wuhan on Saturday, April 20th, 2013, at 5:10 p.m.; correct?

10   A.   Yes.

11   Q.   And he was scheduled to leave Wuhan on Sunday, April 21st,

12   2013, at 1:50 p.m.; correct?

13   A.   Yes.

14   Q.   So he was scheduled to be in Wuhan for less than 24 hours;

15   correct?

16   A.   Yes.

17            MS. GUABA:  And Sal, can you please display

18   previously admitted Government Exhibit 45, Pages 2 and 3, for

19   Ms. Donlon.

20   Q.   And Ms. Donlon, Professor Lieber was scheduled to land in

21   Wuhan on Tuesday, February 25th, 2014, at 7:35 p.m.; correct?

22   A.   I'm sorry.  Could you repeat it, now that this is on my

23   screen?

24   Q.   Yes, no problem.

25            Ms. Donlon, Professor Lieber was scheduled to land in

1    Wuhan on Tuesday, February 25th, 2014, at 7:35 p.m.; correct?

2    A.   Correct.

3    Q.   And he was scheduled to leave Wuhan on Wednesday,

4    February 26th, 2014, at 6:00 p.m.; correct?

5    A.   Correct.

6    Q.   So he was scheduled to be in Wuhan for less than 24 hours;

7    right?

8    A.   Yes.

9         MS. GUABA:   And may we turn to Page 8 on the same

10   exhibit.

11   Q.   Ms. Donlon, you received this itinerary from Wuhan, not

12   Professor Lieber; correct?

13   A.   Yes.

14        MS. GUABA:   And Sal, can we please display previously

15   admitted Government Exhibit 53, Pages 2 and 3, for Ms. Donlon.

16   Q.   Ms. Donlon, Professor Lieber was scheduled to land in

17   Wuhan on Wednesday, November 12th, 2014, at 7:45 p.m.; correct?

18   A.   Yes.

19   Q.   And he was scheduled to leave Wuhan on Friday,

20   November 14th, 2014, at 9:00 a.m.; correct?

21   A.   Yes.

22   Q.   That's about 37 hours in Wuhan; correct?

23   A.   Sure, yes.

24   Q.   And Ms. Donlon, if I can draw your attention to

25   Professor Liqiang Mai's contact information on the top of the

1   page, can you please read the cell phone number that is listed

2   for Professor Mai?

3   A.   Plus 86135-5462-8578.

4   Q.   And can you please read the email address that is listed

5   for Professor Mai?

6   A.   "MLQ@M" -- I'm sorry -- "@CMLIRIS.Harvard.edu."

7   Q.   Thank you.

8          And isn't it true that Professor Lieber also traveled

9   to Canada?

10   A.   I suppose so.  I can't remember exactly.

11   Q.   Well, you prepared his trip summaries when he traveled;

12   correct?

13   A.   Correct.

14   Q.   And isn't it true that Charlie also traveled to Israel?

15   A.   I would -- I'm sorry.  I would need to see the trip

16   summaries to remember.

17   Q.   Very well.

18          And Ms. Donlon, are you aware that Professor Lieber

19   was ill in 2013?

20   A.   Yes.

21   Q.   And are you aware that, that is the reason why he

22   requested first class travel when he went to Wuhan?

23   A.   No.

24   Q.   Ms. Donlon, part of your job duties included updating

25   Professor's CV or resume; correct?

1    A.    Correct.

2              MS. GUABA:  Sal, can you please display previously

3    admitted Government Exhibit 33 on Page 2 for Ms. Donlon.  And

4    can you please highlight the first seven lines of the "Academic

5    and Professional Awards" section.

6    Q.   Ms. Donlon, can you please read the first seven lines of

7    this section of the CV?

8    A.    "Willard Gibbs medal, 2013; Wolf Prize in Chemistry, 2012;

9    Honorary Professor, University of Science and Technology,

10   Beijing, 2011; Fred Kavli Distinguished Lectureship in

11   Nanoscience, Materials Research Society, 2010; Friendship

12   Award, Peoples Republic of China, 2009; Fellow, American

13   Chemical Society, Inaugural Class, 2009; Honorary Fellow,

14   Chinese Chemical Society, 2009; Inorganic Nanoscience Award,

15   ACS Division of Inorganic Chemistry, 2009; Pioneer Award,

16   National Institutes of Health, 2008; Einstein Award, Chinese

17   Academy of Sciences, 2008; Honorary Professorship, Peking

18   University, 2008; Elected Fellow, Materials Research Society,

19   2008; NBIC."

20             MS. GUABA:  Thank you, Ms. Donlon.

21             And Sal, can we please go to the first page of

22   Exhibit 33.

23   Q.   Ms. Donlon, this publication that you discussed earlier

24   was posted on the halls of the Lieber Group offices?

25   A.    Yes.

1    Q.    It was public for everyone to see?

2    A.    Anyone who had access to that building, yeah.

3    Q.    But there was no restriction on the publication being on

4    the wall?  It was on the wall -- the publication was on the

5    wall for everyone to see who passed by --

6    A.    Yes.

7    Q.    -- correct?

8          And Ms. Donlon, you testified on direct that, at

9    times, you would see Professor Lieber's email correspondence.

10   You did not have direct access to Professor Lieber's email

11   account; correct?

12   A.    Correct.

13   Q.    You did not have his password?

14   A.    I did not.

15   Q.    You didn't have all of his emails forwarded to you?

16   A.    Automatically, all of his emails?  No.  He would have to

17   forward them to me.

18   Q.    Okay.  And you did not know how many emails

19   Professor Lieber sent on any given day?

20   A.    No.

21         THE COURT:  You mean to all people or to her?

22         MS. GUABA:  To all people.

23   A.    No.

24   Q.    And you did not know how many emails he received on any

25   given day?

1    A.    Only the ones he forwarded me or cc'd me into.

2    Q.    And Ms. Donlon, you testified on direct about a Chinese

3    bank card?

4    A.    Yes.

5    Q.    That was the only time that you saw the card?

6    A.    It was.

7    Q.    And to be clear, you did not complete a transaction with

8    that card?

9    A.    I was unable to.

10   Q.    You never bought anything with it?

11   A.    I was unable to.

12   Q.    You never withdrew any money with it?

13   A.    I was not intending to.

14   Q.    Ms. Donlon, you did not book another trip to Wuhan for

15   Professor Lieber after the 2014 trip; correct?

16   A.    I can't recall.  I would need to look at all the trip

17   summaries.

18   Q.    And Ms. Donlon, just one more question on the bank card.

19          You remember seeing the exact card that was shown

20   earlier to you today from seven years ago?

21   A.    I do.  It was a very memorable occasion.

22   Q.    Even though that trip was in 2014?

23   A.    It was one of probably four or five times in my entire

24   career there that Professor Lieber came down to my office while

25   I was there.

1    Q.   But you were his gatekeeper?

2    A.   I functioned somewhat as a gatekeeper in terms of

3    screening calls and making sure people didn't come to his

4    office unannounced.

5          MS. GUABA:  Your Honor, if I may confer with

6    co-counsel for a moment?

7          THE COURT:  Of course.

8          MS. GUABA:  No further questions, Your Honor.

9          THE COURT:  Any redirect?

10          MR. DRABICK:  Very brief, Your Honor.

11                   REDIRECT EXAMINATION

12   BY MR. DRABICK:

13   Q.   Ms. Donlon, Ms. Guaba asked you about the publication that

14   you forwarded to Dr. Lieber --

15   A.   Yes.

16   Q.   -- and asked you about the fact that it was publicly

17   available on the wall in the lab; correct?

18   A.   Yes.

19   Q.   And that's the publication that has him listed with an

20   affiliation with the WUT-Harvard Joint Nano Key Lab; correct?

21   A.   Correct.

22   Q.   Did you ever hear Dr. Lieber state that WUT was not

23   authorized to use Harvard's name?

24   A.   No.

25         MR. DRABICK:  Nothing further, Your Honor.  Thank you.

1          THE COURT:  Any recross?

2          MS. GUABA:  None, Your Honor.

3          THE COURT:  Thank you, Ms. Donlon.  You are excused.

4          THE WITNESS:  Thank you.

5          THE COURT:  Have a good trip back.

6          THE WITNESS:  Thank you.

7          THE COURT:  I think this is as good a time to stretch

8    as any because we've got a new witness.

9          Who's the next witness?

10          MR. CASEY:  The Government calls Special Agent,

11   Kara Spice.

12          (Stretch break.)

13          THE CLERK:  Could I have you raise your right hand.

14          (Witness sworn.)

15          THE WITNESS:  Yes.

16          THE CLERK:  Can I just ask you to remove your mask?

17   And could you please state your name, spelling your last name

18   for the record, please.

19          THE WITNESS:  Sure.  My name is Kara, K-a-r-a; last

20   name, Spice, S-p-i-c-e.

21          THE CLERK:  Thank you.

22          THE COURT:  You may be seated.

23          KARA SPICE, having been duly sworn by the Clerk, was

24   examined and testified as follows:

25

```
 1                      DIRECT EXAMINATION
 2   BY MR. CASEY:
 3   Q.   Good morning.
 4   A.   Good morning.
 5            THE COURT:  You may proceed.
 6            MR. CASEY:  Thank you, Your Honor.
 7   Q.   Just make sure you pull the microphone close to you and
 8   speak in a loud, clear voice.
 9            Ms. Spice, where do you work?
10   A.   I work for the Federal Bureau of Investigation.
11   Q.   What do you do there?
12   A.   I'm a Special Agent.
13   Q.   How long have you been a Special Agent?
14   A.   17 years.
15   Q.   How long have you been with the FBI?
16   A.   17 years.
17   Q.   Did you graduate from the FBI Academy?
18   A.   Yes.
19   Q.   Generally speaking, what are your duties and
20   responsibilities as a Special Agent with the FBI?
21   A.   So, I'm a Field Agent.  I conduct investigations of
22   Federal crimes, I collect evidence, I conduct interviews --
23            THE COURT:  Can you arrange the microphone so that
24   it's a little bit --
25            THE WITNESS:  Sure.  How's this?
```

```
 1              THE COURT:  Can you hear her?  Good.
 2    A.   As I was saying, I conduct investigations for Federal
 3    crimes.  I collect evidence, I interview, and I execute search
 4    warrants and arrest warrants.
 5    Q.   Were you involved in the investigation of an individual
 6    named Charles Lieber?
 7    A.   Yes.
 8    Q.   Can you give the jury just an overview of your role in the
 9    investigation?
10    A.   Sure.  I was involved in the arrest and interview of
11    Dr. Lieber on January 28th, 2020.  I attended a briefing that
12    morning, we conducted an interview --
13    Q.   Well, just before we get into the specifics of the arrest,
14    what was your role in the investigation after that point?
15    A.   After that point, I attended a few team meetings and
16    really didn't play a role in the investigation until the summer
17    of this year, 2021.
18    Q.   Have you had an opportunity to review evidence in the
19    case?
20    A.   Yes.
21    Q.   Okay.  Let's talk in a little more detail about
22    January 28th, 2020.
23              Was that the day you participated in the Defendant's
24    arrest?
25    A.   Yes.
```

1   Q.   What did you do that morning?

2   A.   I attended an arrest briefing at approximately 5:30 in the

3   morning.

4   Q.   And what was the purpose of the briefing?

5   A.   Just to go over the operational plan.  We were executing

6   both an arrest and two search warrants that morning.

7   Q.   And which locations were being searched?

8   A.   Dr. Lieber's home in Lexington, Massachusetts, as well as

9   his office at Harvard University.

10   Q.   And did you have an arrest warrant and two search

11   warrants?

12   A.   Yes.

13   Q.   Were you assigned to a particular task that day?

14   A.   Yes.

15   Q.   And what was that?

16   A.   I was assigned to execute the arrest, as well as attempt

17   an interview of Dr. Lieber.

18   Q.   Was anyone else assigned to assist you with that?

19   A.   Yes.

20   Q.   And who was that?

21   A.   Special Agent Robert Plumb.

22   Q.   Is he also a Special Agent with the FBI?

23   A.   Yes.

24   Q.   And what was the plan?  How were you going to go about

25   arresting the Defendant and attempting to talk to him?

1    A.    Initially we were going to go a little bit probably after

2    6:00 a.m. and knock on his door and attempt to conduct an

3    interview.

4    Q.    And if he didn't agree to speak to you?

5    A.    We were going to arrest him.

6    Q.    I think you already said this, but what town was the

7    Defendant's house located in, just the town?

8    A.    Lexington, Massachusetts.

9    Q.    Did you go to his house that morning, as planned?

10   A.    No, we did not.

11   Q.    Why not?

12   A.    We had surveillance on the home just to kind of keep --

13   kind of an idea of his location, and probably around 5:45,

14   approximately, we had information from our surveillance team

15   that lights had turned on in the home and a male who

16   looked -- who appeared to be Dr. Lieber had left the home --

17   Q.    Okay.

18   A.    -- in a vehicle.

19   Q.    And this was 5:30 in the morning?

20   A.    5:45, a little bit before 6:00.

21   Q.    Okay.  Now, what did you do at that point?

22   A.    We kind of decided what our Plan B would be.

23   Q.    And what was Plan B?

24   A.    We let the surveillance team follow him so that we could

25   figure out where he was going, and once we determined that he

1    was heading towards Cambridge, Harvard University, we decided

2    that we would go to Harvard University to arrest him.

3    Q.   Did you have an understanding at that time where the

4    Defendant worked?

5    A.   Yes.

6    Q.   And where was that?

7    A.   The chemistry building at Harvard University.

8    Q.   Okay.  Is that where you went?

9    A.   Yes.

10    Q.   And what did you do once you arrived?

11    A.   We arrived at the building, it was probably about 6:15,

12    6:30, we went inside the building, and we went to his office

13    and knocked on the door.

14    Q.   Did you have any assistance getting into the building?

15    A.   Yes.

16    Q.   From whom?

17    A.   Harvard University Police Department.  There were two

18    detectives.

19    Q.   How was it that -- was there some coordination with

20    Harvard University Police Department?

21    A.   Yes.

22    Q.   And why was that?

23    A.   Because we were executing a search warrant at the

24    University at his office, and so we had already known that we

25    would need assistance in entering the building.

1   Q.   Did you go to -- you and Special Agent Plumb go to

2   Dr. Lieber's office?

3   A.   Yes.

4   Q.   And what happened?

5   A.   We knocked on the door, and we also had two other

6   Special Agents with us.  We knocked on the door, he answered,

7   and we let him know that we had an arrest for -- arrest warrant

8   for him.

9   Q.   And what was his reaction?

10  A.   He was surprised, shocked.

11  Q.   Did you, in fact, arrest him?

12  A.   Yes.

13  Q.   Was he handcuffed?

14  A.   Yes.

15  Q.   Why was he handcuffed?

16  A.   We put handcuffs on all individuals that we arrest.

17  Q.   Okay.  Was the Defendant cooperative?

18  A.   Yes.

19  Q.   What did you do after you arrested him?

20  A.   We put him in a vehicle and transported him to the Harvard

21  University Police Department.

22  Q.   For what purpose?

23  A.   All people who are arrested have to be what we call

24  booked, and we usually conduct that at a police department or

25  our office, and Harvard had offered their booking to be there.

1    Q.    The Harvard Police Department?

2    A.    Yes.

3    Q.    What is booking?

4    A.    Booking is where we kind of process the individual.  Their

5    fingerprints are taken, they're photographed.  It's just a

6    formal type of paperwork that has to be conducted before we can

7    present them to court.

8    Q.    Did you observe the Defendant throughout the booking

9    process?

10   A.    Yes.

11   Q.    Did he continue to be cooperative?

12   A.    Yes.

13   Q.    Are you familiar with what are called Miranda rights?

14   A.    Yes.

15   Q.    And what are those?

16   A.    Those are rights notifying a person who's been arrested or

17   in custody of their privilege to an attorney, their right to

18   remain silent, if they have -- they can consult an attorney

19   before they're arrested, and if they can't afford an attorney,

20   one will be provided, and they can stop the interview at any

21   time.

22   Q.    Okay.  Did you hear anyone tell the Defendant his Miranda

23   rights during the booking process?

24   A.    Yes.

25   Q.    And who did you hear tell him that?

1    A.    The booking officer, the police officer for Harvard
2    University.
3    Q.    What happened after that process was completed?
4    A.    After that was completed, we escorted him to an interview
5    room at the Police Department.
6    Q.    And why did you do that?
7    A.    We wanted to attempt to conduct an interview with
8    Dr. Lieber.
9    Q.    Did Dr. Lieber agree to answer questions?
10   A.    Yes.
11   Q.    Was the interview audio- and video-recorded?
12   A.    It was.
13   Q.    Okay.  We're going to come back to that in a little bit,
14   but first I want to talk to you about your review of some of
15   the evidence in the case.
16         First off, did you review any document evidence
17   obtained during the investigation?
18   A.    Yes.
19   Q.    And just generally speaking, what were the sources of
20   documents and evidence that you reviewed?
21   A.    We received documents from Harvard University pursuant to
22   a Grand Jury subpoena, and there were electronic devices,
23   digital devices that were seized during the execution of the
24   two search warrants, at his home and at his office.
25   Q.    And did you review documents and evidence from both

1    sources?

2    A.   Yes.

3          MR. CASEY:  Your Honor, at this time, I would like to

4    read a stipulation between the parties.

5          THE COURT:  Go ahead.

6                         STIPULATION

7          MR. CASEY:  "In lieu of live testimony at trial,

8    counsel for the United States and counsel for the Defendant

9    have stipulated and agreed to the following facts:  Government

10   Exhibits 10 through 111A and 133 and Defense Exhibits BG, BS,

11   CF, CG, CI, CJ through DD, and DF, DG through EU, are true and

12   correct images of select emails and attachments extracted from

13   Microsoft Outlook data housed on Harvard University's

14   electronic servers.  The data-extraction process produced an

15   accurate result that did not alter the images or metadata

16   associated with the extracted email or attachment in existence

17   at that time.

