<pre>
 1                 UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2

 3
                                    )
 4   UNITED STATES OF AMERICA,       )
                                    )
 5         Plaintiff,                )
                                    )   Criminal Action
 6   v.                              )   No. 1:20-cr-10111-RWZ-1
                                    )
 7   CHARLES LIEBER,                 )
                                    )
 8         Defendant.                )
                                    )
 9

10

11             BEFORE THE HONORABLE RYA W. ZOBEL
                 UNITED STATES DISTRICT JUDGE
12

13                         JURY TRIAL
                             DAY 4
14

15                     December 17, 2021
                         9:03 a.m.
16

17          John J. Moakley United States Courthouse
                    Courtroom No. 12
18                  One Courthouse Way
                 Boston, Massachusetts 02210
19

20

21

22             Linda Walsh, RPR, CRR
                Official Court Reporter
23     John J. Moakley United States Courthouse
            One Courthouse Way, Room 5205
24          Boston, Massachusetts 02210
                lwalshsteno@gmail.com
25
</pre>

APPEARANCES:

On Behalf of the Government:

     UNITED STATES ATTORNEY'S OFFICE
     By: AUSA James R. Drabick
        AUSA Jason A. Casey
     1 Courthouse Way, Suite 9200
     Boston, Massachusetts 02210
     617-748-3498
     james.drabick@usdoj.gov


On Behalf of the Defendant:

     MUKASEY FRENCHMAN LLP
     By: Marc L. Mukasey, Esq.
        Torrey K. Young, Esq.
        Catherine M. Deist, Esq.
        Stephanie Guaba, Esq.
     570 Lexington Avenue, Suite 3500
     New York, New York 10022
     212-466-6400
     marc.mukasey@mfsllp.com


                 Proceedings reported and produced
                  by computer-aided stenography.

```
 1                            INDEX

 2   WITNESS                      DIRECT   CROSS  REDIRECT  RECROSS

 3   KARA SPICE (Continued)

 4      By Mr. Casey              4-7
        By Mr. Mukasey                    4-103
 5

 6                       E X H I B I T S

 7
                          DESCRIPTION              RECEIVED
 8
     GOVERNMENT EXHIBITS
 9
        11   ...........................................  4-90
10
        23   ...........................................  4-91
11
        27   ...........................................  4-91
12
        43   ...........................................  4-24
13
        44   ...........................................  4-92
14
        48   ...........................................  4-30
15
        49   ...........................................  4-32
16
        50   ...........................................  4-34
17
        52   ...........................................  4-36
18
        54   ...........................................  4-38
19
        55   ...........................................  4-39
20
        59   ...........................................  4-16
21
        60   ...........................................  4-45
22
        62   ...........................................  4-46
23
        66   ...........................................  4-47
24

25
```

1                        EXHIBITS (continued)

2
        68    .............................................  4-50

        69    .............................................  4-53

        71    .............................................  4-54

        78    .............................................  4-55

        79    .............................................  4-57

        82    .............................................  4-59

        89    .............................................  4-60

        93    .............................................  4-61

        94    .............................................  4-62

        101   .............................................  4-72

        109   .............................................  4-75

        111   .............................................  4-76

        161   .............................................  4-7

        162   .............................................  4-7

        163   .............................................  4-7

        164   .............................................  4-11

        165   .............................................  4-13

        167   .............................................  4-15

        168   .............................................  4-18

        169   .............................................  4-21

        211   .............................................  4-97

        213   .............................................  4-97

EXHIBITS (continued)

214    ...........................................    4-102

215    ...........................................    4-101

217    ...........................................     4-95

218    ...........................................     4-97

219    ...........................................    4-101

300    ...........................................     4-81

301    ...........................................     4-81

302    ...........................................     4-81

303    ...........................................     4-81

304    ...........................................     4-81

305    ...........................................     4-81

306    ...........................................     4-81

307    ...........................................     4-81

321    ...........................................     4-79


                                                      PAGE

Stipulation..........................................     4-94

Stipulation..........................................     4-99

```
 1                    P R O C E E D I N G S
 2           THE COURT:  Please be seated.
 3           The jury is en route.  If anybody wants to put
 4    anything on the record, now is a good time to do that.
 5           Mr. Mukasey.
 6           MR. MUKASEY:  Thank you, Judge.  And thank you for
 7    hearing us this morning.
 8           I think both parties agree that this trial has to keep
 9    a pace, and I think Mr. Casey will move in whatever he needs to
10    move in or try to, I'll make a quick objection, Your Honor can
11    make a quick ruling, there won't be extensive commentary or
12    discussion, and we can keep the case moving along.  I'm just
13    going to protect the record on behalf of the client.
14           THE COURT:  Thank you.
15           THE CLERK:  All good?  All rise, please.
16           (Jury is present for the following)
17           THE COURT:  Good morning.  Please be seated.
18           Where is our witness?  There you are.  Understand
19    that, although we will not swear you again today, you are still
20    under oath.
21           THE WITNESS:  Yes.
22           THE COURT:  Okay.  You may proceed.
23           MR. CASEY:  Thank you, Your Honor.
24           THE COURT:  And let us identify the witness for the
25    record, too, please.
```

```
 1              KARA SPICE, having been previously duly sworn by the
 2   Clerk, was examined and testified as follows:
 3                     CONTINUED DIRECT EXAMINATION
 4   BY MR. CASEY:
 5   Q.   Could you just state your name, please.
 6   A.   Kara, K-a-r-a, Spice, S-p-i-c-e.
 7   Q.   And you're a Special Agent, again, with the FBI?
 8   A.   Yes.
 9              MR. CASEY:  Okay.  Your Honor, first, the Government
10   moves to admit Exhibits 161, 162, and 163, by agreement of the
11   parties.
12              THE COURT:  Okay.
13              THE CLERK:  161, 162, and 163.
14              (Government Exhibit 161, 162, and 163 received in
15              evidence.)
16              MR. CASEY:  And, Mr. Bruemmer, could I have Exhibits
17   161 and 162 side by side, please.
18   Q.   Special Agent Spice, do you see Exhibit 161 on the left of
19   your screen?
20   A.   I do.
21   Q.   And at the bottom there, is that an email from Liqiang to
22   Dr. Lieber dated September 24th, 2013?
23   A.   Yes, it is.
24   Q.   And does Liqiang reference some attachments to his email?
25   A.   Yes.
```

1    Q.   And what does he reference?

2    A.   "Brief introduction and related pictures."

3    Q.   And do you see Exhibit 162 on the right?

4    A.   Yes.

5         MR. CASEY:  Your Honor, the parties have agreed that

6    the file name associated with Exhibit 162 is "WUT 1 THOUSAND

7    LIEBER 20130924-CN-EN" and that the "created" date associated

8    with Exhibit 162 is September 24th, 2013.

9    Q.   Special Agent Spice, the file name I just read for

10   Exhibit 162, do you see that anywhere on 161?

11   A.   Yes.

12   Q.   Where do you see it?

13   A.   The subject line.

14        MR. CASEY:  Mr. Bruemmer, if we could go to Page 3 of

15   Exhibit 162.  And if you could highlight the second full

16   paragraph, please.

17   Q.   Could you just read the -- why don't you read the whole

18   paragraph, please.

19   A.   "Professor Lieber and Wuhan University of Technology, WUT,

20   have been holding a close collaboration.  He is the Director of

21   the WUT-Harvard Joint Nano Key Laboratory, which was

22   established in 2009.  In the same year, he won the,

23   quote-unquote, the Friendship Award of Chinese government

24   because of his great contribution to scientific research and

25   talent cultivation in China.  In 2011, Professor Lieber was

1    appointed to be, quote-unquote, strategic scientist by WUT.   In

2    2012 Professor Lieber was selected as the, quote-unquote,

3    One Thousand Talent High-Level Foreign Experts.   Professor

4    Lieber has been promoting the development of WUT in talent

5    cultivation, joint research and international cooperation.   The

6    collaboration has gained notable achievements, which can be

7    summarized as follows."

8           MR. CASEY:   Mr. Bruemmer, could we go back to

9    Exhibit -- the split screen.

10   Q.   And does Dr. Lieber, in Exhibit 161, respond to Dr. Mai's

11   email?

12   A.   He does.

13   Q.   And what does he say?

14   A.   "I have reviewed quickly the documents.   I believe they

15   are fine to submit without further change."

16          MR. CASEY:   Mr. Bruemmer, could you replace Exhibit

17   161 on the right with Exhibit 163.   I'm sorry.   Keep 161.   I

18   think I misspoke.   We'll have 161 on the left and 163 on the

19   right.

20          Your Honor, the parties have stipulated that the file

21   name associated with Exhibit 163 is "Lieber pictures 20130924,"

22   with CN and EN caption and that the "created" date was

23   9/24/2013.

24   Q.   Special Agent Spice, do you see Exhibit 163 on the right

25   there?

```
 1   A.   Yes.

 2   Q.   And do you recognize the person in the top picture there?

 3   A.   I do.

 4   Q.   Who is that?

 5   A.   It's Dr. Lieber.

 6            MR. CASEY:  Could we go to the next page.

 7   Q.   Do you see Dr. Lieber in those pictures?

 8   A.   I do.

 9            MR. CASEY:  Next page, please.

10   Q.   Do you see Dr. Lieber in those pictures on Exhibit 163?

11   A.   Yes.

12            MR. CASEY:  Next page.

13   Q.   And are you able to see Dr. Lieber in those the two

14   photographs?

15   A.   I am.

16            MR. CASEY:  All right.  Thank you.  Could we have

17   Exhibit 164, which is not in evidence.  Mr. Bruemmer, I think

18   the top of this is redacted on this one.  If you could redact

19   it here.  Just the top email below the subject line.  Even down

20   further, please.  Right there.  Yes.

21   Q.   Special Agent Spice, do you recognize Exhibit 164?

22   A.   Yes.

23            MR. CASEY:  And if we could go to --

24   Q.   Well, at the bottom there, what do you see there?

25   A.   There's an email correspondence between Dr. Lieber and
```

1    Dr. Mai.

2    Q.   Okay.  And the bottom email, is that from Professor Mai to

3    Dr. Lieber?

4    A.   Yes.

5    Q.   From October 13th, 2013?

6    A.   Yes.

7    Q.   And does Dr. Lieber respond?

8    A.   He does.

9          MR. CASEY:  And could we just go to the second page,

10   please.

11   Q.   And is this Dr. Mai's email, or portions of it, to

12   Dr. Lieber?

13   A.   Yes.

14         MR. CASEY:  Your Honor, I offer Exhibit 164.

15         MR. MUKASEY:  No objection.

16         (Government Exhibit 164 received in evidence.)

17         MR. CASEY:  And Mr. Bruemmer, on Page -- on the page

18   you're on right now, could you please highlight the

19   second-to-last paragraph here.

20   Q.   Do you see that paragraph, Special Agent Spice?

21   A.   Yes.

22   Q.   And is Dr. Mai talking about WUT's ranking?

23   A.   Yes.

24         THE COURT:  I'm sorry.  Who wrote this document?

25   Q.   Who authored this email, Special Agent Spice?

1    A.   Dr. Mai.

2         MR. CASEY:  Okay.  If we could go to Page 1.  At the

3    very bottom there, could you just highlight the text from --

4    there you go.  Thank you.

5    Q.   And could you read the very bottom sentence from

6    Professor Mai?

7    A.   "The following are the updates about your recommendation

8    for foreign academicians of the Chinese Academy of Sciences

9    that President Zhang and I would let you know."

10        MR. CASEY:  And could we highlight the email above

11   that, please.

12   Q.   And can you just read the text of Dr. Lieber's response?

13   A.   "Dear Liqiang:  Thank you for the update, and thank you

14   and President Zhang for your support.  Also, congratulations on

15   the improved ranking of WUT.  This is very nice to see and

16   think that President Zhang deserves great credit for his

17   successful efforts to raise the level of WUT.  Best regards,

18   Charlie."

19        MR. CASEY:  All right.  Could we go to Exhibit 165,

20   not in evidence.  Hold on one second.

21   Q.   Do you see Exhibit 165 in front of you?

22   A.   I do.

23   Q.   And what is that?

24   A.   It's an email from Dr. Lieber to Xiaojie Duan dated

25   November 8th, 2013.

1          MR. CASEY:  Your Honor, I offer Exhibit 165.

2          MR. MUKASEY:  This we're going to object to.  If the

3     Court could just look at it on relevance grounds.

4          THE COURT:  I think that it is relevant, and it will

5     be marked in evidence.  166 is in evidence.

6          (Government Exhibit 165 received in evidence.)

7          MR. CASEY:  Could you just highlight, Mr. Bruemmer --

8          THE CLERK:  Wasn't it 165?

9          MR. CASEY:  165, that's right.

10         THE COURT:  Oh, I'm sorry.  165, yes.

11         MR. CASEY:  Could you just highlight the text of

12    Dr. Lieber's email, including the "Dear" up at the top.  Thank

13    you.

14    Q.   And could you read that, Special Agent Spice?

15    A.   "Dear Xiaojie:  Okay, I've calmed down.  We should talk

16    sometime.  I definitely do not have a good taste or feeling

17    about many, quote-unquote, friends in China anymore.  But that

18    does not mean I have to be negative about everything (I am

19    not), just need to remember that these people want to use me so

20    will let them -- will let that happen verse me" --

21    Q.   I'm sorry.  Does he say "will not let that happen"?

22    A.   "Will not let that happen" -- excuse me -- "verse me using

23    them (but be ever so polite on the outside.)"

24         MR. CASEY:  Thank you.

25         And could we go to Exhibit 166, not in evidence or,

1    actually, I'm sorry, I think the parties are in agreement on

2    this one, so the Government will offer it.

3              MR. MUKASEY:  No objection.

4              (Government Exhibit 166 received in evidence.)

5    Q.   Do you see Exhibit 166 in front of you?

6    A.   Yes.

7    Q.   And is this email from Liqiang Mai to Dr. Lieber dated

8    November 28th, 2013?

9    A.   Yes.

10             MR. CASEY:  And Mr. Bruemmer, if you could highlight,

11   please, the second number one, the one in parentheses right

12   there.

13   Q.   Do you see a reference there to an article?

14   A.   Yes.

15   Q.   Okay.  And what is Dr. Lieber -- oh, I'm sorry -- Dr. Mai

16   asking here?

17   A.   He's asking for -- that the acknowledgments from the

18   Chinese grants be added to the manuscript for the paper.

19   Q.   And do you see a reference to One Thousand Talent here?

20   A.   Yes.

21   Q.   And could you just read the last sentence.  I know it's

22   hard to find it.  I think it says, "About the paper," in the

23   middle there.  Could you read that sentence?

24   A.   Sorry.  I'm trying to find the start.  Oh, there it is.

25             "About this paper, according to President Zhang, it

1    would be appreciated if you let us know the possibility to

2    include National Basic Research Program of China, 2013CB934103;

3    and the International Science and Technology Corporation

4    Program of China, 2013DFA50840, in acknowledgments of this

5    paper during proof, which will be very important and helpful

6    for report and evaluations for your, quote-unquote, One

7    Thousand Talent and these projects.  In consideration of that,

8    some of Lin's research and life cost in Harvard come from these

9    funds.  We will respect your opinion and listen to you."

10           MR. CASEY:  All right.  Could I have Exhibit 167,

11    which the parties agree should be an exhibit.

12           (Government Exhibit 167 received in evidence.)

13    Q.   Do you see Exhibit 167 in front of you?

14    A.   Yes.

15    Q.   And what's the date of this email?

16    A.   November 29th, 2013.

17    Q.   Is that the day after the email we just saw in

18    Exhibit 166?

19    A.   Yes.

20    Q.   And is this from Dr. Lieber?

21    A.   Yes.

22           MR. CASEY:  And Mr. Bruemmer, if you could highlight

23    No. 6 towards the bottom.

24    Q.   And could you -- do you recognize any of the funding

25    referenced in Item 6 from the previous exhibit?

1    A.   I do.

2    Q.   And do they appear to be the same?

3    A.   Yes.

4    Q.   Or at least some of them?

5    A.   Yes.

6         MR. CASEY:  All right.  Could I have Exhibit 59,

7    which I will offer, Your Honor, by agreement of the parties.

8    59.

9         THE COURT:  59, not 159?

10        MR. CASEY:  Just 59, yes.

11        (Government Exhibit 59 received in evidence.)

12   Q.   Is this an email from Dr. Lieber to an individual, Joe

13   Hur?

14   A.   Yes.

15   Q.   And are there some papers attached to this email?

16   A.   Yes.

17        MR. CASEY:  All right.  If we could go to Page 39.

18   Q.   Do you recognize the title of this article?

19   A.   Yes.

20   Q.   Is this the same title of the article referenced by

21   Professor Mai in Exhibit 166?

22   A.   It is.

23   Q.   And is Dr. Lieber one of the authors of this article?

24   A.   Yes.

25   Q.   Is Dr. Mai one of the authors of this article?

1    A.    He is.

2              MR. CASEY:  If you could highlight at the very

3    bottom, please --

4    Q.    Well, actually, do you see -- how many numbers do you see

5    next to Dr. Lieber's name there at the top?

6    A.    Three.

7    Q.    One, two, and three?

8    A.    Yes.

9              MR. CASEY:  If you could highlight the whole bottom,

10   please, Mr. Bruemmer.

11   Q.    Does that indicate to you what affiliations Dr. Lieber was

12   representing --

13   A.    Yes.

14   Q.    -- as having in this particular article?

15              What were they?

16   A.    Department of Chemistry and Chemical Biology, Harvard

17   University, Cambridge, Massachusetts; State Key Laboratory of

18   Advanced Technology for Materials Synthesis and Processing,

19   WUT-Harvard Joint Nano Key Laboratory, Wuhan University of

20   Technology; and, three, School of Engineering and Applied

21   Sciences, Harvard University.

22              MR. CASEY:  If we could go to Page 44.  And could you

23   highlight the "acknowledgment" section, please.

24   Q.    Do you recognize any of the grant numbers in the

25   acknowledgement section here on Exhibit 167?

1   A.   I do.

2   Q.   And how do you recognize them?

3   A.   By the name of -- what we just read in the previous

4   exhibit, the name of the grant as well as the numbers.

5   Q.   These are the grant numbers that Dr. Mai referenced in his

6   email in Exhibit 166?

7   A.   It is.

8        MR. CASEY:  Okay.  Your Honor, at this time, I'll

9   offer Exhibit 168, by agreement of the parties.

10       MR. MUKASEY:  No problem, Judge.

11       THE COURT:  No objection?

12       MR. MUKASEY:  No objection.

13       MR. CASEY:  I'm sorry.  Can you take that down,

14  please.  We'll need to redact the top of the first page on to

15  the second page.

16       Could I just have this for counsel and the witness

17  only, please, while we do some redactions.

18       THE COURT:  I thought there was no objection.

19       MR. CASEY:  There isn't, but we agreed to some

20  redactions that didn't get applied to the document, so I want

21  to make sure they're applied before we show it to the jury.

22       MR. CASEY:  Ms. Urso, this can be published.

23       THE CLERK:  Okay.

24       (Government Exhibit 168 received in evidence.)

25       MR. CASEY:  And if you could just scroll down,

1    Mr. Bruemmer.

2    Q.   Do you see Exhibit 168 in front of you?

3    A.   I do.

4    Q.   And is this an email from Dr. Lieber to Liqiang Mai and

5    others dated December 5th, 2013?

