```
 1                      UNITED STATES DISTRICT COURT
 2                    FOR THE DISTRICT OF MASSACHUSETTS
 3

 4                                     )
     UNITED STATES OF AMERICA,         )
 5                                     )
             Plaintiff,                )
 6                                     )   Criminal Action
     v.                                )   No. 1:20-cr-10111-RWZ-1
 7                                     )
     CHARLES LIEBER,                   )
 8                                     )
             Defendant.                )
 9                                     )

10

11
                    BEFORE THE HONORABLE RYA W. ZOBEL
12                     UNITED STATES DISTRICT JUDGE

13
                                JURY TRIAL
14                                DAY 5

15
                            December 20, 2021
16                             9:01 a.m.

17

18             John J. Moakley United States Courthouse
                          Courtroom No. 12
19                        One Courthouse Way
                      Boston, Massachusetts 02210
20

21

22
                        Linda Walsh, RPR, CRR
23                      Official Court Reporter
               John J. Moakley United States Courthouse
24                  One Courthouse Way, Room 5205
                      Boston, Massachusetts 02210
25                      lwalshsteno@gmail.com
```

1    APPEARANCES:

2    On Behalf of the Government:

3          UNITED STATES ATTORNEY'S OFFICE
           By: AUSA Jason A. Casey
4              AUSA James R. Drabick
           1 Courthouse Way, Suite 9200
5          Boston, Massachusetts 02210
           617-748-3264
6          jason.casey2@usdoj.gov

7
     On Behalf of the Defendant:
8
           MUKASEY FRENCHMAN LLP
9          By: Marc L. Mukasey, Esq.
               Torrey K. Young, Esq.
10             Catherine M. Deist, Esq.
               Stephanie Guaba, Esq.
11         570 Lexington Avenue, Suite 3500
           New York, New York 10022
12         212-466-6400
           marc.mukasey@mfsllp.com

13

14

15

16                  Proceedings reported and produced
                     by computer-aided stenography.
17

18

19

20

21

22

23

24

25

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| KARA SPICE | | | | |
| By Mr. Mukasey | | 5-5 | | 5-32 |
| By Mr. Casey | | | 5-21 | |
| AMY ROSE MOUSSEAU | | | | |
| By Mr. Drabick | 5-34 | | 5-81 | |
| By Mr. Mukasey | | 5-62 | | |
| MICHAEL LAUER | | | | |
| By Mr. Drabick | 5-84 | | 5-120 | |
| By Ms. Young | | 5-110 | | |
| CARL GOODMAN | | | | |
| By Mr. Drabick | 5-123 | | 5-164 | |
| By Ms. Deist | | 5-159 | | |
| COLLEEN RANAHAN | | | | |
| By Mr. Drabick | 5-166 | | 5-180 | |
| By Ms. Deist | | 5-178 | | |

E X H I B I T S

| DESCRIPTION | RECEIVED |
|-------------|----------|
| GOVERNMENT EXHIBITS | |
| 3     ........................................... | 5-106 |
| 87    ........................................... | 5-45 |
| 177   ........................................... | 5-151 |
| 240   ........................................... | 5-131 |
| 241   ........................................... | 5-140 |

EXHIBITS (continued)

242    ...........................................    5-146

243    ...........................................    5-150

245    ...........................................    5-154

246    ...........................................    5-154

247    ...........................................    5-154

249    ...........................................    5-157

250    ...........................................    5-163

260    ...........................................    5-143

265    ...........................................    5-155

322    ...........................................    5-57

323    ...........................................    5-57


                        DESCRIPTION                RECEIVED

DEFENDANT EXHIBITS

   AB    ...........................................    16


                                                       PAGE

Stipulation..........................................    5-55

Stipulation..........................................    5-142

Stipulation .........................................    5-155

Stipulation..........................................    5-177

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  All rise, please.
 3              THE COURT:  Good morning.  Please be seated.
 4              THE CLERK:  Should we bring the group down -- Judge,
 5    should we bring the jurors down?
 6              THE COURT:  Yes, that's a good idea.
 7              I have a motion and objection.  Can we deal with that
 8    later?
 9              MR. DRABICK:  Yes, Your Honor.  We wanted to put it on
10    your radar that there are certain exhibits to be addressed.
11              THE COURT:  Thank you.
12              THE CLERK:  All rise, please.
13              (Jury is present for the following.)
14              THE COURT:  Good morning.  Please be seated.
15              MR. MUKASEY:  May I proceed, Judge?
16              THE COURT:  Ms. Spice, understand that you're still
17    under oath even though we will not again swear you today.
18              THE WITNESS:  Yes, Your Honor.
19              THE COURT:  You may proceed.
20              MR. MUKASEY:  Thank you, Judge.
21              KARA SPICE, having been previously duly sworn by the
22    Clerk, was examined and testified as follows:
23                             CROSS-EXAMINATION
24    BY MR. MUKASEY:
25    Q.   Hi, Agent Spice.
```

1   A.   Good morning.

2   Q.   Good morning.

3        In connection with your investigation in this matter,

4   did you become aware that Harvard University has offices in

5   China?

6   A.   I'm not aware of that.

7   Q.   So you didn't contact Harvard's offices in China; correct?

8   A.   No.

9   Q.   We saw on video last week that you interviewed

10  Professor Lieber on January 28th, 2020; you remember that?

11  A.   Yes.

12  Q.   When did you get involved in this case?

13  A.   Around that time, around January 28th or the day before.

14  Q.   Okay.  So you had not reviewed any documents at the time

15  that you sat down with Professor Lieber; correct?

16  A.   I reviewed the complaint.  I reviewed some documents

17  before in preparation for the interview.

18  Q.   Can you tell us what those documents were?

19  A.   Yes.  So, it was the complaint, the search warrant

20  complaints -- the arrest complaint, the two search warrant

21  complaints, and the documents that kind of were cited inside of

22  the complaint.

23  Q.   Okay.  So, with respect to the documents that you showed

24  Professor Lieber during the meeting on January 28th, you had

25  reviewed those, or you had not reviewed those?

A.    I had reviewed those.

Q.    And had you reviewed the other emails produced by Harvard
in connection with this case?

A.    No, I did not.

Q.    And I think I asked you this last week, but just to
double-check, you know there was a meeting between Harvard
University lawyers, NIH and the U.S. Attorney's Office on
January 21, 2020; right?

A.    I'm aware that there was a meeting, but I didn't attend
it.

Q.    Your partner or colleague Agent Plumb attended that;
correct?

A.    I believe so.

Q.    And at that meeting, a Harvard University lawyer spoke
about the emails that she provided to the U.S. Attorney's
Office; correct?

        MR. CASEY:  Objection, Your Honor.  She didn't attend
the meeting.

        THE COURT:  Were you present during this conversation?

        MR. MUKASEY:  I don't think she was.  I'm asking for
her understanding.

        THE WITNESS:  No.

        THE COURT:  So what's the point?

        MR. MUKASEY:  I want to understand the background and
Harvard's role in this investigation, if she knows.

1    THE COURT:  If she wasn't there, she can't tell us
2    about it.
3            MR. MUKASEY:  Fair enough.  Fair enough.
4    Q.   If you don't know, you don't know.
5    A.   I don't know.
6    Q.   So you say you got involved in the case a day or so before
7    the arrest and the interview; correct?
8    A.   Yes.  I was aware of the investigation, but I wasn't
9    involved in the day-to-day activities.
10   Q.   Okay.  So January 28, 2020, was basically your first day
11   actively involved in the case; correct?
12   A.   I would say the day before, January 27th.
13   Q.   Fair enough.  And you showed Professor Lieber a number of
14   documents when you interviewed him; right?
15   A.   We did.
16   Q.   Okay.  I'm going to review those documents with you now
17   for a moment.  You showed him GX 11 during your interview;
18   correct?
19   A.   I'm not aware of what GX 11 is.
20   Q.   It should be right in front of you.  It's a Government
21   exhibit.  You've never seen this document before?
22   A.   I'm sorry.  I have a blank screen.
23   Q.   Oh, sorry.
24           THE CLERK:  No.  I just want to make sure we were
25   on -- there we go.

1    A.    I see it.

2    Q.    That's one of the documents you showed Professor Lieber;

3    right?

4    A.    Yes.

5    Q.    Can you tell us the date on that document, please?

6    A.    The top email is dated November 9th, 2011.

7    Q.    Okay.  You also showed him Government Exhibit 13 during

8    the interview on January 28th; correct?

9    A.    I believe so.

10   Q.    And that's also from 2011, is it not?

11   A.    It is.

12   Q.    And Government Exhibit 17 -- 17A, I should say?

13   A.    Yes.

14   Q.    And that is dated in April of 2012; right?

15   A.    Correct.

16   Q.    And I'll just do one more.  Government Exhibit 50,

17   five-zero, that's a June 17, 2014 email that you showed him

18   during the interview; right?

19   A.    I believe so.

20   Q.    And these are documents that you had reviewed that day or

21   the day before; correct?

22   A.    Correct.

23   Q.    Now, I want to focus for a moment on Government

24   Exhibit 23.

25             MR. MUKASEY:  And we can go to the third page,

1    Mr. Chan, if you don't mind.

2    Q.   This is one of the documents that you showed

3    Professor Lieber; correct?

4    A.   Yes.

5    Q.   Now, you don't know who drafted this document, do you?

6    A.   I do not.

7    Q.   You don't know who translated it from English to Chinese

8    or Chinese to English?

9    A.   I do not.

10   Q.   You don't see any letterhead from any university on here,

11   do you?

12   A.   I do not.

13   Q.   You have no idea, as you sit here today, whether this is

14   an official document of the Wuhan University of Technology, do

15   you?

16   A.   I do not.

17   Q.   And you have no idea whether it's an official document of

18   the Thousand Talents Program; right?

19   A.   I do not.

20   Q.   If you go down this page to Roman numeral one, "Duration

21   of the Contract," in the last line, it talks about permission

22   of the Superior Authorities Department; you see that?

23   A.   I do.

24   Q.   You don't know who are the Superior Authorities this

25   document refers to, do you?

1    A.   I can make an assumption, but I don't know for sure.

2    Q.   I'm asking for your knowledge.  We don't operate on

3    assumptions here, please.

4    A.   I do not.

5             MR. MUKASEY:  Slide down to the bottom, Mr. Chan.

6    Q.   Tell us what page number this is.

7    A.   There's not a number designated.

8    Q.   Maybe there's a number on the next page.  Take a look at

9    the next page.  No page number; correct?

10   A.   Correct.

11   Q.   How about the next page?

12            Nothing; right?

13   A.   Correct.

14   Q.   Now, on the top of Page 4, there's a Roman numeral three.

15   It starts with, "Rights and Obligations."  It should be Page 4

16   of this document.  There you go.

17            The first paragraph refers to conducting regular

18   supervision; do you see that?

19   A.   Yes.

20   Q.   You have no evidence that regular supervision of anybody

21   was conducted under this document, do you?

22   A.   We've seen emails.

23   Q.   I'm asking your knowledge of what's in this contract, not

24   emails.

25            Who conducted the regular supervision here pursuant

1   to this supposed agreement?

2   A.   I don't know.

3   Q.   Two lines down, it talks about the working instructions of

4   One Thousand Talent Plan.

5            Have you recovered a copy of the working

6   instructions?

7   A.   I don't believe so.

8   Q.   Now, if you take a look at the next page, which is Page 5

9   of this document, Roman numeral B -- I'm sorry -- letter B, the

10  paragraph that begins, "Scientific Research Funding"; you see

11  that?

12  A.   Yes.

13  Q.   The second sentence talks about money that shall be

14  managed.

15           You don't know what money was managed under this

16  contract, do you?

17  A.   I do not.

18  Q.   Then, under Paragraph D, as in dog, lower case D, it

19  mentions that "Party A shall provide Party B with 50,000 U.S.

20  dollars per month before tax."

21           You have no evidence that this kind of money, this

22  amount of money, was ever paid, do you?

23  A.   Yes, I do.

24  Q.   You have documentary evidence that this was paid?

25  A.   Documentary?  No.

1    Q.    Okay.  Now, same is true with respect to the one million

2    Chinese Yuan; correct?  No documentary evidence that this was

3    ever paid?

4    A.    No documentary evidence.

5    Q.    Paragraph 3, at the bottom of this page, talks about Party

6    A providing policies.

7            You've never seen any policies provided by any

8    Party A, have you?

9    A.    No.

10   Q.    And what page number are we on at the bottom of this?

11           No page number; correct?

12   A.    Correct.

13   Q.    Next page, Paragraph 3, at the top, Subsection 2, it says,

14   "Party B can appeal to the administrative authority."

15           You don't know who that is, do you?

16   A.    No.

17   Q.    And all the way at the bottom of the page, it talks about

18   Party B fulfilling the tasks assigned and shall be subject to

19   Party A's inspection, assessment and supervision.

20           Do you know who the inspectors were?

21   A.    I do not.

22   Q.    And I assume you don't know who the assessment folks or

23   the supervision folks were; right?

24   A.    I do not.

25   Q.    Related to that, on the next page, IV, Paragraph 3 talks

1    about overseas experts who will be invited to join the

2    assessment.

3            Tell me who the overseas experts are.

4    A.   I can't.

5    Q.   And you can't confirm that this ever happened -- right? --

6    that the assessment report was delivered to a related national

7    department?

8    A.   I don't know.

9    Q.   Now, if you look at the last page of this document, under

10   VII, it says, "This contract in triplicate becomes effective

11   from the date of signatures by two parties."

12           MR. MUKASEY:  Can you scroll to the bottom of this,

13   Mr. Chan.

14   Q.   No signatures; correct?

15   A.   No.

16   Q.   No stamp of authorization?

17   A.   No.

18   Q.   No seal, nothing like that?

19   A.   No.

20   Q.   Agent Spice, you don't know when this document was

21   drafted; correct?

22   A.   No.

23   Q.   How many people had input into its drafting?

24   A.   No.

25   Q.   You don't know if it meets Thousand Talent Plan

1  requirements?

2  A.   I do not.

3  Q.   Do you even know if there are official Thousand Talent

4  Plan requirements?

5  A.   I do not.

6  Q.   Do you know if this document was emailed with the

7  permission of the Wuhan University of Technology?

8  A.   We believe Liqiang Mai is an employee.

9  Q.   Okay.  Did you just say you believe?  That's what you just

10  testified to?  I'm asking about your knowledge because we don't

11  operate on beliefs in the Courtroom; right?

12  A.   Liqiang Mai emailed the document.

13  Q.   Do you know if that was done with the permission of

14  Wuhan University of Technology?  Yes or no.

15  A.   No.

16  Q.   And, by the way, you have never seen an executed version

17  of this document; correct?

18  A.   Correct.

19  Q.   If I may now, I'd like to show you some documents that are

20  photographs that I believe were stipulated to during your

21  direct testimony.

22       MR. MUKASEY:  Mr. Chan, can you go to DX, defense

23  Exhibit AB, please.

24       THE CLERK:  Excuse me.  Do you have a list of your

25  exhibits?

```
 1              MR. MUKASEY:  Of the ones I'm about to do?

 2              THE CLERK:  Or just in general?  Is it filed?  Yes?

 3              MR. CHAN:  I'll email them.

 4              MR. MUKASEY:  The boss is in charge of that.

 5              THE CLERK:  Okay.  I'm sorry.  I just want to make

 6     sure.  Is this admitted?  I can't tell.

 7              MR. MUKASEY:  I think pursuant to stipulation; right,

 8     Jason?

 9              MR. CASEY:  Correct.

10              THE CLERK:  What number?

11              MR. MUKASEY:  Defense Exhibit AB, as in Adam, baby.

12              (Defendant Exhibit AB received in evidence.)

13     Q.   Agent Spice, tell me if you see Defense Exhibit AB,

14     No. 987, in front of you.

15              THE CLERK:  Okay.  I have that from the other day.

16     Q.   These are photographs from the search, I believe, of the

17     residence on January 28th; correct?

18     A.   Yes.

19     Q.   Okay.  And you see some plaques depicted on the bottom of

20     the floor there?

21     A.   Yes.

22              MR. MUKASEY:  Okay.  We can go to 988.

23     Q.   Another view of the plaques; correct?

24     A.   Yes.

25     Q.   989 is, I believe, that Strategic Scientist plaque that we
```

1    had in the Courtroom the other day; right?

2    A.    I think we're having some technical difficulties.

3    Q.    I can show you the hard copies, if you want.

4    A.    989.  Is that photograph 989?

5    Q.    989, right there.  No. 22, that's the Strategic Scientist

6    plaque; right?

7    A.    I can't see the photo number.  It keeps --

8    Q.    Let's try 990.

9          There it is; right?

10   A.    Yes.

11   Q.    And 991, these are other awards or honors or plaques or

12   certificates that your team of Agents photographed at

13   Professor Lieber's house; right?

14   A.    It appears to be, yes.

15   Q.    Same with 994.

16         And let's just finish up with 826.  That's a

17   photograph of some Chinese noodles and some Chinese alcohol; is

18   that correct?

19   A.    I have no idea.  I recognize the noodles, but I don't know

20   what's in that bottle.

21   Q.    Fair enough.

22         Agent Spice, when you arrested Professor Lieber, this

23   case was categorized as one with no victims; correct?

24   A.    I don't know that.  I don't know.

25   Q.    Is there something that I can show you that might jog your

```
 1    memory or might help you answer the question?
 2    A.    I would need to see our central database to check that.
 3    Q.    Well, let me see if I can take a stab at showing you --
 4    just you, not the jury yet -- USAO 1989 at Page 3.  Just look
 5    at it to yourself silently, and then I'll ask you a question.
 6              MR. MUKASEY:  And Mr. Chan, maybe you can show her
 7    what I'm referring to.
 8    Q.    Let me ask you the question again:  When this case was
 9    filed by the U.S. Attorney's Office with the help of your
10    office, it was categorized as a case with no victims; correct?
11              MR. CASEY:  Objection, Your Honor.
12              THE COURT:  What's the objection?
13              MR. CASEY:  He was asking if the witness's memory was
14    refreshed, so I think the question should be is her memory
15    refreshed.
16              THE COURT:  If she knows, she can tell us.
17    A.    This form says no, but we also have a database that we use
18    at the FBI where victims are identified.  I don't know that.
19    Q.    I'm asking you about the day of the arrest how the
20    U.S. Attorney's Office classified the case.  They classified it
21    as one with no victims; right?
22              MR. CASEY:  Objection.
23              THE COURT:  How would she know that?
24              MR. MUKASEY:  I'm showing her a Government document.
25              MR. CASEY:  He's just reading from a document.
```

1            THE COURT:  Well, if this document is in evidence,

2     then it's there, the evidence is in.

3            MR. CASEY:  It's not in evidence.

4            THE COURT:  What's the document?  Is this the sheet

5     that gets put --

6            MR. MUKASEY:  It's a filing form, yes.

7            THE COURT:  Is there any objection to it?

8            MR. CASEY:  There is an objection, Your Honor.

9            THE COURT:  It's part of the Court document.

10           MR. CASEY:  It's not probative of anything.

11           THE COURT:  Well, I don't know that yet.

12           It may be admitted into evidence, at least de bene.

13           MR. CASEY:  Are you offering it?

14           MR. MUKASEY:  I'm not offering it.  I just want one

15     question.

16     Q.   The case is categorized as one with no victims; right?

17           THE COURT:  I mean, you're asking her about what the

18     Assistant U.S. Attorney who filed the document put on the

19     document that is part of the Court papers.

20           MR. MUKASEY:  Correct.

21           THE COURT:  Well, if it's part of the Court papers,

22     the Court papers are -- the jury can look at them.

23           MR. MUKASEY:  Fair enough.

24           THE COURT:  I mean, it's not true of all Court papers,

25     but in this instance, it's part of the beginning of the case.

1        MR. MUKASEY:  So we will move in just that section of

2   this form.  We will move in just the section of the form that

3   speaks to no victims.  Is that acceptable, Judge?

4        MR. CASEY:  And we'll just object because it's not

5   relevant to any issue in the case, Judge.

6        THE COURT:  Well, I don't know yet whether it's

7   relevant.  I'll admit it subject to striking it if it turns out

8   to not be relevant.

9        Members of the jury, when the lawyer, whether it's the

10  Government or any lawyer, starts a case, files a case here by

11  filing a complaint in a civil case or an indictment or

12  information in a criminal case, then they have to go to the

13  Clerk's Office or do it automatically, I mean, through the

14  computer on the Clerk's Office.

15       And one of the documents that's generated by the

16  Court, actually, but based on information given by the counsel,

17  is this document.  It's just part of what the court maintains

18  in order to classify cases and know who the lawyers are and so

19  on.  And it's just part of the case.

20       So I'm not exactly sure what it's doing before you

21  right now, but I guess we'll find out.

22       THE CLERK:  So I'm going to put it in?

23       MR. MUKASEY:  I'm only putting in that tiny portion.

24       THE COURT:  I didn't realize they hadn't seen it.

25       THE CLERK:  So is it okay to show?

```
 1            MR. MUKASEY:  Only that tiny portion is what I'm
 2    moving in.
 3            THE CLERK:  I know.
 4            MR. MUKASEY:  Yes, you can show that portion.
 5            THE COURT:  But the whole document is in evidence
 6    because this, without anything else, doesn't tell us anything.
 7    We don't know what it means, who made it.  So the whole
 8    document has to come in.  I mean, it's simply, if you will, a
 9    bureaucratic necessity.
10    Q.   Last question, Agent Spice:  When you arrested
11    Professor Lieber, he had 12 bucks in his pocket; is that right?
12    A.   I don't remember the amount in his wallet.
13            MR. MUKASEY:  I have nothing further, Judge.
14            THE COURT:  Any redirect?
15            MR. CASEY:  Very briefly, Your Honor.
16                        REDIRECT EXAMINATION
17    BY MR. CASEY:
18    Q.   Good morning, Special Agent Spice.
19    A.   Good morning.
20    Q.   Do you recall last week you were asked some questions
21    about best practices when documenting an interview of a subject
22    or a target?  Do you recall those questions?
23    A.   Yes.
24    Q.   And you testified that it's best practices to take notes;
25    is that right?
```

1    A.    Yes.

2    Q.    Is it best practices to have your notes be a verbatim

3    transcript of what was said during an interview?

4    A.    I'm not capable of doing verbatim, so no.

5    Q.    Okay.  And you said that notes are one way that you would,

6    in turn, create a formal report of an interview; correct?

7    A.    Correct.

8    Q.    That's one of the things you would rely on?

9    A.    Yes.

10   Q.    Is there anything else that you rely on when you draft a

11   formal report of an interview, aside from notes?

12   A.    Just my presence at the interview and witnessing the

13   interview myself.

14   Q.    Is that a way of saying you rely on your memory?

15   A.    Yes.

16   Q.    You were asked a number of questions about whether you

17   were aware of any evidence that money was deposited into the

18   Defendant's bank account at ICBC in China; do you recall those

19   questions?

20   A.    Yes.

21   Q.    Did the Defendant make any statements to you on

22   January 28th, 2020, concerning money in his ICBC China account?

23   A.    Yes.

24   Q.    Do you recall what he said?

25   A.    He said something to the effect that, when he checked the

1    ATM, there was approximately $200,000, U.S. dollars.

2    Q.   And that was in 2014?

3    A.   Yes.

4    Q.   And are you aware of various emails that the Defendant

5    authored asking that a portion of his salary be deposited into

6    his bank account?

7    A.   Yes.

8    Q.   You were also asked some questions about seeking or trying

9    to obtain bank records from ICBC; correct?

10   A.   Yes.

11   Q.   And I think you made reference in one of your answers to a

12   Grand Jury subpoena to ICBC?

13   A.   I'm aware that one was served.

14   Q.   Are you aware of any documents produced in response to

15   that subpoena?

16   A.   I'm not.

17   Q.   Do you know if ICBC China and ICBC USA are separate legal

18   entities?

19   A.   I do not.

20   Q.   Okay.  Do you know if there's any formal process for

21   obtaining corporate records from a Chinese company?  When I say

22   formal, legal process.

23   A.   We can ask, but they don't have to comply.

24   Q.   Is that a way of saying there is no formal legal process?

25            MR. MUKASEY:  Objection to the form.

1   Q.   Can you explain your answer?

2   A.   China doesn't have to follow U.S. law when it comes to

3   asking for these documents.

4        MR. MUKASEY:  Objection to the legal analysis.

5        MR. CASEY:  That's fine, Your Honor.  I'll move on.

6        THE COURT:  He's given up.

7   Q.   You were asked just now some questions about Exhibit 23,

8   which is one of the documents that you showed Professor Lieber

9   during your interview; correct?

10  A.   Yes.

11  Q.   And that was a draft Thousand Talents contract that the

12  Defendant had discussed in emails with Wuhan University;

13  correct?

14  A.   Yes.

15  Q.   And you were asked specifically, well, among other things,

16  about the payment provisions of the contract; correct?

17  A.   Yes.

18  Q.   And whether any money had been paid pursuant to the

19  contract?

20  A.   I believe so.

21       MR. CASEY:  Could I have Exhibit 51, Mr. Bruemmer --

22  or 151, rather, in evidence.

23       THE CLERK:  Yes.  There we go.

24  Q.   All right.  Do you see Exhibit 151 in front of you?

25  A.   I do.

