UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                    )
UNITED STATES OF AMERICA,           )
                                    )
        Plaintiff,                  )
                                    )  Criminal Action
v.                                  )  No. 1:20-cr-10111-RWZ-1
                                    )
CHARLES LIEBER,                     )
                                    )
        Defendant.                  )
                                    )
```

BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT JUDGE


JURY TRIAL
DAY 6


December 21, 2021
8:02 a.m.


John J. Moakley United States Courthouse
Courtroom No. 12
One Courthouse Way
Boston, Massachusetts 02210




Linda Walsh, RPR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way, Room 5205
Boston, Massachusetts 02210
lwalshsteno@gmail.com

 1    APPEARANCES:

 2   On Behalf of the Government:

 3        UNITED STATES ATTORNEY'S OFFICE
          By: AUSA James R. Drabick
 4            AUSA Jason A. Casey
          1 Courthouse Way, Suite 9200
 5        Boston, Massachusetts 02210
          617-748-3498
 6        james.drabick@usdoj.gov

 7   On Behalf of the Defendant:

 8        MUKASEY FRENCHMAN LLP
          By: Marc L. Mukasey, Esq.
 9            Torrey K. Young, Esq.
              Catherine M. Deist, Esq.
10            Stephanie Guaba, Esq.
          570 Lexington Avenue, Suite 3500
11        New York, New York 10022
          212-466-6400
12        marc.mukasey@mfsllp.com

13

14

15

16

17                Proceedings reported and produced
                   by computer-aided stenography.
18

19

20

21

22

23

24

25

1
INDEX

2
WITNESS                          DIRECT   CROSS   REDIRECT   RECROSS

3
SARAH AXELROD

4
    By Mr. Casey                 6-37
    By Ms. Young                          6-50

5
ANQI ZHANG

6
    By Ms. Deist                 6-54

7
    By Mr. Drabick                        6-67

8
E X H I B I T S

9

10
DESCRIPTION                              RECEIVED

11
GOVERNMENT EXHIBITS

12
  126   .........................................   6-43

13
  130   .........................................   6-48

14
  134   .........................................   6-48

15
PAGE

16
Government Rests.......................................   6-52

17
Defendant Rests.......................................   6-72

18
Charge Conference.....................................   6-87

19
Government Closing Argument By Mr. Casey..............   6-103

20
Defendant Closing Argument By Mr. Mukasey.............   6-130

21
Government Rebuttal By Mr. Casey......................   6-152

22
Court's Jury Charge...................................   6-157

23
Questions From the Jury...............................   6-189

24
Jury Verdict..........................................   6-193

25

```
 1                    P R O C E E D I N G S
 2              (The jury is not present for the following.)
 3              THE COURT:  Counsel wanted to talk to me.  What do you
 4    want to talk about?
 5              MR. DRABICK:  Good morning, Your Honor.
 6              Well, one item is there were a handful of exhibits
 7    that the Government understands were only provisionally
 8    admitted at the beginning of this trial in comparison with the
 9    notes held by Ms. Urso as to the admitted exhibits.  We
10    understand that those that were explicitly only provisionally
11    admitted were Exhibits 12, 13 and 14.
12              THE COURT:  Not 11?
13              MR. DRABICK:  Not 11, by my note, by the Clerk's
14    notes.  That being said, that initial portion of the testimony,
15    you will recall, there were a number of objections made by
16    Mr. Mukasey, and for avoidance of any doubt in the record, the
17    Government asked that the Court lift the provisional label for
18    any of the admitted exhibits.
19              Going along with that, understanding that
20    Mr. Mukasey's objections tended to be hearsay objections, we
21    have proposed, and we have generally I think reached agreement
22    on a general limiting instruction for emails and communications
23    sent to Dr. Lieber by Professor Mai and others in Wuhan.  It's
24    the instruction that was included in the Government's brief
25    filed on Sunday evening.  Defense counsel has proposed a few
```

1    minor edits to that, which I have been reviewing right now, and

2    I think we will be able to reach agreement on a joint proposal

3    limiting instruction.  And with that, Your Honor, we move that

4    the provisional label be removed from all admitted exhibits in

5    this case.

6         MS. DEIST:  Good morning, Your Honor.

7         For the reasons set forth in our papers, first, of

8    course, we don't believe that they should be moved into

9    admission.

10        THE COURT:  Why are they not admissible, not for the

11   proof of them but for the context?

12        MS. DEIST:  Well, I think that's the most important

13   thing.  The Government has proposed, like, a general limiting

14   instruction; and we think, because these particular documents

15   are, I don't know, they were so -- I don't know what word I am

16   trying to find -- contentious, or that we disagree on the use

17   of the documents.  We do ask that Your Honor specifically state

18   what -- for what reason the jury can consider them.

19        The most important thing for the jury to know in this

20   case, especially with all of the documents that have been

21   admitted for some other reason than the truth of the matter

22   asserted, is to explain to a bunch of people who have no idea

23   of what the truth of the matter asserted or 404(b) or 801 is,

24   and so that's why, in our papers, of course, we ask that you

25   deny that, deny admission of those documents.

1          But, if you were to admit them, instead of a general

2     instruction, just if Your Honor could specifically state for

3     what reasons those documents are coming in and how they can be

4     considered.

5          THE COURT:  Is there any reason why I can't lump them

6     together in groups?  I mean, I don't want to do this for each

7     one of these.  There are a bunch of them.

8          MS. DEIST:  Your Honor, there's not that many.  I do

9     think you could brief them.  So that would be our other request

10    is, if it's possible to group them, we're certainly fine with

11    that; we just don't want a general instruction that says, Hey,

12    if it came in, it's not for the truth of the matter, just

13    consider it for whatever purpose you think is relevant and

14    appropriate.

15         THE COURT:  Let me tell you what I think we are

16    talking about.  There are a number of these.  Documents No. --

17    or Exhibits No. 11, 12, 13, 14, 18, 19, 21, 22, 23, 25, 26.

18    Those I think is what we're talking about.  If there are

19    others, then I need to know that.

20         MR. DRABICK:  Your Honor, that is the time period

21    early on in Agent Spice's testimony that is the timeframe we're

22    talking about.  Just for the record, Your Honor, you mentioned

23    I believe Exhibit 19.  My notes reflect that you did not allow

24    entry into evidence, either provisionally --

25         THE COURT:  So 19 is already out.

1          MR. DRABICK:  19 is out.  And I don't -- the others,

2     21 through 26, were also in that same timeframe.

3          Again, my understanding from Ms. Urso's notes is the

4     only ones that were actually provisionally admitted were 11, 12

5     and 13.  That being said, we understand there were a lot of

6     objections, and we had jumped essentially into the deep end of

7     the case right off the bat.  But this string of emails relates

8     to the heart of the case.  It is the beginning and through the

9     consummation of the negotiation of the Thousand Talents Program

10    contract.  The Defendant responds to a number of them.  It is,

11    as Your Honor noted, a continuing conversation regarding that

12    contract.  Some of the emails in a particular email exhibit do

13    not have the Defendant's response; but then we see a response

14    regarding the Thousand Talents contract, you know, a few -- an

15    email later, and it's a conversation that concludes in the

16    negotiation of that contract.  It is clearly relevant.

17         And, Your Honor, I believe it's unworkable for

18    Your Honor, in instructions, to go back and identify, among the

19    hundred or so exhibits that have been admitted, which ones are

20    Professor Mai emails that do not have a response in the exhibit

21    itself.  A general limiting instruction that echos what

22    Your Honor told the jury while these were coming in is more

23    than sufficient to ensure that the jury understands that they

24    can treat Professor Lieber's statements for the truth of the

25    matter asserted and Professor Mai's statements either for

1    context or Professor Lieber responses; or, if they so find,

2    they can use it if it tends to prove Professor Lieber's state

3    of mind, knowledge or intent.

4            THE COURT:  If you were a layperson who didn't

5    understand and hadn't tried cases like this or any other kind

6    of criminal cases, would you really understand a document comes

7    in not for the truth of it but for context?  My -- partly, my

8    problem with these things is that, while I try to explain it

9    and I try to give them examples, it's not at all clear to me

10   that it's -- that it's clear.

11           MR. DRABICK:  Understood, Your Honor.  I would say:

12   One, the law recognizes that --

13           THE COURT:  Maybe to protect the record.

14           MR. DRABICK:  Understood.  The law provides that we

15   presume the jury can and will follow your instructions; and the

16   proposed instruction, which Ms. Deist provided to me this

17   morning that they essentially agreed to our proposed

18   instruction, provides not only the law but provides explanation

19   and explains that, for example, for a Professor Mai email, you

20   may only consider it if the Defendant responded, you can

21   consider it for context; and if the Defendant didn't respond,

22   you can always consider it if you think it shows something

23   about the Defendant's state of mind.

24           THE COURT:  Okay.  Ms. Deist.

25           MS. DEIST:  I just want to say there's not 100; about

1    75.  We have grouped them into three categories.  I think it's

2    fairly important for the jury to understand, specifically for

3    11 and 12, for example, and 13, those talk about a Strategic

4    Scientist.  It was before Thousand Talents.  The Government

5    argues that every email written between these two parties for a

6    period of decades is all somehow related.

7         And, as we've gone through this case, I think it's

8    been shown that you can separate them or at least identify

9    which pieces of those emails are most important to the

10   Government and would probably be most noticeable or -- most

11   noticed by the jury.  So I do think it's possible.

12        And I also want to highlight that the Government loves

13   to argue or has argued that the jury always follows the

14   limiting instructions, which is why we think it's even more

15   important for Your Honor to tell them exactly how to consider

16   the evidence before them.  So the actual documents that you're

17   considering today really are not many at all, just a handful,

18   as you've identified.  So I don't think it's too laborious for

19   this Court or for the jury to, you know, hear it in three

20   categories of evidence and how they should be receiving it.

21        Again, I will note that some of those, Professor

22   Lieber just flat out never responded to.  It was prior to the

23   time of TTP.

24        THE COURT:  Well, I think the ones he didn't respond

25   to don't come into evidence.

```
 1            The objection to Exhibits 18, 19, 21, 22, 23, 25 and
 2   26 is sustained on the grounds that Mr. Lieber had nothing --
 3   did not respond to them, so I don't know what they tell us,
 4   other than what somebody thinks or somebody suggests.
 5            Wait one second.
 6            With respect to Exhibits 11, 12, 13 and 14, I think
 7   those do come into evidence.  They themselves provide context
 8   to the issues in dispute, and they are responded to by the
 9   Defendant, so it seems to me the jury is entitled to see them.
10            And any others that were admitted sort of de bene are
11   now in, except to the extent that they're out.
12            MR. DRABICK:  Your Honor, if I may.  I believe some of
13   the exhibits you just listed as --
14            THE COURT:  Does "if I may" mean that I can say no?
15            MR. DRABICK:  Well, sorry, Your Honor.  Just some of
16   the exhibits that I believe you just identified as the
17   Defendant not responding to include the Defendant's responses.
18   And so I believe, just following the -- what Your Honor's
19   approach has identified, I believe we do have exhibits that
20   there are responses from the Defendant within that should come
21   in, certainly because they are the Defendant's responses
22   regarding the Thousand Talents Plan and the contract.  And so
23   I'm happy to go through on a document-by-document basis, but I
24   think it is important that we parse these as --
25            THE COURT:  Which ones are those?
```

 1          MR. DRABICK:  Well, so Your Honor, the Exhibit 23

 2   certainly has the Defendant's responses within it; 24 has the

 3   Defendant's responses within it; and 26 includes the

 4   Defendant's responses.

 5          THE COURT:  24 isn't even on my list.

 6          MR. DRABICK:  I'm sorry, Your Honor?

 7          THE COURT:  I don't know what 24 is.  Is that one that

 8   was not admitted or was admitted de bene?

 9          MR. DRABICK:  Well, Your Honor, all of the items in

10   the 20s, by my notes and by Ms. Urso's notes, were admitted and

11   not admitted provisionally.  They were in a portion of the

12   testimony when Mr. Mukasey was lodging objections.

13          THE COURT:  If they are admitted, I don't have to make

14   a ruling on them.

15          MR. DRABICK:  Correct, Your Honor.  The only ones that

16   I understand actually were provisionally admitted were 11 --

17   or, excuse me, 12, 13 and 14.  Those are the only ones that we

18   understand were actually provisionally admitted.

19          The rest we identified for Your Honor as -- given the

20   Defendant's objections, were identified as appropriate for a

21   general limiting instruction, which we understand the defense

22   has agreed to, although once it's parsed by particular

23   categories of exhibits, I understand.

24          THE COURT:  Ms. Deist.

25          MS. DEIST:  I guess I'm not understanding.  So you're

```
 1   saying -- can you clarify exactly which exhibits you're saying

 2   are not provisionally admitted?

 3            MR. DRABICK:  The only ones that Ms. Urso identified

 4   as provisionally admitted were 12, 13 and 14.

 5            THE COURT:  11, too.

 6            MS. DEIST:  I don't have that.  And your motion

 7   doesn't say that.

 8            THE COURT:  11, 12, 13 and 14, which I think are the

 9   ones provisionally admitted, I will overrule the objection to

10   their total admission.  So they will come in as exhibits in the

11   case.

12            With respect to -- there's a whole bunch of others

13   that apparently are still at issue:  18, 19, 21, 22, 23, 25 and

14   26.

15            MR. DRABICK:  Your Honor, 19 is not at issue.

16   Your Honor denied that, and it wasn't viewed by the jury.

17            THE COURT:  So they're gone.

18            MR. DRABICK:  19 certainly wasn't never in and is not

19   in.

20            THE CLERK:  Okay.  I don't have 20 in either.

21            MR. DRABICK:  Yeah, 20 is not in either.  Judge Zobel

22   didn't mention that.

23            THE CLERK:  Oh, okay.  I'm sorry.

24            THE COURT:  So that is how I think this comes out.

25            MR. DRABICK:  And 21 through 26 were admitted by
```

1  Your Honor and I understand is Ms. Urso's notation.  The

2  Government proposed, because it was early in the case, because

3  Mr. Mukasey was lodging objections and because Your Honor was

4  considering them in the context for that continuing discussion,

5  we proposed a general limiting instruction to ensure the jury

6  treats each individual email appropriately.  I believe we have

7  agreement on the general limiting instruction language and can

8  provide that to Your Honor.

9        THE COURT:  So, are we now in sync?

10        MS. DEIST:  One moment.  I don't think I agree.  I

11  want to see -- make sure that our records -- Your Honor, I have

12  21 as striking the words "Chinese government."

13        MR. DRABICK:  That's fine, Your Honor, with that

14  redaction.

15        MS. DEIST:  I just want to make sure that that's

16  correct.

17        For 22, I have conditional; for 23, I have as

18  conditional, but the unsigned papers are allowed, but I

19  don't -- I'm sorry.  That's 23.  21 is strike "Chinese

20  government"; 22 is conditional; 23 is conditional and signed

21  papers allowed.  These are just my records, Your Honor, so I

22  may -- it may not match up with the transcript, which we're

23  checking -- 24 is conditional; and 25 is conditional, only for

24  the first paragraph; and then 26, I do have that that's in.  I

25  don't believe that matches Government's papers, though.

1          THE COURT:  Can you do me a favor and tell me

2    which -- get together and tell me which ones are really still

3    at issue and that I need to decide.

4          MR. DRABICK:  We can do our best, Your Honor.  My

5    understanding, based on the Clerk's notes, is that only 12, 13

6    and 14 were provisionally admitted.  Based on that and

7    Your Honor's ruling, I believe the record is clear that 21

8    through 26 are admitted.  There are certain redactions, for

9    example, to 21 that Ms. Deist identifies that the Government

10   has no problem with.

11         THE COURT:  11, 12, 13 and 14, if they are at issue, I

12   am prepared to allow into evidence.

13         MR. DRABICK:  Thank you, Your Honor.

14         MS. DEIST:  I just want to point out --

15         THE COURT:  Then there is another bunch -- 18 and 19

16   apparently was already decided.  21, 22, 23, 28 -- no -- 25 and

17   26, which I would rule out.

18         MR. DRABICK:  I'm sorry.  Which ones, Your Honor?

19         THE COURT:  18, 19, 21, 22, 23, 25, and 26, the

20   objection is sustained.

21         MS. DEIST:  Thank you, Your Honor.

22         MR. DRABICK:  Your Honor, which objection is

23   sustained?  I'm sorry.

24         THE COURT:  The number of the document you want?

25         MR. DRABICK:  No.  I'm sorry.  The objection to their

1  admission?

2          THE COURT:  Yes.

3          MR. DRABICK:  Your Honor --

4          THE COURT:  I think they were -- they were either

5  admitted de bene or I said we would wait to see.

6          MR. DRABICK:  Your Honor, I don't believe that matches

7  Ms. Urso's record as to those exhibits.  Nevertheless, a number

8  of those exhibits include the Defendant's admissions.  The

9  Defendant's admissions are clearly, in the Government's view,

10  admissible statements of a party opponent.  He is discussing,

11  stating that he has reviewed the Thousand Talents Plan

12  contract, it is good with the provisions, How can we complete

13  signing?

14          THE COURT:  These are largely statements, as I

15  understand it, that were made by Professor Mai but that to

16  which the Defendant did not respond.

17          MR. DRABICK:  There are -- in a -- in two of -- maybe

18  two or three of those exhibits, there are statements from

19  Professor Mai that are unresponded to.  There are, however,

20  statements of the Defendant responding to Professor Mai's

21  emails and commenting on the draft contract he was sent.

22          So, for example, he has sent a draft contract in 22,

23  Exhibit 22, and then in Exhibit 23 is stating that he will

24  review the documents when he has time, and then in Exhibit 24

25  is stating that, I apologize for the delay in responding on the

1    agreement, which he had been sent in 22 and 23.  I think this

2    revised version --

3         THE COURT:  And 24 is a response, a substantive

4    response?

5         MR. DRABICK:  It is absolutely a substantive response.

6    He is responding to the contract he has been sent.  And the

7    Defendant's argument is the email sending him the contract to

8    which he then responds somehow isn't relevant and can't be

9    admitted.  Your Honor, his response regarding the contract that

10   he was sent is his admission of a party opponent and is clearly

11   admissible.

12        The fact that it was sent in one stand-alone email and

13   then responded to in a second email does not mean the first

14   email cannot come in.  He is responding to that email.  And as

15   Your Honor noted as we were going through these exhibits on

16   Thursday, these exhibits reflect the discussion about this

17   contract.  He is responding.  And the fact that he doesn't

18   respond to the exact byline but, instead, responds to a second

19   email does not make the first email inadmissible.

20        These exhibits, between 21 and 26, reflect the

21   negotiation of this contract, his receipt of the draft, his

22   response, his statement that it looks good, How can I sign?

23        THE COURT:  Let me review these because I thought that

24   they had not been responded to.  I mean, sometimes the response

25   comes in a different way from the way I thought it should.

1          MR. DRABICK:  Yes, absolutely, Your Honor.  We're

2     happy to go through them individually right now at Your Honor's

3     convenience.

4          THE COURT:  No, I don't want to do it right now.

5     First, I want to find out if there are any other issues that we

6     need to discuss before the jury gets here.

7          MS. DEIST:  Your Honor, may I please respond, for the

8     for the record, to this?

9          THE COURT:  Quickly.

10         MS. DEIST:  I will be quick.  We just don't see it

11    that way.  The Government has plenty of exhibits in, plenty of

12    documents in and --

13         THE COURT:  I understand you have a disagreement with

14    the Government's position as to what these show.  I want look

15    at them again.

16         MS. DEIST:  Okay.  I just wanted to make that clear.

17         THE COURT:  Now, what else do we need to do now before

18    the jury gets here?  Mr. Mukasey.

19         MR. MUKASEY:  I'm not sure we need to do anything at

20    the moment, other than maybe discuss what Your Honor's plan is

21    for the rest of the day and how you want to proceed.

22         THE COURT:  Well, my plan is to get the case to the

23    jury today.

24         MR. MUKASEY:  We have some what I would call

25    supplemental jury instructions that we'd like to submit to the

1    Court.

2           THE COURT:  Well, I'm happy to receive them, but I do

3    have a charge.  I was here late last night to do this charge.

4           MR. MUKASEY:  I have no doubt.  We appreciate the

5    Court's hard work during this whole case.

6           THE COURT:  I don't think I work nearly half as hard

7    as you guys.

8           MR. MUKASEY:  We're going to submit a couple of

9    charges.  Maybe Your Honor can consider them.  They're pretty

10   simple.  I don't know if it's in Your Honor's traditional

11   charges to tell the jury that it's the obligation of the

12   lawyers to object to evidence, and they shouldn't take any sort

13   of -- I don't know -- negative view of this.  I spent a lot of

14   this trial standing up yelling about their exhibits, and I

15   think the jury deserves to know that it's our obligation.

16          THE COURT:  I'm happy to tell them that.

17          MR. MUKASEY:  Thank you.

18          THE COURT:  I usually tell them that in the context of

19   the trial itself.

20          MR. MUKASEY:  Perfect.  Whatever you like, as long as

21   they don't think I'm --

22          THE COURT:  I mean, if there's an objection by you

23   filed as we go on, I'll explain it to the jury.

24          MR. MUKASEY:  Well, then, now I'm going to have to

25   make an objection.

```
1              Judge, if I may approach, I'd like to hand you a
2    couple of charges that we think are relevant.  The Government
3    has them.
4              THE COURT:  What do you mean a couple?  This is a
5    book.  I will have to read that.
6              MR. MUKASEY:  We'll just put on the record what they
7    are.
8              THE COURT:  Well, I can read them, and they are part
9    of the record now that you have given them to me.
10             MR. MUKASEY:  Okay, fair enough.  Thank you.
11             THE COURT:  They'll be marked.
12             Is there anything else that we can do now before the
13   jury gets here that will advance this case?  How much more do
14   you have in the way of evidence and time?
15             MR. DRABICK:  We have one witness we think will be
16   about ten minutes, Your Honor.
17             THE COURT:  And how long will your case be?
18             MS. DEIST:  We just have one witness.  I think it
19   should take, for us, about 20 minutes.
20             THE COURT:  So there's no reason why the jury can't
21   get the case this morning?
22             MS. DEIST:  I think that they should be able to, yes.
23             THE COURT:  Okay.  So what we will do -- I assume -- I
24   mean, I suppose we can go over the charge now if you want, even
25   though the evidence has not closed.
```

```
 1              Who's going to make the argument for the defense?

 2              MS. DEIST:  I guess it will be me, Your Honor.

 3              THE COURT:  And for the Government?

 4              MR. DRABICK:  I will discuss the charge, Your Honor.

 5              THE COURT:  I'm sorry.  You will?

 6              MR. DRABICK:  I'm sorry.  Closing argument or the --

 7              THE COURT:  Closing argument.

 8              MR. DRABICK:  Oh, closing argument will be Mr. Casey.

 9              MS. DEIST:  And closing argument will be Mr. Mukasey

10    for us.

11              THE COURT:  Oh, that's what I meant.  Okay.

12              And how long will closing argument be, Mr. Mukasey,

13    approximately?

14              MR. MUKASEY:  45 minutes, maybe a little less.

15              THE COURT:  And I assume the Government about the

16    same.

17              MR. CASEY:  Probably about 30 minutes, although I was

18    hoping to reserve five or ten minutes for rebuttal.

19              THE COURT:  Okay.  Well, is there any reason why I

20    can't review with you now what the charge is, leaving out for

21    the moment the additions which I haven't looked at yet?

22              MS. DEIST:  No, I don't think that there's any reason

23    why you wouldn't be able to review all the charges in full.

24              THE COURT:  Okay.  We have a half an hour, so we might

25    as well do that now instead of having the jury sit and wait.
```

1   They have been incredibly patient with us, so I think I would

2   like to get them home as quickly as possible.

3           MR. DRABICK:  Yes, Your Honor.  And I may suggest I do

4   believe it is important that we resolve the Exhibits 21 to 26

5   issue before the close of the Government's case.

6           THE COURT:  Yes, we will do that.

7           MR. DRABICK:  Okay.  I'm happy to walk --

8           THE COURT:  That's good.  I would like to see them.

9           MR. DRABICK:  I'm happy to hand them to Your Honor and

10  walk you through them.

11          MS. DEIST:  Your Honor, I would ask, though, if

12  Mr. Drabick is going to narrate you walking through them, that

13  we be able to do that together, or you are just going to review

14  them?  We just have a -- I think we just have a major

15  disagreement as to whether or not they're continuing

16  conversations, which is what the Government has continued to

17  say.

18          THE COURT:  What do you want to do, or what do you

19  want me to do?

20          MS. DEIST:  I don't mean to jump around.  I do think

21  this is a really important issue as far as these particular

22  exhibits.  And I'm wondering, if we don't handle it now, when

23  we would be able to handle it in time for -- we have to take a

24  break before closing arguments, so maybe if Your Honor could

25  kind of give us a timeline that you're thinking of so we would

1    make that decision.

2              THE COURT:  Well, I need to look at this, so I need a

3    little time to look at it before I can decide what to do with

4    it.  And I will do that as quickly as I can.  If, in fact, the

5    evidence is as short as you say it is, there's no reason why we

6    have a recess at that point, discuss further what the issue is.

7              We have time now to go over the charge, so we don't

8    have to do that later.

9              MR. DRABICK:  Your Honor, I would propose, if

10   Your Honor would indulge me, I will spend two minutes just

11   walking through the highlights of those documents; and then we

12   can go over the charge, Your Honor can review them when

13   Your Honor has a moment; and then we can argue, as needed,

14   about the documents when Your Honor is ready before the close

15   of the Government's case.

16             THE COURT:  So, do the charge now instead of this and

17   then do it later?

18             MR. DRABICK:  I would propose I spend two minutes just

19   explaining what I believe those documents show, and then we'll

20   do the charge.

21             THE COURT:  But I think Ms. Deist needs to have her

22   two minutes to say --

23             MR. DRABICK:  Absolutely, sure.

24             Thank you, Your Honor.

25             So, these Exhibits 21 to 26 cover a short few-month

1    timeframe where Mister -- Professor Lieber is noted that he has

2    been awarded a Thousand Talent Program contract, he is provided

3    a contract, he responds about the contract, and he states his

4    intent to sign the contract and send it to China and then

5    receives notice that they have received the signed contract.

6         And Exhibit 21 is an email from Professor Mai to

7    Professor Lieber stating in bullet point 3, "As you know, in

8    the world-recruitment plan of renowned experts in China, also

9    called as One Thousand Plan of Foreign Experts, you have been

10   approved and awarded as invited Strategic Foreign Expert by the

11   Chinese government."

12        THE COURT:  Did the Defendant respond to that?

13        MR. DRABICK:  So, here -- we do not see in this

14   particular email a response; what we see is then the contract

15   being sent to him and him responding to the contract.  So, in

16   Exhibit 22, Your Honor --

17        THE COURT:  Wait a minute.  Stay with 21 for the

18   moment.

19        MR. DRABICK:  Sure.

20        THE COURT:  Let me see if I can find it.

21        21 is a long memo from Mai to the Defendant, right?

22        MR. DRABICK:  It is a back-and-forth between the

23   Defendant and Professor Mai.  For example, Professor Lieber

24   responds to an email from Professor Mai at the top of Page 2.

25   However, it does not become particularly relevant to our case

1    until the final email in the chain when Professor Mai puts the

2    Defendant on notice of his award into the One Thousand Plan.

3              THE COURT:  And which document is that?

4              MR. DRABICK:  That is 21 where he is being put on

5    notice that he has been awarded into the One Thousand Plan.

6    And, again, Your Honor --

7              THE COURT:  The last one you mentioned is in evidence

8    or is not?

9              MR. DRABICK:  Well, Your Honor, 21, I -- 21, by

10   Ms. Urso's notes, was admitted into evidence.  The Defendant

11   objected on hearsay grounds.  We maintain that it should

12   continue to remain in evidence.  It was shown to the jury, and

13   it was admitted.

14             THE COURT:  So 21 is already in evidence?

15             THE CLERK:  I have it in.

16             THE COURT:  It is in evidence, so what are we fighting

17   about?

18             THE CLERK:  I have it as in evidence, Judge.  I have

19   them all in evidence, and then 25, just one paragraph on

20   Exhibit 25 --

21             MR. DRABICK:  To be redacted.

22             THE CLERK:  Yep.

23             That's what I have, Judge.  I have that also right

24   there, I have them in, except for the Chinese government in one

25   paragraph in No. 25.  But I have them in.

