# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————

UNITED STATES OF AMERICA )
)
)
v. )
) Case No. 20-cr-10111-RWZ
)
CHARLES LIEBER, )
)
Defendant. )
———————————————————————)

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR A JUDGMENT OF ACQUITTAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 29(c) OR, ALTERNATIVELY, FOR A NEW TRIAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33(a)

Torrey K. Young (BBO# 682550)
Marc L. Mukasey (*pro hac admitted*)
Kenneth A. Caruso (*pro hac pending*)
Catherine Deist (*pro hac admitted*)
Stephanie Guaba (*pro hac admitted*)

MUKASEY FRENCHMAN LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
(212) 466-6400

*Attorneys for Charles Lieber*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................1

STATEMENT OF THE CASE............................................................................2

ARGUMENT .....................................................................................................3

POINT I         THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL...................3

    A.    Count One (False Statement) -- The Government
Introduced Insufficient Evidence to Sustain The Verdict...............................4

        1.  First Specification -- That Professor Lieber States "That He Was
Never Asked To Participate In China's Thousand Talents Program"...................4
        2.  Second Specification -- That Professor Lieber Stated
"That He 'Wasn't Sure' How China Categorized Him"...........................................8

    B.    Count Two (Causing A False Statement) – The
Government Introduced Insufficient Evidence Of Falsity...........................12

    C.    Counts Five And Six (Failure To File Reports Of Foreign Bank
Account) -- The Regulation Upon Which The Government Relies Is Void...............14

    D.    Count Five (Failure To File A Report Of Foreign Bank Account For Year
2014) -- The Government Introduced Insufficient Evidence Of Willfullness............18

POINT II        THE COURT SHOULD GRANT A NEW TRIAL .............................................20

    A. The Verdicts Fall Under The Yates/Griffin Doctrine .......................................20

        1.  The Applicable Law -- The Yates/Griffin Doctrine .............................................20
        2.  The Verdict On Count One Falls .............................................................21
        3.  The Verdicts On Counts Five And Six Fall...........................................................21
        4.  The Verdicts On Counts Three And Four Fall.......................................................24

    B. The Court Erred When Instructing The Jury ...................................................24

        1.  The Court Erred When It Failed To Instruct The Jury Regarding Certain
Elements Of The Offenses Charged In Counts Three, Four, Five And Six...........24

            a.  The Court Erred When It Failed To
Instruct The Jury Regarding Willfulness ...............................................25
            b.  The Court Erred When It Failed To Instruct The Jury Regarding The
Regulatory Definitions Of A "Financial Interest In" Or "Signature Or
Other Authority Over" A Bank Account ...............................................25

2.  The Court Erred When It Failed To Give The Jury A Specific Unanimity Instruction ..................................................................................................26

C.  The Court Should Suppress Professor Lieber's Post-Arrest Statement............................28

D.  The Court Should Grant A New Trial In The Interest Of Justice ......................................28

1.  The Verdicts Were Against The Weight Of The Evidence ...................................29
2.  The Court Should Reconsider Its Evidentiary Rulings.........................................35

CONCLUSION...........................................................................................................................40

# TABLE OF AUTHORITIES

## CASES

*Bryan v. United States,*
    524 U.S. 184 (1998) ................................................................................ 19

*Dep't of Homeland Security v. MacLean,*
    574 U.S. 383 (2015) .......................................................................... 22, 23

*Dep't of Treasury v. FLRA,*
    494 U.S. 922 (1990) .......................................................................... 22, 23

*Didrickson v. Dep't of Interior,*
    796 F. Supp. 1281 (D. Alas. 1991) ...................................................... 17

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976) ................................................................................ 15

*Griffin v. United States,*
    502 U.S. 46 (1991) ...................................................................... 20, 21, 24

*In re JPMorgan Chase Bank, N.A.,*
    799 F.3d 36 (1st Cir. 2015) ...................................................... Passim

*Lawrence + Memorial Hosp. v. Burwell,*
    812 F.3d 257 (2d Cir. 2016) .................................................................. 18

*Maracich v. Spears,*
    570 U.S. 48 (2013) .......................................................................... 16, 17

*Nash v. United States,*
    54 F.2d 1006 (2d Cir. 1932) .................................................................. 38

*Neder v. United States,*
    527 U.S. 1 (1999) .................................................................................... 24

*Norman v. United States,*
    942 F.3d 1111 (Fed. Cir. 2019) ...................................................... 17, 18

*Powell Elec. Sys. v. Nat'l Union Fire Ins. Co.,*
    No. H-10-993, 2011 U.S. Dist. LEXIS 96848 (S.D. Tex. Aug. 29, 2011) ................ 7

*Ramos v. Louisiana,*
    140 S. Ct. 1390 (2020) .......................................................................... 27

*Ratzlaf v. United States*,
   510 U.S. 135 (1994) ................................................................................ 19, 25

*Russello v. United States*,
   464 U.S. 16 (1983) ........................................................................................ 23

*Se-Kure Controls, Inc. v. Vanguard Products Group, Inc.*,
   2008 WL 169054 (N.D. Ill. Jan.17, 2008) ................................................... 11

*Smart v. Gillette Co. Long-Term Disability Plan*,
   70 F.3d 173 (1995) ........................................................................................ 23

*Trenkler v. United States*,
   268 F.3d 16 (1st Cir. 2001) .......................................................................... 22

*United States v. Anming Hu*,
   20-cr-00021-TAV-DCP, (E.D. Tenn. Sept. 9, 2021) ..................................... 2

*United States v. Aversa*,
   984 F.2d 493 (1st Cir. 1993) ........................................................................ 19

*United States v. Boots*,
   80 F.3d 580 (1st Cir. 1996) .......................................................................... 20

*United States v. Boskic*,
   545 F.3d 69 (1st Cir. 2008) ................................................................... Passim

*United States v. Boulerice*,
   325 F.3d 75 (1st Cir. 2003) ..................................................................... 19, 25

*United States v. Calamaro*,
   354 U.S. 351 (1957) ........................................................................... 15, 16, 17

*United States v. Castro*,
   704 F.3d 125 (3d Cir. 2013) ......................................................................... 12

*United States v. Craigue*,
   539 F. Supp. 3d 245 (D.N.H. 2021) .............................................................. 6

*United States v. Crisci*,
   273 F.3d 235 (2d Cir. 2001) ......................................................................... 28

*United States v. DiMasi*,
   810 F. Supp. 2d 347 (D. Mass. 2011) ........................................................... 29

*United States v. Dockray*,
  943 F.2d 152 (1st Cir. 1991) ................................................................... 19

*United States v. Dodd*,
  43 F.3d 759 (1st Cir. 1995) ..................................................................... 13

*United States v. Fernandez-Jorge*,
  894 F.3d 36 (1st Cir. 2018) ..................................................................... 20

*United States v. Finucan*,
  708 F.2d 838 (1st Cir. 1983) ..........................................................Passim

*United States v. Gang Chen*,
  21-cr-10018-PBS (D. Mass. Jan. 20, 2022)............................................... 2

*United States v. Gatewood*,
  173 F.3d 983 (6th Cir. 1999) ................................................................... 14

*United States v. Gipson*,
  553 F.2d 453 (5th Cir. 1977) ................................................................... 27

*United States v. Golomb*,
  811 F.2d 787 (2d Cir. 1987) .................................................................... 12

*United States v. Griffin*,
  524 F.3d 71 (1st Cir. 2008) ..................................................................... 19

*United States v. Hernandez-Ferrer*,
  599 F.3d 63 (1st Cir. 2010) ..................................................................... 23

*United States v. Indelicato*,
  611 F.2d 376 (1st Cir. 1979) ................................................................... 29

*United States v. Kahn*,
  5 F.4th 167 (2d Cir. 2021) ................................................................ 17, 18

*United States v. Karani*,
  984 F.3d 163 (1st Cir. 2021) ............................................................ 27, 28

*United States v. Mehanna*,
  735 F.3d 32 (1st Cir. 2013) ..................................................................... 21

*United States v. Merlino*,
  592 F.3d 22 (1st Cir. 2010) ..................................................................... 29

v

*United States v. Moses*,
    94 F.3d 182 (5th Cir. 1996) ................................................................ 14

*United States v. Newell*,
    658 F.3d 1 (1st Cir. 2011) .................................................................... 27

*United States v. Nieves-Burgos*,
    62 F.3d 431 (1st Cir. 1995) .................................................................. 21

*United States v. Poutre*,
    646 F.2d 685 (1st Cir. 1980) ............................................... 4, 5, 29, 30

*United States v. Rea*,
    958 F.2d 1206 (2d Cir. 1992) ........................................................ 10, 11

*United States v. Reveron Martinez*,
    836 F.2d 684 (1st Cir. 1988) ....................................................... Passim

*United States v. Richardson*,
    421 F.3d 17 (1st Cir. 2005) ........................................................... 12, 21

*United States v. Rodriguez-Martinez*,
    778 F.3d 367 (1st Cir. 2015) ............................................................. 3, 4

*United States v. Ruiz*,
    105 F.3d 1492 (1st Cir. 1997) ............................................................. 29

*United States v. Sebaggala*,
    256 F.3d 59 (1st Cir. 2001) ................................................................. 13

*United States v. Serafini*,
    167 F.3d 812 (3d Cir. 1999) ................................................................ 14

*United States v. Simon*,
    12 F.4th 1 (1st Cir. 2021) .................................................................... 29

*United States v. Spinney*,
    65 F.3d 231 (1st Cir. 1995) ................................................................... 4

*United States v. Tonelli*,
    577 F.2d 194 (3d Cir. 1978) ......................................................... 14, 35

*United States v. Wilkerson*,
    251 F.3d 273 (1st Cir. 2001) ............................................................... 29

*Whalen v. United States,*
    445 U.S. 684 (1980) ............................................................................................... 15

*Woodman v. WWOR-TV, Inc.,*
    411 F.3d 69 (2d Cir. 2005) ............................................................................ 10, 11

*Yates v. United States,*
    354 U.S. 298 (1957) ............................................................................................... 20

## STATUTES

18 U.S.C. § 1001 ............................................................................................ 3, 13, 27

26 U.S.C. § 7206(1) ............................................................................................... 3, 25

31 U.S.C. § 5314 ............................................................................................... Passim

31 U.S.C. §§ 5322 ............................................................................................. Passim

## RULES

Fed. R. Crim. P. 29 ................................................................................................ 1, 3

Fed. R. Crim. P. 31(a) ............................................................................................... 27

Fed. R. Crim. P. 33 ....................................................................................... 1, 29, 35

Fed. R. Evid. 602 ..................................................................................................... 11

## REGULATIONS

31 C.F.R. § 103.24 ...................................................................................... 17, 18, 23

31 C.F.R. § 1010.350 ........................................................................................ Passim

42 Fed. Reg. 63774 (Dec. 20, 1977) ...................................................................... 17

76 Fed. Reg. 10234 (Feb. 24, 2011) ...................................................................... 18

76 Fed. Reg. 10235 (Feb. 24, 2011) ...................................................................... 18

## OTHER AUTHORITIES

*Black's Law Dictionary* (6th ed. 1990) ..................................................................... 7

*Black's Law Dictionary* (11th ed. 1990) ................................................................. 16

Defendant, Professor Charles Lieber, respectfully submits this memorandum of law in support of his motion, pursuant to Rule 29(c)(2), F. R. Crim. P., for a judgment of acquittal and pursuant to Rule 33(a), F. R. Crim. P., for a new trial.