18         "Government Exhibits 150 through 179 are true and

19   correct images of select emails, attachments and/or documents

20   extracted from digital devices collected on January 28th, 2020,

21   from Charles M. Lieber's home and/or office at Harvard

22   University.

23         "The digital devices collected on January 28th, 2020,

24   from Charles M. Lieber's home and/or office at Harvard

25   University included a Dell Laptop 7400" -- I'm sorry -- "a Dell

1   Latitude 7400 laptop, Serial No. 8J9BZY2; and multiple external

2   hard drives containing in total approximately 5.4 terabytes of

3   data and 1.79 million items.  After removing duplicates and

4   operating system files, the drives were determined to contain

5   approximately 1.45 terabytes of data and approximately 91,000

6   unique items.

7        "The data-extraction process for Government

8   Exhibits 150 through 179 collectively, for purposes of this

9   stipulation, referred to as digital data exhibits, produced an

10  accurate result that did not alter the images or metadata

11  associated with the extracted email, attachment or document in

12  existence at the time.

13       "Select metadata files for the digital data exhibits

14  are found in Table A attached to the stipulation."

15       And Your Honor, I may refer to the Table A throughout

16  my questioning.

17       THE COURT:  So does that mean that all of these

18  documents that are referenced are now in evidence?

19       MR. CASEY:  It does not mean they're in evidence.  I

20  think the parties are just stipulating that they are true and

21  correct copies of things from the servers of Harvard University

22  or these digital devices, and they will be subject to

23  objections on a document-by-document basis.

24       THE COURT:  So the point is only to leave open the

25  issue of hearsay or anything like that?

1          MR. CASEY:  That's correct.

2          THE COURT:  So they're not in evidence now as a result

3     of the stipulation?

4          MR. CASEY:  That is right.

5          All right.  Mr. Bruemmer, if I could have, please,

6     Exhibit No. 12, not in evidence.

7     Q.   Ms. Spice, do you see Exhibit 12 in front of you?

8     A.   I do.

9     Q.   And if you want, you're welcome to flip to Tab 12 in your

10    binder.  It's whatever you're most comfortable with.

11    A.   I think I'm missing Volume I.

12         MR. CASEY:  Well, that's a problem.  One moment, Your

13    Honor.

14         May I approach briefly?

15         THE COURT:  Yes.

16         THE WITNESS:  There we go, yeah.  Sorry.

17         MR. CASEY:  Crisis averted.

18    Q.   Do you see Exhibit 12 in front of you?

19    A.   I do.

20    Q.   And what is it?

21    A.   It's an email exchange between Dr. Lieber and

22    Professor Liqiang Mai around the date of November 10th, 2011.

23    Q.   And at the bottom of Page 1 of Exhibit 12, is there a

24    reference to "Strategic Scientist in WUT"?

25    A.   Yes.

1           MR. MUKASEY:  Objection.

2           THE COURT:  What's the objection?

3           MR. MUKASEY:  Relevance and hearsay.

4           THE COURT:  Well, it's in evidence, as I understand

5   it.

6           MR. CASEY:  I haven't offered it yet, Your Honor.

7   It's not in evidence, but -- I haven't offered it yet.

8           MR. MUKASEY:  It's not in evidence.  I don't want her

9   reading from it.

10          THE COURT:  Yeah, until it's in evidence, let's not

11  get into the content.

12          MR. CASEY:  I'm simply trying to establish whether it

13  is relevant.

14          THE COURT:  Yeah, but you can't -- if the evidence is

15  not admissible, we can't use it to establish the admissibility

16  of the document, can we?

17          MR. MUKASEY:  This is part of the 404(b) objection.

18          THE COURT:  At the moment, I am with you.

19  Q.   The email at the bottom of Exhibit 12, what is it

20  concerning?

21  A.   "Strategic Scientist in WUT."

22          MR. CASEY:  And could we just go to Page 2 of

23  Exhibit 12.

24  Q.   Is that a continuation of Professor Mai's email to

25  Dr. Lieber concerning the issue you just described?

1  A.   Yes.

2          MR. CASEY:  And if we could go back to Page 1.

3  Q.   Does Dr. Lieber respond in the middle of the first page of

4  Exhibit 12?

5  A.   Yes.

6          MR. CASEY:  Your Honor, I offer Exhibit 12.

7          MR. MUKASEY:  We object.  It's 404(b), it's

8  irrelevant, and it's hearsay.

9          THE COURT:  Well, the relevance, I would allow it

10  de bene.

11          What was the other reason?

12          MR. MUKASEY:  It's hearsay.  It does not go to state

13  of mind, it does not go to any element of this case --

14          THE COURT:  Well, I don't know that.

15          MR. MUKASEY:  -- and it's 404(b).

16          It does not speak to the Thousand Talents Program; it

17  speaks to something else.

18          MR. CASEY:  Your Honor, I'd ask for you to admit

19  conditionally, subject to the next exhibit.

20          THE COURT:  I will take it de bene.

21          What that means, members of the jury, it is allowed

22  into evidence conditionally, that it satisfies the Rules of

23  Evidence as we go along.  As you understand now, there are

24  complicated rules, and sometimes you -- the counsel

25  can't -- this is true for both counsel -- they can't fulfill

1    all of the requirements to have a document actually admitted

2    into evidence, so they have to start someplace.  They go

3    partway, and then they hope to finish it later.

4            So, at the moment, this is in, subject to being ruled

5    out if they don't finish providing all of the necessary

6    requirements for it to be an admissible document.

7            MR. MUKASEY:  Thank you, Judge.  And I think, at an

8    appropriate time, maybe we will agree on an instruction to

9    discuss the purposes for this ---

10           THE COURT:  Well, whenever you are ready, you tell me

11   what you want me to tell the jury, and I will consider it and

12   tell them probably something slightly different, but maybe not.

13           MR. MUKASEY:  Thank you, Judge.

14           MR. CASEY:  May this be published, Your Honor?

15           THE CLERK:  Can it be published, No. 12?

16           THE COURT:  Well, it can, but subject to the fact that

17   I will ask the jury to wipe it out of their minds.

18           MR. CASEY:  Understood.

19           THE CLERK:  Okay.

20           (Government Exhibit 12 offered de bene.)

21           MR. CASEY:  Mr. Bruemmer, could you just highlight the

22   email beginning with, "Dear Charlie" at the very bottom and

23   also the date and time and so forth.  There you go.

24   Q.   Is this an email from Professor Liqiang Mai dated

25   11/9/2011?

1    A.    Yes.

2    Q.    And could you just read it, please?

3    A.    "Dear Charlie:  Please find the attached contract for

4    Strategic Scientist in WUT for use in ceremony.  The drafted

5    schedule for your Wuhan trip is attached.  If you have any

6    questions, comments, ideas, revisions, please be free to let us

7    know."

8          MR. CASEY:  And Mr. Bruemmer, could we go to Page 2

9    and just highlight at the top that text there.  Thank you.

10   Q.    Special Agent Spice, could you read that, please?

11   A.    "I am also happily to let you know that, about your

12   recommendation of 'the recruitment program of global experts.'

13   Our University has been asked to provide your further

14   information, patents, projects, funding, et cetera, which is a

15   good hint for success, according to the officer.  Now we are

16   trying to finish this form from the website, Internet and

17   others."

18         MR. CASEY:  Could we go to Page 1, please,

19   Mr. Bruemmer, and could you highlight the email in the middle

20   of the page, please, including the header information.  I'm

21   sorry.

22   Q.    And Special Agent Spice, is this an email from Dr. Lieber

23   to Liqiang dated November 10th, 2011?

24   A.    Yes.

25   Q.    And could you read the text of the email, please?

1    A.    "Dear Liqiang:  Thank you for the updated schedule and

2    other information.  Everything looks good.  I think that we can

3    sign the three copies of the contract during my visit.  I will

4    not bring copies unless you want me to print out here.  See you

5    on Sunday.  Best regards, Charlie."

6              MR. CASEY:  And if we could highlight the top email

7    on Exhibit 12, please.

8    Q.    Could you just read the first two sentences, please?

9    A.    "Dear Charlie, thanks for your soon kind response.  Yes,

10   you do not need to bring copies, and we will sign the three

11   copies of the contract during your visit."

12   Q.    Okay.  And what's the date of this email?

13   A.    November 10th, 2011.

14             MR. CASEY:  If I could have Exhibit 11, please, not

15   in evidence.

16   Q.    Do you recognize this email, Special Agent Spice?

17   A.    Yes.

18   Q.    And what is it?

19   A.    It's an email correspondence between Dr. Lieber and

20   Liqiang Mai dated around November 9th, 2011.

21   Q.    Is that the day before the last email we just saw in

22   Exhibit 12?

23   A.    Yes.

24   Q.    And is there an attachment, or are there attachments to

25   this email?

1    A.   Yes.

2         MR. CASEY:  If we could go to Page 11.

3    Q.   Is that one of the attachments?

4    A.   Yes.

5    Q.   And is it the contract referred to in Exhibit 12?

6    A.   Yes.

7         MR. CASEY:  Move to admit, Your Honor.

8         MR. MUKASEY:  Objection.

9         THE COURT:  How does she know it's the contract?

10   Q.   Well, is it a strategic scientist contract?

11   A.   It is.

12        MR. MUKASEY:  Objection.  Objection.

13        THE COURT:  Well, he's trying to establish its

14   admissibility.  He can ask about -- it is a document that was

15   signed by whom?

16        MR. MUKASEY:  The strategic scientist contract, Judge,

17   we submit, is 404(b), and it's improper at this moment.

18        THE COURT:  No, I don't think it goes out on 404(b),

19   but we need to have a proper question, and then I can rule on

20   the proper question.

21        MR. MUKASEY:  There's also, Judge, just as an

22   additional objection, a whole lot of interchange in here that

23   really shouldn't come in for the truth of the matter asserted

24   in any respect.  I don't even think the Government believes it

25   should.

1           THE COURT:  So the Government is offering this exhibit

2      for what purpose?

3           MR. CASEY:  It goes to the Defendant's state of mind,

4      Your Honor.

5           MR. MUKASEY:  There's a bunch of random emails from

6      China.  How does that go to his state of mind?

7           THE COURT:  These are letters and documents from China

8      to him, but I thought there were also some going back

9      acknowledging them.

10           MR. CASEY:  Well, so, Your Honor, Exhibit 12, the

11      email we just read, the Defendant said, "Everything looks

12      good" -- was sent the agreement and "Everything looks good."

13      Exhibit 11, the metadata, which is part of the stipulation,

14      establishes that the document that I just referred to --

15           THE COURT:  Which exhibit is this?

16           MR. CASEY:  Exhibit 11 establishes that the document I

17      just showed her, which is up on your screen, is the attachment

18      to this email.  The defense has agreed to that.

19           THE COURT:  I will allow it.

20           MR. CASEY:  Okay.

21           Could you highlight the top email for me,

22      Mr. Bruemmer, on Page 1.

23      Q.   Special Agent Spice, is this an email from Professor Mai

24      to Charles Lieber dated 11/9/2011?

25      A.   It is.

1   Q.   And is that the day before the email we just saw in

2   Exhibit 12?

3   A.   It is.

4   Q.   Okay.  Could you read the first sentence, please --

5   actually, the first two sentences.

6   A.   "Dear Charlie:  Please find the attached contract for

7   strategic scientist in WUT for use in ceremony.  The drafted

8   schedule for your Wuhan trip is attached."

9           MR. CASEY:  And Mr. Bruemmer, could we please go to

10  Page 11.

11  Q.   Could you just read the first two lines at the very top of

12  the page?

13  A.   "Wuhan University of Technology, Contract for Strategic

14  Scientist Appointment."

15  Q.   And who is identified as employer and employee at the top?

16  A.   Employer is Wuhan University of Technology, WUT; and

17  employee is Strategic Scientist.

18  Q.   And do you see Article I?

19  A.   Yes.

20  Q.   What's the duration of the contract?

21  A.   Five years.

22          MR. CASEY:  If we could go to the next page.

23  Q.   Do you see, towards the bottom of the page --

24          MR. CASEY:  Actually, Mr. Bruemmer, maybe you could

25  highlight the second number 4, this section.

1    Q.    Could you read just Item No. 4 on Exhibit 11?

2    A.    "Once Party B gains a Chinese government-sponsored

3    position through successful application for various Chinese

4    talent-related projects, Party A shall adjust its payment terms

5    to ensure that Party B enjoys more benefits on the principle of

6    'taking the higher pay,' but the same benefit terms will not be

7    paid twice."

8              MR. CASEY:  Okay, thank you.

9              Could I have Exhibit 13, not in evidence?  Thank you.

10   Q.    Do you recognize Exhibit 13, Special Agent Spice?

11   A.    Yes.

12   Q.    And what is it?

13   A.    It's an email exchange between Dr. Lieber and Dr. Mai

14   circa November 24th, 2011.

15   Q.    Okay.  And the email in the middle of the chain, is that

16   from Dr. Lieber to Professor Mai?

17   A.    Yes.

18             MR. CASEY:  Your Honor, I move to admit Exhibit 13.

19             MR. MUKASEY:  Objection.  404(b), hearsay, and this is

20   not an email from Professor Lieber that is responsive.

21             MR. CASEY:  Your Honor, we're not offering the top

22   email for the truth.  The bottom -- the next email from

23   Dr. Lieber is his statement.

24             THE COURT:  So what's the purpose of this one?

25             MR. CASEY:  Well, again, I don't want to read from the

1   document, but I can ask the witness if it references a trip, if

2   Your Honor would like.  It's also an email with Professor Mai.

3          MR. MUKASEY:  It's also cumulative of the last email.

4          THE COURT:  I'm sorry?

5          MR. MUKASEY:  It's also cumulative of the last email.

6          THE COURT:  Well, it may be cumulative, but it's also

7   a continuance of something.

8          MR. MUKASEY:  I think the question is:  Continuance of

9   what that's relevant to the issues on trial?

10          THE COURT:  Well, relevance is hard to determine until

11   you know something; and at the moment, I'm still learning the

12   something.

13          MR. MUKASEY:  Right.  Me, too.  I just want to

14   understand that these are going to be admitted conditionally

15   because, if they're not connected up to the issues on trial,

16   hopefully, they will be struck.

17          THE COURT:  I certainly will hear the evidence

18   conditionally, and then you can make sure that I heard -- that

19   we all heard it finally in full.

20          MR. CASEY:  Sure.

21          MR. MUKASEY:  And we may move to strike them,

22   obviously.

23          THE COURT:  Or you move to strike.

24          MR. CASEY:  Thank you, Judge.

25          THE CLERK:  So in?

1          THE COURT:  It's in conditionally.

2          THE CLERK:  Okay.

3          THE COURT:  Sometimes we say it's in de bene; that is,

4     it's in okay, but it may go out again, or it may stay in.  And

5     sometimes it's very difficult to determine whether a particular

6     exhibit really is -- has to do with the case, what it has to do

7     with the case, and should it come in under the Rules under

8     which we operate?  And sometimes we don't have -- I don't have

9     enough information to make that ruling at this stage, so I make

10    a conditional ruling allowing it in to allow me to determine,

11    based on what happens now and hereafter, whether this is a

12    document that should be properly admitted.  So I may tell you

13    to strike it from your minds at some point.

14          (Government Exhibit 13 offered de bene.)

15          MR. CASEY:  If we could go to Page 2 of Exhibit 13.

16    And could you highlight the email at the top beginning with

17    Charles Lieber's name.  Thank you.

18    Q.   Special Agent Spice, do you see the email highlighted on

19    your screen?

20    A.   Yes.

21    Q.   Is that the email we just saw in Exhibit 12 from

22    Dr. Lieber to Liqiang Mai?

23    A.   Yes.

24          MR. CASEY:  And if we could go to Page 1, please.

25    Q.   Does Dr. Mai respond?

1    A.    Yes.

2              MR. CASEY:  Okay.  Can you highlight that, the bottom

3    email, for us, Mr. Bruemmer.  Thank you.

4    Q.    And could you read the first -- well, why don't you read

5    the whole email.

6    A.    "Dear Charlie:  I hope you had a good trip from Beijing to

7    Boston.  We know the very tight schedule made you so busy and

8    tired.  Sorry for it.  We very much appreciate your great

9    effort, contribution, support for your visiting WUT, which was

10   really successful and productive.  Following our discussion and

11   your valuable supervision suggestion, I will figure out Nano

12   Key Lab construction, website and recruiting for your approval

13   soon."

14             MR. CASEY:  And could we highlight the top email --

15   or, I'm sorry, the next email, the one below that.  Thank you.

16   Q.    And is this a responsive email from Charles Lieber to

17   Liqiang Mai?

18   A.    Yes.

19   Q.    And what's the date of that?

20   A.    November 18th, 2011.

21   Q.    Could you read the email, please.

22   A.    "Dear Liqiang:  Thank you for your note.  I very much

23   appreciate the effort that you put into making my visit a good

24   one.  I also agree that it was productive and hope that we can

25   push forward, as per discussions, to build up the joint

1    laboratory to a truly world-level facility.  Best regards,

2    Charlie."

3              MR. CASEY:  Could I have Exhibit 14, not in evidence.

4    Q.    Do you recognize Exhibit 14, Special Agent Spice?

5    A.    Yes, I do.

6    Q.    And what is it?

7    A.    It's an email exchange between Dr. Lieber and

8    Professor Mai dated December 22nd, 2011.

9    Q.    And do there appear to be some attachments to this email?

10   A.    Yes.

11             MR. CASEY:  Okay.  If we could go to Page -- Page 5.

12   Q.    Do you see Page 5 of Exhibit 14?

13   A.    Yes.

14   Q.    And is there a reference there to the joint lab?

15   A.    Yes.

16             MR. CASEY:  Your Honor, I offer Exhibit 14.

17             MR. MUKASEY:  The same objection, for the record,

18   Judge.

19             THE COURT:  Okay.  It may be marked.

20             THE CLERK:  To show?

21             THE COURT:  Yes.

22             (Government Exhibit 14 offered de bene.)