6    A.   It is.

7           MR. CASEY:  And Mr. Bruemmer, could you just highlight

8    Items 1 and 2, please -- or, actually, why don't we start with

9    just 1, Item 1.

10   Q.   Could you read that, please?

11   A.   "I do not want WUT to nominate me again as a foreign

12   member of C-A-S/CAS.  The results from the recent election are

13   an insult to me and all that I have done for Chinese scientists

14   (student through high-level faculty/CAS members) the past

15   15-plus years and my scientific standing worldwide.  In

16   addition, your previous email to me was insulting and to me

17   reflects poor excuses.  I was not even a finalist in the

18   voting, yet the people elected have no comparison to my

19   scientific accomplishments (by any measure) and at least in

20   several cases, have done little for China.  Based on my

21   discussion of CAS members (and nonmembers) at PKU, Tsinghua and

22   ICCAS, I will pursue a different path if I consider this

23   again."

24          MR. CASEY:  And could you highlight No. 2, which goes

25   on to the second page.

1    Q.   And could you read that, please?

2    A.   "2:  Your other points sound good, but actions and results

3    speak much more than empty words to date.  Yes, I am

4    disappointed.  You say a lot, but most of these things could

5    very well be empty promises.  I have done many quantitative

6    things for you and WUT (and as I said at outset, money's an

7    easy thing, and I can get that from any school, although you do

8    owe me salary for the work that I have done from June to now).

9    Also, all the improvements to Joint Lab are things that are

10   very beneficial to you (not me), so do not make it seem like

11   you are doing me some favor.  There is not much else to say.  I

12   will probably arrange a trip to China in the first quarter of

13   2014 (schedule to be determined by meetings with people at PKU

14   and ICCAS) and if a visit to WUT makes sense at that time, we

15   can also arrange details for that.  Sincerely, Charlie."

16            MR. CASEY:  If we could go further down on Page 2.

17   Keep going.

18   Q.   Is Dr. Lieber responding to an email from Professor Mai?

19   A.   Yes.

20            MR. CASEY:  Okay.  And could you just highlight the

21   first paragraph, please, of that email.

22            THE COURT:  Is this said to be the document that he

23   was responding to?

24            MR. CASEY:  Correct.

25            THE COURT:  Why are we doing it in reverse order?

```
 1              MR. CASEY:  I made a mistake.  I apologize.
 2              THE COURT:  Oh, okay.
 3              MR. CASEY:  All right.  We'll have Exhibit 169, which
 4     I'd offer, by agreement of the parties, Your Honor.
 5              THE CLERK:  I'm sorry.  What number was that?
 6              MR. CASEY:  169.
 7              THE CLERK:  Okay, thank you.
 8              (Government Exhibit 169 received in evidence.)
 9     Q.   Is this an exhibit that you recognize, Special Agent
10     Spice?
11     A.   Yes.
12     Q.   And is it an email from Charles Lieber to Xiaojie Duan
13     dated December 8th, 2013?
14     A.   It is.
15              MR. CASEY:  And Mr. Bruemmer, if you could just
16     highlight the paragraph beginning with "My initial proposal."
17     That's perfect.  Thank you.
18     Q.   And could you please read that?
19     A.   "My initial proposal:  Given that I do not want to impose
20     of PKU and I do not want to owe extra time or favors to ICCAS
21     or NCNST (Ying), the simplest thing might be for WUT to pay for
22     all of my travel costs.  I have no problem being tough on this
23     and making short visits such that I can collect "salary" from
24     them, but you might have other thoughts.  Assuming this, my
25     initial suggestion (but completely open to discussion) for
```

1    schedule would be as follows."

2    Q.    And then does he go on to propose a schedule?

3    A.    Yes.

4         MR. CASEY:  All right.  Could I have Exhibit 43, which

5    is not in evidence.

6         THE COURT:  Any objection?

7         MR. MUKASEY:  I have a "hearsay within hearsay"

8    objection, Judge.

9         THE COURT:  So you do object?

10        MR. MUKASEY:  Yes.

11        THE COURT:  Which part of 43 are we talking about?

12        MR. CASEY:  I'm going to focus a little bit

13   on -- there's an email from Dr. Lieber on Page 2.  If you could

14   scroll, Paul.

15        And then the emails between Dr. Lieber and Kathleen

16   Ledyard on Page 1.  So there's an email from Dr. Lieber at the

17   top, and I can ask some questions of the Special Agent, if that

18   would help, Your Honor.

19        THE COURT:  I don't understand the hearsay objection.

20        MR. MUKASEY:  In the sections from Dr. Mai, he refers

21   to statements from yet another person.

22        THE COURT:  So there's no objection to this piece?

23        MR. MUKASEY:  Not Professor Lieber's words, no.

24        MR. CASEY:  And we're not offering Mai's email for the

25   truth; it's just context to establish what Dr. Lieber was

1    responding to.

2           THE COURT:  Well, there's no objection to this.  I

3    don't know the other part of it.

4           MR. CASEY:  Again, we're not focusing on Dr. Mai's

5    email; it's just simply context for what Dr. Lieber's

6    responding to.

7           THE COURT:  Okay.

8           MR. MUKASEY:  Judge, may I make a quick request?

9           THE COURT:  I'm sorry?

10          MR. MUKASEY:  May I make a quick request?  As I

11   understand it, the government is not offering Dr. Mai's email

12   for the truth of the matter asserted; correct?

13          THE COURT:  Simply for the fact that he said it.

14          MR. MUKASEY:  Yes.  Could Your Honor instruct the jury

15   that sometimes things come in for a limited purpose, not for

16   the truth?

17          THE COURT:  Members of the jury, that is a wise

18   request, a difficult one to carry out.  Usually, or most of the

19   time, a document or something, a picture or a thing is offered

20   into evidence in order to assist you to determine the facts in

21   this case.  That's what you ultimately have to do.  And you

22   need the evidence in order to do that.

23          Now, some documents and other exhibits come in not for

24   the truth of what they show, but for something else.  For

25   instance, in this case, I'm not exactly sure what it's being

1    offered for, but it's not to show that the document tells the

2    truth about what happened, but simply it may be that such a

3    document was sent by a particular person.  Do you understand

4    the difference?

5            So it doesn't come to you -- if the document were to

6    say, It was a very hot day when we went to the beach, it isn't

7    offered to show it was a very hot day, but simply that the

8    person who wrote it thought so and that it is relevant to what

9    the person who wrote it thought.  Do you understand the

10   difference?  Okay.

11           MR. MUKASEY:  Thank you, Judge.

12           THE CLERK:  So we're in?

13           THE COURT:  I don't know where we are.

14           MR. CASEY:  I think Exhibit 43 is in, Your Honor, as I

15   understand.

16           THE CLERK:  Okay.

17           (Government Exhibit 43 received in evidence.)

18           MR. CASEY:  Mr. Bruemmer, if we could just go to

19   Page 2, please.

20   Q.   Now, at the bottom half of the page, is that an email from

21   Dr. Lieber to Liqiang Mai and copying Xiang Fan dated

22   January 18th, 2014?

23   A.   Yes.

24           THE COURT:  Now, to put this in context with what I

25   just told the jury, it is not being offered for the truth of

1   what is in this statement but for the fact that he made it for

2   some --

3          MR. CASEY:  Well, this is Dr. Lieber's statement,

4   Your Honor, so we do believe this comes in for the truth.

5          THE COURT:  Okay.

6          MR. CASEY:  And could you just highlight Item No. 2,

7   please, just the top, the first paragraph of that section.

8   Q.   And can you just read the first -- actually, why don't you

9   read the whole paragraph, please.

10  A.   "2, Yunlong Zhao:  If you're still interested in having

11  Yunlong join my group as a joint WUT-HU joint Ph.D. student,

12  like Lin Xu before, I now have the time and space for him to

13  join my group at Harvard.  The previous issue primarily

14  surround my time, and now I do feel I can provide him with the

15  level of guidance that will be necessary of next several years

16  to reach a level necessary to become a good independent

17  scientist junior professor.  The two caveats of this are:  A,

18  WUT and/or Joint Nano Lab would need to support all of his

19  salary and research costs while working in my lab; and, B, he

20  would need to start relatively soon, given the way projects now

21  stand (and opportunities for joining exciting project)."

22         MR. CASEY:  Okay.  If we could go to Page 1, please,

23  Mr. Bruemmer.  And if you could just highlight the --

24  Q.   Well, at the bottom of the page there, the second email

25  from the bottom, is that an email from Charles Lieber to

1    Kathleen Ledyard dated January 23rd, 2014?

2    A.   Yes.

3         MR. CASEY:  And if you could just highlight that,

4    please, Mr. Bruemmer.

5    Q.   And if you could just read the -- just the first paragraph

6    there, please.

7    A.   "Dear Kathleen:  Given need to have people doing research

8    but within context of our financial constraints, I have now

9    agreed that Yunlong Zhao can come here, but as you can see, all

10   salary and research expenses have to be covered by WUT.  On

11   this note, I wonder whether we can extract more money from this

12   agreement in case of Lin (and Yunlong); that is, there are a

13   lot of materials expenses (e.g., photoresists, wafers, metals,

14   gases, et cetera."

15        MR. CASEY:  That's enough, thank you, just to move it

16   along.

17        And then if we could go to the top email, please,

18   Mr. Bruemmer.

19   Q.   Is that another email from Dr. Lieber?

20   A.   Yes.

21        MR. CASEY:  You can highlight the whole thing.

22   Q.   And could you read that, please?

23   A.   "Dear Kathleen:  Well, perhaps if you do not feel too

24   guilty, you can increase it sooner and then increase more than

25   two times when Yunlong comes.  Sources of fundings are there,

1    and they get a tremendous amount from connection with us simply

2    by name, so I feel fine (given their wealth) obtaining more

3    compensation for the lab.  Please go for it.  Best, Charlie."

4              MR. CASEY:  And if we could have Exhibit 44, which is

5    not in evidence.

6              And this will need -- the top email will need to be

7    redacted, please.

8              We're going to offer this with a redaction, Marc.

9              MR. MUKASEY:  Yeah.  No objection.

10   Q.   Special Agent Spice, do you see Exhibit 44 in front of

11   you?

12   A.   Yes.

13   Q.   And at the very bottom there, is that an email from

14   Dr. Lieber to Liqiang Mai dated November -- I'm sorry --

15   January 23rd, 2014?

16   A.   Yes.

17   Q.   And do you see the light-colored text at the top of the

18   email?

19   A.   Yes.

20   Q.   Can you just read that?

21   A.   "To follow up on items not yet covered in recent email."

22   Q.   And above that, does it say, "Dear Liqiang"?

23   A.   Yes.

24              MR. CASEY:  Could we go to the next page,

25   Mr. Bruemmer.  Could you highlight No. 4, please, including

1    that -- thank you.

2    Q.   Could you read No. 4, please?

3    A.   "4:  About your salary, we will pay you half of salary

4    (for current period) in U.S. dollars during your visit to WUT,

5    with remainder deposited into the bank according to your

6    suggestions.  Thank you very much for holding the party during

7    Lin's Ph.D. defense last year.  All the students and faculty

8    feel very honored and encouraged about that.  We respect your

9    suggestions and the (00) will be deducted from half U.S.

10   dollars of salary."  And then it says, "Confirmed."

11              MR. CASEY:  Okay.  And can you highlight the entry

12   No. 6 below that and the light-colored text below that, please.

13   Q.   In the dark-colored text above that, is there a reference

14   to the Nobel prize nomination there?

15   A.   Yes.

16   Q.   Okay.  And can you read the light-colored text below that?

17   A.   "Given the ridiculous response/excuses on CAS foreign

18   associate nomination, you can hardly expect me to take former

19   President Gu's comments seriously, can you?  Are you simply

20   giving people money for nothing, or are they seriously going to

21   do something, and do they really understand how the process

22   works and what is necessary?  I do not have a lot of

23   confidence, given results on CAS, and simply saying you are

24   going to invite someone to do something does not mean they are

25   going to do the job or do the job in a manner that is

1    effective.  I return to the results on CAS foreign associate

2    election as perfect and, easier example."

3              MR. CASEY:  Okay.  Could I have Exhibit 47, please,

4    which is not in evidence.

5    Q.   Do you see Exhibit 47, Special Agent Spice?

6    A.   Yes.

7    Q.   And is that an email from Dr. Lieber to Liqiang Mai and

8    Xiang Fan -- copying Xiang Fan, dated February 22nd, 2014?

9    A.   Yes.

10             MR. CASEY:  Your Honor, I offer Exhibit 47.

11             MR. MUKASEY:  No objection.

12             MR. CASEY:  And could you, Mr. Bruemmer, just

13   highlight the first two paragraphs, please.

14   Q.   And could you read the first sentence, please?

15   A.   "One additional thing that I would like to talk with you

16   (and President Zhang if he has time available) are plans for a

17   nano-bio component of the joint laboratory, especially hiring

18   of faculty."

19   Q.   And is there a particular person he's recommending to

20   Professor Mai here?

21   A.   Yes.

22   Q.   And who is that?

23   A.   Dr. Gao Ning.

24             MR. CASEY:  All right.  Could I have Exhibit 48,

25   which is not in evidence?

1    Q.    Do you see Exhibit 48, Special Agent Spice?

2    A.    Yes.

3    Q.    And what is it?

4    A.    It's an email correspondence between Dr. Lieber and

5    Xiang Fan on June 13th, 2014.

6    Q.    Is the top email in the chain from Dr. Lieber?

7    A.    Yes.

8    Q.    And the bottom email as well?

9    A.    Yes.

10           MR. CASEY:  Your Honor, I offer Exhibit 48.

11           MR. MUKASEY:  No objection.

12           (Government Exhibit 48 received in evidence.)

13           MR. CASEY:  Could you highlight the bottom email for

14   us, Mr. Bruemmer.

15           THE COURT:  I'm sorry?

16           MR. CASEY:  I was just asking Mr. Bruemmer to

17   highlight the bottom.

18   Q.    Is that an email from Dr. Lieber to Xiang Fan dated June

19   12th, 2014?

20   A.    Yes -- no.  2000, yeah, 14.

21   Q.    And what's the subject of the email?

22   A.    "Business Question."

23   Q.    And could you read the email, please?

24   A.    "Dear Fan:  I wanted to get an update on my 'bank account

25   in China.'  The reason I'm asking now is I'm taking quick

1    two-day trip to Beijing, Tianjin, for a U.S. sino-conference in

2    July and might want to use bank card.  The questions are:  One,

3    is the old account, ICBC, still good; and, two, if this old

4    account is no longer active, could you let me know situation

5    with new account that we were applying for during my last visit

6    (which seemed so difficult at bank).  Best, Charlie."

7            MR. CASEY:  And could you go to the next email, please

8    Mr. Bruemmer, and highlight that, please.

9    Q.   And is this a responsive email from Xiang Fan?

10   A.   Yes.

11   Q.   And could you read that, please?

12   A.   "Dear Charlie:  Yes, the old card is still good, and I

13   will check the new card Monday next week.  I am very sorry for

14   the slow pace.  Because the new card is a credit card, it takes

15   more time to finish all process.  It is not very usual for

16   foreign visitors to apply for credit card in the local bank.

17   Hope you could understand.  I am sorry.  With warmest regards,

18   sincerely yours, Fan."

19           MR. CASEY:  We're happy with -- I presume you're going

20   to ask --

21           MR. MUKASEY:  Respectfully, Judge, that's another

22   example of an email, the one that was just read, that's not

23   being offered for the truth but simply to provide some

24   background for Mr. Casey.

25           THE COURT:  Okay.  The jury understands it now; right?

1    Thank you.

2            MR. CASEY:  And Mr. Bruemmer, could you highlight the

3    top email, please.

4    Q.   And is this an email from Dr. Lieber responding to

5    Xiang Fan's email?

6    A.   Yes.

7    Q.   And could you read it, please?

8    A.   "Dear Fan:  It is no problem or rush.  I am happy to use

9    the old card (if needed) in China.  Look forward to seeing you

10   again sometime in the fall.  Your big but not too big brother,

11   Charlie."

12           MR. CASEY:  And could we have Exhibit 49, which is

13   not in evidence?

14           Mr. Mukasey, we're going to redact --

15           MR. MUKASEY:  No objection.

16           MR. CASEY:  Thank you, Ms. Urso.

17           (Government Exhibit 49 received in evidence.)

18   Q.   Do you see Exhibit 49 in front of you?

19   A.   Yes.

20           MR. CASEY:  And if we could go to Page 3, please.

21   Q.   And is that an email from Dr. Lieber to Liqiang Mai,

22   copying Xiang Fan, dated June 11th, 2014?

23   A.   Yes.

24   Q.   And what's the subject?

25   A.   "Update."

```
 1            MR. CASEY:  If you could just highlight the first
 2   paragraph under, "Dear Liqiang."
 3   Q.   And could you read that, please?
 4   A.   "We have not talked in some time, and I wanted to provide
 5   you with a brief update of things.  Overall, I am under a
 6   little less stress now, given that my health is better, so it
 7   is possible to devote more time to research.  With regards to
 8   the WUT-Harvard Joint Lab collaboration and students, here is a
 9   brief summary."
10            MR. CASEY:  And could you just zoom out, please.
11   Q.   And do you see some names referenced below that?
12   A.   Yes.
13   Q.   And could you read the names?
14   A.   "One, Xu Lin; two, Zhao Yunlong; three, Gao Ning."
15            MR. CASEY:  And could we go to the next page, please,
16   Mr. Bruemmer.  And could you highlight just the very first
17   paragraph under Item No. 4.
18   Q.   And does Dr. Lieber reference another person joining his
19   laboratory here?
20   A.   Yes.
21            MR. CASEY:  All right.
22            THE COURT:  Is this a good time to stretch?
23            MR. CASEY:  It's a great time.
24            (Stretch break.)
25            THE COURT:  You may proceed.
```

1          MR. CASEY:  Mr. Bruemmer, could we just go to the

2     first page of Exhibit 49.

3     Q.   And the email at the bottom there, is that an email from

4     Dr. Lieber to Liqiang Mai dated June 16th, 2014?

5          MR. CASEY:  And Mr. Bruemmer, could you just

6     highlight the first very two sentences there, please.

7     Q.   Special Agent Spice, could you read that, please?

8     A.   "Dear Liqiang:  Congratulations on passing the Defense for

9     National Science Fund for Distinguished Young Scholars.  I am

10    very happy for you and proud of how well you have done the past

11    several years.  I agree on points for Lin, Yunlong, and Ning.

12    We will stay in touch, and I will do my very best to help them

13    achieve at highest level."

14         MR. CASEY:  All right.  And could we have -- I'll

15    offer Exhibits -- I'll offer Exhibit 50, by agreement of the

16    parties, Your Honor.

17         (Government Exhibit 50 received in evidence.)

18    Q.   Do you see Exhibit 50, Special Agent Spice?

19    A.   Yes.

20    Q.   And the bottom email, is that from Charles Lieber to Fan?

21    A.   It is.

22         MR. CASEY:  And Mr. Bruemmer, if you could just

23    highlight that, please.

24    Q.   What's the date of that email?

25    A.   June 16th, 2014.

1    Q.   And could you read that, please?

2    A.   "Dear Fan:  If it is not too much trouble, maybe it would

3    be better to simply keep my bank account the way it has been

4    for now (even though I know this means more taxes) as it would

5    probably be easier for me just to keep.  We could then do

6    similar thing during visit (independent of how deposited into

7    account):  One, half of the amount for period into account;

8    and, two, about half of amount for period in cash to me.  I

9    think this is close to what have been done in the past.  Thank

10   you, Charlie."