```
 1              MR. CASEY:  Okay.  And Mr. Bruemmer --
 2    Q.   Well, the bottom email, is that from Xiang Fan to
 3    Charles Lieber dated October 26th, 2012?
 4    A.   It is.
 5    Q.   And is that after the date of the email in Exhibit 23?
 6    A.   Yes.
 7              MR. CASEY:  And Mr. Bruemmer, if you could highlight
 8    the second paragraph in the bottom email, please.
 9    Q.   Could you read that, please, Special Agent Spice.
10    A.   "Before your visit, I would like to talk about one detail
11    in the implementation of the contract of 'One Thousand Talent
12    High-Level Foreign Expert' between you and our University."
13              MR. CASEY:  And if you could zoom out, Mr. Bruemmer.
14    Q.   Does the Defendant respond to that email?
15    A.   Yes.
16    Q.   And what does he say?
17              MR. CASEY:  If you could highlight that, Mr. Bruemmer.
18    Just the first paragraph, please.
19    A.   "Dear Fan:  When I spoke with my wife about this, she
20    asked, 'Could do both?' as she was worried about complexity of
21    transfer from bank in China.  Specifically, open account at
22    ICBC but split the payment with part being deposited to bank
23    account and part in cash.  If this is too complicated, let me
24    know."
25              MR. CASEY:  Could I have Exhibit 44, Mr. Bruemmer.
```

1    Q.   At the bottom of the exhibit here, is that an email from

2    Dr. Lieber to Liqiang Mai and Xiang Fan from, it looks like,

3    January 23rd, 2014?

4    A.   Yes.

5    Q.   And at the very bottom there in that faint text, can you

6    just read the first sentence, please.

7    A.   "Dear Liqiang:  To follow up on items not yet covered on

8    recent email."

9         MR. CASEY:  Could we go to the next page,

10   Mr. Bruemmer.  And could you please highlight No. 4 and the

11   text below that, please, just the one word below that.

12   Q.   Is No. 4 an email concerning the payment of salary?

13   A.   Yes.

14   Q.   Okay.  And can you read the faint text at the bottom

15   there?

16   A.   "Confirmed."

17        MR. CASEY:  Mr. Bruemmer, could I have Exhibit 52.

18   Q.   All right.  Is this another email exchange between the

19   Defendant and Xiang Fan?

20   A.   Yes.

21   Q.   Are there any Harvard employees, other than the Defendant,

22   copied in this email?

23   A.   I don't see any others.

24   Q.   Okay.  And the bottom email, is that from Ms. Fan to

25   Dr. Lieber from, it looks like, November, 2014?

1    A.    Yes.

2    Q.    Do you know if the Defendant took a trip to Wuhan right

3    after this email?

4    A.    I believe he did.

5          MR. MUKASEY:  I'm going to object to that.  She has no

6    personal knowledge of this.  She's just reading off documents.

7          MR. CASEY:  I can rephrase the question.

8          MR. MUKASEY:  Thank you.

9          THE COURT:  I'm sorry?

10         MR. CASEY:  I'll rephrase the question.

11   Q.    Are you aware of any documents indicating that Dr. Lieber

12   traveled to China in November, 2014?

13         MR. MUKASEY:  Objection.

14         THE COURT:  If she knows about any documents

15   concerning a trip, she can tell us yes or no.

16         MR. MUKASEY:  What the documents said, I have no

17   objection.

18         MR. CASEY:  That's all I'm asking.

19   A.    Yes, I believe there's a trip summary.

20   Q.    And can you read -- is the top email from Dr. Lieber?

21   A.    Yes.

22         MR. CASEY:  Could you highlight that for us,

23   Mr. Bruemmer.

24   Q.    And can you read that, please?

25   A.    "Dear Fan:  For this business email, my preference is (if

1     it can be arranged without taking too much time from day) is to

2     have half a payment since last visit (or past half year is

3     easier) in U.S. dollars.  If this does not work out this visit

4     given short time, then we can do so for next visit.  Best,

5     Charlie."

6                 MR. CASEY:  Thank you.

7                 Mr. Bruemmer, you can take that down.

8     Q.    Ms. Spice, do you also recall being asked some questions

9     about portions of the contract in Exhibit 3 that discussed

10    supervision of Dr. Lieber's activity?

11    A.    Yes.

12    Q.    And evaluation of Dr. Lieber's activity?

13    A.    Yes.

14                MR. CASEY:  Mr. Bruemmer, if we could have

15    Exhibit 156.

16    Q.    And if we could go to -- let's just first start at the

17    bottom email.

18                Is that an email from Professor Mai to Dr. Lieber

19    dated June 21st, 2013?

20    A.    Yes.

21                MR. CASEY:  And could we go to the fourth page,

22    please.  And could you highlight No. 3.

23    Q.    And could you read that, please?

24    A.    "3:  Besides recently, WUT need to submit a summary

25    material of your One Thousand Plan.  Could you please send the

1    copy of the first page, including your photo of your passport

2    and visa, records to China (from 2011 to now) Wuhan or other

3    cities in China, which is needed in the summary materials of

4    your One Thousand Plan.  President Zhang hopes to get them

5    before next Monday, June 24th.  We are sorry to push you in

6    this."

7             MR. CASEY:  And if we could go to the first page,

8    please.

9    Q.   And is that an email from Dr. Lieber to Professor Mai on

10   the same day?

11   A.   Yes.

12   Q.   And are there any attachments to this email, that you can

13   see?

14   A.   Yes.

15   Q.   And can you read the name of the attachment?

16   A.   "CML_PSPT-Visa.PDF."

17   Q.   And in the bottom of the email, can you read Item No. 2?

18   A.   "Attached please find copies of passport pages per your

19   request."

20             MR. CASEY:  Could I also have Exhibit 166,

21   one-six-six.

22   Q.   Is this an email that Dr. Lieber received on June 28th,

23   2013?

24   A.   November 28th.

25   Q.   I'm sorry.  November 28th, 2013?

1  A.   Yes.

2  Q.   And it's from Professor Mai?

3  A.   Yes.

4       MR. CASEY:   Okay.   Mr. Bruemmer, can you highlight

5  Item No. 1 at the very top.

6  Q.   Could you read that, please?

7  A.   "1:  We are preparing the annual work report to State

8  Administration of Foreign Expert Affairs on your 'One Thousand

9  Talent Plan/High-Level Foreign Expert Plan.'  In this report,

10 we will briefly summarize the joint research, the main

11 achievement, including international collaboration project,

12 talent-training/supervision.  In particular, we will summarize

13 the following breakthrough under your strong supervision and

14 financial support from collaboration project (with any

15 suggestions/comments).  Please be free to let me know."

16       MR. CASEY:   All right.   And if we could go -- zoom

17 back out and just highlight the item in parentheses, No. 1,

18 below that.

19 Q.   Does Professor Mai reference an article, essentially, in

20 the first sentence there?

21 A.   Yes.

22 Q.   And could you read the second sentence?

23 A.   "This paper is very important for this annual report

24 because you are the corresponding author representing Harvard

25 and WUT, and Lin and I are co-authors from WUT."

1    Q.   And does Professor Mai go on to ask Dr. Lieber to add some

2    Chinese grants to the paper, the acknowledgments of the paper?

3    A.   Yes.

4             MR. CASEY:  If we could go to Exhibit 167.

5    Q.   Is this an email from Dr. Lieber the following day,

6    November 29th, 2013?

7    A.   Yes.

8    Q.   And do you see in the cc field -- actually, do you see the

9    subject line of the email?

10   A.   Yes.

11   Q.   And, among other things, does it say "Nature and

12   Nanotechnology"?

13   A.   It does.

14   Q.   Is that the name of the article that we saw in the

15   previous exhibit that this article was to be published in?

16   A.   Yes.

17            MR. CASEY:  If you could highlight No. 6.

18   Q.   Do you recognize the grants in Item No. 6 here on

19   Exhibit 167?

20   A.   Yes.

21   Q.   And where do you recognize them from?

22   A.   From the previous email request from Dr. Mai.

23            MR. CASEY:  Just one moment, Your Honor?

24            (Pause.)

25            MR. CASEY:  Thank you, Your Honor.  Nothing further.

```
1            THE COURT:  Any recross?
2            MR. MUKASEY:  Very brief.
3                         RECROSS-EXAMINATION
4    BY MR. MUKASEY:
5    Q.   Agent Spice, you have no personal knowledge that this Mai
6    person was authorized to act on behalf of Wuhan University;
7    correct?
8    A.   We have emails suggesting that he --
9    Q.   I'm not asking about your suggestions.  Just do me a
10   favor, just listen to my question.
11           THE COURT:  Hold it.  Hold it.
12           Can you answer the question, as it was phrased,
13   please; or, if you cannot answer it, you can say that.
14   A.   Would you please repeat it.
15   Q.   You have no personal knowledge that this Mai person was
16   authorized to act on behalf of Wuhan University; correct?
17   A.   No personal knowledge.
18   Q.   And no personal knowledge that he was authorized to act on
19   behalf of some Thousand Talents Program; right?
20   A.   No personal knowledge.
21   Q.   And if you look at Government Exhibit 44, which we can
22   display for you and the jury --
23           THE CLERK:  Are we back?
24           MR. CASEY:  It's in.
25           THE CLERK:  So are we going with yours?
```

```
 1              MR. MUKASEY:  Does the jury have it?
 2    Q.   -- which you just read a little bit from a moment ago with
 3    Mr. Casey?
 4    A.   Yes.
 5    Q.   Does this refer to the Thousand Talents Plan anywhere?
 6    A.   Could I see Page 2, please?
 7    Q.   You can see the whole thing.
 8    A.   And the third page, please.  And the fourth page, please.
 9              I don't believe I saw it.
10              MR. MUKASEY:  Nothing further.  Thank you, Judge.
11              THE COURT:  Thank you.  You are excused.
12              Members of the jury, we will stretch.
13              Who's next?
14              MR. DRABICK:  Your Honor, the Government calls
15    Amy Mousseau.
16              (Stretch break.)
17              THE CLERK:  Good morning.  If you could just come up
18    and remain standing for a brief moment.
19              (Witness sworn.)
20              THE WITNESS:  I do.
21              THE CLERK:  Would you mind just taking off your mask
22    while speaking, so everyone can hear.
23              Could you please state your name, spelling your last
24    name for the record for us, please.
25              THE WITNESS:  Amy Rose Mousseau, M, as in Mary --
```

```
 1              THE COURT:  I think you need to repeat that into the
 2    microphone.
 3              THE CLERK:  Please remain seated.  Just talk into the
 4    microphone.
 5              THE COURT:  Thank you.
 6              THE WITNESS:  Amy Rose Mousseau, M, as in Mary, O-U-S,
 7    as in Sam, S, as in Sam, E-A-U.
 8              THE COURT:  Thank you.  You may proceed.
 9              MR. DRABICK:  Thank you, Your Honor.
10              AMY ROSE MOUSSEAU, having been duly sworn by the
11    Clerk, was examined and testified as follows:
12                        DIRECT EXAMINATION
13    BY MR. DRABICK:
14    Q.   Good morning, Ms. Mousseau.
15    A.   Good morning.
16    Q.   Please just keep that microphone close to your mouth and
17    speak loudly.
18              Where are you employed?
19    A.   I'm a Special Agent with the Defense Criminal
20    Investigative Service.
21    Q.   Is that known as DCIS for short?
22    A.   It is.
23    Q.   What is DCIS?
24    A.   It is a division of the Department of Defense Office of
25    Inspector General.  It's the criminal investigative arm of the
```

1    DoD OIG.

2    Q.    Is that a department of the Executive Branch of the

3    Federal Government?

4    A.    It is.

5    Q.    And what does DCIS do?

6    A.    We investigate various types of fraud to include

7    procurement fraud, grant fraud, health care fraud, public

8    corruption, bribery, major theft committed against the

9    Department of Defense.

10   Q.    And what are your responsibilities as a DCIS Special

11   Agent?

12   A.    We -- I investigate the same criminal activity I just

13   mentioned.

14   Q.    And how long have you been a Special Agent?

15   A.    With DCIS, since December of 2015.

16   Q.    And what did you do before that?

17   A.    I was a Special Agent with the Naval Criminal

18   Investigative Service from January of 2003.

19   Q.    Is that similar to DCIS?

20   A.    It is.

21   Q.    Are you familiar with the name "Charles Lieber"?

22   A.    I am.

23   Q.    When did you first become familiar with that name?

24   A.    April of 2018.

25   Q.    And how did his name come to your attention?

1   A.   It was provided to me by a DCIS office in New Haven,

2   Connecticut.

3   Q.   For any -- in regards to anything in particular?

4   A.   Yes.  I received a referral noting that Dr. Lieber is

5   possibly or was possibly a member of the Thousand Talents

6   Program.

7   Q.   And what was your understanding at that time as to what

8   the Thousand Talents Program was?

9           MR. MUKASEY:  Objection.  It calls for hearsay.

10          MR. DRABICK:  Your Honor, this is relevant to --

11          THE COURT:  Her understanding may be helpful.  I mean,

12   it doesn't prove -- her understanding can't prove that such an

13   entity existed or what it did; however, it may be relevant to

14   her testimony and her perceptions, which you will have to judge

15   when you're in the jury room deciding your verdict.

16          So I will allow it on that ground.

17          MR. DRABICK:  Thank you, Your Honor.

18   Q.   Just to repeat, Agent Mousseau, what was your

19   understanding at that time as to what the Thousand Talents

20   Program was?

21   A.   My understanding at that time was that it's a

22   Chinese-sponsored program to recruit talent from the U.S. to

23   China for various research and development.

24   Q.   And --

25          THE COURT:  Members of the jury, let me just remind

1    you, her understanding cannot be evidence of the fact that she

2    understands; it's simply her understanding, and it's in

3    evidence to explain what she did, but that doesn't prove what

4    in fact this process or whatever it was, was.

5           Thank you.

6           MR. DRABICK:  Thank you, Your Honor.

7    Q.   And just one additional question on that particular point:

8    Agent Mousseau, what was your understanding, if any, as to

9    whether the program involved any payment?

10          MR. MUKASEY:  Objection.  This is asking for her

11   speculation, not her --

12          THE COURT:  The objection's sustained.

13   Q.   Did the referral from New Haven DCIS fit with any project

14   you were working on at the time?

15   A.   It did.

16   Q.   And could you describe briefly what the purpose and nature

17   of that project was?

18   A.   I was assigned to work on research and development fraud

19   projects focused on grant fraud in the Boston area.

20   Q.   And any particular risks or concerns that you were looking

21   at as part of their project?

22   A.   There are several types of grant fraud.  Two of the most

23   basic types are when a principal investigator --

24          MR. MUKASEY:  Objection to the scope of this

25   testimony.  This is not factual testimony; it's a soliloquy

1    about different types of fraud.  There's no fraud charge in

2    this case.

3              THE COURT:  Well --

4              MR. MUKASEY:  It's irrelevant.

5              THE COURT:  -- I will allow it only as an introduction

6    to what they're really getting at.

7    Q.   Agent Mousseau, did you ultimately meet with

8    Charles Lieber?

9    A.   I did.

10   Q.   Do you see him in the Courtroom today?

11   A.   I do.

12   Q.   Could you please just point him out for the jury?

13              In April of 2018 --

14              MR. MUKASEY:  She indicated, for the record, the

15   Defendant.  Sorry.

16              MR. DRABICK:  Thank you.

17              Just for the record, Your Honor, Ms. Mousseau has

18   identified the Defendant.

19              THE COURT:  Okay.

20   Q.   In April of 2018, did Professor Lieber have any active

21   grants with DoD?

22   A.   He did.

23   Q.   How many?

24   A.   Three.

25   Q.   And which DoD departments were funding those grants?

1    A.    Two with the Air Force, Office of Scientific Research, and

2    one with the Naval Research Laboratory.

3    Q.    Do you recall the approximate value of those grants?

4    A.    Approximately $3 million.

5    Q.    Had Professor Lieber previously had any grants with DoD

6    that had expired before April, 2018?

7    A.    Yes.

8    Q.    And the money that the Department of Defense uses to

9    provide research grants, where does that come from?

10   A.    Ultimately, the taxpayer.

11   Q.    Are you familiar with the phrase --

12         MR. MUKASEY:  I am going to object and move to strike,

13   Judge, about how this case affects the taxpayer.  It's totally

14   irrelevant.

15         THE COURT:  It's interesting, though.

16         MR. MUKASEY:  It's also prejudicial.

17         MR. DRABICK:  Your Honor, Agent Mousseau's motivations

18   and purposes for her actions are important to materiality in

19   this case.

20         THE COURT:  I will allow the last question.  We will

21   proceed.  Go ahead.

22         MR. DRABICK:  Thank you, Your Honor.

23   Q.    Agent Mousseau, are you familiar with the phrase

24   "fundamental research"?

25   A.    I am.

1    Q.   What does that refer to?

2    A.   It's the basic-level research funded by the DoD to develop

3    new projects that may be of interest to the Department of

4    Defense.

5    Q.   And does fundamental research involve classified material?

6    A.   No.

7    Q.   Are the results usually published?

8    A.   Yes.

9    Q.   And why does DoD fund this type of research?

10   A.   Ultimately, DoD funds this type of research so that

11   projects can expand to various interests of the Government, to

12   the DoD, and they may be then taken into the DoD research and

13   development arena separate from commercial entities.

14   Q.   Could fundamental research evolve into things that might

15   be classified?

16            MR. MUKASEY:   Objection.   Calls for speculation.

17            THE COURT:   Sustained.

18   Q.   Did Professor Lieber's research under his DoD grants fall

19   under the fundamental research category?

20   A.   Yes.

21   Q.   The referral that you received from DCIS New Haven, what

22   was your understanding as to where the information came from?

23   A.   Open-source research.

24   Q.   What does that mean?

25   A.   Research available to the public on the Internet.

1   Q.   And did your office decide whether the information was

2   worth following up on?

3   A.   Yes.

4   Q.   And what were you assigned to do, if anything?

5   A.   Contact Dr. Lieber and interview him.

6   Q.   And what, if anything, were you trying to find out?

7   A.   Ultimately, I was trying to determine whether or not there

8   was any possibility of grant fraud taking place and whether or

9   not Dr. Lieber was a member of the Thousand Talents Program.

10  Q.   And any particular form of grant fraud that you were

11  interested in investigating?

12       MR. MUKASEY:  Objection.  This is not a case about

13  grant fraud.

14       MR. DRABICK:  Your Honor, this is --

15       MR. MUKASEY:  This is the fifth time he said it.  It's

16  prejudicial.

17       MR. DRABICK:  Your Honor, the record is clear, there

18  is no grant fraud charge in the case; however, the motivations

19  of the Agents who interviewed the Defendant in this false

20  statements case are important to materiality and relevant to

21  materiality.  What they were trying to find out and what the

22  Defendant told them and the impact of what they told him is

23  relevant to materiality.

24       MR. MUKASEY:  The impact of what he told them is

25  relevant; grant fraud --

1          THE COURT:  I will allow the question, but I don't

2     want to go into everything that she thought and her colleagues

3     thought about what was going on.  They can -- she can tell us

4     what they did and what they found out.

5          MR. DRABICK:  Thank you, Your Honor.

6     Q.   Just one question, Agent Mousseau:  What was the nature of

7     your interest in whether Professor Lieber was a member of the

8     Thousand Talents Program?

9     A.   There's a possibility, if somebody is receiving foreign

10    funding --

11         MR. MUKASEY:  Objection to a possibility.

12         THE COURT:  It is not being offered for the truth of

13    it; it is being offered for her state of mind at the time that

14    she did the investigation.

15         MR. DRABICK:  Thank you, Your Honor.

16         THE COURT:  And it determines the nature of the

17    investigation, hopefully.

18         MR. MUKASEY:  Thank you, Your Honor.

19    A.   Sorry.  Can you repeat the question.

20    Q.   I'll do my best.

21         What was the nature of your interest in whether

22    Professor Lieber was a member of the Thousand Talents Program?

23    A.   If a principal investigator is receiving money both from

24    the DoD and a foreign entity, our interest is in whether or not

25    the funding streams overlap and, therefore, the person could be

1    what we call double-dipping where they're receiving money to

2    conduct similar research from two entities, one of which being

3    the Department of Defense.

4    Q.    And was it important to you to determine if that was going

5    on?

6    A.    Yes, that is what we investigate, one of the things.

7    Q.    Are you familiar the name "Wuhan University of

8    Technology"?

9    A.    I am.

10   Q.    How, if at all, did, I'll call it, WUT fit into what you

11   were doing?

12   A.    Part of the information that was provided to me identified

13   Dr. Lieber as closely associated with Wuhan University of

14   Technology.

15   Q.    And was that suspected affiliation something you wanted to

16   talk to him about?

17   A.    Yes.

18   Q.    And was that for the same reason?

19   A.    Yes.

20   Q.    Did anybody else work with you on this matter involving

21   Professor Lieber?

22   A.    Yes.

23   Q.    And who was that?

24   A.    My colleague from my office, Special Agent Ben Hochberger.

25              THE COURT:   Could you spell his last name.