```
 1            THE COURT:  I don't understand why we are doing this
 2   again.
 3            MR. DRABICK:  Your Honor, the Government raised this
 4   issue because there were a handful of provisionally admitted
 5   documents that Your Honor ruled on.  At this early stage of --
 6            THE COURT:  Why do I need to rule on it again?
 7            MR. DRABICK:  Your Honor, I believe they are admitted.
 8   I will simply ask the Court --
 9            THE COURT:  That's what the docket shows.
10            THE CLERK:  Yep.
11            THE COURT:  The docket shows they're in evidence.
12            THE CLERK:  Yeah, I have them in.
13            THE COURT:  There is certainly opposition by the
14   Defendant, but --
15            THE CLERK:  Judge, I have them coming in on the 16th.
16            THE COURT:  My intention was, again, to overrule the
17   Defendant's objections to 11, 12, 13 and 14.
18            MR. DRABICK:  Very good, Your Honor.
19            THE COURT:  And those are already -- I think they're
20   already in evidence, so I'm not sure why I have to deal with
21   them again.
22            But then there is objection to 18, 19, 21, 22, 23, 25
23   and 26, which has not been decided.
24            MR. DRABICK:  Your Honor, Your Honor admitted them
25   at the time.  There was -- at that portion of the introduction
```

1    of evidence, there was some, I will say, confusion as to

2    exactly which portions were coming in for what purpose.

3    Your Honor -- the Government raised this issue simply so that

4    we could propose the general limiting instruction to cure any

5    uncertainty with regard to how Professor Mai's email should be

6    treated by the jury.

7           THE COURT:  Well, the problem is that some of these

8    were not responded to by the Defendant, so they're statements

9    of Mai without a response by the Defendant.  And I don't --

10   it's not clear to me that -- and that response I don't think

11   ever came.

12          MR. DRABICK:  So, Your Honor, what the group of

13   exhibits shows is a continuing discussion where the Defendant

14   is responding to Professor Mai's sending of the contract and

15   statements about the contract.  What you see in 21 is that he's

16   notified he's awarded; what you see in 22 is Professor Mai

17   sending the contract; what you see in 23 is his statement that

18   he intends to review the contract; what you see in 24 is his

19   statement that he has reviewed the contract, finds it

20   acceptable with some revisions and asks how he can sign it;

21   what you see in 25 is Professor Mai saying that Wuhan is

22   signing it and sending it to him; and what you see in 26 is him

23   saying, I received the signed contract, and I'm sending back my

24   signed contract and Professor Mai responding and saying, We've

25   received your signed contract.

1          It's the negotiation and consummation of the contract.

2     So, the fact that, for example, in 22 you don't see in that

3     particular email a response but, instead, in an email response

4     in 23 to the same subject is immaterial.  This is the Defendant

5     responding to the contract he is being sent, agreeing to the

6     contract, stating his intention to sign the contract and then

7     being put on notice that they have received the signed

8     contract.

9          These are all acts of the Defendant and Professor Mai

10    in the negotiation of the contract.  They come in -- the

11    Defendant's statements certainly come in for his admissions and

12    for the truth of the matter asserted.  Professor Mai's

13    statements come in not for the truth of the matter asserted but

14    for the act of negotiating this contract and for what it tends

15    to prove about Professor Lieber's state of mind about having

16    entered into this contract.

17         And as Your Honor noted, these were admitted at the

18    time.  There's nothing Your Honor needs to rule on, except the

19    Government asks, or proposes, based on the defense's

20    objections, that a limiting instruction be provided.  We've

21    crafted what we believe is an appropriate limiting instruction

22    that we understand the defense is generally amenable with.

23         THE COURT:  So, the limiting instruction would

24    continue to apply?

25         MR. DRABICK:  The limiting instruction -- Your Honor

1    provided limiting instructions at the time, and this general

2    limiting instruction would just reiterate that in one clear,

3    concise statement for the jury as part of the final instruction

4    reminding the jury that Professor Mai's emails don't come in

5    for the truth; they come in for the context of the Defendant's

6    responses; or, if the jury so finds, they come in if they tend

7    to prove the Defendant's state of mind, intent or knowledge.

8           MS. DEIST:  Your Honor, we just don't see it that way.

9    First of all, the first email that comes from Professor Mai in

10    Exhibit 18 is the beginning of April, no response; then, again,

11    April 28th, no response --

12           THE COURT:  That's 19, the second one is 19.

13           MS. DEIST:  I'm sorry.  19, no response; 20 is early

14    May, middle of May -- I'm sorry -- 20 is out, actually.  21

15    is -- 19 is out?  I'm sorry.  21 is end of May, no response;

16    the next one, June 1st, no response.

17           Professor Lieber doesn't even respond to anything

18    until June, and then the Government continues to say --

19           THE COURT:  But if he responds at some time to the

20    subject matter, why does that not go back to the earlier

21    subject-matter letter -- emails from Mai?

22           MS. DEIST:  Your Honor, there's not enough connection.

23    The contract has not been signed, so it's not a signed -- in

24    fact, the contract that is discussed later doesn't even -- it's

25    not the contract that's even attached by description.

1          So I think the Government -- they haven't alleged a

2     scheme of any kind.  They don't say it's part of an ongoing

3     scheme, but they continue to say that every email that takes

4     place between the Defendant and this Professor Mai is a

5     continuing ongoing conversation, and it should come in for

6     context and possibly state of mind.

7          And I just don't see how the state of mind, someone

8     who receives an email and does not actually respond to it,

9     could possibly affect the state of mind of that recipient,

10     unless the statement is taken as true, and that's what's going

11     to happen if the jury receives those statements.

12          THE COURT:  Well, it is not unnatural for parties to

13     negotiate about a contract, and they'll go back and forth on

14     it.  And isn't that what happened here?

15          MS. DEIST:  Your Honor, to that I would say there's no

16     actual contract here.  The whole dispute is whether a contract

17     even happened.  I agree that, if there's a contract in

18     existence and the parties are perhaps disputing about the terms

19     of that contract, certain conversations would be relevant.  I

20     think they would be relevant as verbal acts because I think

21     then you could say, Those discussions go directly to an actual

22     contract in existence.

23          And here, the Government is just saying, It actually

24     just goes to state of mind that Professor Lieber, going back to

25     the charge, should just know that he was in this Thousand

1    Talents Plan, and that's just not --

2         THE COURT:  There were heavy negotiations back and

3    forth, as is evident by these exhibits.  And at some point,

4    there was an understanding -- was there not? -- that they were

5    working on a contract.

6         MR. MUKASEY:  No.

7         MS. DEIST:  That's what's disputed.  There are

8    discussions that say --

9         THE COURT:  Why is that not, then, for the jury?

10        MS. DEIST:  I think that, in the consideration of the

11   bulk of 75 emails, there certainly are some emails that the

12   jury would consider for various purposes, and I think that our

13   arguments would go directly to how they would receive those

14   documents.

15        But when you have a document right before you have no

16   response from the Defendant and you're just saying, Oh, it's

17   just for the state of mind, I think that's just a step too far.

18        MR. DRABICK:  Your Honor, if I may.

19        So, Exhibit 22 Ms. Deist asserts is not responded to.

20   It is responded to.  In 22 is an email where Professor Mai

21   sends a contract; 22 is reproduced in Exhibit 23 with the

22   Defendant's response.  22 is necessary to be introduced so that

23   we know what the Defendant is responding to.

24        In 23, the Defendant responds specifically to the

25   email in Exhibit 22 and states, "I will review the documents

1    for the One Thousand Plan when I have time."  He acknowledges

2    receiving the draft contract in 22 and states that he will

3    review it.  And then, in 23 -- Exhibit 22 has the attachment

4    that he's talking about -- right? -- I have reviewed this

5    document that's attached in Exhibit 22.  So that's why 22 is

6    necessary, so the jury can understand, What the heck is he

7    responding to?  Here's the attachment to the email.

8         MS. DEIST:  That's clarifying the statement of the

9    Defendant in the email.

10        THE COURT:  Wait a minute.  He has the floor.

11        MR. DRABICK:  Your Honor, may I just finish this one

12   item of the thread, Your Honor?

13        23 includes that initial email in 22 -- in 21, the

14   response in 22 and then a further response of the Defendant

15   stating that he has now reviewed the contract, finds it

16   acceptable and asks how he can sign it, and then in --

17        THE COURT:  Are we in agreement that, if there is an

18   email from Mai to Lieber and then a series of emails back and

19   forth, that if I deem them to be responsive to each other, that

20   they come in?  Is that agreed?

21        MS. DEIST:  I think if Your Honor deemed them

22   responsive to each other, then I think that that would be

23   admissible but only for a very specific purpose.  So I guess

24   this -- our position is still --

25        THE COURT:  If they don't come in together, then they

1    don't come in.

2         MS. DEIST:  Yes, Your Honor.  I would say secondarily

3    that I think this conversation here among us, this

4    disagreement, only highlights the mass confusion the jury must

5    feel receiving all of these documents, so --

6         THE COURT:  No, it doesn't.  It doesn't reflect

7    anything that the jury feels.  We have no idea what the jury

8    feels.  Think about my feelings because I have to decide this

9    thing.

10        I mean, I -- very often in relationships, they don't

11   go smoothly, they go like this and then they go sideways, and

12   then they come back to the main road.  And I don't know here

13   exactly where we are on this, but there was -- it is clear --

14        (Discussion off the record)

15        THE COURT:  In any event, I think it is necessary for

16   me to review these emails.  I have this packet.  If you want to

17   add to the packet that was just given to me, I will take it, I

18   will look at it, and I will try to determine what the story is,

19   the packet being Exhibits 21, two, three, four, five and six.

20        MS. DEIST:  Yes, Your Honor.  Thank you.  I just want

21   to state one thing, that if Your Honor could just take our

22   papers, they do state -- they do outline our position.  I know

23   you have those and you have read them, but also --

24        THE COURT:  I think I already have those.

25        MS. DEIST:  I think you do, yes, I think you do,

1    Judge.

2              THE COURT:  Yes.

3              MS. DEIST:  This is not a contract case; this is a

4    case about a person who sent a contract that, or -- I'm

5    sorry -- some documents that the Government alleges are a

6    contract.  They were never signed.

7              THE COURT:  I understand that.  Nonetheless, the

8    parties were talking to each other about what was going on and

9    what they thought.

10             MS. DEIST:  In some cases, they were; and in other

11   cases, then Mr. Drabick and I do disagree.

12             THE COURT:  Okay.  Anything else with respect to the

13   evidence?

14             MR. DRABICK:  Your Honor, at an appropriate juncture,

15   I do think it would make sense for the parties and Ms. Urso to

16   just go over the exhibit list to make sure we're all on the

17   same page as to what is admitted.

18             THE COURT:  Well, that's a good idea, but she always

19   does that.  You just have to find the time for it.

20             THE CLERK:  We have been going over it.

21             THE COURT:  Yeah.

22             Do we have time to review the charge, or shall we wait

23   on that until the evidence is closed?

24             MR. MUKASEY:  Wait.

25             MS. DEIST:  I think we should get started -- oh, I'm

1    sorry.

2          MR. MUKASEY:  I think we should wait.

3          MS. DEIST:  I'm hearing we should wait.

4          MR. DRABICK:  We defer to Your Honor for Your Honor's

5    preference on that.

6          We, like the Defendant, proposed -- submitted proposed

7    instructions.  We're prepared to respond to the Defendant's

8    proposed instructions from earlier, but we can also wait for an

9    appropriate break.

10         THE COURT:  Well, I think we'll take a recess now.  As

11   soon as the jurors are all here, we will begin with the

12   remaining evidence.  And if counsel, in fact, are correct in

13   their estimate of how long they take, it should not be a

14   problem to have a charge conference after the evidence is

15   closed.  It won't be all that long.

16         MR. MUKASEY:  Your Honor, after the Government rests

17   and before we call our witness, we're obviously going to want a

18   motion outside the presence of the jury.  I understand how

19   Your Honor is likely to respond to that, but we want to put

20   that on the record as well as submit some --

21         THE COURT:  So long as you don't extend it for hours,

22   it's okay.

23         MR. MUKASEY:  Probably not too many hours.

24         THE COURT:  Okay.  All right.  Well, let's take a

25   recess now.  And I understand that there will be the motions

1   for judgment of acquittal, which almost certainly I will

2   reserve on until after the jury has spoken and then we will

3   have arguments and charge, and the jury will begin its

4   deliberations, and I assume there will be another motion for

5   judgment of acquittal after the arguments and charge, and

6   almost certainly that would be denied as well, but I don't know

7   really what happens during the -- what will happen during the

8   arguments.  So there may be a door for you to get out.

9           We are in recess.

10          MR. DRABICK:  Your Honor, with the Court's indulgence,

11   may I just have that packet back for ten more seconds?

12          THE COURT:  Well, if you want it back, then I can't

13   study it.

14          MR. DRABICK:  Well, I just want to put two more

15   highlights on it that I inadvertently left off.

16          (Recess taken from 8:45 to 9:02.)

17          (The Jury is not present for the following)

18          THE CLERK:  All rise, please.

19          THE COURT:  Please be seated.

20          With respect to the argument we just had --

21          THE CLERK:  Is that okay?  The jurors are here.

22          THE COURT:  Wait just one moment.

23          THE CLERK:  One second, okay.  I'm sorry.

24          THE COURT:  The jury is en route.

25          As I understand it, having heard argument now, this

1     was all a nullity in a way because these documents were offered

2     and accepted into evidence before, and I'm not going to

3     reconsider that now.  However, the limiting instruction I will

4     give whenever you want me to give it.  We can do it in the

5     course of the charge, or we can do it at some time before you

6     argue.  It's entirely up to you.  So think about it.  Don't

7     tell me now.  The jury is ready, and we will proceed.

8              THE CLERK:  All rise for the jury, please.

9              THE COURT:  Who is the next witness?

10             MR. CASEY:  The Government is calling Sarah Axelrod.

11             THE COURT:  Is that person in the Courtroom?

12             MR. CASEY:  She will be.

13             (The Jury is present for the following)

14             THE COURT:  Good morning.  Please be seated.

15             Members of the jury, that clock is wrong.  It's really

16    just 9:00 right now.  We've been working since 8:00, trying to

17    iron out things that needed to be ironed out.

18             I can assure you that you will get the case today to

19    determine your verdict.  We have some more witnesses, and after

20    that, there will be arguments by counsel, I will then instruct

21    you on the law, and then the case will be in your hands.  And I

22    must tell you that counsel's worked extremely hard, and they've

23    been very efficient about presenting their case in order to get

24    it done so that you would not be here on Christmas day.

25             You may proceed.  We need to swear the witness.

```
 1              THE CLERK:  Yes.  Could you please stand and raise
 2     your right hand, please.
 3              (Witness sworn.)
 4              THE WITNESS:  I do.
 5              THE CLERK:  Could you please speak into the mic and
 6     state your last name -- state your name, spelling your last
 7     name for the record, please.
 8              THE WITNESS:  Sarah Axelrod, A-x-e-l-r-o-d.
 9              THE COURT:  You may proceed.
10              MR. CASEY:  Thank you, Your Honor.
11              SARAH AXELROD, having been duly sworn by the Clerk,
12     was examined and testified as follows:
13                          DIRECT EXAMINATION
14     BY MR. CASEY:
15     Q.   Good morning.
16     A.   Good morning.
17     Q.   Ms. Axelrod, where do you work?
18     A.   At Harvard University.
19     Q.   And what do you do there?
20     A.   I'm the Assistant Vice-President for the Office for
21     Sponsored Programs.
22     Q.   And how long have you held that position?
23     A.   About six years.
24     Q.   How long have you worked in the Office for Sponsored
25     Programs?
```

1   A.   About nine and a half years.

2   Q.   And how long have you worked at Harvard?

3   A.   About 21 years.

4   Q.   And can you just tell us very briefly what the Office for

5   Sponsored Programs is?

6   A.   Sure.  All grants that come in from external organizations

7   that fund the research at Harvard, they come in -- the

8   proposals go out from the Office and then get negotiated, and

9   all of the transactions are the responsibility of the Office

10   for Sponsored Programs.

11   Q.   And is the Office for Sponsored Programs often referred to

12   just as OSP?

13   A.   Yes, that's correct.

14   Q.   Does OSP review grant proposals before they're sent to a

15   sponsor agency?

16   A.   All grant proposals from the Cambridge campus of Harvard

17   go out through the Office for Sponsored Programs.

18   Q.   Do you know approximately how many proposals are funneled

19   through OSP in a given year?

20   A.   About 2,000.

21   Q.   Are you familiar with something called the

22   Grants-Management Application Suite at Harvard?

23   A.   Yes.

24   Q.   Is that GMAS, for short?

25   A.   GMAS, for short.

1    Q.   What is GMAS?

2    A.   GMAS is the software program that's the system of record.

3    What that means is it's the official record for everything

4    relating to grants for Harvard.

5    Q.   Do you know when Harvard began using GMAS?

6    A.   Yes, in 2004.

7    Q.   Have you, as the Vice-President for the Office for

8    Sponsored Programs, had occasion to use the GMAS system in

9    connection with your work?

10   A.   Yes, I use it regularly.

11   Q.   What sorts of things are maintained in GMAS?

12   A.   So, all the initial proposals is -- are always in there;

13   any certifications; any keeping track of things like

14   human-subjects protection, the guarantee that those are being

15   followed; as well as all financial transactions.

16   Q.   How does information get entered into GMAS?

17   A.   It's generally entered one of two ways:  It is either

18   typed directly into the software program, or it is uploaded

19   into the program.

20   Q.   Uploaded how?

21   A.   Generally, it's scanned and then put into a document

22   repository, so there's a place to put documents.  So they're

23   scanned and put in and someone -- what's called "logs it" --

24   indicates they were the person who did it and puts the date.

25   Q.   So, you're referring to hard-copy documents, for example?

1    A.    Correct, yes.

2    Q.    You mentioned certifications a moment ago; do you recall

3    that?

4    A.    Yes.

5    Q.    What type of certifications are maintained in GMAS?

6    A.    There are various certifications.  At the time of

7    proposal, the principal investigator certifies that the

8    information is correct; there are also certifications that go

9    along with sending in progress reports, and those are the two

10   primary ones.

11   Q.    When a document is entered into GMAS, is the date and time

12   that that document is entered, is that recorded?

13   A.    Yes, it is.

14   Q.    Is the name of the individual who entered the document

15   recorded?

16   A.    Yes, it is.

17   Q.    Is the same true for the types of certifications that you

18   just mentioned?

19   A.    Yes.

20   Q.    So when a certification is entered into GMAS, is the date

21   and time recorded?

22   A.    Yes, it is.

23   Q.    Okay.  Just to confirm, GMAS is an electronic system;

24   correct?

25   A.    Yes, it is.

1   Q.   Okay.  Are you familiar with the term "principal

2   investigator"?

3   A.   Yes.

4   Q.   And what does that mean to you?

5   A.   That is the primary person on a grant who will be doing

6   the work and takes responsibility for the science of the work.

7   Q.   Are PIs, or principal investigators, ever granted access

8   to GMAS?

9   A.   All principal investigators have access to GMAS.

10  Q.   And how is it that principal investigators access GMAS?

11  A.   Everyone who uses the system logs in with their own

12  identifier and then enters a password.

13  Q.   Are PIs required to submit certifications in GMAS?

14  A.   Yes.

15  Q.   When?

16  A.   At the time the proposal is -- just before it's ready to

17  go out to the sponsor -- before we submit it.  So we're the

18  authorized submitters.  Before that goes out, the PI will sign

19  a certification that the information is accurate.

20  Q.   Are PIs allowed to delegate that certification

21  responsibility to anyone else?

22  A.   No.

23       MR. CASEY:  Mr. Bruemmer, could I have Exhibit 126,

24  which is not in evidence.

25  Q.   Do you see Exhibit 126 in front of you, Ms. Axelrod?

```
 1   A.    I do.

 2   Q.    Okay.  And do you recognize that document?

 3   A.    I do.

 4   Q.    And what is it?

 5   A.    That is a certification.  These were the certifications

 6   that were used -- let me just take a look, if you don't mind.

 7          Yes, that was the -- this was the certification that

 8   was used for NIH proposals until 2009.

 9   Q.    Okay.  And is this a document maintained in Harvard's GMAS

10   system?

11   A.    Yes.

12   Q.    And is this a record that's kept in the ordinary course of

13   Harvard's business?

14   A.    Yes.

15          MR. CASEY:  Your Honor, I move to admit Exhibit 126.

16          MS. YOUNG:  Objection.

17          THE COURT:  What's the objection?

18          MS. YOUNG:  Relevance.  This document is over a decade

19   prior to the charged conduct.

20          MR. CASEY:  It goes to the element of willfulness as

21   to Counts 1 and 2.

22          MS. YOUNG:  From a decade before?

23          THE COURT:  You mean as an example?

24          MR. CASEY:  Absolutely, yes.

25          THE COURT:  It is not being offered for the truth of
```

1    it but as an example of what the witness has just explained?

2            MR. CASEY:  Well, it I think may come --

3            THE COURT:  Does it have to do with this case?

4            MR. CASEY:  I can ask her a question.

5    Q.    Do you see a name at the bottom?

6    A.    Yes, I do.

7    Q.    Is that -- do you see Charles Lieber's name?

8    A.    I do.

9            THE COURT:  I know, but we are talking about a certain

10   period of time.  Does this have to do with that time, or is it

11   being offered as an example of the kind of thing that is

12   subject to the witness's supervision?

13           MR. CASEY:  I think it's being offered as an example,

14   Your Honor.

15           THE COURT:  Okay.  As an example, it comes in.

16           I mean, it doesn't prove any particular conduct with

17   respect to this case, but it shows how Harvard deals with this

18   kind of a thing.  I think that's what it's being offered for.

19           MR. CASEY:  Thank you, Your Honor.

20           THE COURT:  I accept it.  That is the basis upon which

21   it is accepted and you should use it.

22           MR. CASEY:  Thank you, Your Honor.

23           (Government Exhibit 126 received in evidence.)

24   Q.    And Ms. Axelrod, are you able to tell us which sponsored

25   agency this certification relates to?

1    A.    Yes.  This particular one was for the National Institute

2    of Health, NIH.

3              MR. CASEY:  Okay.  And Mr. Bruemmer, if you could

4    highlight the bottom of the form here where it says, "This

5    change is effective" -- just before, above that, actually.

6    Yeah.

7    Q.    Now, do you see Charles Lieber's name there at the bottom?

8    A.    Yes, I do.

9    Q.    And is there a signature above that?

10   A.    There is.

11   Q.    Okay.  And could you read Item No. 2, please, in

12   parentheses above the signature?

13   A.    "Any false, fictitious" --

14             THE COURT:  Well, it doesn't mean anything without the

15   introductory part of the sentence.

16             MR. CASEY:  I'm happy to have her read that, if you'd

17   like.

18   Q.    Well, why don't you read the whole thing beginning with,

19   "Pursuant to"?

20   A.    "Pursuant to the above-cited NIH requirements, I

21   certificate that the information submitted within the

22   application is true, complete and accurate, to the best of my

23   knowledge; two, any false, fictitious or fraudulent statements

24   or claims may subject me to criminal, civil or administrative

25   penalties; and, three, I accept -- I agree to accept

1    responsibility for the scientific conduct of the project and to

2    provide the required progress reports if a grant is awarded as

3    a result of this application."

4         MR. CASEY:  All right.  Could I have Exhibit 130,

5    which is not in evidence.

6    Q.   Do you see Exhibit 130 in front of you?

7    A.   Yes, I do.

8    Q.   And do you recognize that document?

9    A.   I do.

10   Q.   What is it?

11   A.   This is the summary of information in the Harvard GMAS

12   system of everything relating to an initial proposal.

13   Q.   Okay.  And who is the PI on this proposal?

14   A.   Dr. Lieber.

15   Q.   Okay.  And is this a record that's maintained in Harvard's

16   GMAS system in the ordinary course of Harvard's business?

17   A.   Yes, it is.

18        MR. CASEY:  Your Honor, I move to admit Exhibit 130.

19        MS. YOUNG:  Objection.

20        THE COURT:  What's the objection?

21        MS. YOUNG:  It contains hearsay.  There's references

22   to submissions by other parties in this document --

23        THE COURT:  There's what?

24        MS. YOUNG:  -- Marybell Ramos.

25        THE COURT:  I'm sorry.  What is the objection?

1           MS. YOUNG:  Hearsay.

2           THE COURT:  Well, it's not being offered for the truth

3      of it; it's being offered to show how this process works.

4           MR. CASEY:  It's also a business record, Your Honor.

5           MS. YOUNG:  Your Honor, there's no program fraud or

6      grant fraud alleged in this case.  Why is this process

7      relevant?

8           THE COURT:  I don't understand that.

9           MS. YOUNG:  It's also an irrelevant document.  It has

10     nothing to do with any of the grants in the case or any of the

11     charges.

12          THE COURT:  I don't know that yet.

13          Go ahead and inquire about it and what it is.

14          MR. CASEY:  May it be admitted?

15          MR. MUKASEY:  No.

16          THE COURT:  Well, let's just find out what it has to

17     do with the case.

18          MR. CASEY:  Okay.

19     Q.   Could you --

20          MR. CASEY:  Well, let's take a look at the top of

21     Page 1.

22     Q.   Do you see the letters "PI" there on the left?

23     A.   Yes, I do.

24     Q.   And who is the PI for this particular grant?

25     A.   Dr. Lieber.

1    Q.   All right.  And are you able to see who the sponsor of
2    this award is?
3    A.   Yes, it's the Air Force.
4            MR. CASEY:  Okay.  And if we could go to the second
5    page, please.
6    Q.   Do you see Mr. Lieber's name anywhere on Page 2 of
7    Exhibit 130 for ID?
8    A.   Yes, I do.
9    Q.   And what, if anything, does that designation next to
10   Charles Lieber's name in this document indicate?
11   A.   It indicates that he electronically signed this on
12   July 30th of 2013.
13   Q.   And do you know what he signed as of July 30th, 2013?
14   A.   Yes.  There's an attestation that pops up for -- so, when
15   you get the screen, there's an attestation that says -- similar
16   to the one we just saw on the previous exhibit.
17   Q.   Are you familiar with the attestation language in the GMAS
18   system as of July 30th, 2013?
19   A.   Yes, I am.
20           MR. CASEY:  Could I have Exhibit 134.
21   Q.   And is this that attestation language you just referred
22   to?
23   A.   Yes, that would be a screenshot of the attestation
24   language.
25           MR. CASEY:  Your Honor, I offer Exhibits 130 and 134,

```
 1    subject to a redaction in the upper left-hand corner of the
 2    years there.
 3              THE COURT:  Okay.
 4              MS. YOUNG:  Objection.
 5              THE COURT:  Overruled.  It may be marked -- they may
 6    be marked --
 7              MR. CASEY:  Thank you, Your Honor.
 8              THE COURT:  -- subject to the redaction.
 9              (Government Exhibits 130 and 134 received in evidence.)
10              MR. CASEY:  Actually, why don't we go back first to
11    Exhibit 130, please.
12    Q.   So I'm going to show you Exhibit 130 again.
13              Do you see that on your screen?
14    A.   I do.
15    Q.   And, again, this is a screenshot essentially from
16    Harvard's GMAS system?
17    A.   Yes, it is.
18    Q.   And it contains information regarding a grant on which the
19    Defendant was the PI; correct?
20    A.   That's correct.
21    Q.   And what's the -- are you able to determine the active
22    period of this award?
23    A.   Sure.  It's from July 15th, 2014, to October 31st, 2018.
24              MR. CASEY:  Okay.  And then on the second page,
25    please, Mr. Bruemmer.
```

1  Q.   And, again, do you see Dr. Lieber's name at top of Page 2?

2  A.   I do.

3  Q.   And can you just explain for the jury, since they're

4  seeing the document now, what that entry indicates?

5  A.   Sure.  That entry indicates that Dr. Lieber electronically

6  signed this on July 30th, 2013.

7  Q.   Okay.  And you said he would have agreed to an

8  attestation?

9  A.   Correct.

10       MR. CASEY:  And Mr. Bruemmer, could I have 134, with

11  that redaction.

12  Q.   Is this the attestation language that existed in GMAS as

13  of July 30th, 2013?

14  A.   That's correct.

15       MR. CASEY:  And Mr. Bruemmer, could you just highlight

16  where it says, "For grant applications," and the three items

17  below that.

18  Q.   Could you read, Ms. Axelrod, beginning where it says, "For

19  grant applications"?

20  A.   "For grant applications, the PI certifies that:  One, the

21  information submitted within the application is true, complete,

22  and accurate, to the best of my knowledge; two, any false,

23  fictitious or fraudulent statements or claims may subject me to

24  criminal, civil, or administrative penalties; and, three, I

25  agree to accept responsibility for the scientific conduct of