<u>PRELIMINARY STATEMENT</u>

This Court has the opportunity to correct a manifest injustice.  The Court should do so by entering a judgment of acquittal in favor of Professor Lieber or by setting aside the verdicts against him.  The evidence at trial was insufficient to demonstrate beyond a reasonable doubt that Professor Lieber made or caused to be made false statements to the Department of Defense ("DOD") or to the National Institutes of Health ("NIH"), filed false tax returns or failed to file reports of a foreign bank account.  No rational juror could have found Professor Lieber guilty on the evidence presented to the jury – antiquated emails from persons halfway around the world who could not be cross-examined at trial, government agents who could not recall questions and answers in their interview of Professor Lieber, interview "statements" that were never properly memorialized and were, in fact, warped by the government, and a post-arrest statement that was puzzling and indecipherable.  The Court therefore should enter a judgment of acquittal as set forth below.

At the very least, the Court should grant a new trial in this ill-conceived and ill-advised case.  The government's investigation and prosecution of Professor Lieber arose from the Department of Justice's highly controversial and deeply flawed "China Initiative."  That project, according to the Department of Justice, "reflects the strategic priority of countering Chinese national security threats and reinforces the President's overall national security strategy."

The China Initiative, in fact, has accomplished no such thing.  Instead, it has produced a string of hollow prosecutions, which include the acquittal of Professor Anming Hu on all

charges, *see United States v. Anming Hu*, 20-cr-00021-TAV-DCP, Dkt. 101 (E.D. Tenn. Sept. 9, 2021), and the dismissal of all charges against Professor Gang Chen, *see United States v. Gang Chen*, 21-cr-10018-PBS, ECF 94 (D. Mass. Jan. 20, 2022), a meritless case prosecuted by the same U.S. Attorney's office that tried Professor Lieber.

The dismissal of Professor Chen's case, mere weeks after the verdicts against Professor Lieber, came amidst a continued and growing call for an end to the China Initiative – and to the accompanying intimidation and harassment of lawful pursuits by academicians. Prominent among those speaking out are former U.S. Attorney Andrew Lelling, who commented shortly before Professor Lieber's trial, "I think the point has been made and, going forward, they should stop. How many academics do you need?"[1] Mr. Lelling added, "If the point was to scare the [expletive] out of the entire academic community, the Initiative did that. They should change or shut down that portion of the program." *Id.* And Brown College President Christina Paxson recently commented, "The message that we've been signaling out to the world is 'don't come' – particularly in case you're from China—and I believe that's an enormous, big mistake."[2]

This prosecution of Professor Lieber is of a piece with the flawed China Initiative prosecutions identified above. The Court should closely scrutinize the verdicts, which, on the law and on the facts, cannot stand.

<u>STATEMENT OF THE CASE</u>

A grand jury returned a Superseding Indictment (the "Indictment"), ECF 35, charging Professor Lieber in six Counts. Counts One and Two charged that Professor Lieber made, or

---

[1] *See* Chris Villani, DOJ's China Initiative On Trial As Harvard Prof. Faces Jury, LAW360 (Dec. 10, 2021), https://www.law360.com/articles/1447748/doj-s-china-initiative-on-trial-as-harvard-prof-faces-jury.

[2] Henry Ren, Ivy League's Brown Rues 'Big Mistake' on U.S.-China College Ties, BLOOMBERG (Feb. 3, 2022), https://www.bloomberg.com/news/articles/2022-02-03/ivy-league-s-brown-rues-big-mistake-on-u-s-china-college-ties?utm_source=google&utm_medium=bd&cmpId=google.

caused to be made, false statements in violation of 18 U.S.C. § 1001(a)(2). Specifically, Count

One charges that Professor Lieber made a false statement when he:

> told investigators from the DOD's Defense Criminal Investigative
> Service, that he was never asked to participate in China's
> Thousand Talents Program, and that he "wasn't sure" how China
> categorized him, when, in fact, LIEBER had previously been asked
> by representatives of Wuhan University of Technology ("WUT")
> in China to participate in China's Thousand Talents Program, and
> in or about July 2012, signed a three-year contract with WUT
> entitled "Employment Contract of 'One Thousand Talent' High
> Level Foreign Expert."

Count Two charges that Professor Lieber:

> caused Harvard University to tell the NIH that LIEBER "[wa]s not
> and has never been a participant in" China's Thousand Talents
> Program, when, in fact, [he] had signed a three-year Thousand
> Talents Agreement with WUT entitled "Employment Contract of
> 'One Thousand Talent' High Level Foreign Expert" in or about
> July 2012.

Counts Three and Four charge that Professor Lieber filed a false tax return for tax years

2013 and 2014, respectively, in violation of 26 U.S.C. § 7206(1). Counts Five and Six charge

that Professor Lieber failed to file a report of a foreign bank account for calendar years 2014 and

2015, respectively, in violation of 31 U.S.C. §§ 5314(a) and 5322.

On December 21, 2021, after a six-day trial, a jury found Professor Lieber guilty on all

counts.

<u>ARGUMENT</u>

POINT I

THE COURT SHOULD
<u>ENTER A JUDGMENT OF ACQUITTAL</u>

On a motion for a judgment of acquittal under Rule 29, F.R. Crim. P., the Court "focuses

on whether a rational jury could have found that the government proved each element of the

crime beyond a reasonable doubt." *United States v. Rodriguez-Martinez*, 778 F.3d 367, 371 (1st

Cir. 2015).  The Court "evaluate[s] the evidence in the light most favorable to the prosecution

and draw[s] all reasonable evidentiary and credibility inferences in favor of the verdict. . . .

Nevertheless, [the Court] must 'reject those evidentiary interpretations and illations that are

unreasonable, unsupported, or overly speculative.'"  *Id*., quoting *United States v. Spinney*, 65

F.3d 231, 234 (1st Cir. 1995).

A.    Count One (False Statement) -- The Government
       <u>Introduced Insufficient Evidence To Sustain The Verdict</u>

The Court, when reviewing a guilty verdict in a false statement prosecution, will closely

scrutinize the evidence proving the question asked of the defendant and the answer given by the

defendant.  There is a "need in false statement prosecutions for reliable evidence of precisely

what was said."  *United States v. Poutre*, 646 F.2d 685, 688 n.4 (1st Cir. 1980).

Analysis proceeds as follows: "Because the falsity of an answer must be evaluated with

reference to the question asked . . . [the Court] begin[s] by considering the content of the

question that triggered [the defendant's] allegedly false response."  *United States v. Boskic*, 545

F.3d 69, 88 (1st Cir. 2008) (internal citation omitted).  And, assuming legally sufficient evidence

of the content of the question, the Court continues by considering the sufficiency of the evidence

of the defendant's answer and of its falsity.  *Id.*  "At a bare minimum," the answer "must have

been literally false."  *United States v. Reveron Martinez*, 836 F.2d 684, 689 (1st Cir. 1988).

Here, examining the evidence of the question and the answer, the verdict on Count One

cannot stand.

1.    First Specification -- That Professor Lieber Stated "That He Was
       <u>Never Asked To Participate In China's Thousand Talents Program"</u>

Count One charges that Professor Lieber falsely "told investigators . . . that he was never

asked to participate in China's Thousand Talents Program[.]"  ECF 35 ¶ 43.  For the following

three reasons, however, the government did not introduce sufficient evidence to prove that charge.

First, the government did not introduce sufficient "reliable evidence of precisely what was said[]" by the agents when they asked questions of Professor Lieber. *Poutre*, 646 F.2d at 688 n.4. Thus, the government introduced no trial testimony whatsoever showing precisely what the agents said. Indeed, Agent Mousseau testified that she "did not recall the specific language [she] used in her question or questions on th[e] topic" of whether or not Professor Lieber "was a member" of the Thousand Talents Program. Tr. 5-53:20-22; 5-78:11-13. The parties, furthermore, stipulated that Agent Hochberger "does not recall with specificity the exact words used in the questions that were posed to the Defendant regarding the Thousand Talents Program." Tr. 5-56:22—57:4.

The question of law for the Court therefore becomes whether the meager written record provides sufficient evidence to support the verdict. The answer to that question is no. Thus:

The government did not transcribe the interview at issue. Agent Hochberger's report did not memorialize any question asked of Professor Lieber, EX 322, and Agent Hochberger's handwritten notes merely stated, "Approached to be a member?" EX 323. Research discloses no case upholding a conviction for false statement where, as here, the question may appear only in a snippet of an agent's handwritten notes of the interview, which the agent did not even carry forward into his later written report or trial testimony. *See Poutre*, 646 F.2d at 688 (reversing conviction for insufficiency where two of three alleged false statements "are not included in" the written record of an interview, even though agent testified to the third); *Boskic*, 545 F.3d at 89 (finding evidence sufficient where agent who interviewed defendant testified at trial to her "customary practice" when asking questions).