23             MR. CASEY:  Mr. Bruemmer, if we could go to Page 1.

24   Q.    The top email, is that an email from Liqiang Mai to

25   Charles Lieber dated December 22nd, 2011?

1   A.    Yes.

2   Q.    And could you read the subject line, please?

3   A.    "Website file of our nano lab."

4         MR. CASEY:  And Mr. Bruemmer, could you just

5   highlight the text of the top email, please.

6   Q.    Could you just read the email for us briefly?

7   A.    "Dear Charlie:  We are sorry to trouble you about this.

8   It is probably because the versions of the browser we used are

9   different.  The technician in charge of the internet asked us

10  to send the following testing website for you viewing/checking

11  the web page.  After your view, we will update them immediately

12  based on your suggestions, comments, ideas."  And then there's

13  a website.

14        MR. CASEY:  That's fine.

15        We'll move on to Page 5, please.

16        And Mr. Bruemmer, could you just highlight the box in

17  the upper right-hand corner.

18  Q.    Special Agent Spice, could you just read the first

19  paragraph there?

20  A.    "WUT-Harvard Joint Nano Key Laboratory was established in

21  2009.  Professor Charles M. Lieber from Harvard University acts

22  as the Director, and Professor Liqiang Mai from Wuhan

23  University of Technology acts as the Executive Director."

24        MR. CASEY:  Could we go to the next page, please.

25        THE COURT:  What is this document?  I mean, what is

1    it, a letter to somebody?

2              MR. CASEY:  It's an attachment to an email from

3    Professor Mai to Dr. Lieber with a draft website.

4              THE COURT:  But what is it?  Is it a news report or

5    what?

6              MR. CASEY:  We can go back to the first page, and I

7    can make it more clear.

8              Mr. Bruemmer, could you just highlight the text right

9    here, this line.

10   Q.    Does Dr. Mai describe what he's attaching to his email?

11   A.    He does.

12   Q.    And what does he say?

13   A.    "Meanwhile, I also attached the PDF files for the web page

14   for your reference.  We are hopeful of succeeding in the

15   attempt.  Please be free to let us know with any questions.

16   Thank you."

17             THE COURT:  Thank you.

18             MR. CASEY:  You're welcome.

19             And could we go back to -- actually, why don't we go

20   to Page 6.

21   Q.    Do you see Dr. Lieber's name on Page 6 of Exhibit 14?

22   A.    I do.

23   Q.    And is there a title associated with him at the top of the

24   page there?

25   A.    Yes.

1   Q.   And what is it?

2   A.   Laboratory Director.

3          MR. CASEY:  Could we go to Exhibit 17A, which I

4   understand there is no objection to.

5          MR. MUKASEY:  No objection.

6          MR. CASEY:  Thank you.

7          (Government Exhibit 17A received in evidence.)

8          MR. CASEY:  And if we could go to the second page,

9   please.

10  Q.   Special Agent Spice, is this a document that you've

11  reviewed?

12  A.   Yes.

13  Q.   And is it an email from Professor Mai to Charles Lieber?

14  A.   Yes.

15  Q.   And do you see the date at the very bottom?

16  A.   Yes.

17  Q.   And is that April 3rd, 2012?

18  A.   Yes.

19          MR. CASEY:  Mr. Bruemmer, could you just highlight

20  the first paragraph, please.

21  Q.   And can you read that for the jury?

22  A.   "I'm very happy to let you know that, in the world

23  recruitment plan of renowned experts in China, also called One

24  Thousand Plan of Foreign Experts, you have been approved and

25  awarded as invited strategic foreign expert by Chinese

1    government because of your world-leading achievements, the

2    good-collaboration basis between you and WUT and your great

3    contribution to national academic exchange from China and USA.

4    You are provided with the personal benefit of one million RMB,

5    approximately 158,800 U.S. dollars, and a research funding of

6    five million RMB, approximately 794,000 U.S. dollars, for

7    development of the WUT-Harvard Joint Nano Key Lab and

8    collaboration research.  This plan is the highest

9    plan/program for famous foreign scientists in the Chinese

10   scientific field, and only 40 famous experts from the world

11   were awarded.  President Zhang, let me express his sincere

12   congratulations to you."

13            MR. CASEY:  And could we go to Page 1, please.

14   Q.   And does Dr. Lieber respond to that email?

15   A.   He does.

16            MR. CASEY:  Could you highlight that for us,

17   Mr. Bruemmer.

18   Q.   And could you read the last sentence of Dr. Lieber's

19   email?

20   A.   "Please send my regards and sincere thanks to

21   President Zhang."

22            MR. CASEY:  Could we have Exhibit 18, which is not in

23   evidence.

24   Q.   Do you recognize Exhibit 18, Special Agent Spice?

25   A.   Yes.

1    Q.   And what is it?

2    A.   It's an email exchange between Dr. Lieber and

3    Professor Mai dated April 7th, 2012.

4    Q.   And in Professor Mai's email, does he make reference to

5    any attachments?

6    A.   Yes.

7            MR. CASEY:  And if we could go to Page 3.

8            THE COURT:  This is all still without the jury seeing

9    it?

10           MR. CASEY:  Correct.  This is -- I understand there

11   will be an objection to this.

12   Q.   Do you see Dr. Lieber's name at top of Page 3 of

13   Exhibit 18?

14   A.   I do.

15   Q.   Do you see Wuhan University's identified as well?

16   A.   Yes.

17           MR. CASEY:  Your Honor, I move to admit Exhibit 18.

18           MR. MUKASEY:  Objection.  The portion of this that's

19   being offered is really the portion written by the gentleman in

20   China.  There is no responsive or adoptive acknowledgment by

21   Professor Lieber.  It's pure hearsay.

22           THE COURT:  Is it part of a series of letters back and

23   forth, which end with this one?

24           MR. MUKASEY:  No.

25           THE COURT:  This is all by itself?

1          MR. MUKASEY:  This is part of an ongoing chain of

2     communication, but not on Professor Lieber's part with respect

3     to this document.  It's simply sent to him from China, and

4     there's no response.  It's an inadmissible hearsay.  It's not

5     his admission.

6          THE COURT:  Well, that may be, but it shows a

7     continuum of activities.  I think that's what it's being

8     offered for.

9          MR. MUKASEY:  I think there has to be a very clear

10    instruction that it's not coming in for the truth of it at all.

11    It can't even come in for state of mind, in my respectful

12    opinion.  He doesn't respond to it.

13         THE COURT:  That may be.  I'm not exactly sure about

14    that yet, members of the jury, but you can see, counsel have to

15    start someplace when they offer evidence.  Sometimes that

16    evidence is not properly admissible at that point because we

17    don't know enough, just as I tried to explain to you earlier.

18         So that's why we have this notion that we can admit

19    de bene, sort of on condition that it will be made admissible

20    at some point through additional evidence that shows the

21    purpose for which it was made and that, in fact, it satisfies

22    the Rules.

23         MR. CASEY:  Your Honor, just to be clear, it's not

24    being offered for the truth; it's being offered to show the

25    continuum of communications and the fact that this conversation

1    occurred and that this communication was made to Dr. Lieber.

2           THE COURT:  So it is being admitted for -- at the

3    moment, for that limited purpose, to show that there was an

4    ongoing series of letters going back and forth.

5           It is important for you, when you look at this, if in

6    fact it goes to the jury room with you and it doesn't get

7    thrown out before that, to make sure that, in fact, it involves

8    the Defendant, Mr. Lieber, that he was a participant in that

9    chain in some way during -- while the chain back-and-forth was

10   being carried out.

11          It is not admissible to show what was happening in

12   China separate and apart from Dr. Lieber.  He is the person who

13   is here.  He has to be shown to be involved in this activity

14   that the Government is now telling us about or that's trying to

15   get the witness to tell us about.

16          MR. MUKASEY:  Just as a reminder, Your Honor -- and

17   thank you for that explanation -- this is a Publishers

18   Clearinghouse Email, "Congratulations, you've won the

19   Publishers Clearinghouse," that nobody responds to.

20          THE COURT:  Okay.

21          MR. CASEY:  Can we show it to the jury?

22          THE COURT:  I'm sorry?

23          THE CLERK:  Yes.

24          MR. CASEY:  I just -- thank you.

25   Q.   And at the top of Exhibit 18, is that an email from

1    Professor Mai to Charles Lieber dated April 7th, 2012?

2    A.    Yes.

3    Q.    And in the text of the email, does Professor Mai reference

4    any attachments?

5    A.    Yes.

6    Q.    What does he reference?

7    A.    A budget, a drafted budget, and agreement.

8    Q.    And can you read the sentence after where he references

9    the budget and the agreement?

10   A.    "I will discuss with you when we meet in 17 April, in

11   respect listen to your ideas, suggestions, comments."

12           MR. CASEY:  And if we could go to Page 3.

13   Q.    Do you see Dr. Lieber's name there at the top of Page 3 of

14   Exhibit 18?

15   A.    I do.

16   Q.    And can you identify or read who employer and employed

17   foreign expert, Party B, are?

18   A.    "Employer, Party A, Wuhan University of Technology;

19   employed foreign expert, Party B, 'One Thousand Talent,'

20   Charles M. Lieber.

21           MR. CASEY:  And Mr. Bruemmer, could you highlight the

22   English language below that, beginning with "Both sides," just

23   that one section.

24   Q.    Special Agent Spice, could you read that for the jury,

25   please?

1   A.   "Both sides, in line with the principle of legality,

2   fairness, equality, and mutual agreement to ensure the

3   implementation of 'One Thousand Talent Plan' and to guarantee

4   the legal rights and obligation of both sides on the basis of

5   Chinese laws and rules concerned, agree to sign this contract."

6        MR. CASEY:  Thank you.  And if you could just

7   highlight the next section beginning with, "Duration of the

8   contract."

9   Q.   What's the duration of the contract?

10  A.   "The term of the contract shall be March 1st, 2012, to

11  February 28th, 2015."

12       MR. CASEY:  And if we could go to the next page.

13  Q.   Does this list Party B's employment objectives and tasks?

14  A.   It does.

15  Q.   And, again, who is identified as Party B in this contract?

16  A.   Dr. Lieber.

17       MR. CASEY:  If we could go to the next page.

18  Q.   Is this a continuation of the employment tasks and

19  objectives?

20  A.   Yes.

21       MR. CASEY:  If we could go to the next page --

22  actually, why don't we go to one page after that -- actually,

23  I'm sorry, go back one.  My apologies.

24  Q.   At the bottom there, do you see where it's Party A 's

25  obligations?

1     A.    Yes.

2     Q.    And who is Party A in this contract?

3     A.    Wuhan University of Technology.

4           MR. CASEY:  And can you highlight Item B at the very

5     bottom of the page.

6     Q.    Could you read that for the jury?

7     A.    "Scientific Research Funding:  Party A shall provide

8     Party B ten million Chinese Yuan, 10,000 -- or ten million RMB,

9     during the term of the contract to the construction of new

10    direction and infrastructure construction.  Three million

11    Chinese Yuan, three million RMB, among the total amount can be

12    used to the construction of new direction."

13          MR. CASEY:  Could you go to the next page,

14    Mr. Bruemmer, and just highlight the top section of the English

15    language there.  Thank you.

16    Q.    Could you continue, Special Agent Spice?

17    A.    So, it was this total from the other page.  "This total

18    amount of money shall be managed by Party A.  Party B can

19    decide how to use it.  Team Construction Condition:  Party A

20    shall construct academic team according to Party B's

21    requirement and provide five million Chinese Yuan, five million

22    RMB, as the funds of team construction.  The funds shall be

23    mainly used as the payment, accommodation and travel expense of

24    Party B and the team members.  This amount of money shall be

25    managed by Party A.  Party B can decide how to use it.

1              "Section D, Payment and Living Conditions:  Party A

2     shall provide Party B with 50,000 U.S. dollars, 50,000 a month

3     before tax.  Party A shall provide Party B with one million

4     Chinese Yuan, one million RMB, after tax as living allowance,

5     which will be paid one third a year for three years in U.S.

6     dollars."

7              MR. CASEY:  Okay.  We're going to move to the next

8     page.  Could you highlight the section at the top, "Party B's

9     obligations."

10    Q.   And Special Agent Spice, could you read Items No. 2 and

11    No. 4?

12    A.   No. 2, "Party B shall work for Party A for no less than

13    mine months a year."

14             No. 4, "Party B's educational and academic

15    achievements, which are made at the position, are to be

16    achievements by using the resources of Party A, the papers and

17    works published and awards, patents.  And the scientific

18    project with Party A applied for should be signed by Party B

19    and the university he works for, and the Party A shall be the

20    first place in the author's information."

21    Q.   Again, who is Party A?

22    A.   Wuhan University of Technology.

23             MR. CASEY:  And if we could just go briefly to Page 1

24    of -- let's see -- Exhibit 18.  Thank you.

25    Q.   And does Professor Mai ask for ideas, comments and

1    suggestions from Dr. Lieber?

2    A.   Yes.

3            MR. CASEY:  Okay.  If we could go to Exhibit 19.

4            MR. MUKASEY:  Judge, may I, very briefly with one

5    question, voir dire the witness on this before we move off it?

6            MR. CASEY:  Your Honor, he has an opportunity to

7    cross-examine her on it.

8            THE COURT:  Well, that's sort of unorthodox.  Are you

9    suggesting this question goes to the admissibility of this

10   document?

11           MR. MUKASEY:  Well, I do think it does, Judge.  And

12   there's only one thing --

13           THE COURT:  I'm sorry I suggested it.

14           MR. MUKASEY:  It's one question.

15           MR. CASEY:  Your Honor, he'll have an opportunity to

16   cross-examine the witness.

17           THE COURT:  I think so.  I don't think we want to

18   interrupt the flow of things quite that much.

19           MR. MUKASEY:  Okay.  It does go to the admissibility.

20           THE COURT:  But your objection to my ruling is noted.

21           MR. MUKASEY:  Thank you, Judge.

22           THE COURT:  Thank you.

23           MR. CASEY:  Exhibit 19, not in evidence.

24   Q.   Do you recognize Exhibit 19?

25   A.   Yes.

1    Q.   And what is it?

2    A.   It's an email exchange between Dr. Lieber and

3    Professor Mai dated 4/28/2012.

4    Q.   And is this roughly three weeks after the email and

5    attachment that we just saw in Exhibit 18?

6    A.   Yes.

7    Q.   Okay.  And, again, the top email is from Professor Mai to

8    Dr. Lieber?

9    A.   Yes.

10            MR. CASEY:  Your Honor, I offer it.

11            MR. MUKASEY:  Objection.  Hearsay within hearsay as to

12   the top email; relevance.

13            THE COURT:  Which one are you offering?

14            MR. CASEY:  Your Honor, we're offering the top email

15   as a verbal act to show that, you know, it's a statement

16   about --

17            THE COURT:  The one that --

18            MR. CASEY:  The very top email.  It's a statement

19   about the negotiation of a contract.

20            THE COURT:  But it's not Dr. Lieber.

21            MR. CASEY:  Correct.  It's just offered for the fact

22   that the statement was made, and it's a continuation of the

23   same discussion about the contract.  And so it's offered for

24   that purpose, not for the truth.

25            MR. MUKASEY:  Judge, the email that they're offering

1   is from this gentleman in China who is repeating other

2   statements from a President Zhang in China.  So, not only is it

3   hearsay, but it's hearsay contained within hearsay.  And there

4   is no response such that --

5           THE COURT:  Well, I don't know about the no response.

6   Is there a response?

7           MR. CASEY:  Well, I'd just point out, in the last --

8           THE COURT:  It seems to me the second paragraph is

9   admissible; the first one we probably should leave out.

10          MR. CASEY:  The first paragraph is not being offered

11  for the truth, Your Honor.

12          THE COURT:  Okay.

13          MR. CASEY:  It's being offered as a verbal act to show

14  that they were discussing a contract, that's it.

15          THE COURT:  I don't think we need that, so that goes

16  out.  But you can start it with, "Moreover."

17          (Government Exhibit 18 received in evidence.)

18          MR. CASEY:  We'll move on to Exhibit 20.

19  Q.   Do you recognize Exhibit 20?

20  A.   I do.

21  Q.   And what is it?

22  A.   It's an email from a Noel Dou to Dr. Lieber dated May

23  11th, 2012.

24  Q.   And is there a reference to the Thousand Talents Program?

25          MR. MUKASEY:  Objection.

```
 1              THE COURT:  The objection is sustained.

 2              What is this being offered for?

 3              MR. CASEY:  It's offered for Dr. Lieber's state of

 4    mind.

 5              MR. MUKASEY:  It's an email from a journalist.

 6              THE COURT:  Is this to him?

 7              MR. MUKASEY:  It's an email from a journalist.

 8              THE COURT:  At the moment, I'm with you.

 9              MR. CASEY:  Your Honor, it's being offered to show

10    that the Defendant knew how he was being categorized in China.

11              THE COURT:  Well, but there's no evidence in this

12    document that he has ever seen it.

13              MR. CASEY:  Well, it's sent to his email account.

14              THE COURT:  I don't think so.

15              The objection is sustained.

16              MR. CASEY:  Okay.  Exhibit 21.

17    Q.    Do you recognize Exhibit 21?

18    A.    Yes.

19    Q.    And what is it?

20    A.    It's an email exchange between Dr. Lieber, Dr. Mai and cc

21    of others, dated May 27, 2012.

22    Q.    Okay.  And do you see Item No. 3?

23    A.    Yes.

24              MR. CASEY:  Your Honor, I offer Exhibit 21.

25              THE COURT:  Is there an objection?
```

1            MR. MUKASEY:  There's an objection.

2            THE COURT:  What's the objection?

3            MR. MUKASEY:  It's the Publishers Clearinghouse

4    objection.

5            THE COURT:  I'm sorry?

6            MR. MUKASEY:  It's the Publishers Clearinghouse

7    objection.  If somebody sends me an email saying that I'm part

8    of something or I've won something, it doesn't mean anything.

9    It's a relevance objection.

10           MR. CASEY:  Your Honor, it's a continuation of the

11   same discussion about the same thing, and it's offered for that

12   purpose.