11        MR. CASEY:  And could you go to the next email,

12   please, Mr. Bruemmer.

13   Q.   Is this another email from Charles Lieber to Fan?

14   A.   Yes.

15   Q.   And could you read this email:

16   A.   "Dear Fan:  After discussing this more, I definitely would

17   like to keep my existing bank account and bank card (not have

18   credit card).  It will be much simpler for me, even if there is

19   a tax disadvantage.  Hopefully, you can confirm this will be

20   okay within the next week or so.  Sorry about any trouble this

21   causes.  Best, Charlie."

22        MR. CASEY:  Could I have -- could I have Exhibit 52,

23   which I'll move to admit, by agreement of the parties,

24   Your Honor.

25        MR. MUKASEY:  No objection.

```
 1              (Government Exhibit 52 received in evidence.)
 2    Q.   Do you see Exhibit 52, Special Agent Spice?
 3    A.   Yes.
 4    Q.   And the bottom email there, who is that from and to?
 5    A.   It's from Xiang Fan to Dr. Lieber dated -- it's actually
 6    quite -- 2014, November 5th, 2014.
 7              MR. CASEY:  And could you highlight that, please,
 8    Mr. Bruemmer, the text of the email.
 9    Q.   And could you read that, please, Special Agent Spice?
10              THE COURT:  Which part?  The whole thing?
11              MR. CASEY:  I'll probably have her stop close to the
12    bottom, but I think we'd like to read most of it.
13              MR. MUKASEY:  And, again, Judge, I don't think this is
14    being --
15              THE COURT:  I'm sorry?
16              MR. MUKASEY:  I don't think this is being offered for
17    the truth of the matter conveyed in it.
18              THE COURT:  Well, it's a statement by the -- I
19    gather -- no.  By somebody to the Defendant.
20              MR. MUKASEY:  By somebody in China to the Defendant,
21    so it doesn't come in for the truth.
22              THE COURT:  So it's whatever the person said that may
23    or may not be true.
24              MR. MUKASEY:  Thank you.
25              THE COURT:  It's for context.
```

1    Q.   Go ahead, Special Agent.

2    A.   "Dear Charlie:  It's such an exciting thing that you will

3    come to visit our University next week.  Thank you very much

4    for sparing your valuable time to come.  I am sure you will

5    have another very busy schedule in China again.  If you do not

6    mind, I would like to give some explanation about the payment

7    in 2014.  From January, 2014, the payment has gone to your

8    account monthly, as I had told you when you visit in March.

9    The payment goes to your account ten times a year, as planned.

10   Exactly speaking, the payments go to your account in January,

11   March, April, May, June, July, September, October, November,

12   December, except February and August because it is interrupted

13   by the winter or summer vacation.  Payment of all other months

14   are going smoothly, except March because of the fault

15   processing in the Financial Department.  The payment in March

16   will go to your account in December, 2014; or January, 2015.  I

17   am very sorry for this mistake, and we are making it up.

18   Because of the change of way of paying, all amounts will go

19   directly to your account.  I wonder whether you still want to

20   exchange a part of the total amount into U.S. dollar, cash.  If

21   so, I wonder how much you want to exchange.  It is still half

22   of the total amounts?  We would help to prepare in advance if

23   you could suggest.  We can talk about this by phone or other

24   way you suggest if you think it is better.  I could call any

25   time or other way when you are available.  Thank you again,

1    with warmest regards."

2          MR. CASEY:  And Mr. Bruemmer, if you could highlight

3    the email at the top of the exhibit.

4    Q.   Is this Dr. Lieber's response?

5    A.   Yes.

6    Q.   And could you read it, please?

7    A.   "Dear Fan:  For this business email, my preference, if it

8    can be arranged without taking too much time from day, is to

9    have half of payment since last visit or past half year is

10   easier in U.S. dollars.  If this does not work out this visit,

11   given short time, then we can do it so for next visit.  Best,

12   Charlie."

13         MR. CASEY:  Your Honor, I offer Exhibit 4, by

14   agreement -- or Exhibit 54, by agreement of the parties.

15         THE COURT:  6-4, did you say?

16         MR. CASEY:  5-4.

17         THE COURT:  I'm sorry.

18         (Government Exhibit 54 received in evidence.)

19   Q.   Do you see Exhibit 54, Special Agent Spice?

20   A.   Yes.

21   Q.   And the second email in the chain, is that an email from

22   Ning Gao to Charles Lieber dated November 13th, 2014?

23   A.   Yes.

24   Q.   And at the bottom, do you see where it says, "Sorry"?

25   A.   Yes.

1    Q.   Can you read that?

2    A.   "Sorry for your busy schedule.  Will you leave Wuhan

3    soon?"

4         MR. CASEY:  And then could you highlight the top

5    email, Mr. Bruemmer, please.

6    Q.   Is this Dr. Lieber's response?

7    A.   Yes.

8    Q.   And could you read that, please?

9    A.   "Yes, I will be leaving for airport in about 20, 30

10   minutes.  Keep pushing hard on your paper and experiments,

11   Ning.  Best, Charlie."

12        MR. CASEY:  All right.  I'll offer Exhibit 55, by

13   agreement of the parties.

14        (Government Exhibit 55 received in evidence.)

15   Q.   Do you see Exhibit 55?

16   A.   Yes.

17   Q.   Is this an email from Charles Lieber to Liqiang Mai,

18   copying Xiang Fan, dated November 14th, 2014?

19   A.   Yes.

20        MR. CASEY:  And Mr. Bruemmer, could you just

21   highlight the top where it says, "Dear Liqiang," the first two

22   sentences there.

23   Q.   Special Agent Spice, could you read that, please?

24   A.   "Dear Liqiang:  I wanted to follow up on a couple of

25   points per our discussion at Wuhan and on plane to Beijing.

1   Overall, I think the visit was very productive, although

2   tiring.  Perhaps make day a little shorter next time or give me

3   a little free time during day.  And I very much appreciate the

4   effort that you, Fan Xiang, and President Zhang put into making

5   the visit a good one.  Thank you."

6           MR. CASEY:  If you could scroll down so we can see the

7   bottom of Page 1 on to Page 2.  And could you highlight No. 6,

8   please.

9   Q.   Could you read that, Special Agent Spice?

10  A.   "6:  Last but not least, I want to remind you about what I

11  said/requested in terms of support for nomination by WUT.  This

12  takes serious effort on your parts and needs to follow in part

13  the points I have made to you to have most impact.  In the end,

14  this can benefit both me and WUT a lot of successful, so it's

15  worthwhile to take seriously.  The time to push is now.  Best,

16  Charlie."

17          MR. CASEY:  Could I have Exhibit 60, which is not in

18  evidence?

19          THE COURT:  Any objection?

20          MR. MUKASEY:  We do have a hearsay objection, Judge.

21  This is an email to which -- it was sent to Dr. Lieber to which

22  he did not respond.

23          THE COURT:  I'm sorry.  What is being offered?  The

24  whole thing?

25          MR. CASEY:  The whole thing, Your Honor.  The top

1   email --

2           THE COURT:  The letter to --

3           MR. CASEY:  So the bottom email is from Professor Mai

4   to Liqiang.  The top is --

5           THE COURT:  Well, which part are you offering?  Both

6   letters?

7           MR. CASEY:  Correct.  We're offering the top letter,

8   the response.  It's relevant to the Defendant's state of mind;

9   not for the truth, but his state of mind.

10          MR. MUKASEY:  Again, I don't see -- and I don't mean

11  to --

12          THE COURT:  Whose state of mind?

13          MR. CASEY:  The Defendant's.  It's a response to the

14  Defendant's email, answering a question that he asked.

15          THE COURT:  It's hard for me to see how the answer can

16  be the Defendant's state of mind.  The bottom part certainly

17  could be.

18          MR. CASEY:  Could I just be heard briefly, Your Honor?

19          THE COURT:  I'm sorry?

20          MR. CASEY:  Could I just be heard very briefly on

21  that?

22          The bottom email is Dr. Lieber asking a question of

23  Professor Mai.  The top email --

24          THE COURT:  The top is the answer?

25          MR. CASEY:  -- the top is the answer, and so the

 1    answer to the question reflects Dr. Lieber's state of mind,

 2    what he understood about what he was asking.

 3            THE COURT:  Well, that's not unreasonable, and I can

 4    explain that to the jury; but I didn't understand that the

 5    bottom would trump the top.

 6            MR. CASEY:  Yeah, they're both connected.  And I think

 7    Your Honor could instruct the jury that the top is not to be

 8    considered for the truth; it's just relevant to what Dr. Lieber

 9    thought in response to his question.

10            THE COURT:  Or what he said he thought?

11            MR. MUKASEY:  I don't want to waste time.  I just want

12    to say that, if I send an email to you, I'm not sure how it's

13    relevant to what's in your head.  You might not even have read

14    it.

15            THE COURT:  Well, certainly the one that Dr. Lieber

16    wrote is admissible; correct?

17            MR. MUKASEY:  Correct.

18            THE COURT:  So the only question is if the other

19    one --

20            MR. MUKASEY:  Correct.

21            THE COURT:  -- the top one that would follow the

22    bottom one --

23            MR. MUKASEY:  Correct.

24            THE COURT:  -- is admissible.

25            Are you proposing to start with the top or the bottom?

1          MR. CASEY:  I'm proposing to have the Agent read the

2    bottom email and then read the top email, which is responsive,

3    as circumstantial evidence of what the Defendant thought.  He's

4    asking a question, and he's receiving an answer.

5          THE COURT:  I don't know about that, but I think it's

6    admissible in response to whatever he -- was said to him --

7    no -- what he said.  But it's somebody else's state of mind,

8    not his, if it's anybody's state of mind; right?

9          MR. CASEY:  Our --

10          THE COURT:  The top is not a statement by Mr. Lieber?

11          MR. CASEY:  Correct, and we're not offering it for the

12    truth; we're just simply offering it for the effect on

13    Dr. Lieber.

14          MR. MUKASEY:  It had no effect.

15          THE COURT:  I don't understand how somebody else's

16    document can have any -- can, by itself, have an effect on him

17    without knowing what the effect is.

18          MR. CASEY:  Well --

19          THE COURT:  If the order in which they were written

20    was that Dr. Lieber wrote first and then he got a response,

21    that doesn't tell us what his state of mind is with respect to

22    the response.

23          MR. CASEY:  Fair enough.  We don't want to spend a lot

24    of time on it either.  We're happy redacting the top, if

25    Your Honor is not going to admit it.

1          MR. MUKASEY:  Fair enough.  Thank you.

2          MR. CASEY:  So we'll redact just the top please of

3     Exhibit 6.

4          THE COURT:  Did you understand any of that?  It's very

5     complicated because any party in a trial has a right to offer

6     statements of the other party under certain circumstances if

7     they're made for various purposes; and sometimes they come in,

8     sometimes they do not, depending on who is -- who made them,

9     for what purpose they're offered, and what the circumstances

10    were under which these documents were created.

11         So it's a difficult journey for somebody like me who

12    has no understanding of the facts of this case until they come

13    out in court at the same time that you hear them.  So that's

14    why I have the colloquy with counsel, to find out really, what

15    is this being offered for, and under what circumstances were

16    they created?  So thank you.

17         MR. CASEY:  Thank you.  Can we publish Exhibit 60,

18    which I understand is admitted?  Any objection, Mr. Mukasey, to

19    Exhibit 60?

20         THE COURT:  I thought there was an objection to

21    the -- not to Dr. Lieber's statement but to the other one.

22         MR. CASEY:  I guess we could take it away from the

23    jury to resolve this.  We've redacted the top.

24         MR. MUKASEY:  Yes, no problem.

25         MR. CASEY:  Thank you, Ms. Urso.

1           (Government Exhibit 60 received in evidence.)

2    Q.    Do you see Exhibit 60, Special Agent Spice?

3    A.    Yes.

4    Q.    And is that an email from Dr. Lieber to Liqiang dated

5    January 27th, 2015?

6    A.    Yes.

7           MR. CASEY:  And Mr. Bruemmer, could you just highlight

8    the bottom portion beginning with, "I want."

9    Q.    And could you read that?

10   A.    "I want to make sure that our current arrangements as far

11   as time, my commitments, will be okay with WUT.  Specifically,

12   I will still only visit several times a year (perhaps slightly

13   more in the next couple years as we try to build up the

14   nano-bio part of the Lab but will be available for electronic

15   communication on a very regular basis with students, email,

16   telephone, Skype, so that they obtain full input from me as an

17   advisor.  Of course those students visiting for periods at

18   Harvard would have same access as normal Harvard graduate

19   students.  Please confirm that this arrangement will be okay

20   with WUT, as we have done in past for Joint Laboratory.

21   Regards, Charlie."

22          MR. CASEY:  Could I have Exhibit 63, which is in

23   evidence?

24   Q.    Special Agent Spice, is this an email from Dr. Lieber to

25   Liqiang Mai, copying Jeremy Bloxham, dated February 3rd, 2015?

1    A.    Yes.

2                MR. CASEY:  And could you just -- okay.

3                And then, if we could go to Exhibit 62, which is not

4    in evidence.

5                THE COURT:  Any objection?

6                MR. MUKASEY:  No objection.

7                (Government Exhibit 62 received in evidence.)

8    Q.    Do you see Exhibit 62?

9    A.    Yes.

10   Q.    The bottom email from Dr. Lieber, is that the email we

11   just saw in Exhibit 63?

12   A.    It is.

13   Q.    And who is the top email from in 2?

14   A.    It's from Dr. Lieber to Xiaojie Duan.

15   Q.    And what's the date?

16   A.    February 3rd, 2015.

17               MR. CASEY:  Could you highlight the email for us,

18   Mr. Bruemmer.

19   Q.    And could you read it, please, Special Agent Spice?

20   A.    "Dearest Xiaojie:  I sent the following to Mai with cc to

21   Dean Bloxham.  I decided it was best to do this proactively

22   verse perhaps waiting to get some reprimand from Dean so that

23   he knows my word is good.  I cannot afford to lose trust of

24   administration colleagues.  I would have liked to have

25   discussed with you first but did not think, based on your

1    message, that we will have time to talk on phone in near

2    future.  Your, CL."

3    Q.   Okay.  What's the date of that email?

4    A.   February 3rd, 2015.

5             MR. CASEY:  All right.  I'll offer Exhibit 66,

6    Your Honor, by agreement of the parties.

7             (Government Exhibit 66 received in evidence.)

8    Q.   Do you see Exhibit 66, Special Agent Spice?

9    A.   Yes.

10   Q.   And is this -- the top email, is that from Charles Lieber

11   to Jinlin Huang dated February 6th, 2015?

12   A.   Yes.

13   Q.   And is that just approximately three days after the email

14   we just saw in Exhibit 65?

15   A.   Yes.

16            MR. CASEY:  And could you highlight the top email for

17   us, Mr. Bruemmer.

18   Q.   And could you read that, please?

19   A.   "Dear Jinlin:  Thank you for your thoughtful comments on

20   this.  I very much appreciate your help and insight.  Please do

21   not feel you need to rush with translation, and I will

22   appreciate whatever you can do when it gets finished.  Part of

23   issue for me is that, because I am going to be Chair of CCB

24   soon and also have formal collaboration with Professor Mai,

25   WUT, I need to be especially careful.  Last thing needed is

1   negative publicity or worse when mostly trying to help Mai.

2   Best, Charlie."

3              MR. CASEY:  And if we could just go to the second

4   page.

5   Q.   Is the first email in this chain --

6              MR. CASEY:  Just scroll up just a bit, Mr. Bruemmer,

7   please.

8   Q.   The first email chain, is that from an individual

9   identified as Fangy?

10  A.   Yes.

11  Q.   To Dr. Lieber?

12  A.   Yes.

13  Q.   And at the bottom there is the name "Ying Fang"?

14  A.   Yes.

15  Q.   And what's the email discussing?  Well, why don't you just

16  read the first two sentences.

17  A.   Okay.

18             MR. MUKASEY:  Judge, I'm going to object to this piece

19  because it comes from somebody in China speaking to Dr. Lieber.

20  I think it should be redacted.  It's got no proper evidentiary

21  basis to be in for the truth of the matter asserted.

22             THE COURT:  It has no what?

23             MR. MUKASEY:  It has no proper evidentiary basis to be

24  in for the truth of what it says.  It's an email from a guy in

25  China.

```
 1              THE COURT:  This is the particular document that is
 2      below what is Exhibit 66?
 3              MR. MUKASEY:  It's the last one on 66.
 4              MR. CASEY:  This email is just the context for what
 5      Dr. Lieber was responding to, which we just read.  It's not
 6      offered for the truth.
 7              THE COURT:  Okay.
 8              MR. MUKASEY:  We're going to hopefully tell the jury
 9      it's not offered for the truth.
10              THE COURT:  I don't even know what it says yet.
11              MR. MUKASEY:  It's the one that starts, "Dear
12      Charlie."
13              THE COURT:  Well, whatever this document says -- and I
14      think you are already reading it -- it is being offered not to
15      show that what is in there is in fact the case; it is being
16      offered to show, I think, the state of mind of somebody; right?
17      Who?
18              MR. CASEY:  Correct.  That's right.
19              THE COURT:  Whose state of mind?
20              MR. CASEY:  It's offered for Dr. Lieber's state of
21      mind and to show the context of what he was responding to
22      above.  We can't understand what Lieber is saying unless we --
23              THE COURT:  Well, it can only show context and whether
24      it is -- I mean, I guess, since he gets it, he will have some
25      thoughts about it --
```

```
 1              MR. CASEY:  That's right.
 2              THE COURT:  -- is the idea.  And the thoughts that he
 3    may have are not directly before us, but you have this evidence
 4    that suggests that he may have thoughts.
 5              MR. CASEY:  That's right.
 6              And could you highlight that email on the top of
 7    Page 2, please.
 8    Q.   And could you just read the first two sentences, please?
 9    A.   "Dear Charlie:  I did some search this morning.  Below are
10    two links accusing WHUT for corruption, and Liqiang's name was
11    mentioned in both articles.  XYS and MITBBS are both major
12    Chinese websites aboard."
13    Q.   And can you read the very last sentences of the email,
14    please?
15    A.   "I don't know how much damage these accusations can do,
16    but I definitely don't want anything to happen to you.  Ying."
17              MR. CASEY:  All right.  Your Honor, I offer
18    Exhibit 68, by agreement.
19              (Government Exhibit 68 received in evidence.)
20    Q.   Do you see Exhibit 68, Special Agent Spice?
21    A.   Yes.
22    Q.   And the bottom email, is that an email from Liqang Mai to
23    Charles Lieber dated February 13th of 2015?
24    A.   Yes.
25    Q.   And is this just shy of a couple weeks after the email we
```

1    just saw in Exhibit 66?

2    A.   Yes.

3    Q.   And the top email, is that from Dr. Lieber responding to

4    Liqiang?

5    A.   Yes.

6         MR. CASEY:  And could you highlight that, please,

7    Mr. Bruemmer.

8    Q.   Could you read that, please, Special Agent Spice?

9    A.   "Dear Liqiang:  Sorry about delayed response.  Please feel

10   free to submit, if you have not done so already.  In addition,

11   I may be in touch with regards to several issues relating to my

12   appointment, salary, funding at WUT and that of Gao Ning.

13   Best, Charlie."

14        MR. CASEY:  All right.  If we could go to Exhibit 69,

15   which is not in evidence.