```
 1              THE WITNESS:  H-o-c-h-b-e-r-g-e-r.
 2              THE COURT:  Thank you.
 3   Q.   Did you take any other steps before interviewing
 4   Professor Lieber?
 5   A.   Yes.
 6   Q.   What did you do, at a high level?
 7   A.   I researched -- sorry.  I spoke with the Government
 8   principal investigators at the Naval Research Laboratory, and
 9   Special Agent Hochberger spoke with the same at the Air Force
10   Office of Scientific Research.
11   Q.   And what was the purpose of doing that?
12   A.   Before we ever interview principal investigators, we
13   usually talk with the Government side counterpart in order to
14   get a better understanding of what the grant is, how successful
15   the grant is, whether there's been any issues, whether there's
16   been any request for publication, just some background
17   information.
18   Q.   Did you set up an interview with Professor Lieber?
19   A.   I did.
20   Q.   How did you go about doing that?
21   A.   By email.
22              MR. DRABICK:  Your Honor, at this time, I move to
23   admit, by agreement, Exhibit 87.
24              I understand there's no objection, Your Honor.
25              MR. MUKASEY:  There's no objection.
```

1          THE COURT:  Okay.  87 is in evidence.

2          (Government Exhibit 87 received in evidence.)

3          MR. DRABICK:  And could we please see Page 2,

4    Mr. Bruemmer.  And if you could highlight that email.

5    Q.   Agent Mousseau, what are we looking at?

6    A.   This is the email that I sent Dr. Lieber on Friday,

7    April 20th.

8    Q.   And could you please just read the first paragraph of your

9    email?

10   A.   "Dr. Lieber:  I am a Special Agent with the Department of

11   Defense Office of Inspector General.  I am conducting an

12   inquiry into several different grants funding by DoD in the

13   Boston area, and your grant entitled 'Innervated Blood/Brain

14   Barrier Tissue for the Study of Neuro-Invasion by VEEV' has

15   been selected for review.  I need to meet with you for about 30

16   to 45 minutes to discuss specific topics relative to this

17   grant."

18   Q.   Did you share with Professor Lieber what you were

19   intending to ask him about?

20   A.   Partly, the grant.

21   Q.   Were there things you wanted to talk to him about that you

22   didn't share in this email?

23   A.   Yes.

24   Q.   And what was that?

25   A.   His involvement with the Thousand Talents Program.

1    Q.   And why did you not tell him that in the email?

2    A.   It's not my practice to tell somebody that I'm going --

3    who I'm going to interview the entire scope of the interview

4    four days in advance of the interview.

5    Q.   Why not?

6    A.   In my experience, it's generally better to talk with the

7    person face to face and get their initial reaction.

8    Q.   Did Professor Lieber respond?

9    A.   He did.

10   Q.   And did you set up the interview?

11   A.   I did.

12   Q.   For when?

13   A.   I believe it was Tuesday, April 24th.

14        MR. DRABICK:  You can take that down, Mr. Bruemmer.

15   Q.   Did the interview take place as scheduled?

16   A.   It did.

17   Q.   And what was your purpose going into the interview?

18   A.   To ascertain whether or not Dr. Lieber was receiving

19   foreign funding as part of the Thousand Talents Program.

20   Q.   And any particular institutions you intended to ask him

21   about?

22   A.   Wuhan University of Technology.

23   Q.   And what level of importance, if any, did information

24   about those topics have for you?

25   A.   It was very important.

1    Q.    Did you have an outline?

2    A.    I did.

3    Q.    How did you draft that outline?

4    A.    In a Word document, based on information that I knew I

5    needed to discuss with him.

6    Q.    Did you include questions about the Thousand Talents

7    Program in your outline?

8    A.    I did not.

9    Q.    Why not?

10   A.    It wasn't necessary for me to use that as a reminder.  The

11   outline was to cover other topics than that.

12   Q.    And where did the interview take place?

13   A.    In his conference room at Harvard.

14   Q.    And who was there?

15   A.    Dr. Lieber and two Harvard employees.

16   Q.    Was Special Agent Hochberger there?

17   A.    He was.

18   Q.    And what role, if any, did Special Agent Hochberger have?

19   A.    He was the note-taker in the interview.

20   Q.    Did you take notes?

21   A.    I did not.

22   Q.    How big was the conference room?

23   A.    Fairly large size.

24   Q.    How many people could the table seat?

25   A.    Maybe ten to 12.

1    Q.   Any first impressions about the Defendant when you

2    arrived?

3    A.   Yes.

4    Q.   And what were those?

5         MR. MUKASEY:   I'm going to object to first

6    impressions.   I mean, what is this relevant to?

7         THE COURT:   How is it admissible?

8         MR. DRABICK:   Your Honor, the statements made during

9    this interview are the statements alleged in Count 1.   The

10   Defendant's demeanor during the interview is relevant to that.

11   I can ask it a different way, Your Honor, as well.

12        MR. MUKASEY:   Let him try.

13        MR. DRABICK:   Thank you, Mr. Mukasey.

14   Q.   Agent Mousseau, how would you describe the Defendant's

15   demeanor during the interview?

16   A.   Very cooperative and respectful and friendly.

17   Q.   And approximately how long did the interview last?

18   A.   Maybe an hour.

19   Q.   And how did you begin the interview?

20   A.   After introductions of everybody in the room, I asked

21   Dr. Lieber to explain one of the grants he was working on, the

22   NRL grant.

23   Q.   And why did you start there?

24   A.   In my experience speaking with the principal

25   investigators, it tends to put them at ease, and they like

1   explaining the grant to people that are inquiring about it in

2   layman's terms that we can understand.

3   Q.   Were there any other topics discussed at the beginning of

4   the interview?

5   A.   Yes.

6   Q.   And what were those?

7   A.   We discussed his process for hiring postdocs into his

8   laboratory and what they work on; we discussed his recent, or

9   at the time recent, interaction with the University of Michigan

10  in which they were using his name without his permission.

11  Q.   Did you ask him any questions about data security?

12  A.   I did.

13  Q.   And why did you do that?

14  A.   A lot of times when we speak with principal investigators,

15  they're not aware of the risk that they take when they travel

16  overseas with their research in some format, whether it be on

17  their phone or on their computer, so we try and get a sense of

18  how operational security is viewed by them.

19  Q.   Did you ask about his travel?

20  A.   Yes.

21  Q.   And why did you do that?

22  A.   For the same reasons, whether or not -- to get a sense of

23  whether or not he travels internationally and to where

24  specifically.

25  Q.   At any point, did you ask Professor Lieber whether he has

1   ever received any money from overseas sources?

2   A.   I did.

3   Q.   What do you recall about that discussion?

4   A.   He told me that he receives money for travel when he

5   travels to -- overseas, either to China or in -- he also

6   referenced Israel.  He receives travel expenses, stipends for

7   money and incidental expenses while he's traveling and maybe a

8   small fee for speaking engagements.

9   Q.   Is that small fee, is that sometimes referred to as an

10  honorarium?

11  A.   It can be, yes.

12  Q.   Did he mention any other sources of payment he's received

13  from overseas?

14  A.   No.

15  Q.   Was this portion of the interview limited to any

16  particular timeframe?

17  A.   No.

18  Q.   At any point, did the interview turn to whether

19  Professor Lieber has or had any affiliation with

20  Wuhan University of Technology?

21          THE COURT:  I'm sorry?

22          MR. MUKASEY:  I object.

23          THE COURT:  What was the question?

24          MR. DRABICK:  Your Honor, the question was:  "At any

25  point, did the interview turn to whether Professor Lieber has

1   or had an affiliation with Wuhan University of Technology?"

2           MR. MUKASEY:  I'm going to object to the leading.  If

3   he wants to ask what she said and what he said, he should do

4   that, but the leading is --

5           THE COURT:  Members of the jury, a leading question is

6   one that suggests the answer.  And normally, when counsel

7   conduct the direct examination, they're not allowed to lead.

8   But there are exceptions.

9           And, in any event, let me explain to you.  I could ask

10  you, what time did you wake up this morning?  And you could say

11  6:00 or whatever; or I could say, Now, didn't you wake up at

12  6:00 this morning?  The second is a leading question.  And

13  normally, as I said, during direct examination, leading

14  questions aren't permitted.

15          I don't find this so incredibly leading as to say it

16  can't be done, so the objection is overruled.

17          MR. DRABICK:  Thank you, Your Honor.  And I'll try to

18  ask it in a more simple fashion as well.

19  Q.   What, if anything, did you discuss with the Defendant

20  about Wuhan University of Technology?

21  A.   I asked him about his affiliation with Wuhan University of

22  Technology.

23  Q.   And do you recall if he had any responses?

24  A.   He mentioned that several years prior, in 2015, he learned

25  that a former student of his was working at that University,

1    and he explained that the student and the Wuhan University were

2    using his name and Harvard's name without his permission.

3    Q.    Did he reference any communications?

4    A.    Yes, he said that he sent them correspondence to cease and

5    desist the use of those -- of his name and Harvard's name in

6    association with the Wuhan University.

7    Q.    Did you request copies of those communications?

8    A.    I did.

9    Q.    Why?

10   A.    For corroborating information.

11   Q.    Did you ask Professor Lieber any questions about the

12   Thousand Talents Program?

13   A.    I did.

14   Q.    Where in the overall timeline of the interview did you

15   raise that topic?

16   A.    More towards the end.

17   Q.    Why?

18   A.    I wanted to take the opportunity to keep him at ease and

19   learn the most about Dr. Lieber before answering that question

20   in case he then decided to terminate the interview.

21   Q.    And why did you bring that topic up?

22   A.    That was one of the purposes of my interview with

23   Dr. Lieber.

24   Q.    Did you advise the Defendant of anything around the time

25   you broached this topic?

1    A.    I advised him that it was important for him to be

2    truthful.

3    Q.    Was this portion of the interview limited to any

4    particular timeframe?

5    A.    No.

6    Q.    Did he say whether he had any awareness of the Thousand

7    Talents Program?

8    A.    He did.

9    Q.    And what did he say?

10   A.    He said that he was aware of it because he had endorsed

11   several of his students for the Program.

12   Q.    Did the topic of whether he personally had any affiliation

13   with the program come up?

14   A.    Yes.

15   Q.    Was that portion of the interview limited to any

16   particular time period?

17   A.    No.

18   Q.    And what were you intending to elicit with your questions?

19   A.    Whether or not he was a member of the program.

20   Q.    Do you recall the specific language you used in your

21   question or questions on that topic?

22   A.    I do not.

23   Q.    Do you recall the specific language he used in his

24   answers?

25   A.    Other than him telling me that he's not sure how they

1   characterized him -- categorized him, I do not.

2   Q.   Did you have a reaction to that statement?

3        MR. MUKASEY:  Objection.

4        THE COURT:  Did who have a reaction?

5        MR. DRABICK:  Agent Mousseau.

6        THE COURT:  Well, I mean, if she had another question,

7   fine; but I don't think we want to get the reaction.

8   Q.   Do you recall whether Professor Lieber ever affirmatively

9   stated that he previously had had an affiliation with the

10  Thousand Talents Program?

11  A.   He did not tell me that.

12  Q.   Would you have approached your interview differently if he

13  had?

14  A.   Yes.

15       MR. MUKASEY:  Objection.  Calls for speculation.

16       MR. DRABICK:  Your Honor, this goes to materiality.

17       THE COURT:  I will allow it.

18       MR. DRABICK:  I'm sorry, Your Honor?

19       THE COURT:  She may answer.

20  A.   I would have approached it differently, yes.

21  Q.   How so?

22  A.   If Dr. Lieber had told me that he was a member of the

23  Talents Program, I would have expanded my interview at that

24  time to ascertain more information about his involvement with

25  the Program, how he was recruited to the Program, how much he

1    was paid and whether or not he had published any information

2    relative to his research with DoD.

3            MR. MUKASEY:  Objection and move to strike as to what

4    she would have done in a hypothetical situation.

5            MR. DRABICK:  Your Honor, the Government --

6            THE COURT:  I don't think so.  The objection's

7    overruled, and the request is overruled -- denied.

8    Q.    Agent Mousseau, did you ask the Defendant those sorts of

9    follow-up questions you just identified?

10   A.    No.

11   Q.    Why not?

12   A.    I didn't deem it necessary at the time.

13   Q.    What, if anything, would you have done after the interview

14   if he had identified this information?

15           THE COURT:  No, I don't think we're going to get

16   into --

17           MR. DRABICK:  Very good, Your Honor.

18           Your Honor, at this time, I propose reading a

19   stipulation to the jury.

20                          STIPULATION

21           "Ladies and Gentlemen, in lieu of live testimony at

22   trial, counsel for the United States and counsel for the

23   Defendant have stipulated and agreed to the following facts:

24           "Benjamin Hochberger is a Special Agent with the

25   Defense Criminal Investigative Service within the Department of

1   Defense Office of the Inspector General; he has been a DCIS

2   Special Agent since approximately 2000, and he is assigned to

3   the DCIS Boston office.

4         "On April 24th, 2018, Special Agent Hochberger

5   participated in an interview of the Defendant, Charles Lieber,

6   on the campus of Harvard University.  Special Agent Hochberger

7   took notes of the interview.  Special Agent Hochberger's notes

8   were not intended to be and were not a verbatim transcript of

9   the interview.  The notes are intended to generally capture

10  what the Defendant said, and their purpose was to serve as a

11  vehicle for the later preparation of a formal report of the

12  interview.

13        "Between May 1st and May 7th, 2018, Special Agent

14  Hochberger prepared the formal report of the interview intended

15  to memorialize what the Defendant said during the interview.

16  Special Agent Hochberger relied on his contemporaneous notes

17  and his memory of the interview to prepare the report.  The

18  interview was still fresh in Special Agent Hochberger's mind at

19  the time he prepared the formal report, and Special Agent

20  Hochberger believed the report to be accurate when he drafted

21  it.

22        "Today Special Agent Hochberger does not recall with

23  specificity the exact words used in the questions that were

24  posed to the Defendant regarding the Thousand Talents Program.

25  Special Agent Hochberger also does not recall with specificity

1   the exact answer or answers the Defendant provided in response

2   to those questions, except that Special Agent Hochberger does

3   recall the Defendant stating that he, the Defendant, was not

4   sure how they, the Chinese, categorized him.

5        "Special Agent Hochberger's notes are marked as

6   Exhibit 322, and the parties jointly move for their admission.

7   Special Agent Hochberger's interview report is marked as

8   Exhibit 323, and the parties jointly move for its admission."

9        Your Honor, the Government offers those exhibits into

10  evidence.

11       THE COURT:  Okay.

12       (Government Exhibits 322 and 323 received in

13       evidence.)

14       MR. DRABICK:  Mr. Bruemmer, could we please bring up

15  Exhibit 322.  And could we please go to the fourth page at the

16  bottom; and could you highlight the last paragraph beginning,

17  "One Thousand Talents Program."

18  Q.   Agent Mousseau, could you please read that portion of the

19  notes beginning, "One Thousand Talents Program"?

20  A.   "One Thousand Talents Program, his understanding,

21  recognizes outstanding young scholars/students.  He has

22  endorsed some former students, perhaps five.  He did not recall

23  names.  He has made such recommendations based upon written

24  works.  Approached to be a member?  He's not sure how they

25  characterized -- categorized him."  Categorized.

1          "Received payment, stipend, airfare."

2          MR. DRABICK:  And Mr. Bruemmer, could we please bring

3     up Exhibit 323, Page 1.

4     Q.    Do you recognize this document, Agent Mousseau?

5     A.    I do.

6     Q.    And what is it?

7     A.    This is the report of interview of Dr. Lieber.

8     Q.    And did you see this report near the time it was drafted?

9     A.    I did.

10    Q.    Do you recall whether at that time you believed it

11    accurately reflected that was said during the interview?

12    A.    Yes.

13          MR. DRABICK:  Could we please go to Page 3.  And could

14    you please highlight the paragraph in the middle beginning

15    with, "Lieber has heard of the Thousand Talents Program."

16    Q.    Could you please read that paragraph to the jury?

17    A.    "Lieber has heard of the Thousand Talents Program.  His

18    understanding is that the PRC uses this Program to identify its

19    outstanding young scholars.  He's endorsed some of his former

20    students for this Program at the request of the students.  He's

21    endorsed perhaps five students over the years.  He did not

22    recall their names.  He made his recommendations based upon

23    their written works.  Although Lieber was not explicitly asked

24    to be a member of this Program, he added he was not sure how

25    they categorized him."

1  Q.   Agent Mousseau, that paragraph references the PRC.  Do you

2  have any understanding of what the PRC refers to?

3  A.   The People's Republic of China.

4       MR. DRABICK:  And could you please highlight the next

5  paragraph.

6  Q.   And could you please read that paragraph?

7  A.   "Lieber has never received a retainer from WUT.  He has

8  received airfare and stipend payments for his visits to WUT.

9  Lieber did not declare any of the travel or stipend payments

10 from the PRC to the DoD.  He did not know if such a disclosure

11 was required.  He normally visited WUT for three to four days.

12 He never visited it for more than five days.  Lieber has never

13 received a retainer from the Israeli government.  He took that

14 trip to receive award."

15      MR. DRABICK:  We can take that down, thank you.

16 Q.   Was it important to you at that time whether Professor

17 Lieber had been asked to participate in the Thousand Talents

18 Program?

19 A.   It was important, yes.

20 Q.   Why?

21 A.   That would have expanded the scope of my investigation.

22 Q.   How so?

23 A.   If he was a member of the Thousand Talents Program, I

24 would have expanded the scope of the investigation to determine

25 whether or not there was any grant fraud involved with that.

```
 1           MR. MUKASEY:  Objection.  Move to strike as to what
 2   she would have done hypothetically.
 3           MR. DRABICK:  Your Honor, this goes to the heart of
 4   materiality.
 5           THE COURT:  I'll allow it to remain.  The motion to
 6   strike is denied.
 7   Q.   Was it important to you whether Professor Lieber knew how
 8   China categorized him?
 9   A.   I'm sorry?
10   Q.   Was it important to you to understand whether Professor
11   Lieber knew how China categorized him?
12   A.   I needed to understand, yes.
13   Q.   Okay.  Why?
14   A.   Well, if Professor Lieber believed he was part of the
15   Program, then that would have expanded my investigation.
16   Q.   After the interview ended, did you receive any materials
17   from Harvard?
18   A.   I did.
19   Q.   What did you receive?
20   A.   The correspondence that Dr. Lieber had mentioned from 2015
21   where he told Wuhan University to cease and desist using his
22   name and Harvard's name.
23           MR. DRABICK:  Could we please bring up Exhibit 63,
24   admitted into evidence previously; and if we could just blow up
25   the email itself.
```

1   Q.   Do you recognize this document, Agent Mousseau?

2   A.   I do.

3   Q.   And what do you recognize it to be?

4   A.   This was one of the two emails that was provided to me by

5   Harvard.

6           MR. DRABICK:  And could we see Exhibit 65, previously

7   admitted into evidence.

8   Q.   And do you recognize this email?

9   A.   Yes.

10  Q.   And what do you recognize it to be?

11  A.   That is also an email that was provided to me from

12  Harvard.

13  Q.   And these are emails that Professor Lieber had sent to an

14  individual identified as Professor Mai?

15  A.   Yes.

16  Q.   And what, if any, additional steps did you take in your

17  inquiry after the interview and after receiving the information

18  from Harvard?

19  A.   I received this information, and it corroborated

20  Dr. Lieber's statements; and so I, in effect, closed my

21  investigation.  But I also circled back with the Naval Research

22  Laboratory principal investigator I spoke with.

23  Q.   Why did you stop your inquiry?

24  A.   To me, Dr. Lieber had been truthful about his involvement

25  with WUT and China.

1   Q.   And what did you understand him to have --

2           MR. DRABICK:  Strike that, Your Honor?

3   Q.   Did the Defendant's statements regarding the Thousand

4   Talents Program play a role in your decision?

5   A.   Yes.

6   Q.   How so?

7   A.   When he had said that he wasn't sure how they categorized

8   him, and along with this information, I believed that he was a

9   victim of Chinese propaganda.

10          MR. DRABICK:  Nothing further, Your Honor.

11          THE COURT:  Any cross?

12          MR. MUKASEY:  A little bit.

13                          CROSS-EXAMINATION

14  BY MR. MUKASEY:

15  Q.   Hi, Special Agent Mousseau.  My name is Marc Mukasey.

16          We haven't met before, right?

17  A.   No.  Good morning.

18  Q.   Good morning.

19          It's not a crime to belong to the Thousand Talents

20  Program, is it?

21  A.   It is not.

22  Q.   You mentioned that the amount of money of the active

23  grants that Professor Lieber had with DoD was about $3 million

24  at the time of your inquiry?

25  A.   That was the total award amount.

1    Q.    Okay.  That award amount, that three million bucks, that

2    doesn't go into his bank account; right?  It goes to Harvard;

3    right?

4    A.    Yeah.  It definitely does not go to him.

5    Q.    Okay.  And you said that your group or your specialty

6    looks into procurement fraud and grant fraud; right?

7    A.    Yes.

8    Q.    And double-dipping?

9    A.    Correct.

10   Q.    Okay.  There's no procurement fraud charges in this case;

11   you know that, right?

12   A.    I do.

13   Q.    There's no grant fraud charges in this case; right?

14   A.    Correct.

15   Q.    And there's no double-dipping evidence in this case;

16   right?

17   A.    Correct.

18   Q.    Okay.  Now, you mentioned that you heard about this case

19   from colleagues in Connecticut?

20   A.    Yes.

21   Q.    Okay.  New Haven; right?

22   A.    Correct.

23   Q.    And your recruitment into the case, if you will, your

24   referral to you came from their work; right?

25   A.    Yes.

1    Q.   And what they did was they conducted open-source research?

2    A.   A colleague of theirs did.

3    Q.   Okay.  Open-source research is something that I can do or

4    any member of the jury can do or the Judge can do; right?

5    A.   Yes.

6    Q.   That's just Googling; right?

7    A.   In effect.

8    Q.   Okay.  And you were told, were you not, that New Haven had

9    identified Professor Lieber as somebody that maybe should be

10   interviewed; right?

11   A.   Yes.

12   Q.   And part of the concern that New Haven had about

13   Professor Lieber, as conveyed to you, was that he had a lot of

14   Chinese students working in his lab; right?

15   A.   No, that did not come from New Haven.

16   Q.   Well, did you -- did it come from your office?

17   A.   The person that said that to me came from the Naval

18   Research Laboratory.

19   Q.   Okay.  But I'm correct that part of the concern that

20   ultimately made its way to you was --

21             THE COURT:  Whose concern?

22             MR. MUKASEY:  I'm sorry?

23             THE COURT:  Whose concern?

24             MR. MUKASEY:  The concern of somebody that Special

25   Agent Mousseau contacted.