```
1    the project and to provide the required progress reports if a
2    grant is awarded as a result of this application."
3            MR. CASEY:  Thank you.  No more questions, Your Honor.
4            THE COURT:  Any cross?
5            MS. YOUNG:  Yes, Your Honor.
6            Mr. Chan, can we please pull up GX 126.
7                        CROSS-EXAMINATION
8    BY MS. YOUNG:
9    Q.   Ms. Axelrod --
10           THE COURT:  We haven't got it, at least I don't.  Is
11   it coming?
12           There we go.
13           MS. YOUNG:  Ms. Urso, I believe we need to make it
14   available for the witness.
15           THE CLERK:  Yes.
16           MS. YOUNG:  I have it.
17           THE CLERK:  She has it.
18           MR. CHAN:  And the jury.
19           THE CLERK:  And the jury?  Is it in?
20           MR. CHAN:  Yeah.
21           MS. YOUNG:  It is.
22           THE CLERK:  Oh, okay.  How do I know that?
23           MS. YOUNG:  Thank you.
24   Q.   Ms. Axelrod, this document is submitted upon application
25   of a grant; correct?
```

1   A.   Correct.

2   Q.   And once it's submitted, it's logged within the GMAS

3   system; correct?

4   A.   Correct.

5   Q.   And the date of this document is January, 2008; correct?

6   A.   Yes.

7   Q.   And you do not have any information that Mister -- or

8   Dr. Lieber has seen this document since January, 2008; correct?

9   A.   I don't know that.

10  Q.   Is there an audit trail available to this document?

11  A.   Of who has looked at it?  I'm not sure I understand your

12  question.

13  Q.   Correct.

14  A.   Of who has looked at it?  I'm not sure.  There's audit

15  trails within the system.  I don't know specifically about

16  viewing.

17  Q.   But nothing on this page suggests that Dr. Lieber has seen

18  this document since 2008?

19  A.   I don't know.

20  Q.   Okay.

21  A.   Nothing suggests that, no.

22          MS. YOUNG:  Mr. Chan, could we please pull up

23  Document GX 130.

24  Q.   Now, this document is dated 2013 -- is that correct? --

25  July 30th, 2013?

1   A.   This document's a summary of different things that

2   happened relating to this grant.   It's not a particular date.

3            MS. YOUNG:   Could we please go to Page 2, top of the

4   page, "Charles Lieber."

5   Q.   This is the only entry associated with Dr. Lieber in this

6   summary of this grant; correct?

7   A.   That is correct.

8   Q.   And the last dated entry is July, 2013?

9   A.   Correct.

10  Q.   So there's nothing to suggest Dr. Lieber has seen this

11  document since 2013; correct?

12  A.   Nothing on the document, no.

13           MS. YOUNG:   Okay.   Nothing further.

14           THE COURT:   Any redirect?

15           MR. CASEY:   No, Your Honor.   Thank you.

16           THE COURT:   Thank you.   You're excused.

17           Who's next?

18           MR. DRABICK:   The Government rests, Your Honor.

19           (Government rests.)

20           THE COURT:   Okay.   Does the defense have any

21  witnesses?

22           MR. MUKASEY:   We do, Your Honor.   May we be heard very

23  briefly at the sidebar before we decide to open our case

24  concerning a motion?

25           THE COURT:   Oh, well, file the motion, and we'll have

1    a hearing but not right now.

2              MR. MUKASEY:  Okay.  Can we --

3              THE COURT:  I'll reserve on the motion until we can

4    argue without interrupting this.

5              MR. MUKASEY:  Okay.  We just want to note for the

6    record that we're going to move under Rule 29.

7              THE COURT:  Right.

8              MR. MUKASEY:  Thank you.

9              THE COURT:  Members of the jury, when counsel say

10   they're resting, I guess there is something to that because now

11   the burden shifts to the other side.  They have to decide

12   whether they wish to offer any evidence, and the Defendant does

13   wish to offer evidence.

14             The Defendant is also asking me to make certain

15   rulings, but I'm reserving on those until we can argue and not

16   use your time for that purpose because it would be done outside

17   your hearing because it has nothing to do with what you have to

18   do.

19             So, who is your first witness?

20             MS. DEIST:  Your Honor, I just want to comment first

21   that the burden for the defense doesn't shift; but we do

22   have a witness that we'd like to call, and that witness is

23   Ms. Anqi Zhang.

24             THE COURT:  Okay.  Who is the witness?

25             MS. DEIST:  Ms. Anqi Zhang.

1           THE COURT:  Is somebody going to get her, or him?

2           MS. DEIST:  I think they're getting her right now.

3           THE COURT:  Thank you.

4           THE CLERK:  Good morning.

5           THE COURT:  Please remain standing for the moment

6     while you take the oath.

7           THE CLERK:  Would you please raise your right hand.

8           (Witness sworn.)

9           THE WITNESS:  Yes.

10          THE CLERK:  Okay.  Could you just please remove your

11    mask while speaking?  And could you please state your name,

12    spelling your name, please.

13          THE WITNESS:  My name is Anqi Zhang, A-n-q-i,

14    Z-h-a-n-g.

15          THE COURT:  Please be seated.

16          You may proceed.

17          ANQI ZHANG, having been duly sworn by the Clerk, was

18    examined and testified as follows:

19                        DIRECT EXAMINATION

20    BY MS. DEIST:

21    Q.   Ms. Zhang, where do you currently live?

22    A.   I'm living in Palo Alto, California.

23    Q.   And what do you do, if anything, for work in Palo Alto?

24    A.   I'm a postdoc at Stanford University.

25    Q.   How long have you been there?

1    A.    I've been there since August, 2020.

2    Q.    And where were you before that, before August, 2020?

3    A.    Before that, I was a Ph.D. student at Harvard in the

4    Lieber Lab.

5    Q.    And how long were you at the Lieber Lab?

6    A.    For six years, from -- between 2014 to 2020.

7    Q.    And did you work with Professor Lieber in the Lieber Lab?

8    A.    Yes.

9    Q.    And is he here today?

10   A.    Yes.

11   Q.    And could you identify him in the Courtroom?

12   A.    There.

13         MS. DEIST:  All right.  The witness has properly

14   identified Professor Lieber.

15         THE COURT:  Well, I know she pointed her finger in the

16   general direction.

17         MS. DEIST:  Would it be appropriate, then,        Your

18   Honor, to say she's correctly identified -- thank you.

19   Q.    Ms. Zhang, I want to go over the layout, the physical

20   layout, of the Lieber Lab with you.

21         Now, you said you worked in the Lieber Lab.  Do you

22   have some familiarity about the Lieber Lab, the physical layout

23   of that lab?

24   A.    Yes, of course.

25   Q.    And about how big was it?  Can you describe it for us?

1    A.    So, we had lab space on two stories in the Chemistry

2    Building at Harvard.  So, we had lab space on the ground floor

3    that's half underground with windows, and also some space in

4    the basement that's below -- one floor below the ground floor.

5    Q.    And where -- if you're walking in, walking in the door,

6    where is Professor Lieber's desk?  If he has one, where is it?

7    A.    Yes.  So, the entrance we usually take is the -- a small

8    door on the right side to the main entrance facing Oxford

9    Street.  And if you go into that -- go in through that small

10   door and immediately turn right, Charlie's office is on the

11   left side.

12   Q.    And did you have an office or a desk in the lab?

13   A.    Yes, I did.  I was in a student office, also on the same

14   floor, on the ground floor of the building.

15   Q.    And where did you sit in relation to Professor Lieber?

16   A.    It might have been -- can you say that again?

17   Q.    How close were you to Professor Lieber, your desk to his

18   desk?

19   A.    So, it's a, like, 30-second walk.

20   Q.    But -- so, just on the same floor, very close, would you

21   say?

22   A.    Yes.

23   Q.    Okay.  And do you know Renee Donlon?

24   A.    Yes.

25   Q.    And did she also work at the Lieber Lab?

```
 1   A.    Yeah.  I had some overlap with her in the beginning of my
 2   grad school, and then she left later.
 3   Q.    Did she have a desk also at the Lab?
 4   A.    Yeah.  Her office was in the basement.  That's the one
 5   floor below Charlie's office.
 6   Q.    And do you know Kathleen Ledyard?
 7   A.    Yes.  She is the Lab Manager.
 8   Q.    And did she have a desk at the Lieber Lab as well?
 9   A.    Yes.  Her office is very close to Charlie's office.  Her
10   office was on the ground floor, maybe like a ten-second walk
11   from Charlie's office.
12   Q.    Okay.  So, just to clarify, you and Professor Lieber and
13   Kathleen Ledyard are on the ground floor; is that right?
14   A.    Yes.
15   Q.    And then Ms. Donlon would be the floor below?
16   A.    Yes.
17   Q.    In the Lab, did Professor Lieber ever display any kind of
18   awards or certificates on the walls?
19   A.    I don't recall any.
20   Q.    Did he display anything on the walls?
21   A.    There are some printed publications, research papers, on
22   the wall outside of his office.
23   Q.    And would those be available for public viewing, for
24   people to see if they were to come into the Lab?
25   A.    Yeah.  And it's actually very common for professors
```

1    working in the Chemistry Department.  I remember seeing a lot

2    of professors having the research papers outside of their

3    office.  And, also, the publications are available online for

4    everybody to read.

5    Q.   Ms. Zhang, can you describe sort of what kind of research

6    is done at the Lieber Lab.  Do you have knowledge of that?

7    A.   Yes.  So, the -- so, in short, the goal of our research is

8    to understand how human brains work and also to treat brain

9    diseases.  So, in everybody's brain, there are millions of

10   cells called neurons and the neurons communicate with each

11   other using electrical signals; and these electrical signals

12   controls all of our thoughts and behaviors, and if these

13   electrical signals are abnormal, then people are going to have

14   some brain diseases like Parkinson's, Alzheimer's, epilepsy or

15   stroke.

16        So, the -- so, if we can -- if we can record and

17   monitor the electrical signals in the brain, we can better

18   understand how the brain works and how the brain diseases

19   develop, and then we can treat the diseases better.  So, the

20   goal of our research is to develop tools that can make better

21   and more accurate recordings; and with that information, we can

22   learn how the brain diseases start and also develop some

23   treatment for them.  That's our research goals, yes.

24   Q.   All right.  About how many people worked at the Lieber Lab

25   when you were there?

1  A.   So, by the time that I graduated, there were about 14
2  group members, and half of them were Ph.D. students, and half
3  of them were postdocs.
4  Q.   All right.  And you mentioned that, when you were at the
5  Lieber Lab, you were a Ph.D. student --
6  A.   Yes.
7  Q.   -- is that right?
8  A.   Yes.
9  Q.   And you said at Stanford, you're now a postdoc?
10 A.   Yes.
11 Q.   Can you explain the difference between a Ph.D. student and
12 a postdoc?
13 A.   Yes.  So, the Ph.D. student will get Ph.D. Degrees when
14 they finish the program.  And then postdocs are research
15 scientists positions that people get after they get Ph.D.
16 Degrees and before they get permanent positions as professors.
17 So, postdocs are temporary positions.
18 Q.   About how many years would a postdoc typically stay at a
19 lab?
20 A.   There's no fixed length of postdocs because there is no
21 degree at the end of postdoc term.  I would say usually, in
22 Charlie's lab, postdocs will stay for at least three years.
23 Q.   And were there international students that worked at the
24 Lieber Lab?
25 A.   Yes.

1    Q.   And I'll ask:  Are you an international student, or were

2    you an international student in the Lieber Lab?

3    A.   Yes.

4    Q.   And where are you originally from?

5    A.   I'm from China.

6    Q.   And can you tell us anything about the background of the

7    other international students at the Lieber Lab?

8    A.   Yes.  So, we had international students and postdocs.  The

9    students -- so, when I was in the Lab, I met students from

10   China and Canada.  And for postdocs, postdocs are more diverse.

11   We had postdocs from Korea and Israel and Mexico and Turkey and

12   also China.

13   Q.   And as a Ph.D. student, what were your duties at the

14   Lieber Lab?

15   A.   My duties was to do research.  As I said, we were trying

16   to develop tools that can better record the signals in the

17   brain, so I was doing experiments trying to develop the tools.

18   And every one of us in the Lab had a small project, and Charlie

19   managed all the projects.

20   Q.   So, you worked -- did you work directly with

21   Professor Lieber?

22   A.   Yes.

23   Q.   All six years that you were there?

24   A.   Yes.

25   Q.   How often were you personally in the Lab every week?

1    A.    I was in the Lab seven days a week.

2    Q.    All six years?

3    A.    No, not all six years, but most of the time.  I didn't

4    really take breaks.

5    Q.    And did you observe Professor Lieber in the Lab when you

6    were there?

7    A.    Yes.  Charlie worked really hard.  Charlie worked for --

8    when I was in the Lab, Charlie worked for six days a week and

9    every day from 6:00 a.m. to 7:00 to 8:00 p.m.  He worked really

10   hard.  He's such a devoted scientist.

11   Q.    And how often, about, would you say that you met with

12   Professor Lieber?  How much contact did you have with him?

13   A.    So, whenever I make some progress for my research

14   projects, I will send him an update, and then he will set up a

15   meeting time so we would meet in person and talk about research

16   progress, and I would say every three weeks.

17          And, in addition to that, I also see him in the

18   hallway and in the kitchen, and we would talk briefly about

19   research.  That's considered very frequent meeting with

20   advisors because most professors are not available all the

21   time, but Charlie really cared about us, and he wanted to spend

22   more time with us and teaching us how to do great research, and

23   I really appreciated that.

24   Q.    So, during your time at the Lieber Lab, did you ever work

25   with other universities to do research for the Lieber Lab?

1   A.   I personally did not.

2   Q.   And did Professor Lieber ever ask you to do research in

3   China for the Lieber Lab?

4   A.   No.

5   Q.   And did Professor Lieber ever ask you to collaborate with

6   a foreign university for the Lieber Lab?

7   A.   No.

8   Q.   Are you aware of Wuhan University of Technology?

9   A.   Yes.

10  Q.   How are you -- how are you aware of that University?  What

11  are you -- have you been there before?

12  A.   No, I've never been there, but I read their research

13  papers.  All the scientists publish their work, and they're

14  available to everybody in the world to read, so I read their

15  papers.

16  Q.   So, are those research -- or are the research papers

17  indicative of -- typically indicative of the kind of research

18  that that lab does?

19  A.   Yes, because all of the scientists, they really want to

20  publish their work.  That's how we share our knowledge and

21  advance the field.  Like, for example, if we develop some

22  treatment for rare brain disease, we don't want to keep it in

23  the -- in one lab or in one country; we want to share it with

24  the world and let everybody know about it.  Science has no

25  borders.

1   Q.   So, in reading those papers that came from Wuhan

2   University of Technology, were you able to get a sense of their

3   area of focus in their research labs?

4   A.   Yes.  So, their research is focused on nanotechnologies in

5   batteries, which means that they're using nanomaterials to make

6   batteries that are more efficient and more durable.  And

7   that's -- their research area is really, really different from

8   ours because we focus on the brain research.  That's a biology

9   subject.

10  Q.   So, you would say that the areas of research between

11  Lieber Lab and the Wuhan University of Technology Lab don't

12  overlap?

13  A.   Yes, completely different.

14  Q.   Between 2014 and 2020, so I'm shifting gears just a little

15  bit here, were you ever -- did you ever become personally aware

16  of Professor Lieber's health status?

17  A.   Yes.  In 2015, Charlie told me that he had lymph node

18  cancer and that he tried many different treatments, and the

19  cancer -- like, during the time I was in the Lab, the cancer

20  went away and came back multiple times, and it also came back

21  after he was arrested.  And I'm really worried about his health

22  conditions.

23          MR. DRABICK:  Objection, Your Honor.  Move to strike.

24  Relevance.

25          THE COURT:  Well, the last part of it may be stricken.

```
 1   Q.   Did you ever observe any changes in Professor Lieber
 2   during the time that you were there that maybe would have been
 3   reflective of his -- the health status that you might have been
 4   aware of?
 5            MR. DRABICK:  Objection, Your Honor.  Relevance.
 6            THE COURT:  What time period are you talking about?
 7            MS. DEIST:  Your Honor, I think, if the witness can
 8   answer the question, you'll see that that timeframe is very
 9   relevant to the charged timeframe.
10            THE COURT:  But I need to know before in order to make
11   a ruling.  What's the timeframe?
12            MS. DEIST:  I think it's 2018.  I don't want to speak
13   for the witness, but she can correct if I'm wrong.
14            THE COURT:  But 2018 is not the timeframe of this
15   case, is it?
16            MS. DEIST:  Yes, Your Honor.  It's the time during
17   which Professor Lieber would have made statements, so it's
18   actually the timeframe of one of the charges.
19            THE COURT:  Well, I'll take it on that representation.
20   And then if it's not, I'll have to tell the jury to disregard
21   it.
22            MS. DEIST:  Thank you, Your Honor.
23   Q.   Ms. Zhang, was there ever a time during your -- when you
24   were working at the Lieber Lab that you ever noticed a visible
25   change in Professor Lieber?
```

```
 1    A.    Of his appearance?

 2    Q.    Just maybe that you -- just anything about -- you learned

 3    that he was diagnosed with cancer in 2015?

 4    A.    Yes.

 5    Q.    Did you notice that, that affected his work in any way,

 6    his attendance at the Lab?

 7    A.    Yes.

 8               MR. DRABICK:  Objection, Your Honor.  Relevance.

 9               THE COURT:  I don't know that yet.  You may answer.

10    A.    So, I remember around 2018, he became really sick.  He

11    told me he went through chemotherapy, but it didn't really work

12    and had a lot of side effects, so he couldn't really focus on

13    work.

14               MR. DRABICK:  Objection, Your Honor.  Move to strike.

15    The witness is offering statements of the Defendant.  It's

16    hearsay.

17               MS. DEIST:  Your Honor, she's actually about to get to

18    the point at which she was able to observe some changes in

19    Dr. Lieber.

20               THE COURT:  Well, tell us what you observed and when.

21    First when.

22               THE WITNESS:  Around 2018.  But I don't remember the

23    specific time, but around then.

24               THE COURT:  And what's the relevance of 2018 to this

25    case?
```

1          MS. DEIST:  Your Honor, in Count 1, when he was asked

2     about the statement that's actually in Count 1, his health

3     condition, anything he might have been experiencing during that

4     time would have affected his state of mind and the things he

5     was thinking about when he was answering questions asked to him

6     by DoD or NIH.

7          MR. DRABICK:  Your Honor, I object to any statements

8     from the witness about statements the Defendant made.

9          THE COURT:  Well, 2018 is part of what the Government

10    has charged.

11         MR. DRABICK:  No dispute, Your Honor, that Count 1

12    charges false statements in 2018.

13         THE COURT:  Okay.  So you may answer.

14    A.   I noticed that he was not in the Lab for -- like, very

15    often, and also he replied to the emails much slower than

16    usual.  Usually he would reply to emails within one hour, but

17    at that time, he might take several days to reply to my emails.

18    And also, he was rather slow in revising the papers.

19    Q.   And that was unusual to you?

20    A.   Yeah, very unusual.

21    Q.   This might be a silly question.  Do you speak Chinese?

22    A.   Yes.

23    Q.   And do you know if Professor Lieber -- are you aware if

24    Professor Lieber speaks Chinese?

25    A.   No.

1  Q.   No, he does not?

2  A.   No, he does not.

3          MS. DEIST:  All right.  One moment just to confer

4  with co-counsel.

5          (Pause.)

6          MS. DEIST:  All right.  Thank you, Ms. Zhang.  I may

7  have some follow-up, but I'm going to pass the mic.

8          THE COURT:  Any cross?

9          MR. DRABICK:  Briefly, Your Honor.

10                    CROSS-EXAMINATION

11  BY MR. DRABICK:

12  Q.   Good morning, Ms. Zhang.

13  A.   Good morning.

14  Q.   You are currently a postdoc at Stanford; correct?

15  A.   Yes.

16  Q.   And before that, you were a graduate student at Harvard?

17  A.   Yes.

18  Q.   In Professor Lieber's lab; correct?

19  A.   Yes.

20  Q.   And before that, you were at -- is it Fudan University in

21  China?

22  A.   Yes.

23  Q.   And forgive me if I get the number wrong, but I believe

24  you've been the named author on approximately 35 papers -- is

25  that right? -- a named author?

1    A.    I'm sorry.  I'm not sure about the number.

2    Q.    Okay.  Approximately how many papers have you been a named

3    author in?

4    A.    I would say about 20.  So, you said more than 30.

5    Probably because I co-authored a book with Charlie, and the

6    group of scholar considered every chapter of that book as a

7    separate publication.  So, on my "Google Scholar" profile, it

8    has more publications than the actual number.

9    Q.    Very good.  You have outed me as having found that on

10   "Google Scholar."

11          Professor Lieber was the corresponding author on many

12   of your articles; correct?

13   A.    Yes.

14   Q.    The majority of your articles?

15   A.    Yes.

16   Q.    What is the corresponding author?

17   A.    Corresponding author is usually the PI of the lab, the

18   advisor of the other authors.

19   Q.    Fair to say that Professor Lieber's participation in your

20   papers has helped your career?

21   A.    Yes.

22   Q.    And the most cited article, at least as I could tell from

23   "Google Scholar," that you were the first author on with

24   Professor Lieber was an article called, "Nano-Bioelectronics,"

25   in the "Chemistry Review"; is that right?

1   A.   Yes.

2   Q.   And both you and Professor Lieber listed your affiliations

3   as Harvard's Chemistry Department; correct?

4   A.   Yes.

5   Q.   And you did so because that's where you were doing your

6   graduate work; correct?

7   A.   Yes.

8   Q.   And you were no longer at Fudan University, so you didn't

9   list Fudan University; correct?

10   A.   Yes.

11   Q.   And Professor Lieber listed the Chemistry Department as

12   his first affiliation; correct?

13   A.   Correct.

14   Q.   And he also listed Harvard School of Engineering and

15   Applied Sciences as his second affiliation; correct?

16   A.   Yes.

17   Q.   That's because Professor Lieber's primary appointment was

18   with the Chemistry Department at Harvard; correct?

19   A.   Yes.

20   Q.   And so it makes sense to list that affiliation first;

21   correct?

22   A.   Yes.

23   Q.   And you published some papers while you were at

24   Fudan University; correct?

25   A.   Yes.

 1   Q.   And for those, you listed Fudan University as your

 2   affiliation; correct?

 3   A.   Yes.

 4   Q.   Have you ever, in a published paper, listed an affiliation

 5   you didn't have?

 6   A.   No.

 7           MR. DRABICK:  Could we please see admitted Exhibit 33

 8   at Page 34.  And if we could please highlight the title and

 9   affiliation section.

10           THE WITNESS:  Okay, I see it.

11   Q.   Do you see that, Ms. Zhang?

12   A.   Yes.

13   Q.   This isn't a paper that you were an author on; correct?

14           MS. DEIST:  I'm going to object on relevance to this.

15   She has no personal relevance about this document at all.

16           THE COURT:  Well, I don't know yet whether it's

17   relevant or not, although it seems a bit afar.

18           MR. DRABICK:  It's an admitted document in evidence,

19   Your Honor, and --

20           THE COURT:  Well, that may be, but what does it have

21   to do with what she's testifying about?

22           MR. DRABICK:  She just testified about the

23   appropriateness of how authors list affiliations in papers.

24           MS. DEIST:  That's a misstatement, Your Honor, of her

25   testimony.

```
 1            THE COURT:  Well, he may have the question.  Maybe
 2     that will clarify it.
 3     Q.   Ms. Zhang, do you see Professor Lieber's name as the
 4     corresponding author?
 5     A.   Yes.
 6     Q.   Okay.  And do you see that he is -- his first affiliation
 7     is listed as the WUT-Harvard Joint Nano Key Laboratory at
 8     Wuhan University?
 9     A.   Yes.
10     Q.   You don't know anything about his affiliation with
11     Wuhan University; correct?
12     A.   I heard about it.
13     Q.   So, you do know that he had an affiliation with
14     Wuhan University?
15     A.   I don't know the specifics, but I just heard about
16     Wuhan University of Technology.
17     Q.   And you see here that he listed it as his first
18     affiliation in this paper?
19     A.   Yeah.
20     Q.   You don't know anything about his participation in the
21     Thousand Talents Program, do you?
22     A.   No.
23     Q.   Or whether he brought any Wuhan University students to his
24     Lab as part of that program?
25     A.   No.
```

1    Q.   Or whether he was paid by Wuhan University for his

2    participation in that Program?

3    A.   No.

4    Q.   Or whether he was paid in cash?

5    A.   No.

6    Q.   Or whether he opened a bank account in China?

7    A.   No.

8            MR. DRABICK:  Thank you.  No further questions,

9    Your Honor.

10           THE COURT:  Any redirect?

11           MS. DEIST:  No, Your Honor.

12           THE COURT:  Thank you.  You are excused.

13           Who's next?

14           MS. DEIST:  I'll let Mr. Mukasey take over on that

15   one.

16           MR. MUKASEY:  The defense rests.

17           (Defendant rests.)

18           THE COURT:  Any rebuttal?

19           MR. DRABICK:  No rebuttal case, Your Honor.

20           THE COURT:  That, members of the jury, means that

21   you've heard all the evidence you're going to hear in the case.

22   I think -- I don't know if your goodies are upstairs, but --

23           THE CLERK:  I don't think so.

24           THE COURT:  Nonetheless, we will need to take a recess

25   now because I need to talk to the lawyers and explain to them

1    primarily what I intend to tell you about the law in the case

2    before you begin your deliberations.

3         When you come back, we will be ready to hear counsel's

4    argument starting with the Government and then the Defendant,

5    and the Government will have an opportunity for a brief

6    rebuttal; and, after that, I will charge you on the law.  Maybe

7    we can get all of this done before the luncheon recess.  We

8    will provide you with lunch.  If not, then we will finish the

9    presentations to you -- the admonitions to you, at least from

10   me, after lunch.  But we will try to move it right along.  As

11   you can see, counsel are being very good at doing that.

12        So, we'll take a recess now.  I can't tell you exactly

13   how long it will be because I need to talk to the lawyers.

14        THE CLERK:  All rise, please.

15        (The Jury is not present for the following.)

16        THE COURT:  Please be seated.

17        So, how do you want to proceed, Mr. Mukasey?

18        MR. MUKASEY:  Judge, there's a couple of things.

19   Perhaps we could just quickly put on the record our Rule 29

20   oral argument.  We're filing the papers.  And then I'll have

21   one other thing I want to put on the record very quickly before

22   we proceed with the charge conference.  Ms. Young is going to

23   speak to the Rule 29 argument.

24        MS. YOUNG:  Your Honor, as you'll see in the papers,

25   the Court should enter a judgment of acquittal on Counts 5 and

1   6 because the regulation expands the regulatory authority to

2   reach conduct that of the statutory section for the FBAR

3   counts.  This also will impact the --

4            THE COURT:  What's the basis of the motion?

5            MS. YOUNG:  So, Your Honor, there is First Circuit law

6   that demonstrates that the regulation, as it relates to the

7   FBAR statute, actually expands the scope of the statute.  The

8   statute requires that a person report a foreign bank account if

9   there's a transaction; whereas, the regulation adds additional

10  language and says that the reporting is that there is a

11  relationship.

12           We submit to you that the relationship language is

13  different than the transaction language; and, therefore, as a

14  matter of law, the question is whether or not there was a

15  transaction.  Here, there are no transactions.

16           THE COURT:  So, you say that, although there is

17  reference to -- although the rule is that there has to be a

18  relationship and there has to be a transaction or that the

19  relationship is the transaction, or the transaction is a

20  relationship?

21           MS. YOUNG:  No, Your Honor.

22           I submit that a transaction is distinct from a

23  relationship and is a distinct and separate occurrence, an

24  event, compared to a relationship.

25           THE COURT:  Excuse me.

1              Does that mean that, if a person has a bank account in

2      China of the requisite amount and it sits there and he does

3      nothing with that account, that -- but except that, at some

4      point, he doesn't report it to the Government, and the

5      Government thinks he should have, that that is not an offense

6      because nothing happened to that account during that particular

7      year?  Is that the argument?

8              MS. YOUNG:  Yes, Your Honor.  And I would direct you

9      to "In Re:  J.P. Morgan Chase," which is a First Circuit 2015

10     case, regarding demonstrating that, if the regulation adds to

11     the statute something which is not there, then the regulation

12     is a nullity for purposes of the bank account.

13             I can also, and you'll see in the papers, see how, in

14     *Calamaro*, another criminal case --

15             THE COURT:  Now, which year are we talking about that

16     nothing happened?

17             MS. YOUNG:  Well, Your Honor, there is no evidence of

18     any transaction in any year.

19             THE COURT:  Well, there was a transaction depositing

20     this money -- correct? -- at some point?

21             MS. YOUNG:  No.  I believe the evidence will show that

22     the bank account has a 0.00 balance in all instances.

23             THE COURT:  You mean there was nothing in the account?

24             MS. YOUNG:  Correct, Your Honor.

25             THE COURT:  I'll hear you.  This bank account has

1   existed for some years now; correct?

2          MS. YOUNG:  I do not know that, Your Honor.  I know

3   the application in 2012 --

4          THE COURT:  It existed for some years during the

5   period shown or named in the indictment; correct?

6          MS. YOUNG:  No, Your Honor.  The application and the

7   sole bank account documents were from 2012 with a 0.00 balance.

8   The Government has charged for FBAR Counts 2014 and 2015.

9   Quite frankly, I have no evidence of a transaction or a

10  relationship; but I submit to you that, if you're going to

11  instruct them, at minimum, it should be a transaction, which

12  matches the statutory language.

13         THE COURT:  And the indictment charges 2014-'15, and

14  that statements about it were due in '15-'16; correct?

15         MS. YOUNG:  Your Honor --

16         THE COURT:  The offense is not having the bank

17  account; it is not reporting the bank account?

18         MS. YOUNG:  Correct.

19         THE COURT:  And you say that, in order for there to be

20  the need to report, there has to be activity in the account?

21  It's not enough that the account existed?

22         MS. YOUNG:  Well, the statute requires not just the

23  existence; it also requires a minimum balance, an amount of

24  $10,000, which there is no evidence of, as well as authority,

25  which is a separate issue.

1          THE COURT:  Okay.  Is that it?

2          MS. YOUNG:  Yes, Your Honor.

3          MR. DRABICK:  May I respond to that point, Your Honor?

4          THE COURT:  Yes.

5          MR. DRABICK:  So, for one, there absolutely is

6     evidence of a balance.  The Defendant himself stated that there

7     was a $200,000 balance in 2014.

8          THE COURT:  Who stated this?

9          MR. DRABICK:  The Defendant.  In his statement -- in

10    his interview with Agents Plumb and Spice, he stated that --

11         THE COURT:  Is that in evidence?

12         MR. DRABICK:  It absolutely is.

13         THE COURT:  Has it been presented?

14         MR. DRABICK:  Yes, it has, Your Honor.  It's been

15    played for the jury, and it's an admitted video exhibit.

16         There's also many emails in which the Defendant is

17    requesting deposits of his salary, half into his bank account

18    in China and, obviously, emails referencing his bank account

19    China and his additional admissions about his bank account in

20    China.  The -- so, there absolutely is evidence of a balance in

21    2014 and 2015.

22         To the legal argument, Ms. Young launches a broadside

23    attack on the statute itself two years into this case here at

24    the charge conference.  The statute reads that it apply -- that

25    the regulatory scheme will apply to individuals who make a

1     transaction or maintain a relation for any person with a

2     foreign financial agency.

3          The regulations were promulgated pursuant to this

4     statute.  The Defendant's own jury instructions initially

5     proposed two weeks ago do not make this broadside attack, but

6     I'm sticking with the regulatory scheme, which has been

7     undisputed for the entirety of this case, that the requirement

8     is to report simply the maintenance of a bank account, the

9     having of a bank account with a balance of over $10,000 at any

10    point throughout the year.

11         Your Honor, at a minimum, we have received no notice

12    of this broadside attack on the statute.  I don't believe it

13    has merit; but, at a minimum, it should be presented to the

14    jury as the parties originally proposed and we could brief it

15    afterwards, if necessary.

16         THE COURT:  Anything else on that?

17         MS. YOUNG:  Yes, Your Honor.

18         The proposed instructions actually did indicate our

19    analysis and proposed it in the alternative but had indicated

20    this to you, as well as the instructions that I believe were

21    filed or provided to you earlier this morning, that describe

22    our analysis regarding the regulation versus the statute.

23         And as far as evidence goes, Your Honor, there's no

24    documentary evidence in the record --

25         THE COURT:  It doesn't have to be documentary.  I

1   mean, there's all kinds of -- there are all kinds of emails,

2   for instance, and they talk about the bank account, as I

3   recall.

4           MS. YOUNG:  Not specifically to this account for any

5   amount in any year.

6           THE COURT:  Well, that's for the jury to determine.

7   Your motion is denied.

8           What else?  Is that it?

9           MS. YOUNG:  Your Honor, our pro forma motion on

10  Counts 1 through 4 regarding our Rule 29 motion, which will be

11  filed.

12          THE COURT:  That too is denied.

13          What else?

14          MR. MUKASEY:  Judge, I just wanted to put on the

15  record that, prior to resting our defense case, I reviewed with

16  Professor Lieber his opportunity to testify if he so chose.  I

17  wanted to put on the record that we had a full and fulsome

18  discussion about that.  Dr. Lieber is aware that he has every

19  right to testify if he wishes, and he's voluntarily and

20  knowingly declining to do so and that that was the decision

21  that was made before we rested.

22          THE COURT:  Okay.  Are we ready for the -- for me to

23  tell you what I propose to tell the jury, or do you need a

24  recess?

25          MR. MUKASEY:  Do we have a proposed charge?

1          THE COURT:  You don't have it.  I have it.

2          MR. MUKASEY:  Do we get a copy of it?

3          THE COURT:  Well, I don't usually do that.

4          MR. CASEY:  Yeah, I agree it would be helpful to have

5    a copy and also a quick recess for a bathroom break, if

6    possible.

7          THE COURT:  Well, we will take a recess before the

8    argument.  The question is whether you want me to tell what I'm

9    about to tell the jury or whether you need to have a copy.  I

10   mean, I don't usually follow my copies slavishly.

11         MR. MUKASEY:  I think, because of the unique nature of

12   the tax and FBAR charges, it would be very helpful for us to be

13   able to know and read what you're going to charge.

14         THE COURT:  It just makes it easier for you to be

15   critical of everything I say and ask me to change it.

16         MR. MUKASEY:  It's not personal.

17         THE COURT:  I know.

18         MR. DRABICK:  We're just trying to be helpful,

19   Your Honor.

20         THE COURT:  I don't know.  I'll have to think about

21   that.  I guess we have to take a recess because I only have one

22   copy, in any event.  So, if I decide that it's appropriate to

23   give you a copy, understanding that this is not something that

24   I will sort of just read to the jury --

25         MR. MUKASEY:  I think there are some disputes between