Second, a charge of false statement fails as a matter of law where, as here, a "compari[son]" between the charge in an indictment and the evidence of the defendant's statement does not show that the defendant made the statement charged in the indictment. *United States v. Finucan*, 708 F.2d 838, 846-47 (1st Cir. 1983); *see United States v. Craigue*, 539 F. Supp. 3d 245, 248 (D.N.H. 2021) (dismissing indictment "[i]n light of the discrepancy between the false statement alleged and the statement [defendant] is alleged to have made[]"). Here, even assuming the existence of legally sufficient evidence of the content of the question put to Professor Lieber, the record contains no evidence that Professor Lieber gave the answer charged in the Indictment – that is, that Professor "LIEBER told" the agents "that he was never asked to participate" in China's program. ECF 35 ¶ 43. Thus:

At trial, neither agent testified that Professor Lieber gave such an answer. Indeed, Agent Mousseau testified that she did not "recall the specific language that [Professor Lieber] used in his answers[]" regarding this specification of false statement. Tr. 5-53:20-22. And the parties stipulated that Agent Hochberger similarly did not "recall with specificity the exact answer or answers" given by Professor Lieber. Tr. 5-56:22—57:4.

Turning again to the written record, neither the agent's notes nor the agent's report showed that Professor Lieber gave the answer charged in the Indictment. The report merely stated, in pertinent part: "Although Lieber was not explicitly asked to be a member of this program[.]" EX 323. That report, however, provided no evidence that Professor Lieber made the statement charged in the Indictment – that he "was never asked to participate[.]" ECF 35 ¶ 43.

In short, a "compari[son]" between the charge in the Indictment and the evidence at trial fails to show that Professor Lieber gave the answer charged in the Indictment. *Finucan*, 708

6

F.2d at 846-47.  Indeed, the record contains no evidence that Professor Lieber made the statement charged in the Indictment.  Accordingly, the verdict cannot stand.

Third, the answer attributed to Professor Lieber in the agent's report (that Professor Lieber "was not explicitly asked to be a member") does not prove the falsity of the statement charged in the Indictment ("that he was never asked to participate").  To be a "member" of a program and to "participate" in that program are different things.  *See Black's Law Dictionary* (6th ed. 1990) (defining "Member" as "[o]ne of the persons constituting a family, partnership, association, corporation, guild, court, legislature or the like[]"); *Powell Elec. Sys. v. Nat'l Union Fire Ins. Co.*, No. H-10-993, 2011 U.S. Dist. LEXIS 96848, at *18-19 (S.D. Tex. Aug. 29, 2011) (where contract did not define "Participate[,]" court applied its "normal accepted meaning[,]" which is to "take part[]").  Clearly, a non-member of a program can nevertheless participate in – that is, take part in – the program by, for example, giving a speech at a conference convened by the program.

Professor Lieber, furthermore, according to the agent's report, used the qualifier, "not explicitly asked[.]"  *See* EX 323.  As a matter of law, not to mention logic, that qualified statement does not prove the falsity of the unqualified statement charged in the Indictment. Evidence that (Professor Lieber said) he was "not explicitly asked" does prove or support a jury verdict that (Professor Lieber said) he was "never asked[,]" as charged.

The qualified answer attributed to Professor Lieber obviously implied that he had been, or may have been, "implicitly asked," rather than "explicitly asked."  The government, however, "must show more than that the interdicted statement was unresponsive or guarded.  At a bare minimum, the remark must have been literally false[,]"  *Reveron Martinez*, 836 F.2d at 689, which the proof here did not establish.  "Where the government cannot prove that the

defendant's [statement], although incomplete and evasive, was not actually a false response to the question posed, the district court does not err in dismissing the indictment." *Finucan*, 708 F.2d at 847-48.

The government, in sum, must litigate the record it made.  The government "bears the burden to clarify the statement through additional inquiry." *Boskic*, 545 F.3d at 92 (internal quotation marks and citations omitted).  Here, however, the government failed to make additional inquiry.  "[T]he government is [therefore] saddled with what was *said*, rather than what might have been meant[,]" *Reveron Martinez*, 836 F.2d at 690, and has "los[t] the opportunity to have a jury resolve the ultimate question of falsity[.]" *Boskic*, 545 F.3d at 93.

2.  Second Specification -- That Professor Lieber Stated
    <u>"That He 'Wasn't Sure' How China Categorized Him"</u>

Count One also charges that Professor Lieber falsely "told investigators . . . that he 'wasn't sure' how China categorized him[.]" ECF 35 ¶ 43.  For the following four reasons, however, the government did not introduce sufficient evidence to prove that charge.

<u>First</u>, the record contains no evidence that the agents asked Professor Lieber a question as to how China "categorized" him.  On the contrary, the record, described above and viewed in a light most favorable to the government, shows only the following in Agent Hochberger's notes of the interview: "Approached to be a member?"  EX 322.  Again, research discloses no case upholding a conviction for false statement where, as here, the question may appear in a snippet of an agent's handwritten notes of an interview, which the agent did not even carry forward into his later written report or trial testimony.

<u>Second</u>, a "compari[son]" between the charge in the Indictment and the evidence at trial fails to show that Professor Lieber gave the answer charged in the Indictment, *Finucan*, 708 F.2d at 846-47, as required to sustain the verdict.  The Indictment charges that Professor Lieber "told

investigators . . . that he 'wasn't sure' how China[,]" the foreign country itself, "categorized him[.]"  The trial record, however, contains no evidence that Professor Lieber gave that answer. On the contrary, according to Agent Mousseau, Professor Lieber said "that he's not sure how they" – whoever "they" were – "categorized him[.]"  Tr. 5-53:23—54:1.  And, Agent Hochberger's notes and report also stated that Professor Lieber used the ambiguous (or vague) "they."  EX 322, EX 323.

On this record, the verdict cannot stand.  The record contains no evidence that Professor Lieber gave the answer charged in the Indictment.

The record, furthermore, contains no evidence that would allow the jury to infer that "they" meant "China."  On the contrary, Agent Hochberger's notes use "they" in reference to the "program[,]" not China.  EX 322.

The evidence, viewed in a light most favorable to the government, showed that Professor Lieber communicated or dealt with individuals who purported to act regarding a "program" administered through a university located in China.  Those individuals and that program were "Chinese," which is how Agent Hochberger understood Professor Lieber's use of the word "they."  Tr. 5-56:22—57:4; EX 322; EX 323.  But the government introduced no evidence that those individuals and that program were "China," the foreign country itself.  Indeed, Agent Spice testified that she did not know whether the individuals with whom Professor Lieber dealt had authority from WUT or from the Thousand Talents Plan, much less from China, the foreign country itself.  Tr. 4-121:12—124:7.

Third, assuming the existence of legally sufficient evidence that the agents asked Professor Lieber, "Approached to be a member?" (or, more conversationally, "Were you

approached to be a member?"), and assuming further that Professor Lieber gave the answer alleged in the Indictment, the verdict falls because the answer was literally true.

Under the doctrine of literal truth, "a jury could not be allowed to consider a perjury charge [or a false statement charge] where the allegedly false statement was literally true but not responsive to the question asked and arguably misleading by negative implication. . . . In such instances, the questioner bears the burden to clarify the statement through additional inquiry." *Boskic*, 545 F.3d at 92 (internal quotation marks and citations omitted). Where "the matter was not contemporaneously pursued, the government is saddled with what was *said*, rather than what might have been meant." *Reveron Martinez*, 836 F.2d at 690.

The literal-truth doctrine applies here. According to Agent Hochberger's notes, the agents asked, "Approached to be a member?" EX 322. According to the Indictment, Professor Lieber answered "that he 'wasn't sure' how China categorized him[.]" ECF 35 ¶ 43. That answer was obviously unresponsive to the question; the answer ignored the question in two respects — whether Professor Lieber was "approached" and the purpose of any such approach ("to be a member?").

The answer, finally, was literally true. It was a statement by a speaker (Professor Lieber) about the state of mind of another person (China), a matter of fact, which the speaker cannot know and as to which the speaker cannot be "sure."

No person can know the state of mind of another person. *See, e.g., United States v. Rea*, 958 F.2d 1206, 1218 (2d Cir. 1992) (holding "objectionable" a question, put to a witness, "Did Bill Rea know that[?;]" the question "called for a factual answer on a matter that the witness could not know as a matter of fact[]"); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 87 (2d Cir. 2005) (holding that party is not "competent to testify to how <u>others</u> . . . perceived her"), citing

10

Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").  A witness or a party, in short, "is . . . not a mind-reader."  *Se-Kure Controls, Inc. v. Vanguard Products Group, Inc.*, 2008 WL 169054 *3 (N.D. Ill. Jan.17, 2008) (witness "may not testify that he knows [another person's] intent").

Here, taking the evidence in a light most favorable to the government, Professor Lieber made a statement of fact as to the state of mind of China – that is, as to what China knew and had concluded.  That statement provided "a factual answer on a matter that [Professor Lieber] could not know as a matter of fact[.]"  *Rea*, 958 F.2d at 1218.  It follows as a matter of law that Professor Lieber's answer – "that he was 'wasn't sure' how China categorized him[]'" — was literally true.  No one can know or be "sure" about another person's state of mind.

The government, of course, could have put follow-up questions to Professor Lieber, such as: "Do you have an understanding of how China categorized you?"  Or, "What is your understanding of how China categorized you?"  Such questions would have asked Professor Lieber about his own state of mind.  The government, however, chose not to do so.  "Since the matter was not contemporaneously pursued, the government is saddled with what was *said*, rather than what might have been meant[,]"  *Reveron Martinez*, 836 F.2d at 690, and has "los[t] the opportunity to have a jury resolve the ultimate question of falsity[.]"  *Boskic*, 545 F.3d at 93.

<u>Fourth</u>, in the alternative, the government did not introduce sufficient evidence that Professor Lieber's answer, as charged in the Indictment, was "literally false[,]" as required "[a]t a bare minimum[.]"  *Reveron Martinez*, 836 F.2d at 689.  *See Finucan*, 708 F.2d at 847-48 ("Where the government cannot prove that the defendant's testimony, although incomplete and evasive, was not actually a false response to the question posed, the district court does not err in

11

dismissing the indictment[]"); *United States v. Richardson*, 421 F.3d 17, 32-37 (1st Cir. 2005) (addressing, in the alternative, issues of literal truth and sufficiency of evidence of falsity).

The government here introduced no evidence that would allow a jury to conclude, beyond a reasonable doubt, that Professor Lieber was, in fact, "sure" about China's state of mind, even assuming that it is possible to prove such a fact. Again, the government did not ask Professor Lieber a follow-up question about his own understanding or about his own belief.

"Knowledge[,]" here, Professor Lieber's knowledge of China's state of mind, "and belief[,]" here, Professor Lieber's own belief, left unexplored by the government, "are very different mental states[.]" *United States v. Castro*, 704 F.3d 125, 140 (3d Cir. 2013). "[K]nowledge implies a much higher degree of certainty[,]" *United States v. Golomb*, 811 F.2d 787, 792 (2d Cir. 1987), a degree of certainty that the evidence here simply did not establish.