13           THE COURT:  There is back and forth here, and this is

14   part of the back and forth.  As I understand what has happened

15   so far, and I am assuming, correctly I hope, that the

16   Government is continuing the back and forth, and that makes it

17   admissible.

18           MR. CASEY:  That's correct, Your Honor.  Thank you.

19           (Government Exhibit 21 received in evidence.)

20           MR. CASEY:  Could we show Exhibit 21 to the jury,

21   please, Ms. Urso.  Thank you.

22   Q.   And first of all, at the very bottom, does that

23   appear -- does it appear to be an email from Dr. Lieber to

24   Professor Mai from May 25th, 2012?

25   A.   Yes.

1   Q.   Okay.  And then at the top of the page, who is that email

2   from and to?

3   A.   It's from Dr. Mai to Dr. Lieber, and there's another

4   Harvard employee cc'd on it.

5   Q.   And could you read Item No. 3, please.

6   A.   "As you know, in the world recruitment plan of renowned

7   experts in China," quote -- I'm sorry -- "(also called for One

8   Thousand Plan of Foreign Experts) you have been approved and

9   awarded, as invited, strategic foreign expert by Chinese

10  government because of your world-leading achievements, the

11  good-collaboration basis between you and WUT and your great

12  contribution to national academic exchange between China and

13  USA.  Now Chinese government needs to use your high-resolution

14  three pictures as follows by showing your world-leading

15  achievements, the good-collaboration" --

16          MR. MUKASEY:  Objection.  Move to strike as to what

17  the Chinese government needs.

18          THE COURT:  I don't think we need that one.  It may be

19  stricken.

20          MR. CASEY:  Fair enough.  I'm not going to focus on

21  it, Your Honor.

22          And if we could go to -- well, why don't we go to the

23  next exhibit, Exhibit 22.

24  Q.   Do you recognize this document?

25          THE COURT:  That's the same one.

1          MR. CASEY:  I'm asking for Exhibit 22.

2     Q.    Do you recognize Exhibit 22?

3     A.    I do.

4     Q.    And what is it?

5     A.    It's an email exchange between Dr. Lieber and Dr. Mai

6     dated June 1st, 2012.

7     Q.    Are there any attachments to this email?

8     A.    Yes.

9          MR. CASEY:  Could we go to Page 14.

10    Q.    Is this a document that was attached to Professor Mai's

11    email?

12    A.    Yes.

13    Q.    Do you see Dr. Lieber's name anywhere on this document?

14    A.    Yes.

15         MR. CASEY:  Your Honor, I offer Exhibit 22.

16         MR. MUKASEY:  Objection, only to the extent the

17    witness said it's an exchange.  It's not an exchange; it's a

18    one-way from China.

19         THE COURT:  But it's part of a series of things,

20    series of communications, and I allowed it as part of

21    the -- the context is the series of back and forth, and there

22    is a back and forth.

23         MR. CASEY:  Thank you, Your Honor.

24         THE CLERK:  So, yes?

25         THE COURT:  Yes.

 1              (Government Exhibit 22 received in evidence.)

 2              MR. CASEY:  Could we go to Page 1, Mr. Bruemmer, of

 3    Exhibit 22.  And could you highlight just the bottom portion

 4    where it says, "BTW," at the very bottom.  I'm sorry.

 5              THE COURT:  No.  It's just -- it's in the middle of

 6    Paragraph -- at the end of Paragraph 2.

 7    Q.   And, again, is this an email from Professor Mai to

 8    Dr. Lieber?

 9    A.   Yes.

10    Q.   And could you read just the two sentences beginning with,

11    "BTW"?

12    A.   "BTW," by the way, "I also attached the agreement of One

13    Thousand Plan of Foreign Experts of China.  Please check and

14    give your further comments and modifications, if you have."

15              MR. CASEY:  And could we go to Page 14, please.

16    Q.   And could you read the English-language heading at the top

17    of the page?

18    A.   "Employment contract of 'One Thousand Talent' high-level

19    foreign" -- spelled wrong -- "expert."

20    Q.   And could you identify or read who employee or Party B is?

21    A.   "Party B is One Thousand Talent high-level foreign expert,

22    Professor Charles M. Lieber, from Harvard University, USA."

23              MR. CASEY:  And just bear with me briefly.  If we

24    could put Exhibit 18 next to this, please.

25              And if we could go on Exhibit 18 to Page 3 and on

1    Exhibit 22 to Page 14.

2           So, just for the record, Exhibit 18 is being displayed

3    on the left-hand side, and Exhibit 22 is being displayed on the

4    right-hand side.

5    Q.   So, beginning on the right, with Exhibit 22 on the right,

6    has the employee, Party B -- how do those compare between

7    Exhibit 18 and Exhibit 22?

8           MR. MUKASEY:  Objection, Judge.  She has no personal

9    knowledge of any of this.

10          MR. CASEY:  I'm simply asking her to compare them; I'm

11   not asking her how they were -- if they were changed by --

12          THE COURT:  Well, the jury can compare them.  You can

13   point it out.

14   Q.   How do the Party B identifications in Exhibit 18 and

15   Exhibit 22 compare?

16   A.   They are different.

17   Q.   And how are they different?

18   A.   The title is longer in Exhibit 22.

19   Q.   And how is Party B identified in Exhibit 22?

20   A.   "'One Thousand Talent' high-level foreign expert,

21   Professor Charles M. Lieber, from Harvard University, USA."

22   Q.   And how about below where it says, "Duration of the

23   contract," how do those compare?

24   A.   They're different.

25   Q.   And how are they different?

```
 1   A.   There's a date specification in Exhibit 18, and Exhibit 22

 2   is three-year timeframe.

 3             MR. CASEY:  If we could go to -- bear with me.  If we

 4   could go to Page 18 of Exhibit 22 and Page 6 of Exhibit 18.

 5   Q.   And do you see on the left, "Party A's Obligations"?

 6   A.   Yes.

 7   Q.   And on the right, "Party A's Obligations"?

 8   A.   Yes.

 9   Q.   And do Items 1 and 2 appear to be the same?

10   A.   Yes.

11   Q.   And at least what you can see at the bottom of Exhibit 18

12   on the left, does Item B at the bottom, is that different at

13   all from Item B on the right?

14   A.   It's different.

15   Q.   And how is it different?

16   A.   The amount of money quantified in each.

17             MR. CASEY:  Okay.  And if we could just go to the

18   next page on Exhibit 18.

19   Q.   And Item C, are those different at all in these two

20   contracts?

21   A.   Yes.

22   Q.   And how are they different?

23   A.   The money quantified.

24             MR. CASEY:  May I have a moment, Your Honor?

25             THE COURT:  I'm sorry?
```

```
 1            MR. CASEY:  Could I just have one moment, Your Honor?
 2     I apologize.
 3            (Pause.)
 4            MR. CASEY:  Could I see Page 19 of Exhibit 22 and
 5     Page 8 of Exhibit 18.
 6     Q.   And do you see on the left there, "Party B's Obligations"?
 7     A.   Yes.
 8     Q.   And, again, Party B is Dr. Lieber?
 9     A.   Yes.
10     Q.   And can you read Item No. 2?
11     A.   On Exhibit 18?
12     Q.   Correct.
13     A.   "Party B shall work for Party A for no less than nine
14     months a year."
15     Q.   And on the right, do you see where it says, on Exhibit 22,
16     "Party B's Obligations"?
17     A.   Yes.
18     Q.   And can you read Item No. 2 in that exhibit?
19     A.   "Party B shall work for Party A for no less than nine
20     months a year, including the time he works in WUT or other ways
21     working for Party A, such as declaring international
22     cooperation projects, cultivating young teachers and Ph.D.
23     students, organizing international conference, applying for
24     patents and publishing articles in the name of Party A."
25            MR. CASEY:  And if we could go to, on Exhibit 22, the
```

1    previous page.

2          THE COURT:  How much more do you have with this

3    witness?

4          MR. CASEY:  Quite a bit longer.  It might be a good

5    time to recess.

6          THE COURT:  So why don't we just stop now and take the

7    morning recess.

8          THE CLERK:  All rise, please.

9          THE COURT:  We will resume in about 20 minutes.

10          (Recess taken from 11:00 to 11:23 a.m.)

11          THE COURT:  Please be seated.

12          (Jury is present for the following).

13          THE COURT:  Members of the jury, I'm sorry that I

14    brought you down when we weren't quite ready.  I understand

15    that you wanted to know what 404(b)is.  404(b), this is a book

16    that contains a bunch of rules, rules about evidence, rules

17    about civil cases, criminal cases, and how they should be run

18    and so on.

19          404(b) is one of the Rules of Evidence, and it has

20    404(a) and 404(b), and what it talks about -- what it says, in

21    essence, is, "Evidence of a crime, wrong or other act is not

22    admissible to prove a person's character in order to show that,

23    on a particular occasion, that person acted in accordance with

24    that character."

25          You see, the rules are very complicated.  I think, if

1   you think about what I just read to you, you probably can

2   manage to figure out what it means, but it's complicated in

3   many ways.  It also has other pieces to it, and it describes

4   what it can be used for.  For example, it is admissible to

5   prove motive, opportunity, intent, preparation, plan,

6   knowledge, but not to show that the person is -- has a bad

7   character or acted in accordance with that character.

8          So that's why it's so difficult to explain to you what

9   it means.  And that is why counsel referred to it as 404(b)

10  instead of explaining the gist of what it actually concerns,

11  because it concerns a number of different things that don't

12  apply in each instance when the issue arises in the context of

13  the evidence being presented.

14         By the way, there are a number of documents that are

15  in evidence.  You will have those with you in the jury room.  I

16  think at the moment, since you have seen them on the screen,

17  there's no sense in reproducing them and having you hold them

18  in your hot little hands in your lap.

19         So we will continue in this way.  If you do have a

20  question like this or any other questions, raise your hand, and

21  we'll try to answer.  It's a good question that you asked, and

22  I'm sorry that I can't give you a very straight answer because

23  this is so broad and complicated and depends on the context in

24  which the evidence was presented.  Are you with me?

25         Okay.  You may proceed.

1          MR. CASEY:  Thank you.

2          THE CLERK:  Are we back on the same exhibit?  I'm

3    sorry.

4          MR. CASEY:  We're back on Exhibit 22.

5          THE CLERK:  22, okay.

6    Q.   Special Agent Spice, when we broke, you recall we were

7    looking at Exhibit 22; correct?

8    A.   Yes.

9          MR. CASEY:  And if we could go to Page 14.

10   Q.   And is this the document attached to the email in

11   Exhibit 22?

12   A.   Yes.

13         MR. CASEY:  If we could go to the next page.  And

14   Mr. Bruemmer, if you could just highlight the top section,

15   please.

16   Q.   Special Agent Spice, could you just read the portion of

17   this section of the document starting with "Party B shall"?

18   A.   "Party B shall deepen research in basic science, broaden

19   the prospect of the application, cultivate talents and develop

20   science and technology, research at the high-level

21   international frontier with the goal of making Party A to be

22   the important influencing base of scientific research, talents

23   cultivation and international cooperation.  Party B is supposed

24   to get influencing research achievements to build a high-level

25   innovative research team and to cultivate a group of young and

1    middle-aged academic backbone researchers and excellent

2    Ph.D.s."

3                MR. CASEY:  If you could highlight the next section,

4    Mr. Bruemmer.

5    Q.   Could you read beginning with, "Party B shall"?

6    A.   "Party B shall face to the needs of the national strategy

7    and the frontier of international science and technology, to

8    organize the team to apply and undertake national major

9    projects, key projects or international cooperation projects

10   and to publish high-level articles in the renowned and

11   important international academic journals in the name of Wuhan

12   University of Technology and strive to publish articles in the

13   journals of nature or science, including the guild, the team

14   members to publish articles."

15               MR. CASEY:  If we could go to the next page, please.

16   And highlight No. 2 at the top.

17   Q.   Could you begin reading where it says, "Party B shall"?

18   A.   "Party B shall build a talent team with strong ability of

19   research and innovation in his field and introduce/cultivate

20   Cheung Kong scholars and high-level talents, such as national

21   outstanding youth scientific fund winners."

22               MR. CASEY:  If we could go to the next section,

23   Mr. Bruemmer.

24   Q.   Could you please read beginning with, "Party B shall"?

25   A.   "Party B shall guide one to two distinguished young

1    scholars and two to four doctoral students of Wuhan University

2    of Technology and help them to publish systematic articles in

3    the international renowned journals, and Party B shall guide

4    youth teachers to obtain national awards for outstanding

5    scientific research achievement or important international

6    academic awards."

7            MR. CASEY:  And if we could highlight the next

8    section, please.

9    Q.   Could you please read beginning where it says, "Party B

10   should"?

11   A.   "Party B should also organize and hold one to two" --

12           THE COURT:  I'm sorry.  You lost a word there.  "Help

13   organize."

14   Q.   Start from the beginning.

15   A.   I'm sorry.  Excuse me.

16           "Party B should also help organize and hold one to

17   two predominant influencing international conferences in his

18   field in the name of Wuhan University of Technology.  Party B

19   shall invite one to three international top scientists to work

20   in the lab as visiting scholar or give lectures."

21           MR. CASEY:  If we could go to the next page, please,

22   and highlight the top section.

23   Q.   Is this Party A's rights?

24   A.   Yes.

25   Q.   And Party A, in this agreement, is who?

1    A.    Wuhan University of Technology.

2    Q.    And could you read Items 1 and 2, please?

3    A.    One, "Party A shall conduct regular supervision and review

4    of Party B's working performance according to the employment

5    objectives and tasks of introduced talents in our University on

6    the basis of the working instructions of 'One Thousand Talent

7    Plan' and the Chinese laws and rules concerned."  No. 2, "Party

8    A shall conduct regular evaluation of Party B's working

9    performance according to the Chinese laws and the regulations

10   of Party A."

11            MR. CASEY:  If we could go to the next page, please.

12   And if you could highlight Item D.

13   Q.    Could you read that section, please?

14   A.    D, "Payment and Living Conditions:  Party A shall provide

15   Party B with 50,000 U.S. dollars, $50,000, per month before

16   tax, paid according to his working time in Wuhan University of

17   Technology.  Party A shall provide Party B with one million

18   Chinese Yuan, one million RMB, after tax as living allowance,

19   which will be paid one third a year for three years."

20            MR. CASEY:  And if we could go to the next page,

21   please.  And highlight the section at the bottom beginning

22   with, "Party B's Obligations."

23   Q.    And if you could read Item No. 2, please?

24   A.    Two, "Party B shall work for Party A for no less than nine

25   months a year, including the time he works in WUT or the other

1    ways working for Party A, such as declaring international

2    cooperation projects, cultivating young teachers and Ph.D.

3    students, organizing international conference, applying for

4    patents and publishing articles in the name of Party A."

5            MR. CASEY:  If we could go to the first page again.

6    Q.   What is the date of this email to the Defendant?

7    A.   June 1st, 2012.

8            MR. CASEY:  If we could go to the next exhibit,

9    Exhibit 23, which is not in evidence.

10   Q.   And do you see that --

11           MR. CASEY:  Well, actually, let's go to the second

12   page.

13   Q.   Is this the email that we just looked at in Exhibit 22?

14   A.   Yes.

15           MR. CASEY:  If we could go to Page 1.

16   Q.   Does the Defendant respond to that email?

17   A.   Yes.

18   Q.   And what's the date of his response?

19   A.   It is June 2nd, 2012.

20   Q.   Okay.  And then what's the email at the top?

21   A.   It's an email from Dr. Mai to Dr. Lieber.

22   Q.   And what's the date?

23   A.   June 27th, 2012.

24   Q.   And is there any attachment to that email?

25   A.   Yes.

1           MR. CASEY:  If we could go to Page 3.

2    Q.   Is that the attachment?

3    A.   Yes.

4           MR. CASEY:  Your Honor, I move to admit Exhibit 23.

5           MR. MUKASEY:  Your Honor, with respect to the

6    top -- with respect to the top email, it contains hearsay

7    within hearsay, as it refers to Dr. Mai passing along

8    statements from another person named President Zhang to Lieber.

9    So that's hearsay within hearsay as to the top email.

10           MR. CASEY:  We're just offering it to show the

11   continuation of the conversation.

12           MR. MUKASEY:  There's no -- I looked at the Federal

13   Rules of Evidence in the break, and there's no "just offering

14   to show a continuation" exception to hearsay.  This is double

15   hearsay.

16           MR. CASEY:  It's not being offered for the truth; it's

17   just being --

18           THE COURT:  What is it being offered for?

19           MR. CASEY:  It's offered to show the evolution of the

20   conversation about the document and the fact that the

21   conversation occurred; not the truth of it, just the fact it

22   occurred and the evolution of the conversation.

23           THE COURT:  For the fact that it occurred, can we

24   stipulate that there was a continuation?

25           MR. CASEY:  Well, we also need to know what they were

1    talking about, so --

2          THE COURT:  So you want the --

3          MR. CASEY:  And we're not offering it for the truth of

4    what they were saying, just the fact that they were discussing

5    it.  Again, verbal acts are specifically identified in the

6    Rules of Evidence as something --

7          THE COURT:  I understand that, but is there some way

8    to do this without going through these documents and putting

9    them in evidence?

10         MR. CASEY:  We think they are admissible into evidence

11   not for the truth, but to show, A, the fact that they occurred

12   and also the Defendant's state of mind.  He's being sent this

13   document --

14         THE COURT:  Well, it's being offered for a whole host

15   of reasons.

16         MR. CASEY:  What's that?

17         THE COURT:  It's being offered for the substance of

18   what's in there and under the Rules for various purposes.

19         MR. CASEY:  We believe they're admissible for various

20   purposes; not for the truth, but for various purposes, the

21   Defendant's state of mind and as verbal acts.

22         MR. MUKASEY:  Let me point out that this is an

23   unsigned document.  It's unsigned.  There's no contract, so

24   there's no verbal act exception.