16        THE COURT:  But there's no objection; right?

17        MR. MUKASEY:  We have an objection.  404(b), Judge.

18        THE COURT:  You have an objection to the text of this?

19        MR. MUKASEY:  Yes.  We think it goes to a collateral

20   issue not relevant to the actual charges.

21        THE COURT:  But there's been evidence of this already.

22   I mean, it's come in already.

23        MR. MUKASEY:  I think it's the forwarding of the email

24   that we're objecting to, Judge.

25        THE COURT:  I'm sorry?

1          MR. MUKASEY:  It's the forwarding of the email that

2    we're objecting to, sending it on to China.

3          THE COURT:  I mean, the part that is being offered, as

4    I understand it, is the part that is addressed to, "Dear

5    Colleagues;" correct?

6          MR. CASEY:  Correct.  We do think the top email has

7    some relevance, which I think will become more evident later

8    on, so I'd ask --

9          THE COURT:  I'm sorry.  What will have relevance?

10         MR. CASEY:  The forward of the email to the individual

11   at the top of the exhibit, Exhibit 69.  We'd ask for a little

12   bit of leeway, or at least a conditional admittance, for a

13   reason that I think will become apparent.

14         THE COURT:  Well, then, we can add it when we need to

15   add it.  But I think that the part at the bottom -- I mean, I

16   didn't even realize there was a -- the very faint piece is the

17   one that you're insisting on?

18         MR. CASEY:  Yeah, why don't we start -- we're happy to

19   redact the top to start and then --

20         THE COURT:  Just start with "I'm delighted."  Is that

21   the part?

22         MR. CASEY:  Sure, yeah.

23         THE COURT:  And this is an email from the Dean who was

24   a witness yesterday to I don't know exactly whom, a pile of

25   people.

1            MR. CASEY:  Mr. Mukasey, are you fine with that

2    redaction?

3            MR. MUKASEY:  Yes.

4            THE CLERK:  We're all good?

5            MR. CASEY:  So I move to admit Exhibit 69, as

6    redacted.

7            MR. MUKASEY:  No objection.

8            (Government Exhibit 69 received in evidence.)

9    Q.   Do you see Exhibit 69, Special Agent Spice?

10   A.   Yes.

11           THE COURT:  Now, this is -- and we should identify

12   what it is.  I'm not sure that we've done that.

13           MR. CASEY:  Yep.

14   Q.   Is this an email from Dean Jeremy Bloxham to a number of

15   individuals?

16   A.   Yes.

17   Q.   Okay.  And what's the date of the email?

18   A.   March 4th, 2015.

19   Q.   And the subject?

20   A.   "Chair Announcement."

21   Q.   And could you just read the first couple of sentences

22   there?

23   A.   "Dear Colleagues:  I am delighted to announce that

24   Charles Lieber, my kind and junior professor of chemistry, has

25   agreed to become the next Chair for CCB for a five-year term

1    beginning July 1, 2015."

2         MR. CASEY:  All right.  Could we go to Exhibit 71,

3    which is not in evidence.

4    Q.   Do you see Exhibit 71, Special Agent Spice?

5    A.   Yes.

6    Q.   And what is it?

7    A.   It's an email between -- well, it starts with from Dr. Mai

8    to Dr. Lieber on April 4th, 2015; and then it's sent to

9    Dr. -- there's a response from Dr. Lieber to Dr. Mai and others

10   on April 6th, 2015.

11   Q.   So the top email in the chain is an email from Dr. Lieber

12   to Professor Mai?

13   A.   Yes.

14   Q.   And is Ning Gao -- well, Xiang Fan is copied, and Ning Gao

15   is blind-copied?

16   A.   Yes.

17         MR. CASEY:  Your Honor, I offer Exhibit 71.

18         MR. MUKASEY:  No objection.

19         (Government Exhibit 71 received in evidence.)

20   Q.   So the bottom email in the chain, is that an email from

21   Professor Mai to Dr. Lieber copying Ning Gao dated April 4th,

22   2015?

23   A.   Yes.

24   Q.   So this is about a month after the exhibit we just saw

25   announcing Dr. Lieber as the Chair?

1    A.    Yes.

2            MR. CASEY:  And could you highlight the top email,

3    please, Mr. Bruemmer.

4    Q.    Is this Dr. Lieber's response?

5    A.    Yes.

6    Q.    And could you read that, please?

7    A.    "Dear Liqiang:  I received your email.  I will be unable

8    to respond in detail at this time, given my other commitments,

9    e.g., as Chair, and will only make the following remarks:

10   First, I would like to discuss this email and matter during

11   next visit; second, given that all of my comments on bio nano

12   were depending on working with Ning Gao, you should now put

13   this on hold as related to my involvement.  Best regards,

14   Charlie."

15           MR. CASEY:  All right.  Could I have Exhibit 78,

16   please, not in evidence.

17   Q.    Special Agent Spice, is Exhibit 78 an exchange of emails

18   between Dr. Lieber and Liqiang Mai from November of 2015?

19   A.    They are.

20           MR. CASEY:  I offer Exhibit 78, Your Honor.

21           MR. MUKASEY:  I don't have an objection to this.

22           THE COURT:  I'm sorry?

23           MR. MUKASEY:  No objection.

24           THE COURT:  Okay.

25           (Government Exhibit 78 received in evidence.)

1          MR. CASEY:  Mr. Bruemmer, could you just highlight the

2     bottom email, please.

3     Q.   And could you please read Professor Mai's email to the

4     Defendant, or at least the first -- let's start with the first

5     two sentences.

6     A.   "Dear Charlie:  President Qingjie Zhang let me send you

7     the warmest and sincerest congratulations to you.  Just now we

8     are very happy and honored to get the news that you have

9     unanimously passed the votes for foreign academician candidates

10    of CAS at 11:00 a.m. today.  And all the voters give you the

11    highest evaluation for your world-leading achievement, great

12    contribution to the development for science and technology, the

13    high-level talent training for China and your One Thousand Plan

14    program and fruitful high-level collaboration achievements

15    between you and WUT."

16         MR. CASEY:  And could we just go to the top email,

17    please, Mr. Bruemmer.

18    Q.   Is this Dr. Lieber's response?

19    A.   Yes.

20    Q.   And could you read it?

21    A.   "Dear Liqiang:  Thank you.  FYI, the reason for the

22    election is due to my friends and support at Peking University

23    and National Center of Nanoscience and Technology.  This had

24    nothing to do with WUT.  So do not try to take any credit for

25    this.  From my perspective, you have not fulfilled your

1    promises to me, despite all that I have done for WUT.

2    Sincerely, Charlie."

3            MR. CASEY:  All right.  Could we go to Exhibit 79,

4    not in evidence?

5    Q.   Is Exhibit 79 an exchange of emails between Dr. Lieber and

6    Liqiang Mai dated November 20th, 2015?

7    A.   Yes.

8    Q.   And that's approximately one week or so after the email we

9    just reviewed?

10   A.   Yes.

11           MR. CASEY:  Your Honor, I offer Exhibit 79.

12           MR. MUKASEY:  No objection.

13           (Government Exhibit 79 received in evidence.)

14           MR. CASEY:  Mr. Bruemmer, could you just highlight

15   the bottom email, please.

16   Q.   And Special Agent Spice, could you just begin reading the

17   email down through the end of that first long paragraph,

18   please, ending in "Chinese partners."

19   A.   So starting at, "Just like"?

20   Q.   I'm sorry.  Beginning with, "Dear Charlie," ending at that

21   first -- at the end of that first long paragraph where the

22   mouse is.

23   A.   Okay.

24           "Dear Charlie:  Here I am sending the follow note and

25   kind invitation from State Administration of Foreign Experts

1    Affair.  Just like what the leader of One Thousand Plan Program

2    discussed with you in Wuhan last year, State Administration of

3    Foreign Experts Affair, SAFEA, gives you the highest evaluation

4    for your very success One Thousand Plan Program and fruitful

5    high-level collaboration achievements between you and Chinese

6    institutions, as well as your world-leading achievement, great

7    contribution to the development of science and technology, the

8    high-level talent training for China.  They are very happy to

9    know that you agree to continue to keep your good

10   collab" -- sorry -- "keep good collaborations with your

11   partners in China.  SAFEA is planning to provide further full

12   support to you in collaboration research, traveling,

13   corresponding high-level salary by 'Top-Level Foreign Experts

14   Program,' which is a follow-up program of 'One Thousand Plan

15   Program' to award the distinguished 'One Thousand Plan Program'

16   experts and the high-level collaboration achievements between

17   foreign experts and Chinese partners."

18            MR. CASEY:  And could we go to the top email, please.

19            THE COURT:  I'm sorry?

20            MR. CASEY:  I'm just directing Mr. Bruemmer to expand

21   that top email.

22            Thank you.

23   Q.   Is this Dr. Lieber's response?

24   A.   Yes.

25   Q.   And could you read it, please?

1    A.    "Dear Liqiang:  At the present time, I cannot agree to

2    participation in 'Top-Level Foreign Experts Program.'

3    Sincerely, Charlie."

4             MR. CASEY:  Could I have Exhibit 82, not in evidence?

5             THE COURT:  Any objection?

6             MR. MUKASEY:  No, not as redacted.

7             MR. CASEY:  Thank you.

8             (Government Exhibit 82 received in evidence.)

9    Q.    Do you see Exhibit 82, Special Agent Spice?

10   A.    Yes.

11   Q.    And the bottom email, is that an email from Liqang Mai to

12   Dr. Lieber dated January 13th, 2016?

13   A.    Yes.

14   Q.    And is he extending an invitation essentially to

15   Dr. Lieber?

16   A.    Yes.

17            MR. CASEY:  And Mr. Bruemmer, could you highlight

18   Dr. Lieber's response, please.

19   Q.    Could you read that, please, Special Agent Spice?

20   A.    "Dear Liqiang:  Per my previous discussion with you, I am

21   not willing to be a member of the Committee.  You would like to

22   use my name, and this does nothing for me.  In fact, you did

23   not follow through on previous promises of what you, WUT, would

24   do for me while I gave significant help to you and your

25   students.  Please do not ask me further for such one-sided

 1   arrangements.  I am not interested in your selfish behavior.

 2   Sincerely, Charlie."

 3         MR. CASEY:  All right.  Could I have Exhibit 89?  And

 4   I'll offer it, Your Honor, by agreement.

 5         MR. MUKASEY:  No objection.

 6         (Government Exhibit 89 received in evidence.)

 7   Q.   Do you see Exhibit 89 --

 8   A.   Yes.

 9   Q.   -- Special Agent Spice?

10   A.   Yes.

11   Q.   And the bottom email, is that an email from Amy Mousseau

12   to Dr. Lieber, copying Benjamin Hochberger, dated April 20th,

13   2013?

14   A.   It is.

15   Q.   And is Amy Mousseau -- does she identify herself as a

16   Special Agent with the Department of Defense, Office of

17   Inspector General?

18   A.   Yes.

19   Q.   And is she asking to set up a meeting with Dr. Lieber?

20   A.   She is.

21         MR. CASEY:  And could you highlight the email at the

22   top of the chain, please, Mr. Bruemmer.

23         THE COURT:  I'm sorry?

24         MR. CASEY:  I'm just asking Mr. Bruemmer to highlight

25   that top email.

1   Q.   Is this an email from Dr. Lieber to Ning Gao?

2   A.   Yes.

3   Q.   And could you read it, please?

4   A.   "Dear Ning:  In case I do not seem happy, under more

5   stress than normal, see this email out of blue I got while

6   traveling to UIUC, see two highlights below.  I need to meet

7   with them tomorrow (I am not trying to get support from Harvard

8   because I have no idea what this is about" -- "(I am trying to

9   get support from Harvard because I have no idea what this is

10   about).  Normally these things always go through

11   Harvard-sponsored research administration, and then they and

12   then Government official meet with faculty, et cetera.  (I have

13   been audited before, but that is not a big deal.  I am worried

14   about this.  Charlie."

15   Q.   And what's the date of that email?

16   A.   April 23rd, 2018.

17        MR. CASEY:  Your Honor, I move to admit Exhibit 93, by

18   agreement.

19        Any objection, Mr. Mukasey?

20        MR. MUKASEY:  No objection.

21        (Government Exhibit 93 received in evidence.)

22   Q.   Do you see Exhibit 93, Special Agent Spice?

23   A.   Yes.

24   Q.   And is it an email from Dr. Lieber to Ning Gao dated

25   April 26th, 2018?

1    A.   Yes.

2    Q.   Is that approximately three days after the email we just

3    looked at in the prior exhibit?

4    A.   Yes.

5         MR. CASEY:   And could you just expand that for us,

6    Mr. Bruemmer.

7    Q.   Could you read the email, please, Special Agent Spice?

8    A.   "Dear Ning:  Could you also provide me with the link info

9    to CAS web page where I am listed as directing that lab at

10   Wuhan.  I lost a lot of sleep worrying about all these things

11   last night and want to start taking steps to correct sooner

12   than later.  I will be careful about what I discuss with

13   Harvard University, and none of this will be shared with

14   Government investigators at this time.  Best, Charlie."

15        MR. CASEY:   Could I have Exhibit 94, not in evidence?

16        THE COURT:   Any objection?

17        MR. MUKASEY:   Actually, I need to see it.

18        No objection, Judge.

19        (Government Exhibit 94 received in evidence.)

20   Q.   Do you see Exhibit 94, Special Agent Spice?

21   A.   Yes.

22   Q.   And the top email, is this an email from Charles Lieber to

23   Diane Lopez and some other individuals at Harvard, dated

24   April 26th, 2018?

25   A.   Yes.

1    Q.    And is this the same day as the last exhibit that we just

2    saw, Exhibit 93?

3    A.    It is.

4          MR. CASEY:  If you could highlight the email, please.

5    Q.    And could you read it, please?

6    A.    "Dear Diane:  I will try to explain some of the

7    collaboration early on, but from my perspective, what is most

8    relevant is post-February, 2015, where it was agreed in email

9    that they could not use Harvard's name and could only use my

10   name after asking me first.

11         "The photograph from this year clearly shows that

12   this agreement had not been followed (as they have continued to

13   call their laboratory the WUT-Harvard Joint Laboratory under my

14   direction), which it is not.  Moreover, I have not visited WUT

15   since 2014 and have had little interaction with them.  There is

16   a postdoctoral fellow in my lab supported by WUT, but that is

17   only agreement I have.

18         "I do believe the DoD investigation relates to, or at

19   least it should, refer to interactions during the period of the

20   grant, which started 7 December 2015 (Roseanne or Elizabeth

21   could confirm this date).  They are still calling their lab

22   WUT-Harvard Joint Laboratory and incorrectly using my name as

23   Director.  This, WUT-Harvard Joint Laboratory "directed by me,"

24   is apparently even listed as such on the Chinese Academy of

25   Sciences website.  And my understanding is that they have

1     used claimed relationship with Harvard and me to secure

2     research funding and attract international visitors.  I am

3     trying to get some links from student in my group but do not

4     yet have these in hand.

5               "I believe it may be difficult to untangle all of the

6     earlier interactions pre- 2014-'15, but what I can 100 percent

7     assert is that, from the start of 2009 through end of 2013, I

8     only visited WUT four times and never more than two days.  The

9     only responsibility that I agreed to as part of the

10    relationship was to discuss their students' research with them

11    during these visits and provide input (pretty much what

12    everyone does when visiting schools) and to host a student or

13    postdoctoral in my lab, and that is about all that I have been

14    involved in.  Best regards, Charles."

15              MR. CASEY:  And could I have Exhibit 101, which is not

16    in evidence?

17    Q.   Now, special Agent Spice, is Exhibit 101 an exchange of

18    emails between Charles Lieber and Xiaojie Duan dated

19    December 3rd, 2018?

20    A.   Yes.

21    Q.   And do you know the date when NIH and Dr. Michael Lauer

22    inquired of Harvard regarding Dr. Lieber?

23    A.    It was approximately November 30th, 2018.

24              MR. CASEY:  Your Honor, I offer Exhibit 101.

25              MR. MUKASEY:  We object, Judge, on hearsay grounds.

1      This is being offered for the truth of the matter asserted.

2      It's being written by somebody -- the conversation is with

3      somebody who's in China.

4              MR. CASEY:  So the top email, Your Honor, is from

5      Dr. Lieber; and we believe the email below that, which is what

6      he's responding to from Ms. Duan, should come in as an adopted

7      admission.

8              THE COURT:  I have trouble understanding the bottom.

9      It's simply a response correcting assertions in the top letter;

10     correct?

11             MR. CASEY:  So the second email down is an email from

12     Xiaojie Duan to the Defendant where she says things to the

13     Defendant --

14             THE COURT:  Oh, wait a minute.  I skipped one.  There

15     was one to X and then one to C; correct?  And then there's

16     another one at the bottom, or is that part of it?

17             MR. CASEY:  Mr. Bruemmer, do you want to highlight the

18     email where your mouse is.  Just right there.  Perfect.

19             THE COURT:  So the bottom part is not being read?

20             MR. CASEY:  This is primarily what we're interested

21     in, as well as there's an email from the Defendant below that

22     Ms. Duan is responding to.  But this is an email in the middle

23     of the chain that I think Mr. Mukasey's objecting to on hearsay

24     grounds.

25             THE COURT:  But there was another piece below that --

 1    wasn't there? -- not the bottom.  Was there more?

 2              MR. CASEY:  Why don't you zoom out, please.

 3              So the bottom is an email from Dr. Lieber --

 4              THE COURT:  Wait a minute.  Which bottom?  We have two

 5    pieces here.

 6              MR. CASEY:  Do you see at the bottom there where it

 7    says, "On December 2nd, 2018"?

 8              THE COURT:  Okay.

 9              MR. CASEY:  So that is an email from Dr. Lieber.

10              THE COURT:  You're not objecting to that, are you?

11              MR. MUKASEY:  I'm not sure of the relevance of it; but

12    I think if you keep moving up, you'll see how irrelevant it is.

13              THE COURT:  Well, it's certainly relevant and

14    particularly in light of the testimony that was just read -- or

15    the letters that were just read.

16              MR. MUKASEY:  Although the next email from the woman

17    in China who has nothing to do with Wuhan should not come in,

18    the one that says, "Dear Charlie."

19              THE COURT:  So the first one --

20              MR. MUKASEY:  The bottom one.

21              THE COURT:  The first one we just looked at.  Now, the

22    second one is addressed, "Dear Charlie."  Is that the one

23    you're talking about?

24              MR. MUKASEY:  Yes.

25              THE COURT:  And what's the objection to this?

1          MR. MUKASEY:  This is hearsay and irrelevant.  It's an

2     email from somebody who has nothing to do with Wuhan giving her

3     commentary on what she saw on the Internet.  What could be less

4     reliable and less relevant than that?

5          THE COURT:  Well --

6          MR. CASEY:  If I may, Your Honor?

7          THE COURT:  It is relevant and I guess objected to

8     primarily for the second paragraph?

9          MR. CASEY:  It is relevant, Your Honor --

10         MR. MUKASEY:  It's her opinion.  What does her opinion

11     have to do with the case, have to do with the facts?  It's a

12     person who has never been in this Courtroom who doesn't have

13     any affiliation with Wuhan, and she's just spouting her

14     opinion.