```
 1              THE COURT:  I'm simply trying to clarify the question.
 2   Q.    Tell me whose concern it was that he had too many Chinese
 3   students in his lab.
 4   A.    That comment -- if I recall correctly, that comment came
 5   from Dr. Pirlo, P-i-r-l-o, from the Naval Research Laboratory.
 6   Q.    Okay.  Did you review a DCIS case summary report in this
 7   matter?
 8   A.    I reviewed the referral.  Are you talking about now or in
 9   2018?
10   Q.    At any point.
11   A.    A case summary report.
12   Q.    DCIS case summary report.  Maybe we can show it to you
13   just so you know what we're talking about.
14   A.    That would be helpful.
15              MR. MUKASEY:  If you could show USAO-009762, Pages 1
16   to 2.
17   Q.    Just take a look at that.  I'm not asking you if you're --
18              MR. DRABICK:  Not for the jury.
19              MR. MUKASEY:  Not for the jury.
20              MR. DRABICK:  Maybe we can go to the top of Page 2.
21   Q.    And just read the section beginning with the word,
22   "Additionally."
23   A.    "Additionally, Lieber has" --
24   Q.    No, no.  Read it to yourself.
25   A.    I'm sorry.
```

1    Q.   Read it to yourself, and let me just pose the question

2    again.

3              Part of what made Dr. Lieber a person to be

4    interviewed was that he had had many Chinese students working

5    in his lab?

6              MR. DRABICK:  Objection, Your Honor.  I ask that the

7    document be taken down if it was used to refresh --

8              MR. MUKASEY:  Yes, you can take it down.

9              MR. DRABICK:  And also object to the extent it's

10   asking for her to testify about other people's concerns.

11             THE COURT:  Well, let's have a question.  I'm not sure

12   which question we are now dealing with.

13   Q.   Special Agent Mousseau, did it come to your attention, in

14   connection with this investigation, that Dr. Lieber had many

15   Chinese students working in his lab?  Yes or no.

16   A.   Yes.

17   Q.   A couple of questions for you about the grant that you

18   mentioned I think that you took as your responsibility.

19             Hochberger looked at an Air Force grant, and you

20   looked at an NRL grant; right?

21   A.   Yes.

22   Q.   NRL is the Naval Research Laboratory; correct?

23   A.   Yes.

24   Q.   And the research that -- and just so everybody's clear, I

25   mean, you were looking at money that had been provided or

1    granted, that had been provided to Harvard to allow Dr. Lieber

2    to work on this project, this grant project; right?

3    A.    Yes.

4    Q.    Now, the work that Professor Lieber was doing on this

5    grant was not classified; correct?

6    A.    Correct.

7    Q.    It was not confidential?

8    A.    Correct.

9    Q.    Not secret or top secret?

10   A.    Correct.

11   Q.    In fact, as I think you said on direct, it was called

12   basic research; right?

13   A.    Yes.

14   Q.    And that meant that it could be published and shared

15   without restrictions?

16   A.    After following the proper publication channels, yes.

17   Q.    Okay.  And the world would have access to anything that

18   was published as a result of following proper publication

19   channels; right?

20   A.    Yes.

21   Q.    And this grant -- and I want to say that it had something

22   to do with the Venezuelan encephalitis virus?

23   A.    Yes.

24   Q.    This grant -- it was a medical project; right?  It was

25   medical research?

1    A.    I would assume so, yes.

2    Q.    I'm sorry?

3    A.    I'm not an expert on that; but, yes, I guess so.

4    Q.    You're not an expert on the Venezuelan encephalitis virus?

5    A.    No, I'm not.

6    Q.    Okay.  Well, it was a medical -- we can agree it was a

7    medical project; right?

8    A.    Yes.

9    Q.    And the grant, if you know, was for research to study the

10   way to detect in real time how a virus can get into the brain,

11   and we may be able to learn how to fight that kind of virus;

12   right?

13   A.    Yes.

14   Q.    Okay.  And that work was not much different than other

15   work that Professor Lieber had published on similar topics;

16   right?

17   A.    I don't know.

18   Q.    Okay.  So you weren't familiar with his other work?

19   A.    No.

20   Q.    All right.  And it is true, is it not, that it was your

21   understanding that a foreign country could not glean or get

22   information from this work that could have been used against

23   the U.S.?

24   A.    One of my interviews provided the information that it

25   can't be used offensively against the United States, yes.

1   Q.   Thank you, excellent.

2        And it's true, of course, that foreign national

3   students in American Universities are permitted to work on this

4   basic-level research; right?

5   A.   As long as it's not export-controlled.

6   Q.   Correct.

7   A.   Correct.

8   Q.   Okay.  Now, when you were getting ready to interview

9   Professor Lieber, did you do some background work on his career

10  or on his pursuits at that time?

11  A.   Just the information that was provided to me.

12  Q.   From New Haven?

13  A.   Yes.

14  Q.   You didn't do any independent investigation?

15  A.   No.

16  Q.   Did you look at the Lieber Group website?

17  A.   I don't believe I did.

18  Q.   Were you aware that the Lieber Group website contains --

19  or at the time --

20       MR. DRABICK:  Objection, Your Honor.  She just said

21  she didn't look at the website.

22       MR. MUKASEY:  She didn't look at the website.  I'll

23  rephrase the question.

24       THE WITNESS:  I did not.

25  Q.   Do you know whether the equipment and materials

1    Professor Lieber used to conduct his research were available

2    publicly?

3    A.    I don't know.

4    Q.    Okay.  You didn't look into that; right?

5    A.    No.

6    Q.    Did you ever look at Professor Lieber's files related to

7    his trips?

8    A.    No.

9    Q.    Did you ever look at files related to lectures or speeches

10   he had given?

11   A.    No.

12   Q.    Did you ever look at honoraria he had received from around

13   the country and around the world?

14   A.    No.

15   Q.    Did you ever ask to look at any of this stuff?

16   A.    I didn't ask to look at it.  I asked about it.

17   Q.    Okay.  But you didn't ask to look at it beforehand?

18   A.    No.

19   Q.    If you were interested in the grants, did you ask to speak

20   to people at Harvard who helped work with grants?

21   A.    That would have been part of my future investigation, not

22   the first thing I would have done, no, not before interviewing

23   Dr. Lieber.

24   Q.    Okay.  So the answer's no?

25   A.    Correct.

1    Q.   And you know that Harvard has -- well, I should ask:  Do

2    you know that Harvard has scores of people who work on grants?

3    A.   That doesn't surprise me.

4    Q.   Grant applications, grant awards, grant compliance, grant

5    accounting, that doesn't surprise you; right?

6    A.   That doesn't surprise me.

7    Q.   And Dr. Lieber had an executive, an administrator, who

8    worked with him who essentially ran his grants; are you aware

9    of that?

10   A.   Yes.

11   Q.   Her name is Kathleen Ledyard?

12   A.   Yes.

13   Q.   And when you made your appointment to speak with

14   Dr. Lieber about this grant, he asked you whether you wanted

15   Kathleen Ledyard in the meeting with him; right?

16   A.   Correct.

17   Q.   And you said you did not want his grant manager in the

18   meeting with him; you wanted him one on one; right?

19   A.   Correct.

20   Q.   Now, with regard to scheduling this meeting, you emailed

21   Professor Lieber for the first time on April 20th at about

22   3:40 p.m.; do you recall that?

23   A.   I know it was April 20th.  I don't know the time.

24   Q.   If you look at GX 87 -- or you can take my word for it.

25   A.   I can take your word for it.

1   Q.   Okay.  And that was a Friday afternoon; right?

2   A.   Yes.

3   Q.   And he got back to you immediately; right?

4   A.   Yes.

5   Q.   And when you emailed him, you didn't include anyone else

6   from Harvard; right?

7   A.   I don't believe I did.

8   Q.   Okay.  And you wrote to him that you wanted to review the

9   "Innervated Blood/Brain Barrier Tissue for the Study of

10  Neuro-Invasion by VEEV"; right?

11  A.   Yes.

12  Q.   Truth of the matter is, you didn't know anything about

13  that; right?

14  A.   I certainly didn't know any details about it, other than

15  what I was already told by the Naval Research Laboratory

16  person.

17  Q.   And the truth is:  You really didn't care about that;

18  right?  You wanted to talk to him about TTP; right?

19  A.   Well, I care about the grant.

20  Q.   Well, of course you care about the grant, but when you

21  went in there, you really wanted to talk to him about the

22  Thousand Talents Program; right?

23  A.   Part of what I wanted to talk to him about is the Thousand

24  Talents Program, yes.

25  Q.   Okay.  And there was very little discussion about this

1   grant that you told him you wanted to talk about; right?

2   A.    No.  Actually, we talked about the grant for a while.

3   Q.    Okay.  Did you talk about his research on the grant, his

4   work on the grant, his substantive findings on the grant,

5   anything like that?  Yes or no.

6   A.    Yes.

7   Q.    Now, you told him you wanted to meet for 30 or 45 minutes;

8   right?

9   A.    Yes.

10  Q.    And that you wanted to discuss specific topics related to

11  this grant that I don't want to try to say again?

12  A.    Yes.

13  Q.    Okay.  And you gave a specific day you wanted to meet;

14  right?

15  A.    If he was available, yes.

16  Q.    And a specific time window on that date?  You told him you

17  wanted to meet on April 24th before 2:00 p.m.; right?

18  A.    Yes.

19  Q.    And he said, No problem; right?

20  A.    Correct.

21  Q.    You didn't have a subpoena for him, you didn't have a

22  court order; this was a voluntary request, right?

23  A.    Yes.

24  Q.    And he could have blown you off?

25  A.    Absolutely.

1    Q.    He didn't; right?

2    A.    No.

3    Q.    Now, you had some communication with Dr. Lieber, and you

4    had some communication with another administrator at Harvard --

5    right? -- before the meeting?

6    A.    I think somebody sent me directions on how to get to his

7    office.

8    Q.    And do you recall the name "Roseanne Luongo"?

9    A.    From the interview, yes.

10   Q.    Okay.  Before we get to the interview, in any of the

11   back-and-forth setting up the interview, you never mentioned

12   Thousand Talents Program; right?

13   A.    Correct.

14   Q.    Okay.  And when you had back-and-forth with this

15   Roseanne Luongo, which I think you said was setting up the

16   interview or getting the address, you never mentioned Thousand

17   Talents Program; right?

18   A.    I never mentioned it to whomever it was I was setting the

19   directions with.  It may have been Roseanne, it may not have

20   been Roseanne.

21   Q.    Okay.  And you wanted to surprise him -- right? -- with

22   Thousand Talents Program questions?

23   A.    I wanted to ask him face to face, not over email.

24   Q.    Okay.  But you could have asked him face to face even if

25   you told him about it in an email, but you wanted to surprise

1  him; right?

2  A.    I wanted to get a genuine reaction.

3  Q.    Okay.  An on-the-spot reaction; right?

4  A.    Correct.

5  Q.    So let's talk about the interview for a second.  You

6  mentioned there were a couple of other people in the interview.

7        You recall the name "Roseanne Luongo"; right?

8  A.    Yes.

9  Q.    How about Elizabeth Lennox?

10 A.    Yes.

11 Q.    These are Harvard administrators, as you understood it?

12 A.    Yes.

13 Q.    And do you know how Harvard categorized them?

14 A.    No.

15 Q.    Their titles?

16 A.    No.

17 Q.    You don't know how Harvard categorized them?

18 A.    I don't know verbatim.  I know one works for the Chemistry

19 Department, and one works for the grant -- or Compliance

20 Department.

21 Q.    Okay.  And in terms of Charlie's official position, do you

22 know how Harvard categorized him?

23 A.    He's a Senior Professor at Harvard.

24 Q.    Or University Professor -- do you know that? -- or

25 Chairman?  Do you know how they really categorized him?

1    A.    Not as I sit here today.

2    Q.    Okay.  Now, during the interview, you were asking the

3    questions, and Special Agent Hochberger was taking the notes;

4    correct?

5    A.    Yes.

6    Q.    You mentioned an outline that you had prepared?

7    A.    Yes.

8    Q.    And when Mr. Drabick asked you whether the outline had any

9    reference to Thousand Talents Program, you said no; right?

10   A.    Correct.

11        MR. MUKASEY:  Sal, can you show, just to Agent

12   Mousseau, USAO --

13        MR. DRABICK:  Your Honor, I object.  It's not in

14   evidence.  I mean, are you offering it?

15        MR. MUKASEY:  I'm just showing it to her for a moment.

16        MR. DRABICK:  But she hasn't -- there's no -- she

17   hasn't said she doesn't remember.

18        THE COURT:  I'm sorry.  When you have your private

19   discussion, I don't understand what you are saying.

20        MR. DRABICK:  I'm sorry, Your Honor.  I --

21        MR. MUKASEY:  Let me rephrase.

22   Q.    Isn't it true that your outline did, in fact, mention

23   Thousand Talents Program?

24   A.    I don't recall.  Could I see the actual outline?

25        MR. MUKASEY:  Can you show USAO_011258 only to the

1  witness.

2  Q.    And I'll direct --

3  A.    Sorry.

4  Q.    And I'll direct your attention to the bottom section that

5  says what it says at the bottom.

6  A.    This was not my outline.  This was the outline that was

7  sent from New Haven.  This isn't what I brought with me.

8  Q.    Okay.  So do you have a copy of the outline that you

9  brought with you?

10  A.    I'm sure it's in one of these binders.  Sorry.

11        MR. MUKASEY:  May we have a moment to confer, Judge?

12  May we have a moment to confer?

13        (Counsel confer.)

14        MR. MUKASEY:  I'll move on while he's looking for the

15  document.

16  Q.    Special Agent Mousseau, you were saying that you took the

17  role of asking questions, and Hochberger took the notes; right?

18  A.    Correct.

19  Q.    And, obviously, the idea in taking notes is to be as

20  accurate and thorough as possible; right?

21  A.    Every Agent has a different process of taking notes.

22  They're just used to refresh your memory for making the report.

23  Q.    Okay.  But are you saying you don't want to be accurate?

24  A.    Of course the notes we want to be accurate, but they are

25  not a verbatim transcription.

1    Q.    But you want to be complete?

2    A.    Sorry?

3    Q.    You want to be complete?  I understand it's not verbatim,

4    but you want to be complete as to the important parts?

5    A.    Complete enough to be able to make the report.

6    Q.    Now, during this meeting, you did not write anything down?

7    A.    I do not -- did not.

8    Q.    Okay.  And this meeting was, as we sit here now, three and

9    a half years ago, approximately?

10   A.    Yes.

11   Q.    And you don't remember exactly what you asked

12   Professor Lieber about the Thousand Talents Program; right?

13   A.    No, I don't.

14   Q.    And you don't remember exactly what he said; right?

15   A.    Other than what I already said.

16   Q.    Okay, we'll get there in a second.

17          You don't remember what he said about membership or

18   any association with Thousand Talents Program, but you do

19   remember that he said he didn't know how they categorized him;

20   right?

21   A.    I don't remember the verbatim back and forth.

22   Q.    Now, I want to show you what the Government's already put

23   in as Government Exhibit 322.  And I'm going to ask you to

24   focus on the exact same spot that the Government asked you to

25   focus on, which is Page 4, the last nine lines starting where

1    it says, "Thousand Talents Program."

2              Do you see that?

3    A.   Yes.

4    Q.   And, again, these are Hochberger's notes, not yours;

5    right?

6    A.   Correct.

7    Q.   These are the only notes of the interview; right?

8    A.   Yes.

9    Q.   These handwritten notes don't say anywhere in this

10   paragraph that Professor Lieber denied membership in Thousand

11   Talents, do they?

12   A.   It does not say that in the notes.

13   Q.   And these notes, in this section, don't say anywhere the

14   word "participate"; correct?

15   A.   The notes do not say that.

16   Q.   Okay.  But they do say, "Not sure how they categorize";

17   right?

18   A.   Yes.

19              MR. MUKASEY:  Now, we can take this off the screen.

20   Q.   And you mentioned that, after the interview, I think about

21   a week or so, Special Agent Hochberger prepared a formal

22   report, a typewritten report; right?

23   A.   Yes.

24   Q.   And that's standard procedure; correct?

25   A.   Yes.

```
 1            MR. MUKASEY:  And those have been admitted as
 2   Government Exhibit 323.  We can post that, if you don't mind.
 3   Q.   And I'm going to turn your attention to Page 3 and the
 4   jury's attention to Page 3.
 5            The paragraph that begins, "Lieber has heard," and
 6   I'm going to again ask you:  This report doesn't say anywhere
 7   that Lieber denied membership in the Thousand Talents Program?
 8   A.   He says he was not explicitly asked to be a member of the
 9   Program.
10   Q.   It does not say anywhere that he denied membership;
11   correct?
12   A.   Not in those terms, no.
13   Q.   And it doesn't say anywhere the word "participate";
14   correct?
15   A.   It does not.
16   Q.   This whole meeting with Professor Lieber --
17            MR. MUKASEY:  We can take this down.
18   Q.   -- lasted 45 minutes or an hour?
19   A.   Approximately.
20   Q.   To you, that was a blip on the radar; correct?
21   A.   It was a short interview.
22   Q.   It was a blip on the radar, wasn't it?
23   A.   Because I closed the case, yes.
24            MR. MUKASEY:  Yes, thank you very much.
25            Nothing further, Judge.
```

1          MR. DRABICK:  Briefly, Your Honor.

2          THE COURT:  Any redirect?

3          MR. DRABICK:  Very briefly, Your Honor.

4                    REDIRECT EXAMINATION

5    BY MR. DRABICK:

6    Q.   Agent Mousseau, Mr. Mukasey asked you about -- or in your

7    answers to Agent -- to Mr. Mukasey's questions, you mentioned

8    proper publication protocols?

9    A.   Yes.

10   Q.   Were those protocols of interest to you in your interview

11   with the Defendant?

12   A.   Yes.

13   Q.   How so?

14   A.   When a principal investigator wants to publish their

15   research that was funded by the Department of Defense, there

16   are certain protocols they have to follow with the Department

17   of Defense.  If those aren't followed, then there can be an

18   issue with the funding office.

19   Q.   And going into the interview, I believe you said that one

20   of your purposes was to ask about the Thousand Talents Program;

21   is that right?

22   A.   Yes.

23   Q.   Did your interest in the Thousand Talents Program relate

24   at all to those publication protocols?

25   A.   Yes.

1    Q.    How so?

2    A.    If somebody -- in my experience, that if a principal

3    investigator was working for both the Chinese government as a

4    member of the TTP and working for the DoD, they could be

5    publishing DoD-funded research in China.

6    Q.    And were you interested in finding out if that was

7    happening?

8    A.    Yes.

9    Q.    Was that important to you?

10   A.    Yes.

11   Q.    Mr. Mukasey asked you a number of questions about what you

12   looked at or didn't look at before the interview; do you recall

13   that?

14   A.    Yes.

15   Q.    What was the main investigative step you took in your

16   inquiry?

17   A.    Interviewing Dr. Lieber.

18   Q.    And asking questions of Dr. Lieber?

19   A.    Yes.

20   Q.    And why did you take that approach?

21   A.    With the information that was provided to me, I determined

22   that talking with Dr. Lieber directly would be the best

23   possible way to get the information that I needed.

24   Q.    And after you talked with Dr. Lieber, what did you do with

25   your inquiry?

1    A.    I, in fact, closed my inquiry.

2    Q.    And did you rely on Dr. Lieber's statements in making that

3    decision?

4    A.    I did.

5              MR. DRABICK:  Nothing further, Your Honor.

6              THE COURT:  Any recross?

7              MR. MUKASEY:  No, Judge.

8              THE COURT:  Thank you.  You are excused.

9              Who's next?

10             MR. DRABICK:  Your Honor, the Government calls

11   Dr. Michael Lauer.

12             THE COURT:  We get to stretch.

13             How long will you be with that witness?

14             MR. DRABICK:  About 15 minutes, Your Honor.

15             THE COURT:  How many?

16             MR. DRABICK:  15 minutes, Your Honor.

17             THE COURT:  You can set your watches.

18             MR. DRABICK:  Approximately 15 minutes, Your Honor.

19             THE CLERK:  Step in there.  Yes, please, sir.

20             Sir, could I ask you to raise your right hand.

21             (Witness sworn.)

22             THE WITNESS:  I do.

23             THE CLERK:  Sir, could I just ask you to remove your

24   mask while you're answering the questions.

25             Could you state your name, spelling your last name,

```
 1    sir, for the record.
 2              THE WITNESS:  Michael Lauer, L-a-u-e-r.
 3              THE CLERK:  Thank you.
 4              THE COURT:  Please be seated.
 5              THE WITNESS:  Thank you.
 6              MICHAEL LAUER, having been duly sworn by the Clerk,
 7    was examined and testified as follows:
 8                          DIRECT EXAMINATION
 9    BY MR. DRABICK:
10    Q.   Good morning, Dr. Lauer.
11              I'm going to ask you to just keep the microphone
12    close and answer loudly today.
13    A.   Yes.
14    Q.   Where are you employed, sir?
15    A.   The National Institutes of Health.
16    Q.   And what is your title?
17    A.   I am the Deputy Director for Extramural Research.
18    Q.   What is the National Institutes of Health?
19    A.   The National Institutes of Health is an agency of the
20    Department of Health and Human Services.  Its primary function
21    is to fund biomedical research.
22    Q.   And you commonly refer to it as NIH?
23    A.   Yes, NIH.
24    Q.   Is NIH part of the Executive Branch of the Federal
25    Government?
```

1   A.   Yes.

2   Q.   And at a high level, what does NIH do?

3   A.   NIH does two things:  One is that we have our own

4   laboratory and conduct biomedical research; the second is that

5   we fund research conducted in universities, medical centers,

6   medical schools, small businesses around the country to do

7   biomedical research.

8   Q.   And that external funding, is that referred to as

9   extramural research?

10   A.   Yes.

11   Q.   And how much does NIH spend on research in total?

12   A.   Our total budget is about $41 billion a year.

13   Q.   And what percentage goes to outside or extramural

14   research?

15   A.   A little over 80 percent.

16   Q.   How long have you been Deputy Director?

17   A.   Six years.

18   Q.   And how long have you worked for NIH?

19   A.   14 years.

20   Q.   And just briefly, what roles did you hold before becoming

21   Deputy Director?

22   A.   I was the Director of a Division of Cardiovascular

23   Sciences.  We oversaw a $1.5 million portfolio in

24   cardiovascular research.

25   Q.   And what did you do, just at a high level, before you

1  joined NIH?

2  A.   I was a cardiologist and active scientist at the Cleveland

3  Clinic in Cleveland, Ohio.

4  Q.   And what are your responsibilities as Deputy Director for

5  Extramural Research?

6  A.   So I oversee the Office of Extramural Research.  We have

7  approximately 500 employees and contractors.  We are

8  responsible for the corporate infrastructure of extramural

9  research at NIH.  We're also responsible for accountability and

10  stewardship.

11       THE COURT:  How many of you are there who review what

12  the people in the field do?

13       THE WITNESS:  I'm sorry?

14       THE COURT:  How many of you -- how many people work

15  directly for you in reviewing what the scientists and the

16  public do?

17       THE WITNESS:  In my office, we have about 500 people.

18  It's about 220 Federal employees and about 300 contractors.

19       THE COURT:  Thank you.

20       MR. DRABICK:  Thank you, Your Honor.

21  Q.   What is the purpose of NIH's extramural research funding?

22  A.   The purpose is to fund biomedical research; this is

23  research on the fundamental aspects of living things, living

24  systems, and the application of the knowledge that we gain from

25  that research to improve human health, improve longevity,

1     improve quality of life and reduce suffering from illness and

2     disease.

3     Q.    Are there any foundational principles to guide how NIH

4     pursues that purpose?

5     A.    Yes.

6     Q.    Could you please explain?

7     A.    Yes.  So we are -- first and foremost, we're concerned

8     about funding the best science, the highest quality science

9     that is most likely to yield useful findings; and, equally

10    important, we want to assure accountability and stewardship in

11    the oversight of those funds.

12    Q.    How do researchers go about receiving NIH funding?

13    A.    So, it's not easy.  What one has to do is write out an

14    application.  The application can be dozens to hundreds of

15    pages long.  That application then gets submitted to the

16    agency.  The agency then undergoes -- undertakes a process

17    called peer review.

18            What we do is we bring in thousands of scientists

19    from all around the country to look at the applications that we

20    receive and give a critique as well a score.  Essentially, it's

21    like grading a paper.  And those -- and that then gets

22    discussed in the course of meetings.  Those applications that

23    get the highest scores are then the ones that are considered

24    for potential funding.

25    Q.    And when NIH provides funding, to whom does the funding

1    go?

2    A.    The funding goes to an institution.  So it could be a

3    university, a medical school, an academic hospital or a small

4    business.

5    Q.    So fair so say it doesn't go to the principal investigator

6    him or herself?

7    A.    That's correct.

8    Q.    And just the term "principal investigator," what does that

9    refer to?

10   A.    The principal investigator is the scientist who's

11   primarily responsible for the scientific oversight and conduct

12   of the research.

13   Q.    What role does the institution play in the grant process

14   and implementation?

15   A.    The institution is responsible for assuring that proper

16   processes are followed.  They are the primary fiscal or

17   business partner with whom we work, so they're responsible for

18   the infrastructure within which the work is done.  They're also

19   responsible for working with us to make sure that the work is

20   conducted with honesty, integrity, transparency and

21   objectivity.

22   Q.    Is NIH able to fund every grant application it receives?

23   A.    No, not even close.  This is a -- we call it a

24   hypercompetitive system.  We receive about 80,000 applications

25   a year, and because of limited funds, we're only able to fund

1   about 20 percent of the applications that we receive, meaning

2   that thousands of outstanding applications are left on the

3   table.

4   Q.   And how does NIH choose among the applications?

5   A.   So we do a couple of things.  One is we go through this

6   peer-review process that I mentioned where we have the

7   applications reviewed by other scientists who provide

8   critiques.  That information is critical in helping us decide

9   which applications we're going to fund.  And then we consider a

10  variety of other criteria as well.

11  Q.   Do the researchers' other funding sources, if any, play a

12  role?

13  A.   Yes.  So we want to make sure that the research that we

14  are funding is unique.  In other words, we shouldn't be paying

15  for research that's being paid for by somebody else.  So one of

16  the things that we want to know is what other sources of

17  support, or financial support, does a researcher have to

18  undertake his individual research endeavors.

19  Q.   And why does NIH not want to fund research that somebody

20  else is also funding?

21  A.   Well, that would be a waste.  That would essentially be

22  duplicative funding.  As I mentioned, we're only able to fund

23  20 percent of the applications that we receive, so we want to

24  make sure that every funding decision is one that is fully

25  informed and fair and that it's -- that we're funding something

1    which, if we didn't fund it, it wouldn't happen.

2    Q.   Are you familiar with the phrase "double-dipping"?

3    A.   Yes.

4    Q.   And what does that mean to you?

5    A.   Double-dipping would be a situation, for example, where a

6    researcher is getting the same research funded by two different

7    agencies.  It could be two different agencies of the

8    United States Federal Government, or it could be -- it could be

9    a U.S. Federal Government agency and an agency from a foreign

10   government or a private foundation to do the same work.

11   Q.   Is avoiding double-dipping important to NIH?

12   A.   Yes.

13   Q.   How, if at all, are researchers' other time commitments

14   considered?

15   A.   We want to make sure that researchers have the time to

16   conduct the research.  If they are committed in other

17   activities so much so that they don't have the time to get the

18   research done successfully, we call that a conflict of

19   commitment, and that's something that we very much want to

20   avoid.

21   Q.   And how, if at all, are researchers' financial interests

22   considered?

23   A.   So a researcher's financial interests are considered very

24   importantly, so what happens -- so the reason why we're

25   concerned about this is because that may color or bias the way

1    a researcher conducts, designs or reports off their research.

2              So, for example, if they are paid for by a drug

3    company to do work on a particular drug and at the same time we

4    are funding them to do research on that drug, they may not

5    conduct the research funded by the Government in a wholly

6    unbiased way.  That's something we call a financial conflict of

7    interest.

8    Q.   Are financial conflicts of interest something that can be

9    managed?

10   A.   Sometimes, yes.

11   Q.   And how does that happen?

12   A.   So what happens is the researcher has an obligation to

13   disclose all their significant financial interests to their

14   institution.  They have to tell their institution all of the

15   sources of money that they are getting directly to them.

16              The institution then makes a decision as to whether

17   or not that significant financial interest might constitute a

18   conflict with a funded grant.  And if they do, they then submit

19   a plan to the NIH.  We call that a conflict of interest

20   management plan.  We then have a discussion with the

21   institution as to whether or not we consider that plan

22   adequate.

23   Q.   And how, if at all, does a researcher's candor matter to

24   NIH?

25   A.   It matters enormously.

1    Q.    Why is that?

2    A.    So a couple of reasons:  One is that, before an

3    application is submitted to NIH, the scientist, the principal

4    investigator, is required to attest that all the information

5    that he is providing is true, complete and accurate, to the

6    best of his knowledge; the second is that trust and honesty is

7    integral to the success of science.  If science is conducted

8    with dishonesty or with a lack of candor, that destroys trust

9    in science, and it destroys the credibility of the whole

10   enterprise.

11   Q.    Does NIH have policies in place regarding scientific,

12   budgetary and time-commitment overlaps?

13   A.    Yes.

14   Q.    And just at a high level, what do those policies require?

15   A.    It requires that, at the time that we are about to

16   seriously consider funding an application, the institution has

17   to submit something which we call "Just in Time."  It's a

18   report in which a variety of issues are covered.

19            So one of the issues is:  What are the other sources

20   of support that a scientist has for their research endeavors?

21   What -- not only what are they, but what are they paying for?

22   What kind of science?  What's the budget?  What's the time

23   commitment so we can assess a potential conflict of commitment?

24   And that's also the time to report a possible financial

25   conflict of interest.

1    Q.   If it comes to NIH's attention that there is a potential

2    overlap, what does NIH do?

3    A.   So then what we do is we engage in a negotiation with the

4    institution and with the scientist.  Typically what that

5    involves is that we'll decrease the amount of the budget, we

6    might slice the budget by a third, and we might cut certain

7    parts of the grant out because we're saying that that part of

8    the grant is being funded by somebody else.

9    Q.   These concerns you've identified in terms of overlap and

10   financial conflicts of interest, are they ever considered after

11   a grant has been awarded or funded?

12   A.   Yes.

13   Q.   When and how?

14   A.   So it has to be considered at the time of progress

15   reports.  So when an institution receives a grant, they have to

16   turn in a progress report every year.  As part of that progress

17   report, we ask for updates on other sources of financial

18   support for their research.

19            Also, if there is a new significant financial

20   interest that might constitute a conflict of interest, that has

21   to be reported to the agency within 30 days.

22   Q.   Are there any other ways or circumstances that might

23   result in a review of the researcher's other support?

24   A.   Yes.

25   Q.   And what does that include?