```
 1   the parties, perhaps Your Honor will solve them, over some of
 2   the elements of some of the charges.  I have no doubt that
 3   Your Honor's basic charge on the typical duties of a jury and
 4   burden of proof and presumption of innocence is all top notch.
 5   I think we probably both want to see how the Court will
 6   describe the elements.
 7           THE COURT:  You're double-teaming me now.
 8           Well, let me have a look at this, and then I need to
 9   make copies.  Do you want one for each of your lawyers?
10           MR. MUKASEY:  I think we can make due with one copy.
11           THE COURT:  Plus one for Mr. Lieber.
12           MR. MUKASEY:  He can follow along with us.  Whatever
13   is most efficient.
14           THE COURT:  You want two?
15           MR. DRABICK:  We can make due with one as well,
16   Your Honor.  Thank you.
17           THE COURT:  All right.  I think we have enough paper.
18   We'll take a recess so I can do printing.
19           By the way, I think there are some minor issues left.
20   There was a proposal with respect to exhibits, some of which
21   was mentioned earlier today.  There were objections to exhibits
22   11, 12, 13 and so on.  And those documents are in evidence
23   already, so I'm not exactly sure what we're supposed to do with
24   them other than throwing them away, which we're not about to
25   do.
```

1          With respect to -- well, let's see -- 11, 12, 13 and

2     14, I did allow those into evidence I think this morning.  18

3     through 26 has been in evidence, but there was an agreed, I

4     think, stip -- no, not a stipulation; a proposed supplemental

5     instruction that you had agreed to, and I don't think that

6     should be part of the charge that I'm about to give the jury

7     but should be a separate issue.

8          So, I don't know how you want to deal with these

9     exhibits, which I thought, as of this morning's argument, were

10    not in evidence but which, in fact, had been admitted into

11    evidence or shown on the docket as having been admitted.

12         MR. DRABICK:  Your Honor, if I may.

13         So, one housekeeping:  Just -- 19 and 20 are not in.

14    I believe the parties are in agreement 19 and 20 are not in.

15    The rest, you clarified and ruled this morning they are in.

16         THE COURT:  They were ruled out?

17         MR. DRABICK:  Yes.  19 and 20 are out.  The rest of

18    the exhibits we mentioned are in.

19         THE COURT:  So, why did we argue about them this

20    morning?

21         MR. DRABICK:  We resolved it this morning, Your Honor.

22    It is resolved.

23         MS. DEIST:  The Government wrote the motion.  They

24    included every one of those exhibits, so I had to respond to

25    them and --

1          THE COURT:  No, you didn't.  You could have said that

2     they were already in evidence.

3          MS. DEIST:  Well, I disputed that they were in

4     evidence, Your Honor, and we objected.  So, I would be remiss

5     if I didn't respond, but that is why --

6          THE COURT:  But, in any event, that has nothing to do

7     with that anymore.

8          MR. DRABICK:  The only remaining issue, Your Honor, is

9     what you identified as the limiting instruction.  I don't know

10    Mr. Mukasey's view.  I don't believe there is a problem with

11    reading that instruction as part of the general instruction to

12    the jury.

13         The parties also, I believe, agree on a 404(b)

14    instruction to be read at that same time.  The Government

15    certainly has no objection to reading that as part of the

16    general instruction to the jury.

17         MR. MUKASEY:  It's critical to preserve

18    Professor Lieber's rights that --

19         THE COURT:  But how do we do this, given the

20    peculiar --

21         MR. MUKASEY:  We do it in the middle of the charge,

22    wherever Your Honor thinks it's comfortable in the middle of

23    the charge; but the jury has got to know, before it goes back

24    to deliberate, that certain evidence is not be considered for

25    its truth but for other reasons and that certain items of

1    evidence are not part of the charge but are brought in for

2    other reasons; namely, the 404(b) reasons, and we've been

3    fighting this whole case to protect Dr. Lieber's rights on

4    those two scores.

5           THE COURT:  No.  I understand that.  I just want

6    to -- this is a somewhat unusual way of doing it, at least from

7    my perspective.

8           MR. MUKASEY:  Because there were so many disputed

9    exhibits --

10          THE COURT:  Well, that may be, but now I need to

11   understand exactly what the parties are in agreement on as to

12   how this information is to get to the jury.

13          MR. MUKASEY:  I think we're in agreement that, because

14   there were so many disputed exhibits and you couldn't read a

15   limiting instruction every five minutes during the trial, that

16   it is appropriate to read a 404(b) instruction and a hearsay

17   instruction as part of the general charge.

18          THE COURT:  This supplemental jury instruction that

19   you gave me deals with both of the issues?

20          MR. DRABICK:  It deals with one of them, Your Honor.

21   I believe the one you are holding is the limiting instruction

22   about the Wuhan communications.

23          We had proposed a 404(b) instruction as well.  The

24   defense made a few minor edits, which we're fine with, and I

25   can bring that up now, Your Honor.

1          THE COURT:  I haven't seen that yet?  I'm asking.

2          MR. DRABICK:  I don't believe so.  Well, I believe

3     your clerks may have a copy.  I don't know if you've seen it.

4          THE CLERK:  Oh, yes.  Didn't you see this?  Didn't you

5     have this piece in there?  Isn't that what you have right

6     there?

7          THE COURT:  No.

8          THE CLERK:  Oh, that's a different one.  I'm sorry.

9          THE COURT:  So, are counsel agreed that I should

10    incorporate this into the jury instructions?

11         MR. MUKASEY:  I need to see those because I think

12    we're not necessarily in agreement yet.

13         THE COURT:  Both of you in the back who are standing

14    up, you can just sit down or go away or whatever you want to

15    do.

16         MR. DRABICK:  Your Honor, if I could have that back

17    for a moment?

18         THE CLERK:  Do you want to make a copy?

19         MR. DRABICK:  I can show him.

20         THE CLERK:  Oh, all right.

21         (Counsel confer.)

22         THE COURT:  Where are we?  You can send a messenger,

23    let me know what the scoop is, what you want me to do.

24         MR. DRABICK:  I think we'll be about ten seconds,

25    Your Honor, but we'll send them back.

```
1            THE CLERK:  Are you going to go back?

2            THE COURT:  Yes.

3            (Recess taken from 10:09 to 10:29 a.m.)

4            (The Jury is not present for the following.)

5            THE COURT:  I don't think we want anybody standing, so

6    please find a seat.  I think there's room over there in the

7    last row.

8            Counsel have changed my normal way of doing things, so

9    I'm slightly bollixed up here.

10           The two documents pertaining to the exhibits that you

11   gave me earlier today, which I have now carefully -- I propose

12   to add, on the first page where I explain about exhibits --

13           MR. DRABICK:  Your Honor, to clarify, the two

14   instructions the parties proposed regarding the Wuhan

15   communications and 404(b) evidence, our understanding is you

16   propose to read them in your outline on Page 1 where you

17   mention exhibits; is that correct?

18           THE COURT:  Right, right.

19           MR. DRABICK:  Thank you, Your Honor.

20           THE COURT:  But I can't find one of them now.

21           Does one of you have -- I have the proposed

22   supplemental jury instruction No. 2.  I don't have the --

23           THE CLERK:  The No. 3 that we were just doing?  Oh,

24   here.  Here we go.

25           (Document handed to judge)
```

1          THE COURT:  I am missing all of 2 now.  This is the

2    supplemental.

3                        CHARGE CONFERENCE

4          THE COURT:  So, are there any objections to the

5    proposed charge, Mr. Mukasey?

6          MR. MUKASEY:  There are clarifications and objections,

7    Judge.  I'll try to be as brief as possible.

8          First of all, with respect to Count 1, the indictment

9    says that the false statement Dr. Lieber made to DoD was that

10   he was never asked to participate in China's Thousand Talents

11   Program, and he wasn't sure how China categorized him.

12         We would respectfully ask that Your Honor charge the

13   jury that both of those prongs, both of those clauses, have to

14   be found beyond a reasonable doubt, not one or the other.

15         The indictment charges a false statement, one false

16   statement consisting of two halves, that he was never asked to

17   participate in China's Thousand Talents Program and wasn't sure

18   how China categorized him.  The Government needs to prove both

19   of those beyond a reasonable doubt.

20         We think that can be laid out for the jury on your

21   Page 6 description.

22         THE COURT:  I'm sorry.  Where in the charge are you

23   referring to?  I'm on Page 4 where I elaborate on Counts 1 and

24   2, and I tell them what Count 1 says --

25         MR. MUKASEY:  Right, right.

1          THE COURT:  -- which is both that he had -- he was

2    never asked to participate and wasn't sure how China

3    categorized him.

4          MR. MUKASEY:  Right.  And all I'm saying is:  The jury

5    should be unanimous as to both of those factors, both of those

6    prongs, both of those clauses.

7          MR. DRABICK:  The Government respectfully disagrees,

8    Your Honor.  If the jury finds that either a false statement --

9    if the jury unanimously finds as to either statement, that it

10   was made falsely, willfully, intentionally and that the

11   statement was material, the jury may convict as to either

12   statement.

13         MR. MUKASEY:  But those are not charged as two

14   different statements; they are charged as one statement.

15         THE COURT:  Well, I don't know that I need to

16   emphasize it.  I tell them those are the two things that are in

17   the indictment.

18         MR. MUKASEY:  I think that you need to tell them they

19   can't just find one or the other.  Both are charged as the

20   single statement.  If they're going to find beyond a reasonable

21   doubt unanimously --

22         THE COURT:  "Making a materially false statement in

23   the manner," and then --

24         MR. DRABICK:  Your Honor, either statement is a manner

25   that the statute can be offended.  Either statement is a crime.

1    The Government can allege in the conjunctive and prove in the

2    disjunctive.  Either statement is a crime.  It is one count,

3    but either statement is sufficient for the jury.  If they find

4    unanimously as to that statement, that is sufficient to

5    convict.

6            MR. MUKASEY:  They charged a coupled statement, a

7    statement with two pieces.  They can't pick either/or now; they

8    have to prove unanimously both.

9            THE COURT:  Well, I lost my copy of the -- let me see

10   here.

11           Well, the indictment talks about a statement --

12           MR. DRABICK:  Respectfully, Your Honor, the indictment

13   is titled, "False Statements," plural, and describes two

14   statements made; that is, the operative "and" describes two

15   statements made.

16           THE COURT:  That he willfully made a material false

17   statement, which he knew to be false; that is, he told

18   investigators that he never -- he was never asked to

19   participate in the Thousand Talents Program and signed a

20   three-year -- and to -- I don't know.  There really is only the

21   one.

22           MR. MUKASEY:  But it's one statement with two pieces,

23   right.  They have to prove both pieces of the statement; that

24   is --

25           THE COURT:  Where do you get the two things that I

1    should say to the jury?

2         MR. MUKASEY:  Count 1 says, "The material false

3    statement," singular, "is he would never ask to participate in

4    China's Thousand Talents Program and he wasn't sure how China

5    categorized him."  That's the statement.  They have to find

6    that full statement, not a little bit of it or 50 percent of

7    it; the full statement, that he wasn't asked to participate and

8    he wasn't sure how China categorized him.  That's the statement

9    that's charged.  That's what has to be found unanimously, not

10   50 percent of that.

11        MR. DRABICK:  Your Honor, the jury is required to find

12   to convict unanimously that there was a false statement made.

13        MR. MUKASEY:  And they defined the false statement

14   with two pieces.

15        MR. DRABICK:  Count 1 refers to one interview that was

16   conducted that we heard evidence about on that particular date.

17   Count 1 then describes -- Count 1 quotes the operative statute

18   and then describes two statements made.

19        It's the Government's position, Your Honor, that they

20   are alternative ways.  Each statement alone, if found to be

21   false and material and made willfully, if found unanimously by

22   the jury, is sufficient to convict.  The fact that it is

23   alleged in the conjunctive does not mean it cannot be proved in

24   the disjunctive.

25        MR. MUKASEY:  He's just watering down the burden of

1    proof.  He charged the statement with two parts.  He should be
2    required to prove both parts.
3             THE COURT:  Well, I can certainly add it, but I'm not
4    sure that -- I'm not going to tell them that this is one
5    statement.  I'm not going to emphasize that; that's for you to
6    do.
7             MR. MUKASEY:  But they have to be unanimous on the
8    full statement.
9             THE COURT:  They have to be unanimous on every aspect
10   of it.
11            MR. DRABICK:  Your Honor, it's the Government's
12   position they have to be unanimous that there was a false
13   statement made.  There are two false statements alleged in
14   Count 1.  If they are unanimous on either false statement, that
15   is sufficient to convict, if it is found by the jury to be
16   material; meaning, if all of the elements are met as to either
17   of the statements, that he was never asked to participate or
18   that he was not sure how they categorized him.
19            It's standard for any -- for many statutes, they can
20   be proved in alternative ways, that the indictment will allege
21   in the conjunctive but only needs to be proved in the
22   disjunctive.  It is standard law that they may be proved in the
23   disjunctive.  Either statement, if found unanimously, is
24   sufficient to convict.
25            MR. MUKASEY:  Judge, I vehemently disagree.  If I say

```
 1   that I'm wearing a shirt that's white and blue and they want to
 2   prove that I've made a false statement, they can't just say I'm
 3   wearing a shirt that's white; they have to say I'm wearing a
 4   shirt that's white and blue.  They have to have both parts for
 5   it to be a false statement.  They just can't pick 50 percent of
 6   what they've charged and claim that's a statement.
 7            MR. DRABICK:  Your Honor, I would argue that
 8   Mr. Mukasey's analogy is not apt because that is one
 9   description of one shirt.  These are two separate statements.
10   To say I was never asked to participate and that he was not
11   sure how they categorized him, those are separate statements.
12            MR. MUKASEY:  He's charged as one false statement.
13   It's got two parts.  They should prove both.
14            MR. CASEY:  Your Honor, I'd just note, in the
15   indictment language, there's a comma in between the two false
16   statements, which I think is important.
17            MR. MUKASEY:  He shouldn't go to prison, not over a
18   comma.  That's just not right.  They should be required to
19   prove what they charged, one statement, two parts.
20            THE COURT:  Well, there is a comma between the two --
21            MR. MUKASEY:  Yes.
22            THE COURT:  -- which suggests that they are not
23   joined.
24            MR. MUKASEY:  Then, why is it called one false
25   statement, "A false statement"?
```

```
 1              THE COURT:  "Made a false statement."

 2              MR. MUKASEY:  Yeah, with two parts.

 3              THE COURT:  One of the two, separated by a comma.

 4              MR. MUKASEY:  It doesn't say two parts.

 5              THE COURT:  I'm not going to emphasize it one way or

 6      the other, but you can certainly argue what you want to argue.

 7      The false statement is not the combination of the two, at least

 8      that's not how I read it.

 9              MR. DRABICK:  We agree, Your Honor, that it is --

10              THE COURT:  When I'm with you, don't agree with me.

11              MR. CASEY:  Could I just raise one possible concern on

12      this?  The Government's concern is that Mr. Mukasey's going to

13      close on this point --

14              THE COURT:  Why are you talking because I just said I

15      would do what you want me to do.

16              MR. CASEY:  Fair enough.

17              MR. MUKASEY:  Well, you can note our objection.

18              THE COURT:  That he was never asked to participate in

19      China's Thousand Talents Program and that he wasn't sure how

20      China categorized him.  I mean, you can combine the two, or you

21      can do it separately, it seems to me, and I will leave it to

22      the jury.  I'm not going to say these are two separate

23      statements and the Government has to prove at least one of them

24      or that it is one statement with two parts to it.  I will not

25      give them that instruction, but you can argue it.
```

1          MR. MUKASEY:  All right.  We take exception to that,

2     but we'll argue it.  Thank you, Judge.

3          THE COURT:  See, this is the problem with giving you

4     the charge ahead of time in writing.

5          MR. MUKASEY:  I'm just trying do my job, Your Honor.

6          THE COURT:  It's a highly -- for me, a highly unusual

7     thing to do.

8          I did tell you -- except I keep losing my papers --

9     that I propose to add the two supplemental instructions that

10    you had asked me to give.  I add them to the exhibit part of

11    the outline of the evidence on Page 1.

12         MR. MUKASEY:  Fair enough.  Thank you.

13         THE COURT:  I mean, I don't know where else to put

14    them.

15         MR. MUKASEY:  Thank you.

16         THE COURT:  They are far more detailed than I would

17    normally give to the jury.

18         What else is there, Mr. Mukasey, that you want me to

19    worry about?

20         MR. MUKASEY:  Judge, with respect to Count 2, which is

21    the false statement that made its way to NIH, Professor Lieber

22    is not charged, obviously, with speaking directly to NIH but

23    with causing Harvard to make a false statement to NIH, and

24    that's discussing --

25         THE COURT:  "He knowingly and willfully made and

1 caused to be made a materially false statement."

2      MR. MUKASEY:  Right.  The only problem is the

3 Government seems to be proceeding here on an aiding and

4 abetting theory, that he aided and abetted.

5      THE COURT:  Well, it's not an aiding or abetting case.

6 He did or he didn't.

7      MR. MUKASEY:  Well, they didn't ask -- they didn't

8 charge aiding and abetting, and they didn't ask for a request

9 to charge on aiding and abetting, yet they're proceeding on

10 causing someone else to do something, which is aiding and

11 abetting.

12      THE COURT:  No, I don't think so.

13      MR. MUKASEY:  That's normally --

14      THE COURT:  It's not aiding and abetting.  I mean,

15 it's not that the other person is charged with a crime and he

16 is helping him.  That's what aiding and abetting means to me.

17      MR. MUKASEY:  Well, the false statement is attributed

18 to Dr. Lieber, but he's alleged to have caused Harvard to have

19 submitted that, and normally that would be charged under

20 18 U.S. Code, Section 1001 and 2, U.S. Code, Section 2.  So,

21 for purposes of this discussion, I want to put that on the

22 record.

23      THE COURT:  Well, I'm not going to change what I'm

24 saying about that because I find it altogether too cumbersome

25 and confusing.

1              What's next?

2              It's not that I'm totally wedded to my prose, but it's

3    not too different from what I've been doing for many years; and

4    it doesn't get reversed on those grounds or hasn't been.

5              MR. MUKASEY:  That's some tough talk.

6              I just wanted to clarify something in the middle of

7    Page 8, please.

8              THE COURT:  I'm sorry.  Page which?

9              MR. MUKASEY:  Eight, Page 8.

10             THE COURT:  Page 8?  My copy doesn't seem to have

11   complete pagination.

12             Yes?

13             MR. MUKASEY:  I think, on Page 8, you're talking about

14   both Count 3 and Count 4, the two tax return charges.

15             This is a little bit of semantics, but I just want to

16   make sure it's clear.  You have a paragraph that begins, "If

17   all of you are convinced beyond a reasonable doubt" -- do you

18   see that?

19             THE COURT:  Yes.

20             MR. MUKASEY:  -- "that the Government has proven that

21   Defendant provided false information with respect to one or

22   both returns, you may find him guilty."  It's really he's got

23   to be found guilty on both of them; right?  He's got to be

24   found guilty on the 2013 and/or the --

25             THE COURT:  Why?

```
1              MR. MUKASEY:  -- or the 2014.

2              Well, they don't have an option as between twenty --

3    they're two separate counts.  They don't have an option as

4    between 2013 or 2014.

5              THE COURT:  Or both.

6              MR. MUKASEY:  Right.  All I'm saying is they --

7              THE COURT:  And they're two separate offenses.

8              MR. MUKASEY:  -- they have to find guilt on 2013 and

9    separately guilt on 2014.  That's all I'm saying.

10             THE COURT:  Oh.

11             MR. MUKASEY:  I thought this made it sound like they

12   could take either one.

13             MR. DRABICK:  A suggestion:  Does it make sense to

14   replace "one or both" with "either"?

15             MR. MUKASEY:  That's exactly what I wrote on mine,

16   exactly.

17             THE COURT:  "One or both" -- "either or both."  No, I

18   guess one or both or either?

19             MR. MUKASEY:  No.  "With respect to either return."

20             THE COURT:  Okay.

21             What else?  Anything else?

22             MR. MUKASEY:  I have nothing else at the moment.  If

23   something comes out during the charge that I need to take

24   exception to, I'll wait until the end.

25             THE COURT:  Okay.  Anything for the Government?
```

 1              MR. DRABICK:  Your Honor -- and Mr. Mukasey and I have

 2      had a chance to discuss -- on Page 9, the FBAR charge --

 3              THE COURT:  Wait a minute.  Page 9 what?

 4              MR. DRABICK:  Page 9 refers to Counts 5 and 6, the

 5      FBAR charges.

 6              THE COURT:  Yes.

 7              MR. DRABICK:  The charge --

 8              THE COURT:  I was running out of steam by this time.

 9              MR. DRABICK:  Understood, Your Honor.  I believe,

10      Your Honor, the way that this reads suggests that the

11      charge --

12              THE COURT:  Which part?

13              MR. DRABICK:  Well, the last sentence states,

14      "Question remains whether he failed willfully and knowingly."

15      I believe the question -- I mean, the Government must also

16      prove that the account had over $10,000 in each applicable year

17      to convict on that count.

18              It is read as part of the statute -- or as part of the

19      indictment describing the offense; but it is, I would submit,

20      and I suspect Mr. Mukasey would agree, that we must prove that

21      he willfully failed to file and also the account had more than

22      $10,000 during the applicable calendar year.

23              MR. MUKASEY:  Right.  There has to be a balance of

24      $10,000 to trigger --

25              THE COURT:  Well, it says that.  On Page 9, it says

1    that he did willfully fail to file with the Department of

2    Treasury this report and tell them that he had at least one

3    bank account in China, which had an aggregate value of more

4    than $10,000 at any time during the years.

5              MR. DRABICK:  Yes, Your Honor.

6              Your Honor, as I read it, it is quoting the indictment

7    there.  For the absence of any uncertainty, we would simply

8    suggest that the charge read, the last sentence, "Questions

9    remain as to whether he willfully and knowingly failed to file

10   and whether the account had more than $10,000 in each calendar

11   year."

12             MR. MUKASEY:  Just so that they're aware that both of

13   those things have to be found.

14             THE COURT:  So it should be whether he failed

15   willfully and knowingly to report a bank account that had more

16   than $10,000 in it.

17             MR. DRABICK:  Fair enough, Your Honor.

18             And then just one clarification, Your Honor, on

19   Page 6.

20             THE COURT:  You will remind me, if I have another

21   charge conference, not to give you the charge ahead of time.

22             MR. DRABICK:  Understood, Your Honor.

23             THE COURT:  No.  I'm just kidding.

24             MR. DRABICK:  The paragraph beginning, "Count 2,"

25   approximately halfway down the page --

1          THE COURT:  Yeah.

2          MR. DRABICK:  -- the second half states that --

3    refers to the submission of a request for funding for

4    Professor Lieber.  I believe the evidence reflects that it

5    was -- that the alleged false statement was made in response to

6    a letter from NIH, and it was not related to a grant proposal.

7          THE COURT:  Wait a minute.  You're talking about the

8    paragraph that begins, "Count 2"?

9          MR. DRABICK:  Yes, Your Honor.  It begins, "Count 2

10   alleges that Professor Lieber caused Harvard to make a false

11   statement to NIH."  And we would submit that the rest of that

12   sentence reads something to the effect of, In response to a

13   letter from NIH.

14         MR. MUKASEY:  Or you could just end it after "NIH."

15         THE COURT:  It is a false statement to NIH --

16         MR. MUKASEY:  Period.

17         THE COURT:  -- when submitting a request for funding

18   for Professor Lieber's projects?

19         MR. MUKASEY:  Right.  He's not alleged -- he's not

20   charged with a false statement in order to get funding; he's

21   just charged with submitting -- or causing Harvard to

22   submit --

23         THE COURT:  So, what do you want me to add?

24         MR. MUKASEY:  I would just put a period after NIH and

25   cut the rest of the sentence.

 1            MR. DRABICK:  That's fine, Your Honor, with the

 2    Government.

 3            THE COURT:  Okay.  All right.  Are we ready for the

 4    jury?

 5            MR. DRABICK:  From the Government's perspective, yes,

 6    Your Honor.

 7            THE COURT:  So, let's go get them.

 8            (The Jury is present for the following.)

 9            THE COURT:  Please be seated.  Did your refreshments

10    arrive by the way, up there.  Oh good.

11            I'm sorry this has taken so long, but part of -- one

12    of the things that I need to do with counsel at the end of the

13    evidence -- and I think both have rested in front of the jury;

14    is that correct?

15            THE CLERK:  Yes.

16            THE COURT:  So, then I need to talk with them about

17    what I will tell you the law is, and there are always problems

18    because they don't agree with me, so we have to hash it out.

19    And that's why it has taken so long.

20            We will now continue the trial with the opening

21    statement -- rather, the closing argument by the Government

22    followed by the closing argument of the Defendant.  The

23    Government has a brief rebuttal available to it after the

24    Defendant speaks, then I suspect we will take the luncheon

25    recess, and I will charge you immediately -- we'll have a short