Professor Lieber's answer, furthermore, which used the word "categorize," was unresponsive and ambiguous (or vague). That answer can refer to the way China "categorized" him as a scientist (e.g., "brilliant" or "an expert" or merely "pretty good"), as a person or colleague ("cooperative" or "uncooperative," or "difficult" or "easy to work with"), as a mentor to students ("caring" or "distant"), as a "participant" or "non-participant" in a program, or as a "member" or "non-member" of a program. The burden, however, rested on the government "to resolve the ambiguities created by nonresponsive answers with follow-up questions[,]" *Boskic*, 545 F.3d at 93, which the government here chose not to ask. The government therefore "los[t] the opportunity to have a jury resolve the ultimate question of falsity[.]" *Id.*

B.    Count Two (Causing A False Statement) – The
      <u>Government Introduced Insufficient Evidence Of Falsity</u>

Count Two charged that Professor Lieber caused Harvard University to make a false statement to the NIH. To prove that charge, the government bore the burden of proving, as an

essential element of the offense, that Harvard's statement to the NIH was false.  *United States v. Sebaggala*, 256 F.3d 59, 63 (1st Cir. 2001) (holding, under 18 U.S.C. § 1001, that prosecution must prove a "statement to the government, which was false[]"); *United States v. Dodd*, 43 F.3d 759, 763 (1st Cir. 1995) (holding that "one who 'causes the commission of an indispensable element of the offense by an innocent agent or instrumentality, is guilty as a principal'").

To prove falsity, in turn, the government must prove, "[a]t a bare minimum," that the statement at issue was "literally false[.]"  *Reveron Martinez*, 836 F.2d at 689.  Here, however, as demonstrated below, the government did not prove that bare minimum.  Harvard's statement to the NIH was not literally false.

The evidence, viewed in a light most favorable to the government, showed the following: Harvard drafted a letter to the NIH, which stated, "Dr. Lieber has represented that he is not and has never been a participant in China's 'Thousand People Plan.'"  EX 3.  Harvard sent that draft to Professor Lieber and asked him to review it.  EX 108.  Professor Lieber did so and did not change the statement quoted above in this paragraph.  *Id*.  Harvard then sent the letter to the NIH, including the statement quoted above in this paragraph.  EX 133.

As a matter of law, this evidence does not support a jury verdict that Harvard's statement to the NIH was literally false.  Harvard stated to the NIH: "Dr. Lieber has represented" that he is not and never has been a participant in China's Thousand People Plan. And, taking the evidence in the light most favorable to the government, Professor Lieber had indeed "represented" that to Harvard, when Professor Lieber reviewed Harvard's draft letter, which contained that very statement, and did not change that statement.  Accordingly, Harvard's statement was not "literally false[,]"  *Reveron Martinez*, 836 F.2d at 689, or as some Circuits put it, Harvard's statement "on its face[,] [wa]s not false."  *United States v.*

13

*Gatewood*, 173 F.3d 983, 987 (6th Cir. 1999) (internal quotation marks omitted) (citing cases); *United States v. Moses*, 94 F.3d 182, 189 (5th Cir. 1996) (where statement "was not false on its face, the evidence was insufficient to support the conviction") (citing cases). The verdict therefore cannot stand.

To be sure, the Indictment, and the government in summation, truncated Harvard's statement to the NIH. ECF 35 ¶ 45; Tr. 6:114:16-20; *cf.* EX 3. The government, however, cannot "lift[] a statement of the accused [or here, Harvard] out of its immediate context and thus giv[e] it a meaning wholly different than that which its context clearly shows." *United States v. Tonelli*, 577 F.2d 194, 198 (3d Cir. 1978) (internal quotations marks omitted); *see United States v. Serafini*, 167 F.3d 812, 820 (3d Cir. 1999) (citing cases).

Harvard here did not simply "tell the NIH that LIEBER '[wa]s not and never has been a participant in' China's Thousand Talents Program[,]" as the Indictment charged, ECF 35 ¶ 45, and as the government argued. Harvard, rather, told the NIH that Professor Lieber made a certain "represent[ation]" to Harvard. EX 3. "[T]he government is saddled with what was *said*, rather than with what might have been meant." *Reveron Martinez*, 836 F.2d at 690.

C.     Counts Five And Six (Failure To File Reports Of Foreign Bank
       Account) -- The Regulation Upon Which The Government Relies Is Void

Counts Five and Six charge that Professor Lieber failed to file reports of a foreign bank account. The government relies on sections of the Bank Secrecy Act (the "BSA"), 31 U.S.C. §§ 5314(a) and 5322(a), and on a regulation promulgated by the Secretary of the Treasury (the "Secretary"), 31 C.F.R. § 1010.350 (the "Regulation").

The Court, however, should enter a judgment of acquittal on these Counts. As shown below, the Regulation is void because it "add[s] to the statute . . . something which is not there[.]" *In re JPMorganChase Bank, N.A.*, 799 F.3d 36, 42 (1st Cir. 2015) (internal quotation

marks omitted).  Specifically, the Regulation adds a requirement that a U.S. person report a "relationship" with a foreign bank.  Such a requirement "is not there" in the statute, which requires that a U.S. person report a "transaction[,]" not a "relationship[.]"  A "transaction" and a "relationship" are different things.  Accordingly, the Regulation expands regulatory authority to reach conduct that section 5314(a) does not outlaw.  The Regulation is therefore void.

*      *      *

Under the Constitution, and its principle of separation of powers, "the power to define criminal offenses . . .  resides wholly with the Congress."  *Whalen v. United States*, 445 U.S. 684, 689 (1980).  Congress, of course, may empower an agency of the Executive Branch to promulgate regulations, but the "scope" of a regulation "cannot exceed the power granted [to the agency] by Congress[.]"  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213-14 (1976).

The First Circuit has summarized the law: "The rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law.  Rather, it is the power to adopt regulations to carry into effect the will of Congress as expressed in the statute. . . . Where Congress has spoken with specificity, an agency may not promulgate regulations that are an attempted addition to the statute of something which is not there, even if the intent behind the attempted addition is consistent with the intent behind the authorizing statute."  *JPMorgan*, 799 F.3d at 42 (internal quotation marks omitted), citing *Hochfelder*, 425 U.S. at 213-14; and *United States v. Calamaro*, 354 U.S. 351, 358-59 (1957).

*Calamaro*, a criminal case, is particularly instructive.  *Calamaro* involved "a type of lottery[,]'" which employed three participants – a "banker," a "writer," and a "pick-up man[.]"  *Id.* at 353 (internal quotation marks omitted).  The Court affirmed the reversal of the conviction

of a pick-up man, holding that the applicable statute reached the banker and the writer but not the pick-up man. *Id.*

The government sought to salvage the conviction on the ground that "the Treasury Regulations relating to the statute purport to include the pick-up man[.]" *Id.* at 358.  The government contended that the regulation "constitutes an administrative interpretation to which [the Court] should give weight in construing the statute[.]" *Id.*  The Court rejected the contention: "[W]e cannot but regard this Treasury Regulation as no more than an attempted addition to the statute of something which is not there.  As such the regulation can furnish no sustenance to the statute." *Id.* at 359 (footnote omitted).

Here, Congress has spoken "with specificity[.]" *JPMorgan*, 799 F.3d at 42.  Thus, 31 U.S.C. § 5314(a) provides, in pertinent part, that the Secretary shall require a U.S. person to file a report when the U.S. person "makes a transaction" with a foreign financial agency."[3]  Treasury, however, promulgated a regulation that imposes an "addition to the statute of something which is not there[.]" *JPMorgan*, 799 F.3d at 42 (internal quotations marks omitted).  Thus, the Regulation provides, in pertinent part, that a U.S. person having a specified interest in, or specified authority over, a specified kind of account shall report such "relationship[.]"

A "transaction" and a "relationship" are different things.[4]  Indeed, "relationship" reaches much further than "transaction."  "[R]elations[,]" in fact, "stop nowhere." *Maracich v. Spears*, 570 U.S. 48, 59 (2013) (internal quotations marks omitted).  The Regulation therefore expands

---

[3] The Regulation also empowers the Secretary to require a U.S. person to file a report when the person "maintains a relation for any person" with a foreign financial agency.  Here, however, the Indictment does not charge, and the government did not prove, that Professor Lieber maintained a relation with ICBC "for any person[.]"

[4] *See Black's Law Dictionary* (11th ed. 2019) (defining "transaction" as "The act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract. . . . Something performed or carried out; a business agreement or exchange. . . . Any activity involving two or more persons.") (defining "relationship" as "The nature of the association between two or more people; esp., a legally recognized association that makes a difference in the participants' legal rights and duties of care.").

regulatory authority to reach conduct that the statute does not outlaw.  The Regulation "operates to create a rule out of harmony with the statute," *United States v. Kahn*, 5 F.4th 167, 176 (2d Cir. 2021) (internal quotation marks omitted), by "broaden[ing] [Treasury's] regulatory authority over activities that the plain language of the statute would not otherwise permit." *Didrickson v. Dep't of Interior*, 796 F. Supp. 1281, 1291 (D. Alas. 1991).  Such a regulation "is a mere nullity[;]" *Kahn*, 5 F.4th at 176 (internal quotation marks omitted); it "can furnish no sustenance to the statute." *Calamaro*, 354 U.S. at 359 (footnote omitted).

The history of the BSA and the Regulation confirm the foregoing conclusion.  "'It is well-settled that when a regulation conflicts with a subsequently enacted statute, the statute controls and voids that regulation.'" *Kahn*, 5 F.4th at 175, quoting *Norman v. United States*, 942 F.3d 1111, 1118 (Fed. Cir. 2019).

Here, Congress, in 1970, enacted the BSA.  Treasury, in turn, in 1977, promulgated a regulation, which provided that a U.S. person "having a financial interest in, or signature or other authority over, a bank, securities or other financial account in a foreign country shall report such relationship[.]"  42 Fed. Reg. 63774 (Dec. 20, 1977), amending 31 C.F.R. § 103.24.