25         THE COURT:  But these are letters.

1          MR. MUKASEY:  These are emails --

2          THE COURT:  Emails.

3          MR. MUKASEY:  -- emails that contain --

4          THE COURT:  They're not signed by the person in the

5   way we normally would see a signature --

6          MR. MUKASEY:  Right.

7          THE COURT:  -- with a pen, but their names are there.

8          MR. MUKASEY:  But the email attaches a Chinese

9   document that we've been going through with the Chinese writing

10  on it.  They say this is a contract.  It's actually an unsigned

11  piece of paper.  There's no signature there.

12         THE COURT:  Okay.  So this comes with respect to an

13  unsigned paper that the jury has seen?

14         MR. CASEY:  That's correct.

15         THE COURT:  I will allow it for that purpose.

16         MR. CASEY:  Thank you, Your Honor.

17         MR. MUKASEY:  Thank you, Judge.

18         MR. CASEY:  If we could let the jury see Exhibit 23,

19  please.  And Mr. Bruemmer, if we could just go to Page 2.

20  Q.   Special Agent Spice, is this the email that we just saw in

21  Exhibit 22 from Liqiang Mai to Dr. Lieber?

22  A.   Yes.

23  Q.   And at the bottom there, is there a reference to the One

24  Thousand Plan of Foreign Experts?

25  A.   Yes.

1          MR. CASEY:  And if we could go to Page 1.  If you

2    could highlight, Mr. Bruemmer, the email from Charles Lieber in

3    the middle of the page.  Down, yeah.  Up, down, below, there.

4    Could you just try and capture all the -- I'm sorry.  Thank

5    you.

6    Q.   Is this an email from Dr. Lieber to Professor Mai?

7    A.   Yes.

8    Q.   And is this -- it's dated June 2nd, 2012?

9          MR. CASEY:  I'm sorry.  If we could zoom out and

10   capture the date as well.  Thank you.

11   Q.   What's the date of the email?

12   A.   June 2nd, 2012.

13   Q.   And can you read Dr. Lieber's email, please?

14   A.   "Dear Liqiang:  One, attached is letter summarizing main

15   achievements; feel free to modify as necessary.  Two, also

16   attached is what I would prefer for list of 15 publications; I

17   assume that you can update citations.  Thank you for your

18   support.  I will review the documents for Thousand Plan when I

19   have time.  Best regards, Charlie."

20          MR. CASEY:  If we could highlight the top email,

21   please.

22   Q.   Is this an email from Professor Mai to Charles Lieber

23   dated June 27, 2012?

24   A.   Yes.

25   Q.   And if you could please read the email?

1   A.   "Dear Charlie:  I am glad to let you know that your

2   recommendation work of foreign member of CAS is in good

3   progress, and those members also expressed good expectation for

4   your success in this.  By the way," BTW, "President Zhang let

5   me ask your idea, comments, suggestions about the agreement of

6   One Thousand Plan of Foreign Experts of China in the

7   attachment.  According to the related announcement, it would be

8   appreciated if you could give your response reply in one week

9   when your schedule allows (of course, the sooner the better).

10  I am sorry to push you in this.  With best regards, Liqiang."

11           MR. CASEY:  And if we could go to Page 3, please.

12  Q.   Is this the same document that was attached to Exhibit 22?

13  A.   Yes.

14           MR. CASEY:  All right.  If we could go to Exhibit 24,

15  please, not in evidence.  Thank you.

16  Q.   Do you recognize Exhibit 24?

17  A.   Yes.

18  Q.   At the bottom there, is that an email from Dr. Lieber to

19  Professor Mai?

20  A.   Yes.

21  Q.   And is that dated June 28th, 2012?

22  A.   Yes.

23  Q.   Is that the day after his email -- I'm sorry -- Dr. Mai's

24  email to him in Exhibit 23?

25  A.   Yes.

1          MR. CASEY:  Okay.  And if we could go, actually, to

2     the third page.

3     Q.   Does this appear to be a continuation of the discussion,

4     of the email discussion between Dr. Lieber and Professor Mai

5     that we saw in Exhibit 23?

6     A.   It does.

7          MR. CASEY:  Your Honor, I move to admit Exhibit 24.

8          THE COURT:  Same ruling, same objection.

9          MR. MUKASEY:  So I should just be quiet?

10         THE COURT:  I'm sorry?

11         MR. MUKASEY:  So I'll just be quiet.  Thank you,

12    Judge.

13         THE COURT:  Okay.

14         THE CLERK:  So it's showing but reluctant?  Are we

15    showing?

16         THE COURT:  Yes.

17         THE CLERK:  Yes, okay.

18         (Government Exhibit 24 received in evidence.)

19         MR. CASEY:  All right.  And if we could just go to the

20    third -- well, we're on the third page.

21    Q.   Is that an email from Dr. Lieber to Professor Mai?

22    A.   Yes.

23    Q.   Okay.  And he says, "I will review the documents for the

24    Thousand Plan when I have time"?

25    A.   Yes.

1            MR. CASEY:  And if we could go to the next page.

2    Actually, why don't we go to the first page.

3    Q.   And at the bottom there, who is that email from, and who's

4    it to?

5    A.   It's from Dr. Lieber to Professor Mai.

6    Q.   And what's the date?

7    A.   June 28th, 2012.

8    Q.   And what's the subject line?

9    A.   "Regarding the documents for Thousand Plan, Liqiang."

10            MR. CASEY:  Okay.  And if we could go to the second

11    page.  And if you could highlight the portion beginning with,

12    "I apologize" at the top.  Down.  I'm sorry.

13    Q.   And could you please read that?

14    A.   "I apologize for the delay in responding on the Thousand

15    Plan agreement.  I think this revised version, which addresses

16    the previous concerns we discussed at Harvard, is good.  How

17    should we proceed with completing (signing)?"

18            MR. CASEY:  And if you could highlight the

19    next -- beginning with "1" -- "Regarding this," down to where

20    it says, "Regards, Charlie."

21    Q.   And can you read what it says at the very top there?

22    A.   "Regarding this Thousand Plan and joint lab."

23            MR. CASEY:  And if we could go to the first page.

24    And could you highlight the header information and the text in

25    bold, the first four lines, please.

1    Q.   Is this an email from Liqiang Mai to Professor Lieber

2    dated June 28th, 2012?

3    A.   Yes.

4    Q.   Okay.  And can you read the text of that email?

5    A.   "Dear Charlie:  Thank you very much for your kind reply

6    and notes.  I very much appreciate your very strong support in

7    my PNAS paper.  Our university will sign Thousand Plan

8    agreement and send to you for your signature by FedEx."

9         MR. CASEY:  Okay.  If we could go to the next

10   exhibit, Exhibit 25, not in evidence.

11   Q.   Do you recognize Exhibit 25?

12   A.   I do.

13   Q.   And what is it?

14   A.   It's an email from Dr. Mai to Dr. Lieber from July 10th,

15   2012.

16        MR. CASEY:  Okay.  If we could go to the second page.

17   Q.   Is that an email from Dr. Lieber to Dr. Mai from

18   June 28th, 2012?

19   A.   Yes.

20   Q.   Is this the email we just saw in the prior exhibit?

21   A.   Yes.

22   Q.   Okay.  And the first page, does that appear to be

23   Professor Mai's response?

24        MR. CASEY:  If you could go to the first page,

25   Mr. Bruemmer.  Oh, there you go.  Thank you.

```
 1   A.   It does.
 2             MR. CASEY:  Your Honor, I move to admit Exhibit 25.
 3             MR. MUKASEY:  Objection, as hearsay.
 4             MR. CASEY:  Your Honor, we're offering it for the same
 5   purpose, but he's referencing an act, not a statement of fact,
 6   in the top; but we're offering it for the same purpose as the
 7   other emails, to show the continuing evolution of this
 8   conversation.
 9             MR. MUKASEY:  This has reference to other players,
10   other events, other issues --
11             THE COURT:  Well, certainly the first paragraph is
12   admissible under the Rule.  So it comes in to the address and
13   the first paragraph, and the rest of it we'll strike.  It has
14   nothing to do with what we were talking about.
15             MR. CASEY:  Thank you, Your Honor.
16             THE CLERK:  So, I'm sorry, the first page did you say?
17             THE COURT:  It's whatever the next exhibit -- I guess
18   it's Exhibit 25, but it comes into evidence only with respect
19   to the salutation and the first paragraph.
20             THE CLERK:  Okay.
21             MR. CASEY:  When we pull up the exhibit for the jury,
22   I'm going to have Mr. Bruemmer redact everything.
23             THE CLERK:  Okay.  Let me know when to do that.
24             MR. CASEY:  Your Honor, I think we are good.
25             THE CLERK:  We're all good?
```

1          MR. CASEY:  Yes.  Thank you.

2          (Government Exhibit 25 received in evidence.)

3          MR. CASEY:  I should ask, if you go to Page 2, is that

4    going to go away?

5          MR. BRUEMMER:  It will.

6          MR. CASEY:  Okay.  Well, we'll start with this.

7    Q.  Is this an email from Professor Mai to Charles Lieber

8    dated June 10, 2012?

9    A.  It is.

10   Q.  And can you read it, please?

11   A.  "Dear Charlie:  I am glad to let you know the Thousand

12   Plan agreement has been signed by President Zhang and mailed to

13   you, and Mrs. Fan Xiang will contact with you about this."

14         MR. CASEY:  Okay.  And could we go to the second

15   page, please.

16   Q.  Is this the email communication from Dr. Lieber to

17   Professor Mai that we just saw in the previous exhibit,

18   Exhibit 24?

19   A.  Yes.

20         MR. CASEY:  Okay.  All right.  Exhibit 26, please,

21   not in evidence.

22   Q.  Do you recognize this exhibit?

23   A.  Yes.

24         MR. MUKASEY:  Judge, move it in.  That's fine.

25         MR. CASEY:  Thank you.

1          MS. YOUNG:  No problem.

2          THE COURT:  Thank you.

3          (Government Exhibit 26 received in evidence.)

4          MR. CASEY:  And if we could go to the second page,

5     please.

6     Q.    Do you see the email at the bottom?

7     A.    Yes.

8     Q.    Is that an email from Charles Lieber to Liqiang Mai dated

9     July 13th, 2012?

10    A.    Yes.

11    Q.    And is that three days after the email from Professor Mai

12    we just saw in Exhibit 25?

13    A.    It is.

14    Q.    And can you read Professor Lieber's email, please?

15    A.    "Dear Liqiang:  I received documents by DHL from WUT

16    today.  Unfortunately, there is no cover letter explaining what

17    must be done, and the documents have no English (all Chinese)."

18          MR. CASEY:  Okay.  And if you could go to Page 1,

19    please, Mr. Bruemmer.

20    Q.    And this bottom email, is this -- at least in the middle

21    of the page here, is that an email from Charles Lieber to

22    Professor Mai dated June 13th, 2012?

23    A.    It is.

24    Q.    And can you just read the first two sentences of that

25    email -- or I should say the first three sentences of that

1    email?

2    A.   "Dear Liqiang:  Thank you for your explanation.

3    Unfortunately, I did not receive Fan's email (or I received and

4    accidentally deleted).  The instructions you sent are clear,

5    and when I return from current trip (in Europe) early next

6    week, I will sign and have Kathleen return to you by FedEx."

7    Q.   And then below that, is there an email from Professor Mai

8    to Lieber -- Charles Lieber dated June 13, 2012?

9    A.   Yes.

10   Q.   Okay.  And do you have an understanding, based upon

11   Page 2 of this exhibit, what the italicized text in Exhibit 26

12   is at the bottom there?

13          MR. MUKASEY:  Objection.

14          THE COURT:  She can answer yes or no.

15   A.   Yes.

16   Q.   And what do you understand that to be?

17          MR. MUKASEY:  There's no foundation for this, Judge.

18   She's --

19          THE COURT:  Sustained.

20   Q.   What do you understand the italicized text to be at the

21   bottom?

22          MR. MUKASEY:  Objection.

23          MR. CASEY:  It's the same question.  I just repeated

24   it.

25          THE COURT:  I know.  I just ruled it out.

```
 1              MR. CASEY:  Oh, I thought you said we could.
 2              THE COURT:  The objection is sustained.
 3              MR. CASEY:  I wasn't meaning to overrule Your Honor.
 4              THE COURT:  Okay.
 5    Q.   Well, why don't you read the text at the bottom.  Why
 6    don't you read the italicized portion and then the portion
 7    below that, please.
 8    A.   Under -- Okay.
 9    Q.   I'm sorry.  At the very bottom of the page.
10              MR. CASEY:  And Mr. Bruemmer, if you want to
11    highlight that, that might be helpful, beginning where it says,
12    "Unfortunately."  Thank you.
13    A.    Okay.  "Unfortunately, there is no cover letter explaining
14    what must be done, and the documents have no English (all
15    Chinese).  We are sorry for it.  According to Ms. Huiju Wang
16    and Fan Xiang of international office, there are five copy of
17    them, in each of which the first paragraph (Page 1 to 10 or so)
18    is in Chinese, and the second part (Page 11 to 20 or so) is in
19    English."
20              MR. CASEY:  And could we continue to the next page,
21    please.
22    Q.   And the text at the very end, was it "President Zhang" on
23    the last page?
24    A.    Yes.
25    Q.   Continue reading at the very top, please.
```

1    A.    "President Zhang has signed at Page 10 or so (Chinese

2    part) and Page 20 or so (English part).  Please sign the

3    corresponding blank space in parallel with President Zhang's

4    signature.  After you finish signing, please send four copies

5    of them to me (you keep one copy) ASAP," as soon as possible,

6    "according to the following address."  And then there's an

7    address.  I can read that.

8                MR. CASEY:  If we could go to Page 1, please.  And if

9    you could highlight the very top email.

10   Q.    And is this an email from Professor Mai to the Defendant

11   and some others on June -- I'm sorry -- July 21st, 2012?

12   A.    It is.

13   Q.    And is that roughly a week after the email we just read?

14   A.    Yes.

15   Q.    And can you read it, please?

16   A.    "Dear Charlie and Kathleen:  I am glad to let you know I

17   have received the signed documents.  Thank you so much.  With

18   my regards, Liqiang."

19                MR. CASEY:  Your Honor, at this time, we'd ask --

20   well, the Court has admitted a number of exhibits

21   conditionally.  We would ask the Court to remove the

22   conditionally admittance and admit them in full.  And I have

23   the exhibits here.  It's 11 through 14, 18, 21 subject to the

24   Court's redaction requests, 22, 23, 24, 25 and 26, as the

25   discussions about the negotiation of the contract.

```
 1              THE COURT:  Let me think about it.

 2              MR. CASEY:  Fair enough.

 3              THE COURT:  I understand the defense to continue to

 4    object.

 5              MR. MUKASEY:  Thank you, Judge.

 6              MR. CASEY:  I understand that, too.  All right.

 7              Let's go to Exhibit 27, which is not in evidence.  Is

 8    there an objection to this coming in?

 9              MR. MUKASEY:  Give me one second.

10              MR. CASEY:  Sure, take your time.

11              (Pause.)

12              MR. MUKASEY:  There is an objection.  To be specific,

13    it's a hearsay objection.

14              MR. CASEY:  It's not a statement of fact, Your Honor;

15    it's a question.

16              MR. MUKASEY:  It's a rather long --

17              THE COURT:  What is this being offered for?

18              MR. CASEY:  Well, I don't want to comment on the

19    substance of the document.  I'm happy to if Your Honor would

20    like to have a sidebar.

21              THE COURT:  No.

22              MR. CASEY:  I would ask Your Honor to take a look at

23    the second paragraph, so to speak, and note that the date of

24    this email is subsequent to the emails we just admitted into

25    evidence concerning the contract.
```

1           THE COURT:  Well, are you objecting to the second

2     paragraph by itself?

3           MR. MUKASEY:  The whole document is hearsay.  It

4     doesn't -- it comes from an out-of-court speaker who happens to

5     by I think in China.

6           THE COURT:  Who is Fan?

7           MR. CASEY:  He has been -- she has been referred to in

8     prior exhibits as being affiliated with Wuhan University.  I'm

9     happy to -- I mean, we can go back.

10          THE COURT:  I don't want to go back; I want to go

11    forward.

12          MR. CASEY:  Yes.

13          MR. MUKASEY:  It's hearsay.  It's an out-of-court

14    statement.

15          THE COURT:  I understand.  How does it come in?

16          MR. CASEY:  It's not a -- first of all, it's not a

17    statement of fact; it's a question.  They're asking Dr. Lieber

18    a question.  And it also goes to his state of mind, given the

19    way that they are -- the description in that second sentence in

20    particular.  The whole email is relevant, but the second

21    sentence in particular goes to the Defendant's state of mind,

22    in light of Counts 1 and 2.

23          THE COURT:  The sentence that begins with "Before"?

24          MR. CASEY:  Correct, given the description of sort

25    of --

 1           THE COURT:  It's a description of the writer's idea

 2     about what is going to happen maybe.

 3           MR. CASEY:  Correct, to Dr. Lieber.  So it's being

 4     sent to him, it goes to his state of mind.  And, again, it's

 5     also -- I mean, questions are not hearsay.

 6           THE COURT:  I don't see how it can go to his state of

 7     mind because somebody addresses him about something.

 8           MR. CASEY:  Count 2, Your Honor --

 9           THE COURT:  We don't know what his response is.

10           MR. CASEY:  Fair enough.  Count 1, Your Honor, charges

11     him with stating falsely that he did not know how China

12     characterized him.  And so, to the extent he's receiving an

13     email that is telling him exactly how they characterize him,

14     then it's relevant to his state of mind.

15           THE COURT:  I think -- I mean, let me think about

16     this.  We'll go on to the next one.

17           MR. CASEY:  Well, we might solve this problem with the

18     next one.

19           THE COURT:  Thank you.

20           MR. CASEY:  Let's go to -- excuse me for a second.

21     Let's go to Exhibit 150 -- I'm sorry -- yes, 150.

22           Is there an objection to this email?  I don't believe

23     so, but I just want to confirm.