15         THE COURT:  Who is this person?

16         MR. CASEY:  Well, Your Honor, we've seen a number of

17     email exhibits where she has been forwarded documents by

18     Dr. Lieber, where she has been blind-copied.

19         THE COURT:  Who is she?

20         MR. CASEY:  The top of the exhibit, Your Honor,

21     identifies her as Xiaojie Duan.  And we're offering the second

22     email, Your Honor, her email to Dr. Lieber to which he

23     responds, as an adopted admission.  She's writing something to

24     Dr. Lieber, he's responding, and he's not --

25         THE COURT:  Who wrote the first one on top?  Not

1    Mr. Lieber.

2              MR. CASEY:  The top email is from Dr. Lieber

3    responding to Xiaojie Duan's email.

4              THE COURT:  Oh, yes, there it says, "Charlie," okay.

5              MR. CASEY:  And to the extent he's not correcting or

6    altering what she has said at a time that NIH has already sent

7    its letter to Harvard, we believe it's an adopted admission.

8              THE COURT:  Can we pass it while I think about it?

9              MR. CASEY:  Of course.  We can --

10             THE COURT:  Just go to the next one.  We'll come back

11   to it, if necessary.

12             MR. CASEY:  Could I temporarily redact the top email

13   while we walk through the -- or the middle email, rather?

14             THE COURT:  Well, the top part is -- I don't know why

15   the top part isn't admissible.  It's a document by the

16   Defendant.

17             Mr. CASEY:  It is, Your Honor.

18             MR. MUKASEY:  What they're arguing is that Dr. Lieber

19   adopted what this woman said in the middle of the page.

20             He did not adopt it; he said, Let's get back to you.

21   I'll get back to you later.  That's not an adoption of what she

22   said; that's, I'll handle this at some other point.

23             THE COURT:  But I don't understand why this is not

24   admissible.  It's a document by him.

25             MR. MUKASEY:  The middle part I think we agree is not

1   admissible because it comes from a woman in China that's got

2   nothing to do with this case.  The top part is Dr. Lieber

3   writing back to that woman --

4          THE COURT:  I understand.

5          MR. MUKASEY:  -- saying, Whatever you've just said to

6   me, I'll get back to you later.  That's not relevant, and

7   that's not adopting what she said.

8          THE COURT:  Well, it's part of the context.

9          MR. CASEY:  At a minimum, it's part of the context, so

10  I think it comes in either way.  The question is whether it

11  comes in for the truth.

12         THE CLERK:  So we're in?  Oh, I'm sorry.

13         THE COURT:  It is coming in, in the order in which it

14  is here; correct?

15         MR. CASEY:  That's right, Your Honor.

16         THE COURT:  And the top is a response to the bottom?

17         MR. CASEY:  That's correct.

18         THE COURT:  And how does the bottom come in?

19         MR. CASEY:  The bottom is also Dr. Lieber's email.

20  It's his statement.

21         MR. MUKASEY:  But the middle --

22         THE COURT:  The bottom is?  Who is the person who

23  wrote the bottom?

24         MR. CASEY:  Dr. Lieber.  It's an email of Dr. Lieber's

25  to Xiaojie.  The middle is --

```
1                THE COURT:  But it's addressed to Dr. Lieber.

2                MR. CASEY:  The bottom says, "Dear Xiaojie," and then

3     above that, it says --

4                THE COURT:  Oh, I'm sorry.  I was in the top of the

5     page.

6                MR. CASEY:  That's okay.  It's not the clearest email.

7                THE COURT:  So we start with the bottom of the page?

8                MR. CASEY:  We're offering the whole thing, including

9     Dr. Lieber's email at the top.

10               THE COURT:  What is the order in which these were

11    written?

12               MR. CASEY:  The bottom is the first email in the

13    chain, the middle email is Ms. Duan's response --

14               THE COURT:  The one that says, "Dear Charlie"?

15               MR. CASEY:  Correct.

16               THE COURT:  Above No. 1?

17               MR. CASEY:  Correct.  -- and then the top email is the

18    last email in the chain from Dr. Lieber.

19               MR. MUKASEY:  And we contend that the middle email

20    from the woman in China has nothing to do with the case and is

21    pure hearsay.

22               THE COURT:  The middle one being --

23               MR. MUKASEY:  From the woman in China.

24               THE COURT:  -- the one that says, "Dear Charlie"?

25               MR. MUKASEY:  Correct.
```

```
 1            THE COURT:  Well, it does have to do with the case.
 2            MR. MUKASEY:  It has to do with her discussion of
 3    websites in China.
 4            THE COURT:  But it tells him what she found, and it
 5    won't -- it won't come in for the fact that she actually found
 6    it but that he was informed of what she was doing and he was
 7    working with her.
 8            MR. MUKASEY:  Well, he wasn't working with her.
 9            THE COURT:  Well, he had been working with her.
10            MR. MUKASEY:  He had not, in this case, been working
11    with her; but I understand how the Court is viewing this.  And
12    if there could be an instruction that the email from the woman
13    in China is not admissible for its truth --
14            THE COURT:  Okay.  It's admissible as part of an
15    exchange of information or disinformation.
16            MR. MUKASEY:  His emails come in for the truth because
17    they're admissions.
18            THE COURT:  But without somebody else's emails that
19    he's responding to, they don't make a whole lot of sense.
20            MR. MUKASEY:  And I want the jury to understand
21    everything.  So if that middle part comes in, it comes in not
22    for the truth but for context.
23            THE COURT:  Okay.
24            MR. MUKASEY:  Fair enough.
25            MR. CASEY:  If I may just -- I don't want to beat a
```

1    dead horse, but we are offering it for the truth as an adopted

2    admission.  If Your Honor is not inclined, then --

3              THE COURT:  At the very least, members of the jury,

4    you're entitled to hear this because it's part of the whole

5    picture.  It may or may not be true, but it is ultimately your

6    judgment based on the whole bunch of evidence that you get,

7    both the documents and what people say about them.

8              THE CLERK:  So we're in?

9              THE COURT:  It's in.

10             THE CLERK:  Okay.

11             (Government Exhibit 101 received in evidence.)

12             MR. CASEY:  All right.  If we could just highlight --

13   or just go to the bottom, to the email that leads onto the

14   second page, if you could just expand the bottom email.

15   Q.   Is that an email from Charles Lieber?

16   A.   Yes.

17   Q.   And could you read it, please?

18   A.   "Dear Xiaojie:  I was just informed that I am being

19   investigated yet again for ongoing close research association

20   with Wuhan University of Technology, WUT, and Dr. Mai.  This

21   time it is NIH, and they are threatening not only to end my

22   funding, which is most of my research support, but also force

23   me to pay back the past three-plus years they supported my

24   work.  Argh.  Could I ask you a favor, to check online, other?,

25   to see if WUT/Mai are claiming relationship with me/my research

1    group still.  This is very serious, and I am legally bound to

2    respond to NIH within the next two weeks or face the loss of

3    funding, as per above.  I know that you have many other things

4    on your mind, but if you can spare any time, I would appreciate

5    it.  Thank you, Charlie.  PS:  Perhaps someone, Chinese?, who

6    does not like me brought this to the attention of NIH, although

7    I hope not because I have always just tried to help people."

8         MR. CASEY:  And Mr. Bruemmer, if we could just

9    highlight the email in the middle of the page, please.  Scroll

10   up just a little bit.  There you go.  You've got it.  Thank

11   you.

12   Q.   And is this an email from Xiaojie Duan to Charles Lieber

13   on the same day, December 2nd, 2018?

14   A.   It is.

15   Q.   And could you just read the first two paragraphs, please?

16   A.   "Dear Charlie:  I found several old web pages on Internet,

17   which recorded the activities of you related with WHUT as

18   follows:  My assistant is digging more into the Internet.  For

19   those on public services, such as baidu.com, we will contact

20   them and try to make some editions, for example, to add a

21   timeline for your relation with WHUT (2009 to" -- I think

22   that's -- "2015?)  For the first one, do you want to contact

23   with them, or you want me to do that?  I guess the main reason

24   for this investigation is because you have been hired in the

25   One Thousand Talent Program' through WHUT.  I heard many

1   scientists in this program in U.S.A. are being investigated by

2   NIH.  Will update you when we found more.  Best, Xiaojie."

3            MR. MUKASEY:  And Judge, it's the last couple of

4   sentences where this woman in China says, Maybe the reason

5   you're under investigation --

6            THE COURT:  Well, it's what she says but that -- that

7   there is an investigation; it doesn't prove that he was.

8            MR. MUKASEY:  Correct.  Thank you.

9            MR. CASEY:  And could you go to the top email, please,

10  Mr. Bruemmer.

11  Q.   Is this Dr. Lieber's response?

12  A.   Yes.

13  Q.   And what does he say?

14  A.   "Dear Xiaojie:  Thank you for your time (and your

15  assistant's time) on this.  Let me get back to you after my

16  meeting at 12:00 p.m. with Harvard University people as start

17  to prepare response document for NIH.  Hope you are well.

18  Charlie."

19            MR. CASEY:  All right.  If we could go to Exhibit 109,

20  which I --

21             THE COURT:  I think, before we do that, it's time to

22  stretch.

23            (Stretch break.)

24            THE COURT:  Okay.  Are we about to finish with this?

25            MR. CASEY:  We are.  I have two more emails.

1          THE COURT:  I jumped the gun.

2          MR. CASEY:  But some other stuff after that, so --

3          THE COURT:  Go ahead.

4          MR. CASEY:  Mr. Mukasey, any objection to Exhibits 109

5   or 111, or I could do them individually?

6          MR. MUKASEY:  No.

7          MR. CASEY:  Okay.  Could I have Exhibit 109, please,

8   which I offer, Your Honor, by agreement, without objection.

9          (Government Exhibit 109 received in evidence.)

10  Q.   Do you see Exhibit 109?

11  A.   Yes.

12  Q.   And the top email, is that an email from Dr. Lieber to

13  Elizabeth Lennox dated January 9th, 2019?

14  A.   Yes.

15  Q.   And what's the subject line?

16  A.   "Draft of Letter to NIH."

17         MR. CASEY:  And could you highlight just that top

18  email, please, Mr. Bruemmer.

19  Q.   And could you read it, please?

20  A.   "Dear Elizabeth:  Unfortunately, and sad to say not

21  surprising, I have failed to hear back from Diane Lopez on my

22  reasonable edits suggestions.  Do they actually take their jobs

23  seriously or care about investigators?  I turned around their

24  document within one to two hours and was surprised that, after

25  so much delay, it had obvious mistakes.  Could they have been

```
 1   less careful in attributing the location of Wuhan University to

 2   Beijing?  Even if mistake was made by NIH at outset, why didn't

 3   they catch this early on if they were actually serious in

 4   protecting me verse only caring about the University?  I guess

 5   they think I am a serial liar.  Best, Charlie."

 6            MR. CASEY:  And Exhibit 111, please.

 7            (Government Exhibit 111 received in evidence.)

 8   Q.   Do you see Exhibit 111?

 9   A.   Yes.

10            MR. CASEY:  Mr. Bruemmer, if you could highlight the

11   bottom email, please.

12   Q.   Is that an email from Dr. Lieber to Kathleen Ledyard,

13   copying Elizabeth Lennox?

14   A.   Yes.

15   Q.   And it's dated January 8th, 2019?

16   A.   Yes.

17   Q.   And could you read that, please?

18   A.   "Dear Kathleen:  I am really disappointed that we have not

19   yet received the draft response to NIH, as promised.  Is this

20   or is this not a priority?  I am really busy today and will be

21   out tomorrow, Thursday.  As far as I can tell, there is little

22   support of my case, and I expect the opportunity to

23   correct/provide input to any errors in "their draft letter."

24   By the way, I have never received money from WUT, and they only

25   covered my airfare, as is done by convention by any school that
```

```
 1    invites speakers in U.S. abroad.  I am really unhappy about the
 2    situation.  Regards, Charlie."
 3              MR. CASEY:  All right.  Thank you.
 4              Mr. Bruemmer, you can take that down.
 5    Q.   All right.  So yesterday you testified about an interview
 6    that you conducted of Dr. Lieber on January 28th, 2020; do you
 7    recall that?
 8    A.   Yes.
 9    Q.   And who, again, conducted that interview with you?
10    A.   Special Agent Robert Plumb.
11    Q.   And where did the interview take place?
12    A.   Harvard University Police Department.
13    Q.   And this was after he had been arrested a couple of hours
14    or so earlier; correct?
15    A.   Correct.
16    Q.   And was Dr. Lieber handcuffed during the interview?
17    A.   No.
18    Q.   Do you recall how long the interview lasted?
19    A.   About three hours.
20    Q.   Was it audio- and video-recorded?
21    A.   It was.
22    Q.   Did you or Special Agent Plumb advise the Defendant of his
23    rights at the outset of the interview?
24    A.   Yes.
25    Q.   And who did that, you or Special Agent Plumb?
```

1    A.   Special Agent Plumb.

2    Q.   And how did he do it?

3    A.   He advised him of his rights via a form that we use, an

4    FBI form.

5    Q.   And what was Dr. Lieber's response?

6    A.   He said something to the effect, I'll sign this, but I

7    think I probably should have an attorney.

8    Q.   And what did you or Special Agent Plumb do?

9    A.   Special Agent Plumb responded that he understood that he

10   was -- that he -- that we would want to speak to him but

11   because of that privilege, he needed to review the form and

12   understand his rights and make a decision basically.

13   Q.   And did he review the form with him again?

14   A.   He did.

15   Q.   And what did the Defendant do?

16   A.   He said he understood and that he would sign it and agreed

17   that he could stop at any time.

18            MR. CASEY:  Mr. Mukasey, any objection to Exhibit 321?

19            MR. MUKASEY:  Only that I think it's cumulative.

20            MR. CASEY:  I can put it up.  It's up to you.

21            MR. MUKASEY:  It's the form that he signed.  I'm not

22   contesting that he signed it.  I don't think we need the

23   exhibit and we can just move on, but --

24            THE COURT:  You're not doing what?

25            MR. MUKASEY:  I'm not contesting that he signed the

1     form.
2              THE COURT:  Okay.  So you're not contesting for the
3     jury to see it?
4              MR. MUKASEY:  If he wants to show it, that's fine.
5              MR. CASEY:  I'll just move it into evidence.  I don't
6     think we need to show it.
7              THE COURT:  Okay.
8              (Government Exhibit 321 received in evidence.)
9     Q.   Did you and Special Agent -- after the Defendant signed
10    the form, did you and Special Agent Plumb begin asking
11    questions?
12    A.   We did.
13    Q.   And did Dr. Lieber ask to stop the interview at any time?
14    A.   He did not.
15    Q.   Did he ask for an attorney at any time?
16    A.   He did not.
17    Q.   Did you offer him any food or water or other things to
18    drink?
19    A.   Yes, several times.
20    Q.   And did he accept?
21    A.   No.
22    Q.   Just generally speaking, how did the interview begin?
23    A.   Generally, it began with just building rapport,
24    introducing ourselves, and just kind of getting him
25    comfortable.

1          MR. MUKASEY:  Objection.  Move to strike.  This is

2     totally irrelevant, establishing rapport and getting him

3     comfortable.  He was under arrest.

4          THE COURT:  It won't get stricken, but we won't

5     progress with it.

6     Q.   At some point, did you discuss with him Wuhan University

7     and the Thousand Talents Program?

8     A.   Yes.

9          MR. CASEY:  May I approach, Your Honor?

10          THE COURT:  Yes.

11          Does Mr. Mukasey know what you're doing?

12          MR. MUKASEY:  I do.

13     Q.   Special Agent Spice, I'm handing you what's been marked as

14     Exhibits 301 to 307.  Do you recognize those?

15     A.   I do.

16     Q.   And what are they?

17     A.   They are video clips, portions of the interview that we

18     recorded.

19     Q.   And how do you recognize them as that?

20     A.   I initialed and dated on December 14th, 2021.

21          MR. CASEY:  Your Honor, I offer Exhibits 300 through

22     307.

23          MR. MUKASEY:  No objection, other than one of the

24     clips on a relevancy basis, which perhaps we can discuss at the

25     break.

```
 1              THE COURT:  Which counsel had agreed to?

 2              MR. CASEY:  Your Honor, we're largely in agreement on

 3    the clips.  I think there's a portion of Exhibit 302 that they

 4    are objecting to either on relevance or 404(b) grounds.

 5              THE COURT:  It's not -- you don't agree that it should

 6    not come in?

 7              MR. CASEY:  Oh, no.  We think it should come in; and,

 8    in fact, there's already been evidence in the case about it.

 9              THE COURT:  But you're not going to show it now, so we

10    don't have to deal with it at the moment; correct?

11              MR. CASEY:  We are going to show it.  It's the third

12    clip, and it will probably come up before the break.  If

13    Your Honor wants to take a break now, we can deal with it,

14    or --

15              THE COURT:  No, I don't want to take a break now; we

16    need to take a break when the jury's refreshments are there.

17              MR. CASEY:  Fair enough.  I agree.  Well, we'll play

18    the first two clips and then --

19              THE COURT:  Okay.

20              (Government Exhibits 300 to 307 received in evidence.)

21              MR. CASEY:  Mr. Bruemmer, could I have Exhibit 300,

22    please?  And if you could just push "play" and then immediately

23    press "pause."

24              (Video playing.)

25    Q.   Special Agent Spice, could you explain what we're looking
```

1    at here in Exhibit 300?

2    A.   So this is the interview room at Harvard University Police

3    Department.  To my left is Special Agent Robert Plumb.  You can

4    kind of see my hands and the top of my head to the right.  And

5    in front of us is Dr. Lieber.

6              MR. CASEY:  Okay.  Mr. Bruemmer, if you could just go

7    back and then push "play" again.

8              (Video playing.)

9              THE COURT:  Can you hear?  No.  We need to have more

10   volume.

11             MR. CASEY:  Ms. Urso, do you have the ability to

12   control volume?  I think our volume is all the way up.

13             THE CLERK:  No, I don't -- oh, wait a minute.  Maybe I

14   do.

15             MR. CASEY:  Paul, maybe turn yours down so when you

16   push "play," it doesn't --

17             THE COURT:  Try it out and see.

18             (Video playing.)

19             THE COURT:  That's better.  Thank you.

20             MR. CASEY:  Your Honor, I'm going to restart the

21   video.

22             THE COURT:  It's okay now.

23             (Video playing.)

24             MR. CASEY:  I'll just note for the record, Your Honor,

25   there are occasional audio cutouts.

1          (Video playing.)

2          MR. CASEY:  Mr. Bruemmer, could I have Exhibit 301?

3          And Your Honor, I said this earlier, but I'll just

4     make it clear again, there are occasional audio redactions

5     during the video, so if the audio cuts out, that is why.

6          (Video playing.)

7          MR. CASEY:  Your Honor, the next exhibit, portion of

8     the interview, discusses documents that have been conditionally

9     admitted, particularly Exhibits 11 and 17A.  We're asking the

10    Court to remove the conditional admittance and admit them as

11    full exhibits.

12          THE COURT:  I have no idea what they are.

13          MR. CASEY:  I'm happy to have Mr. Bruemmer pull them

14    up.

15          THE COURT:  Is the Defendant insisting on the

16    conditions?

17          MR. CASEY:  I'm sorry.  17A is fully in.  Mr. Drabick

18    has corrected me.  So it's Exhibit 11.

19          MR. MUKASEY:  We are contesting it, Judge.

20          THE COURT:  Can I see it?

21          MR. CASEY:  And, Your Honor, the relevant portion is

22    one of the attachments.

23          THE COURT:  Are these not emails that we've already

24    seen?

25          MR. CASEY:  We've already seen them, and Your Honor

1    admitted them conditionally.