```
 1   A.    So if we, for some reason, discover that a researcher may
 2   not have fully disclosed their other sources of support, then
 3   we may contact the institution and ask them questions about
 4   what may or may not have happened.
 5   Q.    Is your office the office responsible for reviewing
 6   potential policy violations involving extramural research?
 7   A.    Yes.
 8   Q.    And what do you call those reviews?
 9   A.    Compliance reviews.
10   Q.    And do compliance reviews ever relate to foreign sources
11   of support?
12   A.    Yes.
13   Q.    And what are the range of remedies, if any, that can
14   result from a compliance review?
15   A.    There are a variety of remedies that we could consider.
16   We could consider suspending a grant, renegotiating a grant,
17   removing the principal investigator from a grant, we could
18   terminate a grant, we could renegotiate the terms and
19   conditions of the award, how much money is going to the grant,
20   and we can also refer the problem to other agencies in
21   Government for their consideration and review.
22   Q.    I would like to direct your attention, Dr. Lauer, to
23   August of 2018.
24          Did NIH send out any sort or communication concerning
25   foreign sources of support?
```

A.   Yes.

Q.   And what was that?

A.   It was a letter that was written to the general research community by the Director of NIH, Dr. Francis Collins.

Q.   Did you play any role in the letter?

A.   Yes.

Q.   What was your role?

A.   I helped draft that letter.

Q.   And what was the purpose of the letter?

A.   The purpose of the letter was to alert the research community that NIH had become aware of potential problems and that the NIH would be likely to contact institutions about problems regarding specific scientists.

Q.   What were the potential problems you were pursuing?

A.   So we were concerned about possible diversion of intellectual property, about proper -- possible mishandling of confidential information that was received during the course of peer review and, also, about a possible failure on the part of scientists to disclose their financial interests and their other sources of research support, and that failure to disclose may have led to our agency making ill-informed, distorted funding decisions.

Q.   And that third item you just mentioned, was that important to NIH?

A.   Yes.

1    Q.   And what, if anything, had prompted that particular

2    concern?

3    A.   We had been informed by the FBI about a series of

4    problems.

5    Q.   Now, at that time, in late 2018, had you heard of

6    something called the Thousand Talents Program?

7    A.   Yes.

8    Q.   And at that time, again, late 2018, what did you

9    understand it to be?

10   A.   My understanding of the Thousand Talents Program at that

11   time was that it was a program run by the Chinese government

12   and by the Chinese Communist Party.  The purpose of this --

13          MS. YOUNG:  Objection.

14          THE COURT:  What's the objection?

15          MS. YOUNG:  Hearsay.

16          THE COURT:  I'm sorry?

17          MS. YOUNG:  Hearsay.

18          MR. DRABICK:  Your Honor, it's his understanding

19   informing his subsequent acts.

20          THE COURT:  The objection's overruled.

21   Q.   Please continue, Dr. Lauer.

22          THE COURT:  You may continue.

23   A.   Okay.  So my understanding at the time was that it was a

24   program run by the Chinese government.  What they were doing

25   was they were recruiting American scientists who work at

1  institutions at China.  They were going to be employed by those

2  institutions, run research programs, be paid to run those

3  research programs and do it in such a way that the American

4  institutions were unaware of what was going on.

5  Q.   So, based on that understanding, did that program, as you

6  understood it, give you any concerns?

7  A.   Yes.

8  Q.   And why?

9  A.   Well, we were concerned that there may be problems with

10  undisclosed research support, meaning that we were engaging in

11  duplicative funding, wasteful funding; there may have been

12  problems with conflict of commitment or financial conflicts of

13  interest that we were unaware of and not properly managed, so

14  we may have made a series of funding decisions that were

15  inappropriate or incorrect.

16  Q.   Are you familiar with the name "Charles Lieber"?

17  A.   Yes.

18  Q.   Is that a name you had any familiarity with before 2018?

19  A.   No.

20  Q.   And in 2018, was Professor Lieber the principal

21  investigator on any NIH-funded grants?

22  A.   Yes.

23  Q.   What kind of grants?

24  A.   He was the principal investigator on two grants:  One was

25  called a Pioneer Award, or a DP-1 Award; and one was called an

1  exploratory award, or an R-21 Award.

2  Q.   What is a Pioneer Award?

3  A.   A Pioneer Award is a -- it's a prestigious kind of NIH

4  grant, which is designed to support research which is highly

5  innovative and something that's different from what the

6  researcher had been previously doing.

7  Q.   Is it prestigious at all?

8  A.   Yes.

9  Q.   And what makes it prestigious?

10 A.   A couple of things:  One is that it's actually more

11 competitive than most NIH grants, which themselves are highly

12 competitive; and, second, it is designed to support highly

13 innovative unusual types of work.

14 Q.   Do you recall the value of the Award?

15 A.   I believe it was around 4.5 million -- $4.5 million.

16 Q.   And are you aware of whether Professor Lieber had any

17 previous Pioneer Awards?

18 A.   Yes.

19 Q.   And when was that Award?

20 A.   He had an Award that ran from 2008 to 2014.

21 Q.   And how is it that Professor Lieber's name came to your

22 attention?

23 A.   I was informed about his name from the FBI.

24 Q.   And was his name provided to you alone or with other

25 names?

1   A.   With other names.

2        THE COURT:  How much more do you have with this

3   witness?

4        MR. DRABICK:  Probably ten minutes, Your Honor, so now

5   may be a good time for a break.

6        THE COURT:  Okay.  We will take the recess now, and

7   then resume with this witness afterwards.

8        THE CLERK:  All rise, please.

9        THE COURT:  We will be in recess for about 20 minutes

10  and then continue.

11       (Recess taken from is 11:00 to 11:25 a.m.)

12       THE COURT:  Please be seated.

13       (The jury is present for the following.)

14       THE COURT:  You may proceed.

15       MR. DRABICK:  Thank you, Your Honor.

16  Q.   Dr. Lauer, when we left off, you were identifying

17  information you'd received from the FBI.

18        At a high level, what were you provided?

19  A.   We were given a spreadsheet with a number of names on them

20  and some information about each of those names.

21  Q.   And do you have any understanding as to how the FBI

22  generated that list?

23  A.   No.

24  Q.   And what, if anything, did you do upon receiving that

25  information?

```
1    A.   We went through each of the names, we identified those who

2    were currently funded by NIH, and we did our own internal

3    review to see whether or not there might be a compliance

4    problem.

5    Q.   And what did that internal review entail?

6    A.   It entailed looking at the information that the FBI gave

7    us.  It also entailed doing a detailed review of all the grants

8    documents we had received.  We also did some open-search

9    activities as well.

10   Q.   When you say "open search," you mean --

11   A.   I mean, open source.  I'm sorry.  Open-source searches.

12   Q.   Reviewed the Internet?

13   A.   Reviewed the Internet, materials that are publicly

14   available.

15   Q.   How much, if at all, did it matter to you that it was the

16   FBI that provided the initial information?

17   A.   Not at all.

18   Q.   Was the information of interest to you?

19   A.   Yes.

20   Q.   Did you reach out to Harvard?

21   A.   Yes.

22   Q.   Why?

23   A.   Because we were concerned that there may have been a

24   compliance problem, there may have been problems with

25   duplicative funding, conflicts of scientific overlap, budgetary
```

 1    overlap, commitment overlap or undisclosed financial conflicts

 2    of interest.

 3              MR. DRABICK:  Could we please see Exhibit 2, already

 4    admitted.

 5              THE WITNESS:  This is what's on the screen here?

 6              MR. DRABICK:  It will be just momentarily.

 7              Thank you, Ms. Urso.

 8    Q.   Dr. Lauer, do you recognize Exhibit 2?

 9    A.   Yes.

10    Q.   And what is it?

11    A.   It's an email that I sent on November 30th, 2018.

12    Q.   To Harvard University staff?

13    A.   Yes.

14    Q.   And did you draft this email?

15    A.   Our team put this together.

16    Q.   And in broad strokes, what, if anything, are you asking

17    Harvard to do?

18    A.   We're asking Harvard to do their own compliance review and

19    work with us to determine whether or not there was a problem.

20              MR. DRABICK:  Could we please highlight the first

21    paragraph, Mr. Bruemmer.

22    Q.   Could you please read this paragraph?

23    A.   "It has come to our attention that there are issues of

24    potential noncompliance with NIH policies regarding the

25    disclosure of outside research support and relevant

1    affiliations or foreign components at Harvard University."

2    Q.   And could you translate that into more plain English?

3    A.   Yes.  It means that we were concerned that we may not have

4    been given complete information by Harvard University at the

5    time that applications were submitted; and, therefore, we may

6    have had inappropriate or ill-informed funding decisions.

7    Q.   And what kinds of violations were you referring to?

8    A.   One possibility is, is that there was other research

9    support that had not been disclosed, meaning that there may

10   have been duplicative funding, scientific overlap, budgetary

11   overlap, there may have been conflict of commitment, and there

12   may have been undisclosed financial conflicts of interest.

13   Q.   And did those concerns all stem from your -- from the

14   information identified potentially linking Professor Lieber to

15   the Thousand Talents Program?

16   A.   In part.

17   Q.   And could you describe for the jury the purpose of the

18   second and third paragraphs?

19   A.   The second and third paragraphs lay out the policies and

20   regulations that apply to grants and that would be applicable

21   to this situation.  In other words, these are the kinds of

22   noncompliance, in a generic sense, that we would be worried

23   about.

24        MR. DRABICK:  And Mr. Bruemmer, if we could please

25   highlight the last full paragraph beginning, "NIH has become."

1    Q.    And could you read that paragraph, please?

2    A.    Yes.  "NIH has become aware that applications submitted to

3    the NIH for the investigators named below may have failed to

4    comply with the above policies regarding other support,

5    disclosing foreign financial interests and/or obtaining NIH

6    prior approval for the use of foreign components on NIH

7    awards."

8    Q.    And in plain English, what are you communicating here?

9    A.    We are communicating that we have concerns that other

10   support may not have been disclosed, meaning that we may have

11   made inappropriate funding decisions; there may have been

12   scientific budgetary commitment overlap; we are concerned that

13   there may have been significant financial conflicts of interest

14   that were not disclosed; and we were also worried about foreign

15   components, meaning significant parts of an NIH-funded project

16   occurring outside of the United States without going through

17   proper approval.

18          MR. DRABICK:  And Mr. Bruemmer, if we could please

19   highlight the bulleted portion at the bottom of 2 and on to 3,

20   that whole paragraph.

21   Q.    Dr. Lauer, in this paragraph, you are identifying

22   Dr. Lieber as one of the two individuals you were expressing

23   concern about?

24   A.    Yes.

25   Q.    And you identify his two active grants there?

1    A.    Yes.

2    Q.    And could you please read the portion of the paragraph

3    beginning, "Dr. Lieber also holds"?

4    A.    "Dr. Lieber also holds an affiliation at the Wuhan

5    Institute of Technology in China.  Dr. Lieber was selected as a

6    foreign expert for China's Thousand People Plan, which may have

7    included a stipend from the Chinese government, along with the

8    position at Wuhan University of Technology.  Several of

9    Dr. Lieber's NIH-supported publications were also supported by

10   foreign awards, suggesting a collaboration.

11          "Harvard University may have failed to fully disclose

12   Dr. Lieber's affiliation with Wuhan University of Technology

13   and the foreign components of the awarded projects and

14   applications and progress reports which designated Dr. Lieber

15   as the principal investigator or key personnel."

16   Q.    And what was the basis for your statements in that

17   paragraph?

18   A.    This was from the material that was given to us by the

19   FBI, our open-source Internet searches and our detailed review

20   of our grant documents.

21   Q.    And you used the phrase "Thousand People Plan."  What were

22   you referring to there?

23   A.    The Thousand Talents Program.

24   Q.    And were these affiliations listed here reported into NIH?

25   A.    Yes.

1  Q.   And what, if anything, did you ask Harvard to do?

2  A.   We asked Harvard to undertake their own internal

3  compliance review and get back to us and let us know whether or

4  not there was indeed a problem.

5  Q.   Did these issues potentially affect the integrity of

6  Harvard's grants for Dr. Lieber?

7  A.   Yes.

8  Q.   How so?

9  A.   Because we may have made inappropriate or ill-informed

10  funding decisions from lack of disclosure about other research

11  support, about financial conflicts of interest and about

12  foreign components.

13  Q.   And what sorts of remedies, if any, were customary for the

14  types of policy violations you identified here?

15  A.   We could do a variety of things.  We could suspend the

16  grant, restrict funds on the grant, renegotiate the terms and

17  conditions of the grant, indicate that the principal

18  investigator needs to be removed from the grant.  We could also

19  refer the problem to another federal agency for further review.

20  Q.   Are those among the more serious types of remedies NIH

21  pursues?

22  A.   Yes.

23  Q.   And there was a redacted portion in this letter.  Does

24  that relate to a different researcher?

25  A.   Yes.

1          MR. DRABICK:  You can take that down, Mr. Bruemmer.

2   Q.   Did Harvard respond?

3   A.   Yes.

4          MR. DRABICK:  Could we please show to the witness

5   only Exhibit 3.

6   Q.   Do you recognize Exhibit 3, Dr. Lauer?

7   A.   Yes.

8   Q.   What is this?

9   A.   It's a letter that was sent to me dated January 10th,

10  2019, from Harvard Financial Administration.

11         MR. DRABICK:  Your Honor, at this time, I move to

12  admit Exhibit 3.

13         MS. YOUNG:  No objection.

14         THE COURT:  It's in evidence.

15         (Government Exhibit 3 received in evidence.)

16  Q.   Dr. Lauer, does this letter provide Harvard's answers and

17  explanation?

18  A.   Yes.

19  Q.   Including regarding Professor Lieber?

20  A.   Yes.

21  Q.   Were you interested in Harvard's response?

22  A.   Yes.

23         MR. DRABICK:  Okay.  Mr. Bruemmer, if we could please

24  highlight the first paragraph under "Dr. Lieber" on the first

25  page.  Sorry.  Beginning at the "Dr. Lieber" heading.

1   Q.   And Harvard's letter cites three allegations.  Are those

2   the allegations you were interested in learning about?

3   A.   Yes.

4   Q.   Could you please read the last sentences of that

5   paragraph?

6   A.   "Our inquiry leads us to conclude that each of these

7   allegations rests on a misunderstanding of the facts, and we

8   respond in detail to each."

9   Q.   What did you take away from that statement?

10  A.   That, in fact, there was no compliance problem; there were

11  no problems with scientific overlap, budgetary overlap or a

12  conflict of commitment, and there were no undisclosed financial

13  conflicts of interest.

14  Q.   I'll direct you to Page 2, Section 2.

15        MR. DRABICK:  If you could please highlight that,

16  just the first full paragraph under Section 2 in the heading.

17  Thank you, Mr. Bruemmer.

18  Q.   Could you please read the heading and the first full

19  sentence?

20  A.   "Selection as Foreign Expert for the Thousand People Plan

21  and Publication Support:  Dr. Lieber has represented that he is

22  not and has never been a recipient in China's Thousand People

23  Plan."

24  Q.   Did you understand Harvard to be referring to the Thousand

25  Talents Program there?

1    A.    Yes.

2    Q.    And was information about Dr. Lieber in the Thousand

3    Talents Program information you were looking for?

4    A.    Yes.

5    Q.    And what would you take away from that statement?

6    A.    That, in fact, Dr. Lieber never had anything to do with

7    the Thousand Talents Program.

8    Q.    And was that important to your work at NIH?

9    A.    Yes.

10   Q.    And why?

11   A.    Because we were concerned that undisclosed support from

12   the Thousand Talents Program could constitute scientific

13   overlap, budgetary overlap, conflict of commitment or an

14   undisclosed significant personal financial conflict of

15   interest.

16   Q.    Did you review the entire letter, as it related to

17   Professor Lieber?

18   A.    Yes.

19   Q.    And what further action, if any, did you take on this

20   matter as to Dr. Lieber after receiving the letter?

21   A.    None.

22   Q.    Why?

23   A.    Because we were satisfied with this answer.

24   Q.    If the letter had described Dr. Lieber as having

25   participated in the Thousand Talents Program, even if in the

1   past, would that have caused you to take a different course of

2   action?

3   A.   Yes.

4   Q.   How so?

5   A.   We would have asked for copies of his Thousand Talents

6   application, contract, progress reports.  We would have asked

7   for copies of his employment contract with the Wuhan University

8   of Technology.  We would have had lots of questions.  We

9   probably also would have restricted funds on active grants.

10  Q.   Would his participation have potentially affected your

11  funding decisions?

12  A.   Yes.

13  Q.   How so?

14  A.   Because there may have been problems with scientific

15  overlap, budgetary overlap or commitment overlap; and the other

16  is that there may have been problems because the way

17  these -- our understanding of the Thousand Talents Program was

18  that people were paid, they got money directly paid to them,

19  and that would create a significant financial conflict -- a

20  significant financial interest, which could be a financial

21  conflict of interest.

22  Q.   What is a retrospective review?

23  A.   So a retrospective review is a situation where it is

24  deemed that there may have been an undisclosed financial

25  conflict of interest.  It should have been disclosed upfront,

1    but it wasn't, and so now the question is, is whether or not

2    there actually was a problem with a bias in the way research

3    was conducted and reported.  And we do that -- we ask the

4    university to do that in a retrospective way.

5    Q.   If Harvard had disclosed a past affiliation with the

6    Thousand Talents Program, was a retrospective review something

7    NIH might have done?

8    A.   Yes, we would have asked for that.

9    Q.   Was it important to you to receive accurate information as

10   to whether Professor Lieber participated in the Thousand

11   Talents Program?

12   A.   Yes.

13           MR. DRABICK:  Nothing further, Your Honor.

14           THE COURT:  Any cross?  How long will you be?

15           MS. YOUNG:  15 minutes, Your Honor.

16           THE COURT:  We start counting.

17                       CROSS-EXAMINATION

18   BY MS. YOUNG:

19   Q.   Dr. Lauer, the NIH supports collaborative research; right?

20   A.   Yes.

21   Q.   Including international collaborative research at times;

22   correct?

23   A.   Yes.

24   Q.   Because collaboration advances science; right?

25   A.   Yes.

1  Q.    Expands knowledge; yes?

2  A.    Yes.

3  Q.    And those international collaborations that NIH permits

4  can be with China; correct?

5  A.    Yes.

6  Q.    In fact, NIH has supported scientific cooperation between

7  the U.S. and China for over 30 years; right?

8  A.    Yes.

9  Q.    Safe to say that NIH has permitted scientific cooperation,

10 then, back in 2010?

11 A.    Yes.

12 Q.    2011?

13 A.    Yes.

14 Q.    '12?

15 A.    Yes.

16 Q.    '13, '14, '15; yes?

17        Now, that's more formal collaboration.  There's a

18 spectrum of other activity I want to ask you about.

19        NIH does not prohibit researchers from traveling to

20 China; correct?

21 A.    Correct.

22 Q.    NIH does not prohibit researchers from giving talks in

23 China; right?

24 A.    Yes.

25 Q.    NIH does not prohibit visiting a former student in China;

1    right?

2    A.    Yes.

3    Q.    NIH does not prohibit a researcher from reviewing

4    publications from another scientist in China; correct?

5    A.    Yes.

6    Q.    NIH does not prohibit a researcher from receiving an

7    honorary title in China?

8    A.    Yes.

9    Q.    NIH does not prohibit a researcher from receiving

10   honorarium from China?

11   A.    Yes, that's right.

12   Q.    I assume, then, that NIH doesn't prohibit receiving a

13   plaque or taking a picture in China?

14   A.    Yes.

15   Q.    So what NIH cares about is support for research; is that

16   correct?

17   A.    Yes, and financial -- and financial interests.

18   Q.    Like a foreign grant; correct?

19   A.    That's included, yes.

20   Q.    So you testified just a moment ago that around November

21   30th, 2018, you sent that letter to Harvard; right?

22   A.    Yes.

23   Q.    And that was not the only letter you sent to a university

24   around that time; correct?

25   A.    Yes.

1    Q.   You sent similar letters to about 87 other universities;

2    right?

3    A.   Yes.  And more, yes.

4    Q.   All across the country; correct?

5    A.   Yes.

6    Q.   And that letter to Harvard, like the other letters, were

7    sent to the universities, not the individual researchers;

8    right?

9    A.   Yes.

10   Q.   Because the university, not the researcher, gets NIH's

11   funding; correct?

12   A.   Yes.

13   Q.   And of those letters sent, approximately 93 percent

14   related to researchers who identify -- identify as having a

15   connection to China; correct?

16   A.   Yes.

17   Q.   So not Africa or South America or Europe; China?

18   A.   We have cases in Europe, Australia, other countries.

19   Q.   But 93 percent pertained to China?

20   A.   Yes.

21   Q.   Okay.  So now I want to talk to you about the letter to

22   Harvard specifically.

23          There were, I think, three different areas that were

24   specified in the letter pertaining to Professor Lieber;

25   correct?

1   A.   Yes.

2   Q.   Only one of which was that Professor Lieber had been

3   selected as a Thousand People Plan member, that had been

4   identified for you; correct?

5   A.   Yes.

6   Q.   And Thousand People Plan you understand today to be the

7   same as Thousand Talent Plan?

8   A.   Yes.

9   Q.   At the time, did you understand it to be different?

10   A.   No.

11   Q.   So are there other plans that you also assume are a

12   Thousand People Plan or Thousand Talent Plan?

13   A.   My understanding is, is that there are hundreds of

14   talent-recruitment programs in China.

15   Q.   But they're not all titled "Thousand People Plan";

16   correct?

17   A.   Yes.

18   Q.   And this identification of Professor Lieber as being a

19   member was not something that you personally identified; right?

20   A.   Yes.

21   Q.   It came to your attention from the FBI, and then the NIH

22   did an open search -- or open-source search; right?

23   A.   Yes.

24   Q.   Which you mean Google; correct?

25   A.   Yes.

1  Q.   Now, that open-source search, that Googling, identified

2  some web pages; correct?

3  A.   Yes.

4  Q.   Some Chinese web pages?

5  A.   Yes.

6  Q.   Did you personally review those websites?

7  A.   No.

8  Q.   So you're not aware that one of those websites was

9  baidu.com?

10  A.   I've heard of that, but I'm not aware in this case.

11  Q.   Do you understand that to be a credible source of

12  information?

13  A.   I don't know.

14  Q.   And the listing on these websites, they were not current;

15  correct?  They were dated past entries; correct?

16        MR. DRABICK:  Objection, Your Honor.  He said he

17  didn't review the websites.

18        MS. YOUNG:  He might be aware of the information

19  contained in the websites.

20        THE COURT:  I'm sorry.  What are you asking about now?

21        MS. YOUNG:  The websites that were the source of his

22  information that were the rationale and reason for sending the

23  letter to Harvard.

24        THE COURT:  I don't understand what the relevance of

25  that is.

1  Q.   Dr. Lauer, when you sent the letter to Harvard, you had

2  concerns regarding Professor Lieber; correct?

3  A.   Yes.

4  Q.   And those concerns were based on websites that were

5  identified for you; correct?

6  A.   In part.

7  Q.   When those concerns were brought to your attention, you

8  did not contact the websites, the web pages, did you?

9  A.   I didn't, no.

10 Q.   Did you contact journal articles, journal publications?

11 A.   My colleagues did.

12 Q.   But you did not?

13 A.   No.

14 Q.   And as of November, 2018, you did not stop the grants that

15 Professor Lieber was working on; correct?

16 A.   Yes.

17 Q.   And you did not stop him from publishing or continuing his

18 research; correct?

19 A.   Yes.

20 Q.   Now, in the letter to Harvard, you referred to two, not

21 one, professor; right?

22 A.   Yes.

23 Q.   And with respect to Professor Lieber, not the other

24 professor, there were two specific NIH grants listed; correct?

25 A.   Yes.

1   Q.   And those were his then current grants, his active grants;

2   right?

3   A.   Yeah, those were active grants going to Harvard supporting

4   Dr. Lieber.

5   Q.   And those grants were awarded to Harvard supporting

6   Dr. Lieber in 2017; correct?

7   A.   I think so, yes.

8   Q.   Professor Lieber had other grants from NIH in 2012

9   and '13, '14 and '15; correct?

10  A.   Yes.

11  Q.   But this letter focused on his then current grants; right?

12  A.   This letter identified those as his active grants.

13  Q.   And the letter was addressed to a Ms. Nuala McGowan at

14  Harvard; correct?

15  A.   Yes.

16  Q.   And you understood her position to be related to Harvard's

17  Research Finance; right?

18  A.   Yes.

19  Q.   Because you expected Harvard to respond to the letter, not

20  Professor Lieber?

21  A.   Yes.

22  Q.   And you did not request an interview of Professor Lieber;

23  correct?

24  A.   Yes.

25  Q.   You did not request Harvard perform an email review?

1    A.   I don't remember.

2    Q.   You don't recall if that letter sent to Harvard asked

3    Harvard to do an email review?

4    A.   Oh, it wasn't in the letter, no.

5    Q.   And your letter did not list specific questions to be

6    raised with Professor Lieber, did it?

7    A.   No.

8    Q.   The letter requested that Harvard confirm compliance with

9    certain requirements and provide a corrective action plan, if

10   needed; right?

11   A.   Yes.

12   Q.   So Harvard was not required by NIH to interview

13   Professor Lieber to respond your letter?

14   A.   No.  Harvard was required to do a compliance review

15   however they wanted to do it.

16   Q.   Isn't it true that NIH has funded researchers who are

17   participants in TTP?

18   A.   Yes.

19   Q.   NIH did not prohibit researchers from participating in TTP

20   in 2015; correct?

21   A.   Yes.

22   Q.   Or '14?

23   A.   Yes.

24   Q.   Or '13?

25   A.   Yes.

1    Q.   Or '12?

2    A.   Yes.

3    Q.   Or even in 2018?

4    A.   Yes.

5    Q.   Now, you received a written response to the letter that

6    you wrote Harvard; correct?

7    A.   Yes.

8    Q.   And based on that response, NIH closed its inquiry?

9    A.   Yes.

10   Q.   And Professor Lieber continued to work on his two NIH

11   grants; right?

12   A.   Yes.

13   Q.   Isn't it true that a year later, around January, 2020, you

14   received a phone call from Harvard's lawyers; correct?

15   A.   Yes.

16   Q.   The phone call was not from the FBI, not from DCIS, not

17   from the U.S. Attorney's Office?

18   A.   No.  It was from a Harvard attorney, that's correct.

19   Q.   Ms. Savage, who's present?

20   A.   Yes, Christine Savage.

21   Q.   And then you attended a meeting with a number of people in

22   this Courtroom; right?

23   A.   Yes.

24   Q.   That includes Mr. Casey and Mr. Drabick, Harvard's

25   lawyers, Special Agent Plumb?

1    A.   Yes.

2    Q.   And there was a discussion about the facts of this case;

3    correct?

4    A.   Yes.

5    Q.   So you learned new information from that group of people

6    at that meeting; correct?

7    A.   Yes.

8    Q.   And after that meeting, did you personally verify any of

9    the information that you learned?

10   A.   Yes.

11   Q.   You called Wuhan University?

12   A.   No.

13   Q.   You called Thousand Talents Plan in China?

14   A.   No.

15          MS. YOUNG:  One moment.

16          (Pause.)

17          MS. YOUNG:  Nothing further.

18          THE COURT:  Any redirect?

19          MR. DRABICK:  Very, very brief, Your Honor.

20                    REDIRECT EXAMINATION

21   BY MR. DRABICK:

22   Q.   Dr. Lauer, Ms. Young identified the two grants as being

23   active grants that you reference in your letter; correct?

24   A.   Yes.

25   Q.   Were you interested only in the timeframe of his active

1    grants?

2    A.    No.

3    Q.    Why not?

4    A.    Because compliance problems are compliance problems

5    irrespective of when they happened.

6    Q.    And what were your concerns regarding Professor Lieber's

7    suspected affiliation with the Thousand Talents Program?

8    A.    We were concerned that there may have been undisclosed

9    other research support, which may have led to scientific

10   overlap, budgetary overlap, conflicts of commitment or

11   financial conflicts of interest that we didn't know about that

12   led us to make inappropriate funding decisions.

13   Q.    Would you need additional information to determine if

14   there were any remedies that needed to be taken?

15   A.    Yes.

16   Q.    And what step did you take to ascertain the information

17   you needed?

18   A.    I'm sorry?

19   Q.    That was poorly worded.

20         What steps, if any, did you take to try to acquire

21   that information?

22   A.    In 2019?

23   Q.    Yes.

24   A.    None.

25   Q.    Did you write a letter to Harvard?