```
1    recess for you to have lunch, and then I will instruct you on
2    the law.
3           If we have time before that, I will certainly do it
4    before that; okay?  So, there's a lot of talking at you going
5    on.  It is very important because, as the evidence comes in,
6    sometimes it's not very clear why counsel did what they did,
7    but they can now explain to you what it is that -- why they
8    offered certain evidence and what its meaning was.
9           Understand, however, that when you are deliberating on
10   your verdict after I finish with you, you need to base your
11   verdict on the evidence, not on what counsel tell you, but on
12   your understanding of the evidence; and I will repeat that to
13   you in the context of the entire charge, which explains to you
14   the details of the three separate accusations that have been
15   made against the Defendant.
16          He's charged with three separate offenses.  Counts 1
17   and 2 charge him with failing to file tax returns for certain
18   years, I think, and -- no.  Counts 1 and 2 accuse him of
19   causing false statements to be made to the National Institutes
20   of Health; Counts 3 and 4 accuse him of filing false tax
21   returns for the years 2013 and '14; and Counts 5 and 6 allege
22   that he willfully failed to file reports concerning a foreign
23   bank account and financial -- well, under the statute, about
24   financial accounts in his name that existed in China in the
25   years 2014 and '15 and which had a balance of at least $10,000
```

1    in it during at least part of that time.

2         So those are the three separate offenses.  They all

3    grew out of a general set of conduct by the Defendant, and

4    counsel will explain it to you better than I can.

5         Thank you.

6         Ms. Urso tells me she ordered lunch to be delivered at

7    1:00, and I think we'll probably go until then with the closing

8    arguments.  And if you'd be finished before, then they'll be

9    here a little bit early anyhow.

10        Who will argue?

11        MR. CASEY:  I will, Your Honor.

12                      GOVERNMENT CLOSING ARGUMENT

13   BY MR. CASEY:

14        My colleague, Mr. Drabick, told you at the outset of

15   this case that it is about three things:  False statements,

16   false tax returns, and an unreported bank account in China.

17        You've heard and you've seen all the evidence, and you

18   know what the Defendant did.  The Defendant did make false

19   statements to the National Institutes of Health and to the

20   Department of Defense about the Thousand Talents Program; he

21   did file false tax returns in 2013 and 2014 and failed to

22   report any of the income that Wuhan University had paid him in

23   those years; and the Defendant did knowingly fail to file FBARs

24   with the U.S. Treasury disclosing his bank account at ICBC,

25   despite the fact that he said, in 2014, that that bank account

had a balance of at least $200,000.

I'm going to walk you through each of these three categories of charges and explain why the evidence proves beyond a reasonable doubt that the Defendant is guilty of each and every count in the indictment.

Let's start with the money.  In Counts 5 and 6, the Defendant, again, is charged with failing to file FBARs with the U.S. Treasury Department in 2014 and 2015, those particular calendar years, disclosing his ICBC bank account.  The Judge is going to instruct you on the elements of these particular counts, the legal elements, and I won't steal her thunder here.

But as you consider the evidence as to these two counts, I'd ask you to focus on four things:  The Defendant had a bank account at the Industrial and Commercial Bank of China in 2014 and 2015; the balance in that bank account exceeded $10,000 in both years; the Defendant knew that he had to disclose the bank to the Government by filing an FBAR; and the Defendant failed to do so.  That last part, you will recall from a stipulation that was read to you yesterday, the parties have agreed to.  No FBARs were filed by the Defendant in either 2014 or 2015.

As to the first point, it is a fact, an undisputable fact, that the Defendant had a bank account at ICBC beginning in November of 2012.  You're going to have the account-opening paperwork with you when you go back into the jury room.  You

1    can pull it out and look at it.

2         I'm going to also cite some exhibits as I sort of walk

3    through the evidence here, so if you want to write them down,

4    it might help you when you do deliberate.  The photographs, the

5    close-up photographs of this ICBC account paperwork and the

6    booklet that was found with it are Exhibits 211, 212, 213 and

7    214.  These documents prove that the Defendant went to ICBC on

8    Wuhan's campus in November of 2012, he showed the folks there

9    his passport, his passport number's right on the top of it, and

10   he opened an account.  And while he was there, he signed and

11   dated the bottom of that form.  The forms were found on the

12   Defendant's desk in his house right next to his passport on the

13   day of his arrest.

14        You also saw the Defendant's ICBC debit card.  That's

15   Exhibit 230.  It had his signature on the back.  Renee Donlon

16   told you that.  The account numbers on the debit card match the

17   account numbers on the ICBC application form, so you know the

18   card and the application form relate to the same account.

19        You also saw email after email after email between the

20   Defendant and Xiang Fan and Liqiang Mai discussing in 2013 and

21   '14 the Defendant's ICBC bank account and the fact that a

22   portion of the Defendant's salary was deposited into that

23   account.  There are a number of these emails, Exhibits 150,

24   151, 154, 44, 48, 50, 52, 169.  All of that proves beyond any

25   doubt that the Defendant had an account at ICBC in 2014 and

1    2015.

2          How do you know that the balance in that account

3    exceeded $10,000?  Because that's what the Defendant said.  He

4    said that on the day of his arrest when he was being

5    interviewed by Special Agent Spice and Special Agent Plumb.

6    You'll have those videos with you when you deliberate, and I

7    encourage you to look at those.

8          Exhibits 302 and 304 are the particular videos where

9    the Defendant mentions receiving -- mentions the particular

10   balance in the account in 2014.  He talks about the fact that

11   Wuhan University and he set up a bank account in China and that

12   that bank account was used to deposit some of his salary

13   payments.  He said he checked the balance in 2014 and that he

14   thought there was approximately $200,000 in the account.  He

15   said he never touched the money.

16         If he never touched the money and there was $200,000

17   in there in 2014, then necessarily there was at least $200,000

18   in there in 2015.  But, as you know from the Defendant's

19   emails, he continued to receive salary payments from Wuhan

20   University throughout 2014; and so, in all likelihood, the

21   balance in that account continued to increase.

22         In terms of the amount of money that the Defendant was

23   receiving on a monthly basis, there are some documents that you

24   should review that are important.  The contract that the

25   Defendant agreed to, that's Exhibit 23, we looked at the

1    financial provision of that contract.  It entitled the

2    Defendant to $50,000 a month.  I'm not suggesting necessarily

3    that the Defendant was always paid $50,000 a month, but we're

4    talking about significant amounts of money; right?  I mean,

5    even a fraction of that would get over the $10,000 threshold.

6           You should also take a look at this document.  This

7    was found, again, on the Defendant's desk next to his passport

8    wrapped up with this ICBC account paperwork.  This is the

9    Charles M. Lieber subsidy document.  It reflects -- it's a

10   receipt is what it is, it's a receipt reflecting payments to

11   Dr. Lieber back in 2012, $50,000, more or less, in the bank.

12   In other words, we're talking about deposits that are

13   substantial, that are significant, that are going to very

14   easily trigger the $10,000 reporting requirement.

15          As to the third point, the Defendant knew that he had

16   an obligation to file an FBAR for a couple of reasons.  The

17   first is that the Defendant's tax returns told him that he did.

18   You heard yesterday from IRS Revenue Agent Ranahan that there's

19   a particular question on Schedule B to the IRS 1040 that

20   notifies the taxpayer of their obligation to report foreign

21   bank accounts, and it specifically mentions FBAR.

22          The Defendant signed those Forms 8879 for both the

23   2013 and 2014 tax years.  If you look at those forms, which,

24   again, the Defendant signed, he's acknowledging that he's

25   reviewed the returns.  He's reviewed the returns, and he

1    becomes aware of his obligation to file an FBAR.

2           He was also aware of his obligation to file an FBAR

3    because that's what Carl Goodman told him.  Carl Goodman was

4    his tax preparer who testified yesterday.  Carl Goodman sent

5    the Defendant retainer letters in 2013 and '14 and '15.  Those

6    are Exhibits 240, 245 and 249.  Those letters contain a very

7    robust FBAR warning, Tell me about your foreign bank accounts,

8    and if the balance is over a certain amount, we're going to

9    have to report it.

10          One of those engagement letters was signed by the

11   Defendant on January 6th, 2016.  That is five months before the

12   deadline for filing his 2015 FBAR, which is Count 6 of the

13   indictment.  So five months before the filing deadline, he is

14   signing a document that is telling him, Disclose your foreign

15   bank account, you have a legal obligation to do so and to file

16   an FBAR under certain circumstances.

17          The Defendant knew about the FBAR rule, and he ignored

18   the rule.  As you heard, no FBARs were filed in either 2014 or

19   2015.  And it's obvious why the Defendant didn't file an FBAR.

20   His ICBC bank account in Wuhan, China, was a place for him to

21   park money without paying taxes on it.

22          There was no need for him to have to set up a bank

23   account in China.  He could have had Wuhan University wire him

24   the money into a bank account in the United States, he could

25   have had them write him a check and carry it back with him.  He

1    chose to set up this account and to park the money there.  And

2    so filing an FBAR would have completely eviscerated his plan to

3    keep that money secret, and so he didn't file FBARs, and he

4    concealed the account from the Government.  That is why he is

5    guilty of Counts 5 and 6.

6            The next group of charges are Counts 3 and 4.  Those

7    charges allege that the Defendant subscribed to material and

8    false income tax returns for the 2013 and 2014 tax years.  And,

9    again, Judge Zobel will give you all the particulars as to the

10   legal elements of those charges; but for now, I'd ask you to

11   focus on three things:

12           First, that the Defendant earned substantial income in

13   China, cash payments and payments into his bank account, in

14   2013 and 2014; the Defendant did not report any of that income

15   on his tax returns; and, third, that he signed those tax

16   returns under the pains and penalties of perjury.

17           I'll start with the third point because that's

18   probably the lowest hanging fruit.  You saw yesterday, again,

19   the Form 8879s.  Those were the forms that the Defendant signed

20   and authorized his tax preparer to submit the returns on his

21   behalf.  Read the fine print in the middle of that form.  The

22   Defendant acknowledges that he reviewed the returns, the

23   returns are accurate, and that he signed the returns under the

24   pains and penalties of perjury.

25           And, again, if you want to make a note, those are

1    Exhibits 248 and 177.  And they satisfy the particular element

2    of Counts 3 and 4 that requires that the Defendant sign the

3    return under the pains and penalties of perjury.

4         As to this first point, that the Defendant earned

5    income, it is not reasonably in dispute in this case.  The

6    Defendant earned income in China in 2013 and 2014.  You know

7    this because the Defendant admitted that he did in his

8    interview with Special Agent Spice and Special Agent Plumb.

9         You saw the Defendant's trip summaries to Wuhan

10   University in 2013 and 2014.  Those are those documents that

11   Renee Donlon said she prepared that had the trip summary

12   language at the top, his flight information, his hotels, all

13   that stuff.  Those trip summaries reflect the fact that the

14   Defendant traveled to Wuhan one time in 2013, in April; and he

15   made two trips in 2014, one in February and one in November.

16        The Defendant said during his interview on the day he

17   was arrested that he was paid 10,000 or $20,000 every single

18   time that he went to Wuhan University, and he said that they

19   deposited an equal amount of cash into his bank account.

20        Take a look back through the email exhibits that you

21   saw and heard about during the trial, and you'll see that

22   before all three of these trips, the one in 2013 and the two in

23   2014, the Defendant emails Professor Mai or Fan about his

24   salary before he takes the trip.

25        In Exhibit 154, right before his trip to Wuhan in

1    April of 2013, the Defendant asked Mai to deduct from his
2    salary expenses associated with a thesis-defense party that the
3    Defendant is going to be attending during his trip in April.
4    Several months after that, at the end of the year, in December
5    of 2013, in Exhibit 168, the Defendant emails Mai and is
6    complaining about the fact that he hasn't been paid since the
7    summer, really right after he had visited in April.
8            And then, three days after that, in Exhibit 166, he
9    emails his confident in China, Xiaojie Duan, and he tells her
10   that he's planning a trip to Wuhan so that he can collect his
11   salary.  And then, sure enough, two months later, the Defendant
12   goes to Wuhan, in February.  And right before he goes, in
13   Exhibit 44, he emails Fan, and he confirms, Half my salary in
14   cash, half in the bank account.
15           And again, in November of 2014, right before he goes
16   to Wuhan, he emails Fan again, again, confirming the payment
17   arrangement, Half my salary in cash when I come, half in the
18   bank account.
19           Three trips to Wuhan, ten or $20,000 each trip,
20   according to Lieber himself.  That's between 30,000 and $60,000
21   in 2013 and 2014, and that's just cash alone; that doesn't
22   include any amounts that are put into his bank account, which
23   you heard from Special Agent -- or Revenue Agent Ranahan is
24   taxable to the same extent as if he takes the cash.
25           In other words, just because it goes into his bank

1    account doesn't mean it's not subject to U.S. tax laws.  It is.

2    But if you just assume the 30,000 to 60,000 in 2013 and 2014,

3    that amount of money matters to the IRS.  That amount of money

4    affects their ability to calculate the amount of tax that

5    somebody owes.

6         Special Agent Ranahan -- or Revenue Agent Ranahan did

7    some calculations for you yesterday.  She assumed for tax year

8    2013 that there was only $20,000 of undisclosed income, and you

9    saw that that affected the amount of tax in a significant way.

10   It increased it by about 7,500 bucks.  If the amount goes up to

11   $40,000, then the amount of tax liability goes up by almost

12   $15,000.  So you can see the more money you're disclosing, the

13   more taxes you owe.  By the same token, the more money that

14   you're not disclosing, the more that you are understating the

15   amount of taxes that you owe.

16        It was also significant to the IRS that Lieber

17   answered no to that question on his 2013 and 2014 tax returns

18   about having a foreign bank account.  If you go back through

19   the returns, which I know you are all dying to do, but if you

20   dig deep in there, it's in the 30s, you're going to see on

21   Schedule B the question about foreign bank accounts.  Both

22   years the answer is no.  And, again, not disclosing a foreign

23   bank account affects the IRS's ability to figure out how much

24   tax you owe.

25        As to this second point, it is a fact that the tax

1     returns in 2013 and 2014 did not report any income from Wuhan
2     University or anywhere else in China.  It is also a fact that
3     the Defendant knew that the money he had received from Wuhan
4     University in those years had not been reported to the IRS, and
5     he knew that was improper.  How do you know that?  Because the
6     Defendant said so.  He said, on the day of his arrest when he
7     was being interviewed, that he did not declare the money to
8     anyone.  And when he was asked to confirm that he didn't pay
9     taxes on the money, he said something that I'm sure you all
10    knew before you even came into this Courtroom today, that that
11    was obviously illegal.  He knew that because that was his plan
12    all along.  He never had any intent to report any of the money
13    that he was receiving from Wuhan on his taxes, going all the
14    way back to 2012, when he set up the bank account in China and
15    he made this payment arrangement with Liqiang Mai, half in cash
16    half in the bank account.
17            Again, think of it this way:  The Defendant just as
18    easily could have asked Wuhan to wire the money to his bank
19    account in the United States or to write him a check.  He
20    wouldn't have had to worry about carrying bags of cash through
21    the airport and on airplanes.  He wouldn't have had to worry
22    about how he was going to go about withdrawing money from a
23    bank account in China.
24            But those things, a wire transfer or a check,
25    presented different problems for the Defendant, tax problems.

1    If you're trying to conceal money from the Government, you

2    operate in cash.  Cash doesn't come with a 1099.  The only way

3    the IRS is going to know about cash you received is if you tell

4    them, and the Defendant did not tell them.

5            So, again, go back and listen to the Defendant's

6    interview.  He admits that the money was not declared.  When

7    he's asked to confirm why he didn't pay taxes on it, he says

8    that was illegal.  He knows his actions were wrong.  He knows

9    that he was required to report the money.  He knows that he did

10   not report the money.  That is why he is guilty of Counts 3 and

11   4.

12           That brings us to Counts 1 and 2, and those are the

13   false statement counts.  Count 2 charges the Defendant with

14   causing Harvard to tell National Institutes of Health that he

15   was not and had never been a participant in the Thousand

16   Talents Program.  I'm going to ask you to focus on four things

17   that prove the Defendant is guilty of this offense.  He caused

18   Harvard to make a statement, that statement was false, the

19   Defendant knew it was false, and the statement was material or

20   it was important to NIH.

21           Let's talk about the first point, which really starts

22   with Dr. Lauer.  He's the Deputy Director of Extramural

23   Research at NIH who testified yesterday.  He said in 2018 he

24   received some information about Dr. Lieber, NIH conducted some

25   of their own research, and the information they discovered was

1    concerning to them and to Dr. Lauer, and so he wrote a letter
2    to Harvard about it.

3         He sent that letter on November 30th, 2018, and he
4    asked for a response.  That letter is Exhibit 2.  Harvard
5    received the letter around that time, and they asked
6    Jennifer Ponting to spearhead Harvard's efforts to respond to
7    the letter.  And one of the main things that she did in order
8    to prepare her response was she talked to the Defendant, and
9    she did that with one of her colleagues, Matthew Fox.  That
10   interview occurred on December 14th, 2018.

11        Before that interview, Ponting and Fox provided the
12   Defendant with a list of the questions that they wanted to ask
13   him during the interview.  One of those questions, "Have you
14   ever participated in the Chinese government's Thousand Talents
15   Program?"  That's Exhibit 104.

16        Jennifer Ponting told you that she asked the Defendant
17   that question when she met with him on December 14th, 2018, and
18   the Defendant said he never participated in the Thousand
19   Talents Program.  And he explained what he meant by that.  The
20   Defendant said that he had been invited to participate by a
21   number of Chinese universities but that he had declined those
22   invitations, he did not say yes because he believed it entailed
23   too much of a time commitment, particularly in China.

24        Keep that in mind when we get to Count 1 when he says
25   something completely different to the DoD Agents.  He declined

the invitations because the time commitment did not work with
his schedule.  Therefore, he never participated in the Thousand
Talents Program.  And so, based upon what the Defendant told
her, Jennifer Ponting drafted a response to NIH, and in that
response it said, "Dr. Lieber has represented that he is not
and has never been a participant in China's Thousand Talents
Program."

There's one very important fact to remember about
Count 2.  The false statement that is charged in Count 2 is the
false statement in Harvard's letter to NIH on January 10th,
2019.  The important thing to remember is that the Defendant
reviewed and approved that letter two days before it went out
the door.  That's Exhibit 108.

The Defendant was sent the letter, he reviewed the
letter, he submitted comments to the letter.  He did not say
that the statement about never having participated in the
Thousand Talents Plan was wrong, he didn't ask for it to be
removed, he didn't say it was inaccurate.  After the Defendant
reviewed and did not object to that sentence and other aspects
of the letter, he did have some other comments.

Mr. Ponting -- or Ms. Ponting sent the letter to NIH
on January 10th, 2019.  And, again, that's the letter that
contains the false statement that's charged in Count 2.  It was
the Defendant, through his statements to Ms. Ponting and his
approval of the letter, who caused that statement to be made.

1            As to the second point, that the statement was false

2   and that the Defendant knew it was false, there is overwhelming

3   evidence.  The Defendant was not just a participant in the

4   Thousand Talents Program; he was an active participant.  He

5   actively engaged in a contract negotiation with Wuhan

6   University between April and July of 2012.  He reviewed an

7   initial draft of the contract -- that's Exhibit 17A -- in

8   April, 2012.  He discussed various changes and revisions to the

9   contract with Professor Mai when Professor Mai visited Harvard

10   in April of 2012.  Again, that's reflected in Exhibits 18 and

11   24.

12            The defendant then received a revised version of the

13   contract in Exhibit 23 and 24 that incorporated his suggested

14   revisions, and we walked through some of those I think on the

15   second day of trial where I put side by side the particular

16   provision of the contract that talked about Dr. Lieber's

17   responsibility and how much time he would need to spend at

18   Wuhan.  The early version of the contract had very strict,

19   rigid language.  It said, Dr. Lieber shall -- and I'm

20   paraphrasing -- shall work at Wuhan University for nine months

21   of the year, which, obviously, wouldn't work for a full-time

22   professor at Harvard.  And so he worked with Mai on the

23   language, and they softened it.  And in Exhibit 23, you see

24   that it basically allows him to do all of this work for Wuhan

25   University from his office at Harvard.  That was the change,

1    among others, that the Defendant negotiated.

2          The Defendant accepted, in an email, this revised

3    contract, and he talked about how they could go about signing

4    it.  Three days later, the Defendant acknowledged that he

5    received the documents via DHL, and these were the formal

6    copies of the contract, not this draft without page numbers

7    that they had been looking at before that, and it's two

8    documents.  It's a Chinese document, and it's an English

9    document with all the fancy seals I'm sure that the defense was

10   pointing out through their questions of some witnesses.  And

11   the Defendant says he will sign it and return it.  And he does

12   sign it.  And Wuhan receives it.  And they have an agreement.

13         After that point, the evidence, again, is

14   overwhelmingly clear that the Defendant acted, often at

15   Professor Mai's direction, in accordance with the contract.

16   When Professor Mai asked the Defendant to send him materials

17   for his Thousand Talents summary, things like passport photos

18   and biographies, the Defendant provides them to him.

19         When Professor Mai asked the Defendant to review

20   manuscripts, the Defendant generally did.  When he asked the

21   Defendant to add Wuhan University's name to certain papers,

22   again, you saw the Defendant did that.  And in one instance, he

23   actually put Wuhan University above Harvard, which is exactly

24   what the contract said he should do.

25         When he asked Dr. Lieber to add Chinese grants to the

1  acknowledgment section of one of his papers, the Defendant did

2  that.  In late 2013, at Dr. Mai's suggestion, the Defendant

3  agreed to host another Wuhan University student in his lab at

4  Harvard.  Also at Professor Mai's suggestion, the Defendant

5  signed, on behalf of Harvard University, an academic

6  cooperative agreement.

7        Professor Mai told the Defendant that that agreement

8  was particularly important to the Defendant's One Thousand

9  Talents Program, which, by the way, is a reference that you see

10  really only after the Defendant has agreed to the contract.

11  "Pursuant to your One Thousand Talents Plan," or, "This is very

12  important to your One Thousand Talents Plan."  That's the

13  language that Professor Mai is using after the Defendant has

14  agreed to this contract.

15        And in 2014, the Defendant makes plans with

16  Professor Mai to expand the Wuhan-Harvard Joint Nano Lab.  They

17  talk about building up the nanobio component of the lab.

18  You'll see that in the some of the exhibits.  And he

19  recommended a particular researcher for a full-time faculty

20  position at Wuhan who might be able to oversee that sort of

21  expansion of the Lab.

22        And this was equally clear that the Defendant was paid

23  for his work.  He was paid in 2012, he was paid in 2013, he was

24  paid in 2014, and he had big plans to do more with Wuhan

25  University in 2015.  There's an email, which we're going to

1    come back to in a few minutes, from January 27th, where the

2    Defendant essentially outlines his plan for 2015, talks about

3    visiting more, being very available to Wuhan students as an

4    advisor, things like that.

5         That was his plan on January 27th, 2015, until

6    January 29th, 2015, when Jeremy Bloxham confronted him about

7    the Harvard-Wuhan Joint Nano Lab that the Defendant had never

8    told anyone at Harvard about.  And, again, we're going to come

9    back to that in a minute.  And here are some of the exhibit

10   references that I've just referenced.  I'm not following my own

11   slideshow.  I apologize.

12        The Defendant also admitted, after his arrest in

13   January, 2020, that he probably did sign a Thousand Talents

14   document with Wuhan and that he shouldn't have had an agreement

15   with Wuhan and accepted money.

16        Based upon all of the evidence, there is little

17   question that the statement charged in Count 2 in Harvard's

18   letter to NIH was false and that the Defendant knew it was

19   false.  He did participate in the Thousand Talents Plan, and he

20   knew he had participated in the Thousand Talents Plan.

21        As you examine what the Defendant knew, you should

22   also consider some of the other statements that the Defendant

23   made to Jennifer Ponting and Matt Fox when they met in

24   December, 2018.  The Defendant made other false statements

25   during that interview about his relationship with Wuhan

University of Technology.  He said he never had an appointment there, and he said that he was never paid by Wuhan, except for travel-related expenses.  But of course he had an appointment there.  You saw the plaque, it's right over there, "Strategic Scientist Appointment."  He had that since 2011.

And we've already covered the Defendant received significant compensation for a lot of things other than just his travel; salary.  The take-away from this is that the Defendant had absolutely no intent of being truthful with Jennifer Fox or Matt -- Jennifer Ponting, rather, and Matthew Fox or Harvard University during that interview.  His false statement about participating in the Thousand Talents Program was intentional.

Finally, Dr. Lauer, again, from NIH, told you yesterday that the Defendant's statements in that letter from January 10th, 2019, were important to him and to NIH. Harvard's response, which, you know, described portions of the Defendant's statement, including the one charged in Count 2, led him to believe there was no real concern about Dr. Lieber. There was no evidence of budgetary overlap or commitment overlap or a financial conflict of interest that he could see and that all of this seemed to be based, as Harvard said, on a misunderstanding of the facts.

And without any sort of concerns whatsoever about Dr. Lieber based upon the things that he says, Dr. Lauer closed

1  NIH's compliance review.  And he said that, if he received

2  different information, information indicating that the

3  Defendant had participated in the Thousand Talents Program at

4  any point in time, he would have expanded their review.  He

5  would have asked for documents, he would have possibly put the

6  Defendant's grant funding on hold; and there were a number of

7  potential remedies that might have flowed from whatever they

8  found as a result of that enhanced inquiry.

9          So, to summarize, the Defendant caused Harvard to tell

10  NIH that he had never been a participant in the Thousand

11  Talents Program.  That statement was false.  The Defendant knew

12  and had to have known that that statement was false, and

13  because that false statement mattered to NIH and it influenced

14  their decision-making, the Defendant is guilty of Count 2.

15          That brings us to Count 1.  The Defendant is charged

16  in Count 1 with making two false statements during his

17  interview with DCIS Agents Amy Mousseau and Ben Hochberger, in

18  April, 2008.  The first statement, that he was never asked to

19  participate in the Thousand Talents Program; and the second was

20  that he was not sure how China categorized him with respect to

21  the Thousand Talents Program.

22          And just with as Count 2, I'm going to ask you to

23  focus on four things that will prove to you the Defendant's

24  guilt as to this count beyond a reasonable doubt:

25          First, the Defendant made these false statements;

1    second, the Defendant's statements were material or -- I'm

2    jumping ahead -- the Defendant's statements were false; the

3    defendant knew his statements were false; and, lastly, the

4    Defendant knew the statements were material.

5         As to the first point, you heard from DCIS Special

6    Agent Mousseau yesterday.  She testified that, similar to

7    Dr. Lauer, she had received some information about the

8    Defendant that suggested he might have affiliation with the

9    Thousand Talents Program through Wuhan University.

10        And at the time, Special Agent Mousseau was in the

11   middle of this sort of long-term project that focused on grant

12   fraud, she had conducted a number of different interviews

13   pursuant to that long-term project, and she was in the process

14   of transitioning it over to Special Agent Hochberger.  And so

15   they worked together to set up an interview with the Defendant,

16   which they did on April 24th, 2018.

17        The purpose of that interview, she said, was to ask

18   the Defendant about his relationship with the Thousand Talents

19   Program and then seeing what, of course, what his responses

20   were but then what the implications might be on his DoD-funded

21   research.  Special Agent Mousseau asked the questions during

22   that interview, Special Agent Hochberger took notes; and then,

23   based upon those notes and his memory of what happened during

24   the interview, Special Agent Hochberger drafted a report, a

25   report of the interview.

1          Special Agent Mousseau testified that the topic of the

2    Thousand Talents Program came up during the interview, and she

3    testified, and the stipulation -- you heard in the stipulation

4    that was read to you, that both Special Agent Mousseau and

5    Special Agent Hochberger recall the Defendant saying that he

6    was not sure how China categorized him with respect to the

7    Thousand Talents Program.

8          The report of the interview, which is in evidence,

9    Exhibit 322, reflects that statement; and so do Special Agent

10   Hochberger's notes of the interview, which are Exhibit 323.

11   Those are all consistent.  The report of the interview further

12   indicates that the Defendant said that he was never asked to

13   participate in the Thousand Talents Program.  There's

14   absolutely no reason why you could not or should not rely on

15   that portion of Special Agent Hochberger's report in support of

16   Count 1.

17         As a foundational matter, Special Agent Mousseau

18   testified that she went to interview the Defendant really

19   solely to sort of ask this question.  That was the reason that

20   she was there, to figure out what affiliation, if any, the

21   Defendant had with the Thousand Talents Program.  So, of

22   course, she asked Lieber about it.  There's, I don't think,

23   really any question about that.

24         And, in fact, the question about whether he was ever

25   asked to be a member of the Thousand Talents Program is

1    reflected in Special Agent Hochberger's notes on Page 4 at the

2    bottom.  It's clear from the report and the notes that

3    Dr. Lieber was asked whether he had ever been asked to be a

4    member of the Thousand Talents Program, and Lieber said that he

5    wasn't.  That's what Special Agent Hochberger's report says

6    because that's what the Defendant said.

7         As to points -- the second two bullet points, the

8    proof is essentially the same as what I just described to you

9    in Count 1.  The history of the Defendant's relationship with

10   Wuhan University, as reflected in his own emails and

11   statements, make very clear that the two statements charged in

12   Count 1 that I just described were false and that the Defendant

13   knew that they were false.

14        You know that the Defendant was asked by Wuhan

15   University to participate in the Thousand Talents Program, and

16   you know because Jennifer Ponting told you when she testified

17   that the Defendant admitted to her that he had been asked by

18   multiple universities in China to participate in the Thousand

19   Talents Program.  And he was aware that he had been asked

20   because, when Wuhan asked him, he agreed to participate, and he

21   did participate personally and substantially, and he knew how

22   China categorized him because he was a member and a

23   participant.

24        And you also heard what the Defendant said about his

25   interview with the DCIS agents after he was arrested in

1   January, 2020.  In Exhibit 305, which is one of the video clips

2   you saw, when specifically asked about his interview with the

3   DCIS Agents, the Defendant said, "I did do something wrong."

4   And then he said, "I was not completely transparent with the

5   DoD investigators by any stretch of the imagination.  I was not

6   completely transparent with the DoD investigators by any

7   stretch of the imagination."

8        What he meant was:  I didn't tell them the truth about

9   my relationship with the Thousand Talents Program.  I did not

10  tell them that I was asked to participate.  I did not tell them

11  that I did know how China categorized me.  That's what the

12  Defendant meant when he said he was not completely transparent.

13  A few minutes later during the interview, when asked why he was

14  not honest with the DoD investigators, he said, "It was wrong.

15  What can I say?  It was wrong."  Why was he not truthful?  He

16  said he was scared of being arrested, "Like I am now."  You

17  don't have to guess or speculate or wonder if the Defendant

18  made false statements to the special agents during that

19  interview because the Defendant himself has said that he did.

20        And, lastly, as to Count 1, Special Agent Mousseau

21  testified yesterday that the Defendant's statements to her were

22  important; that much like Dr. Lauer, when he read Harvard's

23  response, Special Agent Mousseau heard what the Defendant was

24  saying; and she read those emails from 2015 that the Defendant

25  had sent to Professor Mai saying essentially cease and desist,

1    she read those and said, Oh, this is a misunderstanding.   I

2    think Charlie Lieber is the victim here.   And so she did

3    nothing further with the inquiry.   In reality, DCIS was the

4    victim, the victim of the Defendant's false statements.

5         One last question you might ask yourself as you're

6    deliberating is:  Why?  Why did the Defendant get involved with

7    Wuhan University and the Thousand Talents Program in the first

8    place?  Why did he not tell DoD and NIH the truth?  The answer

9    to the first question you already know because the Defendant

10   told you and told the FBI on the day he was arrested.   He

11   wanted to win a Nobel Prize, he wanted to be recognized for

12   what he'd done, and he thought he would go to China and link up

13   the Thousand Talents Program and accomplish those things.

14   That, and of course the money that he was paid, explains why he

15   went to Wuhan, it explains why he participated in the Thousand

16   Talents Program.

17        Why did the Defendant not tell DoD and NIH the truth?

18   That's an easy one, too.  In January 29th, 2015, Dr. Lieber

19   catches the Defendant with his hand in the cookie jar.   He

20   finds out about the Harvard-Wuhan Joint Lab, which he has never

21   heard anything about and that no one at Harvard seems to know

22   anything about, and he goes to confront the Defendant about it.

23        At the time, the Defendant knew he had signed

24   agreements with Wuhan, he knew that he had been paid by Wuhan,

25   he knew that he allowed Wuhan to use Harvard's name.   In fact,

1    he himself had promoted Harvard at Wuhan.  He knew that he had

2    done all of this without telling anyone at Harvard, and he knew

3    he had a lot on the line.  He was about to become the Chair of

4    the Chemistry Department at Harvard.  He was actively vying to

5    get nominated for the Nobel Prize.

6            Two days before that, on January 27th, 2015 -- I

7    referenced this earlier -- the Defendant emailed Professor Mai

8    and was telling him all the great things he was going to do for

9    Wuhan in 2015 and all the trips he was going to make and all

10   the ways he was going to help Wuhan students.  Two days later,

11   that changed.  That's when Jeremy Bloxham confronted the

12   Defendant about the Wuhan Lab.

13           With everything on the line, what did the Defendant

14   do?  He made up a story.  He acted completely surprised when

15   Bloxham confronted him about the Lab.  He pretended like he

16   didn't know anything about it.  And then he sent an email to

17   Professor Mai saying, Cease and desist, stop, this is beyond

18   the terms of our agreement, which, of course, was not true.

19           After things calm down, after he was able to convince

20   Jeremy Bloxham that his relationship with Wuhan was really

21   nothing extraordinary, it was sort of typical of what academics

22   do, he thought this was all behind him; that is, until April of

23   2018 when he's sitting in the room with two DCIS investigators,

24   Mousseau and Hochberger, and two Harvard administrators,

25   Roseanne Luongo and Elizabeth Lennox, and they are asking him,

1    the DCIS Agents, questions about the Thousand Talents Program

2    and Wuhan University.

3            The Defendant cannot possibly tell the truth in that

4    interview.  If he does, he will be revealing that he was not

5    truthful with Jeremy Bloxham, that he had violated Harvard's

6    policies by committing Harvard to agreements with Wuhan

7    University, that he had purposely and knowingly slapped

8    Harvard's name on the side of the Wuhan-Harvard Joint Nano Lab.

9    He can't tell the truth.  He has to stick with the same false

10   story that he told Jeremy Bloxham in April -- or in January,

11   2015, a story, by the way, that he's had two and a half years

12   to rehearse, and so that's what he does.

13           And then it comes back around on him in December,

14   2019.  NIH is knocking this time, asking questions about Wuhan

15   and the Thousand Talents Program, and so he's interviewed again

16   by Harvard.  And, again, he has to continue to perpetuate this

17   same false story.  The stakes are even higher now.  He's told

18   another round of false statements in front of Elizabeth Lennox

19   and Roseanne Luongo months before, and so he continues to

20   perpetuate that same story, ignoring everything that happened

21   and that he did with Wuhan University between 2012 and 2015.

22           He purposely chose to conceal the truth in 2019 with

23   NIH and Harvard because he knew that, if he had told the truth,

24   his career would be on the line, his grant money would be on

25   the line.  You don't have to ignore what happened prior to 2015