Congress, next, in 1982, amended the BSA, by enacting section 5314, which empowers the Secretary to require a U.S. person to file a report when that person "makes a transaction" with a foreign financial agency.  Treasury, however, failed to amend its 1977 regulation so as to harmonize it with the 1982 statute, which imposed no requirement that a U.S. person file a report regarding a "relationship[.]"  On the contrary, Treasury simply carried forward, to this day, the pertinent part of the 1977 regulation, including its requirement that a U.S. person having a specified interest in, or specified authority over, a specified kind of account, report "such

17

relationship[.]"  31 C.F.R. § 1010.350(a).[5]  *Cf. Kahn*, 5 F.4th at 175 (noting that "Treasury's relaxed approach to amending its regulations to track Code changes [wa]s well documented[]") (internal quotation marks omitted).

It follows in this case that the Regulation is void and cannot provide the foundation for a conviction.  The Regulation, which originated in pertinent part in 1977, "conflicts with a subsequently enacted statute[.]"  *Kahn*, 5 F.4th at 175, quoting *Norman*, 942 F.3d at 1118.  Accordingly, "the statute controls and voids that regulation."  *Id.*

Finally, the delegation-of-authority provision set forth in section 5314 does not save Counts Five and Six.  Section 5314(b)(5) provides, in pertinent part: "The Secretary may . . . prescribe other matters the Secretary considers necessary to carry out this section[.]"  That delegation, however, merely gives the Secretary power to promulgate regulations that "carry out this section[;]" – that is, section 5314 itself.  That delegation therefore merely returns the analysis to its starting place – the language of section 5314, which, as shown above, conflicts with the language of the Regulation.

Section 5314(b)(5), in short, "does not constitute authorization to issue a regulation that contradicts" or exceeds "an express provision of the statute[,]" *Kahn*, 5 F.4th at 173, no matter how convenient the government may find the Regulation.  "[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."  *Lawrence + Memorial Hosp. v. Burwell*, 812 F.3d 257, 267 (2d Cir. 2016) (internal quotation marks omitted).

D.     Count Five (Failure To File A Report Of Foreign Bank Account For Year
       2014) -- The Government Introduced Insufficient Evidence Of Willfullness

---

[5] The 1977 regulation, 31 C.F.R. § 103.24, remained in effect until 2011, when the current Regulation, 31 C.F.R. § 1010.350(a), came into effect.  Meanwhile, Treasury renumbered the sections, without "intend[ing] to have any substantive effect on the BSA regulations."  *See* 76 Fed. Reg. 10234, 10235 (Feb. 24, 2011).

Count Five required the government to prove that Professor Lieber "willfully" failed to file a report of a foreign bank account, in violation of 31 U.S.C. § 5314(a).  ECF 35 ¶ 51.  Under that statute, the government, to prove that the defendant acted "willfully," must prove that "the defendant was aware of the specific provision of the [statute] that he was charged with violating."  *Bryan v. United States*, 524 U.S. 184, 194 (1998).  Thus, the government must prove that the defendant had "both knowledge of the reporting requirement *and* a specific intent to commit the crime, *i.e.*, a purpose to disobey the law."  *Ratzlaf v. United States*, 510 U.S. 135, 141 (1994) (internal quotation marks omitted).  In short, the government must prove a "voluntary, intentional violation of a known legal duty[.]"  *Id.* at 142 (internal quotation marks omitted); *see United States v. Boulerice*, 325 F.3d 75, 80 (1st Cir. 2003) ("voluntary, intentional violation of a known legal duty[]") (internal quotation marks omitted); *United States v. Griffin*, 524 F.3d 71, 77-78 (1st Cir. 2008) (same).

Section 5314(a) and similar statutes "carv[e] out an exception to the traditional rule that ignorance of the law is no excuse and require that the defendant have knowledge of the law."  *Bryan,* 524 U.S. at 194-95 (internal quotation marks omitted).  *See Id*. at n.22 (government must prove that "'the defendant was subjectively aware of the duty at issue[]'"), quoting *United States v. Aversa*, 984 F.2d 493, 502 (1st Cir. 1993) (Breyer, C.J., concurring); *United States v. Dockray*, 943 F.2d 152, 156 (1st Cir. 1991) ("the willfulness requirement in tax evasion serves a function unique in criminal law: it makes ignorance of the law a defense[]").

Count Five charged that Professor Lieber willfully failed to file, by June 30, 2015, a report of a foreign bank account for calendar year 2014.  That charge required proof that Professor Lieber had – by June 30, 2015 – subjective knowledge of the reporting requirement and that he voluntarily and intentionally violated that requirement.

19

The government, however, introduced no such proof.  Professor Lieber's accountant testified that he "sent them[,]" a reference to Professor Lieber and his wife, an engagement letter, dated January 3, 2015, Tr. 5-152:20-22, which set forth the reporting requirement.  *See* EX 245. The record, however, contains no evidence that Professor Lieber read that letter; he certainly did not sign that letter, as the accountant had requested.  The government therefore failed to prove an essential element of the offense charged in Count Five, and the verdict cannot stand.

POINT II

THE COURT SHOULD
GRANT A NEW TRIAL

A.     The Verdicts Fall Under The Yates/Griffin Doctrine

     1.     The Applicable Law – The Yates/Griffin Doctrine

Where the government prosecutes a single crime on two theories, and the jury returns a general verdict of guilty, the verdict cannot stand if either one of the government's theories is legally invalid or inadequate.  *Griffin v. United States*, 502 U.S. 46, 56-59 (1991) (holding that conviction cannot stand where "one of the possible bases of conviction . . . was . . . legally inadequate").  The verdict cannot stand because it may rest on conduct that "fails to come within the statutory definition of the crime."  *Id.* at 59; *see Yates v. United States*, 354 U.S. 298, 312 (1957); *United States v. Fernandez-Jorge*, 894 F.3d 36, 52 (1st Cir. 2018); *United States v. Boots*, 80 F.3d 580, 589 (1st Cir. 1996).

*Griffin* states the theoretical basis for this rule:

> Jurors are generally not equipped to determine whether a particular theory of conviction submitted to them is contrary to law -- whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime.  When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.

20

502 U.S. at 59.  *See United States v. Nieves-Burgos*, 62 F.3d 431, 434-37 (1st Cir. 1995)

(explaining the doctrine); *United States v. Mehanna*, 735 F.3d 32, 47-51 (1st Cir. 2013) (same).

Here, applying the foregoing authorities, the general verdicts of guilty on Counts One,

Three, Four, Five and Six cannot stand.

> 2.    The Verdict On Count One Falls

The government prosecuted Count One on two theories — that Professor Lieber falsely

stated, first, "that he was never asked to participate in China's Thousand Talents Program, and

[second] that he 'wasn't sure' how China categorized him[.]"  ECF 35 ¶ 51.  For the reasons

shown above, however, the second of those theories failed as a matter of law.  The answer

alleged in the Indictment, quoted above, was literally true.

Accordingly, the government's "theory" of false statement is "contrary to law."

*Richardson*, 421 F.3d at 33.  The verdict therefore cannot stand because it may rest upon the

legally invalid theory, and upon conduct that "fails to come within the statutory definition of the

crime."  *Griffin*, 502 U.S. at 59.

> 3.    The Verdicts On Counts Five And Six Fall

The government prosecuted Counts Five and Six on two theories – that Professor Lieber

failed to file a report disclosing, first, that he had "an interest in" a bank account in China, and

second, that he had "signature and other authority over[]" that account.  ECF 35 ¶ 51.  For the

reasons shown below, however, the second of those theories fails as a matter of law.

31 C.F.R. § 1010.350(a) provides, in pertinent part: "Each United States person having a

financial interest in, or signature or other authority over, a bank, securities, or other financial

account in a foreign country shall report such relationship[.]"  The Indictment charges that

Professor Lieber committed the offenses alleged in Counts Five and Six by failing to file a report

disclosing that he had both a "financial interest in[]" an account, and "signature or other authority over[]" the account.  Here, however, as a matter of law, the latter prong of the Regulation – that is, the "signature or other authority over" prong – does not apply.  Thus:

Section 1010.350(c) makes sub-section (a) applicable to three "[t]ypes of reportable accounts[]" – a "Bank account[,]" a "Securities account[,]" and an "Other financial account." Sub-section (e), in turn, describes how the government may prove "[a] financial interest in a bank, securities or other financial account[.]"  Sub-section (f), by contrast, describes how the government may prove "[s]ignature or other authority" over "a financial account[]" – but not over "a bank [or] securities account[.]"  Accordingly, for the following three reasons, sub-section (f) excludes "bank [and] securities . . . account[s.]"

First, "Congress [or here, the Secretary] generally acts intentionally when it uses particular language in one section of a statute [or here, a regulation] but omits it in another." *Dep't of Homeland Security v. MacLean*, 574 U.S. 383, 391 (2015).  Accordingly, the omission in one section of language present in another section "gives rise to a negative inference" that the draftsperson intentionally omitted the language.  *Trenkler v. United States*, 268 F.3d 16, 23 (1st Cir. 2001).

Here, the Secretary included particular language in sub-section (e) of the Regulation but omitted it in sub-section (f) of the Regulation.  The Court should therefore draw the negative inference: The Secretary intentionally omitted "bank account" and "securities account" from sub-section (f), and intentionally limited sub-section (f) to "financial account."  *See MacLean*, 574 U.S. at 391 ("Congress's choice to say 'specifically prohibited by law' rather than 'specifically prohibited by law, rule or regulation' suggests that Congress meant to exclude rules and regulations."); *Dep't of Treasury v. FLRA*, 494 U.S. 922, 932 (1990) ("A statute that in one

section refers to 'law, rule or regulation,' and in another section to only 'laws' cannot, unless we abandon all pretense at precise communication, be deemed to mean the same thing in both places.").

Had the Secretary intended to include all three types of accounts in sub-section (f), the Secretary "presumably would have done so expressly, as [the Secretary] did in the immediately [preced]ing subsection" (e). *Russello v. United States*, 464 U.S. 16, 23 (1983). The Court should "refrain from concluding here that the differing language in the two subsections has the same meaning in each[,]" especially where, as here, one "speaks broadly" and the other uses "less expansive language[.]" *Id.*

Second, the *expressio unius* canon applies here. That canon "translates roughly as 'the expression of one thing is the exclusion of other things[.]'" *United States v. Hernandez-Ferrer*, 599 F.3d 63, 67 (1st Cir. 2010). "Th[at] maxim instructs that, when parties list specific items in a document, any item not so listed is typically thought to be excluded." *Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173, 179 (1995).

Here, the Secretary listed "financial account" in sub-section (f). Therefore, "bank account" and "securities account" are excluded from sub-section (f). The expression of one thing in sub-section (f) (coverage of only one type of account) is the exclusion of other things from sub-section (f) (coverage of the other two types of accounts).