24           THE COURT:  There was a time when we used to write

25     letters and give them to the post office, and we never

1    accumulated this many letters in any particular thing.  I think

2    we should go back to that, don't you?

3              MR. CASEY:  It certainly would make my job easier.

4              MR. MUKASEY:  We have no objection to this.

5              THE COURT:  Okay.

6              THE CLERK:  That was No. 150?

7              MR. CASEY:  Yes, Exhibit 150.

8              THE CLERK:  Okay.

9              MR. CASEY:  Your Honor, can I just -- this is

10   admitted, Your Honor?

11             THE CLERK:  Yes.

12             MR. CASEY:  Thank you.

13             (Government Exhibit 150 received in evidence.)

14   Q.   Beginning with the email at the bottom of the page,

15   Special Agent Spice, is that an email from Fan Xiang to

16   Charles Lieber dated October 26th, 2012?

17   A.   Yes.

18   Q.   And do you see the email extension associated with

19   Xiang Fan?

20   A.   Yes.

21   Q.   And can you read it?

22   A.   "WHUT.edu.cn."

23             MR. CASEY:  And Paul, could you just highlight -- or,

24   Mr. Bruemmer -- excuse me -- highlight the bottom email.

25   Q.   And could you please read that, Special Agent Spice?

1   A.   "Dear Charlie:  I am very pleased that you can come back

2   to our university again in the middle of November for the

3   opening ceremony of the joint laboratory.  We are looking

4   forward to meeting you on our campus.  Before your visit, I

5   would like to talk about one detail in the implementation of

6   the contract of, quote-unquote, One Thousand Talent high-level

7   foreign expert between you and our university.  According to an

8   article concerning the payment and living conditions, I want to

9   know the way you prefer to be paid so that everything can be

10  prepared before your coming.  I would like to provide two

11  options for you to choose, if you do not mind.  Option one:  I

12  help you open a new bank account in the Chinese bank named

13  ICBC.  The payment will be put into your account, and you can

14  get the payment from the branch of ICBC in your country."

15        MR. CASEY:  Could we go to the next page.  And just

16  highlight the top, please.

17  Q.   And could you please read that?

18  A.   "Option two:  I can prepare the payment in cash.  You

19  could make your choice or suggest the way you prefer.  All the

20  best, sincerely yours, Fan."

21        MR. CASEY:  All right.  And then Page 1 again, and

22  highlight the top email, please.

23  Q.   Who is this email from and to?

24  A.   It's from Dr. Lieber to Jennifer Lieber.

25  Q.   And what's the subject line?

1    A.    "China Question."

2    Q.    Could you read the email, please?

3    A.    "Dear J.:  Do you want to check the bank mentioned?  What

4    do you think?  I guess my only concern with cash is that

5    carrying a lot back has risk, but there is potentially also

6    risk with putting in bank in China (not sure about taxes both

7    ways) and transfer.  We can discuss this weekend.  XXXO, C."

8           MR. CASEY:  If we could go to Exhibit 51, any

9    objection to that?

10          THE COURT:  51 or 151?

11          MR. CASEY:  151.  I'm sorry.

12          MR. MUKASEY:  No objection.

13          No objection, Judge.

14          THE COURT:  Thank you.

15          (Government Exhibit 151 received in evidence.)

16   Q.    The bottom email on Exhibit 151, is that the email from

17   Fan to the Defendant we just saw in Exhibit 150?

18   A.    Yes.

19   Q.    And does Dr. Lieber respond to that at the top of Exhibit

20   151?

21   A.    Yes.

22   Q.    And can you read his response, please?

23   A.    "Dear Fan:  When I spoke with my wife about this, she

24   asked if we could do both, as she was worried about complexity

25   of transfer from bank in China.  Specifically, open account at

1   ICBC but split the payment with part being deposited to bank

2   account and part in cash.  If this is too complicated, let me

3   know.  See you in a couple of weeks.  Best, Charlie."

4          MR. CASEY:  Thank you.

5          If you could go to Exhibit 31, please, not in

6   evidence.

7   Q.   And do you recognize Exhibit 31?

8   A.   Yes.

9   Q.   And what is it?

10  A.   It's an email to Dr. Lieber from Lin Xu dated

11  December 2nd, 2012.

12  Q.   Okay.  And does it concern a manuscript?

13  A.   It does.

14  Q.   And on the second page --

15         MR. CASEY:  If we could go to that, please.

16  Q.   -- is that an email from Dr. Lieber?

17  A.   Part -- yes, part of it.

18  Q.   Preceding the one you just spoke about?

19  A.   Uh-huh.

20  Q.   And who is copied on that email?

21  A.   Oh, sorry.  Quan Qing with a Harvard edu extension;

22  Liqiang Mai, Professor Mai.

23  Q.   Okay.  And what's the date of that email?

24  A.   November 30th, 2012.

25         MR. CASEY:  Your Honor, I move to admit Exhibit 31.

```
 1            MR. MUKASEY:  No objection.
 2            MR. CASEY:  And Mr. Bruemmer, if you could just
 3   highlight right where your mouse is there all the way down
 4   below to the bottom of the email, please.
 5   Q.   And could you just read the very top couple of sentences
 6   beginning with, "Attached are"?
 7   A.   "Attached are revised manuscript and supplementary
 8   information files.  There are a lot of changes on the
 9   manuscript, so I want you to be very careful in making your
10   revisions addressing my questions/points."
11   Q.   And can you read Item No. 5 below that?
12   A.   "5:  Lin, please check with Professor Mai the correct
13   acknowledgment funding support.  I want this correct now and
14   not later."
15            MR. CASEY:  And if we could go to Page 4.
16   Q.   Is this the attachment or one of the attachments to
17   Exhibit 31?
18   A.   It is.
19   Q.   Okay.  And do you see Dr. Lieber's name at the top?
20   A.   I do.
21            MR. CASEY:  And if you could highlight the authors,
22   Mr. Bruemmer, and then the text below that.  Yeah, perfect.
23   Thank you.
24   Q.   And what are Dr. Lieber's affiliations, according to this
25   attachment?
```

1    A.   So those little symbols above "Lieber," one is an

2    asterisk, and that is -- let's go to the -- okay, the one with

3    the little cross, I don't know the formal names of those --

4    "WUT-Harvard Joint Nano Key Laboratory, State Key Laboratory of

5    Advanced Technology for Materials Synthesis and Processing,

6    Wuhan University of Technology, Wuhan 430070, China."

7            And then the symbol that's a line with a -- a line

8    running across, as well as the two slanted lines, depict that

9    he's a part of Department of Chemistry and Chemical Biology and

10   School of engineering and Applied Science, Harvard University,

11   Cambridge, Massachusetts, 02138, United States.

12           MR. CASEY:  And if we could just zoom out.

13   Q.   And if I could ask you to read the title of this

14   manuscript?

15   A.   "Design and Synthesis of Diverse Functional Kinked

16   Nanowire Structures for Nanoelectronic Bioprobes."

17           MR. CASEY:  If we could go to Exhibit 33, please,

18   which is already in evidence.  If we could go to --

19   Q.   Is this an email from Renee Donlon to Charles Lieber dated

20   January 8th, 2013?

21   A.   Yes.

22           MR. CASEY:  If we could go to Page 34.

23   Q.   Is the title of this article the same as the article you

24   just -- or manuscript you just read?

25   A.   Yes.

1          MR. CASEY:  If we could go to Page 37.  The next

2     page.  I apologize.  If you could highlight the acknowledgment

3     section, right where your mouse is, yeah.

4     Q.   And could you read the acknowledgment section, please?

5     A.   "Acknowledgments:  Work at Wuhan University of Technology

6     was supported by the National Basic Research Program of China

7     (2013CB934103 and 2012CB933003); the National Natural Science

8     Foundation of China" -- I think that's an S or a 5 -- "1272197,

9     S1072153; Program for New Century Excellent Talents in

10    University, NCET-10-0661); the International S & T Cooperation

11    (2013ZR02930); and the Fundamental Research Funds for the

12    Central Universities (2011YB01).  Research at Harvard was

13    supported by NIH Directors, Pioneer (1DP10D003900 and

14    DODNSSEFF) N00244-09-1-0078 awards."

15          MR. CASEY:  Thank you.

16          If we could go to Exhibit 35, not in evidence.

17    Q.   Do you recognize Exhibit 35?

18    A.   I do.

19    Q.   And just referring to the second page, what is that?

20    A.   It's an email from Professor Mai to Dr. Lieber on

21    January 8th, 2013.

22    Q.   Okay.  And does Dr. Lieber respond to the email?

23          MR. CASEY:  If you could go to Page 1.

24    Q.   Does Dr. Lieber respond there at the bottom?

25    A.   Yes.

```
 1    Q.   Okay.  And then what's the email at the top?

 2    A.   It's an email from Dr. Mai to Dr. Lieber on January 11th,

 3    2013.

 4              MR. CASEY:  Okay.  Your Honor, I offer Exhibit 35.

 5              MR. MUKASEY:  And I object as irrelevant and hearsay.

 6    This is a new conversation about a whole bunch of topics that

 7    have nothing to do with this case between people that have

 8    nothing to do with this case, including this President Zhang.

 9              MR. CASEY:  Your Honor, this is a --

10              MR. MUKASEY:  This is not related to the issues.

11              MR. CASEY:  It's highly related to the issues.  It is

12    a prime example of action and conformance with the contract

13    that was just discussed in all the exhibits we've been talking

14    about.  And in fact -- well, I don't want to comment on the

15    text of the document, but I'd refer Your Honor to the second

16    page.

17              If you want to highlight, Paul, where it begins, it

18    says, "Secondly" right in the middle.

19              THE COURT:  Are we looking at the second page now?

20              MR. CASEY:  Correct, yes.  And the discussion

21    continues on to the first page.  But this is what links it

22    essentially to what we've already been talking about.

23              THE COURT:  And why does it not do that?

24              MR. MUKASEY:  Because it speaks about issues between

25    these people in China and issues even with Dr. Lieber that have
```

     1    nothing to do with this Thousand Talents Program.  It's just a
     2    very long --
     3            THE COURT:  Well, Zhang had to act, so this talks
     4    about how he acted.
     5            MR. MUKASEY:  I'm sorry?
     6            THE COURT:  Isn't that what this tells us, how we got
     7    there?
     8            MR. MUKASEY:  I don't think this reflects at all on
     9    Dr. Lieber's actions.  It's a whole lot of statements by a
    10    couple of people in China.
    11            THE COURT:  But it is an agreement, or it is a
    12    situation in which he was a participant, is it not?
    13            MR. MUKASEY:  We don't agree with that, Judge.
    14            THE COURT:  Can you go back to the beginning of it?
    15            MR. CASEY:  Sure.  So this is --
    16            THE COURT:  This letter.
    17            MR. CASEY:  Yeah.  Well, you see the email from Mai,
    18    and then the email above that, if you want to go to Page 1,
    19    Mr. Bruemmer --
    20            THE COURT:  So this has to do with an award given by
    21    the Chinese government?  Is that what this is?
    22            MR. CASEY:  This relates to the One Thousand Plan and
    23    the implementation of that plan.  They're asking him to do
    24    something, and he's responding there at the bottom, the email
    25    goes on to the second page, and then they're further explaining

```
 1   what needs to be done.
 2         MR. MUKASEY:  Judge, it also refers to cucumber-like
 3   vanadium pentoxide --
 4         THE COURT:  Well, to the extent that it has to do with
 5   the subject of this lawsuit -- or this proceeding here, I will
 6   allow it.  And anything else, the jury will have to disregard.
 7   I mean, if there's talk about cucumbers in there, then they
 8   don't have to worry about it, unless cucumbers are relevant to
 9   Dr. Lieber's activities.
10         MR. CASEY:  Well, that's one sentence, Your Honor, in
11   a two-page email that talks directly about the issues, and
12   we're not focusing on the --
13         MR. MUKASEY:  I think there's also a
14   hearsay-within-hearsay problem.  Dr. Mai in China is conveying
15   what somebody else in China, this President Zhang, thinks about
16   Dr. Lieber.  And that's double hearsay.
17         THE COURT:  But this is Dr. Mai with whom there has
18   been the correspondence all along.  This is a continuation of a
19   correspondence that started several hours ago.
20         MR. CASEY:  That's correct.  It's not -- Mai's email
21   is not being offered for the truth; it's being offered to the
22   show the nature of the relationship, the extent of the
23   relationship, and the continuing discussion.
24         MR. MUKASEY:  But there are pieces in here that the
25   Government's going to use that come from a third party who's
```

1    unknown.

2         THE COURT:  I will allow the document, subject to

3    excision of anything that is truly out of bounds for counsel to

4    work out or to let me know what they don't work out.

5         MR. MUKASEY:  Thank you, Your Honor.

6         THE COURT:  But the document can come in, subject to

7    some of it being deleted.

8         MR. CASEY:  Sure, we're happy to work with

9    Mr. Mukasey.  Of course.

10        THE CLERK:  Is that 35?

11        MR. CASEY:  Exhibit 35, yes, thank you.

12        THE COURT:  But I think it's also time for us to

13   stretch.

14        (Stretch break.)

15        THE COURT:  We will proceed.

16        MR. CASEY:  Mr. Bruemmer, could I have the second page

17   of Exhibit 35.  And if you could just highlight beginning where

18   it says, "Secondly" in the middle of that --

19   Q.   Actually, let's first talk about who the email is from and

20   to, Special Agent Spice.

21   A.   So the email is from Dr. Mai to Dr. Lieber dated

22   January 8th, 2013.

23   Q.   And he's congratulating him for the Willard Gibbs Medal;

24   right?

25   A.   Yes.

 1            MR. CASEY:  Okay.  If you could highlight the portion

 2     below beginning with, "Secondly."

 3     Q.   And if you could read that, please?

 4            THE COURT:  The whole thing?

 5            MR. CASEY:  Well, let's start with the first two

 6     paragraphs.

 7     A.   "Secondly, I am" -- I assume that's glad -- "to know that,

 8     for our international collaboration project proposal, Chinese

 9     government give high emphasis and support (as the world-leading

10     scientist, you are the foreign partner of this collaboration

11     project, which is important).  Meanwhile, President Zhang also

12     has made great efforts by communicating with the officer of

13     this project.  This collaboration application is big funding

14     supported by Chinese side, MOST.  It is not necessary for you

15     and U.S. side to provide the funding.  As I told you last April

16     and November, the collaboration topic is about nanowire-based

17     lithium ion batteries based on the research field of MOST

18     suggests."

19     Q.   And can you read the next -- I'm sorry.  I didn't mean to

20     interrupt -- the next sentence?

21     A.   Sure.  "President Zhang give very high emphasis on this

22     collaboration project because this big funding will be very

23     important and necessary to our collaboration

24     research/development of nano key lab and your One Thousand

25     Plan."

1   Q.   And can you read the next two sentences?

2   A.   "One requirement is one collaboration agreement between

3   you and me, as I told you.  The drafted agreement for this

4   collaboration project is attached for your reference under many

5   discussions/revisions with President Zhang."

6              MR. CASEY:  And Mr. Bruemmer, if you could just go to

7   Page 1 briefly, at the bottom.

8   Q.   And does Dr. Lieber respond to that email?

9   A.   He does.

10             MR. CASEY:  Okay.  And if we could just go to the

11  text of his response at the top of the second page.  Thank you.

12  Could you highlight that, please.

13  Q.   And could you read that, please?

14  A.   "Please provide following ASAP, as soon as possible:  One,

15  date for agreement.  You state November 16, 2011.  Do you

16  really mean this or during my visit 2012?  I do not feel it is

17  acceptable to back-date greater than one year, as suggested by

18  you, but I'm willing to do so to 2012.  Two, please provide

19  complete address for courier (FedEx or DHL) delivery of signed

20  copies and corresponding phone number.  Best regards, Charlie."

21             MR. CASEY:  All right.  And if we could go to the top

22  email on the first page.

23  Q.   Is that an email from Professor Mai to Dr. Lieber?

24  A.   Yes.

25  Q.   And is he essentially -- is he asking him to sign the

1    contract as of November, 2011?

2            MR. MUKASEY:  Objection.

3            THE COURT:  Yeah.

4            MR. CASEY:  I could have her read it, but okay.

5    Q.   Can you read --

6            MR. CASEY:  Why don't you highlight the email first,

7    Mr. Bruemmer.

8    Q.   And do you see in the body of the email there's a bolded

9    November 16, 2011?

10   A.   November 15, 2011?

11   Q.   Below that.

12   A.   Oh, yes, yes.

13   Q.   And can you read that sentence, please?

14   A.   "Therefore, following the date of strategic science

15   appointment, November 16th, 2011, is suggested, which should be

16   very helpful and strong support.  But this suggestion probably

17   is unreasonable for you (we are sorry for it.  Please forgive

18   us).  If so, we will respect and listen to you and use the date

19   that you suggest."

20           MR. CASEY:  Thank you.

21           If we could go to Exhibit 34.

22   Q.   Do you recognize -- do you recognize Exhibit 34?

23   A.   Yes.

24   Q.   What is it?

25   A.   It's an email from Dr. Mai to Dr. Lieber on January 10th,

1    2013.

2    Q.    Okay.  And the email on the second page, is that the email

3    from Professor Mai to Dr. Lieber we just saw on Exhibit 35?

4    A.    It is.

5    Q.    Okay.  And that's the email that references the

6    collaboration agreement; correct?

7    A.    Yes.

8    Q.    And on Page 1, who's that email from and to?

9    A.    It's from Dr. Mai to Dr. Lieber.

10   Q.    And what's the date?

11   A.    January 10th, 2013.

12   Q.    And is that one day after the email in Exhibit 35?

13   A.    Yes.

14   Q.    Are there attachments?

15   A.    Yes, two.

16         MR. CASEY:  Could we go to Page 3.

17   Q.    Is this one of the attachments?

18   A.    It is.

19         MR. CASEY:  Your Honor, I move to admit Exhibit 34.

20         MR. MUKASEY:  No objection.

21         THE COURT:  You said no objection; right?

22         MR. MUKASEY:  No objection.

23         (Government Exhibit 34 received in evidence.)