2            THE COURT:  Were they part of the --

3            MR. CASEY:  It's the beginning of the relationship.

4            THE COURT:  -- earlier testimony?

5            MR. CASEY:  Correct, yep.

6            MR. MUKASEY:  Right.  And you admitted them

7    conditionally.  I objected because they have to do with

8    something that's not the Thousand Talents Program; it's a

9    different program.

10           THE COURT:  But we have already had the testimony, and

11   specifically she has read these documents is my question.

12           MR. CASEY:  That's right, yes.

13           MR. MUKASEY:  And you admitted it conditionally.

14           THE COURT:  Okay.  And the condition being what?

15           MR. MUKASEY:  That, once you heard the rest of the

16   evidence, you would determine whether or not it was relevant

17   because it's not part of the Thousand Talents Program; it's

18   something else.

19           THE COURT:  Well, we'll continue to do it

20   conditionally, then.  We can always wipe it out.

21           MR. CASEY:  I would just note, Your Honor, that there

22   is references, as Special Agent Spice testified to, to

23   talent-recruitment programs in that document.  So that's the

24   initiation of the relationship regarding talent programs.

25           THE COURT:  So this can come in conditionally still.

```
 1              MR. MUKASEY:  And we may ask for an instruction later
 2      that it's to be --
 3              THE COURT:  Yes, of course.
 4              MR. CASEY:  Ms. Urso, is it possible to switch to the
 5      document camera so I can just show the jury what --
 6              We can go back to the computer, and I'll do it a
 7      different way.  That might be easier.
 8              THE CLERK:  Okay.  So this is to be shown?
 9              THE COURT:  Uh-huh.
10              MR. MUKASEY:  Judge, may we confer for ten seconds?
11              (Counsel confer.)
12              MR. CASEY:  Your Honor, this is a longer video, now
13      that I'm thinking about it.  I don't know if you want to take a
14      break now --
15              THE COURT:  You're telling me we should take a break
16      now?
17              MR. CASEY:  I would never presume to tell you, but I
18      would ask you.
19              THE COURT:  Is the stuff in there?
20              THE CLERK:  I think so.  I'm not sure.  Do you want me
21      to run up and check real quick?
22              THE COURT:  We'll take the recess now and hope that
23      the stuff is there.  If not, we'll just have to wait until it
24      gets there.
25              THE CLERK:  All rise, please.
```

1            THE COURT:  We are in recess.

2            (Recess taken from 10:58 to 11:20 a.m.)

3            (Jury is not present for the following)

4            THE COURT:  Do we need to review part of the video

5    before we continue with the jury?

6            MR. MUKASEY:  We have an objection to part of it that

7    refers to the Strategic Scientist Program.  I don't want to

8    waste a lot of time with it, Judge.  I think it can be cured

9    with an instruction at the time that --

10           THE COURT:  So what's the instruction that you want me

11   to give?

12           MR. MUKASEY:  We think that the Strategic Scientist

13   testimony and discussion is 404(b) evidence that should not be

14   considered as evidence that's intrinsic to the case.

15           THE COURT:  So it's being offered for what purpose?

16           MR. MUKASEY:  Well, that's for them to say.  I think

17   it's being offered for no relevant purpose.

18           THE COURT:  Well, except it's what he said, what the

19   Defendant said; correct?

20           MR. MUKASEY:  It concerns a topic that we think is

21   irrelevant to the trial.

22           THE COURT:  What's the topic?

23           MR. MUKASEY:  A different program, not the Thousand

24   Talents Program.

25           THE COURT:  Well, I can certainly tell the jury that

1   the Defendant says that this is a different program.

2          MR. MUKASEY:  That's fine.

3          MR. CASEY:  From the Government's perspective, this is

4   part and parcel of the offense.  It's intrinsic evidence.  The

5   contract references Chinese talent-related projects.  It's sort

6   of the introduction to the talent program, it's the initiation

7   of that relationship that leads to the talent program.

8          THE COURT:  Okay.  You can argue that.  The

9   Defendant's position is -- the Defendant asked me to tell you

10  that, in his view, this has nothing to do -- this is a

11  different project from the one that we're talking about.  The

12  Government says it's the same.  It'll be for you to determine

13  that.

14         MR. MUKASEY:  Correct.

15         MR. CASEY:  Right.  But I think, for purposes of

16  admitting the documents and the video --

17         THE COURT:  Well, it's in.  Isn't it already in

18  evidence?

19         MR. CASEY:  Well, they're disputing that portion of

20  the video should come in, but I think we're both in agreement

21  that it should come in; it's just what the jury makes of it.

22         THE COURT:  Well, I can tell the jury at the time that

23  this is a statement by the Defendant that he says pertains to

24  another program.

25         MR. CASEY:  But he doesn't say that in the interview

```
 1   is my point, like, that's a closing argument Mr. Mukasey can
 2   make if he'd like.
 3           THE COURT:  Okay.  But, to the extent he argues that,
 4   it's for you to determine whether it's the same program or a
 5   different program based on what he said.
 6           MR. MUKASEY:  That's fair to tell them before they
 7   hear it.
 8           THE COURT:  I'm sorry?
 9           MR. MUKASEY:  That's fair to tell them before they
10   hear it.
11           THE COURT:  Yeah.  But I don't know which part.  I
12   think we need to do it at the time we get to see -- or after
13   we've seen it.
14           MR. CASEY:  From the Government's perspective, though,
15   it's evidence that's part and parcel of the crime, so we don't
16   generally pick out just pieces of evidence and say, The
17   Defendant disputes this --
18           THE COURT:  It's part of the trial.  That's why it's
19   in.
20           MR. CASEY:  I know that, but my point is:  Like, I
21   don't see that there's even an instruction that says --
22           THE COURT:  There's no way in which the Defendant can
23   actually point this out, so let's get the jury down.
24           Are we going to finish this today?
25           MR. CASEY:  I'm sorry?
```

1             THE COURT:  How far will we get in the evidence today?

2             MR. CASEY:  We will finish on direct with Special

3    Agent Spice.

4             THE COURT:  How much more time do we have of the

5    video?

6             MR. CASEY:  Probably about 30 more minutes, maybe a

7    little less, 20 to 30 minutes.

8             THE COURT:  And then what?

9             MR. CASEY:  And then we have a few pieces of physical

10   evidence from the search of his home, Dr. Lieber's home, and

11   some photographs, and that's it.

12            THE COURT:  And that's it?

13            MR. CASEY:  That's it.

14            THE COURT:  And can we do that today?

15            MR. CASEY:  Absolutely.

16            MR. MUKASEY:  I'm going to try to finish my

17   cross-examination today.

18            THE COURT:  You will finish?

19            MR. MUKASEY:  I hope so.  If they give me time, if

20   they give me 45 minutes or so, I should be able to finish.

21            MR. CASEY:  We've stipulated to the physical items in

22   the photos -- thank you, Mr. Mukasey -- so we should go very

23   quickly through those.

24            THE COURT:  Lisa, can you tell the jury that we're

25   going to have this fire drill on Monday and that, on Monday, we

1   have to finish at 12:30, or should I not tell them that?

2            (Discussion off the record.)

3            THE CLERK:  We're all set.  All rise, please.

4            (Jury is present for the following)

5            THE COURT:  Please be seated.  You may proceed.

6            MR. CASEY:  Thank you, Your Honor.

7   Q.   Special Agent Spice, I'm about to play for you

8   Exhibit 302.  But before I do that, I want to show you some

9   documents.

10           Well, actually, first, let me ask you:  During this

11  portion of the interview, was Dr. Lieber shown any documents?

12  A.   He was.

13           MR. CASEY:  Okay.  And Mr. Bruemmer, could I have

14  Exhibit 11, please, and specifically Page 18?

15           THE CLERK:  I'm sorry.  That's in?

16           MR. CASEY:  Correct.

17           THE CLERK:  Yes.

18           (Government Exhibit 11 received in evidence.)

19           MR. CASEY:  I'm sorry.  Page 17.  Just keep going

20  back.  Keep going.

21  Q.   All right.  Is this one of the documents that was shown to

22  Dr. Lieber at the beginning of the video clip in Exhibit 302?

23  A.   Yes.

24           MR. CASEY:  And if I could have, please, Exhibit 17A,

25  also in?

```
 1              MR. CASEY:  If you'd go to the next page, please.
 2    Q.   Is this another one of the documents that Dr. Lieber was
 3    shown in this next clip?
 4    A.   Yes.
 5              MR. CASEY:  If we could have Exhibit 23.
 6              (Government Exhibit 23 received in evidence.)
 7              MR. CASEY:  If you could go to Page 3, please,
 8    Mr. Bruemmer.
 9    Q.   Later on during this clip, is Dr. Lieber shown this
10    document?
11    A.   Yes.
12              MR. CASEY:  All right.  If we could go to Exhibit 26.
13    Q.   And after he's shown the document we just saw in
14    Exhibit 23, was Dr. Lieber asked questions about Exhibit 26?
15    A.   Yes.
16              MR. CASEY:  And if we could go to Exhibit 27.
17              (Government Exhibit 27 received in evidence.)
18    Q.   Is this another document that was shown to Dr. Lieber
19    during this clip?
20    A.   Yes.
21              MR. CASEY:  All right.  Thank you, Mr. Bruemmer.
22              If you could pull up Exhibit 302 and push "play."
23    Thank you.
24              (Video playing.)
25    Q.   Special Agent Spice, is Dr. Lieber being shown Exhibit 23
```

 1   at this portion of the interview?

 2   A.   Yes.

 3   Q.   And what's the title of that contract, Exhibit 23?

 4   A.   "Employment Contract of One Thousand Talent High-Level

 5   Foreign Expert."

 6            MR. CASEY:  Okay, thank you.

 7            Push "play."

 8            (Video playing.)

 9            MR. CASEY:  Could we have Exhibit 303, please?

10            (Video playing.)

11            MR. CASEY:  And before we put up the next exhibit,

12   could you pull up -- and I think we're going to need to do a

13   redaction to the next exhibit, so if I could just have it for

14   the witness only, Exhibit 44.  And this is in evidence with the

15   redactions.

16            THE CLERK:  What number was it?

17            MR. CASEY:  44.  Why don't we go to the second page

18   and try to avoid the need to redact.

19            And Ms. Urso, now we can publish it, please.

20            (Government Exhibit 44 received in evidence.)

21   Q.   Special Agent Spice, this next portion of the video,

22   Exhibit 304, is this a document that was shown to Dr. Lieber?

23   A.   Yes.

24            MR. CASEY:  And Mr. Bruemmer, could you highlight Item

25   No. 4 in the middle of the page, please?

1    Q.   Did you and/or Special Agent Plumb ask questions about

2    this particular provision or this particular portion of

3    Exhibit 44?

4    A.   Yes.

5         MR. CASEY:  And Mr. Bruemmer, if we could have

6    Exhibit 50?

7    Q.   Is this another document that Dr. Lieber was shown during

8    this next portion of the video?

9    A.   Yes.

10        MR. CASEY:  Could you just expand a little bit for the

11   jurors, please?

12        All right.  If we could have Exhibit 304.

13        (Video playing.)

14        MR. CASEY:  Before the next video, could you pull up,

15   Mr. Bruemmer, Exhibit 93 in evidence?

16   Q.   And Special Agent Spice, during this next portion of the

17   video in Exhibit 305, is Exhibit 93 a document that Dr. Lieber

18   was shown?

19   A.   Yes.

20        MR. CASEY:  Could you just expand that for the jurors,

21   please, Mr. Bruemmer?

22        All right.  And if we could have Exhibit 305, please.

23        (Video playing.)

24        MR. CASEY:  If we could have Exhibit 306.

25        (Video playing.)

1          MR. CASEY:  And if we could have Exhibit 307.

2          (Video playing.)

3          MR. CASEY:  Thank you, Mr. Bruemmer.  You can take

4     that down.

5     Q.   Special Agent Spice, you mentioned yesterday that some

6     search warrants were executed on the day of the interview?

7     A.   Yes.

8     Q.   And what was the location of those search warrants?

9     A.   It was Dr. Lieber's home in Lexington, Massachusetts, as

10    well as his office at Harvard University.

11    Q.   And did you go to Dr. Lieber's residence after the

12    interview?

13    A.   I did.

14    Q.   And had the search essentially been completed at that

15    point?

16    A.   It was done.

17          MR. CASEY:  Okay.  Your Honor, at this time, I'd like

18    to read a stipulation.

19                         STIPULATION

20          "On the morning of January 28th, 2020, at

21    approximately 6:45 a.m., Federal Agents executed a lawfully

22    obtained search warrant at the residence of Charles and

23    Jennifer Lieber in Lexington, Massachusetts.  23 Federal Agents

24    participated in the search.  The Agents collected approximately

25    25 items from the residence, and they took approximately 571

1    photos of the residence and its contents.

2              "The items collected from the residence have been

3    preserved and maintained in the same format as the day they

4    were seized.  The photographs have been maintained in a digital

5    format, and they are true and accurate representations of

6    certain objects that were photographed that day.

7              "The following exhibits were photographed and/or

8    collected during the search of the residence, and they are

9    admissible in evidence:  Government Exhibits 210, 211, 212,

10   213" -- I can slow down, Ms. Urso, if you'd like.

11             THE CLERK:  Yes, please.

12             MR. CASEY:  It's 210, 211, 212, 213, 214, 215, 217,

13   218, and 219.

14             THE CLERK:  Okay.  So we're skipping 216?

15             MR. CASEY:  Correct, as well as a defense exhibit but

16   particular pages, and I'll note the pages for you.  987, 988 --

17             THE CLERK:  Wait a minute.  Yep.

18             MR. CASEY:  -- 989, 990, 991, 994, 826, 874, and 875.

19             THE CLERK:  Okay.

20             MR. CASEY:  All right.  Mr. Bruemmer, if I could

21   please have Exhibit 217?

22             (Government Exhibit 217 received in evidence.)

23   Q.   Special Agent Spice, is Exhibit 217 some photographs of a

24   room in the Defendant's house?

25   A.   Yes.

1    Q.   And do you see an evidence placard numbered 1 in that

2    photo?

3    A.   I do.

4         MR. CASEY:  If we could go to the next page.  Keep

5    going.

6    Q.   And is this Evidence Item 1 that was discovered during the

7    search on the desk?

8    A.   It is.

9         MR. CASEY:  One more page, please.

10   Q.   Is that a passport?

11   A.   Yes.

12   Q.   And whose passport is it?

13   A.   Dr. Lieber's.

14   Q.   And are you able to see the expiration date of that

15   passport?

16   A.   Yes.

17   Q.   What is it?

18   A.   September 17th, 2019.

19   Q.   And could you read the passport number in the upper

20   right-hand corner?

21   A.   450 -- sorry.  452023221.

22        MR. CASEY:  And could you go to the next page.

23   Q.   And this the inside of the passport, the number of which

24   you just read?

25   A.   Yes.

1          MR. CASEY:  All right.  If we could go to Exhibit 218.

2          (Government Exhibit 218 received in evidence.)

3   Q.   And is this a photograph of the same desk that we just saw

4   in Exhibit 217?

5   A.   Yes.

6          MR. CASEY:  And could we just go to the next picture,

7   please, Mr. Bruemmer.

8   Q.   And is there another evidence placard there you see?

9   A.   Yes.

10  Q.   Item No. 16?

11  A.   Yes.

12         MR. CASEY:  And could we go just one more picture.

13  Q.   Is that another view of the same evidence item?

14  A.   Yes.

15         MR. CASEY:  Next page, please.

16  Q.   And these appear to be those same documents, just

17  unfolded?

18  A.   Yes.

19         MR. CASEY:  May I approach, Your Honor?

20         THE COURT:  Yes.

21  Q.   Ms. Spice, I've handed you what's been admitted as

22  Exhibits 211 and 213.

23         (Government Exhibits 211 and 213 received in

24         evidence.)

25         Are those the -- does that appear to be Evidence Item

1   16, from the photo we're looking at?

2   A.   Yes.

3   Q.   And do you see that evidence item in the evidence bag?

4   A.   Yes.

5           MR. CASEY:  Okay.  If we could have Exhibit 212,

6   please.

7   Q.   Are these scanned images of the document that you have in

8   your hand there, Exhibit 211, the pink paperwork?

9   A.   Yes.

10          MR. CASEY:  Okay.  And Mr. Bruemmer, if you could just

11  highlight or expand the very upper left-hand corner.  That's

12  fine.  A little smaller, please.  Just the corner.  Perfect.

13  Thank you.

14  Q.   And do you see a name written there?

15  A.   Yes.

16  Q.   And what is the name?

17  A.   "Charles Michael Lieber."

18          MR. CASEY:  And if you could just go back, please.

19  And could you -- do you see where it says "ID number" in the

20  top right corner, Mr. Bruemmer?

21  Q.   Ms. Spice, do you see where it says "ID number" there?

22  A.   Yes.

23  Q.   And is that number the passport number that you just read

24  in Exhibit 217?

25  A.   It is.

1              MR. CASEY:  We can go back to the document.

2              And, Your Honor, at this time, I'd like to read

3      another stipulation.

4              THE COURT:  Okay.

5                            STIPULATION

6              "In lieu of live testimony, counsel for the United

7      States and counsel for the Defendant have stipulated and agreed

8      to the following facts:  The Personal Customer Business

9      Application form marked as Exhibit 211, and also reflected in

10     Exhibit 212, contain both Chinese characters and

11     English-language words.  The Chinese characters in the

12     following locations are translated to English as follows" -- if

13     you could just highlight the top here.

14             "At the top of the first page, the Chinese characters

15     immediately to the right of ICBC translate to Industrial and

16     Commercial Bank of China."

17             MR. CASEY:  Go back.

18             "On the first page, the handwritten Chinese characters

19     in the box immediately to the right of 'ID type' translate to

20     'passport.'"

21             Thank you.

22             "On the first page, the handwritten Chinese characters

23     in the box immediately to the right of the address box

24     translate to 'New Materials Institute, Wuhan University of

25     Technology.'"

1                    Thank you, Mr. Bruemmer.  And if you could go to

2      Page 3.

3      BY MR. CASEY:

4      Q.   And do you see a signature at the bottom of the page?

5      A.   Yes.

6      Q.   And is there a date associated with the signature?

7      A.   Yes.

8      Q.   And what's the date?

9      A.   November 12th, 2012.

10               MR. CASEY:  And if you could go to the next page,

11     Mr. Bruemmer.  Sorry.  One more.

12     Q.   Is this a document that was found folded up with the ICBC

13     paperwork we just looked at?

14     A.   Yes.

15               MR. CASEY:  Can you just expand that for the jurors,

16     please, Mr. Bruemmer.

17     Q.   And could you read that to the jury, please?

18     A.   "600,000 RMB" --

19     Q.   I'm sorry.  Just start at the top, if you could.

20     A.   "Charles M. Lieber Subsidy."

21     Q.   Keep going.

22     A.   "600,000 RMB in total:  300,000 RMB in bank card of ICBC;

23     2,730 -- 330 Yuan after tax; 300,000 RMB in cash.  It's 279,330

24     RMB after tax, then we exchange them into U.S. dollars.

25     November 8th, one dollar equals 6.2566 Yuan.  279,330 Yuan is

1    equal to $44,645.65; rounded-number money, $44,700."

2              MR. CASEY:  All right.  And if we could have

3    Exhibit 219.

4              (Government Exhibit 219 received in evidence.)

5    Q.   Is Exhibit 219 some additional photos from the search

6    warrant at the Defendant's residence?