```
1    A.    Oh, in 2018.

2    Q.    Sorry.  Yes, in 2018.

3    A.    Yes, we wrote a letter to Harvard.

4    Q.    Asking what?

5    A.    We identified the potential problems, and we asked for

6    them to conduct a compliance review.

7    Q.    Was the purpose to find out the information so you could

8    evaluate it?

9    A.    Yes.

10          MR. DRABICK:  Nothing further, Your Honor.

11          THE COURT:  Any recross?

12          MS. YOUNG:  No, Your Honor.

13          THE COURT:  Thank you very much, Mr. Lauer.  You are

14   excused.

15          Who's next?

16          MR. DRABICK:  The Government calls Carl Goodman.

17          THE COURT:  Could somebody please bring him in?

18          MR. DRABICK:  Yes.

19          THE COURT:  Could you please come over here and step

20   into the witness box.  It's that thing over there.

21          THE CLERK:  You can just go in around that way.  Thank

22   you.

23          Could I swear you in, sir.

24          (Witness sworn.)

25          THE WITNESS:  I do.
```

```
 1            THE CLERK:  Sir, could I just ask you to remove your
 2   mask briefly while you answer the questions, so we can
 3   understand.
 4            THE WITNESS:  Sure.
 5            THE CLERK:  Sir, could you state your name, spelling
 6   your last name for the record for us, sir, please.
 7            THE WITNESS:  Carl Goodman, G-o-o-d-m-a-n.
 8            THE CLERK:  Thank you.
 9            CARL GOODMAN, having been duly sworn by the Clerk, was
10   examined and testified as follows:
11                         DIRECT EXAMINATION
12   BY MR. DRABICK:
13   Q.   Good morning, Mr. Goodman.
14   A.   Good morning.
15   Q.   I'd just ask you to hold that microphone close or pull
16   that microphone close to you and speak loudly.
17            What do you do for a living, sir?
18   A.   I'm a CPA.
19   Q.   And do you provide tax-preparation service?
20   A.   I do.
21   Q.   How long have you been doing that?
22   A.   Probably 40 years or more.
23   Q.   Do you have your own business?
24   A.   I do.
25   Q.   And where is your business located?
```

1    A.    Framingham.

2    Q.    Framingham, Massachusetts?

3    A.    Yes.

4    Q.    Any employees?

5    A.    No.

6    Q.    And what's your educational background?

7    A.    I've got a B.S. in Business Administration, a Masters in

8    Business Administration and a Masters in Taxation.

9    Q.    Do you hold any certifications?

10   A.    CPA, as well as a Personal Financial Specialist

11   designation.

12   Q.    What does CPA mean?

13   A.    Certified Public Accountant.

14   Q.    And what are the range of services you provide for your

15   tax clients?

16   A.    Tax preparation, some small business bookkeeping and, in

17   some cases, some financial advisory work.

18   Q.    Approximately how many clients do you have?

19   A.    Probably about 100.

20   Q.    And what's the mix of clients you have?

21   A.    Mostly individuals.

22   Q.    Are you familiar with the names Jennifer and

23   Charles Lieber?

24   A.    I am.

25   Q.    How so?

1    A.    They're clients -- or they were clients.

2    Q.    And what relationship do you understand Jennifer and

3    Charles Lieber to have?

4    A.    Married.

5    Q.    And when were they clients of yours?

6    A.    I think they started in 2005.

7    Q.    Are they still clients of yours?

8    A.    No.

9    Q.    And what services did you provide for them?

10   A.    Tax preparation.

11   Q.    Did you prepare a single return for the Liebers?

12   A.    No.  It was a joint return.

13   Q.    So a return for both of them?

14   A.    Yes.

15   Q.    And who was your point of contact for the Liebers?

16   A.    Jennifer Lieber.

17   Q.    Was that true for the duration of the time you had the

18   Liebers as clients?

19   A.    Yes.

20   Q.    And how would you communicate with Mrs. Lieber?

21   A.    Either by phone or email.

22   Q.    And during the course of your work for the Liebers, did

23   you ever receive signed documents from Mrs. Lieber?

24   A.    Yes.

25   Q.    Did those documents ever include signatures for the name

1    Charles Lieber?

2    A.   Yes.

3    Q.   And did you communicate with Mrs. Lieber about their joint

4    tax obligations?

5    A.   Yes.

6    Q.   Was that true for the duration of your relationship with

7    them?

8    A.   Yes.

9    Q.   And would you receive tax-related documents for

10   Charles Lieber from Mrs. Lieber?

11   A.   Yes.

12   Q.   Did that include his Forms W-2?

13   A.   Yes.

14   Q.   And Forms 1099 miscellaneous?

15   A.   Yes.

16   Q.   Did you provide any financial-advisory services for the

17   Liebers?

18   A.   Limited.

19   Q.   And what were those?

20   A.   We opened up an account into which some checks were

21   deposited and invested in CDs.  I think they later deposited

22   some shares of stock, but I don't have a lot of memory of that.

23   It was not very active.

24   Q.   In whose name was the account in?

25   A.   It was joint.

1    Q.    So both of their names?

2    A.    Yes.

3    Q.    And who was the point of contact?

4    A.    Jennifer.

5    Q.    Have you ever met Charles Lieber?

6    A.    No.

7    Q.    Have you ever spoken to him?

8    A.    I have not.

9    Q.    Do you have an understanding of what he does for work?

10   A.    Harvard Professor/Researcher.

11   Q.    And in your role as preparing their taxes, did you come to

12   understand if he was paid a salary for that work?

13   A.    Yes.

14   Q.    Did he have any other forms of income that you were aware

15   of?

16   A.    Outside consulting income.

17   Q.    When you work with married couples, is it out of the

18   ordinary to work with only one of the spouses?

19   A.    Not at all.

20   Q.    Is it common?

21   A.    More common than not, yes.

22   Q.    Have you ever had any reason to doubt that Mrs. Lieber was

23   authorized to work with you on behalf of Charles Lieber?

24   A.    No.

25   Q.    I would like to focus your attention on the 2013 to 2015

1  time period.

2          Can you just walk the jury through at a high level

3  the process for preparing the Liebers' tax returns?

4  A.   By and large, at the beginning of the tax season, I would

5  send out an information letter, an engagement letter, and to

6  the Liebers I sent out a questionnaire.  They would return it

7  at -- provide information sometime, mostly at the end of tax

8  season, sometimes in the middle, and I would prepare either a

9  return or an extension.

10 Q.   I would like to turn specifically to 2013.

11         Did you prepare the Liebers' tax return in 2013?

12 A.   Yes.

13 Q.   And was that prepared and then filed in calendar year

14 2014?

15 A.   Yes.

16         MR. DRABICK:  Your Honor, at this time, I move to

17 admit Exhibit 240, which I understand is without objection.

18         MS. DEIST:  Actually, we object on hearsay.  I mean,

19 it's just a document.  There's no one's signature on it.

20         THE COURT:  I'm sorry?

21         MS. DEIST:  I'm objecting on the grounds of hearsay.

22 It's just a document, so --

23         THE COURT:  I don't know what it is yet.

24         MR. DRABICK:  We'll lay a foundation, Your Honor.

25         Ms. Urso, could we bring up for the witness only --

```
 1              THE CLERK:  Yeah, it's on there.
 2              MR. DRABICK:  -- Mr. Bruemmer, Exhibit 240.
 3    Q.   Do you see a document, Mr. Goodman?
 4    A.   I don't.
 5              MR. DRABICK:  Sorry, Ms. Urso.  I think it's not on
 6    counsel or witness's table.
 7              THE CLERK:  Sorry.
 8              THE WITNESS:  Got it.
 9              MR. DRABICK:  Thank you.
10    Q.   What is this document?
11    A.   It's an engagement letter.
12    Q.   An engagement letter for who?
13    A.   For Charles and Jennifer Lieber.
14    Q.   Okay.  And for what year?
15    A.   2013.
16    Q.   So for the 2013 tax year?
17    A.   Yes.
18    Q.   But it's dated in 2014?
19    A.   That's right.
20    Q.   And what, if anything, did you do with this letter?
21    A.   I sent it out, along with the other tax information and
22    questionnaire.
23    Q.   Is this the letter you sent to the Liebers at the
24    beginning of the tax-preparation process for their 2013 return?
25    A.   It is.
```

1    Q.   And at a high level, what sorts of things does the letter

2    provide?

3    A.   It describes the work I'm to provide, the product I'm to

4    provide, the services I render and the clients' responsibility

5    within the process.

6              MR. DRABICK:  Your Honor, at this time, I move to

7    admit Exhibit 240.

8              MS. DEIST:  I object on hearsay, on the contents of

9    the letter, on inadmissible hearsay.  Whether or not

10   Mr. Goodman sent the letter he can certainly testify, he can

11   even testify about what the contents might have been; but the

12   fact that the letter was actually received, there's no proof of

13   that, and again, the words inside the actual letter are

14   inadmissible hearsay.

15             MR. DRABICK:  Your Honor, the letter is not offered

16   for the truth of the matter in the letter; it's offered for

17   what the letter provides -- what the letter states was provided

18   to the Liebers at the beginning of their tax-preparation

19   process.

20             MS. DEIST:  In this case, there's no signature

21   confirming receipt.

22             THE COURT:  It's not provided, Your Honor, as an

23   adopted admission; it's provided as evidence of what the

24   Liebers were provided at the beginning of their tax-preparation

25   process, which informs and is context for the information they

1    were -- the Liebers subsequently provided to the tax preparer

2    to prepare their taxes.

3            MS. DEIST:  It was not something they were provided.

4    At the very most, it's something that he can testify that he

5    sent to them.

6            THE COURT:  Well, it's not being offered for the truth

7    of every statement in there; it is provided for the fact that

8    they were about to enter into a relationship.  I don't know why

9    we need it because he's already testified to it, but there may

10   be details in there that finish the picture.  I don't know.

11           MR. DRABICK:  The letter, Your Honor, provides the

12   context about the terms of -- the terms of their relationship,

13   which he can testify to, and it is the letter that he provided

14   to them.

15           THE COURT:  I think the letter is admissible, and I

16   will allow it.  And your objection is noted.

17           MR. DRABICK:  Thank you, Your Honor.

18           THE COURT:  But it is admissible for the limited

19   purpose of showing what this witness told the Liebers.

20           MR. DRABICK:  Yes, Your Honor.

21           (Government Exhibit 240 received in evidence.)

22   Q.   Mr. Goodman, is this the engagement letter you sent to the

23   Liebers for the 2013 tax year?

24   A.   Yes.

25           MR. DRABICK:  Mr. Bruemmer, could you please highlight

1    the first two paragraphs.

2    Q.   Would you please read for the jury those paragraphs?

3    A.   "I'm pleased to confirm the terms of my engagement with

4    you and to clarify the nature and extent of the services I'll

5    provide regarding the preparation of your income tax returns.

6    I will prepare your 2013 Federal income tax return and income

7    tax returns for the state and local taxing authorities in which

8    you tell us in writing, or that I prepared for you last year,

9    that you deemed yourself to be a resident or non-resident in

10   2013, collectively, the returns."

11          MR. DRABICK:  You can stop there.  Thank you,

12   Mr. Goodman.

13          Mr. Bruemmer, could you please highlight beginning,

14   "The timeliness of your cooperation."

15   Q.   And could you please read the first two sentences of that

16   paragraph?

17   A.   "The timeliness of your cooperation is essential to our

18   ability to complete this engagement.  Specifically, I must

19   receive sufficient information from you with which to prepare

20   your returns within a reasonable period of time prior to the

21   applicable filing deadline."

22   Q.   Why did you include this language?

23   A.   Because, if I don't get information, I can't get the

24   return out in time, and there will be penalties.

25   Q.   Did you charge a fee to the Liebers?

1    A.    Yes.

2    Q.    And what was that fee?

3    A.    I believe it was 900 or 950.

4          MR. DRABICK:  And the next page, please, if you could

5    please highlight, Mr. Bruemmer, the paragraph about a third of

6    the way down beginning, "If the income tax returns."

7    Q.    Can you please read that paragraph?

8    A.    "If the income tax returns I am to prepare are joint

9    returns, I consider each of you to be my client.  You each

10   acknowledge that there is no expectation of privacy from the

11   other, and I am at liberty to share with either of you without

12   the prior consent of the other any and all documents and other

13   information concerning preparation of your return."

14   Q.    Why did you include this paragraph?

15   A.    To enable me to communicate equally with each, if

16   necessary.

17         MR. DRABICK:  And Mr. Bruemmer, could you please

18   highlight the last paragraph on the page extending on to the

19   next page.

20   Q.    Could you please read that paragraph?

21   A.    "I will prepare the returns from information which you

22   will furnish to me.  It is your responsibility to provide all

23   the information required for the preparation of complete and

24   accurate returns.  Of course, in all phases of the work

25   described here, I'll work with the information and accounting

1    records you provide at face value.  Neither of us expects that

2    my services include an audit or review of any kind.  My

3    services will be limited to those tasks I deem necessary for

4    the preparation of the tax returns only."

5    Q.   And why did you include this paragraph?

6    A.   So that our client understands that I can't create a

7    return out of nothing, they must provide me the records; and I

8    work with their records, I don't audit or verify.

9         MR. DRABICK:  Could you please highlight,

10   Mr. Bruemmer, the paragraph -- third paragraph down beginning,

11   "You should be aware that."

12   Q.   And could you please read the first sentence?

13   A.   "You should be aware that, under tax laws and regulations,

14   it is your responsibility to substantiate with appropriate

15   documentation the income you report and the deductions you

16   claim on your tax return."

17   Q.   And why do you include that?

18   A.   Because the tax return is based on actual data provided.

19        MR. DRABICK:  And Mr. Bruemmer, could you please

20   highlight the paragraph beginning, "My engagement will be

21   fulfilled."

22   Q.   And could you please read that paragraph?

23   A.   "My engagement will be fulfilled upon delivery of the

24   completed returns to you.  Thereafter, you have the final

25   responsibility for the tax returns and should review them

1    carefully before you sign and file the returns with the

2    appropriate taxing authorities and/or authorize me to e-file

3    them on your behalf.  With the return I will provide you with

4    Form 8879, which you must sign and return to me.  I will not

5    e-file until I have received the signed form."

6    Q.   Does this explain the final part of the filing process

7    that you take?

8    A.   Yes.

9         MR. DRABICK:  You can take that down, Mr. Bruemmer.

10   Q.   In 2013 to 2014, did the Liebers file their returns in

11   paper copy?

12   A.   No.  They were e-filed.

13   Q.   And how does that work?

14   A.   I send the returns out to them, in this case, in PDF

15   format, they review them; and, once satisfied, they sign an

16   8879, return it to me, and then I file it.

17   Q.   Did the Liebers physically sign the tax return itself?

18   A.   No.

19   Q.   You mentioned a Form 8879.  What is that?

20   A.   It's a form -- it's the electronic-filing signature page.

21   Q.   And what, if anything, does that form authorize?

22   A.   It authorizes me to file the return on their behalf.

23   Q.   Do they actually sign the 8879 itself?

24   A.   Yes.

25   Q.   Does that get filed with the IRS?

1    A.   No.

2    Q.   What happens to that form?

3    A.   That should just stay in my records.

4    Q.   Does that form include any sort of warnings on it?

5    A.   There's "penalties of perjury" language, as on paper

6    returns.

7    Q.   Was it your general practice to receive these returns

8    before filing the return for the Liebers?

9    A.   Yes.

10   Q.   The engagement letter we were just looking at, did you

11   receive a signed copy back in 2013?

12   A.   No.

13   Q.   Did you receive tax documentation from the Liebers?

14   A.   Yes.

15   Q.   And did you prepare the Liebers' return based on that

16   information?

17   A.   I did.

18   Q.   Did your engagement letter provide any statements as to

19   what would happen if the Liebers provided you tax documentation

20   without signing the engagement letter?

21   A.   It's stated that the terms of the engagement letter, as

22   presented, would apply even if not returned.

23   Q.   So the terms of the letter would apply if they provided

24   you tax documentation?

25   A.   Yes.

1    Q.    And did they do so?

2    A.    Yes.

3    Q.    You mentioned that you sent a questionnaire as well.

4          What is the questionnaire?

5    A.    It's about a four- or five-page general set of questions

6    designed to elicit issues that need to be addressed.

7    Q.    And you also mentioned a cover letter.

8          What was in the cover letter you would send?

9    A.    Generally, timing issues, my privacy policy and a few

10   comments on tax documentation.

11   Q.    What information did you receive from the Liebers for the

12   2013 tax year?

13   A.    I received an Excel spreadsheet listing income and

14   deductions, as well as tax forms reflecting the same.

15         MR. DRABICK:  And if we could show the witness

16   Exhibit 241.

17         Ms. Deist, is there an objection?

18         MS. DEIST:  Yeah, for this particular one.  I mean,

19   it's hearsay, but I also --

20         THE COURT:  I'm sorry?

21         MS. DEIST:  I'm objecting on hearsay; but also, for

22   this particular exhibit, I don't understand the relevance of

23   this.

24         MR. DRABICK:  We'll lay a foundation, Your Honor.

25   Q.    What are you looking at, Mr. Goodman, in Exhibit 241?

1    A.   That's a letter from Harvard Human Resources.

2         MR. DRABICK:  And if you could turn to Page 3 for

3    Mr. Goodman, Mr. Bruemmer.

4    Q.   Do you recognize the document on Page 3?

5    A.   Yes, it's a W-2.

6    Q.   Have you reviewed Exhibit 241 before today?

7    A.   Yes.

8    Q.   And what overall is Exhibit 241?

9    A.   It reports gross earnings and withholdings.

10   Q.   I'm sorry.  The entirety of the exhibit itself.  And if

11   you'd like, there are binders in front of you, and you can open

12   up to Exhibit 241.

13        Do you recognize this package of documents,

14   Mr. Goodman?

15   A.   These are the tax documents I received from Jennifer that

16   support the worksheet she provided.

17   Q.   Okay.  So is this the tax documentation you received from

18   Mrs. Lieber?

19   A.   Yes.

20   Q.   And did you rely on this tax documentation to prepare

21   their taxes?

22   A.   Yes.

23        MR. DRABICK:  Your Honor, I offer Exhibit 241 into

24   evidence.

25        THE COURT:  This is for what tax year?

1          MR. DRABICK:  2013 tax year, Your Honor.  It's

2     relevant to Count 3 of the indictment.

3          MS. DEIST:  And Your Honor, I would like to note that

4     on some of these documents, it appears as if Mr. Goodman has

5     actually noted things on the documents.  We ask at least that

6     those are redacted as the notes by Mr. Goodman.

7          And I guess I'm not seeing really the relevance of all

8     of this.

9          THE COURT:  If the parties have agreed on certain

10    redactions, then I will take the document subject to those

11    redactions being redacted.

12         MR. DRABICK:  The Government has no objection to

13    making the requested redactions, Your Honor.

14         THE COURT:  Okay, that part is done.

15         So what other problem is there?

16         MS. DEIST:  Your Honor -- I'm sorry -- just to be

17    clear, this is being offered just to show what Mr. Goodman

18    relied upon for the 2013 tax year; is that correct?

19         MR. DRABICK:  It is.  He has testified these were the

20    documents he was provided to prepare the Liebers' tax return.

21    It's relevant as evidence of what taxes -- how the taxes were

22    prepared and what information was reported.

23         THE COURT:  Well, the tax years in issue are 2013

24    and '14, so -- and this is 2013.  So why is that not

25    admissible?

1          MS. DEIST:  Your Honor, with my initial objection, as

2    far as the -- as far as Mr. Goodman -- sorry.  As far as the

3    jury being able to consider them for things that Mr. Goodman

4    relied upon, then that was made clear by Mr. Drabick.

5          THE COURT:  So there's no problem?

6          MS. DEIST:  With the noted redactions, no issue.

7          THE COURT:  Okay.  I will rely on counsel to take care

8    of that.

9    Q.   Mr. Goodman, just to confirm, Exhibit 241 --

10          MR. DRABICK:  Ms. Urso, would you mind -- I believe

11    241 has been admitted.  Can we publish to the jury?

12          THE CLERK:  With redactions?

13          MR. DRABICK:  The redactions -- we can do the

14    redactions when we look at those pages, yes.

15          THE CLERK:  Okay.  All right.

16          (Government Exhibit 241 received in evidence.)

17          MR. DRABICK:  Could you go to Page 1, Mr. Bruemmer.

18          THE COURT:  We are going way over the amount of time

19    that you said you would take with this witness.

20          MR. DRABICK:  I'm sorry, Your Honor.  I apologize.

21    This witness was going to be 20 to 30 minutes to go through the

22    tax returns, Your Honor.

23          THE COURT:  That's not what you said.

24          MR. DRABICK:  I apologize if I gave a misimpression,

25    Your Honor.