```
 1   with the Defendant and Wuhan University and the Thousand
 2   Talents Program.  You don't have to ignore the Defendant's
 3   emails, his untarnished emails that he sent when he didn't
 4   think anyone was looking.  Look at the evidence in this case,
 5   trust your common sense, and that will lead you to the only
 6   verdict that is consistent with the evidence:  Guilty on all
 7   counts.
 8            Thank you.
 9            THE COURT:  Let us stretch.
10            (Stretch break.)
11                  DEFENDANT CLOSING ARGUMENT
12   BY MR. MUKASEY:
13            Their main witness is missing.  The contract they're
14   talking about is missing.  The interview questions and answers
15   are missing.  The deposit in a foreign bank account of even one
16   dollar is missing.  The dates, the years and the source of any
17   payment is missing.  Ladies and gentlemen, the proof on every
18   charge in this case is missing.
19            Without these critical items of proof, without the
20   evidence that's missing, the Government cannot prove the
21   charges in this case beyond a reasonable doubt, and that's
22   because their case is made up of three weak links.  The mystery
23   man, Mai, a draft document that they call a contract, and the
24   video clips, and not one of them saves the Government's case.
25            First, the mystery man, Mai.  Isn't it troubling that
```

1    nobody spoke to Liqiang Mai, that the Government's star witness

2    is a mystery man with an agenda that probably nobody knows?

3    What authority does Liqiang Mai have?  Who does he really work

4    for?  Does he work for the Wuhan University of Technology?

5    Does he work for the Thousand Talents Program?  Isn't it

6    troubling that he never set foot in this Courtroom, that the

7    FBI in China never went to talk to him, that not a single

8    Government witness can vouch for this guy?

9           Would anybody on this jury or in this Courtroom buy a

10   house or buy a car from a guy they've never met halfway around

11   the world based on an email that he sent?  Not a chance.

12   Without ever having checked him out?  Isn't it troubling that

13   the Government uses emails from a guy who we've never met, who

14   we know nothing about?

15          Now, it's not like this Mai guy is central to

16   Charlie Lieber's life.  We saw about 40 emails from this guy.

17   Charlie had 90,000 files on his devices.  Mai is a nobody.  The

18   Government wants you to consider his emails to Charlie for some

19   sort of context, but would anybody consider these emails from

20   nowhere for anything?  I mean, would anybody make a decision

21   that's important in their life based on the words of

22   Liqiang Mai or, even worse, based on a ten-year-old email from

23   Liqiang Mai?  The answer is no.  And that's got to give you

24   some serious misgivings about the Government's case.

25          Second, isn't it a serious problem that the Government

1    relies so heavily on this contract, Government Exhibit 23?

2    This is the document they say is Charlie Lieber's secret

3    Thousand Talents Program contract.  This is their proof that he

4    participated in the Thousand Talents Program.  Well, first of

5    all, ask yourself, Does that even make sense?

6         Charlie wasn't going over to Wuhan because he was

7    obligated to under some contract.  You saw evidence in this

8    case that he'd been traveling to mentor students and give

9    speeches and lectures in China way before this contract in 2009

10   and 2008.  He wasn't traveling based on some contract.  But

11   this thing they call a contract, does this seem in any way

12   reliable to you as common-sense people?  Take a look at this

13   thing.  It's like a bad joke.

14        The Government wants you to believe this is an

15   official Wuhan University Thousand Talents Program Chinese

16   Ministry contract.  Does this look like an official anything to

17   you?  It looks like an official piece of trash.  Go through it

18   in the jury room.  That should be the first thing you look at.

19   Go through it in the jury room and see if you think you can

20   rely on it.

21        First of all, where did this thing come from?  Who

22   drafted it?  Who translated it?  What authority did that person

23   have?  Should we ask the mystery man, Mai?  I mean, I guess

24   that's not possible.  Check out whose letterhead -- oh, it's

25   not on anybody's letterhead.  This very official Chinese

1     government document has a spelling error on the first line of

2     the first page.  And by the way, it doesn't have any page

3     numbers.

4            Well, maybe we can look at the signatures, so let's go

5     to the sig -- oh, it has no signatures.  It's full of holes and

6     errors and mistakes and misprints.  It has no signature, no

7     seal, no start date.  And take a look at the terms of it.  I

8     mean, ask yourself, Does Charlie do anything in this contract?

9     It talks about living expenses in Wuhan.  He lives in

10    Lexington.  It requires work in Wuhan no less than nine months

11    a year.  Charlie's travel to Wuhan lasted for hours, not

12    months.

13           By the way, when Mr. Casey says Charlie didn't want

14    anybody to find out about his activities, where do you think

15    they got all these emails from?  They were on his Harvard

16    server.  He wasn't hiding anything from anybody.  His trip

17    summaries were on his Harvard server.  He wasn't hiding

18    anything from anyone.

19           This talks about, in the contract, getting $50,000 a

20    month before taxes and one million RMB after taxes.  Where is

21    that?  There's not a shred of evidence in this case that

22    Charlie Lieber got those amounts.  That would be, like, a total

23    of two million bucks.  Even the Government doesn't say he got

24    that.  So it's got to cause you serious doubt if the

25    Government's asking you to rely on this GX 23 to show that he

1    participated in the Thousand Talents Program.  This isn't up to

2    the level, this document is not up to the level of a kid's

3    first grade homework.  Could anyone seriously rely on an

4    unsigned mistake-laden contract?  That's got to prove serious

5    doubt in your minds.  That's got to give you serious doubt.  I

6    don't think it's worth the paper it's written on, and neither

7    should you.

8            Now, what does the Government say about this document?

9    The Government says it knows the contract was signed because it

10   points to Government Exhibit 26.  But, Ladies and Gentlemen,

11   Government Exhibit 26 refers to a completely different

12   document.  23, as you know, has alternating English and Chinese

13   for about nine pages.  But this email, Government Exhibit 26,

14   at the bottom, it talks about signing the pages that are one to

15   ten or so in Chinese and the second part, 11 to 20, in English.

16   That's not Government Exhibit 23.  That's nine pages long, not

17   20 pages long.  That's got alternating English and Chinese, not

18   a section in English and a section in Chinese.  So that refers

19   to a completely different document.  So, if Charlie signed

20   anything, it sure as heck ain't Government Exhibit 23, and that

21   has to cause you serious doubt if the Government's relying on

22   this document to prove anything.

23            And here comes the nail in the coffin on this supposed

24   contract.  I asked Agent Spice, "You don't know when this

25   document was drafted; correct?

1          "Answer:  No.

2          "Question:  How many people had input into its

3     drafting?

4          "Answer:  No.

5          "You don't know if it meets official Thousand Talent

6     Plan requirements?

7          "I do not.

8          "Question:  Do you even know if there are official

9     Thousand Talent Plan requirements?

10          "Answer:  I do not."

11          Nobody knows what the heck that document is.

12          Let me address the third weak link now of the

13     Government's case.  And this might surprise you, but I want you

14     to listen carefully.  The third weak link is the video clips.

15     Now, do those video clips made of Charlie after he was arrested

16     somehow work against him?  The answer's no.  Are they some sort

17     of confession?  The answer is definitely no.  We want you to

18     watch those video clips when you go back to deliberate because

19     they're really just a muddled mess of misunderstandings and

20     mistakes.

21          It's actually almost impossible to figure out who's

22     talking about what in those clips.  And that's no surprise --

23     right? -- because think about what's going on in those videos.

24     Remember, that interview is in January of 2020.  Charlie hasn't

25     been in Wuhan in six years at the time of that interview.

1   Wuhan is in the rearview mirror for him.  It's yesterday's

2   news.  The only thing that's even remotely related to Wuhan

3   that is even remotely in Charlie's head in January of 2020 is

4   that stupid trademark issue, whether Harvard gave permission to

5   use its name on a lab or not.  It's not a criminal issue;

6   that's a trademark issue.  That's what Charlie thought, Oh, I

7   may not have been straight up about that.  That's not a

8   criminal issue; that's, Did I get permission or not?

9          That had come up in the DCIS interview, that had come

10   up in the NIH questioning, and that's the only Wuhan thing

11   that's on Charlie's mind when he sits down with the FBI.  And

12   the truth is that, since his last trip to Wuhan six years

13   earlier, Charlie has spent, as you heard Anqi Zhang say this

14   morning, every waking minute teaching, researching,

15   experimenting, lecturing, traveling.  And, oh, by the way, when

16   he wasn't studying how to use nanowires to cure brain diseases,

17   he was fighting his own battle against cancer.

18          So, when DCIS Agents in Harvard suits show up and they

19   want to hear what People Plan or Strategic Scientist or

20   Thousand thing might have been offered to him six years ago,

21   ask yourself if that was really at the top of the things that

22   Charlie Lieber thought was important at the time.

23   Awards and photos and plaques and honors, this is what

24   Charlie Lieber thought about them.  Some are in the garbage,

25   some are in the laundry basket, and most of them are on the

1    floor.  That's what he's thinking about awards and honors and

2    talent things.

3            Now, stick with me on the videos.  When the FBI sits

4    down with him, they don't have any clue about Charlie.

5    Agent Spice told us yesterday, at the time of that interview,

6    she had been deeply involved in the case for one day, one day.

7    The Agents don't know anything about Charlie, they don't know

8    anything about the mix-up with the Lab, and they definitely

9    don't know anything about Charlie doing open public "meant to

10   be shared with the world," unrestricted work on research

11   grants.  They don't know that he hasn't been in Wuhan in six

12   years.  They've been on the case for one freaking day.

13           Now, they're not going to let their ignorance about

14   the case or about Charlie get in the way, and they start

15   hitting him in the videos -- right? -- they start hitting him

16   with emails from eight years ago, emails from nine years ago,

17   right out of left field, random emails.  And the documents

18   they're showing him in the video, they have, like, 74 different

19   names and iterations, and there's Strategic Scientists and

20   Thousand Talents and High-Level Foreign Expert and Thousand

21   People Plan and Recruitment Plan and Global Experts.

22           I mean, how is anybody supposed to know, especially

23   Charlie, who gets an award like every week, how's anybody

24   supposed to know what you're in, what you might have been in,

25   what you're categorized, what you might have been nine years

1    earlier, what you're out of, what you're in -- out of.

2         And Ladies and Gentlemen, the only thing more

3    dangerous than an FBI Agent conducting an interview on her

4    first day in a case with a document she doesn't understand is

5    two FBI Agents doing it.  And that's exactly what was going on.

6    And that's what makes the video a total mess.

7         And just think for a second about getting interrogated

8    by the FBI about emails from a decade ago.  I'm not sure,

9    frankly, that I could answer questions about my emails from

10   last week.  But you can be sure there's not a person on this

11   planet who wants to answer questions from their wife or their

12   boss or the FBI about a few random emails from nine years ago

13   or a bank account they never used or draft documents that are

14   unsigned, nine years ago.  That's not an interview; that's a

15   game of gotcha and an email ambush.

16        Now, what does this all mean?  It means that, when you

17   hear Charlie on the video clip sort of prosecuting himself --

18   right? -- you hear him saying, "That's illegal, and that was

19   wrong, and that's a no-no, and I was young and stupid," what

20   he's really saying is, This is all, like, kind of confusing,

21   and it's from, like, ten years ago, and I've been occupied with

22   my teaching and my health and my research, and I'm not sure if

23   I signed it and you have it.

24        But they don't have it.  They don't have it.  And you

25   can watch that video ten times or 20 times or whatever, and you

1    still won't be able to figure out if they're talking about this

2    agreement or that agreement or 2013 or 2014 or 20,000 bucks or

3    40,000 bucks or 50,000 a month or if it was a salary or

4    honorarium or a stipend.  It's a total cluster.  At the end of

5    the day there's nothing that comes out of those video clips,

6    nothing that gives you proof on any counts of the indictment.

7         And with that in mind, let's look at the counts in the

8    indictment, and let's look at them carefully.  The first two

9    counts, as Mr. Casey told you, charge false statements to DCIS

10   and false statements to NIH.  And on both of those counts, the

11   Government has to prove beyond a reasonable doubt that Charlie

12   made a statement, that the statement was false, that it was

13   intentionally false and that it was materially false.

14        This is not a lay-up; this is, like, a three-point

15   shot, maybe a half-court shot.  They can't get over those

16   hurdles on Count 1 or Count 2.  Remember we told you last week

17   that, if you're going to charge someone with making false

18   statements, you'd better have the exact statements.  Well, they

19   don't have the exact statements on Count 1 or Count 2.  They

20   have multiple moving, muddled, missing statements.

21        And let me start with the DCIS interview on Count 1.

22   So, Count 1, if you recall, Charlie's charged with making a

23   false statement to the DCIS Agents.  And you met Agent Mousseau

24   yesterday, and she and her partner show up, and they say that

25   they want to talk about a grant that Charlie's working on.  But

1    that's not really true.  They don't really want to talk about a

2    grant.  Some anonymous Google person found Charlie on some old

3    Chinese website, and they went to talk to him because he had a

4    lot of Chinese students working in his lab, like that's a

5    reason to be suspicious of someone, he had a lot of Chinese

6    students working in his lab.  But that's why they go talk to

7    him.

8         And this Count is dead on arrival because

9    Agent Mousseau testified yesterday she could not remember the

10   questions she asked Charlie about the Thousand Talents or the

11   answers Charlie gave about Thousand Talents.  And if the Agents

12   who conducted the interview cannot tell you what she asked and

13   cannot tell you what Charlie answered, you have no statement;

14   and if you have no statement, you have no crime.  So that's

15   enough to give you reasonable doubt on Count 1.

16        Ah-hah, but don't worry, says the Government.  We have

17   notes and reports of the meeting.  So let's look at the notes

18   and reports.  Remember what Agent Spice told you?  She's the

19   FBI Agent.  She told you that Federal Agents taking notes, you

20   have to be accurate, you have to be thorough, you have to be

21   clear, because each of your notes can be the difference between

22   proving a crime and not proving a crime.  But these notes are

23   moving targets.  They only muck everything up more.

24        Look at the handwritten notes, "Approached to be a

25   member."  Look at the typed report, "Not explicitly asked to be

1    a member."  Look at the indictment, "Never asked to

2    participate."  Three different statements, one's a question,

3    and one's an assertion.  Three different statements.  There is

4    no exact statement.  The only thing that carries from the

5    handwritten notes to the typewritten notes to the indictment is

6    this notion that Charlie said he wasn't sure how China

7    categorized him.

8            Now, with respect to the differences in these notes,

9    keep in mind the Government doesn't get to paraphrase, the

10   Government doesn't get to almost get it right.  Well, the

11   handwritten notes kind of look like the typewritten notes, and

12   the typewritten notes are sort of like the indictment.  That's

13   not how we do it in this country.  You don't get to fudge it.

14   You charge someone with a false statement, you'd better have

15   the false statement, and if you can't remember it, you'd better

16   have it written down; not three different ways.

17           But the only thing they have that's consistent is that

18   Charlie said he was not sure how China categorized him.  And

19   even if you focus only on that part of the statement, it's

20   proof of nothing.  To say that you're not sure how a foreign

21   country categorizes you strike you as an intentional lie?

22   Really?  You're not sure how a foreign country categorizes you,

23   what does that even mean?  How China categorizes him now or the

24   last time he was there?  Can that really be a lie?  Who is

25   sure?  I'm not sure how a foreign country categorizes me.  Does

1    anybody really know how anybody else categorizes them?

2         I asked Agent Spice if she knew how Wuhan categorized

3    Mai, and she said no.  I asked Agent Mousseau if she knew how

4    Harvard categorized Charlie, and she said no.  Is that a crime?

5    Of course not.  And how can saying you're not sure about

6    something be a crime?  Is there anything more honest than

7    saying, I'm not sure?

8         Now, the Government says Charlie should have known how

9    China categorized him based on the emails from the mystery man,

10   Mai.  Well, does that make sense to you?  Mai is the guy who

11   decides how China categorizes people?  Like, what is he, the

12   Prime Minister?  He doesn't decide how people -- how China

13   categorizes people.  He's not the grand-decider of how China

14   categorizes people or how Thousand Talents categorizes anyone.

15        It also makes no sense, by the way, that Charlie would

16   have intentionally lied about being asked to be in the Thousand

17   Talents Program.  Being in the Thousand Talents Program, it's

18   not a crime.  Being asked to be in the program, really, really

19   not a crime.  So why lie about it?  This count fails miserably.

20   There's no statement, there's no false statement, there's no

21   intentional false statement, and there's no crime.

22        So I'm going to move to Count 2, which is the count

23   that charges that Charlie caused Harvard to make a false

24   statement to the NIH.  The first thing I'll say about that is:

25   There is nobody who causes Harvard to do anything that Harvard

```
 1    doesn't want to do.  What happens here is that another guy on
 2    Google -- and maybe you're getting a theme in this case that
 3    it's sort of prosecution by Google -- another guy on Google
 4    went on a Chinese website and thought Charlie might have been
 5    selected for the Thousand Talents Program.
 6            So Dr. Lauer from NIH, he gets wind of this, and what
 7    does he do?  Does he stop Charlie's grants because he's
 8    in TTP?  No.  Does he yank back all the research money because
 9    Charlie is in the Thousand Talents Program?  No.  Does he
10    call the cops?  No.  He writes a letter to Harvard.  Does he
11    write a letter to Harvard saying, You'd better interview
12    Charlie Lieber, you'd better look at his emails?  No, he
13    doesn't do that.  He says, Hey, Harvard, tell us you're doing
14    your job since you're the ones who have our money right now.
15    Harvard got the grant money, not Charlie.
16            So Harvard gets together an army of lawyers,
17    compliance people, grant officials, research people, and they
18    basically say, Listen, guys, get together some response back to
19    NIH that protects our money, that protects our grant money.  So
20    two of these Harvard suits, Jennifer Ponting and Matthew Fox,
21    they show up to talk to Charlie.
22            He sits down, he talks to them, he answers questions
23    if he can, he didn't deny anything.  He tells them, Yeah, I
24    have been asked by a bunch of different places, a bunch of
25    different institutions, to be in the Thousand Talents Program,
```

1    but I would not live by their commitments.  I won't go over

2    there nine months a year.  And if I did decide to do it, I

3    wouldn't do it at Wuhan; I'd do it at a fancier school.  And

4    maybe Wuhan's claiming that I was in TTP, but I don't know.

5         So is that the statement that went to the NIH?  Hell

6    no.  Harvard lawyered that statement, Harvard changed the

7    statement, Harvard cut the statement, Harvard categorized the

8    statement, and a second version of Charlie's statement shows up

9    in an internal memo that Harvard created.  Then it gets

10   lawyered again and changed again and cut again, so there's now

11   a third version.

12        If you take a look at this demonstrative we have on

13   the screen, you'll see Dr. Lauer says, Well, we hear that

14   Charlie was selected as a foreign expert for China's People

15   Plan.  Then Matthew Fox says, Well, Charlie's been asked by

16   several institutions to participate in this.  Wuhan may have

17   claimed him.  But that's not what the Harvard internal memo

18   said.  That says, "He's informed us that he is not and has

19   never been a participant, although he was invited."

20        Then the letter to NIH says, "He's represented that he

21   is not and has never been a participant."  And then that

22   finally makes it into the indictment as a completely different

23   version.  It's like the kid game of Telephone.  I start out

24   saying something, I tell him, who tells her, who tells him, who

25   tells her.  By the end, it's a completely different statement.

1          Now, the Government's going to say, Well, Charlie had

2     a chance to correct it.  He was asked to make comments.  That's

3     a crock, it's a total crock.  Harvard was running this show,

4     and Harvard was doing what Harvard wanted to protect Harvard's

5     money.  Remember, there was another professor that NIH was

6     asking about who was also included in this letter whose name

7     was redacted.  That's the lawyers, that's what lawyers do.

8     Harvard was lawyering his letter.

9          Charlie only sees the part that he's asked to comment

10    on at the eleventh hour, and he makes some comments, and they

11    were rejected right before it was about to be sent to NIH.  And

12    after it's passed through 52 Harvard people and 46 Harvard

13    offices and 27 drafts and lawyered over by Harvard, the changes

14    Charlie makes are rejected, and the letter goes to NIH.  But

15    that letter did not have Charlie Lieber's words in it, did not

16    have Charlie Lieber's statement.  The statement that went was

17    Harvard's statement.

18         Now, was it an intentionally false representation

19    anywhere along the line by Charlie?  Absolutely not.  Harvard

20    has no policy against Thousand Talents Program.  NIH has no

21    policy against Thousand Talents Program.  There's no law

22    against the Thousand Talents Program.  In fact, Dr. Lauer told

23    us he's funding people with his grants who are in the Thousand

24    Talents Program, so why would anybody lie about it?  The

25    Government doesn't have a statement, they don't have a false

1    statement, and they certainly don't have an intentional false

2    statement.

3         Now, on Counts 1 and 2, there's one other issue that I

4    want to close out with, and that's the conflict of materiality.

5    On Counts 1 and 2, the Government's proof fails for lack of

6    materiality.  The Government has to prove beyond a reasonable

7    doubt that whatever Professor Lieber's statements were, they

8    were material, they were capable of influencing the Government.

9         Well, yesterday, Agent Mousseau told us what she cared

10   about, Dr. Lauer told us what he cared about, things like

11   procurement fraud, grant fraud, double-dipping, sharing secret

12   information.  But guess what?  None of that's in this case.

13   It's not even in this case.  So I suggest to you they can't

14   prove materiality.

15        Now, let me turn to the tax counts, Counts 3 and 4,

16   and I'm going to combine them for the sake of expediency with

17   Counts 5 and 6, the FBAR or the bank account charges, now the

18   tax accounts.  Charlie is charged with filing false tax returns

19   for 2013 and 2014 and that are supposedly false in two ways:

20   One, they didn't report income from Wuhan University; and, two,

21   they didn't report this foreign bank account.  I'll get to the

22   bank account potion in a second.  And on both of these counts,

23   the Government has to prove beyond a reasonable doubt that

24   Charlie knowingly and willfully filed a false tax return.

25        Now, here's how the Government gets there:  The