Third, the history of the Regulation shows that the Secretary explicitly narrowed the reach of this prong of the Regulation. Thus, 31 C.F.R. § 103.24, effective from 1977 until 2011, provided, in pertinent part: "Each person subject to the jurisdiction of the United States . . . having a financial interest in, or signature or other authority over, a bank, securities or other financial account in a foreign country shall report such relationship[.]" In 2011, however, the

Secretary amended the Regulation.  That amended version, which remains in force, revised the definition of "Signature or other authority[]" so as to include only "the authority of an individual . . . to control the disposition of money, funds or other assets held in a financial account[,]" but not in "a bank [or] securities account[.]"  Plainly, the "signature or other authority over" prong of the Regulation does not apply to a "bank account" or a "securities account."

Accordingly, the "signature or other authority over" prong does apply in this case, which involves a "bank account," not a "financial account."  The verdicts therefore cannot stand because they may rest upon the inapplicable (and therefore invalid) legal theory, and upon conduct that "fails to come within the statutory definition of the crime."  *Griffin*, 502 U.S. at 59.

### 4.     The Verdicts On Counts Three And Four Fall

The government prosecuted Counts Three and Four on two theories – that Professor Lieber filed a false tax return, "in that: (1) LIEBER underreported and failed to report income from WUT; and (2) LIEBER failed to report that he had an interest in, or signature authority over, a bank" account in China.  ECF 35 ¶ 47.  For the reasons shown above with respect to Counts Five and Six, however, the second of those theories does not apply in this case and therefore failed as a matter of law.  Accordingly, the verdicts cannot stand because they may rest upon the inapplicable (and therefore invalid) legal theory, and upon conduct that "fails to come within the statutory definition of the crime."  *Griffin*, 502 U.S. at 59.

### B.     The Court Erred When Instructing The Jury

#### 1.     The Court Erred When It Failed To Instruct The Jury Regarding Certain Elements Of The Offenses Charged In Counts Three, Four, Five And Six

A defendant has a Sixth Amendment right to have the trial court instruct the jury on every element of the offense charged.  *Neder v. United States*, 527 U.S. 1, 8 (1999).  Here, however,

with respect to Counts Three, Four, Five and Six, the Court failed to instruct the jury on the element of willfulness.  And, with respect to Counts Five and Six, the Court failed to instruct the jury on the element of a "financial interest in," or "signature or other authority over," a bank account.

> a.      The Court Erred When It Failed To
>          Instruct The Jury Regarding Willfulness

Each of Counts Three and Four charged Professor Lieber with "willfully" filing a false tax return, in violation of 26 U.S.C. § 7206(1).  Each of Counts Five and Six charged Professor Lieber with "willfully" failing to file a report regarding a foreign bank account, in violation of 31 U.S.C. §§ 5314(a) and 5322.

As demonstrated in Point I(D) above, the government, to prove that Professor Lieber "willfully" violated the reporting statute, must prove that Professor Lieber had "both knowledge of the reporting requirement *and* a specific intent to commit the crime, *i.e.*, a purpose to disobey the law."  *Ratzlaf*, 510 U.S. at 141 (1994) (internal quotation marks omitted).  Put differently, the government must prove a "voluntary, intentional violation of a known legal duty[.]"  *Id.* at 142 (internal quotation marks omitted); *see Boulerice*, 325 F.3d at 80.  The same definition of "willfully" applies to the tax-law violations charged in Counts Three and Four.  *Id.*

Here, the Court should have instructed the jury on the applicable, high standard of willfulness, as Professor Lieber requested.  The Court, however, did not do so.  The Court should therefore grant a new trial.

> b.      The Court Erred When It Failed To Instruct The Jury
>          Regarding The Regulatory Definitions Of A "Financial Interest
>          In" Or "Signature Or Other Authority Over" A Bank Account

Counts Five and Six required proof that Professor Lieber had a "financial interest in," or "signature or other authority over," a bank account in China.  Those regulatory terms are terms of art, each of which the Regulation defines in detail.  Thus:

A United States person has a "financial interest" in a foreign-country bank account "for which he is the owner of record or has legal title whether the account is maintained for his own benefit or for the benefit of others."  31 C.F.R. § 1010.350(e)(1).  This prong of the regulatory definition required the government to prove that Professor Lieber was the owner of record of, or had legal title to, a bank account in China.

"Signature or other authority over" a foreign-country bank account means "the authority of an individual (alone or in conjunction with another) to control the disposition of money, funds, or other assets held in a financial account by direct communication (whether in writing orotherwise) to the person with whom the financial account is maintained." 31 C.F.R. § 1010.350(f)(1).  This prong of the regulatory definition required the government to prove that Professor Lieber had the authority, alone or in conjunction with another, to control the disposition of money held in a bank account by direct communication to the bank.

Here, the Court should have instructed the jury using those definitions, as Professor Lieber requested.  The Court, however, did not do so.  Indeed, absent instructions defining these regulatory terms, the jury may well have found Professor Lieber guilty based solely on his receipt of money from a source in China, even though the law did not prohibit such receipt. The Court should therefore grant a new trial.

2.    The Court Erred When It Failed To Give
The Jury A Specific Unanimity Instruction

26

The Sixth Amendment gives a defendant the right to insist on a unanimous verdict before conviction. *Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020). Rule 31(a), Fed. R. Crim. P., in turn, implements that right, providing, "The verdict must be unanimous."

Where an "indictment charges two distinct and complete violations of the same statute in a single count joined by the conjunctive 'and,' it is duplicitous. . . . The remedy. . . . is a specific unanimity instruction to ensure that the jury understands that its verdict must be unanimous as to which instance of the alleged statutory violation resulted in a crime." *United States v. Karani*, 984 F.3d 163, 181 (1st Cir. 2021); *see United States v. Newell*, 658 F.3d 1, 26-28 (1st Cir. 2011) (citing cases); *United States v. Gipson*, 553 F.2d 453, 456-58 (5th Cir. 1977).

Here, each Count of the Indictment charged two "instances" of the statutory violation, conduct that would constitute "two distinct and complete violations of the same statute[,]" joined by the conjunctive "and." Count One, for example, charged that Professor Lieber made a false statement in that he told investigators, first, "that he was never asked to participate in China's Thousand Talents Program, and [second] that he 'wasn't sure' how China categorized him[.]" ECF 35 ¶ 43. Plainly, proof of either of those instances would "be enough to make out an independent violation" of section 1001(a)(2). *Newell*, 658 F.3d at 22. Conversely, proof of both instances would make out "two distinct and complete violations" of section 1001(a)(2). *Karani*, 984 F.3d at 181. Indeed, at the charge conference, the government conceded the point. *See* Tr. 6-89:1-3 ("The government can allege in the conjunctive and prove in the disjunctive. Either statement is a crime. It is one count but either statement is sufficient for the jury.")

Accordingly, the Court erred when it refused to give a specific unanimity instruction on Count One (Tr. 6-91:3-6), as Professor Lieber requested. *See* ECF 237. Indeed, as the government conceded, "either statement is sufficient for the jury. . . . [i]f they find unanimously

as to that statement[.]"  Tr. 6-89:3-4.  A specific unanimity instruction would have "ensure[d]
that the jury understands that its verdict must be unanimous as to which instance of the alleged
statutory violation resulted in a crime."  *Karani*, 984 F.3d at 181. *United States v. Crisci*, 273
F.3d 235, 239 (2d Cir. 2001) (holding that a specific unanimity instruction saved a general
verdict where indictment charged seven false statements in single count).

   The same analysis and conclusion apply to the other Counts.  *See* ECF 35 (Count Two;
charging that Professor Lieber caused Harvard to make a false statement that Professor Lieber
"'[wa]s not <u>and</u> has never been a participant[;]" Counts Three and Four; charging that Professor
Lieber filed a false tax return, "in that (1) LIEBER underreported and failed to report income
from WUT; <u>and</u> (2) LIEBER failed to report that he had an interest in, or signature or other
authority over[]" bank account; Counts Five and Six; charging that Professor Lieber failed to file
a report "disclosing that he had an interest in <u>and</u> signature and other authority over" bank
account).  The Court should have given a specific unanimity instruction on those Counts.

C.   The Court Should Suppress
     <u>Professor Lieber's Post-Arrest Statement</u>

   Professor Lieber previously moved to suppress his post-arrest statement.  Professor
Lieber argued, among other things, that the Court should suppress that statement because the
agent who administered *Miranda* warnings mis-stated the applicable law.  ECF 173; ECF 184.

   The Court denied that motion.  ECF 192.  The Court, however, did not specifically
address, much less reject, the foregoing contention.  The Court should therefore address that
contention now, should grant the motion to suppress and should order a new trial at which the
Court would exclude Professor Lieber's post-arrest statement from evidence.

D.   <u>The Court Should Grant A New Trial In The Interest Of Justice</u>

Rule 33(a), Fed. R. Crim. P., provides in pertinent part, "Upon [a] defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." A court's "power to order a new trial is greater than its power to grant a motion for acquittal." *United States v. Ruiz*, 105 F.3d 1492, 1501 (1st Cir. 1997). Thus, "[m]otions for a new trial are directed to the broad discretion of the trial judge, who may weigh the evidence and evaluate the credibility of witnesses[.]" *United States v. Indelicato*, 611 F.2d 376, 387 (1st Cir. 1979); *see United States v. Merlino*, 592 F.3d 22, 32 (1st Cir. 2010). A new trial, while "granted sparingly[,]" is available "when the evidence preponderates heavily against the jury's verdict or a miscarriage of justice otherwise looms." *United States v. Simon*, 12 F.4th 1, 56 (1st Cir. 2021).

On a Rule 33 motion, furthermore, the court may also reconsider its evidentiary rulings, subject to harmless error analysis. *United States v. DiMasi*, 810 F. Supp. 2d 347, 362 (D. Mass. 2011); s*ee United States v. Wilkerson*, 251 F.3d 273, 279–80 (1st Cir. 2001).

1.   <u>The Verdicts Were Against The Weight Of The Evidence</u>

Here, if the evidence was sufficient to sustain the verdicts, it was barely so. Indeed, the evidence, on any view of it, provides "fragile" support for the verdicts, *Poutre*, 646 F.2d at 688, and preponderates heavily against the verdicts. Accordingly, for the host of reasons set forth below, the Court should grant a new trial.