24         MR. CASEY:  If we could just go to the first page,

25   Mr. Bruemmer.  And could you highlight the second paragraph,

1    please.

2    Q.    And could you read that for the jury, please?

3    A.    "Because President Zhang knows that you are giving very

4    strong and positive support on this international collaboration

5    project and this big funding project will be really very

6    important and necessary to evaluation of state key lab this

7    year and your One Thousand Plan evaluation, he has made great

8    effort by going to Beijing for communicating with the officer

9    of this project."

10         MR. CASEY:  And could we go to Page 3, please.

11   Q.    Is this one of the attachments?

12   A.    It is.

13   Q.    And can you read the text in bold at the very top?

14   A.    "Academic cooperation agreement between Harvard

15   University, USA; and Wuhan University of Technology, PR China."

16   Q.    And what's the paragraph below that?  What does that say?

17   A.    Sorry.

18         "To carry out advanced research and development of

19   nanowire-based lithium ion batteries with high performance for

20   electric vehicles, Department of Chemistry and Chemical Biology

21   of Harvard University in U.S. and State Key Laboratory of

22   Advanced Technology for Material Synthesis and Processing of

23   Wuhan University of Technology in PR China have agreed to have

24   made an agreement as below."

25         MR. CASEY:  And Mr. Bruemmer, could you highlight the

1   section that says, "Exchange visits."

2   Q.   Could you read that, please?

3   A.   "Exchange visits:  During the period of this cooperative

4   research program, one to two researchers for Wuhan University

5   of Technology will visit Department of Chemistry and Chemical

6   Biology of Harvard University for two months each year.  In

7   return, one to two researchers from Harvard University will

8   visit State Key Laboratory of Advanced Technology for Materials

9   Synthesis and Processing of Wuhan University of Technology for

10  one to two weeks each year."

11          MR. CASEY:  If we could go to the next page,

12  Mr. Bruemmer.  And could you highlight the section that says,

13  "Publication"?

14  Q.   Could you read that, please?

15  A.   "Publication:  The research achievements resulting from

16  the project should be shared by both partners on an equal

17  basis.  Publication and patents containing materials produced

18  by this cooperative research should bear a co-authorship

19  involving relevant researchers from both partners."

20  Q.   Thank you.  And what's the period of the agreement?

21  A.   Five years.

22          MR. CASEY:  Okay.  Thank you, Mr. Bruemmer.

23  Q.   Do you know if Dr. Lieber signed this agreement?  Have you

24  seen a signed signature page?

25  A.   I've have seen it, yes.

```
 1              MR. CASEY:  And could we go to Exhibit 153, please.
 2              Marc, any objection?
 3              MR. MUKASEY:  No.
 4              MR. CASEY:  Your Honor, I offer Exhibit 153, without
 5    objection.
 6              THE COURT:  Okay, go ahead.
 7              MR. CASEY:  Thank you.
 8              THE COURT:  If you don't object, I don't have to do
 9    anything.
10              MR. CASEY:  I just wanted to make sure the record was
11    clear, that's all.  Thank you.
12              (Government Exhibit 153 received in evidence.)
13    Q.   You see Exhibit 153?
14    A.   I do.
15    Q.   What is that?
16    A.   It's an email from Dr. Mai -- I'm sorry -- from Dr. Lieber
17    to Dr. Mai dated January 11th, 2013.
18    Q.   Okay.  And is this the day after the email we just saw in
19    Exhibit 34?
20    A.   Yes.
21    Q.   Okay.  And can you just read Dr. Lieber's email?
22    A.   "Dear Liqiang:  Attached is a scanned copy of the
23    signature page, per your request.  Please confirm receipt.  The
24    original signed copies (two) will be sent today by Renee.
25    Regards, Charlie."
```

```
 1              MR. CASEY:  And can you go to the second page,
 2    Mr. Bruemmer.
 3    Q.   Is this the signature page of the agreement we just saw on
 4    the previous exhibit?
 5    A.   It is.
 6              MR. CASEY:  Okay.  And can you highlight,
 7    Mr. Bruemmer, where it says, "For and on behalf of" down
 8    through the handwritten text?
 9    Q.   Can you read the text in the upper left-hand corner?
10    A.   "For and on behalf of Harvard University, Charles Michael
11    Lieber, Ph.D., Professor."
12    Q.   And what's the date?
13    A.   November 16th, 2011.
14    Q.   And where was this document found, do you know?
15    A.   The electronic devices seized in one of the search
16    warrants at his home and the office at Harvard.
17              MR. CASEY:  Could we go to Exhibit 36, please.
18    Q.   Do you recognize Exhibit 36?
19    A.   Yes.
20    Q.   And what is it?
21    A.   It's an email to Dr. Lieber from Dr. Mai dated
22    January 12th, 2013.
23    Q.   So it's the following day after Exhibit 153?
24    A.   Yes.
25              MR. CASEY:  Your Honor, I move to admit Exhibit 36.
```

1          MR. MUKASEY:  Objection.  Hearsay and relevance.

2          MR. CASEY:  Offered for the Defendant's state of mind

3     and the continuing conversation.

4          THE COURT:  Well, I don't know how it shows his change

5     of mind.  It's written to him.

6          MR. CASEY:  Well, the fact that he received it and

7     presumably read what's described there.

8          THE COURT:  I don't know how we can presume that.  I

9     mean, I don't know what evidence that is that allows the

10    presumption.

11         MR. CASEY:  All right.  I'll move on.

12         THE COURT:  It may be marked for identification,

13    however.

14         (Government Exhibit 36 marked for identification.)

15         MR. CASEY:  Could I have Exhibit 154.

16    Q.   Do you recognize Exhibit 154?

17    A.   Yes.

18    Q.   Okay.  And what is it?

19    A.   It's an email exchange between Dr. Lieber and Dr. Mai

20    circa March, 2019.

21         MR. CASEY:  And if we could just highlight,

22    Mr. Bruemmer, the second email from the top.

23    A.   I'm sorry.  March, 2013.

24    Q.   Thank you.

25         And what is this?

1   A.   It's an email from Dr. Lieber to Dr. Mai dated March 19th,

2   2013.

3            MR. CASEY:  Your Honor, I offer Exhibit 154.

4            MR. MUKASEY:  May I have just one minute, Your Honor?

5            THE COURT:  I'm sorry?

6            MR. MUKASEY:  May I have just one moment to check it

7   out?

8            No objection.

9            THE COURT:  Okay.

10            (Government Exhibit 154 received in evidence.)

11   Q.   The highlighted portion here of Exhibit 154 that we're

12   looking at, is that an email from Dr. Lieber to Professor Mai

13   dated March 19, 2013?

14   A.   It is.

15   Q.   And could you just read the last full sentence beginning

16   with, "I would be happy"?

17   A.   "I would be happy to cover cost.  You could subtract from

18   salary due for second half of this year if you'd like because I

19   think this is a way to build commitment to work with

20   students -- when students understand that I (we) care about

21   them as well.  Best, Charlie."

22            MR. CASEY:  Okay.  And if you could go to the top

23   email, Mr. Bruemmer.

24   Q.   Is this an email from Professor Mai to Charles Lieber

25   dated March 20th, 2013?

1   A.    It is.

2   Q.    And could you read the email, please?

3   A.    "Dear Charlie:  Thank you very much for your kind

4   suggestion and your encouragement concerning support or our

5   WUT-Harvard Nano Lab and especially for the students and

6   postdocs.  We think the option you suggested sounds great.  We

7   would be very happy to arrange an informal dinner party (as

8   soon as you arrive in Wuhan) in the big conference room (like

9   the parties we sometimes had in our conference room at Harvard)

10  and also invite the people at WUT, as you suggested (such as

11  Ms. Fan Xiang and others at small dinner we had at last visit).

12  Thank you very much for your support for this dinner party, and

13  we may subtract from salary due second half of this year, as

14  per your suggestion.  (It is also no problem for our University

15  to cover this if you agree).  Best regards, Liqiang."

16          MR. CASEY:  One moment, Your Honor.

17          THE COURT:  Is that it?

18          MR. CASEY:  That's it.

19          THE COURT:  Any cross?

20          MR. CASEY:  Oh, I'm sorry.  For this exhibit.  I

21  apologize.  Unfortunately --

22          THE COURT:  Well, I can always hope.

23          MR. CASEY:  Could I have Exhibit 178 that's already in

24  evidence.

25  Q.    Do you see Exhibit 178 in front of you?

```
 1    A.   Yes.
 2    Q.   All right.  Is the top email from Renee Donlon to
 3    Charles Lieber dated April, 2013 -- April 12th, 2013?
 4    A.   Yes.
 5              MR. CASEY:  And if we could go to Page 2.  Sorry.
 6    It's not showing up.
 7              THE WITNESS:  It's blank.
 8              There we go.
 9    Q.   Does the top say "Trip Summary"?
10    A.   Yes.
11    Q.   And does this appear to reflect a trip to Wuhan University
12    and other places from April, 2013?
13    A.   Yes.
14              MR. CASEY:  Okay.  And could we go to Exhibit 155,
15    not in evidence.  Any objection, Marc, to 155?
16              MR. MUKASEY:  Yes.  Relevance.
17              MR. CASEY:  Your Honor, we're happy to redact.
18    Presumably --
19              THE COURT:  Why don't you point out what part you want
20    to have and --
21              MR. CASEY:  It's the top and the -- the top paragraph
22    and then the next sentence.  But the bottom two paragraphs
23    we're happy to redact.
24              MR. MUKASEY:  This concerns an entirely different
25    subject matter between --
```

1          THE COURT:  How do I know that, other than the fact

2    it's four months later?

3          MR. MUKASEY:  Well, that's part of it.  The other

4    reason, Judge --

5          THE COURT:  The big long paragraph is out; right?

6          MR. CASEY:  Correct.  Yeah, we're happy to redact

7    that.  The reason we're offering it, Your Honor, is we just

8    showed Exhibit 178, which referenced a trip to Wuhan in April

9    of -- mid-April of 2013.  This email is dated approximately two

10   weeks later, and it's the second sort of stand-alone sentence

11   that we're offering it for primarily.

12         MR. MUKASEY:  Judge, I'm not sure they've laid a

13   foundation as to the relevance of the --

14         THE COURT:  Well, he just explained it.

15         MR. MUKASEY:  Well, the recipient is not the same

16   person that we've been seeing emails from.  This is a new

17   recipient.  I'm not sure there's any relevance to this person's

18   involvement.

19         THE COURT:  Haven't we seen Yin before?

20         MR. CASEY:  I don't know if we've seen Yin; but,

21   again, it's an admission of the Defendant.  He's referencing an

22   item in the second sentence --

23         THE COURT:  Well, that depends on who this Yin is.  He

24   may have nothing to do with Wuhan.

25         MR. CASEY:  Well, again, I think the link is created

1    by the this stand-alone sentence below the first paragraph,

2    particularly in relation to the exhibit we just saw, 178, that

3    is evidence of a trip to Wuhan and other places in China from

4    two weeks before.  So that's the link.  The recipient of the

5    email is sort of irrelevant, given what he's saying.

6           THE COURT:  I have some difficulty with that.

7           MR. CASEY:  Yeah, and just the fact of a trip to China

8    is relevant.  Again, regardless of who's receiving it, the

9    Defendant making a statement about it is relevant.

10          MR. MUKASEY:  That's just not accurate, Judge.  People

11   go to China for all sorts of reasons unrelated whatever they

12   think they're proving in this trial.  This is a professor

13   talking about a paper with somebody who's not relevant.

14          MR. CASEY:  Again, we're not offering it for the

15   discussion about the paper; we're offering because we have to

16   show that the Defendant did things pursuant to the contract

17   after he agreed to it, and this is evidence of that.

18          THE COURT:  But it doesn't say anything about the

19   contract, does it?

20          MR. MUKASEY:  It's irrelevant.

21          THE COURT:  I mean, other than it was fun.  And the

22   fact that he went before and had fun -- I mean, the fact that

23   he went before is already in evidence.  That he had fun, I'm

24   not sure what it adds, other than the fact that we know he had

25   a party.

```
 1            MR. CASEY:  He's describing in at least general terms
 2    what he did there in that sentence beginning with "My," the
 3    stand-alone sentence.  It's his admission about sort of
 4    describing what he did and how he viewed it, and that's what
 5    it's relevant for.  We have to prove and we intend to prove --
 6            THE COURT:  Just that one sentence that is a
 7    one-sentence paragraph, that's all you're offering it for?
 8            MR. CASEY:  Correct.
 9            MR. MUKASEY:  Not every email that has to do with
10    China has to do with this case.
11            THE COURT:  No, but there is a reference to an earlier
12    trip.
13            MR. CASEY:  To Wuhan.
14            THE COURT:  To Wuhan.  I will allow it for purposes
15    only of that one-line paragraph.
16            MR. MUKASEY:  Judge, if you look at the recipient of
17    the email, it has nothing to do with the Wuhan; it's a
18    different email address, it's a different location, it's a
19    different institution.
20            THE COURT:  Yeah, Yin is telling about what he had
21    done.
22            MR. MUKASEY:  I just don't see how it's connected to
23    the Wuhan -- alleged Wuhan agreement.
24            THE COURT:  It's thin, but there is a connection
25    because he refers to having had a trip to China.  That line you
```

```
 1    have, but the rest of it not.
 2              MR. CASEY:  Could you redact everything between here
 3    and here.
 4              THE COURT:  You can just read it.
 5              MR. CASEY:  Fair enough.
 6              (Government Exhibit 155 received in evidence.)
 7    Q.   We won't be put it on the monitor; but, again, it's an
 8    email from Dr. Lieber to Yin Fang dated April 30th, 2013?
 9    A.   Yes.
10    Q.   And the subject is, "Hello"?
11    A.   Yes.
12    Q.   Can you read only the sentence beginning with, "My trip to
13    China"?
14    A.   "My trip to China was not much fun, but I guess I took
15    care of some necessary visits."
16              MR. CASEY:  All right.  And could we have
17    Exhibit 156?
18              THE COURT:  I hope we will finish this before 1:00.
19              MR. CASEY:  I'm not sure we will, Your Honor.  We're
20    trying to move as quickly as we can.
21              THE COURT:  Oh, I'm sure that's true.
22    Q.   Do you see Exhibit 156 in front of you?
23    A.   I do.
24    Q.   Do you recognize it?
25    A.   Yes.
```

1   Q.   What is it?

2   A.   It's an email exchange between Dr. Lieber and Dr. Mai

3   circa June, 2013.

4   Q.   Okay.  And does Dr. Mai make any requests of Dr. Lieber,

5   without saying what they are?

6           Oh, I'm sorry.  I misspoke.

7           This is an email from Charles Lieber to Professor Mai

8   dated June 21st, 2013; correct?

9   A.   Yes, the top one.

10  Q.   Okay.  And are there -- are there any attachments?

11  A.   Yes.

12          MR. CASEY:  Marc, is there an objection to this

13  document?

14          MR. MUKASEY:  I'm not going to object to this, but I

15  think we're getting really far afield.  And I don't want to

16  disrupt the proceedings, but we're getting far afield.  No

17  objection to this one.

18          THE COURT:  There's no objection, so we'll be

19  proceeding.

20          MR. CASEY:  I was just waiting for it to pop up.

21          THE COURT:  I'm sorry?

22          MR. CASEY:  I was just waiting for it to pop up for

23  the jurors before I ask more questions.

24          (Government Exhibit 156 received in evidence.)

25  Q.   In Dr. Lieber's email at the top here, does he reference

1    attached -- any attachments?

2    A.   Yes.

3    Q.   Okay.  And what does he reference?

4    A.   Passport pages.

5    Q.   Okay.  And is this in response to a request from Dr. Mai?

6    A.   Is this on the second page?

7            MR. CASEY:  Why don't we go to Page 4, actually,

8    Mr. Bruemmer.  And could you highlight No. 3.

9    Q.   Could you read that?

10   A.   "3:  Besides recently, WUT need to submit a summary

11   material of your One Thousand plan.  Could you please send the

12   copy of the first page, including your photo of your passport

13   and visa records to China (from 2011 to now, Wuhan or other

14   cities in China), which is needed in summary materials of your

15   One Thousand Plan.  President Zhang hopes to get them before

16   next Monday, June 24th.  We are sorry to push you in this."

17           MR. CASEY:  If we could go back to the first page.

18   And if we could go to Exhibit 157?

19           MR. MUKASEY:  No objection.

20           (Government Exhibit 157 received in evidence.)

21           MR. CASEY:  And, Your Honor, I'd just note the parties

22   have stipulated that the file name of Exhibit 157 is "CML" --

23   all capitals, underscore -- "PSPT-visa.PDF."

24   Q.   What I just read, Special Agent Spice, is that the same

25   text as the subject line from Exhibit 156?

```
 1    A.    Yes.

 2    Q.    Okay.  And what is Exhibit 157?

 3    A.    It's a picture of a passport.

 4    Q.    Whose passport?

 5    A.    Dr. Lieber.

 6    Q.    Okay.  And if we go to the second page, what is at the

 7    bottom there?

 8    A.    A Chinese visa.

 9    Q.    Okay.  And Page 3, is that the --

10    A.    A photograph of the Chinese visa.

11    Q.    More visas on Page 3; correct?

12    A.    If you could go -- is that the next page?  Is that Page 3?

13    Q.    Yes.

14    A.    Yes.

15          MR. CASEY:  Okay.  If I could have Exhibit 158A?

16          MR. MUKASEY:  No objection.

17          MR. CASEY:  Thank you.

18          (Government Exhibit 158A received in evidence.)

19    Q.    Do you see the email in the middle of the chain,

20    Exhibit 158A?

21    A.    Yes.

22    Q.    Okay.  And is that an email from Charles Lieber to

23    Dr. Mai?

24    A.    Yes.

25    Q.    Okay.  And is that in response to an email from Dr. Mai
```

1    that we see at the bottom of 158A?