7    A.   Yes.

8    Q.   And do you see Evidence Item No. 22 there?

9    A.   Yes.

10             MR. CASEY:  If you could go to the next page,

11   Mr. Bruemmer.

12   Q.   Is this just a closer photo of that same evidence item?

13   A.   Yes.

14             THE COURT:  Next page, please.

15   Q.   Again, another photo of the same item?

16   A.   Yes.

17             MR. CASEY:  May I approach one more time, Your Honor?

18             THE COURT:  I'm sorry?

19             MR. CASEY:  May I approach the witness?

20             THE COURT:  Yes.

21             (Government Exhibit 215 received in evidence.)

22   Q.   Special Agent Spice, I've handed you what's been admitted

23   as Exhibit 215.  Do you see Evidence Item 22 on the outside of

24   that package?

25   A.   Yes.

1    Q.   And could you just pull the item out of the bag, please.

2         And the item that you're holding, Exhibit 215, does

3    that appear to the same plaque that's depicted in Exhibit 219?

4    A.   Yes.

5         MR. CASEY:  Just one moment, Your Honor.

6         (Pause)

7         MR. CASEY:  Bear with me one moment.

8         Could I have Exhibit 214, Mr. Bruemmer.

9         THE COURT:  I'm sorry?

10        MR. CASEY:  I'm just asking Mr. Bruemmer to pull up

11   one final exhibit.

12        (Government Exhibit 214 received in evidence.)

13   Q.   Do you see Exhibit 214 on your screen, Ms. Spice?

14   A.   Yes.

15   Q.   And is that -- does that appear to be the booklet that you

16   have before you, physical item Exhibit No. 213?

17   A.   Yes.

18        MR. CASEY:  Okay.  And could we go to the next page,

19   Mr. Bruemmer.

20   Q.   Does that appear to be the inside of the first page of

21   Exhibit 213?

22   A.   Yes.

23        MR. CASEY:  If we could go to the next page, please.

24   Q.   In fact, if you flip through the book, are all the

25   remaining images or pages of that booklet, Exhibit 213, blank?

```
 1    A.   Yes.
 2              THE COURT:  What is it?
 3              MR. CASEY:  Oh, I'm sorry.  Why don't we go back to
 4    Page 1, Mr. Bruemmer.
 5              THE COURT:  I'm sorry?
 6    Q.   Can you just read what you see on your screen here, the
 7    English language, please?
 8    A.   "Elite club, ICBC."
 9    Q.   And was this with the paperwork in front of you,
10    Exhibit 211, in the Defendant's residence on the day of his
11    arrest?
12    A.   Yes, Item 16.
13              MR. CASEY:  Nothing further.  Thank you.
14              THE COURT:  We will stretch.
15              (Stretch break.)
16              THE COURT:  Cross-examine, Mr. Mukasey.
17              MR. MUKASEY:  If it's okay with the Court.
18                         CROSS EXAMINATION
19    BY MR. MUKASEY:
20    Q.   Special Agent Spice, good afternoon.  Thanks for
21    appearing.
22              THE COURT:  I'm not sure the jury can hear you from
23    over there.
24              MR. MUKASEY:  Okay.  I'm going to try to project, and
25    then I'll come over to you, or if anybody can't hear me, I'll
```

1    be right there.  I just want to stay with this for one moment,

2    please.

3    Q.   214, if you could go to the first page, please.

4         That has a name in the upper right-hand corner; do

5    you see that?

6    A.   Yes.

7    Q.   Can you read the name?

8    A.   "Charles Michael Lieber."

9    Q.   And there's a dollar and cents entry, or an RMB entry, on

10   the first page; can you see that?

11   A.   The 1609?

12   Q.   No.  Right in the middle of the page, "0.00;" do you see

13   that?

14   A.   Yes.

15   Q.   Okay.  And I think Mr. Casey just pointed out there are no

16   further entries anywhere in the bankbook; is that right?

17   A.   It was blank.

18   Q.   Okay.  Thank you.

19        Special Agent Spice, I'm going to try not to show you

20   a million documents.  I'm going to try to be quick.

21        We just watched a video, or a few videos, of

22   Professor Lieber; you recall that, right?

23   A.   Yes.

24   Q.   And in a couple of the exchanges, he says things like, "I

25   shouldn't have done that, that was wrong;" you heard that,

1    right?

2    A.    Yes.

3    Q.    You're aware that Professor Lieber had a dispute with

4    Harvard University over the use of its name; correct?

5    A.    At the time?

6    Q.    Either at the time or now.

7    A.    Yes.

8    Q.    And you testified about emails that had been forwarded to

9    Amy Mousseau at DoD during your testimony with Mr. Casey; do

10   you recall that?

11   A.    Emails forwarded to her?

12   Q.    To DoD, yes.

13   A.    I'm not sure I know that.

14   Q.    Okay.  So you're not aware of a trademark dispute between

15   Professor Lieber and Harvard University; is that right?

16   A.    Correct.

17   Q.    Okay.  Your interview with Professor Lieber that we just

18   saw was January 28, 2020; correct?

19   A.    Correct.

20   Q.    And some of the documents that you and Mr. Casey just

21   discussed, including Government Exhibit 11, which we can show

22   to you, or Government Exhibit 23, those were documents from

23   2011 and 2012; correct?

24   A.    Exhibit 11 I believe was 2011.  And you said the other

25   was --

1  Q.   23.

2  A.   23.  2012.

3  Q.   So those are eight and nine years prior to the interview;

4  correct?

5  A.   Correct.

6  Q.   Now, when you spent a lot of time yesterday and this

7  morning reading emails, you were obviously not involved in the

8  sending or the receiving of those emails; right?

9  A.   Correct.

10 Q.   And those were events taking place or communications

11 taking place that you had no knowledge of back then; right?

12 A.   Back when?

13 Q.   Back in 2011 and 2012, during those exchanges that you

14 were reading.

15 A.   No.

16 Q.   And even sitting here today, you have no personal

17 knowledge of those events; you were just reading emails, right?

18 A.   Correct.

19 Q.   And the emails that you were reading were provided to you

20 when you entered into this investigation sometime in 2019 or

21 2020?

22 A.   All of these?

23 Q.   Yes.

24 A.   Some were provided prior to the arrest, just the day

25 before in the complaint.  I believe all of those are pursuant a

```
 1    Harvard University Grand Jury subpoena.  And everything else
 2    would have been in 2021.
 3    Q.   So you were provided with some of the emails before your
 4    interview and maybe some more of the emails afterwards?
 5    A.   Me personally?
 6    Q.   Yes.
 7    A.   No.
 8    Q.   Where did you get the emails from?
 9    A.   Special Agent Plumb acquired them.
10    Q.   Okay.  And he got them from Harvard University; correct?
11    A.   Pursuant to a Grand Jury subpoena.
12    Q.   Right.  And Harvard collected a number of
13    Professor Lieber's emails and turned them over to the
14    Government, as you understand it?
15    A.   Pursuant to a Grand Jury subpoena.
16    Q.   Right.  Now, were you present for a meeting between
17    Harvard University lawyers, the Government, the NIH on
18    January 21, 2020?
19    A.   No.
20    Q.   Are you aware that, on that day, Harvard University
21    lawyers provided information concerning these emails to the
22    Government?
23              MR. CASEY:  Objection.
24              THE COURT:  Provided what?
25              MR. MUKASEY:  Information concerning this
```

1    investigation, concerning the emails, to the Government.

2            MR. CASEY:  Objection.

3            THE COURT:  She can answer that yes or no, if she

4    knows.

5    A.   I wasn't present at that meeting.

6    Q.   Now, the documents that you've been reading from that were

7    collected pursuant to subpoena, many of them were on the

8    Harvard University server; correct?

9    A.   I think that was stipulated.

10   Q.   And others were on external drives that were taken from

11   Professor Lieber pursuant to a search warrant; right?

12   A.   Two search warrants.

13   Q.   Correct.  And other of the evidence that you've testified

14   about were physical materials taken from the home and office

15   pursuant to search warrant; right?

16   A.   Yes.

17   Q.   And does that comprise basically what you looked at to get

18   ready for your testimony, emails, documents, physical evidence

19   collected by the Government, some provided by Harvard, in the

20   course of the investigation?

21   A.   Yes.

22   Q.   Now, this investigation does not contain any charges -- or

23   this trial, I should say, does not contain any charges that are

24   related to espionage, for example; right?

25   A.   No.

1    Q.   Or spying, just for a lay term?

2    A.   No.

3    Q.   Now, I would like to run back to the bank documents

4    quickly that you and Mr. Casey were discussing.

5              MR. MUKASEY:  And I'll ask Mr. Chan to please show us

6    Government Exhibit 20 -- 212.

7              And that's in evidence.

8              THE CLERK:  Yep.

9              MR. MUKASEY:  Thank you, Ms. Urso.

10             THE CLERK:  Yep.

11   Q.   Are you familiar, Special Agent Spice, with the process of

12   how a foreigner opens a bank account in China?

13   A.   I am not.

14   Q.   Are you familiar with the rules regarding passwords for

15   Chinese bank accounts?

16   A.   No.

17             MR. MUKASEY:  If you'd take 212, Mr. Chan, and

18   compare it side by side with Government Exhibit 200 in

19   evidence?  And it will be Page 3.

20   Q.   Let's start on the left-hand side.

21             Do you see where it says, on the left-hand side,

22   "Mobile number"?

23   A.   Yes.

24   Q.   Can you read that, please?

25   A.   "1355-462-8578."

1    Q.    Now, let's look at the right-hand side.

2              Can you read the second mobile number under

3    "Professor Liqiang Mai"?

4    A.    "86135-5462-8578."

5              MR. MUKASEY:  Now, Sal -- Mr. Chan, if you could go

6    back to 212.

7    Q.    On that pink ICBC document, it's true, is it not, that the

8    section for mobile banking is left blank; correct?

9              MR. MUKASEY:  You can blow that up for Special Agent

10   Spice.  I think you just passed it.  "Mobile banking" on the

11   left-hand side.

12   Q.    That's left blank; correct?

13   A.    I'm trying to determine where it's called mobile banking.

14   Q.    Left-hand side it says "Mobile"?

15   A.    Under "Address"?

16   Q.    Correct.

17   A.    It just says, "Mobile."  I don't know if that says mobile

18   banking.

19   Q.    Left blank; correct?

20   A.    To the left -- or to the right, "Mobile" is blank.

21   Q.    And if we go down to "Internet banking," there's no

22   checkmark there; correct?

23   A.    Correct.

24   Q.    And if we go down to "Telephone banking," that's left

25   blank as well; correct?

1    A.   Correct.

2    Q.   Now, if we move to Page 3 of that document, on the bottom

3    right-hand side, there's a box that's labeled "bank stamp"?

4    A.   Yes.

5    Q.   That's left blank; correct?

6    A.   Correct.

7             THE COURT:  What is this document?

8             MR. MUKASEY:  This is a document that is alleged to be

9    an account-opening document at the ICBC Bank --

10            THE COURT:  Okay.

11            MR. MUKASEY:  -- that's been put into evidence by the

12   Government.

13   Q.   And if you look in the middle of the page, you'll see

14   several what I think are dollars-and-cents amounts or

15   percentages.

16            MR. MUKASEY:  Sal, you can circle them.

17   Q.   All say "0.00;" correct?

18   A.   In English, yes.

19   Q.   And if you go just a couple of lines down, you'll see

20   2019-6-17; you see that?

21   A.   Yes.

22   Q.   Do you understand that to be the expiration date of the

23   account?

24   A.   I see that as a date, but I don't know Mandarin.

25   Q.   You're not familiar with that?

1    A.    Uh-um.

2    Q.    Now, if we can move to 214, and this is going to be the

3    bankbook that you were just talking about that was found in the

4    home?

5    A.    Yes.

6    Q.    And we scrolled through it, and we saw no entries;

7    correct?

8    A.    Correct.

9    Q.    The ICBC Bank has locations in the United States; right?

10   A.    Yes.

11   Q.    You have no records from its locations in the U.S.; right?

12   A.    Not that I'm -- I don't know.  I've heard that a subpoena

13   was issued, but I don't know the results.

14   Q.    Okay.  You have no documents from ICBC Bank in the U.S. in

15   this case, as you sit here?

16   A.    Not that I'm aware of.

17   Q.    Okay.  And you don't have any records, as you sit here,

18   showing any amount was ever deposited in this ICBC Bank

19   account?

20   A.    I'm not aware of any through my review.

21   Q.    Okay.  And you don't have any bank records showing ever

22   any withdrawal from this account?

23   A.    Again, I'm not aware of any through my review.

24   Q.    Okay.  Do you know of other agents that have it?

25   A.    I don't think so.

1    Q.    Okay.  And you don't have any bank records showing that

2    there was ever any transaction in this account; right?

3    A.    I'm not aware of any transactions.

4    Q.    And you discussed, or at least you read the names of a

5    whole bunch of people yesterday during your testimony in

6    various emails.

7              Do you know whether Liqiang Mai had signatory

8    authority on this account?

9    A.    I do not.

10   Q.    Do you know whether President Zhang -- I'm going to

11   mispronounce the last name.  I'll call him President Zhang, and

12   you'll know who I'm talking about.

13             You don't know whether President Zhang had signatory

14   power on this account, do you?

15   A.    I do not.

16   Q.    And you don't know whether Ms. Fan had signature authority

17   on this account, do you?

18   A.    I'm not aware, though she seems to have some relationship

19   with the account.

20             MR. MUKASEY:  Well, I'm going to move to strike that,

21   what seems to be.

22   Q.    Do you know whether she has signature authority on the

23   account, yes or no?

24   A.    No.

25   Q.    Do you know whether any individual associated with

1    Wuhan University of Technology had authority over this account?

2    A.    I do not.

3    Q.    Do you know whether anybody from the Thousand Talents

4    Program in China, some authority of the Thousand Talents

5    Program, had authority or signatory authority over this

6    account?

7    A.    I do not.

8    Q.    And, again, sticking with this account, whether you use

9    214 or 212 --

10           MR. MUKASEY:  We can put them side by side, Sal.

11   Q.    -- you've never seen any bank statements, have you, for

12   this account for the year 2013?

13   A.    No.

14   Q.    2014?

15   A.    No.

16   Q.    2015?

17   A.    No.

18   Q.    And with respect to those three years, 2013, 2014, and

19   2015, you've never seen an account statement for this account?

20           MR. CASEY:  Objection.  Asked and answered.

21           THE COURT:  Count what?

22           MR. MUKASEY:  An account statement.

23           THE COURT:  Well, she just told us she hadn't.

24   Q.    You've never seen a canceled check from this account?

25   A.    No.

1    Q.    A wire-transfer document from this account?

2    A.    No.

3    Q.    A deposit ticket or a withdrawal slip from this account?

4    A.    No.

5    Q.    A money order from this account?

6    A.    No.

7    Q.    You've seen no evidence indicating that one dollar was

8    ever deposited into this account; correct?

9    A.    Correct.

10   Q.    Now, Special Agent Spice, you've been in the Bureau

11   for -- I'm trying to remember -- 15 years or so?

12   A.    17.

13   Q.    17 years.  And you're familiar with the FBI's "Domestic

14   Investigations Operations Guide," or what I'll call the manual?

15   A.    The DIOG, yes.

16   Q.    Right, the DIOG.

17          And it's your goal, of course, to use best practices

18   in your investigations; right?

19   A.    Yes.

20   Q.    And practices that you've learned in your training and at

21   Quantico and your experience and whatever field training you've

22   gotten; right?

23   A.    Yes.

24   Q.    And your goal is to conduct a thorough investigation;

25   right?

1    A.    Yes.

2    Q.    A complete investigation?

3    A.    Yes.

4    Q.    And you're searching for the truth, obviously; right?

5    A.    Yes.

6    Q.    And part of conducting a thorough investigation is

7    conducting interviews; is that fair to say?

8    A.    Yes.

9    Q.    And part of good practice in taking interviews or in

10   conducting interviews is to take notes, if you can; right?

11   A.    If we can.

12   Q.    And when you conduct an interview, if you can, you want to

13   make a record of it for posterity, to recall what was said

14   later on down the line; right?

15   A.    Yes.

16   Q.    And generally speaking, if possible, you have two agents

17   conduct interviews of a witness.  Oftentimes one is the agent

18   asking the questions, and the other one is the one taking

19   notes; not always, but generally?

20   A.    Generally.

21   Q.    And it's important to take accurate notes, yes?

22   A.    Yes.

23   Q.    The importance of taking accurate notes is heightened when

24   time passes after the interview and you later have to figure

25   out or recall what the person who you interviewed said; right?

1   A.   I rely on the report I wrote.

2   Q.   Right.  And the report comes from the notes that are taken

3   in the interview?

4   A.   For the most part.

5   Q.   Okay.  Now, sometimes notes of interviews or reports of

6   interviews are not actually used until months or years after

7   the interview is conducted; right?

8   A.   The notes?

9   Q.   Yes.

10  A.   Once a report is written, we rely on the report.

11  Q.   Right.  And sometimes you don't need to actually use that

12  report or go to that report until months or years later,

13  depending on how a case develops?

14  A.   It's memorialized in our system.

15  Q.   Right.  And sometimes you don't need to go back to the

16  system to get the notes until months or years later?

17  A.   Nowadays, they are uploaded into the system.  We can see

18  them.

19  Q.   Okay.  Maybe I'm not being clear.

20  A.   Sorry.

21  Q.   I understand they're uploaded into a system.  After

22  they're uploaded into the system, you might not need to rely on

23  them for a case or for intelligence for months or years after

24  the interview?

25  A.   Sure.

1    Q.   Great.  Thank you.

2             And would you agree that sometimes the notes that are

3    taken in an interview can be critical to determining whether

4    someone gets charged with a crime or not?

5    A.   They can be.

6             MR. CASEY:  Objection, Your Honor.

7             THE COURT:  I'm sorry?

8             MR. CASEY:  Objection.

9             THE COURT:  What's the objection?

10            MR. CASEY:  Relevance.

11            THE COURT:  No.  I'll allow it.

12   A.   Notes are not a verbatim transcript of an interview.

13   Q.   So I completely understand that.  We're all taking notes

14   here.  There's only one verbatim transcript, and that's the

15   stenographer.

16            My question is:  Sometimes the notes that you take

17   that gets transferred into a report that gets uploaded into the

18   system can be critical in determining whether or not to charge

19   someone with a crime?

20   A.   The notes -- again, we rely on the report.

21   Q.   Okay.  The report can be critical in determining whether

22   or not to charge someone with a crime?

23   A.   Yes.

24   Q.   Now, just getting back to sort of general good

25   investigative practices, always good to speak to people with

1    first-hand knowledge of the events you're investigating;

2    correct?

3    A.   It's ideal.

4    Q.   That is ideal.

5              And would you agree that, where you can, it's

6    important to speak to people, more than one person, get

7    independent views?

8    A.   Yes.

9    Q.   And would you agree with me that it's sort of basic

10   criminal investigation technique that you ought not let one

11   witness speak to another witness?

12   A.   I can't control that.

13   Q.   Well, you think it's okay, then, to allow witnesses to

14   meet together to discuss the facts?

15   A.   In what timing?

16   Q.   That could contaminate an investigation; right?  If

17   witnesses speak to each other about, Well, I saw this and I did

18   that, and you saw this and you did that, don't you lose their

19   first-hand knowledge?  Doesn't it contaminate each of their

20   individual recollections?