```
 1              THE COURT:  It would be well to finish with this
 2    witness today so he doesn't have to come back and so that we
 3    can get this case to the jury tomorrow.
 4              MR. DRABICK:  Understood, Your Honor.  I will move
 5    expeditiously.
 6              THE COURT:  Thank you.
 7    Q.   Mr. Goodman, are these the tax documents you received from
 8    Mrs. Lieber?
 9    A.   Yes.
10    Q.   And what sorts of forms related to income are in these tax
11    documents?
12    A.   W-2s, 1099 for dividend and interest, 1099s for services
13    rendered; brokerage account 1099s and I believe a 1098 for
14    mortgage interest.
15    Q.   What is a W-2?
16    A.   One more time, please.
17    Q.   What is a W-2?
18    A.   It reports salary paid and taxes withheld.
19    Q.   And did Professor Lieber receive a W-2 from Harvard?
20    A.   Yes.
21    Q.   And did you report the W-2 income on the Liebers' tax
22    returns?
23    A.   Yes.
24    Q.   And what is a 1099 miscellaneous?
25    A.   1099 miscellaneous is reported to a recipient who received
```

1    payment for services rendered.

2            MR. DRABICK:  And could we please see Page 21 of this

3    document.

4    Q.   Is this a 1099 for Charles Lieber?

5    A.   Yes.

6            MR. DRABICK:  Okay.  If you could highlight the

7    bottom portion, please.

8    Q.   And is this reporting income for Professor Lieber?

9    A.   Yes.

10   Q.   From the American Chemical Society?

11   A.   Yes.

12           MR. DRABICK:  Your Honor, at this time, I propose to

13   read a stipulation.

14                        STIPULATION

15       "In lieu of live testimony at trial, counsel for the

16   United States and counsel for the Defendant have stipulated and

17   agreed to the follow facts:  Government 260 is an accurate and

18   authenticate copy of Jennifer K. and Charles M. Lieber's

19   certified U.S. individual tax return, including Form 1040 and

20   accompanying schedules and statements, for the tax period

21   ending December 31st, 2013.  The return was filed

22   electronically and received by the U.S. Internal Revenue

23   Service on or about April 15, 2014."

24           Your Honor, at this time, I move to admit Government

25   Exhibit 260.

1          THE COURT:  No objection.  It is part of the

2     stipulation; right?

3          MR. DRABICK:  The authenticity is part of the

4     stipulation, Your Honor, and I believe there is no objection.

5          MS. DEIST:  No objection.

6          THE COURT:  Okay.

7          (Government Exhibit 260 received in evidence.)

8          MR. DRABICK:  And could we please bring up Page 2 of

9     Exhibit 260.

10    Q.   Do you recognize this document, Mr. Goodman?

11    A.   Yes.

12    Q.   Is this the tax return you prepared and filed for the

13    Liebers for 2013?

14    A.   Yes.

15    Q.   And on this second page of the Exhibit, is the Liebers'

16    income reported?

17    A.   Yes.

18          MR. DRABICK:  Mr. Bruemmer, if we could please

19    highlight the income section about halfway down Page 1.

20    Q.   What forms of income are reported?

21    A.   Wages, interest, dividends, business income and capital

22    gain.

23    Q.   Are any of those considered earned income?

24    A.   Yes.

25    Q.   What is earned income?

1   A.    Earned income is income provided for services rendered.

2   Q.    And is there any consulting income reported for 2013?

3   A.    Yes.

4   Q.    How much?

5   A.    Net of 45,111.

6   Q.    You say net.  What does that mean?

7   A.    That's the net income earned by Mr. Lieber during 2013.

8   Q.    For consulting income?

9   A.    Yes.

10  Q.    And is there a separate form that reflects the calculation

11  of the net consulting income?

12  A.    Schedule C.

13          MR. DRABICK:  Could we please see Page 31,

14  Mr. Bruemmer -- sorry.  Page 32.  One more.

15  Q.    Is this the Schedule C?

16  A.    Yes.

17  Q.    Did you prepare it?

18  A.    Yes.

19  Q.    And what does it reflect?

20  A.    It reflects gross income of 70,000 and net income of

21  43,000, I think.

22  Q.    And for who does this reflect income?

23  A.    That's for Charles Lieber.

24  Q.    And did you complete this schedule?

25  A.    Yes.

1    Q.    What did you rely on to complete it?

2    A.    A combination of the spreadsheet provided by Jenny Lieber

3    and the documentation provided by Jenny as well.

4    Q.    And that documentation included Form 1099 miscellaneous?

5    A.    Yes.

6    Q.    Did you complete a second Schedule C for this return?

7    A.    Yes.

8    Q.    Could you please turn to Page 35.

9            Is this the second Schedule C?

10   A.    Yes.

11   Q.    And what does it reflect?

12   A.    It reflects 2,000 in gross income.

13   Q.    Is that additional consulting income for Charles Lieber?

14   A.    Yes.

15   Q.    And did you also rely on materials provided by Mrs. Lieber

16   to prepare this?

17   A.    Yes.

18            MR. DRABICK:  Could we please show the witness only

19   Exhibit 242, 242.

20   Q.    What is Exhibit 242?

21   A.    This is the spreadsheet that Jenny Lieber provided.

22   Q.    And what was the purpose of the spreadsheet from your

23   perspective?

24   A.    It lists all of the information that should go on the

25   return, much of which is backed up by 1099s and W-2s of the tax

1    documents.

2            MR. DRABICK:  Your Honor, at this time, I offer 242

3    into evidence.

4            MS. DEIST:  I object on hearsay.

5            THE COURT:  No.  The objection is overruled.  It may

6    come in.

7            (Government Exhibit 242 received in evidence.)

8    Q.   Mr. Goodman, I would like to just focus on the top left

9    portion under, "1099 misc., Charles."

10           MR. DRABICK:  If could you please highlight that

11   approximate ten rows, Mr. Bruemmer.

12   Q.   What is reflected here?

13   A.   This is the income reported for Charles' Schedule C, and

14   it lists four items.

15   Q.   So this is separate and apart from his Harvard salary;

16   correct?

17   A.   Yes.

18   Q.   And are these the forms of income that tie to the

19   Schedule C we just looked at?

20   A.   Yes.

21   Q.   Could you please just read the four items?

22   A.   Sure.  "ACS Journal, 50,000; IEEE, 1,000; Stanford, 2,000;

23   Elsevier honorarium, 2,000."

24   Q.   Did you understand these to be miscellaneous forms of

25   additional income that Charles Lieber had received?

1    A.    Yes.

2    Q.    Did you receive Forms 1099 for each of these?

3    A.    For the top three.

4    Q.    So you didn't receive a Form 1099 for the Elsevier

5    honorarium?

6    A.    No.

7    Q.    Did that $2,000 nevertheless get reported on the Liebers'

8    tax return?

9    A.    Yes.

10   Q.    Why?

11   A.    Because it was income.

12   Q.    Do you have an understanding as to whether Forms 1099

13   miscellaneous get sent to the IRS?

14   A.    Yes.

15   Q.    Would this $2,000 have been reported to the IRS if it had

16   not been on the Liebers' tax return?

17   A.    No.

18   Q.    Does this reflect all of the miscellaneous income you

19   received for Charles Lieber?

20   A.    There's a licensing fee of 17,000 from Harvard.

21   Q.    And including that licensing fee, does this include all

22   of the miscellaneous income information you received for

23   Charles Lieber?

24   A.    Yes.

25   Q.    For 2013?

1    A.    Yes.

2    Q.    Did you receive any information indicating that

3    Charles Lieber had any earned income from China?

4    A.    No.

5    Q.    Or from the Wuhan University of Technology?

6    A.    No.

7    Q.    Did you report on the Liebers' tax return any income from

8    China?

9    A.    No.

10   Q.    Or the Wuhan University of Technology?

11   A.    No.

12   Q.    If you had received such information, what would have you

13   done with it?

14   A.    I would have inquired into the nature and either reported

15   it or request a consult with someone who could help.

16   Q.    Did you ultimately file their tax return for 2013?

17   A.    Yes.

18   Q.    And did you receive any communication from the Liebers

19   authorizing you to file it?

20   A.    I got an email saying clearly that the 8879 had been filed

21   and uploaded to my portal.

22   Q.    You said the 8879 had been filed --

23   A.    I'm sorry.  Signed and sent back to me.

24          MR. DRABICK:  Could we see Exhibit 243 for the witness

25   only.

1    Q.    What is Exhibit 243?

2    A.    This is the email I just referred to.

3              MR. DRABICK:  Your Honor, I offer 243 into evidence.

4              MS. DEIST:  Your Honor, it's hearsay, and I think it's

5    cumulative.  Mr. Goodman said that he had the authority from

6    Mrs. Lieber to file these --

7              THE COURT:  I'm sorry.  What is the objection?

8              MS. DEIST:  Hearsay.

9              THE COURT:  How is it hearsay?

10             MS. DEIST:  Well, these words are offered by

11   Mr. Goodman from Mrs. Lieber for the truth of the matter

12   asserted.

13             THE COURT:  Jenny is Mrs. Lieber; correct?

14             MS. DEIST:  Yes.  Yes, Your Honor.  And Mr. Goodman

15   already said that he received the signature page through his

16   portal.  So, honestly, this is cumulative as well.

17             THE COURT:  It's a joint return.  She was reporting

18   for both of them.  It seems to me that --

19             MS. DEIST:  Yes.  I don't think that's in dispute,

20   that it's a joint return.

21             MR. DRABICK:  Your Honor, the Government's position,

22   it is admissible under 801D(2)(d) as a statement of the agent

23   for Dr. Lieber; namely, his wife and their joint return.

24             THE COURT:  The witness told us that his connection

25   with the family was through Mrs. Lieber -- correct? -- and that

1    she sent all the information that he needed in order to fill

2    out a tax return for both of them.  So I don't understand why

3    that isn't admissible.

4         MS. DEIST:  Your Honor, I'm not disputing any of that;

5    it's -- I understand, I understand Your Honor's point, and I

6    will withdraw my objection.

7         THE COURT:  Thank you.

8         (Government Exhibit 243 received in evidence.)

9         MR. DRABICK:  If we could please just highlight the

10   top email, Mr. Bruemmer.

11   Q.   Mr. Goodman, what is this email?

12   A.   That's an email from Jennifer Lieber indicating that she

13   downloaded the return, signed the signature pages and then

14   uploaded them to the portal.

15   Q.   And with this authorization, did you go ahead and file the

16   return?

17   A.   I did.

18        MR. DRABICK:  Could we please see Exhibit 177 for the

19   witness only.

20   Q.   Mr. Goodman, do you recognize this form?

21   A.   It's Form 8879 for 2013.

22   Q.   And is this the signature authorization form that you

23   prepared for the Liebers' signature?

24   A.   Yes.

25        MR. DRABICK:  Your Honor, at this time, I just offer

1    the stipulation for the jury that Exhibit 177 is among the

2    digital data exhibits extracted from the digital devices

3    collected on January 28th, 2020, from Charles M. Lieber's home

4    and/or office at Harvard University.

5    Q.   Mr. Goodman, do you see any signatures on this document?

6    A.   Yes.

7            MR. DRABICK:  Your Honor, at this time, I offer 177

8    into evidence.

9            MS. DEIST:  No objection.

10           THE COURT:  Okay.

11           (Government Exhibit 177 received in evidence.)

12   Q.   And if you could just explain for the jury, Mr. Goodman,

13   did you provide this document to the Liebers?

14   A.   Yes.

15   Q.   And is this the signature page that they would sign before

16   you would file their return?

17   A.   Yes.

18           MR. DRABICK:  If we could highlight Part II of that

19   paragraph.

20   Q.   And could you please read the first two sentences?

21   A.   "Under penalties of perjury, I declare that I have

22   examined a copy of my electronic individual tax return and

23   accompanying schedules and statements for the tax year ended

24   December 31, 2013; and to the best of my knowledge and belief,

25   it is true, correct and complete.  I further declare that the

1    amounts in Part I above are the amounts from my electronic

2    income tax return."

3              MR. DRABICK:  And if we could zoom back out,

4    Mr. Bruemmer.

5    Q.   Are there signatures on this document?

6    A.   Yes.

7    Q.   And signatures for whose names?

8    A.   Jennifer Lieber and Charles Lieber.

9              MR. DRABICK:  We can take that down, Mr. Bruemmer.

10   Q.   Did you prepare the Liebers' tax returns for 2014?

11   A.   Yes.

12   Q.   And did you follow the same process that we just saw for

13   2013?

14   A.   Yes.

15   Q.   Did you send them the same engagement letter?

16   A.   Yes.

17   Q.   And is that the engagement letter --

18              MR. DRABICK:  Well, could we bring up Exhibit 240 for

19   the witness -- or 245 for the witness.

20   Q.   Is that the engagement letter you sent them for the 2014

21   tax year?

22   A.   Yes.

23   Q.   And did you receive tax documentation from Mrs. Lieber for

24   2014?

25   A.   Yes.

1              MR. DRABICK:  Could we show the witness Exhibit 246.

2    Q.   And Mr. Goodman, if you could please flip to 246 in your

3    binder.

4              Do you recognize Exhibit 246?

5    A.   Yes.

6    Q.   Is this the tax documentation you received from

7    Mrs. Lieber for the 2014 tax year?

8    A.   Yes.

9    Q.   Does it include the same sorts of documents we saw for

10   2013?

11   A.   Yes.

12   Q.   W-2s and 1099 miscellaneous forms?

13   A.   Yes.

14   Q.   And did you receive a spreadsheet from Mrs. Lieber for the

15   2014 tax year?

16   A.   Yes.

17             MR. DRABICK:  And could we show the witness

18   Exhibit 247, please.

19   Q.   Is that the spreadsheet for the 2014 tax year you

20   received?

21   A.   Yes.

22   Q.   And does it include entries for 1099 miscellaneous income

23   for Charles Lieber?

24   A.   Yes.

25   Q.   Did you rely on the documentation in 246 and 247 to

1  prepare the Liebers' returns?

2  A.  Yes.

3       MR. DRABICK:  Your Honor, at this time, I move to

4  admit Government Exhibits 245, 246 and 247.

5       MS. DEIST:  Your Honor, I just want to note my

6  objections.  245, that letter, again, is unsigned, so there is

7  no proof that --

8       THE COURT:  I understand that you object to them all,

9  and the objection is overruled.  They are in evidence.

10       (Government Exhibit 245, 246 and 247 received in

11       evidence.)

12  Q.  Mr. Goodman, we'll turn to Exhibit 247.

13       MR. DRABICK:  And Mr. Bruemmer, if you could

14  highlight the top left corner.

15  Q.  Does the spreadsheet identify miscellaneous income for

16  Charles Lieber?

17  A.  Yes.

18  Q.  Two entries, "ACS Journal" and "Harvard University

19  licensing fees"?

20  A.  Yes.

21  Q.  Is that the entirety of the miscellaneous income that was

22  reported to you for 2014?

23  A.  Yes.

24  Q.  Did you report that miscellaneous income on their return?

25  A.  Yes.

1    Q.   Did you receive any information for 2014 that

2    Charles Lieber had earned any income in China?

3    A.   No.  I'm sorry.  No.

4    Q.   Did you receive any information indicating that Charles

5    Lieber had received income from Wuhan University of Technology?

6    A.   No.

7    Q.   And did you report any such income on their return?

8    A.   No.

9         MR. DRABICK:  Your Honor, at this time, we are

10   publishing a stipulation.

11                      STIPULATION

12        "In lieu of testimony at trial, counsel for the United

13   States and counsel for the Defendant have stipulated and agreed

14   to the following facts:  Government Exhibit 265 is an accurate

15   and authentic copy of Jennifer K. and Charles M. Lieber's

16   certified U.S. individual tax return, including Form 1040 and

17   accompanying schedules and statements, for the tax period

18   ending December 31st, 2014.  The return was filed

19   electronically and received by the U.S. Internal Revenue

20   Service on or about September 29th, 2015."

21        At this time, Your Honor, I move to admit Exhibit 265.

22        MS. DEIST:  No objection.

23        (Government Exhibit 265 received in evidence.)

24        MR. DRABICK:  And if we could please just go to Page 2

25   of Exhibit 265, Mr. Bruemmer.

1    Q.   Mr. Goodman, is this the tax return you filed for the

2    Liebers for 2014?

3    A.   Yes.

4    Q.   And did you do it after receiving a Form 8879 from the

5    Liebers?

6    A.   Yes.

7    Q.   Did you provide the Liebers a copy of this tax return

8    before you filed it?

9    A.   Yes.

10   Q.   Alongside their Form 8879?

11   A.   Yes.

12            MR. DRABICK:  And if we could please show the exhibit

13   only, Exhibit 248.

14   Q.   What is Exhibit 248?

15   A.   Form 8879, an e-file signature authorization.

16   Q.   And is this the form you received from the Liebers before

17   filing their tax return?

18   A.   Yes.

19            MR. DRABICK:  Your Honor, at this time, I move to

20   admit Exhibit 248.

21            MS. DEIST:  No objection.

22            (Government Exhibit 248 received in evidence.)

23   Q.   Mr. Goodman, is this the same Form 88 -- the same type of

24   form we saw for 2013?

25   A.   Yes.

1   Q.   Does it include the same "pains and penalties of perjury"

2   statement?

3   A.   Yes.

4   Q.   And does it include any signatures?

5   A.   Yes.

6   Q.   Signatures for the names Jennifer Lieber and

7   Charles Lieber?

8   A.   Yes.

9        MR. DRABICK:  And can we please show the witness

10  Exhibit 249.

11  Q.   What is Exhibit 249?

12  A.   This is my engagement letter for the 2015 tax return.

13  Q.   Did you receive a signed engagement letter for 2015?

14  A.   Yes.

15       MR. DRABICK:  Your Honor, I offer into evidence

16  Exhibit 249.

17       MS. DEIST:  No objection.

18       (Government Exhibit 249 received in evidence.)

19       MR. DRABICK:  If we could just go to the fourth page,

20  please.

21  Q.   Are those the -- is that the signed signature page for the

22  engagement letter?

23  A.   Yes.

24       MR. DRABICK:  And can we go to the second page,

25  please.  And if we could highlight the paragraph beginning,

1    "Foreign accounts."

2    Q.    And could you please read that paragraph, Mr. Goodman?

3    A.    "Foreign Accounts:  If you have a financial interest in or

4    signature or other authority over bank accounts, securities or

5    other financial accounts having a value exceeding $10,000 in a

6    foreign country, you are required to report such a

7    relationship.  Such filing requirements apply to taxpayers that

8    have direct or indirect control over a foreign or domestic

9    entity with foreign financial accounts even if you do not have

10   foreign accounts.  For example, corporate-owned foreign account

11   would require filing by the corporations and by the individual

12   corporate officers with signature authority.

13            "If you fail to disclose the required information to

14   the U.S. Department of the Treasury, the failure to disclose

15   may result in substantial civil and/or criminal penalties

16   ranging from 25,000 to a thousand [sic] or more.  I am not a

17   foreign tax specialist.  Accordingly, you are responsible for

18   contacting counsel or telling us of the need to consider these

19   issues."

20   Q.    Did your 2013 and 2014 engagement letters contain that

21   same language?

22   A.    Yes.

23   Q.    Did the Liebers ever bring to your attention any foreign

24   bank accounts?

25   A.    No.

1   Q.   And did you ever report any foreign bank accounts on their

2   tax returns?

3   A.   No.

4          MR. DRABICK:  Nothing further, Your Honor.

5          THE COURT:  Any cross?

6          MS. DEIST:  Yes, Your Honor.

7          Just a brief question or confirm that -- was GX 250

8   admitted into evidence?

9          MR. CASEY:  No.

10         MR. DRABICK:  No.

11                         CROSS-EXAMINATION

12  BY MS. DEIST:

13  Q.   Good afternoon, Mr. Goodman.

14  A.   Good afternoon.

15  Q.   Just to clarify, if you have a question about

16  Professor Lieber's income, you email or call Mrs. Lieber;

17  right?

18  A.   Yes.

19  Q.   And if you have a question about, say, Professor Lieber's

20  IRA, you email or call Mrs. Lieber about that as well?

21  A.   Yes.

22  Q.   And I know you said that you have not met Mr. Lieber, but

23  you also don't know the details of his work beyond the tax

24  forms; is that right?

25  A.   Correct.