```
 1    Government says, Well, we have this crappy contract, Government
 2    Exhibit 23; we have Charlie saying he got money on the video a
 3    few times; and we have some emails talking about his salary.
 4    That sounds like it could lead to a false tax return.  But you
 5    can't get there that way.  That's not the way we do it in this
 6    country.  You need to have proof of each and every element.
 7          If you're going to charge someone with making a false
 8    statement, you've got to have the exact statement.  You'd
 9    better have the income statement or the payroll statement or
10    the bank statement or the yearly statement.  You'd better be
11    able to show how the statements were false.  You'd better be
12    able to show that Charlie knew they were false.  And they
13    haven't shown you any of it.
14          Where's the proof of income from Wuhan University?
15    It's not in this unsigned contract.  That says $50,000 a month
16    and a million dollars of RMB.  Even the Government doesn't
17    believe that.  We know that didn't happen.  So, have you seen a
18    W-2 or a pay stub to Charlie from Wuhan University?  No.  Have
19    you seen a letter from the HR Department at Wuhan?  No.  So how
20    is this income from Wuhan University?  Because Charlie said he
21    got paid when he went over there?  That makes it income from
22    Wuhan?
23          We know that Charlie and many other professors travel
24    around, get cash awards, get honoraria, get paid.  It's not
25    proof of income from Wuhan University.  And by the way, I'm not
```

1    sure you could take to the bank that Dr. Mai, the mystery man,

2    even works for Wuhan University or is authorized to disburse

3    funds on behalf of Wuhan University.  Agent Spice couldn't say

4    it.

5           Second of all, we have no proof of what year this took

6    place.  Watch the videos.  It's 2013; no, it's 2014; maybe it's

7    2013, I'm not sure; it's definitely not 2015 because he wasn't

8    in Wuhan in 2015.  The closest the Government comes to proof of

9    an amount is what Charlie sort of guessed at in the video.

10   Now, I'm not saying that if a guy says he got cash and he

11   carried it into the country, it doesn't raise some suspicion;

12   it does.  We don't convict on suspicion; we convict on proof.

13   We have no amount, we have no income, and we have no year.

14          And if you watch the clips, it's almost like you're

15   watching an auction.  The Agent is saying, Well, was it

16   $10,000?  And Charlie is saying, Well, I don't know.  Well, was

17   it $15,000?  Do I hear 20,000?  How about 30,000?  30,000 going

18   once, 30,000 -- maybe it's 50,000.  And Charlie's just sitting

19   there saying, Well, you know, I got something.  I don't

20   remember exactly what, and I don't remember exactly when.  So,

21   that's not proof beyond a reasonable doubt; that's a guessing

22   game.

23          And, by the way, if you need more proof of this, just

24   remember Agent Ranahan from the IRS who came in yesterday.

25   They didn't give her actual income figures because they don't

1    have them.  They gave her hypothetical figures so she can

2    compute some math about what money Charlie might owe based on a

3    hypothetical.  Now, I find it to be great news, that maybe I

4    can pay my taxes with hypothetical numbers.  I don't think

5    that's true, but that's what they're doing to prove Charlie's

6    taxes.  And remember, tax could have been withheld in China if

7    this was income.  We have a tax treaty with China.  So, really

8    you have nothing solid on Counts 3 and 4.

9         Now, let me address quickly Counts 5 and 6 because

10   this one is easy.  This alleges that Charlie, in 2014 and 2015,

11   didn't file one of these reports that says, I have a foreign

12   bank account that had over $10,000.  And that's actually the

13   easiest charge to get rid of.  You should probably go back to

14   the jury room and deal with those first because the Government

15   failed to prove beyond a reasonable doubt that at least $10,000

16   existed in that ICBC Bank account in 2014 and 2015.

17        In fact, the Government couldn't show that one dollar

18   ever made it into that bank account.  Go back and look at the

19   bankbook.  It's 000, blank, blank, blank.  The Government

20   couldn't show any money ever existed in that account, let

21   alone, by the way, in the year 2014 or 2015, zero dollar, zero

22   cents.

23        And by the way, the Government has to prove to you

24   beyond a reasonable doubt that Charlie knew about the reporting

25   requirement and acted with specific intent to violate that

1  requirement, and that means you have to find that he acted

2  voluntarily, intentionally and with a valid purpose.  Again,

3  the Government comes up empty-handed.  It's not just that

4  there's no money, no witness, no documentary evidence of any

5  money in that account; they don't even have anything to suggest

6  that Charlie actually knew about this reporting requirement.

7  So that's just an epic fail.

8          Ladies and Gentlemen, isn't it troubling that the

9  Federal Agents Googled their way to this case?  Isn't it

10  troubling that the FBI worked on this case for one day?  Isn't

11  it troubling that nobody in this Courtroom has explained what

12  the Thousand Talents Program is and who's in it?  Isn't it

13  troubling that Dr. Lieber's work was all public, was for the

14  benefit of the world, yet he's facing criminal charges for it?

15          Almost everyone got what they wanted in this case.

16  NIH and the Defense Department got to keep Dr. Lieber's grant

17  research.  Harvard got to keep their millions of dollars in

18  grant money.  The FBI got their big case after working hard for

19  one day.  But Charlie Lieber got left holding the bag.  His

20  meetings with DCIS and with the Harvard people, they lasted

21  about 45 minutes each.  The discussion of the Thousand Talents

22  Plan during those meetings probably lasted for a couple of

23  seconds.  Those couple of seconds resulted in this massive

24  Federal criminal case.

25          No villains, no victims, no one robbed, no one got

1    rich; but over a few seconds of conversation -- Special Agent

2    Mousseau called it a blip on the radar, a blip on the radar --

3    the world's greatest nanoscientist facing multiple felonies

4    over a discussion that lasted a nanosecond.

5            Charlie, it's been an honor for our team to stand up

6    and fight for you in this case.

7            Ladies and Gentlemen, I want to thank you, we all want

8    to thank you for your service to the country on this jury.

9    This is a time of year that's been challenging for people but

10   also they can be joyous for people.  It's Christmastime, but

11   please don't rush through your deliberations.  We need you to

12   pay full attention to all of the elements on all of the charges

13   in the case.  And if you get stuck on something or somebody's

14   particularly convinced on something, one of you should say,

15   Well, what would Marc say about that on behalf of Charlie, or

16   what would Torrey or Catherine or Stephanie or Sal, what would

17   they say on Charlie's behalf in that deliberation room?

18           The first thing that I said to you last week was that,

19   if you are going to charge someone with making false statements

20   in a criminal case that threatens to take away everything that

21   a man holds dear, personally and professionally, you damn well

22   better have the exact statements.  The Government doesn't have

23   any of it in this case.

24           Please don't ever forget that Charlie Lieber is

25   presumed innocent.  It's not a hunch, it's not a theory; it's a

1    commitment in your heart when you go back to deliberate, it's a

2    commitment in your heart that he starts out completely innocent

3    of the charges.  And even though we presented a little evidence

4    in his defense, it's not his burden to prove himself innocent;

5    it's always the Government's burden to prove him guilty beyond

6    a reasonable doubt.

7            They haven't done it in this case because they don't

8    have the precise statements, and you should deliver a verdict

9    on all counts of not guilty.

10           THE COURT:  How long do you anticipate to be?

11           MR. CASEY:  Five minutes.  Thank you, Your Honor.

12                        GOVERNMENT REBUTTAL

13   BY MR. CASEY:

14           When you go back to the jury room, play the video of

15   the Defendant's interview from January, 2020.  Watch his

16   demeanor during the interview.  He's not confused, he's not

17   disoriented, and in fact, he spends the whole, you know, first

18   30, 40 minutes sort of waving his arms about searching for

19   answers, not the truthful answers.  He's sort of feeling the

20   agents out, he's trying to figure out what he can say and what

21   he can get away with.  And then he starts seeing documents, and

22   all of a sudden, he remembers all the things that he was doing

23   prior to 2015, the bags of cash and opening bank accounts and

24   contracts.  He's not confused, and he knows exactly what he was

25   doing, and what he was doing was admitting that he made false

1    statements to DCIS and to NIH and that he filed false tax

2    returns.

3           Mr. Mukasey spent quite a bit of time talking about

4    Exhibit 23.  That's one of the emails that the Defendant

5    exchanged with Liqiang Mai about the Thousand Talents contract,

6    and of course it's a draft contract.  That's what they're

7    doing, they're negotiating the agreement.  It's not the

8    Government that's touting that contract; it was the Defendant

9    that touted that contract.  He's the one that said that it

10   looked good and that he wanted to sign, and then he did sign

11   it, not in that form, as Mr. Mukasey points out.  They'd

12   probably put a big fancy seal on it and make it a formal

13   document.

14          But that's not the point of Exhibit 23.  23 is a draft

15   document that they're negotiating.  And Dr. Lieber says, Yes,

16   these terms look good to me.  And Mr. Mukasey, when he read you

17   that part about Dr. Lieber's commitment in China, left out the

18   most important thing, that they added to the agreement language

19   that allowed the Defendant to work for Wuhan by organizing

20   conferences and advising students and publishing articles, all

21   from Cambridge.  That was language that the Defendant wanted in

22   the contract so that he could participate in the Thousand

23   Talents Program.

24          But, again, look at the entire body of emails that

25   relate to the contract.  You'll see exactly how the contract

1    evolved.  You'll see the Defendant agreed to it, that he signed

2    it.  And then after that, they start talking about the

3    implementation of his One Thousand Plan, and Mai is sending him

4    directions, and Dr. Lieber is complying with those directions.

5    He's doing exactly what the contract requires him to do.

6              Mr. Mukasey talked about the communication that the

7    Defendant had with Jennifer Ponting and his statements to her

8    in response to the NIH inquiry.  He likened it to a game of

9    Telephone, and maybe it was a game of Telephone.

10   Unfortunately, for the Defendant, it was a game of Telephone

11   that started and ended with him.  He made the statement, "I've

12   never been a thousand talent participant," and he reviewed the

13   statement right before it went out the door.  He didn't say it

14   was false; he didn't say it was wrong; he didn't say, Take this

15   out of here, I did sign a contract; he didn't even say, I don't

16   remember.  He gave it a thumbs up, and it went out the door.

17   That is the definition of causing somebody to make a false

18   statement.

19             On Count 1, that's the false statement to the DCIS

20   investigators.  The statement that the Defendant made, that

21   there is no dispute that he made, by the way, that he was not

22   sure how they categorized him, of course that's false; right?

23   I mean, you've seen the Defendant's emails, and you've seen the

24   interactions that he's had with folks in China.  He knows

25   exactly how he's categorized because he participated in the

1    Program.  He spent three years doing it.

2            If he had said that he didn't know -- or that he did

3    know, excuse me, how China categorized him, what do you think

4    the first thing that Special Agent Mousseau would have done?

5    She would have said, Well, what do you know?  How do you know

6    it?  And inevitably, that would have led to a chain of

7    questions that ended with this question:  Did you participate

8    in the Thousand Talents Program?  Is that why they're saying

9    this.

10           Of course that statement was material.  When he said,

11   I'm not sure how they categorize me, that statement was

12   material.  The statement was made, the statement was false, the

13   statement was material, and that statement is enough, just by

14   itself, is enough to convict on Count 1.

15           Mr. Mukasey raised some points about Special

16   Agent Hochberger's report.  He didn't give you any reason not

17   to rely on the report or read the report and say, Yeah, that's

18   what the Defendant said.  He just doesn't like what the report

19   says, and the report says that the Defendant said that he was

20   never asked to participate in the Thousand Talents Program.

21   Read it with Special Agent Hochberger's notes.  They are not

22   inconsistent.  They create to you a very clear picture of what

23   happened during that interview.

24           Again, I'm just going to harken back to what I said

25   earlier.  Use your common sense when you're deliberating.  It's

```
 1    not that the Defendant just has no memory of what happened
 2    prior to 2015; it's that he does not want to remember.  He does
 3    not want to remember because he knows that he agreed to
 4    contracts, and he participated in the Thousand Talents Program,
 5    and he took bags of cash with him on an airplane that he never
 6    reported to the IRS, and that he had a bank account in China
 7    that he never told anyone about.  That's what the Defendant
 8    knows about what happened prior to 2015.
 9              Look at the emails, look at the evidence in the case,
10    use your common sense and find him guilty.
11              Thank you.
12              THE COURT:  Members of the jury, we will suspend now.
13    We have ordered lunch.  I hope it's there.  If not, it will be
14    there shortly.  And I think maybe a quarter of 2:00 we should
15    start again, just in case the lunch isn't there immediately.
16    And we'll come back at a quarter to 2:00, and then I will
17    instruct you on the law, and the case thereafter will be in
18    your hands.  I promise not to be any longer than the lawyers.
19    No, no.  They were very good.  I'm not chastising them.
20              So, we will now suspend until a quarter to 2:00, and
21    then we'll come to the final being talked to; and after that,
22    the case is in your hands.  Just leave your notebooks there,
23    and you can get them again before you begin your deliberations.
24              And Court is in recess until a quarter of 2:00.
25              (Recess taken from 12:35 to 1:50 p.m.)
```

1          THE COURT:  Please be seated.

2          (The Jury is not present for the following)

3          THE COURT:  Does anybody have any issues with the

4     verdict form?

5          MR. DRABICK:  No objection from the Government, and

6     one or multiple is fine, Your Honor.

7          THE COURT:  Fantastic.  So let's get the jurors down.

8     And I think it would be useful to have one on each seat, except

9     for one other thing, Lisa.

10          May I see counsel for a moment?  I don't need the

11     record.

12          (Discussion off the record)

13          (The Jury is present for the following)

14          THE CLERK:  All rise, please.

15          THE COURT:  Please be seated.

16                    COURT'S JURY CHARGE

17          Members of the jury, the papers that you found on your

18     seats are several copies of, one for each of you, of your

19     verdict form.  When you are deliberating on the verdict, I

20     thought it would be helpful for each of you to have the form

21     because you really have to make six separate decisions.  But

22     let me start with what we normally tell jurors before we get

23     into the verdict form.

24          Now, I'm about to outline to you what the law is in

25     general as it pertains to this case and specifically with

1    respect to each of the six different counts that you will need

2    to consider.  And I ask you, please, to accept the law as I

3    give it to you even if you think it is unwise, even if you

4    think I'm wrong.  The wisdom is up to others.  If I'm wrong, be

5    sure that there is a higher court that can and cheerfully will

6    tell me so, and then there are consequences.

7         Apply the law to the facts as you find them from the

8    evidence.  And that was the whole purpose of the presentation

9    was to present what the facts are from the perspective of the

10   Government and from the perspective of the Defendant and how

11   you need to look at them.

12        Now, a trial by jury means a commitment by each of you

13   to seek the truth from the same evidence that has been

14   presented to all of you and then to arrive at a verdict by

15   applying the same rules of law that I'm about to give to all of

16   you.

17        You should perform this duty without bias or

18   prejudice, without sympathy or emotion.  The Government and

19   Dr. Lieber depend on you to do just that.

20        Both the parties and the Court expect that you will

21   carefully and impartially consider all the evidence that has

22   been presented and that you will follow the law as I am about

23   to outline it to you and that you will reach a just verdict.

24        Now, the evidence in the case consists -- has three

25   components:  One are the stipulations.  A stipulation is an

1    agreement that certain facts are not in dispute, and here the

2    parties were very generous in agreeing that the other side

3    didn't have to prove certain things because they agreed that

4    they were true, and all of these were explained to you in the

5    course of the trial, so please, you need to remember them and

6    then use them in reaching your verdict.

7          The second component are the exhibits in the case,

8    emails, various documents, and those you should also review

9    carefully and use in making your judgment as to whether the

10   Government has proven the Defendant guilty on one or more

11   counts.

12         Now, there were a couple of statements that counsel

13   wanted me to read to you with respect to these Exhibits, and I

14   will do that.  The exhibits were entered during this trial --

15   exhibits were entered during this trial that reflected

16   communications sent to Professor Lieber's email address from

17   individuals in China and individuals identified as associated

18   with Wuhan University of Technology, including WUT Professor

19   Liqiang Mai, I think it's pronounced.

20         At various points, I instructed you that the

21   communications sent to Professor Lieber's email address may

22   only be used for the limited purpose -- for a limited purpose

23   in your deliberations.  I will reiterate and further explain

24   these communications from individuals in China or individuals

25   at WUT.

1          You may only consider them:  One, for the context of

2     Professor Lieber's responses, if any; or, two, for their

3     effect, if any, on Professor Lieber's state of mind, knowledge

4     and/or intent.  You may not consider such communications for

5     the truth of the matters asserted.  So, if the document that

6     the author, who we did not hear as a witness, says that

7     Dr. Lieber was nasty on that day, it cannot show that he was

8     nasty on that day or that he was good on that day, but it comes

9     in to tell you background and other things like that.

10          But specifically, it can -- you can consider it for

11     the context of other emails and responses by Dr. Lieber to

12     those emails for their effect, if any, on his state of mind,

13     knowledge or intent; and you may not consider them for the

14     truth of the matter asserted, as I have said before.  There is

15     a fair amount of evidence in this case that gives you a general

16     picture of what is going on, but it cannot be taken by you as

17     truth that is stated in that under certain circumstances.

18          Professor Mai's emails may only be considered insofar

19     as you find that they are relevant context for Professor

20     Lieber's responses, if any, or if you find that Professor Mai's

21     emails tend to prove Professor Lieber's state of mind,

22     knowledge and/or intent regarding the charged offenses.  You

23     may, however, always consider Professor Lieber's own statements

24     for the truth of what is asserted.  This is very complicated,

25     and I hope you got it.

1          You also have heard evidence that in February, 2015,

2     Professor Lieber made representations to Harvard Professor

3     Jeremy Bloxham, formerly Dean Bloxham, regarding the Wuhan

4     University of Technology and that Professor Lieber sent emails

5     to Professor Mai regarding the laboratory at WUT, which are

6     reflected in Exhibit 61, 62, 63 and 65.

7          You may not use this evidence to infer that, because

8     Professor Lieber's character -- Professor Lieber carried out

9     the acts charged in this case.  You may consider this

10    evidence only for the limited purpose of deciding whether

11    Professor Lieber had the state of mind or intent necessary to

12    commit the crime charged in the indictment; and, second,

13    whether Professor Lieber had a motive to commit the acts

14    charged in the indictment; and/or, three, whether

15    Professor Lieber committed the acts he is on trial for by

16    accident or mistake.

17         Remember, this is the only purpose for which you may

18    consider this evidence.  Even if you find that Professor Lieber

19    may have committed similar acts in the past, this is not to be

20    considered as evidence of character to support an inference

21    that Professor Lieber committed the acts as charged in this

22    case.

23         I fear that is somewhat complicated, but there it is.

24         Now, I was telling you about the evidence in the case

25    and the exhibits.  The stipulation I've explained to you is an

1    agreement that certain facts are not in dispute.  The exhibits

2    include a bunch of different documents, and I have alluded to

3    some of them and read to you some of them right now.  And you

4    should certainly review them and use them to the extent that

5    they assist you in finding whether the Government has proven

6    its case beyond a reasonable doubt.

7           There are a bunch of different documents, there are

8    pictures and emails of various kinds.  You will have them all

9    with you in the jury room.  You should review them all in

10   deciding primarily what he did and what his state of mind was

11   as he was doing it, "he" being Professor Lieber.

12          The third item in the category of evidence is the

13   testimony of all of the witnesses.  And here, you have a sort

14   of dual task.  First, you have to decide whether you believe

15   what any witness said, and then you have to -- if so, you have

16   to decide whether that the statement is what the statement is

17   that you discerned from the witness's testimony and how it

18   plays out in conjunction with the requirement of the evidence

19   in the case and whether it shows that he did do this beyond a

20   reasonable doubt or that it doesn't support the Government's

21   case.

22          So, with respect to the witnesses, the first job you

23   really have is to determine the believability of a witness.

24   Look at the way in which the witness demeaned him or herself on

25   the stand.  How did they tell their story?  What was their

1   ability to observe the events about which they testified and

2   then to recall these events to you?  What was the relationship

3   of any witness to either the Government or the Defendant?  What

4   interest may the witness have in the outcome of the case?

5        These are all factors that you can take into account

6   in deciding whether you believe the witness and to what extent

7   you believe what the witness told you.  Did the witness show

8   any bias either for or against the Government or for or against

9   the Defendant?  To what extent is the witness's testimony

10  either supported by or contradicted by evidence -- by

11  undisputed fact or evidence that shows undisputed facts?

12       So, once you make judgment about the believability of

13  the witness, then consider what the witness has said and

14  determine whether what the witness has said gets you -- helps

15  you in deciding whether the Defendant is guilty or not.

16       Now, there were some particular witnesses, like the

17  FBI Agents, they work for the Government, and I think there

18  were a number of other witnesses who worked for the Government.

19  That does not make them any more or less credible than anybody

20  else, and you should judge them in exactly the same way as

21  everybody else.

22       Similarly, any witnesses from Harvard, you know, you

23  have to judge their testimony as you do any ordinary person,

24  but the fact that they came from Harvard does not make them

25  more or less credible than anybody else.

1          Now, there's a concept called circumstantial evidence

2     and another one called direct evidence.  And I know that those

3     of you who are old enough to have seen -- what's his name? --

4     Perry, the lawyer Perry, who always said, Oh, it's just

5     circumstantial evidence, suggesting that it's no good, that's

6     not the law.  Circumstantial evidence is simply evidence that

7     knits together into a story about facts, and it is perfectly --

8     if the circumstantial evidence supports facts, then it is

9     perfectly usable by you.

10         So, for example, if the person, the witness, had -- or

11    a witness testifies that she made a cake, she left it on the

12    table, it was all ready to go, chocolate cake with chocolate on

13    top, and she told the kids not to touch it.  When she comes

14    home, the kids are sitting in doing whatever, being perfectly

15    happy, she notices that the cake has indeed been man-handled or

16    child-handled, and she notices that the children have a pile of

17    chocolate on their faces, that is circumstantial evidence that

18    the children went to the cake and did something with it.

19         If, on the other hand, she came in just as they were

20    doing that and saw that the cake was being handled by the kids,

21    that would be direct evidence.  Both are perfectly okay.  You

22    will simply need to, with respect to circumstantial evidence,

23    figure out whether it is proof -- whether it is showing facts

24    that are relevant to your determination.

25         Now, there was a fair amount of talk that was not

evidence, and I simply remind you of that.  The opening

statements by counsel with what their understanding of what the

evidence would be, it's very useful to have that because it

lays the groundwork for our understanding even the first

witness, but it is not evidence.

The closing arguments you just heard are counsel's

interpretation of the evidence that you have now heard, but it

is your interpretation that will have to govern the outcome of

the case.  Periodically counsel asked questions that -- in the

form of a statement that the witness does not adopt.  That

would not be evidence that would be suggested by the statement

if the witness doesn't go along with it.  It's the witness who

has to give you the evidence.

Anything you may have heard outside of the Courtroom

is not evidence, and I ask you please not to even think about

it.

Nothing I have said in the course of this trial,

nothing I say to you now, is evidence.  I want you to follow

the law as I give it to you, but I'm not suggesting to you any

outcome, and I'm not trying in any way to make judgments about

the evidence.

To the extent that there were objections by counsel to

any evidence, anything that came in is evidence; anything I

kept out is not, and you shouldn't begin -- you shouldn't try

to figure out what it might have been and just decide the case

on the basis of what you do know.

And counsel have a right to make objections.  Part of the way in which we operate is on the Rules.  That big fat book I just put away is full of rules, including Rules of Evidence, and counsel have alluded to that on a number of occasions with much energy and verve, no less.

And to the extent that the evidence came in, it is before you.  To the extent it was kept out, don't worry about it.  Just decide the case on what you do know, and don't hold it against counsel that they interrupted by an objection.  It's the only way that counsel have to let the Court know when they think that there is a mistake being made by the other side.

Take your notebooks with you when you next leave the Courtroom.  Use them to assist you in rendering your verdict. I ask you please, however, not to disregard what somebody else remembers that one of you may have written down.  Sometimes we short-circuit when we take notes, and the memory may be better than what is in the notes or more complete than what is in the notes, so just pay attention to whatever each of you has to contribute to the discussion.

I cannot -- I cannot suggest to you -- I cannot offer to you transcripts of anybody's testimony.  Although Ms. Walsh has been -- and she has really the most difficult job here -- she's been taking it all down.  I have been following it on this little screen, and it's really remarkable how accurate she

1    is.  But there's no transcript.  It's all still in the

2    computer, and we can't produce a transcript in two seconds.  It

3    just isn't possible because it has to be proofread, and there

4    are a number of places where she uses all kinds of shorthand,

5    and then she has to interpret that into a full document.  So

6    there will be no transcripts available to you of anybody's

7    testimony.  We just don't have them, and we can't produce them

8    in time.

9           Finally, I ask you, please, to use your common sense

10   and your good judgment as you review the evidence and reach

11   your verdict.

12          Now, the Defendant -- a defendant, any defendant in a

13   criminal case, is presumed to be innocent until you find him

14   guilty.  That means that he is innocent until the Government

15   proves his guilt beyond a reasonable doubt.  It means that he

16   has to prove nothing, he doesn't have to offer any evidence, he

17   does not have to testify because he is entitled to rely on the

18   Government to prove him guilty, and he has no obligation

19   whatsoever to do anything, except to say to the Government, You

20   charged me, now you prove me guilty.

21          Now, here, the Defendant has offered some evidence,

22   and you may consider that, as you should consider that, must

23   consider that evidence in conjunction with all the evidence the

24   Government has offered in reaching your verdict.  But

25   regardless of the fact that he did or did not testify, the

1    Defendant's -- the presumption of innocence remains with the

2    Defendant throughout the trial and during your deliberations.

3    It is not overcome until, from all of the evidence, you are

4    convinced, with respect to any one of the charges, that he is

5    guilty beyond a reasonable doubt.

6            Now, the proof beyond a reasonable doubt does not mean

7    proof beyond all possible doubt or proof to a mathematical

8    certainty.  It does mean proof to a degree of certainty that

9    satisfies your judgment and your conscience as reasonable

10   persons and leaves in your minds a clear and settled conviction

11   of guilt.  A reasonable doubt exists when, after weighing and

12   considering all the evidence using reasonable common sense, you

13   cannot say you have a settled conviction of the truth of the

14   charges.

15           And as I said, you have to look at each of the six

16   charges separately, review the charge itself and the statute

17   and regulations on which they're based separately and then

18   decide separately whether the Government has proven him guilty.

19           Now, a reasonable doubt may arise both from the

20   evidence or from the lack of evidence.  However, the burden of

21   proof always remains to the Government.  It never shifts to the

22   Defendant.  And if you view the evidence as reasonably

23   permitting either of two conclusions:  One, that the Defendant

24   is guilty; the other that he is not guilty, you must find him

25   not guilty.  You cannot find him guilty on the basis of

1  probable cause or preponderance of the evidence or even clear

2  and convincing evidence.  There has to be proof beyond a

3  reasonable doubt.  You certainly can't find him guilty on the

4  basis of suspicion, conjecture or surmise.

5          Now, I'll note that the indictment is not evidence; it

6  is simply the document that contains the accusation.  But it

7  does not show evidence, it does not prove evidence, it is not

8  evidence of guilt.

9          As you go about considering your verdict, understand

10  that, if you find the Defendant guilty, do not worry about

11  punishment, or in the process of determining whether he's

12  guilty or not, do not be concerned about punishment.  If you do

13  find him guilty, I will need to do deal with that, but it has

14  nothing to do with your decision concerning whether the

15  Government has proven him guilty beyond a reasonable doubt.

16          Now, the indictment, although it has six counts, has

17  three separate charges, three separate legal issues underlying

18  each of these three sets of charges by the Government.

19  Counts 1 and 2 accuse the Defendant of making false statements

20  in documents submitted to the Department of Defense in Count 1

21  and the National Institutes of Health in Count 2.  And these

22  are documents that pertain to his activities and relationships

23  with Chinese entities and whatever it was in the early -- 2013

24  and '14, and it says he did so knowingly and willfully.

25          Counts 3 and 4 accuse him of willfully filing false

1    tax returns for the years 2013 and 2014 and that he failed to
2    include as income monies he allegedly received from these
3    Chinese entities for his activities there.
4            Counts 5 and 6 allege that he willfully failed to file
5    reports concerning foreign bank and financial accounts in his
6    name that existed in China in 2014 and '15, which, under
7    another statute and certain regulations, are required to be
8    filed with the Internal Revenue Department.
9            So, that's the big outline of the indictment, six
10   counts, but even within each of the three categories, there are
11   differences.  So let me get to those.
12           The first two, 1 and 2, pertain to false statements in
13   matters within the jurisdiction of certain Government agencies.
14   The statute, which is 18 U.S.C. 1001, which is the false
15   statement count, says, "Whoever, in a matter within the
16   jurisdiction of the Executive, Legislative, or Judicial Branch
17   of Government of the United States, makes any materially false,
18   fictitious or fraudulent statements shall be guilty of an
19   offense against the United States."
20           The indictment says, in Counts 1 and 2, that the
21   Defendant knowingly and willfully made false -- materially
22   false statements in a matter within the jurisdiction of a
23   Government agency, and there's a difference between 1 and 2.
24   Count 1 pertains to allegedly false statements to the
25   Department of Defense Criminal Investigative Service; and

1    Count 2, statements to NIH.  That's the time that was

2    made -- those statements were made through Harvard's submission

3    to NIH that included statements about Professor Lieber's

4    activities.

5         Now, Count 1 says that the Defendant told -- this is

6    more detail so that you can relate to it -- that the Defendant

7    told the Department of Defense investigators that he was never

8    asked to participate in China's Thousand Talents Program and

9    wasn't sure how China categorized him when he knew that he had

10   been asked to "participate" in China's Thousand Talents

11   Program -- just participate in it -- and in 2012 signed a

12   three-year contract with WUT entitled "Employment Contract of

13   One Thousand Talent High-Level Foreign Expert."  That's what

14   the indictment says.

15        And then Count 2 says that Defendant, on or about

16   January 10th, 2019, caused Harvard University to report to NIH

17   that he was not and has never been a participant in China's

18   Thousand Talent Program when, in fact, he had, in 2012, signed

19   the three-year employment contract, which is also the same one

20   that is alleged in Count 1.

21        So, those are the Counts 1 and 2.  It's substantially

22   the same statement but slightly different, one to the

23   national -- to the Institutes of Health and one to the Defense

24   Department.

25        Now, what the Government has to prove as to each of

1    these, is:  One, that the Defendant, on or about the time

2    alleged, knowingly and willfully made or caused to be made

3    material false statements; two, that he made the statements

4    voluntarily and intentionally; and, three, that the statement

5    was made in a matter within the jurisdiction of an agency

6    within the Executive Branch.

7          Now, to go back for a moment, first, that he, on or

8    about the time alleged, knowingly and willfully made

9    statements -- materially false statements.  To do something

10   knowingly means to say something voluntarily and not because of

11   ignorance, mistake or accident.  Willful also refers to

12   something done or said voluntarily and with the specific intent

13   to do or say something the law forbids, to say something with a

14   bad purpose either to disobey or disregard the law.  That's

15   what we mean when we say you spoke willfully.

16         A statement is material if it has a natural tendency

17   to influence or be capable of influencing the decision-maker to

18   whom it is addressed.  It does not have to cause the

19   decision-maker to actually rely on it, only that it is designed

20   and has a tendency to cause somebody to make the -- to

21   influence any decision.  A statement is false if it was untrue

22   when it was made.

23         So, with respect to Count 1, the Government has to

24   prove that the Defendant made a statement knowingly and

25   willfully, that he knew what he was doing, and he had the

1    intent to do something -- to say something that the law

2    forbids, that the statement was material; that is, that it had

3    a tendency to influence the hearer, and that it was false, that

4    it was untrue when it was made.  And the Government has to

5    prove that as the first element with respect to Count 1.

6          Count 2 -- I mean, the second element is that he made

7    the statement voluntarily and intentionally.  Voluntarily

8    refers to conduct freely made, as opposed to be ordered or

9    required to do or say something.  And voluntarily and

10   intentionally, you understand what that means.

11         The third element is that the statement was made in a

12   matter within the jurisdiction of an agency within the

13   Executive Branch.  It pertains to statements allegedly made to

14   the Department of Defense in Count -- I think Defense was

15   Count 1.  I think so.  I have to check it.  The tickets are

16   getting undone here.  Yes, the DoD.  -- pertaining, again, to

17   his participation in the Thousand Talent Program.

18         And here, again, voluntarily refers to a statement

19   freely made, as opposed to one that he is ordered or required

20   to be made.  And with respect to the third element, Count 1

21   pertains to statements made to the Department of Defense.

22   Count 2 pertains to statements made in Harvard's submission to

23   NIH where Harvard -- where the testimony you could find was

24   that Professor Lieber gave information to the Harvard

25   authorities with respect to a document that they were going to

1     file with NIH with respect, I think it was, to a grant for his

2     work at Harvard.

3            Both DoD and NIH are part of the Executive Branch of

4     the United States.

5            Now, to decide these elements, which I have just

6     described to you, to determine that -- you need to determine

7     the Defendant's state of mind and his knowledge at various

8     times when he heard what Wuhan said and when he told others --

9     when he told Harvard and the several U.S. Government agencies

10    who have testified what Wuhan had said and what was done to

11    execute certain joint endeavors.

12           There is usually no direct evidence of what is in a

13    person's mind.  You will need to look at the evidence of what

14    Mr. Lieber said, what others said, what he did, how others

15    responded to what he said and how he behaved in the context of

16    these conversations or emails or whatever; and from that

17    evidence of his conduct and the conduct and statements of other

18    people, you need to discern what he knew and what his state of

19    mind was in connection with any of his actions included in this

20    indictment.  It's not a direct road.  You have to look at the

21    whole picture but particularly him and what he did and what he

22    said and how he reacted to other -- to the statements and

23    actions of others.  And specifically, you need to look at that

24    to determine whether he knowingly and willfully reported false

25    information in the reports to DoD and to Harvard for NIH.

1          If you are, each of you, convinced beyond a reasonable

2    doubt that the Government has proven each of the elements

3    beyond a reasonable doubt, then you may find the Defendant

4    guilty on Count 1; or -- and if all 12 of you are not so

5    convinced, you must find him not guilty.  It takes 12 of you to

6    agree to convict in order for him to be convicted.  But if one

7    of you or two or three of you are not in such agreement, then

8    you must find him not guilty.

9          Count 2 I have already explained.  It pertains to the

10   document that Harvard submitted to an agency within the

11   Executive Department, but it was based on information that

12   Mr. Lieber provided, so the elements are essentially the same

13   as to what I have just told you.  If the Government has proven

14   beyond a reasonable doubt the Defendant gave Harvard the

15   information it communicated to NIH and that the information was

16   materially false, same definition, Defendant gave it and that

17   the Defendant gave it voluntarily and intentionally and that it

18   pertained to a matter within the jurisdiction of NIH, then you

19   may find the Defendant guilty on Count 2.  If you are not

20   convinced of each of these elements, then you must find him not

21   guilty on that count.

22         Counts 3 and 4 pertain to an entirely different

23   subject.  They charge him with having filed false tax returns.

24   And here, the statute says that, "Any person who willfully

25   makes and subscribes any return, statement or other document

1    which contains or is verified by a written declaration that is

2    made under the penalties of perjury and which he does not

3    believe to be true and correct as to every material matter,

4    shall be guilty of an offense against the United States."

5            Now, the indictment with respect to that says that he

6    willfully filed false tax returns in 2014 and 2015 for the tax

7    years 2013 and '14.  Now, what the Government has to prove here

8    are four elements:  One, that he made or caused to be made a

9    Federal income tax return for the year in question that he

10   verified as true.  He does not -- the Government doesn't have

11   to show that he himself filled out the return, and the

12   evidence, as I recall, was that the tax -- the person who

13   prepared the tax return testified how that was done, and you

14   will need to decide whether all the information that went into

15   the return came from Professor Lieber and perhaps his wife, but

16   Professor Lieber specifically.

17           Second, it has to prove that the return was false as

18   to a material matter.  Material means the same thing as I had

19   previously explained to you.

20           And, three, that Professor Lieber signed the return

21   willfully and knowing it was false.

22           And, four, that the return included a written

23   declaration that it was made under the penalty of perjury.

24           Now, the first element, that the Defendant made or

25   caused to be made a Federal income tax return for the year in

1    question that he verified as true I don't think needs any

2    further explanation.  You will need to review the evidence as

3    to what the preparer got in the way of information and what he

4    did with it and that it came from Professor Lieber and his

5    wife.

6         Two, the Government has to prove that the return was

7    false as to a material matter.  A material matter in this

8    context is one that is likely to affect the calculation of the

9    tax due and payable or to affect or influence the IRS in

10   carrying out its functions, including monitoring and verifying

11   tax liability.

12        The third element is that the Defendant signed the

13   return willfully and knowing that it was false.  Here, the

14   Defendant's name, I believe it has been shown to be or there

15   was testimony, was on one or both returns.  That is sufficient

16   evidence that he actually signed it, or them, the two of them,

17   and knew the contents of those returns.  If you so find, you

18   must still determine whether he knew that the information on

19   the return was false.  That was -- yeah, that's the second

20   piece of the third element.

21        And here, I think you probably need to rely on the

22   evidence that the Government had as to various activities of

23   Professor Lieber in China and otherwise, and particularly with

24   respect to money, and then determine whether, in fact, the

25   return -- whether he gave appropriate information to the

1  preparer of the tax return and then ultimately to the IRS

2  because he and his wife signed and filed the returns.

3         Again, review the evidence presented on these issues

4  and decide whether the Government has proven beyond a

5  reasonable doubt as to each count with respect to each of the

6  elements of each count, that the Defendant had provided false

7  information as to certain income and financial accounts for one

8  or both of the returns in question.

9         Again, if all of you are convinced beyond a reasonable

10  doubt that the Government has so proven, then you may find him

11  guilty on that count.  If you are not so convinced, again, you

12  must find him not guilty.

13         The last piece of it are Counts 5 and 6, and they

14  are -- again, let me just remind you that, although there are

15  counts that are very similar, they're not the same.  So,

16  Counts 3 and 4 are two different tax years and two different

17  issues as to that.

18         Now, Counts 5 and 6, similarly, they charge the

19  Defendant with having failed to file certain reports that

20  the -- that the Governmental -- the statutes and regulation

21  require a person to file if they do business abroad of the kind

22  that he did.  And what the statute says is, "The Secretary of

23  the Treasury shall require a resident or citizen of the

24  United States or a person in and doing business in the

25  United States to keep records, file reports -- or keep record

1    and file reports when the resident, citizen or person makes a

2    transaction or maintains a relation for any person with a

3    foreign agency."

4         And there are regulations that supplement the statute

5    that say, "A person willfully violating the subchapter" -- this

6    is another section of the Code -- "A person willfully violating

7    the subchapter or a regulation prescribed under the subchapter

8    shall be guilty of an offense against the United States."

9         And then the regulation says, "Each United States

10   person having a financial interest in or signature or other

11   authority over a bank, securities or other financial account in

12   a foreign country shall report such relationship to the

13   Commission of Internal Revenue for each year in which such

14   relationship through the Commissioner -- in which such

15   relationship exists and shall provide such information as shall

16   be specified in reporting forms required."

17        And the indictment with respect to this says, "On or

18   before the due dates listed below, Charles Lieber did willfully

19   fail to file with the Commission of IRS, U.S. Department of the

20   Treasury, a report of foreign bank and financial accounts" that

21   the Government keeps calling FBAR, "discussing that he had an

22   interest in and signature and other authority over a bank,

23   securities and other financial account in a foreign country; to

24   wit, at least one bank account located in the People's Republic

25   of China at the Industrial Commercial Bank of China, which had

1   an aggregate value of more than $10,000 at any time during the

2   years listed, which, as to Count 5, 2014; and Count 6, June 30,

3   20" -- well, the year 2015.  And, again, as with our tax

4   reports, they have -- the reports are due within the next year,

5   the following year.

6         Now, the parties have stipulated that the Defendant

7   did not file these reports.  You may accept -- this is an

8   agreed fact, a fact that the parties have both agreed to, so

9   you don't have to worry about determining whether he did file

10   or didn't file.  It is agreed that he did not file.

11         The question that you do need to determine is whether

12   he did so knowingly -- willfully or knowingly; that is, whether

13   he willfully and/or knowingly failed to report a bank account

14   in which he had an interest and which had more than $10,000 in

15   it for -- during a year.

16         Now, again, consider the evidence of each count

17   separately and decide separately as to each count whether the

18   Government has proven every one of the elements that I have

19   outlined to you.  And if you find that the Government has

20   proven each element as to any particular count and done so

21   beyond a reasonable doubt, then you may find the Defendant

22   guilty of that count.  But if you find the Government has not

23   so proven, then you must find the Defendant not guilty.

24         I don't know whether we gave you the verdict forms.

25   Did we?

1          THE CLERK:  Yes, yes.

2          THE COURT:  You have them.  So, the first order of

3    business when you get to the jury room is to elect the

4    foreperson from among the 12 of you who will be deliberating on

5    the verdict.  The foreperson does not have any greater voice

6    than anybody else.  His or her job is to make sure you don't

7    come to blows and that you -- the proceedings go forward in a

8    reasonable and successful manner; that is, you do reach a

9    verdict at some point sooner rather than later.  I'm not trying

10   to hurry it up, but it is Christmastime.

11         And then, when you have reached a verdict as to one

12   count, please have your foreperson fill in what that verdict

13   is; and ultimately, when you have decided all six counts, then

14   your foreperson should sign the verdict slip and let the

15   Marshal know that you have a verdict.  We will reassemble in

16   the Courtroom to take your verdict in open Court.

17         You should go forward in your job with good common

18   sense, with -- not decide your verdict on the basis of sympathy

19   or emotion but on the basis of your rational judgment of the

20   evidence and what it shows.

21         That, I think, is it.  If you have any questions in

22   the course of your deliberations, please have your foreperson

23   write it out, let the Marshal know, and I will respond either

24   in writing or by reassembling us in the Courtroom to explain

25   it.