<u>First</u>, the agents who interviewed Professor Lieber could not even recall their questions or Professor Lieber's answers regarding the first specification of false statement. This case therefore provides an extraordinary spectacle – a false statement case in which the government (a) offers neither a transcript nor a live witness who can provide a jury with "reliable evidence of precisely what was said[,]" *Poutre*, 646 F.2d at 688 n.4, and (b) places wholesale reliance on a

snippet in a government agent's handwritten notes of an interview, which the agent did not even carry forward into his later written report or trial testimony.

Second, turning to the alleged answer, the record reveals a discrepancy. The only written evidence, an agent's report, states: "Although Lieber was not explicitly asked to be a member of this program[.]" EX 323. The agent's report does not state that Professor Lieber made the statement charged in the Indictment - that he "was never asked to participate[.]" ECF 35 ¶ 43.

The answer attributed to Professor Lieber in the agent's report, furthermore, that Professor Lieber "was not explicitly asked to be a member[,]" does not prove the falsity of the statement charged in the Indictment ("that he was never asked to participate"). And the agent never bothered to ask follow-up questions as to what Professor Lieber meant by "not explicitly."

Third, turning to the next specification of false statement, the record reveals still other discrepancies. The Indictment charged that Professor Lieber falsely "told investigators . . . that he 'wasn't sure' how China categorized him[.]" ECF 35 ¶ 43. But the record contains no evidence that the agents asked Professor Lieber a question as to how China "categorized" him. On the contrary, the record shows only the following in an agent's notes: "Approached to be a member?" EX 322. Again, the government relies on a snippet of handwritten notes, which the agent did not even carry forward into his later written report or trial testimony.

The record, furthermore, contains no evidence that Professor Lieber actually gave the answer charged in the Indictment – that he "told investigators . . . that he 'wasn't sure' how China[,]" the foreign country itself, "categorized him[.]" According to the agents, Professor Lieber said something different – "that he's not sure how they[,]" whoever "they" were, "categorized him[.]" Tr. 5-53:23—54:1; Tr. 5-56:25—57:4. The record certainly contains no

30

evidence that "they" meant "China[,]" as distinct from a "program" administered in China, which is how Agent Hochberger's notes used "they[.]"  EX 322; EX 323.

Fourth, the government introduced no evidence proving, beyond a reasonable doubt, that Professor Lieber was, in fact, "sure" about China's state of mind, even assuming that it is possible to prove such a fact.  Professor Lieber's answer, furthermore, which used the word "categorize," was unresponsive and ambiguous (or vague).  Again, the government did not ask Professor Lieber a follow-up question about his own understanding of China's state of mind.

Fifth, the government failed to call a single witness from the Thousand Talents Plan or from WUT to prove Professor Lieber's alleged participation in the program – or, how the program or "China" "categorized" him.  Indeed, the government introduced no evidence showing that China ever "categorized" Professor Lieber in any way.

Sixth, the government failed to produce an executed contract for the Thousand Talents Plan.  Instead, the government relied upon EX 23 as evidence of a contract, even though EX 23 was unsigned and riddled with spelling and grammatical errors.  The government also relied on EX 26, an email confirming signature.  EX 26, however, described a document that was different from the draft in EX 23.  The government, finally, argued that Professor Lieber's subsequent actions showed performance of an alleged contract.  The evidence, however, merely demonstrated normal, lawful, scientific and academic activities in which Professor Lieber and others had engaged for years.

Seventh, turning to Count Two, the government urged the jury to find Professor Lieber guilty on the theory that he "approved" Harvard's false statement, which consisted of a single sentence in Harvard's letter to the NIH.  The evidence, however, viewed in its entirety, preponderates heavily against the verdict.

31

The trial evidence showed that Harvard received a letter from Dr. Michael Lauer of the NIH, "suggesting that the University could be in a position to have noncompliance related to research grants" for which Professor Lieber served as "principal investigator." Tr. 2-55:10-13; EX 2. Thereafter, on December 14, 2018, two Harvard lawyers, Jennifer Ponting and Matthew Fox, met with Professor Lieber to prepare a response to the NIH. Tr. 2-65:13-14.

Ponting testified at trial but did not take notes at the meeting. Tr. 75:16-17. Fox, who did not testify, took notes. Tr. 119:7-8. Fox's notes, however, do not reflect that Professor Lieber ever stated that he "was not and has never been a participant in China's Thousand Talents Program," as charged in the Indictment. EX JS; Tr. 2-112:21-23. Rather, Fox's notes reveal that Professor Lieber disclosed details regarding that program:

> Thousand Talents: has been asked by several institutions, including Wuhan, to participate in this. He's always told them he wouldn't spend more than 7 days a year in China, knowing that this program required at least a month per year. If he'd done it, would've gone to a higher profile university like Peking or Chinghua, *but Wuhan may have claimed him all the same.*
>
> A former postdoc co-authored two reviews, not primary research, and she was a Thousand Talents participant and is now an assistant prof at Peking U. The funding acknowledgements were not separated by author, so NIH and TT both followed both their names. While she was here (likely 5-6 years), she had no funding and was entirely supported by CML. This all pre-dated the Thousand Talent appointment, which happened after she moved back and got her job at PKU.

EX JS (emphasis added).

On cross-examination, Ponting admitted that she "could not remember" Professor Lieber's "exact words[.]" Tr. 2-115:6-7. Nevertheless, on redirect, Ponting conveniently answered, in the affirmative, a leading question asking whether Fox's notes were "consistent with [her] memory that Dr. Lieber[ ] told [her] that he did not agree to participate in the Thousand Talents Program[,]" Tr. 2-125:24—126:2, even though Fox's notes say no such thing.

32

Ponting acknowledged that Professor Lieber was eager to meet to discuss the issues, despite his personal health issues, which impacted his availability.  Tr. 2-117:12-13—118:18-20. He offered to provide written responses to Ponting's questions; she declined.  Tr. 2-114:9-14.

After the December 14, 2018, meeting, Ponting co-authored an internal Harvard memorandum, EX JT, but it does not reflect that Professor Lieber stated that he "was not and has never been a participant in" China's Thousand Talents Program.  EX JT.  Ponting and at least two other individuals then authored a draft letter to the NIH, Tr. 2-114:24—115:2, which yet another Harvard lawyer emailed to Professor Lieber, attaching the "Proposed DRAFT Reply to NIH" ("Draft Reply"), and asking him to review the draft and to make comments.  EX 108.

The Draft Reply reflected a decision – by Harvard – to exclude details that Professor Lieber had disclosed to Harvard at the December 14, 2018 interview.  Harvard made that decision because, as a jury could conclude, Harvard determined that those details were not relevant or not necessary to address the NIH's concerns.  Instead, Harvard chose to summarize Professor Lieber's disclosures in one sentence: "Dr. Lieber has represented that he is not and has never been a participant in China's Thousand People Plan."  EX 133; *cf*. EX JS.

In the remainder of the Draft Reply, Harvard focused primarily on Professor Lieber's publication with Dr. Xiaojie Duan, a former postdoctoral fellow, and a "National Thousand Talents Plan" award recipient.  EX 108; EX 133.  Following Harvard's lead, Professor Lieber also focused most of his comments on this issue.

Professor Lieber also added one new comment regarding his travel records, which states that he only visited China "for several days to 1-week each year as a normal scientific visit . . . and hardly constitutes a serious appointment anywhere."  EX 108.  Harvard, however, chose not

to include that information in its letter to the NIH.  Indeed, no Harvard lawyer ever asked Professor Lieber to clarify or amplify his comments to the Draft Reply.

Dr. Lauer testified that the NIH took no further action after receiving Harvard's letter because the NIH was "satisfied with the answer."  Tr. 5-108:19-23.  Not surprisingly, the government did not ask Dr. Lauer whether the NIH would have had additional questions if Harvard had disclosed the details that Professor Lieber had provided during the December 14, 2018, interview (for example, "but Wuhan may have claimed him all the same" (EX JS)), or in his comments to the Draft Reply (EX 108).

On this record, the Court, in the interest of justice, should grant a new trial.  The government presented no evidence that Professor Lieber actually said the words that appear in Harvard's letter to NIH.  On the contrary, Professor Lieber disclosed details to Harvard's lawyers, who decided to omit those details from their draft letter to the NIH.  Professor Lieber could reasonably conclude that Harvard's lawyers had considered all the information that he disclosed to them, and had determined that "less is more."  Professor Lieber therefore refrained from commenting on Harvard's one-sentence summary.

Accordingly, at a retrial, a jury can readily find that Professor Lieber did not "approve" the one sentence at issue, as the government argued.  At least, a jury can readily find that Professor Lieber refrained from comment merely because he acquiesced in Harvard's decision to use that sentence as a summary of details previously disclosed; therefore, Professor Lieber did not knowingly and willfully cause Harvard to make a statement that Harvard wrote and edited.

The government, finally, in summation, truncated Harvard's actual statement to the NIH. Tr. 6:114:16-20.  Harvard stated to the NIH: "Dr. Lieber has represented" that he is not and has never been a participant in China's Plan.  EX 3.  The government, however, "lift[ed]" Harvard's

34

statement "out of its immediate context and . . . g[a]v[e] it a meaning wholly different than that which its context clearly shows." *Tonelli*, 577 F.2d at 198.  Such an argument "was misleading[,]" *id.*, and warrants a new trial.

      2.    <u>The Court Should Reconsider Its Evidentiary Rulings</u>

On a Rule 33(a) motion, the Court may reconsider its evidentiary rulings.  The Court should do so here, and grant a new trial.  The evidence, and the Court's rulings, were confused and confusing for the jury, to the unfair prejudice of Professor Lieber.

The government offered emails and documents without calling a single live witness from China who wrote or received those materials.  Instead, FBI Agent Kara Spice spent two trial days reading approximately 75 email exchanges between Professor Lieber and persons in China who did not testify and could not be cross-examined.  Those emails covered a wide range of topics and spanned an eight-year period.  Agent Spice, of course, had no personal knowledge of the emails' contents or of the identities of the senders or recipients of the emails.  Tr. 4-121:12—124:7.

The government offered substantially all of the emails not for the truth of the matters asserted, but "as proof of the Defendant's state of mind."  Tr. 3-13:13-14.  The government also shifted theories, offering certain emails "to show the continuum of communications" between Professor Lieber and individuals in China.  Tr. 3-94:25.  The Court accepted that theory, even though, as defense counsel correctly noted, "there's no 'just offering to show a continuation' exception" to the rule against hearsay evidence.  Tr. 3-118:13-14.