2    A.   Yes.

3         MR. CASEY:  And if we could just go to the second

4    page, Mr. Bruemmer.  If you could highlight at the very top,

5    Item No. 4.

6    Q.   And can you read Item No. 4, please?

7    A.   "4:  We look forward to receiving your updated information

8    for Nobel prize nomination when your schedule allows."

9         MR. CASEY:  Okay.  If we could go back to Page 1,

10   158A, and just highlight the text of Dr. Lieber's email in the

11   middle.

12   Q.   And could you read the first three sentences, please?

13   A.   "Dear Liqiang:  Attached please find an updated nomination

14   statement and CV/publication list.  I sincerely hope that you

15   (and President Zhang) can help to push my case with

16   Professor Zhau and others, as this is very important to me (one

17   of most important things).  I do appreciate greatly your

18   efforts.

19        MR. CASEY:  Thank you.  If I could have Exhibit 41.

20        Any objection, Marc?

21        MR. MUKASEY:  Just bear with me one second.

22        MR. CASEY:  Sure.

23        MR. MUKASEY:  We have a hearsay objection, Judge.

24        THE COURT:  But that's not serious.

25        MR. MUKASEY:  No.  It is serious.

1           It's quite serious.

2           THE COURT:  It is serious?

3           MR. MUKASEY:  The way my glasses fell off my face was

4    not serious, but my objection is serious.

5           THE COURT:  Is this the document?

6           MR. CASEY:  This is the document starting --

7           THE COURT:  Which part, the bottom or the top?

8           MR. CASEY:  Well, the very top of Exhibit 41 is an

9    email from Dr. Lieber, so that's his statement.  The responses

10   are not offered for the truth but for context.  And there are

11   other statements of the Defendant embedded in this email chain

12   that we're also offering as admissions.

13          THE COURT:  Well, I don't understand.  The gray part,

14   as opposed to the black part, is what you're offering?

15          MR. CASEY:  We're offering the entire email chain,

16   Your Honor.  It's correspondence between the Defendant and

17   Liqiang Mai.  The latest email in the chain at the top here is

18   the Defendant's email, his statement to Professor Mai.  There

19   are other emails from the Defendant, his statements elsewhere

20   in the email chain that we're offering.

21          MR. MUKASEY:  Judge --

22          MR. CASEY:  What he's responding to we're not offering

23   for the truth; it's context so the jury can understand what

24   Dr. Lieber was responding to.

25          MR. MUKASEY:  All these exceptions, Not offering for

1   the truth, not offering for the truth, for state of mind, are

2   threatening to, I think, swallow the entire hearsay rule.

3   Here's the hearsay rule.  They can't put in President Zhang's

4   statements that are in here relayed by a third party.  They

5   can't offer any of this, unless there's a valid non-hearsay

6   reason.

7           MR. CASEY:  There is a reason.  It's Dr. Lieber's

8   email.

9           MR. MUKASEY:  It can't be -- but it has to be relevant

10  also.  It has to be relevant, and it can't --

11          THE COURT:  Well, Dr. Lieber's email was just the one

12  in gray, right?

13          MR. CASEY:  It's the very top email, correct.

14          THE COURT:  It doesn't say very much.  It really comes

15  later on.

16          MR. CASEY:  Correct.  It's an evolving conversation.

17  I'm happy to walk the witness through the earlier emails in the

18  chain that will connect it to the Thousand Talents Plan, and

19  it's a continuing discussion about --

20          THE COURT:  But this is different now.

21          MR. CASEY:  What's that?

22          THE COURT:  This is no longer the Thousand whatever

23  plan.

24          MR. CASEY:  No.  This very much is the Thousand

25  Talents Plan.

```
1              THE COURT:  I can't -- I have only a piece of it now.

2              MR. CASEY:  If we can go to Page 4, Mr. Bruemmer.  If

3      you want to highlight -- well, I'm happy to ask the witness, or

4      I'm happy to tell Your Honor.  I don't want to -- it's an email

5      from Professor Mai to Charles Lieber, and I'd direct --

6              THE COURT:  Well, certainly the email by Dr. Lieber

7      can come in.  The rest of it is the part that I'm stuck on

8      because it --

9              MR. CASEY:  Your Honor, the whole -- again,

10     Dr. Lieber's statements are embedded here, and you see again on

11     Page 4, the first email at the bottom is Professor Mai's email,

12     then we have an email from Dr. Lieber responding to it.

13             THE COURT:  I understand that.  But the problem is the

14     subject matter as well.

15             MR. CASEY:  Again, it's -- Item No. 4, it's the

16     implementation and action in furtherance of the Thousand

17     Talents agreement, which precedes it.  So we have to show that

18     the Defendant participated.

19             THE COURT:  So what you're offering is the email by

20     Dr. Lieber at the top and then a response that has a bunch of

21     stuff in it, including some reference to the -- to what we were

22     talking about before?

23             MR. CASEY:  Yes, it's a particular aspect of the

24     Thousand Talents agreement that they're talking about, and

25     they're sort of figuring it out.  They're talking about what
```

1    they're going to do, and Charlie is responding.  And so it's

2    relevant for that purpose.  It's admissible because these are

3    the Defendant's statements.  The e-mails that are not his have

4    to come in for context; otherwise, we don't know what he's

5    responding to.

6              MR. MUKASEY:  Even if it's relevant and admissible,

7    Your Honor has the discretion, obviously, to keep it out.

8              THE COURT:  Why should it not come in?

9              MR. MUKASEY:  Because it's widely confusing.  I think

10   this discussion demonstrates that.  It's wildly confusing, and

11   it contains a lot of extraneous material that can't be

12   connected up to any part of the case.

13             MR. CASEY:  Your Honor, I'm going to direct the

14   witness, and if the Exhibit comes in, the jury to the

15   particular item at the bottom of Page 4, No. 4, where

16   Professor Mai is proposing a plan, that Dr. Lieber is

17   responding to it and essentially saying, Yeah, let's do it, and

18   they're discussing it.

19             THE COURT:  All I can see is -- let's see.  There is a

20   letter to Dr. Lieber and then a small response by him, and then

21   we go to the long letter.  And with respect to the long letter,

22   are you proposing to put all of it in?

23             MR. CASEY:  We are proposing -- the entire email chain

24   comes in, Your Honor.  It starts with an email from the

25   Defendant.  It's a back-and-forth with the Defendant and

1    Liqiang Mai.

2         THE COURT:  But there is stuff in here that really

3    goes beyond what we're talking about now, I think.  I mean, to

4    some extent, we're going back to what has already been done.

5         MR. CASEY:  No.  Your Honor, this is a discussion

6    about implementing the Thousand Talents contract.

7    Professor Mai is suggesting something to Dr. Lieber about what

8    they should do, Dr. Lieber is responding to it and setting the

9    wheels in motion in order to accomplish it.

10        So this is an example of action in furtherance of the

11   Thousand Talents agreement, and it comes in through Defendant's

12   own admissions.  It's his statements.  We are not going to ask

13   the jury or the witness to focus on every little aspect of the

14   email, but we also shouldn't have to go line by line and redact

15   everything that doesn't relate specifically to implementing

16   this plan or the Thousand Talents agreement or whatnot.

17        THE COURT:  I don't have the entire document to look

18   at.

19        MR. CASEY:  What's that?

20        THE COURT:  I don't have the entire document.

21        MR. CASEY:  I'm happy to walk a hard copy up to

22   Your Honor if you'd like to look at the whole document.

23        THE COURT:  I mean, this one goes through part of

24   Paragraph 4, No. 4.  How much more is there?

25        MR. CASEY:  The next page is just the end of Item

1  No. 4, and they're soliciting -- again, I don't want to read

2  from the document, but if you want to pull up the next page,

3  Paul.  This is the very end of that email.  So they're asking

4  Dr. Lieber something, and he's responding.

5          THE COURT:  Can you go back, please?

6          MR. MUKASEY:  It's entirely conclusory that this has

7  anything to do with TTP.  They have to prove that; they can't

8  just tell you that.

9          MR. CASEY:  Your Honor, I'm happy to have the witness

10  read; but, I mean, Item No. 4, I think, makes reference to a

11  particular provision of the agreement that we've already talked

12  about.  And there's a -- and it's the Government's position

13  that there's a reason they're doing these things.  They're not

14  just doing it because whatever; there's a reason.

15          THE COURT:  Is there going to be another letter after

16  this that responds to --

17          MR. CASEY:  Well, I mean, if we go to Page 1 and

18  Page 2 -- let's go to Page 1.  There is -- again, they're

19  discussing the same issue that's raised in No. 4 of that long

20  email that you just saw.  They're continuing to discuss it

21  here, Professor Mai and Dr. Lieber, and then again Dr. Lieber

22  responds with what he responds with.

23          So it's his statement.  In order to understand his

24  statement, we have to see what's below it.  And it's relevant

25  to their actions in conformance with the contract.

1          MR. MUKASEY:  Judge, I don't want to prolong this

2    because I think we should keep the jury moving along.  I just

3    want to point out there are five or six names in here.  This

4    witness doesn't know who they are.  We don't know who they are.

5    They're just random references on a piece of paper authored by

6    a witness who's not coming to this Courtroom.

7          It's just a bunch of, apparently, Chinese academic

8    folks mentioned in here.  She doesn't know who they are.

9    Nobody knows who they are.  How is it relevant?

10          MR. CASEY:  Your Honor, we have to prove, and we

11    intend to prove, and this is evidence of the Defendant's

12    participation in the Thousand Talents Program.  We've already

13    walked the jury through the exhibits that show --

14          THE COURT:  Where does it tell us that that's what

15    this is about?

16          MR. CASEY:  Well, I'm happy to speak about the content

17    of the document, but we have the jury here.

18          THE COURT:  Just tell me where on this document is the

19    reference to the Thousand whatever.

20          MR. CASEY:  No. 4, in order -- they're talking

21    about --

22          THE COURT:  Wait a minute here.  This is Document 41?

23          MR. CASEY:  I'm sorry.  Page 4.  I forget that

24    Mr. Bruemmer is helping us.

25          THE COURT:  Of Document 41?

```
 1                MR. CASEY:  Correct.

 2                THE CLERK:  Page 4.

 3                THE COURT:  I mean, are you planning to read all of it

 4      starting with --

 5                MR. CASEY:  No.  We're going to be very targeted.  We

 6      want to keep it moving as well.

 7                THE COURT:  Are you offering all of it even if you

 8      don't read it?

 9                MR. CASEY:  We are offering the email chain -- again,

10      it's Dr. Lieber's email, and so what comes below it is the

11      con -- it's his admissions as well, but it's content -- or

12      context, rather.  But, to answer Your Honor's question about

13      how this relates to the agreement, we saw in the agreement that

14      there are talent-training provisions.  That was one of the

15      things that they agreed to.

16                And on Page 4, Item No. 4, there is a reference to

17      talent training, and Dr. Mai is making a suggestion to

18      Dr. Lieber about how that training could be carried out.

19                MR. MUKASEY:  Judge, you know what?  I withdraw my

20      objection.  Let him bring it in.

21                THE COURT:  Well, that counts for something.

22                MR. MUKASEY:  Yeah.

23                THE COURT:  Thank you.

24                MR. MUKASEY:  Go crazy.

25                MR. CASEY:  I promise I'll be brief, Your Honor.  If
```

1   we could just go to Page 4.

2           (Government Exhibit 41 received in evidence.)

3   Q.   Is this an email from -- at the bottom half, an email from

4   Dr. Mai to Charles Lieber dated August 16th, 2013?

5   A.   Yes, it is.

6   Q.   And can you read -- let's start with the first two

7   sentences of Item No. 4.

8   A.   "In order to ensure that the WUT Talent Training Plan can

9   be carried out effectively and the research funding used as per

10  Plan normally, President Zhang and I have carefully discussed

11  and hope that Yunlong could go to your group in Harvard and

12  start his research in January, 2014."

13          MR. CASEY:  Can we go to the next page, please --

14  actually, let's -- yeah.

15  Q.   Can you read the last sentence on Page 5 on to

16  Page -- Page 4, rather, on to Page 5?

17  A.   "President Zhang and I would like to get your idea,

18  comments, suggestions.  We are very sorry to push you in this.

19  Thank you so much for your great contribution in development

20  and talent training of our Joint Key Lab.  We really very much

21  appreciate it.  Best regards, and thank you so much, Liqiang."

22          MR. CASEY:  And could you scroll up, please,

23  Mr. Bruemmer, so we can just see Dr. Lieber's response.

24  Q.   Can you read Dr. Lieber's response, please?

25  A.   "Dear Liqiang:  Regarding point No. 4 below, the plan

1    sounds good.  Please work with Kathleen to the get the proper

2    (CHECK) weather for Yunlong.  Best regards, Charlie."

3              MR. CASEY:  Okay.  And can we look at the first page.

4    Q.   And could you just read Dr. Lieber's email at the very top

5    of the page, please?

6              MR. CASEY:  You don't have to highlight it,

7    Mr. Bruemmer.

8    A.   "Dear Liqiang:  Sorry for the delay in responding.  I

9    think the points for Yunlong Nos. 1 and 2 are very good, and we

10   should move forward one hundred percent with January 14, as

11   expected starting time (depending on visa).  My best to you and

12   President Zhang.  Regards, Charlie."

13             MR. CASEY:  Could I have Exhibit 159?

14   Q.   Do you recognize -- oh, I'm sorry.

15             Do you recognize Exhibit 159?

16   A.   I do.

17   Q.   And what is it?

18   A.   It's an email between Dr. Lieber and Dr. Mai in September,

19   2013.

20   Q.   And what is Dr. Lieber discussing, just generally?

21   A.   The Xu-Lieber -- I'm sorry.  Proposed nano letters paper.

22             MR. CASEY:  Okay.  Your Honor, I offer Exhibit 159.

23             MR. MUKASEY:  No objection.

24             (Government Exhibit 159 received in evidence.)

25             MR. CASEY:  And if we could go to Page 4, please.

1    Could you highlight No. 3 and 4, please, at the bottom.  I'm

2    sorry.  The ones below that.  Thank you.  3 and 4.  Thank you.

3    Q.   And could you read that, please?

4    A.   No. 3, "Another thing we'd like to let you know is as

5    follows:  Considering that you are world-leading nano scientist

6    and the strategic scientist in One Thousand Plan of WUT, WUT

7    Academic Committee have approved your qualification of the

8    Ph.D. supervisor of WUT.  President Zhang suggests that I will

9    help you select and co-guide a few outstanding students in

10   WUT-Harvard Key Joint Lab so that as to send the best students

11   to your group in Harvard.  Your research fields in WUT

12   supervisor lists are suggested to be nano bio-interface and

13   nano electronics (based on your group website).  We would like

14   to forward to your ideas" -- sorry.  "We would like to look

15   forward to your ideas, suggestions, comments on this."

16         No. 4, "President Zhang:  Let me tell you that he is

17   paying attention to the status of your CAS foreign member

18   nomination and will update you if he has any new information."

19         MR. CASEY:  Okay.  If we could go to Page 3, please.

20   Actually, let's go to Page 2, rather.

21   Q.   At the bottom there, do you see, in the second half, an

22   email from Charles Lieber to Dr. Mai?

23   A.   Yes.

24   Q.   And that's dated September 4th, 2013?

25   A.   Yes.

1           MR. CASEY:  And if you could go to the next page,

2   Mr. Bruemmer.

3   Q.    And could you read Dr. Lieber's response to Item No. 4?

4   A.    Four, "Please express my sincere thanks to PRESIDENT Zhang

5   for his support."

6   Q.    And actually, could you read the item above that as well?

7   A.    No. 3, "I would be happy to co-advise Ph.D. students, such

8   as Lin Xu.  The areas of my -- the areas of my interest

9   supervision could be:  A, nano material synthesis and

10  characterization with emphasis on nano wirebase structures; B,

11  nano devices to assemble two- and three-dimensional nano

12  electronics; and, C, nano bio-electronics, from fundamental

13  studies from medical/healthcare applications."

14  Q.    And the first page, 159, at the very bottom, is that an

15  email from Dr. Mai to the Defendant dated September 5th, 2013?

16  A.    Yes.

17          MR. CASEY:  And if we could just go to the second

18  page.

19  Q.    Could you read No. 5, please?

20  A.    No. 5, "I have reported your One Thousand Plan progress to

21  the leaders of Administration of Foreign Experts Affairs of

22  Hubei Province, and they gave very high comments on great

23  contribution, collaboration research, et cetera.  That is very

24  helpful and important to your One Thousand Plan and our nano

25  lab."

1           MR. CASEY:  Your Honor, the next series of exhibits

2    all relate together, and they may take a little bit, so I don't

3    know if this is a good time to recess or if you want me to

4    start.

5           THE COURT:  Might as well take a recess and start in

6    the morning; right?

7           So, members of the jury, again, you are excused until

8    9:00 tomorrow morning.  Please don't think about the case,

9    don't talk about the case; just go home and relax.

10          THE CLERK:  All rise, please.

11          THE COURT:  We'll see you at 9:00 in the morning.

12          (Jury is not present for the following.)

13          THE COURT:  Was there anything we needed to do now on

14   the record?  No.  Well, that's good.

15          Where are we in relation to where you thought we would

16   be at this point?

17          MR. CASEY:  Well, let me take a look.  I think we're a

18   little behind but not too far behind.

19          THE COURT:  Will the Government -- today's Thursday.

20   Will you finish your presentation tomorrow?

21          MR. CASEY:  We will not finish tomorrow.  We're making

22   every effort to finish Monday.

23          THE COURT:  When will you finish?

24          MR. CASEY:  Close of business, but we're really

25   shooting for 1:00 Monday.  I think there's a fair chance of

1     that happening.

2              THE COURT:  You think that you will finish Monday?

3              MR. CASEY:  Correct.

4              THE COURT:  Court is in recess, but I do wish to talk

5     to counsel.  And we don't have to be on the record for this.

6              (Adjourned at 1:00 p.m.)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Linda Walsh, Registered Professional Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter, to the best of my skill and ability.

9              Dated this 16th day of December, 2021.

10

11

12              /s/ Linda Walsh

13              Linda Walsh, RPR, CRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25