21   A.   Generally, if we're conducting an interview, we don't --

22   we interview people separately, but I'm not understanding your

23   timing of when witnesses speak to each other.

24   Q.   Once you have determined that Person A is a witness and

25   has knowledge of an event, Person B is a witness and has

1    knowledge of an event, you try to interview them separately;

2    right?

3    A.   Yes.

4    Q.   And the reason you do that is you don't want their

5    collective memories -- you don't want them sitting together and

6    discussing what happened because one person's memory can

7    affect, or infect, the other's, so you do it separately; right?

8    A.   Yes.

9    Q.   Okay.

10   A.   That's the best practice.

11   Q.   Agreed.  Thank you.

12          Now, you read about four million emails yesterday by

13   a guy named Liqiang Mai.  You have never interviewed

14   Liqiang Mai; correct?

15   A.   Correct.

16   Q.   You've never actually spoken to him at all; right?

17   A.   Correct.

18   Q.   No contact with him at all?

19   A.   No.

20   Q.   And Special Agent Plumb, no contact with Liqiang Mai at

21   all, as far as you know?

22   A.   As far as I know, no.

23   Q.   Okay.  This is Special Agent Plumb right here -- right?

24   A.   Yes.

25   Q.   -- right next to me?

1          MR. CASEY:  Objection, Your Honor.

2          THE COURT:  What's the objection?

3          MR. CASEY:  He's motioning to someone sitting in the

4    gallery in the Courtroom.

5          MR. MUKASEY:  He was on a videotape for about an hour

6    that the jury watched.  Any way --

7          THE COURT:  You may answer.

8    A.   Yes, that is Special Agent Plumb.

9    Q.   Now, neither of you have interviewed or have spoken to

10   Liqiang Mai.

11          Have you personally verified Mai's email addresses?

12   You know that he used multiple email addresses to contact

13   Dr. Lieber; right?

14   A.   Yes.

15   Q.   And have you verified those email addresses?

16   A.   Me?  No.

17   Q.   Okay.  Have you verified whether others beyond Liqiang Mai

18   may have had access to his email?

19   A.   I don't even know, no.

20   Q.   Do you know what Mai's official position is, if he even

21   has one, at the Wuhan University of Technology?

22   A.   I've seen several titles.  I'd have to look at the

23   documents to refresh my memory.

24   Q.   Right.  But we've established that you really don't know,

25   through no fault of your own, you don't know the truth or

1  falsehood of anything in those documents; right?

2  A.   For the most part, regarding Dr. Mai and his titles,

3  correct.

4  Q.   Okay.  So you don't know Dr. Mai's official actual title

5  in real life, not in the emails, at Wuhan University; right?

6  A.   I do not.

7  Q.   Okay.  So you don't know how the Wuhan University of

8  Technology categorizes Mai; right?

9  A.   Independently of the documents?

10  Q.   Correct.

11  A.   Correct.

12  Q.   And you don't know whether he's categorized as a professor

13  or a dean or an administrator or something else?

14  A.   Independent of the documents, no.

15  Q.   Okay.  You haven't verified whether Mai was authorized to

16  give out or invite or award someone to be in the Thousand

17  Talents Program, have you?

18  A.   Independent of the documents?

19  Q.   Correct.

20  A.   No.

21  Q.   Now, you haven't verified whether Liqiang Mai was

22  authorized to give away money on behalf of either Wuhan or the

23  Thousand Talents Program, have you?

24  A.   Independent of the documents, no.

25  Q.   But the documents are just things you've read; right?  You

 1   have no personal knowledge of the documents; correct?

 2   A.   I've read them, yes.

 3   Q.   Okay.  I've read them, too, but we've both read works of

 4   fiction as well, so --

 5        MR. CASEY:  Objection, Your Honor.

 6        THE COURT:  The jury may disregard that.

 7        MR. MUKASEY:  Okay.

 8   Q.   You have no independent factual knowledge that you could

 9   swear to, other than what you're reading there?  You're just

10   reading the words; right?

11   A.   Yes.

12   Q.   Okay.  Now, with respect to President Zhang, same series

13   of questions:  You don't really know what Zhang's relationship

14   is to the Thousand Talents Project, if any?

15   A.   Independent of the documents, no.  But in the documents

16   he's President, and you do see pictures of him -- or you see

17   references to him.

18   Q.   Okay.  And other than what you have seen in the documents

19   provided by Harvard and some of the other documents that have

20   been put into your binder, you don't have any independent

21   knowledge of Mai or Zhang?  You never spoke to them; right?

22   A.   No, I have not.

23   Q.   You've never interviewed them; right?

24   A.   No.

25   Q.   Okay.  Same is true with respect to Fan Xiang who is

1    referred to in the documents as Fan?

2    A.    Yes.

3    Q.    Never had any contact with her?

4    A.    No.

5    Q.    And Xiaojie Duan, never spoke to her, never had any

6    contact with her?

7    A.    No.

8    Q.    Are you aware that the Wuhan University of Technology has

9    an international office?

10   A.    Only by the documents.

11   Q.    Did you contact the international office?

12   A.    No.

13   Q.    Did you ever speak to their Human Resources Department?

14   A.    No.

15   Q.    Their Accounting Department, their Payroll Department?

16   A.    No.

17   Q.    And you've never seen any pay stubs from Wuhan University

18   to Professor Lieber, have you?

19   A.    No.

20   Q.    And you've never seen any pay stubs from the Thousand

21   Talents Program to Professor Lieber; right?

22   A.    No.

23   Q.    Now, the FBI has offices all around the world; correct?

24   A.    Correct.

25   Q.    Including in Shanghai?  Beijing maybe.

```
1    A.   Beijing, yeah.

2    Q.   Right.  And those are called legats or legal attachés?

3    A.   Correct.

4    Q.   You had no contact with the FBI office in Beijing in

5    connection with this case; right?

6    A.   Me personally, no.

7    Q.   Okay.  And do you know whether you had any contact with

8    U.S. Consulates in China in connection with your investigation

9    of this matter?

10   A.   Me personally, no.

11   Q.   Okay.  Now, you never contacted anybody in this case who's

12   actually an authority or an administrator of this Thousand

13   Talents Program; right?

14   A.   Me personally, no.

15   Q.   Okay.  Did Special Agent Plumb?

16   A.   I don't know.

17   Q.   How about the Young Thousand Talents Program?  Have you

18   heard of that?

19   A.   It's referenced in the documents, yes.

20   Q.   Okay.  No contact with anybody from Young Thousand

21   Talents?

22   A.   Me personally, no.

23   Q.   You keep saying you personally.  Are there other agents

24   who've done all this stuff?

25   A.   I'm not aware of that.
```

1   Q.   Okay.  Mr. Casey showed you a plaque that's sitting there.

2          MR. MUKASEY:  Is it okay if I approach quickly, Judge?

3          THE COURT:  Of course.

4   Q.   This plaque has a red seal on the bottom right-hand side?

5          THE COURT:  However, we can't hear you when you --

6   thank you.

7   Q.   The plaque has a red seal on the bottom right-hand side;

8   right?

9   A.   Yes.

10  Q.   And have you learned, in connection with your

11  investigation of this case, that official Chinese documents,

12  official Chinese awards, must have this red seal to be

13  official?

14  A.   I don't know if that is -- if that seal is a must.  I

15  don't know if that's true.

16  Q.   Okay.  So you don't know one way or another whether that

17  seal is official?

18  A.   Correct.

19  Q.   Okay.  And you don't know what's required under Chinese

20  custom for something to be considered official?

21  A.   Correct.

22  Q.   Now, the Thousand Talents Program is completely legal,

23  yes?

24  A.   I think it's probably subject to an -- legal from a U.S.

25  point of view, United States law?

1   Q.   I'm asking you whether it's legal.

2   A.   I guess I need more context.

3   Q.   Okay.  Well, perhaps I could refresh your recollection

4   with an FBI document, which I can put on the screen just for

5   you, which is DX JW, and I can call your attention -- maybe

6   this would help -- to six lines starting with the word

7   "Associating."  Just read it to yourself.

8   A.   (Witness reviews document.)

9   Q.   Isn't it a fact that associating with these talent

10  programs is legal and breaks no laws?

11          MR. CASEY:  Your Honor, I think the question is:  Does

12  it refresh her recollection?

13          MR. MUKASEY:  Okay.

14  Q.   Can you read it to yourself and tell us --

15          THE COURT:  Is this a document in evidence?

16          MR. MUKASEY:  No.  I'm just using it to refresh her

17  recollection.

18          THE COURT:  I'm not sure that her recollection was

19  exhausted.

20  Q.   Okay, then let me take this document down and ask you

21  again:  The Thousand Talents Program and associating with it

22  breaks no laws?

23  A.   And, again, my answer is:  I'm not aware of any U.S.

24  laws.

25  Q.   Okay.

1    A.    I asked you, "U.S. law?" --

2    Q.    Great.

3    A.    -- and then -- yes, that's correct, it's not illegal.

4    Q.    Thank you.

5          Let's take a look at Government Exhibit 11 at

6    Page 1 -- you know, based on your work in this case, there are

7    many different talent programs; correct?

8    A.    Yes.

9    Q.    So if you look at Government Exhibit 11 at Page 1, you see

10   the name there in the middle of the page, "The Recruitment

11   Program of Global Experts"?

12   A.    Yes.

13   Q.    Now, let's look at Government Exhibit 23 at Page 3.

14         And the name on the top of that one is "The One

15   Thousand Talent High-Level Foreign Expert;" right?

16   A.    Yes.

17   Q.    And now let's look at Government Exhibit 2, which is

18   Dr. Lauer's letter, in evidence, where he talks about, at

19   Page 2, China's Thousand People Plan; you see that?

20   A.    I do.

21   Q.    And there are many, many other plans that you're aware of;

22   correct?

23   A.    There are several.

24   Q.    Fair enough.

25         Now, you mentioned during the course of yesterday a

1    number of emails.  You read a number of emails I believe

2    starting in 2011.  Don't quote, but I think most of them went

3    '11, '12, '13.  Does that jibe with your recollection?

4    A.   Yes.

5    Q.   Okay.  Let's take a look at Government Exhibit 14 at

6    Page 5.

7              In the upper right-hand corner, which is a little

8    blurry, can you read the first sentence starting with "WUT"?

9    A.   "WUT-Harvard Joint Nano Key Laboratory was established in

10   2009."

11   Q.   Now, let's go to Professor Lieber's visa, which is GX 210,

12   at Page 30.  That's the visa that I believe you put in evidence

13   yesterday; correct -- or today?

14   A.   I would have to look at the dates.  I think we saw two

15   visas today.  That's why.  I just wanted to refresh.

16             MR. MUKASEY:  Sal, do you want to flip through?

17   Q.   Do you recognize that as GX 210, Government Exhibit 210?

18   A.   Again, I think we saw two visas in that passport.  I might

19   be mistaken.

20   Q.   Well, let's take a look at this one.  What's the issue

21   date on that one, Page 30?  What's the issue date on that one?

22   A.   September 21st, 2009.

23   Q.   Now, if we scroll a little bit in this visa, starting at

24   Page 6, do you see some other stamps?

25   A.   Yes, there are various stamps.

1   Q.   Okay.  And you see an "Admitted China" on the bottom left,

2   October, 2009?

3   A.   Yes.

4        MR. MUKASEY:  Okay.  Let's keep scrolling, Sal.

5   Q.   Do you see "Hong Kong" in the circular one on the bottom

6   right?

7   A.   On the left page?

8   Q.   Yes, exactly.

9   A.   Yes.

10  Q.   And "Singapore" just sort of in the hexagon right there?

11  A.   Yes.

12       MR. MUKASEY:  And Sal, can we see if we can find some

13  other on Page 8?  Maybe we could blow that up.

14  Q.   You see "Israel" on the upper left?

15  A.   I do.

16       MR. MUKASEY:  Okay, that's enough of that.

17       And now let's go to DX AB CML -- and I believe this

18  is in evidence pursuant to the stipulation.

19       MR. CASEY:  Just the photos.

20       MR. MUKASEY:  It's in, isn't it?

21       MR. CASEY:  Just the ones that are in the stipulation.

22       MR. MUKASEY:  Correct.

23  Q.   Now, have you seen this in connection with the evidence

24  that you've reviewed in the case?

25  A.   No, I have not.

1  Q.   Okay.  It's in pursuant to stipulation, and I think the
2  Government will not take issue with me saying this was an award
3  found in Professor Lieber's house?
4       It's called the Friendship Medal; do you see that?
5  A.   I do.
6       MR. MUKASEY:  Are we at 225 and 226, Sal?
7       THE COURT:  Are we about to finish with this?
8       MR. MUKASEY:  I can come to a comfortable resting
9  place in one minute, if that's okay, Judge.
10      THE COURT:  Is it okay?
11      (Jurors nod in the affirmative)
12      MR. MUKASEY:  They're the bosses.
13 Q.   The last thing I really want to show this afternoon is GX
14 33 at Page 2, and this is something that was admitted
15 yesterday.
16      And if you focus on the third line, it talks about
17 the Friendship Award, People's Republic of China, '09 --
18 A.   Yes.
19 Q.   -- which is what we just saw; you see that?
20 A.   I do.
21 Q.   "Fellow, American Chemical Society, Inaugural Class, 2009;
22 Honorary Fellow, Chinese Chemical Society, 2009;" and then at
23 the bottom right, "Honorary Professorship, Peking, 2008;" do
24 you see that?
25 A.   I do.

1          MR. MUKASEY:  Judge, this is probably a good place to

2     break.

3          THE COURT:  Thank you.  Members of the jury, you are

4     now excused for the weekend.  I ask you, please, to come back

5     on Monday morning at 9:00, and we will start as promptly as we

6     can.  I think we've been pretty good about that.

7          My anticipation is that you will be deliberating on

8     your verdict on Tuesday.  I anticipate that we will complete

9     the evidence on Monday.  I need to meet with the lawyers to

10    tell them what I tell you about the law.  We will do that on

11    Monday if we possibly can, and we will begin on Tuesday,

12    hopefully, with the arguments of counsel to you and then with

13    my instructions on the law, and you will have the case well

14    before lunch.  That is my anticipation.  You will then be here

15    until you either have a verdict or tell us that you -- that you

16    need more time, in which case, you'd come back the next day.

17         I thank you very much for your being willing to do

18    this, although with some constraint by us, and wish you a good

19    weekend.  Again, don't think about the case, don't talk about

20    the case, just have a good time and get ready for Christmas.

21         Thank you very much.

22         THE CLERK:  All rise, please.

23         THE COURT:  Until Monday morning at 9:00.

24         (Jury is not present for the following)

25         THE COURT:  And now, where are we in relation to where

1    we thought we would be?

2            MR. CASEY:  I think we're ahead of schedule.

3            MR. MUKASEY:  I probably have a half an hour, maybe a

4    little less.  Yeah, about a half hour Monday morning.

5            THE COURT:  And does the Government have any other

6    witnesses?

7            MR. DRABICK:  We do, Your Honor.  We have -- it

8    will -- all short witnesses, but we will have five witnesses.

9            THE COURT:  How short?

10           MR. DRABICK:  I anticipate the directs of each to be

11   between ten and 20 minutes at most, a half an hour of one of

12   the tax-related --

13           THE COURT:  Are these listed on your list of

14   witnesses?

15           MR. DRABICK:  Yes, Your Honor.

16           THE COURT:  So each of them will be ten to 15 minutes?

17   So that's about two hours' worth of testimony.

18           MR. DRABICK:  The shortest will be ten to 15 minutes.

19   There may be one that would be closer to half hour, but we'll

20   move through it expeditiously.

21           THE COURT:  Does the Defendant have any witnesses to

22   call?

23           MR. MUKASEY:  We're going to cross-examine the

24   witnesses that the Government is calling.  They're very

25   critical witnesses, and we are going to have to cross-examine

 1   them.  And we are going to try to call one of our own

 2   witnesses.  It may have to be Tuesday morning, but it's a very

 3   short witness.

 4        THE COURT:  I devoutly wish that we will finish all

 5   the evidence on Monday.

 6        MR. MUKASEY:  So do we.

 7        THE COURT:  Now, remember, Monday we have a slightly

 8   abbreviated day.  You need to plug that into your calculus.

 9        MR. MUKASEY:  I just have one request of the Court:

10   Because Special Agent Spice is on cross-examination, I would

11   ask you to instruct the Government that they should not be

12   communicating with her about the testimony between now and

13   Monday.

14        THE COURT:  You don't object to that?

15        MR. CASEY:  We don't.

16        THE COURT:  So that means they can't talk to you about

17   the case between now and Monday.

18        THE WITNESS:  Yes, Your Honor.

19        THE COURT:  And if they -- if they try to do that,

20   you've got to tell them they can't do it.

21        Anything else?

22        MR. CASEY:  Could I just raise one issue?  I hate to

23   go to back to the conditionally admitted documents, but I just

24   wanted to note to Your Honor that Mr. Mukasey used or referred

25   to or put on the monitor three of the conditionally admitted

1  exhibits, Exhibits 11, 14, and 23.

2          So he keeps insisting on conditional admittance, yet

3  he's using them on cross-examination.  They're clearly

4  relevant; otherwise, he wouldn't be asking about them.  So,

5  again, we would ask the Court to remove the conditional

6  admittance of those exhibits and have them --

7          THE COURT:  Which document is it?  What number?

8          MR. CASEY:  11, 14, and 23 were the ones that were

9  just shown; but, again, they all sort of relate to the forming

10  of the contract, and so there's no reason, from the

11  Government's perspective, to have a conditional admittance on

12  them.  They should be full exhibits.  They're sort of part and

13  parcel of his participation in the Thousand Talents Program.

14          THE COURT:  Well, I think it's effectively in evidence

15  now, isn't it?  I mean, everybody has talked about it, and

16  everybody has used it.

17          MR. MUKASEY:  Well, our cross-examination was used for

18  a purpose very different than the first witness.

19          THE COURT:  But you keep on doing it now within the

20  time that we have.

21          MR. MUKASEY:  On one document.  But it's used on

22  cross-examination, obviously, for a very different purpose than

23  they're trying to use it.

24          THE COURT:  Well, go ahead and do that.

25          MR. MUKASEY:  We'll craft an instruction that we hope

1    the Court will give on Tuesday morning that takes into account

2    the reason different documents get admitted.  That's fair.

3              THE COURT:  Okay.  Remind me.

4              MR. CASEY:  We're just looking, Your Honor, for --

5    just for Your Honor to say, These are not conditionally

6    admitted; these are exhibits.  We've all been talking about

7    them, the jury has seen them.  We just want the record to be

8    clear that they are exhibits.

9              THE COURT:  Okay.

10             If you have any issues to discuss, I think it would be

11   better if we start at 8:30, rather than a quarter of 9:00.  So

12   let Ms. Urso know, and we'll do that, but hopefully we don't

13   have to.  And I gather that everybody will try very hard to

14   finish the evidence on Monday so that we can get it to the jury

15   on Tuesday.

16             May I see counsel?  We don't need the record.

17             (Adjourned at 1:15 p.m.)

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Linda Walsh, Registered Professional Reporter

4     and Certified Realtime Reporter, in and for the United States

5     District Court for the District of Massachusetts, do hereby

6     certify that the foregoing transcript is a true and correct

7     transcript of the stenographically reported proceedings held in

8     the above-entitled matter, to the best of my skill and ability.

9              Dated this 17th day of December, 2021.

10

11

12              /s/ Linda Walsh

13              Linda Walsh, RPR, CRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25