```
 1   Q.   And so you don't know if he travels for work for his
 2   consulting business?
 3   A.   Correct.
 4   Q.   And you said you've been doing their taxes since about
 5   2005?
 6   A.   Yes.
 7   Q.   And you also do some -- manage some of their investments?
 8   A.   I did, yes.
 9   Q.   You did, okay.  That would include some IRAs, some CDs and
10   some Treasury bonds?
11   A.   Yes.
12   Q.   Sound about right?
13        In your dealings with the Liebers, you'd say that
14   they're pretty conservative investors; right?
15   A.   Yes.
16   Q.   Plain vanilla, does that sound --
17   A.   I'm sorry?
18   Q.   Plain vanilla?
19   A.   Yeah.  Yes.
20   Q.   They've never contacted you about making a large purchase?
21   A.   No.
22   Q.   They've never contacted you about saving for a large
23   purchase?
24   A.   No.
25   Q.   And to your knowledge, they don't own a boat?
```

1   A.   No idea.

2   Q.   And to your knowledge, they don't own a second home?

3   A.   No Idea.

4   Q.   And to your knowledge, you don't know whether they would

5   own -- or you don't know whether they own, let's say,

6   investment property or something?

7   A.   Correct.

8   Q.   Mr. Drabick just talked to you a little bit about those

9   engagement letters and questionnaires.

10        You provided this information in response to a

11   subpoena; is that right?

12   A.   Yes.

13   Q.   And when you provided the engagement letters to the IRS,

14   you just pulled those off of your files; right?

15   A.   Yes.

16   Q.   And I believe there were two years Mr. Drabick talked

17   about that were unsigned?

18   A.   Yes.

19   Q.   And that was 2013 and 2014?

20   A.   Yes.

21   Q.   And so, when you pulled those letters off of your file,

22   that would have just been an example of what actually was sent

23   to the Liebers' home?

24   A.   Yes.

25   Q.   She didn't send you back an unsigned copy, I'm assuming?

1    A.    No.

2    Q.    Okay.  And, again, so at the beginning of each year, you

3    send every client an engagement letter and a questionnaire, and

4    those are standard -- correct?

5    A.    Yes.

6    Q.    -- and those are standard forms from your tax-preparer

7    software?

8    A.    Yes.

9    Q.    And similar to 2013 and 2014, sometimes clients send back

10   engagement letters, and sometimes they don't?

11   A.    Correct.

12   Q.    And for the questionnaires that you sent, did the Liebers

13   ever fill out one of your tax questionnaires?

14   A.    I don't believe so.

15   Q.    Mr. Drabick also went over that Excel sheet that

16   Mrs. Lieber provided to you of a list of the income that

17   Professor Lieber received that year.

18             And I believe that Mr. Drabick also showed you what's

19   been marked for identification as GX 250.  So I'm going to ask

20   Sal to show that on your screen just so that we can talk about

21   it.

22             THE COURT:  What do you need to know?

23             MR. CHAN:  I'm waiting for Lisa -- for Ms. Urso to put

24   it on.

25             THE CLERK:  Let me -- okay.

 1            MS. DEIST:  It's not been admitted yet.  Thank you,
 2      Ms. Urso.
 3      Q.   So, upon your review of this Excel sheet, looking at the
 4      top left column there, you see that that's the -- do you
 5      acknowledge that that's the full list of the amounts that -- of
 6      income that Mrs. Lieber provided to you that year?
 7      A.   Yes.
 8            MS. DEIST:  All right.  I'm going to ask that GX 250
 9      be admitted into evidence as 250.
10            MR. DRABICK:  No objection, Your Honor.
11            MS. DEIST:  And Ms. Urso, if you could publish that,
12      too.  Thank you.
13            THE CLERK:  I'm sorry.  It's 250 on Defendant's or --
14            MS. DEIST:  That would be GX 250.
15            MR. DRABICK:  Government's 250.
16            THE CLERK:  Oh, Government, okay.
17            (Government Exhibit 250 received in evidence.)
18      Q.   And just focusing on that really briefly, Mr. Goodman,
19      you'll notice that it says there, "China compensation, no
20      1099" --
21      A.   Correct.
22      Q.   -- can you see that?
23            And you didn't ask any questions in particular about
24      that partic -- that item right there, did you?
25      A.   No.

```
 1            MS. DEIST:  Sal, you can remove that.  Thank you.
 2   Q.   And going back into 2013, as Mr. Drabick was also speaking
 3   with you, if you don't remember, I can put it up on your screen
 4   as well, but it's listed that Professor Lieber got an Elsevier
 5   honorarium for about $2,000?
 6   A.   Yes.
 7   Q.   But there was no 1099?
 8   A.   Correct.
 9   Q.   And you were not aware that Elsevier is actually a
10   publishing company in the Netherlands?
11   A.   No.
12   Q.   Okay.  And I just want to clarify, you're also -- you're
13   not a foreign tax specialist?  I believe that was written in
14   your engagement letter?
15   A.   Correct.
16            MS. DEIST:  All right.  Thank you.
17            Actually, one moment, Your Honor.  I'm going to check
18   with co-counsel.
19            (Pause.)
20            MS. DEIST:  All right.  Thank you.
21            THE COURT:  Any redirect?
22            MR. DRABICK:  Two questions, Your Honor.
23                      REDIRECT EXAMINATION
24   BY MR. DRABICK:
25   Q.   Mr. Goodman, Ms. Deist showed you Exhibit 250 with China
```

1  compensation for approximately 11,000; correct?

2  A.   Yes.

3  Q.   That was the spreadsheet you received from Mrs. Lieber?

4  A.   Yes.

5  Q.   And you reported that information on their return for

6  2015?

7  A.   Yes.

8  Q.   And to confirm, no information was provided for '13 or '14

9  about any China compensation; correct?

10  A.   Correct.

11  Q.   And in turn, you reported no such income; correct?

12  A.   Correct.

13        MR. DRABICK:  Thank you, Your Honor.

14        THE COURT:  Any recross?

15        MS. DEIST:  No, Your Honor.

16        THE COURT:  The redirect was five or six questions.

17        Thank you.  You are excused.

18        Who is next?

19        MR. DRABICK:  Your Honor, the Government calls

20  Colleen Ranahan.

21        THE COURT:  Is this the last witness?

22        MR. DRABICK:  This will be our last witness for the

23  day.  We will have one additional short witness tomorrow

24  morning, very, very short.

25        THE COURT:  In terms of seconds, how short is short?

1          MR. DRABICK:  In terms of seconds, it requires some

2     math, about I would say 600 seconds.  Ten minutes, Your Honor.

3          And we also endeavor to have Ms. Ranahan on and off

4     the stand before 1:00.

5          THE COURT:  If you are the witness, would you please

6     come forward and step into that box over there.

7          THE CLERK:  Step into the box, please.  Can I ask you

8     to raise your right hand.

9          (Witness sworn.)

10         THE WITNESS:  I do.

11         THE CLERK:  Okay.  Can I please ask you, when you sit,

12    to speak into the microphone to state your name, spelling your

13    last for the record, please.

14         THE WITNESS:  Colleen Ranahan, R-a-n-a-h-a-n.

15         THE CLERK:  Thank you.

16         THE COURT:  You may proceed.

17         COLLEEN RANAHAN, having been duly sworn by the Clerk,

18    was examined and testified as follows:

19                       DIRECT EXAMINATION

20    BY MR. DRABICK:

21    Q.   Ms. Ranahan, please just keep that microphone close and

22    speak up.

23         Where are you employed?

24    A.   Internal Revenue Service.

25         THE COURT:  I'm sorry.  In what?

1          THE WITNESS:  Internal Revenue Service.

2     Q.   And what's your title?

3     A.   Revenue Agent in the Special Enforcement Program.

4     Q.   And what are your responsibilities?

5     A.   I assist IRS's criminal investigation, along with the

6     U.S. Attorney's Office and Department of Justice Tax Division

7     in criminal tax matters.

8     Q.   How long have you been in that unit?

9     A.   Seven years.

10    Q.   And how long have you been a Revenue Agent?

11    A.   15 years.

12    Q.   And what did you do before joining your current unit?

13    A.   I was a civil auditor in small business/self-employed, and

14    I was also a coordinator in Projects and Special Planning.

15    Q.   Have you audited tax returns for the IRS?

16    A.   Yes.

17    Q.   Approximately how many?

18    A.   Hundreds.

19    Q.   Are you familiar with the Internal Revenue Code?

20    A.   I am.

21    Q.   And what is it?

22    A.   It is the Code that lists all of the tax laws.

23    Q.   And do you use it in your job?

24    A.   I do.

25    Q.   How do you use it?

1   A.   I use it for research purposes and to make sure that tax

2   returns are following the tax laws.

3   Q.   Does the United States collect income tax?

4   A.   We do.

5   Q.   And what is income tax?

6   A.   Income tax is tax that is assessed on any earned and

7   unearned income.

8   Q.   And what is earned income?

9   A.   Earned income is income that you earn from a job or

10  services performed, such as wages and salary and small business

11  income.

12  Q.   Would it include things like consulting income?

13  A.   Yes.

14  Q.   And what is unearned income?

15  A.   Unearned income is income that is basically unearned, so

16  your interest on your bank accounts, dividends on bank

17  accounts, capital gains.

18  Q.   How does the United States go about collecting income tax?

19  A.   We follow a voluntary compliance and expect all taxpayers

20  to file a tax return yearly and report their income and any tax

21  due and pay it.

22  Q.   Are individuals required to report both earned and

23  unearned income?

24  A.   Yes.

25  Q.   Is that on an annual basis?

1    A.    Yes.

2    Q.    Are individuals required to report income they earn in

3    foreign countries?

4    A.    Yes.

5    Q.    And what if the income is deposited into a foreign bank

6    account?

7    A.    It needs to be recorded on the tax return.

8    Q.    And what if it's deposited into a foreign bank account and

9    never spent?

10   A.    It still needs to be recorded on the tax return.

11   Q.    And are you familiar with Form 1040?

12   A.    Yes.

13   Q.    Is that the form that an individual uses to file -- to

14   report their income and tax obligations?

15   A.    Yes.

16   Q.    When are Form 1040s due?

17   A.    They are due April 15th of the following year.

18   Q.    And can they be submitted electronically?

19   A.    Yes.

20   Q.    And can they be submitted by a tax preparer?

21   A.    Yes.

22   Q.    And what is a Form 8879?

23   A.    That is the form that a taxpayer signs under penalties of

24   perjury that allows the preparer to electronically file their

25   tax return for them.

1    Q.    Are you familiar with Forms 1099 miscellaneous?

2    A.    Yes.

3    Q.    And what are those?

4    A.    That is an information report that is provided to a

5    taxpayer as well as the Internal Revenue Service that shows any

6    miscellaneous income including non -- excuse me -- including

7    any rents or non-employee compensation.

8    Q.    And who are Forms 1099 provided to?

9    A.    The taxpayer and the Internal Revenue Service.

10   Q.    And where, if at all, is that sort of income reported on

11   the Form 1040?

12   A.    For non-employment compensation, it would be on a

13   Schedule C.

14   Q.    Are there any forms of earned income that are not reported

15   on either Forms W-2 or Forms 1099 miscellaneous?

16   A.    No.

17   Q.    Can an individual earn earned income and not receive a

18   1099 or W-2?

19   A.    Yes.

20   Q.    Are you still required to report that type of income?

21   A.    Yes.

22   Q.    And where on your tax return would you report that type of

23   income?

24   A.    Schedule C.

25   Q.    Does the amount of income an individual earns affect their

1   tax liability?

2   A.   Yes.

3   Q.   How so?

4   A.   The greater the taxable income, the greater the tax due.

5   Q.   Is it calculated as a percentage of income?

6   A.   Yes.

7   Q.   Does your income liability go up if your income goes up?

8   A.   Yes.

9   Q.   And when an individual reports income on a Schedule C, are

10  there any particular forms of additional tax that are due?

11  A.   There is.   There's self-employment tax.

12  Q.   And what is that?

13  A.   That is the Social Security taxes and Medicare taxes that

14  need to be paid by the individual.

15  Q.   Have you reviewed the 2013 and 2014 tax returns for

16  Jennifer and Charles Lieber?

17  A.   Yes.

18  Q.   Have you performed any calculations based on your review

19  of their tax return?

20  A.   Yes.

21  Q.   What sort of calculation?

22  A.   I did an "additional tax due and owing."

23  Q.   And what is that?

24  A.   It is a computation that includes additional income and

25  additional taxes due on that income.

1    Q.    And what was the reason you did that calculation?

2    A.    Because there was additional income received by Dr. Lieber

3    in China.

4         MS. DEIST:  Objection.  We don't have the basis of

5    this witness's opinion.

6         THE COURT:  Well, this is what she considered in

7    coming up with the calculation that she's about to tell us.

8         MS. DEIST:  But she's stating it as a fact.  She's not

9    saying that she --

10        THE COURT:  I just interpreted the fact for the jury.

11   Q.    Agent Ranahan, did you perform --

12        THE COURT:  That is, members of the jury, this witness

13   cannot tell us where the money comes from; she can only tell us

14   what she did with figures given to her by the taxpayer.

15   Q.    For the purposes of your tax due and owing calculation,

16   what figures did you use?

17   A.    I used 20,000 in 2013 and 40,000 in 2014.

18   Q.    And were those essentially hypothetical numbers used to

19   see the impact on the tax return of any additional unearned

20   income?

21   A.    Yes.

22        MR. DRABICK:  Your Honor, at this time, I'd ask to

23   show to the jury Exhibit 320, to be used solely as a

24   demonstrative.

25        Any objection to the demonstrative, Ms. Deist?

1        MS. DEIST:  I can't see it.

2   Q.   Do you see a document on the screen, Agent Ranahan?

3   A.   No.

4        MR. DRABICK:  Ms. Urso, I think you just need to

5   switch to Government.  Thank you.

6   Q.   Agent Ranahan, what is Exhibit 320?

7   A.   It is an "additional tax due and owing" computation.

8   Q.   And did you calculate this based on the 20,000 and $40,000

9   figures?

10  A.   Yes.

11       MR. DRABICK:  Your Honor, I'd just offer this as a

12  demonstrative for the jury.

13       THE COURT:  What this means, members of the jury, is

14  that this was not a document prepared on actual figures that

15  she got in connection with filing -- filling out the tax

16  return, but it's designed to simply show you what numbers would

17  result if she considered these numbers.

18       MR. DRABICK:  Thank you, Your Honor.  May we publish

19  to the jury, Your Honor?

20       THE CLERK:  I thought you said they'd do a

21  demonstrative.

22       MR. DRABICK:  Yes.  We are not moving it into

23  evidence, Ms. Urso.  Sorry.

24  Q.   What does this Exhibit reflect, Ms. Ranahan?

25  A.   It reflects an additional tax due and owing based on

1    additional self-employment income of 20,000 and 40,000.

2    Q.   And does this reflect calculations you performed?

3    A.   Yes.

4    Q.   And reflect your conclusion that if Dr. Lieber had

5    hypothetically received an additional 20,000 in 2013, what the

6    tax liability impact would be?

7    A.   Yes.

8    Q.   Could you just walk the jury through, at a high level,

9    what that impact is and how you reached it?

10   A.   Sure.  The first line is the taxable income that was

11   originally on the originally filed 1040.  The second line is

12   the additional self-employment income, which is the 20,000 in

13   2013 and the 40,000 in 2014.  The third line is adjustments to

14   taxable income.

15        Those are -- sometimes, when there are income

16   limitations on certain deductions, such as exemptions and

17   itemized deductions, so as I increased the income, there were a

18   couple of adjustments due to those limitations, which brings us

19   to the corrected taxable income.

20        Then I determined what the income tax was on the

21   corrected taxable income, and right under that, "Credits and

22   Additional Taxes," those are additional taxes and credits that

23   were on the original return, plus the self-employment tax for

24   the 20,000 and 40,000.  That gave us a corrected tax liability.

25        And then I took that corrected tax liability,

1  subtracted what was the -- listed as the tax on the originally

2  filed 1040 to come up with the additional tax due and owing.

3  Q.   So, is it fair to say, Agent Ranahan, that if Dr. Lieber

4  had earned an additional 20,000 in 2013, his tax liability

5  would have gone up by approximately $7,600?

6  A.   Correct.

7  Q.   And if he had earned an additional 40,000 in 2014, his tax

8  liability would have gone up by an additional approximately

9  $15,200?

10  A.   Yes.

11  Q.   And if he had earned even more, what would you expect

12  would happen to his tax liability?

13  A.   It would increase.

14       MR. DRABICK:  Could we -- we can take that down,

15  Mr. Bruemmer.  Could we please show Agent Ranahan admitted

16  Exhibit 265, Page 2.

17  Q.   Do you recognize this to be the Liebers' 2014 tax return?

18  A.   Yes.

19       MR. DRABICK:  And could we please go to Page 29.

20  Q.   And what is on Page 29?

21  A.   This is a Schedule B, which reports interest and

22  dividends.

23  Q.   And did Dr. Lieber report any?

24  A.   He did.

25       MR. DRABICK:  And if we could turn to Page 30, and if

1    we could highlight that top portion.

2    Q.   What is this portion of Schedule B?

3    A.   This portion is asking a taxpayer if they have any

4    financial interest or signature authority over any foreign

5    financial accounts.

6    Q.   Okay.  Is that Line 7A?

7    A.   Yes.

8    Q.   And what did the Liebers report for 2014?

9    A.   That they did not have an interest or a signature

10   authority.

11   Q.   Could you read the next line beginning, "If yes"?

12   A.   "If yes, are you required to file FinCEN Form 114, Report

13   a Foreign Bank and Financial Accounts, to report the financial

14   interest and signature authority.  See FinCEN Form 114 and its

15   instructions for filing requirements and exceptions to those

16   requirements."

17   Q.   FinCEN Form 114, is that also called an FBAR?

18   A.   Yes.

19   Q.   How does one file an FBAR?

20   A.   It's filed electronically with the FinCEN, which is the

21   Financial Crimes Enforcement Network, and it's filed on a

22   yearly basis.

23   Q.   Is FinCEN a division of the Department of Treasury?

24   A.   Yes.

25   Q.   And when are FBARs required to be filed?

1    A.   They're required to be filed June 30th of the following

2    calendar year.  It's also required if the financial foreign

3    account or the account that a taxpayer has signatory authority

4    has at any point during the year $10,000 or more in that

5    account.

6    Q.   So, if an individual has a foreign account during a

7    calendar year with, at any point, over $10,000, are they

8    required to then file an FBAR?

9    A.   Yes.

10   Q.   And by when?

11   A.   June 30th of the following year.

12   Q.   Do you have to have sole financial interest in the

13   account?

14   A.   You do not.

15   Q.   Do you have to have sole signatory authority?

16   A.   You do not.

17   Q.   And what is the purpose of the FBAR filing requirement?

18   A.   It's for -- to, you know, help make sure that taxpayers

19   are being voluntary-compliant in paying all of their taxes.

20        MR. DRABICK:  Your Honor, at this time, we'll read a

21   stipulation to the jury.

22                        STIPULATION

23        "In lieu of live testimony at trial, counsel for the

24   United States and Counsel for the Defendant have stipulated and

25   agreed to the following fact:  Charles M. Lieber did not file a

1    report of Foreign Bank and Financial Accounts, also known as an

2    FBAR, with the U.S. Department of Treasury for either 2014 or

3    2015."

4              Nothing further, Your Honor.

5              THE COURT:  Any cross?

6              MS. DEIST:  Yes, Your Honor.

7                        CROSS-EXAMINATION

8    BY MS. DEIST:

9    Q.   Ms. Ranahan -- good afternoon, I should say.

10   A.   Good afternoon.

11   Q.   Just to clarify, you are not an investigator in this

12   particular case?

13   A.   Correct.

14   Q.   So when did prosecutors contact you about this case; do

15   you remember?

16   A.   I was brought in to replace a previous agent who currently

17   is retiring, in the process of retiring.  Early November,

18   possibly.

19   Q.   Okay.  And so they contacted you to provide these

20   calculations a hypo, as I believe Mr. Drabick called it, a

21   hypothetical tax liability?

22   A.   Yes.

23   Q.   And in your hypothetical, I'm wondering just kind of what

24   you consider.  Are you familiar with a treaty between China and

25   the United States that gives the United States residents a tax

1    credit for income tax paid to China?  Are you aware of anything

2    like that?

3    A.    The foreign tax credit?

4    Q.    Sure, yes.  In particular with China?

5    A.    I'm aware of the foreign, yes, tax credit.

6    Q.    Well, in other words, maybe in layman's terms, I guess,

7    the foreign tax credit makes sure that U.S. residents aren't

8    double-taxed on income if they -- on income paid to them in

9    China if they pay income taxes in China?

10   A.    Correct.

11   Q.    That's how you understand it?

12   A.    Correct.

13   Q.    All right.  And so, in this particular hypothetical, you

14   weren't able to calculate any foreign tax credit or anything

15   like that?

16   A.    Correct.

17   Q.    And for the sake of argument, since this is a

18   hypothetical, even if Professor Lieber did receive some sort of

19   unreported income in 2013 and 2014 but let's say he paid income

20   tax in China or China took out income tax, hypothetically, he

21   may actually owe zero dollars in the United States?

22   A.    Well, if he reported the income and then also reported the

23   credit, that's possible.

24   Q.    Sure, just asking you what you considered in your

25   calculations.  All right.

1    A.   Nothing was reported, so there was no way for me to

2    determine what the China tax rate is.

3    Q.   I understand.  I'm just asking about what you considered

4    in your hypothetical, that's all.  One moment, Your Honor?

5              (Pause.)

6              MS. DEIST:  Thank you.  No further questions at this

7    time.

8              THE COURT:  Anything else?

9              MR. DRABICK:  One question, Your Honor, just one.

10                          REDIRECT EXAMINATION

11   BY MR. DRABICK:

12   Q.   In Professor Lieber's --

13              (Fire alarm.)

14              MR. DRABICK:  I withdraw the question, Your Honor, and

15   excuse the witness.

16              (Adjourned, 12:54 p.m.)

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Linda Walsh, Registered Professional Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter, to the best of my skill and ability.

9              Dated this 20th day of December, 2021.

10

11

12              /s/ Linda Walsh

13              Linda Walsh, RPR, CRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25