```
 1              May I see counsel, please?
 2              (Discussion at sidebar)
 3              MR. MUKASEY:  Judge, I thought that, in relation to
 4    Counts 1 and 2, you had mentioned once or twice that the false
 5    statements were submitted to DoD and NIH in documents, and they
 6    were actually not in documents.  The false statement to DoD was
 7    oral, and --
 8              THE COURT:  How were they submitted?
 9              MR. MUKASEY:  The statement to DoD was oral, and the
10    statement to Harvard that went to NIH --
11              THE COURT:  I did say that.
12              MR. MUKASEY:  -- was also oral.
13              MR. DRABICK:  The statement to Harvard was oral.
14              THE COURT:  One of you, please.
15              MR. CASEY:  It caused Harvard to make a statement in a
16    document.
17              THE COURT:  But I did say that.
18              MR. MUKASEY:  The statement to DoD was oral.
19              THE COURT:  So there was an oral statement to DoD --
20              MR. MUKASEY:  To DoD.
21              THE COURT:  -- and then an oral statement to
22    Harvard --
23              MR. MUKASEY:  There was an oral statement to Harvard.
24              THE COURT:  -- which then ended up in a document.
25              MR. MUKASEY:  Correct.  He didn't admit to a false
```

1    document.

2            MR. CASEY:  He caused a false statement in a document.

3            MR. MUKASEY:  Fair enough.

4            MR. CASEY:  The statement to Harvard --

5            MR. MUKASEY:  Was oral.

6            MR. CASEY:  But that's not part of the charge.

7            MR. MUKASEY:  He didn't submit a false document.

8            MR. CASEY:  He caused to make a false statement to be

9    extended in a document.

10           THE COURT:  I don't want to fight about it.

11           Is there any reason why I can't explain to the jury,

12   that both statements were oral, Count 1 to DoD --

13           MR. CASEY:  The second -- Count 2 is not an oral

14   statement.

15           MR. MUKASEY:  Count 2 is a written --

16           THE COURT:  No, it wasn't an oral to DoD.

17           MR. MUKASEY:  Count 1 is oral to DoD; Count 2 was he

18   caused a written statement to NIH.

19           MR. CASEY:  Correct.

20           THE COURT:  Say that again.

21           MR. MUKASEY:  Count 1 was an oral statement from

22   Lieber to DoD.

23           THE COURT:  Okay.

24           MR. MUKASEY:  Count 2 was that Lieber --

25           THE COURT:  An oral statement to Harvard and a written

```
 1   document from Harvard to NIH.
 2             MR. MUKASEY:  I'll let him say it.
 3             MR. CASEY:  Count 2 is the Defendant caused Harvard to
 4   make a false statement in a document.  So Count 1 is an
 5   oral --
 6             THE COURT:  How did he communicate to Harvard?
 7             MR. CASEY:  Well, he reviewed the document that was
 8   sent, and the statement is in the document, and so he caused a
 9   false statement in the document submitted to NIH.
10             THE COURT:  Well, does it matter how he talked to
11   Harvard -- I mean, how he got into Harvard?
12             MR. MUKASEY:  They didn't really charge how he got
13   into Harvard.  They charged how Harvard got into NIH.
14             MR. CASEY:  Correct.
15             THE COURT:  Yes, but I think I told them that.
16             MR. CASEY:  You said a false statement in a document.
17   I'm not sure that's incorrect.  I think that's fine.
18             MR. MUKASEY:  Okay.
19             THE COURT:  So I don't have to say anything about
20   Harvard?
21             MR. CASEY:  I think it's just DoD.
22             MR. MUKASEY:  The alleged false statement, the charged
23   false statement, and the DoD was oral.
24             THE COURT:  Oral to DoD.  Okay.  What else?
25             MR. MUKASEY:  Right.  None of the statements had to do
```

1    with grants; the statements were just --

2              THE COURT:  None had to do with what?

3              MR. MUKASEY:  Grants.

4              MS. YOUNG:  Grants.

5              THE COURT:  Well, I didn't say they did.  No.  Harvard

6    did because Harvard was looking for grants from NIH for his

7    projects.

8              MR. MUKASEY:  Right, but the false statement had to

9    deal with something besides the grant.

10             MR. DRABICK:  It was not a specific grant related

11   to -- it was not a specific grant-related communication; it was

12   in response to an NIH letter.  So I think --

13             MR. MUKASEY:  He gave a statement.  It wasn't a

14   statement related to grants.

15             THE COURT:  So what do you want me to tell them?

16             MR. DRABICK:  I would suggest, Your Honor, just for

17   Count 2, that the alleged false statement was not in connection

18   with a grant application but was simply a statement to NIH.

19             THE COURT:  It was not in the application?

20             MR. MUKASEY:  Correct.

21             MR. DRABICK:  It was not made in an application.

22             MR. MUKASEY:  Correct.

23             THE COURT:  But it was --

24             MR. DRABICK:  To NIH.

25             THE COURT:  At what time?

```
 1              MS. YOUNG:  January 10.

 2              THE COURT:  I mean, not in what time but in what

 3      context?

 4              MR. CASEY:  In a letter.

 5              MR. DRABICK:  In a letter.  I don't know that --

 6              THE COURT:  I don't know why you are fighting over

 7      these details.

 8              MR. DRABICK:  I think it's important.  My sense is

 9      it's important to the defense that it wasn't a grant proposal

10      because this is not a grant fraud case.

11              THE COURT:  Not an application --

12              MR. MUKASEY:  Correct.

13              THE COURT:  -- just another document --

14              MR. MUKASEY:  Just a statement.

15              THE COURT:  -- another communication.

16              MR. CASEY:  That's fine.

17              MR. MUKASEY:  Communication.

18              THE COURT:  Anything else?

19              You know, it's easier if you put it all on a big page.

20              Do you have anything?

21              MR. DRABICK:  No, Your Honor.

22              MR. MUKASEY:  That's all, thanks.

23              (End of discussion at sidebar)

24              THE COURT:  I think I told you that the document --

25      that the statement to DoD in Count 1 was some kind of a
```

1    document.  The counsel point out that it was an oral statement

2    to DoD, not a document.

3            And with respect to the advice -- or the request to

4    NIH, that was, and I think I did tell you, it was a statement

5    to Harvard that included it in, not in an application, but in a

6    later communication to NIH.  So the Defendant, if he -- if you

7    find he made such a statement, would still be responsible for

8    it, whether it was oral or in writing; and then the question

9    is:  Was it an honest statement or not, and did he deliberately

10   or voluntarily make false statements with the intent of getting

11   something he wouldn't otherwise be entitled to?

12           (Discussion off the record)

13           MR. CASEY:  Your Honor, could we just speak real

14   briefly again at the sidebar?  I apologize.  We'll make it very

15   brief.

16           THE COURT:  I know, but we're wasting time and -- is

17   it something new or something I said wrong just now?

18           MR. CASEY:  It's something new -- well, something

19   related to what you just said.  I promise we'll be very, very

20   brief.

21           THE COURT:  But very brief means she has to move, I

22   have to move, you have to move, the defense has to move, and

23   the jury sits here.  I'll see you, obviously, but I wish you

24   wouldn't do that.

25           (Discussion at sidebar)

```
 1            MR. CASEY:  I think you just said right now that the

 2     jury has to find that the Defendant made the statement in Count

 3     2 with the intent to get something that he wasn't otherwise

 4     entitled to, and that's sort of like a fraud theory, but that's

 5     not part of making a false statement under 1001.

 6            THE COURT:  So what do you want me to tell them, that

 7     it wasn't that; it was just a false statement in which he knew

 8     to be false.

 9            MR. CASEY:  Correct.

10            MR. MUKASEY:  Materially false statement.

11            MR. CASEY:  A materially false statement.  He didn't

12     have to act with the intent to get something.

13            THE COURT:  Oh, may I see counsel, please?

14            I am going to excuse the last two jurors now, tell

15     them to be available in case we need them, and charge the

16     others to start their deliberations, and I expect counsel to

17     help Ms. Urso put together the exhibits.

18            (End of discussion at sidebar)

19            THE CLERK:  We did.  Everything's all set, Judge,

20     right here.  Yep, yep, they already did that.  Thank you.

21            THE COURT:  Okay.  I shouldn't have shouted at counsel

22     because they were telling me I did give slightly wrong

23     information.

24            With respect to Count 1, I think I said that he --

25     that, if the Defendant, Dr. Lieber, said anything -- I've
```

1   forgotten even what I said; but the real thing, that the

2   Government says he said had to do with simply a false statement,

3   that he made a false statement with respect to  Count 1.

4           Now, Mr. Gagne and Mr. Cooper, you are the alternate

5   jurors in this case.  I'm sorry that only 12 of you can do

6   this.  We are incredibly thankful for you for being here, but

7   don't think you are totally excused yet because, if a problem

8   arises with any of the jurors before we have a verdict, you can

9   bet your bottom dollar that we'll call you and hope that you

10  will become available to take over for anybody who gets sick or

11  can't continue until there's a verdict.

12          So, I thank you very much.  I know that counsel and

13  the parties thank you as well.  You are now excused from further

14  service, unless we need you, in which case we will call you.

15          Members of the jury, I now charge you to commence your

16  deliberations.  Let us know when you have a verdict or a

17  question, preferably the former.

18          THE CLERK:  All rise, please.

19          THE COURT:  Yeah, take your notebooks.

20          Court is in recess until we hear from the jury.

21          (Recess taken from 2:47 to 5:17 p.m.)

22          THE CLERK:  All rise, please.

23          (The Jury is not present for the following)

24          (Discussion at sidebar)

25                      QUESTIONS FROM THE JURY

```
 1              THE COURT:  May I see counsel, please.
 2              They have a question.  Here's the jury's question --
 3    I'll dictate it in a moment.  I think the answer is No; right?
 4              MR. DRABICK:  "If the jury is not unanimous on one
 5    count, do we have to select 'not guilty'"?
 6              THE COURT:  No.  It's simply not -- it's not -- they
 7    can't -- they are not deciding it.
 8              MR. MUKASEY:  There's no verdict.
 9              THE COURT:  On that count.
10              MR. MUKASEY:  Hung on that count.
11              THE COURT:  This is the question.
12              "If the jury is not unanimous on one count, do we have
13    to select 'not guilty'"?
14              And I think I can do that in writing, unless you want
15    me to bring them down?
16              MR. MUKASEY:  I don't think it's necessary to bring
17    them down.
18              THE COURT:  I'm sorry?
19              MR. MUKASEY:  I don't think it's necessary to bring
20    them down.
21              THE COURT:  I don't either.  I'll just write
22    something, and I'll show it to you before I send it to them.
23    But not on that piece of paper, because that get's saved.
24              MR. DRABICK:  Do we agree it should be something along
25    the lines of the jury needs to continue to deliberate until
```

1    they're unanimous?

2              MS. YOUNG:  No.

3              MR. MUKASEY:  No.  That's not where I was going.  It's

4    a yes-or-no question.

5              THE COURT:  The answer is, No, you simply leave that

6    blank.

7              MR. MUKASEY:  I think the answer is, No.

8              MR. CASEY:  Period.

9              MR. DRABICK:  I think the answer is, No, and they

10   should continue to deliberate.  I mean, we're not at an -- I

11   mean, it's been two, three hours.

12             THE COURT:  I think I need to tell them that you may

13   leave the verdict blank, the verdict lines blank.

14             MR. DRABICK:  We'd ask for an instruction that they

15   should continue to deliberate, at least at this juncture.

16   They're indicating lack of unanimity on one count.

17             THE COURT:  It's one count.  This is a technical

18   question.  They want -- they are not unanimous on one count.

19   "Do we have to select 'not guilty,'" and the answer is, No.

20             MR. MUKASEY:  I think it's no period, n-o period.

21             MR. CASEY:  I guess it's just not clear to the

22   government from this question that they wouldn't be able to

23   reach a unanimous verdict if they kept deliberating.

24             THE COURT:  But they're not asking about any -- this

25   is not about the verdict as a whole.  It's about one count, one

```
 1    piece of a count, one question.  So that's all you want me to
 2    say?
 3              MR. MUKASEY:  I think just n-o.
 4              THE CLERK:  Do you want me to just say, No?
 5              MR. MUKASEY:  Let them do what they want to do with
 6    the form.
 7              THE COURT:  They asked a specific question, do we have
 8    to do something.  I have to say no.
 9              MR. MUKASEY:  The answer is no.  I agree.
10              THE COURT:  That becomes part of the record.  The
11    written answer is, "Members of the jury, the answer to your
12    question is 'no.'"  Signed Rya W. Zobel.
13              MR. MUKASEY:  Does this get marked as Court Exhibit 1?
14              THE CLERK:  Yes.
15              THE COURT:  It will be kept.  I don't know how Lisa
16    keeps it.  That's how you call it?
17              THE CLERK:  Yes.  We put -- I have it.
18              THE COURT:  And here's the --
19              THE CLERK:  Yes.  Thank you.
20              THE COURT:  So we wait.
21              Now, did you want me to tell the press or are you
22    going to tell them?
23              MR. MUKASEY:  I'm not telling them anything.
24              THE COURT:  So do nothing.
25              MR. MUKASEY:  Are you going to just let them keep
```

1    deliberating tonight?  Do they go home and come back?

2           THE COURT:  They said earlier they wanted to stay.  So

3    I fear that we're here for a while or maybe not.  I mean, maybe

4    not.

5           (End of sidebar discussion)

6           (Recess taken at 5:22 p.m. to 5:32 p.m.)

7                              JURY VERDICT

8           THE COURT:  Please be seated except for your

9    foreperson, who should kindly remain standing for the moment.

10          THE CLERK:  Mr. Foreperson, has the jury agreed upon

11   an unanimous verdict?

12          THE FOREPERSON:  We have.

13          THE CLERK:  Could you just fold that paper for me,

14   sir, please.  Thank you kindly.  You can be seated, please.

15          THE COURT:  Thank you.  I have to look at it and make

16   sure that you have consistent answers because otherwise -- and

17   generally correctly filled out the papers; otherwise, I have to

18   send you back.

19          Lisa, do you have the note?

20          THE CLERK:  I'm sorry.  Did you bring -- no.  I think

21   it remains upstairs.  Do you want me to go get it?

22          THE COURT:  No, that's okay.  May I see just one

23   counsel on each side, maybe two.

24          (Discussion at sidebar)

25          THE COURT:  I don't think there's anything to do about

1     it, okay.  We just record it (referring to verdict form)?

2               MR. MUKASEY:  Yes, I think so.

3               (End of discussion at sidebar)

4               THE CLERK:  This is the United States versus Charles

5     Lieber.

6               We, the jury, find the defendant, Charles Lieber:

7               On Count 1 of the superseding indictment on false

8     statements, guilty.

9               On Count 2 of the superseding indictment, false

10    statements, guilty.

11              On three of the superseding indictment, filing false

12    tax returns, guilty.

13              On Count 4 of the superseding indictment, filing false

14    tax returns, guilty.

15              On Count 5 of the superseding indictment, failure to

16    file reports of foreign bank and financial account, guilty.

17              On Count 6 of the superseding indictment, failure to

18    file reports of foreign bank and financial account, guilty.

19              Mr. Foreperson, members of jury, do you, upon your

20    oath, say the defendant, Mr. Charles Lieber, at the bar is

21    guilty on Counts 1, 2, 3, 4, 5, and 6?  So say you,

22    Mr. Foreperson, so say you all, members of the jury?

23              THE JURORS:  Yes.

24              THE CLERK:  Thank you.

25              MR. MUKASEY:  I'm only going -- I'm just going to

1    renew the motion.

2              THE COURT:  I'm sorry?

3              MR. MUKASEY:  I'm just going to renew our motion from

4    earlier this afternoon, Judge.

5              MR. DRABICK:  Your Honor, we continue, obviously, to

6    oppose the motion; but otherwise, we're prepared to excuse the

7    jury.

8              THE COURT:  I'm sorry.  What is the motion?

9              MR. MUKASEY:  We just want to renew the Rule 29

10   motion, Judge, for the record.

11             THE COURT:  We don't need to do that now?

12             MR. MUKASEY:  Correct.

13             THE COURT:  Okay.  Members of the jury, I thank you

14   very much.  You have been incredibly attentive and incredibly

15   tolerant of our sometimes difficult schedule.  And you are now

16   excused with the thanks of the Court.  And if you don't mind,

17   if you would just wait for a moment upstairs, I would like to

18   thank you individually and hope you have a good holiday.

19             THE CLERK:  All rise, please.

20             THE COURT:  I assume that we will schedule a hearing

21   on that motion or do you want to argue it now?

22             MR. MUKASEY:  No.  We can schedule a hearing, Judge.

23   Thanks.

24             THE COURT:  Thank you all very much.

25             (Adjourned at 5:38 p.m.)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3            I, Linda Walsh, Registered Professional Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter, to the best of my skill and ability.

9            Dated this 21st day of December, 2021.

10

11

12            /s/ Linda Walsh

13            Linda Walsh, RPR, CRR

14            Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25