The Court, unsure as to the relevance of many exhibits, admitted several of them conditionally, or *de bene*, and advised the jury accordingly.  The Court's instructions to the jury, however, highlight the Court's own confusion, inevitably shared by the jury.[6]

On day three of the trial, the government asked the Court to admit the emails unconditionally, and to confirm the admission of other emails.  Tr. 3-131:19-15.  The Court responded, "Let me think about it."  Tr. 3-132:1.  Before resting, the government moved again for that relief.  ECF 234.  Regarding emails previously admitted during Agent Spice's testimony (EX 18, 19, 21, 22, 23, 25, and 26), the government sought clarification, acknowledging that "there was some . . . confusion as to exactly which portions were coming in for what purpose." ECF 234; Tr. 6-25:24—26:6.

After argument, the Court admitted the evidence that it had previously admitted *de bene*, and the Court ruled several emails inadmissible (EX 18, 19, 21, 22, 23, 25, and 26), thereby reversing the rulings that the Court had made during Agent Spice's testimony.  The Court stated, "I don't know what they tell us, other than what somebody thinks or suggests."  Tr. 6-10:3-4; *see also* Tr. 6-14:15-17.  Notably, those emails included evidence upon which the government relied

---

[6]  "[I]t is allowed into evidence conditionally, that it satisfies the Rules of Evidence as we go along.  As you understand now, there are complicated rules, and sometimes you – the counsel can't – this is true for both counsel – they can't fulfill all of the requirements to have a document actually admitted into evidence, so they have to start someplace.  They go part way, and then they hope to finish it later.  So, at the moment, this is in, subject to being ruled out if they don't finish providing all of the necessary requirements for it to be an admissible document."  Tr. 3-77:21-78:6.

"[I]t's in okay, but it may go out again, or it may stay in.  *And sometimes it's very difficult to determine whether a particular exhibit really is – has to do with the case,* what it has to do with the case, and should it come in under the Rules under which we operate?  And sometimes we don't have – I don't have enough information to make that ruling at this stage, so I make a conditional ruling allowing it in to allow me to determine, based on what happens now and hereafter, whether this is a document that should be properly admitted.  So I may tell you to strike it from your minds at some point."  Tr. 3-86:3-13 (emphasis added).

"*I'm not exactly sure about [the relevance] yet, members of the jury*, but you can see, counsel have to start someplace when they offer evidence.  Sometimes that evidence is not properly admissible at that point because we don't know enough, just as I tried to explain to you earlier.  So that's why we have this notion that we can admit de bene, sort of on condition that it will be made admissible at some point through additional evidence that shows the purpose for which it was made and that, in fact, it satisfies the Rules."  Tr. 3-94:13-22 (emphasis added).

heavily: EX 23, the only documentary evidence of a draft contract for the Thousand Talents

Plan, and EX 26, to which the government pointed as proof that Professor Lieber signed a

contract.

But then the Court heard further argument, during which the Court repeatedly expressed

confusion as to the relevance and the admissibility of these exhibits.  After a recess, the Court

reversed itself yet again, stating "these documents were offered and accepted into evidence

before,[7] and I'm not going to consider that now."  Tr. 6-35:25—6-36:3.  The Court gave no

additional or clarifying rationale regarding the relevance of this evidence.

This record demonstrates the confusion that prevailed at trial, arising from the

government's unfair tactics – offering, through Agent Spice, scores of emails written by persons

in China, which had the effect of portraying Professor Lieber in a prejudicial light, while also

avoiding cross-examination of the emails' authors.  The Court, furthermore, recognized a major

problem: Over the course of five days, over 75 emails covering countless topics and many years

had been read aloud by various witnesses; Agent Spice spent two trial days simply reading aloud

from the witness box.  Substantially all those emails, however, were admitted not for the truth of

the matters asserted, but instead to show Professor Lieber's "state of mind" about the state of

mind of China – something that a jury could hardly determine in the first place.

Accordingly, as the Court recognized more than once, a limiting instruction would leave

the jury confused.[8]  The bell had been rung.  As Judge Learned Hand famously put it, a limiting

---

[7] This ruling applied to EX 18, 21, 22, 23, 25, and 26, but not to Exhibit 19, which had not been admitted during Agent Spice's testimony.

[8] On day three of the trial, the government proposed a limiting instruction for all the emails that it intended to offer., The Court stated, "I don't think the jurors will understand what you're telling me to tell them.  I mean, this is a pretty sophisticated way of explaining the use of a document."  The government responded that it "reflects the [ ] well-established fact that documents can come in for non-hearsay purposes."  Tr. 3-17:20-15.  The Court then emphasized: "Well, that may be well known to you, but when – it's not well known to a juror who may have never heard of such a thing."  Tr. 3-18:1-3.  On day six, the government again proposed a limiting instruction, yet the Court did not waver: "If you were a layperson who didn't understand and hadn't tried cases like this or any other

instruction merely "recommend[s] to the jury . . . a mental gymnastic which is beyond, not only

their powers, but anybody[] else['s]." *Nash v. United States*, 54 F.2d 1006, 1007 (2d Cir. 1932).

In its final instructions, the Court did charge the jury regarding the limited purpose of the

emails.[9]  The Court, however, added its own final thought: "This is very complicated, and I hope

you got it."  Tr. 6-160:24-25.  That thought, unhelpful and counter-productive, all but gave the

jury license to throw up its hands and ignore the instruction.

Plainly, as this record demonstrates, confusion reigned at trial with respect to the

government's evidence, the relevance of exhibits on which the government relied, and the

limited purpose for which the jury was supposed to consider a barrage of emails.  The

government, furthermore, understated matters when it offered evidence for the limited purpose of

showing Professor Lieber's state of mind.  The real question for the jury, one impossible to

answer, was Professor Lieber's "sure" knowledge about China's state of mind; that is, how

China "categorized" him.

The Court also demonstrated confusion regarding the charges and the issues in this case.

Before the opening statements, for example, the Court incorrectly told the jury: "I think there is

probably not much dispute about the fact that he had an arrangement with some Chinese – I

---

kind of criminal cases, would you really understand a document comes in not for the truth of it but for context?  My
-- partly, my problem with these things is that, while I try to explain it and I try to give them examples, it's not at all
clear to me that it's -- that it's clear."  Tr. 6-8:4-10.

[9]  "You may only consider them: One, for the context of Professor Lieber's responses, if any; or, two, for their effect,
if any, on Professor Lieber's state of mind, knowledge and/or intent. You may not consider such communications for
the truth of the matters asserted.  So, if the document that the author, who we did not hear as a witness, says that Dr.
Lieber was nasty on that day, it cannot show that he was nasty on that day or that he was good on that day, but it
comes in to tell you background and other things like that.  But specifically, it can -- you can consider it for the context
of other emails and responses by Dr. Lieber to those emails for their effect, if any, on *his state of mind*, knowledge or
intent; and you may not consider them for the truth of the matter asserted, as I have said before.  There is a fair amount
of evidence in this case that gives you a general picture of what is going on, but it cannot be taken by you as truth that
is stated in that under certain circumstances.  Professor Mai's emails may only be considered insofar as you find that
they are relevant context for Professor Lieber's responses, if any, or if you find that Professor Mai's emails tend to
prove Professor Lieber's *state of mind*, knowledge and/or intent *regarding the charged offenses*.  You may, however,
always consider Professor Lieber's own statements for the truth of what is asserted."  Tr. 6-160:1-25 (emphasis added).

don't know whether it was a governmental group or whatever, whatever the evidence is – he had an interest in some work in China, that he pursued in China for which he got paid." Tr. 2-24:6-10.  In fact, those issues were hotly disputed at trial.

In its final jury instructions, similarly, the Court repeatedly misstated the conduct charged in Count Two.  The Court was confused as to whether Professor Lieber had communicated with Harvard by written statement or by oral statement.  Tr. 6-183:10—184:24.  The Court also incorrectly told the jury that the false statement alleged in Count Two concerned a grant application.  Tr. 6-173:20—174:2.  When, at counsel's request, the Court attempted to correct itself, the Court again misstated Count Two, telling the jury that the alleged false statement was made "with the intent of getting something he wouldn't otherwise be entitled to."  Tr. 6-287:1—188:12.  After another sidebar, the Court apologized to the jury for "giv[ing] slightly wrong information."  Tr. 6-188:21-23.

Amid this confusion, the Court nonetheless prodded counsel to move quickly.  On trial day four, a Friday, the Court expressed to counsel: "I devoutly wish that we will finish all the evidence on Monday."  Tr. 4-134:4-5.  And then again: "I gather that everybody will try very hard to finish the evidence on Monday so that we can get it to the jury on Tuesday."  Tr. 4-136:13-15.

Before jury deliberations, the Court expressed to the jury the same undue sense of urgency: "[The foreperson's] job is to make sure you don't come to blows and that you – the proceedings go forward in a reasonable and successful manner; that is, you do reach a verdict at some point sooner rather than later.  I'm not trying to hurry it up, but it is Christmastime."  Tr. 6-181:6-10.  Lay jurors could easily regard the Court's last statement as irony.

Accordingly, on this record, the Court should grant a new trial.  The evidence confused the Court and the jury.  The Court's delayed and shifting rulings, and the Court's instructions to the jury ("it's in okay, but it may go out again, or it may stay in[;]" "This is very complicated, and I hope you got it[]") failed to clarify the matters at issue.  At a retrial, the Court can take the time necessary to make deliberate, definitive, contemporaneous rulings excluding and admitting evidence for relevance.  And the Court can give the jury clear instructions regarding the purpose for which the jury may consider the evidence.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should enter a judgment of acquittal or grant a new trial.

Dated: New York, New York
        February 7, 2022

By:  /s/ Torrey K. Young
     Torrey K. Young (BBO # 682550)
     Marc L. Mukasey (*pro hac admitted*)
     Kenneth A. Caruso (*pro hac pending*)
     Catherine Deist (*pro hac admitted*)
     Stephanie Guaba (*pro hac admitted*)

     MUKASEY FRENCHMAN LLP
     570 Lexington Avenue, Suite 3500
     New York, New York 10022
     Tel: (212) 466-6400

     *Attorneys for Defendant*

## **CERTIFICATION OF SERVICE**

I, Torrey K. Young, hereby certify that this document filed through the ECF system will

be sent electronically to the registered participants as identified on the Notice of Electronic Filing

(NEF) on February 7, 2022.

 /s/ Torrey K. Young
Torrey K. Young