# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cr-10111-RWZ |
| | ) | |
| CHARLES LIEBER | ) | Leave to File Excess Pages Granted on |
| | ) | February 24, 2022 [ECF 263] |
| Defendant. | ) | |
| | ) | |

# GOVERNMENT'S OPPOSITION
# TO DEFENDANT'S MOTIONS FOR JUDGMENT
# OF ACQUITTAL AND FOR A NEW TRIAL

RACHAEL S. ROLLINS
UNITED STATES ATTORNEY

Donald C. Lockhart
Jason A. Casey
James R. Drabick

Assistant U.S. Attorneys
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, Massachusetts 02210

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

THE TRIAL EVIDENCE .......................................................................................... 1

    A.    Professor Lieber's students, colleagues, and confidants.......................... 1

    B.    Professor Lieber participates in the Thousand Talents Program and is paid several hundred thousand dollars for his work............................ 3

    C.    Professor Lieber makes false statements to the DoD agents ................... 9

    D.    Professor Lieber causes Harvard to make false statements to NIH ...................... 10

    E.    Professor Lieber fails to report his Thousand Talents Program income on his tax returns and fails to file FBARs disclosing his bank account in China ............................................................................. 12

ARGUMENT ........................................................................................................... 14

I.    Standard of review ........................................................................................ 14

II.    The sufficiency claims are unavailing and the other claims fail on plain-error review.... 16

    A.    Ample evidence supports Count 1 ........................................................ 16

        1.    The "never asked to participate" statement ............................... 16

        2.    The "wasn't sure how China categorized him" statement ........................ 19

    B.    Ample evidence supports Count 2 ........................................................ 21

    C.    The challenges to Counts 5 and 6 are baseless ..................................... 25

        1.    The untimely legal attack is waived and fails on plain-error review in any event ................................................................ 25

        2.    There is ample evidence of willfulness.................................... 29

III.    The new trial motion is groundless ............................................................... 30

    A.    Count 1 is unaffected by the *Griffin* rule ............................................. 30

    B.    The untimely legal attack on Counts 5 and 6 is waived and fails on plain-error review in any event .......................................................... 30

C.      The derivative challenge to Counts 3 and 4 is futile ............................................ 32

D.      The jury instruction claims fail on plain-error review ........................................ 33

        1.      The specific unanimity claim ................................................. 33

        2.      The willfulness claim ............................................................ 37

        3.      The "financial interest" and "signature authority" claims ...................... 38

E.      There is no reason to reconsider the ruling denying suppression ...................... 38

F.      The "interests of justice" claims are meritless .................................................... 39

        1.      The verdicts were not against the weight of the evidence ...................... 39

        2.      The Court's evidentiary rulings were sound, and the unwarranted
                attacks on the Court's trial management fail on plain-error review ......... 40

CONCLUSION .............................................................................................................. 41

CERTIFICATE OF SERVICE ....................................................................................... 42

## INTRODUCTION

The indictment alleged that the defendant, Professor Charles Lieber, twice lied to federal authorities when he denied any involvement in a Chinese talent recruitment program that had paid him several hundred thousand dollars pursuant to a three-year contract (Counts 1 and 2); that he failed to disclose this income in two successive tax years (Counts 3 and 4); and that he failed to report his bank account in China, which held about half of his salary payments, the balance of which he had accepted in cash (Counts 5 and 6). [ECF 35]. After deliberating for less than three hours, a jury convicted Lieber on all six counts based on overwhelming evidence of his guilt—evidence that consisted in large part of his own statements in emails that he sent and his damning videotaped confession. The confession itself covered nearly every facet of the charged crimes, and it revealed that Lieber had acted with a keen sense of the wrongfulness of his conduct. Given the weight of this evidence and the insubstantial nature of Lieber's post-trial claims—most of which were not properly preserved—this Court should reject his effort to set aside the jury's verdict.

## THE TRIAL EVIDENCE

### A.    Professor Lieber's students, colleagues, and confidants

Lieber was a Professor in Harvard University's Department of Chemistry and Chemical Biology and became its Chair in July 2015. [T2: 54, 132, 152-153; EX69]. His relationship with Wuhan University of Technology ("WUT")—and his efforts to hide that relationship—were at the heart of his trial. As part of his defense, Lieber suggested his incriminating email exchanges were with unknowable and perhaps even nonexistent individuals, describing them as "phantom[s]" and "invisible" and likening their messages to junk email solicitations. [T2: 42; T3: 18; T6: 130-131]. But the evidence established that Lieber's relationship with WUT involved people he knew well, communicated with regularly, and often spoke about fondly. They were his former students, his

1

colleagues, and his confidants, as shown by his own emails, his former assistant's trial testimony, and his videotaped confession.

Lieber's WUT circle included the following. Liqiang Mai was a postdoctoral fellow in Lieber's lab from 2008 to 2011 and thereafter a professor at WUT. [EX3: 2; EX14: 6; EX55: 30; EX108: 2; T2: 80]. Fan Xiang was an employee in WUT's "international office" who arranged Lieber's visits to WUT and assisted him with his bank account at the Industrial and Commercial Bank of China ("ICBC"). [EX43: 2; EX45: 2; EX48; EX50; EX52; EX150; EX151; Exhibit 1 at 16, 21].[1] Ning Gao was a postdoctoral fellow from WUT in Lieber's lab from 2012 through at least 2016. [EX49: 3-4; EX54; EX55: 31; EX60; EX71; EX82]. Lin Xu was a postdoctoral fellow from WUT who performed research and wrote articles under Lieber's supervision from 2011 through at least 2016, and who worked in his lab for part of this time. [EX14: 13; EX24: 2; EX31: 2, 4; EX33: 1, 34; EX43: 2; EX49: 3; EX55: 29; EX82; EX154; EX159; DEX-JS: 1; T3: 22-27]. And Yunlong Zhao was a visiting Ph.D. student from WUT who worked in Lieber's lab from 2014 through at least 2018. [EX41: 2-3; EX43: 1-3; EX45: 8; EX49: 3; EX55: 30; EX82; EX94; EX156; Exhibit 1 at 11; T3: 22-23, 43].[2]

---

[1] Exhibit 1 transcribes segments of the videotaped confession Lieber made during his July 28, 2020 FBI interview, EX300-EX307. The government and the defense previously agreed that these transcriptions were accurate. In the meanwhile, the government has made minor changes to the format of this document, to reduce its length and to add bracketed references to exhibits Lieber was shown during the interview.

[2] Lieber's email correspondents also included a confidant at another Chinese institution. Xiaojie Duan was a postdoctoral fellow at Lieber's lab from 2007 to 2013, after which she became a professor at Peking University (and later a "Thousand Talent Plan for Young Scholars" awardee). [EX3: 2, 15, 19; EX24: 2; EX45: 2; EX55: 29; EX108: 3; DEX-JT; Exhibit 1 at 1, 8].

**B.  Professor Lieber knowingly participates in the Thousand Talents Program and is paid several hundred thousand dollars for his work**

The government begins at the end. During his videotaped FBI interview on January 28, 2020, Lieber admitted, directly or indirectly, that: (1) he had accepted a Strategic Scientist appointment at WUT in 2011 and joined the Thousand Talents Program ("TTP") through WUT in 2012, agreeing to contracts in both instances; (2) in his view, "Thousand Talent funding . . . is a big . . . no-no to have" because "you're paid a salary by China and you're also a US faculty"; (3) he nevertheless had been paid such a salary, half of which was deposited into his Chinese bank account at ICBC and half of which he received in cash, typically from Liqiang Mai or Fan Xiang; (4) he had a bank card for the ICBC account; (5) during his estimated four trips to China, he received between $10,000 and $20,000 in cash on each visit, in $100 bills that were enclosed in brown paper packages; (6) he was paid a total of between $50,000 and $100,000 in cash by this method, separate and apart from the funds that were being deposited into his ICBC account; (7) he did not declare the cash on returning to the United States or on his tax returns, which he knew was "obviously illegal"; (8) he did not deposit the cash into a bank account but simply kept it on hand to pay for living expenses such as groceries and a house-cleaning service; (9) when he checked his ICBC account in 2014 the balance then stood at about 1.2 million renminbi ("RMB") or $200,000; (10) he and his wife never withdrew money from the ICBC account (and thus its balance necessarily remained well above $10,000 throughout the operative period); and (11) he purposefully misled the Department of Defense ("DoD") agents who interviewed him and knew this was wrong. [Exhibit 1 at 1-21].

The email exhibits confirmed the truth of Lieber's confession. Keeping in mind that the Court reviewed the exhibits as they were admitted, the government limits its summary to some key examples.

3

On April 3, 2012, Mai advised Lieber in no uncertain terms about his approval as a member of the TTP:

> I am very happy to let you know that, in the World Recruitment Plan of renowned experts in China (also called as one thousand plan of foreign experts), you have been approved and awarded as invited strategic foreign expert by Chinese government because of your world-leading achievements, the good collaboration basis between you and WUT, and your great contribution to national academic exchange between China and USA. You are provided with personal benefit of one million RMB (~158,800USD), and research funding of 5 million RMB (~794,000 USD) for development of WUT-Harvard joint nano key lab and collaboration research. This plan is the highest plan/program for famous foreign scientists in Chinese scientific field and only 40 famous experts from the world were awarded. President Zhang let me express his sincere congratulations to you!

[EX17A: 2]. Two days later, Lieber responded to this email and expressed his appreciation for the appointment: "Please send my regards and sincere thanks to President Zhang." [EX17A: 1].

On April 7, 2012, Mai emailed a draft TTP contract to Lieber, noting he had attached the "agreement" and that he would "discuss" it with Lieber when they were to meet in person on April 17, and that he would "respect/listen to your idea/suggestions/comments." [EX18: 1]. The attached 10-page document referred to the "One Thousand Talent" program twice on the first page and again on the third page, set forth in detail the contractual obligations Lieber would undertake over the three-year term of the engagement (*e.g.*, joint scientific projects, research, publications, and conferences, the creation and oversight of a joint lab, and the hosting and supervision of WUT students at his Harvard lab), and specified that Lieber would work for WUT for "no less than nine months a year" under the "regular supervision and review" of WUT. [EX18: 3-12]. In return, Lieber would be paid a salary of $50,000 per month, would receive one million RMB in living expenses, and the joint lab would be funded to the tune of 10 million RMB, half of which would be paid by the Chinese government and half by WUT. [*Ibid.*].

Just under two months later, on June 1, 2012, Mai emailed Lieber a revised agreement for the "One thousand plan of foreign experts of China" and asked for any "further

comments/modifications if you have." [EX22: 1]. The modified TTP contract was prominently titled "EMPLOYMENT CONTRACT of 'ONE THOUSAND TALENT' HIGH LEVEL FORTIGN [*sic*] EXPERT" and referred to "One Thousand Talent" twice on the first page and again on the fourth page. The modified TTP contract also reflected intervening edits to clarify certain points, such as that, although Lieber committed to working for WUT nine months per year, this could be done offsite. [EX22: 14-22; T3: 108-117 (Agent Spice)]. The next day, Lieber wrote back and promised to "review the documents for the 1000 plan when I have time." [EX23: 1].

On June 27, 2012, Mai sent Lieber an identical copy of the TTP contract in an email bearing the subject line: "the documents for 1000 plan (Liqiang)." [EX23: 1]. Mai wrote that President Zhang requested that Lieber respond within a week concerning any further revisions to the "agreement of One thousand plan of foreign experts of China in the attachment." [*Ibid.*]. Lieber replied the next day. [EX24: 1]. Directly below the portion of Mai's email noting President Zhang's request, Lieber wrote: "I apologize for the delay in responding on the 1000 plan agreement. I think this revised version, *which addresses the previous concerns we discussed at Harvard*, is good. How should we proceed with completing (signing)?" [EX24: 2 (emphasis added)]. Lieber then discussed three items regarding the "1000 plan" and "Joint Lab," including his supervision of postdocs, one of whom, Ning Gao, "has the creativity and drive to be [a] real leader of the Bio-Nano effort in the Joint Lab." [EX24: 2]. Later the same day, Mai wrote back: "Our university will sign 1000 plan agreement and send to you for your signature by Fedex." [EX24: 1]. Over the next three weeks, Lieber and Mai exchanged emails confirming that the TTP contract had been signed and received by each side. [EX25: 1-3; EX26: 1-2].

Lieber's emails reflect that he then made good on his obligations under the TTP contract. For example, Lieber: supervised WUT students, both in China and at his Harvard lab; reviewed, commented on, and contributed to various WUT-related articles and studies, including by

associating himself with WUT in his primary author affiliation; and collaborated with WUT on various projects, including the WUT-Harvard Joint Nano Key Laboratory over which Lieber served as Director. [*E.g.*, EX31; EX33; EX34; EX35; EX41; EX43; EX45; EX49; EX59; EX60; EX156: 5-11; EX159; EX161; EX162; EX167; T3: 24-25]. Lieber also traveled to China to attend WUT-related events. [EX40: 3-4; EX45; EX52; EX94; EX154; EX155; EX161; EX162; EX163; EX178; EX200]. And for his part, Mai periodically informed Lieber that President Zhang and Chinese government officials overseeing the TTP were reviewing his efforts and were pleased with his results. [*E.g.*, EX34: 1; EX35: 2-3; EX49; EX156; EX159: 1-2; EX166; EX168: 3-4].

Lieber himself explicitly confirmed WUT's description of his participation in the TTP. For example, on September 24, 2013, Mai emailed Lieber two documents under the subject line "WUT one thousand Lieber 20130924-CN-EN," describing one as a "brief introduction" and the other as "related pictures," and asking Lieber for any comments or corrections. [EX161]. Lieber replied: "I have reviewed quickly the documents, and believe they are fine to submit w/o further change." [*Ibid.*]. The "introduction" document was a two-page biographical sketch of Lieber that was conspicuously titled "'One Thousand Talent' high level foreign expert Professor C. M. Lieber," and that highlighted his accomplishments as follows:

> Prof. Lieber and Wuhan University of Technology (WUT) have been holding a close collaboration. He is the Director of WUT-Harvard Joint Nano Key Laboratory, which was established in 2009 [*sic*]. In the same year, he won 'the Friendship Award' of Chinese government because of his great contribution to scientific research and talent cultivation in China. In 2011, Prof. Lieber was appointed to be the 'Strategic Scientists' by WUT. In 2012, Prof. Lieber was selected as the 'One Thousand Talent' high level foreign experts. Prof. Lieber has been promoting the development of WUT in talent cultivation, joint research and international cooperation.

[EX162: 3]. The five-page "related pictures" document similarly described Lieber as "the director of the WUT-Harvard Joint Nano Key Laboratory" and captured him attending WUT-related events, such as the November 2012 opening ceremony of the joint laboratory and the May 2013

Ph.D. dissertation defense of WUT student Lin Xu. [EX163: 1-5 (Exhibit 2 at 1-5)]. In a photograph of the opening ceremony, Lieber can be seen standing next to what the caption refers to as "leaders" from the "State Administration of Foreign Expert Affairs" and the "Hubei Provincial Foreign Experts Affairs Bureau," in front of a building that bears a large sign stating "WUT-Harvard Joint Nano Key Laboratory." [EX163: 4 (Exhibit 2 at 4)].

And then there was the TTP compensation package, or what Lieber called the "business" part of the TTP arrangement. [EX48; EX52: 1]. Based on Lieber's own words in these emails, the jury learned that: Lieber had opened the ICBC account with the help of WUT contacts; that he several times expressed a preference for receiving half of his salary in cash and half deposited into this account; that he intended to visit an ICBC branch in China with Mai in 2014; and that in June 2014 he tried to learn whether his ICBC card was "still good" so that he might use it during a planned trip to China. [EX40: 1-2; EX44; EX45: 8; EX48: 4; EX50; EX150: 1-2; EX151]. In December 2013, Lieber complained to Mai that "you do owe me salary for the work that I have done from June-now" [EX168: 2], and he told Xiaojie Duan that he intended to visit WUT so that "I can also collect my 'salary' from them" [EX169]. In November 2014, Lieber wrote to Fan Xiang: "Dear Fan, For this business email . . . . . My preference (if it can be arranged w/o taking too much time from day) is to have ½ of payment since last visit (or past ½ year is easier) in US$. If this does not work out this visit given short time, then we can do so for next visit." [EX52: 1].

Evidence of Lieber's ICBC account and his TTP salary was also found in Lieber's house and in his possession. During a search of his house, agents discovered copies of the November 12, 2012 ICBC account opening forms, signed by Lieber and bearing his passport number. They also found, folded within the ICBC forms, a single-page document akin to a receipt reflecting that he had received over $88,000 in November 2012, half in cash and half deposited into his ICBC account. [EX212; EX214; EX217: 19-20; EX230; T3: 51-55, 62; T4: 99; ECF 222]. The

government also introduced a copy of Lieber's ICBC debit card, which the parties stipulated had

been in his possession as of December 14, 2020.  [EX230; T3: 51-52]. The account number on the

card matched the account number referenced in the ICBC account opening forms found in Lieber's

house during the search. In addition, Lieber's assistant testified about a situation in which Lieber

requested that they try to use his ICBC card to pay a flight change fee. [T3: 48-51; EX40].

In November 2015, after the three-year TTP contract period had ended, Mai wrote Lieber

about a proposed next phase for their relationship that would be a step up from the TTP:

> Here I am sending the following note and kind invitation from State
> Administration of Foreign Experts Affair. Just like what the leader of One-thousand
> Plan Program discussed with you in Wuhan last year State Administration of
> Foreign Experts Affair (SAFEA) gives you the highest evaluation for your very
> successful one-thousand plan program and fruitful high-level collaboration
> achievements between you and Chinese institutions as well as your world-leading
> achievement great contribution to the development of science and technology the
> high-level talent training for China. They are very happy to know that you agree to
> continue to keep good collaborations with your partners in China SAFEA is
> planning to provide further full support to you in collaboration research travelling
> corresponding high-level salary by "Top-level Foreign Experts Program" which is
> a follow-up program of "One-thousand Plan Program" to reward the distinguished
> "One-thousand Plan Program" experts and the high-level collaboration
> achievements between foreign experts and Chinese partners SAFEA hopes and
> needs that the experts will spend ~30 days per year in China during this program
> period (3 years).

[EX79]. The next day, Lieber responded: "I cannot agree to participation in the 'top-level foreign

experts program.'" [EX79].

In total, between April 2012 and November 2015, Lieber received at least 20 emails that

explicitly referenced the TTP, either by that title or by close variations on it, and Lieber responded

to all but a few of those emails, often commenting on the TTP subject matter himself. [EX17A: 2;

EX18: 3, 5; EX21: 1; EX22: 1, 6, 14, 17; EX23: 1-3; EX24: 1-4; EX25: 1; EX34: 1; EX35: 2;

EX45: 10; EX49: 2-3; EX79: 1; EX150: 1; EX156: 1-4; EX159: 1-4; EX162: 3; EX166: 1; EX200:

9].

### C.        Professor Lieber makes false statements to the DoD agents

In 2018, Lieber had three active DoD grants totaling approximately $3 million. [T5: 38-39; T6: 43-49; EX130]. In April 2018, DoD Agents Amy Mousseau and Ben Hochberger were investigating these grants and whether Lieber had received additional and overlapping funding for his DoD projects from foreign sources, a problematic form of "double-dipping." [T5: 40-45]. Specifically, the DoD agents were trying to learn whether Lieber had received such funding through participation or membership in the TTP. [*Ibid.*]

On April 20, 2018, Agent Mousseau emailed Lieber to request an interview concerning one of his active DoD grants, and they agreed to meet on April 24. [EX87; T5: 44-46]. The day before the interview, Lieber emailed Ning Gao to say he was "worried" about the DoD investigation. [EX89].

During the April 24 interview, Lieber made two demonstrably false statements to Agents Mousseau and Hochberger: (1) that he had never been asked to be a member of the TTP; and (2) that he was "not sure" how China "categorized" him in this regard. [EX322: 4; EX323: 3; T5: 47-62]. Lieber also made related remarks in an effort to downplay his relationship with WUT, such as: (1) he had "some" connection to WUT through Mai, his former student; (2) Mai was "inappropriately" using Lieber's and Harvard's name to enhance WUT's standing, and he had told Mai to stop doing that; (3) he had never received a "retainer" from WUT, and had only accepted travel expenses and "stipend payments"; and (4) his relationship with WUT was not "close," and he suspected he was a victim of "propaganda." [EX322: 4-5; EX323: 3; T5: 50-62]. The agents believed Lieber's false statements during the interview and, thus, closed their investigation. [T5: 61-62, 82-83].

Two days after the interview, Lieber emailed Ning Gao:

> Dear Ning, Could you also provide me with the link/info to CAS webpage where I am listed as directing(?) that lab at Wuhan? I lost a lot of sleep worrying about all of these things last night and want to start taking steps to correct sooner than later. I will be careful about what I discuss with Harvard University, and none of this will be shared with government investigators at this time.

[EX93]. The same day, Lieber emailed a Harvard colleague about the DoD investigation, falsely claiming that he had had "little interaction" with WUT and that "[t]he only responsibility that I agreed to as part of the relationship was to discuss their students' research with them during these visits and provide input (pretty much what everyone does when visiting schools) and to host a student or postdoc in my lab . . . And that is about all that I have been involved in." [EX94].

### D.    Professor Lieber causes Harvard to make false statements to NIH

In 2018, Lieber had two NIH grants, including a Pioneer grant for approximately $4.5 million. [T5: 97-98; T6: 48-49; EX130]. On November 30, 2018, approximately seven months after Lieber's DoD interview, NIH wrote a letter to Harvard expressing concern that Lieber had received foreign financial support for these grant projects, and NIH noted in particular that there were indications Lieber was affiliated with WUT and had received money through the TTP. NIH requested a response within 30 days. [EX2; EX104: 6-8; T5: 98-105]. NIH was then worried that Lieber might be "double-dipping" by receiving Chinese funding for the same projects, might have a conflict of commitment, and might have financial conflicts of interest. [T5: 84-110]. On December 1, 2018, a Harvard colleague forwarded the NIH letter to Lieber and asked for responsive information. [EX104: 5-6].

The next day, Lieber emailed his former student and confidant Xiaojie Duan about the NIH investigation, saying it was "very serious" and he might lose NIH funding and even be forced to return spent grant monies. [EX101]. Lieber asked Duan to search Chinese websites to see how his WUT affiliations were characterized. [EX101]. Later that day, Duan reported back that her online research had disclosed Lieber's connections to WUT and the joint WUT-Harvard nano lab, and

she sounded a note of caution: "I guess the main reason for this investigation is because you have been hired in the 'one thousand talent' program through Whut. I heard many scientists in this program in USA are being investigated by NIH." [EX101]. Lieber thanked Duan for this information and did not dispute her supposition. [EX101].

On December 13, 2018, Harvard officials preparing to respond to NIH previewed some questions they planned to ask Lieber at a meeting set for the next day, including: (1) "In 2015 and before, did you receive any compensation for your efforts in helping your former postdoc [*i.e.*, Mai] set up the lab?"; (2) "Have you participated in the Chinese government's Thousand Talents program?"; and (3) "Did you ever receive any grant money or other research support from any foreign government?" [EX104: 2; T2: 65-66]. The next day, Lieber replied that he had "written notes" on the questions and would meet with them later that day to discuss the matter. [EX104: 1].

When asked during the meeting whether he had participated in the TTP, Lieber denied any such involvement while explaining that "many institutions" had solicited him to join TTP but that he had always declined "because they required him being in China for long periods of time, and he was never willing to do that." [T2: 82; DEX-JT: 4]. According to one Harvard official present at the meeting: "He was very clear that he was – he had never said yes to that plan." [T2: 83]. Lieber laid special emphasis on a related point: Even if he had harbored some interest in a TTP appointment, he never would have accepted a TTP invitation from a lower-tier university such as WUT. [T2: 125-126; DEX-JS: 1].

After the meeting, and shortly before a draft letter to NIH was circulated for review, Lieber complained to his Harvard lab manager about Harvard's handling of the NIH inquiry, and he falsely assured her: "BTW, I have never received $$$ from WUT, and they only covered my airfare as is done by convention by any school that invites speakers in US/abroad." [EX111].

11

On January 8, 2019, Lieber was asked to comment on a draft letter from Harvard to NIH in which Harvard stated, among other things:

> Harvard University has no reason to believe that Dr. Lieber has or had an appointment or affiliation of any kind with WUT in recent years. Dr. Lieber has denied any such association. In 2012, Dr. Lieber did report to Harvard in his conflict of interest report for that year, that he had a visiting scientist appointment at Wuhan University of Technology. * * * The appointment was not identified by Harvard as presenting a conflict of interest that required further action at that time. In response to our inquiry, Dr. Lieber reported that he had no formal association with WUT after that time, but that WUT continued to falsely exaggerate his involvement with that institution in subsequent years.
>
> * * *
>
> Dr. Lieber has represented that he is not and has never been a participant in China's "Thousand People Plan." [A footnote here clarified that the program NIH referred to as the "Thousand People Plan" was the "Thousand Talents Plan"].

[EX108: 2-3]. Lieber replied that he had reviewed the draft letter, that "[o]verall" it was "good," and that he had some suggested revisions in tracked changes. [EX108: 1]. In his tracked changes, Lieber did not propose any alterations to the text quoted just above. [EX108: 2-3].

On January 10, 2019, Harvard sent NIH a final draft of the letter that included this block-quoted text verbatim. [EX3: 1-2; EX133: 1-3]. After reviewing the letter, NIH was satisfied with the response and closed its investigation. [T5: 106-110, 120-122].

### E.    Professor Lieber fails to report his Thousand Talents Program income on his tax returns and fails to file FBARs disclosing his bank account in China

Before preparing the joint 2013, 2014, and 2015 tax returns for Lieber and his wife, their accountant sent them engagement letters that prominently warned them in plain terms that they were required to file FBARs reporting any foreign bank accounts that they had an interest in or signature authority over and that had a balance exceeding $10,000, and that there were criminal and civil penalties for failing to do so. [EX240: 3; EX245: 3; EX249: 2; T5: 128-131, 152, 157-159]. The warning added: "I am not a foreign tax specialist, accordingly you are responsible for

12

contacting counsel or telling us of the need to consider these issues." [EX240: 3; EX245: 3; EX249: 2]. The Liebers signed and returned the third engagement letter. [EX249: 4; T5: 157-158].

To assist their accountant in preparing their tax returns, the Liebers provided him with materials documenting their income and expenses, including spreadsheets summarizing the data. [EX241; EX242; EX243; EX246; EX247; T5: 131-150, 153-155, 165]. None of these materials revealed Lieber's TTP-related income from WUT despite disclosing outside income from other universities, and none acknowledged the existence of his ICBC account. [*Ibid*.]. Accordingly, the accountant prepared tax returns that omitted the TTP income and that omitted reference to the ICBC account. [EX260 (2013); EX265 (2014); T5: 142-145, 155-156]. In Line 7A of Schedule B, asking if the taxpayer has a financial interest in or signature authority over any foreign financial account, the listed answer was "no" for both the 2013 and 2014 returns. [EX260 (2013): 30; EX 265 (2014): 30; T5: 175-176].

In each case, the Liebers indicated they had reviewed the completed returns before they were filed, and they executed one-page IRS 8879 forms in which they certified the returns were accurate and in which they authorized the accountant to e-file the returns on their behalf. [EX177; EX243; EX248; T3: 55; T5: 150-152, 156-157]. The signed IRS 8879 forms warned the Liebers that filing a false tax return is a crime. [EX177; EX248; T5: 151-152, 156-157]. Thereafter, the accountant e-filed the returns as requested. [T5: 135, 142-145, 155-156; EX260 (2013); EX265 (2014)].

An IRS official testified about the materiality of the unreported TTP income and also explained the FBAR filing requirement. [T5: 166-178]. The parties stipulated that the Liebers did not file FBARs concerning the ICBC account for the years 2015 and 2016 [T5: 177-178], even though the account balance vastly exceeded $10,000, as Lieber well knew (and later confessed).

13

<u>**ARGUMENT**</u>

## I.     <u>Standard of review</u>

In reviewing Lieber's Rule 29 acquittal motion, this Court "view[s] the record in the light most favorable to the prosecution and reject[s] such challenges if any rational jury could have convicted [him] when considering all the evidence, direct and circumstantial, in this way." *United States v. Levin*, 13 F.4th 96, 99 (1st Cir. 2021). And in assessing Lieber's new trial motion under the Rule 33 "interests of justice" standard, the Court "may weigh the evidence and evaluate the credibility of witnesses" but "the remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict." *United States v. Merlino*, 592 F.3d 22, 32 (1st Cir. 2010) (cleaned up).

A distinct test applies to the many issues Lieber failed to preserve. Under Fed. R. Crim. P. 52(b), review of such forfeited issues is for plain error only, and Lieber must establish that the purported error is plain in the sense that it is "obvious," that there is a "reasonable probability" the error altered the verdict, and that a miscarriage of justice has resulted. *See United States v. Lara*, 970 F.3d 68, 86-87 (1st Cir. 2020). As detailed below, most of the claims Lieber presents here are forfeited—if not waived entirely—and are thus subject to this exacting standard.

Rule 52(b)'s plain-error standard does not merely bind the circuit courts. District courts also must apply that test in assessing unpreserved claims of error raised in post-trial motions. *See* 3B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 851 (4th ed. 2021) ("Rule 52 describes how courts are to treat various kinds of errors, and it applies to both the trial court and the appellate courts. It is relied on primarily by appellate courts, although the standards it sets out are controlling when a trial court is passing on a post-trial motion.") (footnotes omitted). This is because the Federal Rules of Criminal Procedure, including Rule 52(b), "govern the procedure in *all criminal proceedings* in the United States district courts, the United States courts

of appeals, and the Supreme Court of the United States." Fed. R. Crim. P. 1(a)(1) (emphasis added); *United States v. Ellis*, 527 F.3d 203, 207 (1st Cir. 2008).

Predictably, therefore, district courts have uniformly reviewed unpreserved jury instruction claims raised in post-trial motions for plain error only. *See United States v. Montgomery*, 442 F. Supp. 3d 875, 884 (W.D. Pa. 2020); *United States v. Cotto*, 2018 WL 2410374, at *8 & n.8 (W.D.N.Y. May 29, 2018), *aff'd sub nom. United States v. Escalera*, 957 F.3d 122 (2d Cir. 2020); *United States v. Messier*, 2015 WL 2348897, at *1 (D. Me. May 14, 2015); *United States v. Williams*, 825 F. Supp. 2d 128, 132-33 (D.D.C. 2011); *United States v. Brandao*, 448 F. Supp. 2d 311, 316-19 (D. Mass. 2006), *aff'd*, 539 F.3d 44 (1st Cir. 2008); *United States v. Johnson*, 434 F. Supp. 2d 301, 307-08 & n.11 (D. Del. 2006), *aff'd*, 292 Fed. App'x 178 (3d Cir. 2008); *United States v. Powell*, 165 F. Supp. 2d 1230, 1238-41 (D. Kan. 2001); *United States v. Jones*, 404 F. Supp. 529, 539, 545 (E.D. Pa. 1975), *aff'd*, 538 F.2d 321 (3d Cir. 1976).

And district courts have taken the same approach in other contexts. *See United States v. Stewart*, 839 F. Supp. 914, 927 (E.D. Mich. 2012); *United States v. Clarke*, 767 F. Supp. 2d 12, 24, 84-85 (D.D.C. 2011), *aff'd sub nom. United States v. Straker*, 800 F.3d 570 (D.C. Cir. 2015); *United States v. Washington*, 263 F. Supp. 2d 413, 426 n.7 (D. Conn. 2003) (citing Fed. R. Crim. P. 1(a)(1)); *United States v. Lawhorne*, 29 F. Supp. 2d 292, 313-17 & n.42 (E.D. Va. 1998) (citing precursor to Fed. R. Crim. P. 1(a)(1)); *United States v. Goodlow*, 910 F. Supp. 476, 478 (D.S.D. 1995); *United States v. Osborne*, 532 F. Supp. 857, 864 (W.D. Va. 1982); *cf. United States v. Goldstein*, 386 F. Supp. 833, 842 n.19 (D. Del. 1974) ("While more frequently applied in an appellate context, Rule 52 governs disposition of post-trial motions at the district court level.").[3]

---

[3] The First Circuit has bypassed whether the plain-error standard applies to a district court's consideration of post-trial motions. *See United States v. Brandao*, 539 F.3d 44, 57 n.5 (1st Cir. 2008) ("We do not get into the debate

Accordingly, this Court must apply the plain-error standard to all claims that Lieber neglected to preserve, as itemized below.

## II.     The sufficiency claims are unavailing and the other claims fail on plain-error review

### A.     Ample evidence supports Count 1

#### 1.     The "never asked to participate" statement

Count 1 charged in part that Lieber told the DoD agents "that he was never asked to participate in China's Thousand Talents Program," when in fact WUT had previously asked him to participate in the TTP and he had signed a three-year TTP contract around July of 2012. [ECF 35 at 13].

Lieber begins by attacking the evidence about what the DoD agents asked him [ECF 259 at 4], arguing there was inadequate "reliable evidence of precisely what [the DoD agents] said," *United States v. Poutre*, 646 F.2d 685, 688 n.4 (1st Cir. 1980), before he made his statement. Lieber forgets, however, that sufficiency review requires the evidence to be viewed in the light most favorable to the verdict under the deferential rational-trier-of-fact standard. *Poutre* did not purport to overturn that settled standard.

There is a further threshold problem. Although Lieber notes that, in a formal specific-question-followed-by-specific-answer context, "the falsity of an answer must be evaluated with reference to the question asked," *United States v. Boskic*, 545 F.3d 69, 88 (1st Cir. 2008), there is no requirement that a false statement follow on the heels of a specific question. Thus, for example, if the DoD agents had begun the interview by saying they wished to speak with Lieber about his

---

between the parties about whether the district court erred in itself utilizing plain error review."). Nothing in First Circuit case law, however, suggests the court would disagree with the apparent consensus view.

connections to China and he had volunteered that he had never participated in the TTP, that false statement would be actionable even though not precipitated by a question. Lieber does not argue otherwise, and for good reason. *See United States v. Licciardi*, 30 F.3d 1127, 1134 (9th Cir. 1994) (affirming Section 1001 conviction based on fact that defendant "volunteered the false statements he made to the BATF agent"); *United States v. McComb*, 744 F.2d 555, 565 & n.11 (7th Cir. 1984) (rejecting claim that volunteered false statement ran afoul of *Bronston v. United States*, 409 U.S. 352 (1973), and stating "[w]e know of no reason . . . to shield one who volunteers false information from liability for perjury"); *United States v. Fern*, 696 F.2d 1269, 1273 (11th Cir. 1983) (affirming Section 1001 conviction based on "an affirmative, unsolicited, false statement which caused a tax auditor to initially conclude that an additional charitable deduction was due the taxpayer").

In any event, even under the flawed assumption that some evidence concerning a pre-statement question was necessary, here there was such evidence, and that evidence easily satisfies the rational-trier-of-fact standard. Agent Mousseau testified that a key goal of the interview was to learn whether Lieber had been a member of the TTP. [T5: 36, 41-43, 46]. After asking Lieber whether he had received money from foreign sources and about his ties to WUT, she began questioning him about the TTP, after first advising him that "it was important for him to be truthful." [T5: 49-53]. Lieber said he was aware of the TTP "because he had endorsed several of his students" for it. [T5: 53]. Agent Mousseau testified that, at this point, she asked Lieber whether he had been "a member of the program," though she could not recall the precise words she used at the time. [T5: 53-58]. Agent Hochberger's rough notes reflect that Lieber was asked whether he had been "approached to be a member of" the TTP [EX322: 4], and his final report indicated that the question was whether Lieber had been "asked" to be a member of that program [EX323: 3]. These formulations of the question are subtle variations on the same theme and they provided ample context for the jury to evaluate Lieber's answer.

17

As the First Circuit has made clear, the fact that the question here was paraphrased in the trial evidence and "the exact wording of that paraphrase [was] unknown," does not implicate "the doctrines of fundamental ambiguity and literal truth." *Boskic*, 545 F.3d at 88. Further, even if the question was "arguably ambiguous"—and it was not—it would still be the case that "the issue of [Lieber's] guilt [wa]s properly one for the jury." *United States v. Mubayyid*, 658 F.3d 35, 63 (1st Cir. 2011).

Turning focus to the answer that followed the question, Lieber contends the evidence was insufficient because, whereas the indictment alleged that Lieber told the DoD agents "that he was never *asked* to *participate in* China's Thousand Talents Program" [ECF 35 at 13], the trial record reflects that slightly different language was used in the actual exchange:

> Lieber has heard of the "Thousand Talents" program. His understanding is that the PRC [*i.e.*, Peoples Republic of China] uses this program to identify its outstanding young scholars. He has endorsed some of his former students for this program at the request of the students. He has endorsed perhaps five students over the years; he did not recall their names. He made his recommendations based upon their written works. Although Lieber was not *explicitly asked* to be a *member of* this program, he added that he was "not sure how they categorized" him.

[EX323: 3 (emphasis added)]. Lieber seems to argue [ECF 259 at 6-8] that these small differences in wording—"asked" versus "explicitly asked" and "participate in" versus "member of"— somehow require a judgment of acquittal. That is nonsense. A rational jury viewing this evidence in the light most favorable to the verdict easily could have concluded that Lieber falsely denied being asked to join the TTP, no matter which quoted phrase serves as the benchmark. In fact, there was overwhelming evidence—including Lieber's own admissions—that Lieber was both a "member of" and a "participant in" the TTP, and that Mai had explicitly asked him to do both. A rational jury also could have rejected any claim (never made to the jury here) that Lieber's response

was literally true, in accord with *United States v. Reveron Martinez*, 836 F.2d 684, 689 (1st Cir. 1988). In the end, these fine gradations in phrasing were merely grist for jury arguments.[4]

### 2.     The "wasn't sure how China categorized him" statement

Count 1 charged not just that Lieber told the DoD agents "that he was never asked to participate in China's Thousand Talents Program," but that he also told them "that he 'wasn't sure' how China categorized him," when in fact WUT had previously asked him to participate in the TTP and he had signed a three-year TTP contract around July of 2012. [ECF 35 at 13].

In his first line of attack on this portion of Count 1—a position developed in just three sentences—Lieber asserts there was no evidence that the DoD agents asked him about how China categorized him. [ECF 259 at 8]. But of course no such threshold requirement exists, and a rational jury readily could have found from Agent Mousseau's testimony and from Agent Hochberger's notes and report that the same question that sparked the first false statement also yielded the second false statement. [T5: 53-54, 57-58, 60, 62; EX322: 4; EX323: 3]. Clinching matters, the report itself states that, after Lieber acknowledged the TTP was run by the Peoples Republic of China, and after he said that he "was not explicitly asked to be a member of this program," he then "*added* that he was 'not sure how they categorized' him." [EX323: 3 (emphasis added)].

Lieber's second claim—that the evidence was insufficient to establish that he made the statement as alleged [ECF 259 at 8-9]—fares no better. A rational jury easily could have decided that the "they" in the sentence just quoted referred to the Chinese government, especially since Lieber had just said that his understanding was that the TTP was a Peoples Republic of China

---

[4] Lieber casts his claim solely in sufficiency terms. He has never argued there was a prejudicial variance between the charge and the proof at trial, so any such claim is forfeited. *See United States v. Chen*, 998 F.3d 1, 7 (1st Cir. 2021). In any event, given the slight semantic differences at issue here, any such claim would necessarily fail. *See, e.g., United States v. Lanza-Vázquez*, 799 F.3d 134, 147-49 (1st Cir. 2015); *United States v. Escobar-de Jesus*, 187 F.3d 148, 171-72 (1st Cir. 1999); *United States v. Arcadipane*, 41 F.3d 1, 6-7 (1st Cir. 1994).

program. [EX323: 3]. Agents Mousseau and Hochberger were both sure that Lieber had made that statement. [T5: 53-54, 57-58, 60, 62]. Moreover, this interpretation of the statement is supported not just by Hochberger's report but by (a) his memory that Lieber was referring here to "the Chinese" [T5: 57], and (b) Mousseau's testimony that, after Lieber made the statement, she was convinced "he was a victim of Chinese propaganda" [T5: 62]. Finally, although not essential to the sufficiency question raised here, the government did in fact introduce substantial evidence that Lieber was aware that the TTP was run by the Chinese government and that his TTP work was being reviewed by Chinese government officials. [*Supra* 3-8]. Indeed, in his confession, Lieber said that the "essence" of the TTP is that "you're paid a salary by China," and he agreed that the money the TTP provides is "one of the things that I think China uses to seduce people." [Exhibit 1 at 2].

Lieber's third claim—that his statement was both unresponsive to the DoD agents' question and literally true [ECF 259 at 9-11]—is also meritless. As an initial matter, the jury easily could have found that the answer was, in fact, part of Lieber's response to the DoD agents' question about whether he had been approached to be a member of the TTP. And in any event, even if the answer could be construed as a volunteered remark, that does not immunize it from Section 1001, as discussed earlier. [*Supra* 16-17]. Nor was Lieber's statement "literally true." Given the TTP contract Lieber reviewed and signed, the TTP negotiations that preceded it, the emails Lieber received in which Mai repeatedly characterized him as a member of the TTP and said that Chinese government officials were pleased with his TTP performance, and Lieber's own expressed understanding that the program was government-run, his statement was manifestly false: He knew perfectly well how China categorized him in this regard, and a rational jury had a sound basis to so find. Finally, Count 1's allegation did not require the jury to decide what Lieber knew about "the state of mind of another person" [ECF 259 at 10] or "the state of mind of China" [ECF 259 at

11]. The charge rested on Lieber's knowledge of how he was touted, not on his ability to divine the inner thoughts of those who touted him.

Lieber's alternative fourth argument—that the government failed to prove his statement was literally false [ECF 259 at 11-12]—largely repeats his untenable "state of mind" theory. Lieber also suggests that, in stating that he was not sure how China categorized him, he may have meant he was not sure how China categorized him "as a scientist" or "as a person or colleague." [ECF 259 at 12]. But given that Lieber made his statement as part of a discussion about the TTP and that he *added it* on the heels of his assertion that he had not been asked to be a member of the TTP [EX323: 3], the most natural inference, and one a rational jury could have drawn, was that he was affirming that he was not sure how China categorized him vis-à-vis the TTP.

### B.    Ample evidence supports Count 2

Count 2 charged that Lieber "caused Harvard University to tell" NIH that Lieber "'[wa]s not and has never been a participant in'" the TTP, when in fact he had signed a three-year TTP contract around July of 2012. [ECF 35 at 14].

There is no question Lieber lied to Harvard when he denied having participated in the TTP. And the trial evidence richly documents the fact that Lieber knowingly and willfully caused Harvard to relay this lie to NIH. [*Supra* 9-12]. Lieber now contends for the first time, however, that the jury's verdict on Count 2 must be erased because, in its letter to NIH, Harvard couched the operative statement in terms of Lieber's "representation" to Harvard: that "Dr. Lieber *has represented* that he is not and has never been a participant in" the TTP. [EX3: 2 (emphasis added)]. Because it is true that Lieber made such (false) representations to Harvard, the argument goes, the recitation of that (false) statement in the NIH letter is simply not actionable under Section 1001. [ECF 259 at 12-14]. But the precedents Lieber cites for this absurd conclusion derive from the Supreme Court's decision in *Bronston v. United States*, 409 U.S. 352 (1973), a case he fails to

address and that reveals the fallacy of his position. As now explained, *Bronston* and the First Circuit cases applying it are easily distinguished.

In *Bronston*, the Supreme Court addressed a question that it termed "narrow": "whether a witness may be convicted of perjury for an answer, under oath, that is literally true but not responsive to the question asked and arguably misleading by negative implication." *Bronston*, 409 U.S. at 352-53. There, the defendant had a personal bank account in Switzerland until 1964. *Id.* at 354. When asked under oath in 1966 whether he had a Swiss bank account, he answered "no," which was then true. *Id.* In reply to the follow-up question whether he had "ever" had such a personal Swiss bank account, instead of answering with a truthful "yes" or a false "no," he evaded the question and answered—unresponsively—that his "company" had once had a Swiss Bank account, which was literally true. *Id.* The theory of prosecution was that "in order to mislead his questioner, petitioner answered the second question with literal truthfulness but unresponsively addressed his answer to the company's assets and not to his own—thereby implying that he had no personal Swiss bank account at the relevant time." *Id.* at 355.

On these idiosyncratic facts, the Supreme Court held that "the federal perjury statute cannot be construed to sustain a conviction based on [the second] answer," reasoning that "the statute does not make it a criminal act for a witness to willfully state any material matter that *implies* any material matter that he does not believe to be true," and that Congress did not intend "to extend the coverage of [18 U.S.C.] § 1621 to answers unresponsive on their face but untrue only by 'negative implication.'" *Id.* at 357-58, 361 (emphasis in original). In reaching this limited holding, the Court stressed the unique circumstances of in-court interrogation:

> Under the pressures and tensions of interrogation, it is not uncommon for the most earnest witnesses to give answers that are not entirely responsive. Sometimes the witness does not understand the question, or may in an excess of caution or apprehension read too much or too little into it. It should come as no surprise that a participant in a bankruptcy proceeding may have something to conceal and

consciously tries to do so, or that a debtor may be embarrassed at his plight and yield information reluctantly. It is the responsibility of the lawyer to probe; testimonial interrogation, and cross-examination in particular, is a probing, prying, pressing form of inquiry. If a witness evades, it is the lawyer's responsibility to recognize the evasion and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination.

It is no answer to say that here the jury found that petitioner intended to mislead his examiner. A jury should not be permitted to engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner; the state of mind of the witness is relevant only to the extent that it bears on whether 'he does not believe (his answer) to be true.' To hold otherwise would be to inject a new and confusing element into the adversary testimonial system we know. Witnesses would be unsure of the extent of their responsibility for the misunderstandings and inadequacies of examiners, and might well fear having that responsibility tested by a jury under the vague rubric of 'intent to mislead' or 'perjury by implication.'

*Id.* at 358-59.

The First Circuit has noted the Supreme Court's own emphasis on the narrowness of this holding. *See United States v. Richardson*, 421 F.3d 17, 32-33 (1st Cir. 2005) ("[T]he *Bronston* Court's holding was narrow."); *United States v. Glantz*, 847 F.2d 1, 6 (1st Cir. 1988) (noting that *Bronston* addressed a "'narrow'" question). The present case differs from *Bronston* in two critical respects, and thus the discrete rule it adopted has no application here.

First, this case is far removed from the in-court interrogation context. *See Boskic*, 545 F.3d at 92 ("[W]e question whether the literal truth defense as articulated in *Bronston* is appropriately invoked outside the context of adversary questioning."). In fact, with respect to Count 2, there was no interrogation of any sort. Prior to meeting with his Harvard colleagues to discuss a proposed response to NIH, Lieber was told that one item on the agenda was whether he had "participated in the Chinese government's Thousand Talents program?," and Lieber indicated he was prepared to answer this as well as the other questions posed. [*Supra* 10]. In the meeting later that day, Lieber was "very clear" that he had never agreed to be part of the TTP; indeed, he was emphatic on this point. [*Supra* 10-11]. Lieber then reviewed a draft letter to NIH that prominently set forth his false

23

denial that he had participated in the TTP, and he proposed no changes to that statement even though he made several other revisions and suggestions. [*Supra* 11-12]. This scenario has nothing in common with the one the Supreme Court confronted in *Bronston*.

Second, even ignoring the fact that the events here bear no resemblance to an in-court adversarial examination, the operative statement cannot be classed as an "answer[] unresponsive on [its] face but untrue only by 'negative implication.'" *Bronston*,  409 U.S. at 361. To the contrary, it was an affirmative and unambiguous lie that was false on its face and that Lieber well knew and intended would be transmitted to NIH. *See United States v. Schafrick*, 871 F.2d 300, 303 (2d Cir. 1989) ("If an answer is responsive to the question, then there is no notice to the examiner and no basis for applying *Bronston*. The purpose of the *Bronston* rule is to place the burden on the examiner to probe for details during the examination."); *accord United States v. Spalding*, 894 F.3d 173, 183 (5th Cir. 2018); *United States v. Strohm*, 671 F.3d 1173, 1185 (10th Cir. 2011).

These two factors distinguish this case from those in which the First Circuit has reversed convictions based on *Bronston*. *See Reveron Martinez*, 836 F.2d at 689-91 ("When a witness bobs and weaves, it is the questioner's obligation to get the proper bearings; a federal perjury prosecution is medicine too powerful to be dispensed casually as a quick fix for unresponsiveness."); *United States v. Finucan*, 708 F.2d 838, 846-48 (1st Cir. 1983) (holding that *Bronston* applies where the charge hinges "on the false implications of a statement that is not alleged to be false in itself"); *Poutre*, 646 F.2d at 687-88. And conversely, the factors bring the case well within the sweep of those in which the First Circuit has found *Bronston* inapplicable. *See United States v. Brown*, 945 F.3d 597, 602 (1st Cir. 2019); *United States v. Mensah*, 737 F.3d 789, 804-05 & n.15 (1st Cir. 2013); *Boskic*, 545 F.3d at 92-93; *United States v. Hatch*, 434 F.3d 1, 5-6 (1st Cir. 2006); *Richardson*, 421 F.3d at 32-34; *United States v. Rowe*, 144 F.3d 15, 21 (1st Cir. 1998); *United States v. Doherty*, 867 F.2d 47, 68 (1st Cir. 1989); *Glantz*, 847 F.2d at 5-7;

*United States v. Moreno Morales*, 815 F.2d 725, 744-47 (1st Cir. 1987); *United States v. Kehoe*, 562 F.2d 65, 68-69 (1st Cir. 1977).

     **C.     The challenges to Counts 5 and 6 are baseless**

         **1.     The untimely legal attack is waived and fails on plain-error review in any event**

On the eve of trial, Lieber advanced a new but narrow attack on the scope of conduct covered by the Bank Secrecy Act and charged in Counts 5 and 6. [ECF 207 at 27-28]. Then, as the trial came to a close, Lieber dramatically enlarged this attack, targeting the entire statutory and regulatory scheme that criminalizes willful failures to report foreign bank accounts. [ECF 239 at 3-7]. His argument, repeated here [ECF 259 at 14-15], is both waived and meritless.

The Bank Secrecy Act ("BSA") provides in pertinent part that "the Secretary of the Treasury shall require a . . . citizen of the United States . . . to keep records, file reports, or keep records and file reports, when the . . . citizen . . . makes a transaction or maintains a relation for any person with a foreign financial agency," 31 U.S.C. § 5314(a), and it empowers the Secretary to issue implementing regulations, *id.* § 5314(b). Pursuant to this authority, the Secretary promulgated a regulation stating: "Each United States person having a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country shall report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists and shall provide such information as shall be specified in a reporting form prescribed under 31 U.S.C. 5314 to be filed by such persons." 31 C.F.R. § 1010.350(a); *see generally United States v. Chen*, 815 F.3d 72, 75-76 (1st Cir. 2016) (discussing statute and regulation). The prescribed form for such reports is the Report of Foreign Bank and Financial Accounts ("FBAR"). 31 C.F.R. § 1010.350. The FBAR must be "filed with FinCEN on or before June 30 of each calendar year with respect to foreign financial accounts exceeding $10,000

maintained during the previous calendar year." 31 C.F.R. § 1010.306(c), (d). Willful failures to file an FBAR constitute a felony offense. 31 U.S.C. § 5322; 31 C.F.R. § 1010.840(b).

Based on these provisions, Counts 5 and 6 alleged that, for the years 2014 and 2015, Lieber willfully failed to file FBARs concerning a Chinese bank account that he had an interest in and signature authority over and that had an account balance exceeding $10,000. [ECF 35 at 17]. Prior to trial, Lieber made no effort to fault these charges and never moved to dismiss the indictment.

Lieber now contends that 31 C.F.R. § 1010.350 is "void" in requiring the reporting of a "relationship" with a foreign financial account (*e.g.*, maintaining a bank account), when, according to him, the BSA only requires the reporting of a "transaction" with respect to such an account. [ECF 259 at 14-15]. In his own proposed jury instructions, however, Lieber implicitly conceded that the indictment properly charged an unreported *bank account* and that the indictment was *not* required to allege unreported *transactions*; he argued instead (and only) that the indictment's "signature authority" allegation was legally invalid, and that the government could only prevail on Counts 5 and 6 by proving that he had an "interest in" the unreported bank account. [ECF 207 at 27-28]. Lieber's new theory that the FBAR regulation is void first surfaced in his motion for judgment of acquittal filed on the final day of trial. [ECF 239 at 3-7].

Although Lieber cloaks his new FBAR thesis in sufficiency-of-the-evidence garb, in reality it is nothing less than a broadside legal attack on the validity of the indictment and on the regulation undergirding Counts 5 and 6. At bottom, his contention is that Counts 5 and 6 fail to charge an offense as a matter of law. *See, e.g.*, *United States v. Moss*, 872 F.3d 304, 305, 309 (5th Cir. 2017) (treating defendants' claim "that any regulations that would hold them criminally liable exceed Congress's explicit grant of statutory authority" as one alleging a "failure to state an offense" under Rule 12); *United States v. Whitlow*, 714 F.3d 41, 43 (1st Cir. 2013) (affirming denial of motion to dismiss indictment where defendant had claimed that regulations underlying the criminal charge

"were invalid"); *United States v. Guthrie*, 50 F.3d 936, 939, 943 (11th Cir. 1995) (affirming denial of motion to dismiss indictment where defendant had advanced a "collateral attack" on the regulation underlying his criminal charge, and citing "decisions [that] suggest that collateral review of an agency regulation in a criminal proceeding should be narrow or nonexistent").

This distinction has consequences. A claim that an indictment "fail[s] to state an offense" is among those claims that "must be raised by pretrial motion when the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(B)(v); *Grzegorczyk v. United States*, 997 F.3d 743, 747 (7th Cir. 2021); *United States v. Rodríguez-Rivera*, 918 F.3d 32, 34 (1st Cir. 2019). Here, Lieber failed to move for dismissal of the indictment based on his FBAR theory (or on any theory) prior to trial. Rather, as stated, he first unveiled the FBAR theory in a motion for judgment of acquittal filed on the final day of trial. [ECF 239 at 3-7]. Because this legal theory was "reasonably available" to him prior to trial and required no factual development at trial, his end-of-trial FBAR argument must be rejected as untimely. Fed. R. Crim. P. 12(c)(3). Although such a default may be excused when a defendant shows "good cause" for the untimely claim, Fed. R. Crim. P. 12(c)(3), Lieber has never endeavored to meet this standard and there is no evident ground for a "good cause" finding. Hence, his claim is waived entirely. *See United States v. Reyes*, 24 F.4th 1, 8 n.8 (1st Cir. 2022); *United States v. Lindsey*, 3 F.4th 32, 40-42 (1st Cir. 2021); *United States v. Muresanu*, 951 F.3d 833, 839 (7th Cir. 2020); *United States v. O'Brien*, 926 F.3d 57, 83 (2d Cir. 2019).

And even if the claim were not waived, it is forfeited and reviewed at best for plain error. *See United States v. Ferriero*, 866 F.3d 107, 122 n.17 (3d Cir. 2017). If the Court bypasses the waiver problem and indulges in plain-error review, the proper question on such review is whether

it is "obvious" that the Treasury Department exceeded its authority under the BSA in promulgating the regulation. The answer is clearly "no."[5]

As pertinent here, the BSA requires a citizen to keep records or file reports when the citizen "makes a transaction *or* maintains a relation *for any person* with a foreign financial agency." 31 U.S.C. § 5314(a) (emphasis added). Despite Lieber's undeveloped claim to the contrary [ECF 259 at 16 n.3], the "any person" plainly includes the citizens themselves and not just third parties. Moreover, the BSA gives the Secretary broad powers to "prescribe . . . a reasonable classification of persons subject to or exempt from a requirement under this section or a regulation under this section." 31 U.S.C. § 5314(b)(1).

The conclusion that the BSA covers a citizen's relationship with foreign banks and not just transactions with such banks is reinforced by the statute's list of the four categories of information that the records and reports must contain: (1) "the identity and address of participants in a transaction *or relationship*; (2) "the legal capacity in which a participant is acting"; (3) "the identity of real parties in interest"; and (4) "a description of the transaction." 31 U.S.C. § 5314(a)(1)-(4) (emphasis added). The mere fact that the fourth category refers to transactions and not relationships hardly establishes that Congress only intended to require reports relating to transactions. Congress plainly meant to require reports concerning relationships with foreign financial agencies such as banks, as the balance of the statutory language makes clear. Lieber's contrary position offends the statutory construction principles that "courts must give effect, if possible, to every clause and word of a statute," *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1948 (2020) (cleaned up), and that "absurd results are to be avoided." *United States v. Wilson*, 503 U.S. 329, 334 (1992). Thus, the

---

[5] For purposes of evaluating Lieber's argument, the government assumes *arguendo* that Lieber might have challenged the validity of the regulation here in a timely-filed motion to dismiss the indictment. *See generally Adamo Wrecking Co. v. United States*, 434 U.S. 275, 285 (1978); *Guthrie*, 50 F.3d at 943.

Secretary acted well within the discretion afforded by the BSA in issuing regulations covering such relationships, including maintaining a foreign bank account.

The Second Circuit case Lieber cites, *United States v. Khan*, 5 F.4th 167 (2d Cir. 2021), does not assist him. Indeed, *Khan* takes it as a given that the BSA reporting requirements apply to a citizen's bank accounts and not just to transactions in those accounts. *Id.* at 169. Unsurprisingly, circuit court decisions, including one from the First Circuit, uniformly support this reading of the statute. *See, e.g.*, *United States v. Bittner*, 19 F.4th 734, 737 (5th Cir. 2021); *United States v. Boyd*, 991 F.3d 1077, 1078-79 (9th Cir. 2021); *Kimble v. United States*, 991 F.3d 1238, 1242 (Fed. Cir. 2021); *United States v. Horowitz*, 978 F.3d 80, 81 (4th Cir. 2020); *Bedrosian v. United States of Am., Dept of the Treasury, Internal Revenue Serv.*, 912 F.3d 144, 148 (3d Cir. 2018); *Chen*, 815 F.3d at 76; *United States v. Simon*, 727 F.3d 682, 685 (7th Cir. 2013).

### 2.      There is ample evidence of willfulness

Lieber also contends there was insufficient evidence he acted willfully in failing to file FBARs for the years 2014 and 2015—reports that were due to be filed by June 30, 2015 and June 30, 2016 respectively. [ECF 259 at 18-20]. But in fact, there was abundant proof on this point. For example, Lieber's accountant sent him no fewer than three short letters that described prominently and in clear terms the FBAR requirement and the criminal penalties for failure to file reports, and Lieber signed and returned the last of the three letters on February 10, 2016 (*i.e.*, before the June 2016 filing deadline for 2015); Lieber's 2013 and 2014 tax returns (which he verified he reviewed) also discussed that requirement; and Lieber revealed in his confession that he and his wife had not accessed the funds in his ICBC account because "we realize[d] that this was not an appropriate thing." [*Supra* 12-13; EX240: 3; EX245: 3; EX249: 2; EX260 (2013): 30; EX 265 (2014): 30; T5: 128-131, 152, 157-159, 175-176; Exhibit 1 at 16]. Viewing this and the other evidence in the light most favorable to the verdict, a rational jury easily could have found willfulness. Lieber's

suggestion that he may not have read the letters or the tax returns—a proposition for which there is no record support—is merely a jury argument, and one he evidently thought was not worth making. [T6: 146-150].

### III.   The new trial motion is groundless

#### A.   Count 1 is unaffected by the *Griffin* rule

Lieber tries to invoke *Griffin v. United States*, 502 U.S. 46 (1991), in an effort to undermine Count 1, repeating his (erroneous) claim that the second statement charged in Count 1 (*i.e.*, that Lieber was not sure how China categorized him) was "literally true" as a factual matter.  [ECF 259 at 21]. But that claim, even if it had legs, would simply implicate the sufficiency of the evidence as to that theory of guilt; it would not establish that the theory is contrary to law. Thus, the *Griffin* rule has no application here. *See United States v. Richardson*, 421 F.3d 17, 31-33 (1st Cir. 2005); *see also United States v. Pena*, 24 F.4th 46, 74 (1st Cir. 2022) ("When a jury returns a general guilty verdict on a sole count, and there is sufficient evidence as to one of two alternative theories of guilt in that count . . .  insufficiency of the evidence as to the other theory of guilt will not undermine the conviction."); *United States v. Gerhard*, 615 F.3d 7, 30 (1st Cir. 2010) (holding *Griffin* rule inapplicable if "the jury could not have relied on a defective legal theory"); *United States v. Figueroa-Cartagena*, 612 F.3d 69, 76 (1st Cir. 2010) (citing *Griffin* in stating "we cannot overturn the verdict because it might have been based on a factually unsupported theory").

#### B.   The untimely legal attack on Counts 5 and 6 is waived and fails on plain-error review in any event

As noted, Counts 5 and 6 alleged that for the years 2014 and 2015, Lieber willfully failed to file FBARs concerning a Chinese bank account that he had (a) an interest in and (b) signature authority over, and that had an account balance exceeding $10,000. [ECF 35 at 17]. Prior to trial, Lieber made no effort to fault these charges and never moved to dismiss the indictment.

A mere nine days before trial, Lieber filed proposed jury instructions in which he argued for the first time that the indictment's "signature authority" allegation was legally invalid as exceeding the scope of 31 C.F.R. § 1010.350, and that the government could only prevail on Counts 5 and 6 by proving that he had an "interest in" the unreported bank account. [ECF 207 at 27-28]. He now renews that argument here. [ECF 259 at 21-24]. As in the case of his other FBAR theory [*supra* 24-26], this is merely an untimely failure-to-state-an-offense claim that is waived or at best forfeited. *See* Fed. R. Crim. P. 12(b)(3)(B)(v); *Grzegorczyk*, 997 F.3d at 747; *Rodríguez-Rivera*, 918 F.3d at 34. Even if the Court were to afford Lieber plain-error review, he would fail every element of the four-part test, which requires him to establish: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *United States v. Padilla*, 415 F.3d 211, 218 (1st Cir. 2005) (en banc) (cleaned up).

There was no error, let alone an obvious error. Indeed, Lieber's argument here is frivolous. The pertinent regulation states:

> Each United States person having a financial interest in, or *signature or other authority* over, a bank, securities, or *other financial account* in a foreign country shall report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists and shall provide such information as shall be specified in a reporting form prescribed under 31 U.S.C. 5314 to be filed by such persons.

31 C.F.R. § 1010.350(a) (emphasis added). Under the plain terms of this provision, the signature authority component applies to "bank" and "securities" accounts as well as to any "other financial account" (terms defined in 31 C.F.R. § 1010.350(c)). Moreover, the "other" in that phrase plainly reveals that bank and securities accounts are themselves types of "financial" accounts. And the title of the C.F.R. provision ("Reports of foreign financial accounts") conveys the same point. The mere fact that the definition of "signature or other authority" in 31 C.F.R. § 1010.350(f) only refers

to the overarching category ("financial account") hardly means that the signature authority component of § 1010.350(a) does not apply to bank and securities accounts. Lieber's contrary reading of the regulation makes no sense, whether as a matter of language, logic, or policy.

Finally, and in any event, Lieber cannot show a reasonable probability that, if the jury's consideration had been limited to the allegation that he had an "interest in" the ICBC account (as opposed to "signature authority over" that account), he would have been acquitted on Counts 5 and 6. The evidence discussed above made manifest that Lieber had a potent interest in that account [*supra* 3-4, 7-8], and nothing in the record even remotely suggests the verdict would have been different if that had been the lone theory before the jury.

## C. The derivative challenge to Counts 3 and 4 is futile

Lieber argues relatedly that the tax counts also must be invalidated because they rested in part on an allegation that he failed to report a foreign bank account that he had an interest in and signature authority over. [ECF 259 at 24]. This argument, however, conflates the charges in Counts 5 and 6, which are predicated on a citizen's independent responsibility under the BSA and implementing regulations to file a FBAR in certain circumstances, with the charges in Counts 3 and 4, which rest on Lieber's free-standing false statements in his 2013 and 2014 tax returns. The trial evidence established that Lieber's 2013 and 2014 tax returns contained the following question: "At any time during [the tax year], did you have a financial interest in or signature authority over a financial account (such as a bank account …) located in a foreign country?" [EX260: 30; EX265:30; T5: 175-76]. The evidence also revealed that in both returns, Lieber falsely answered this question, "No." [*Ibid.*] Lieber does not challenge the sufficiency of the evidence as to these material false statements or otherwise contest the legal validity of this alternative basis for his convictions on Counts 3 and 4. Thus, his effort to import his meritless FBAR theory into the tax context goes nowhere.

32

### D.   The jury instruction claims fail on plain-error review

### 1.   The specific unanimity claim

Count 1 alleged that Lieber made two false statements to the DoD agents: (1) "he was never asked to participate in China's Thousand Talents Program"; and (2) "he 'wasn't sure' how China categorized him." [ECF 35 at 13]. Count 1 then alleged that Lieber had made these false statements notwithstanding the fact that WUT representatives had asked him to participate in the TTP and he had signed a TTP contract in 2012. [*Ibid.*].

Prior to trial, Lieber never challenged Count 1 as duplicitous under Fed. R. Crim. P. 12(b)(3)(B)(i). Moreover, Lieber did not request a specific unanimity instruction as to Count 1 in his proposed charge filed on December 5, 2021. [ECF 207]. With those issues seemingly off the table, then, the matter proceeded to trial nine days later.

The final trial day began on December 21, 2021, at about 8:00 a.m. [T6: 1]. Half an hour later, and shortly before the scheduled charge conference, Lieber filed proposed supplemental jury instructions. [ECF 237; T6: 17-19, 84-87]. In that submission, Lieber characterized the false statements charged in Count 1 (*i.e.*, "that he was never asked to participate in China's Thousand Talents Program" and "that he 'wasn't sure' how China categorized him") as "two alleged false statements," and he requested an instruction that the government had to prove every element of the offense "with respect to *at least one* of those two Statements." [ECF 237 at 4 (emphasis added)]. To underscore his point that Count 1 charged two separate statements that could each support a guilty verdict independently, he also proposed the following language: "You cannot find Professor Lieber guilty on Count One unless you all agree, with respect to the *same Statement*, that the government has proven all five elements of the alleged offense." [ECF 237 at 4 (emphasis added)].

Lieber then abruptly changed course at the charge conference later that morning and took a position diametrically opposite from the one he had just advanced in his proposed supplemental instructions. He now posited that the statements charged in Count 1 were merely "two pieces" or "two parts" of one overarching "single statement," and that the government needed to prove *both* for a conviction. [T6: 87-94]. The government disagreed with that interpretation of the indictment, citing the settled principle that the prosecution may charge in the conjunctive and prove in the disjunctive. [T6: 88-89]. Lieber thereafter adhered to his late-blooming "single statement" theory, but he did not renew his written request that, if the two statements provided separate grounds for conviction (as he had conceded they did in his proposed supplemental instructions), the jury needed to be unanimous in deciding that the government had proven one or both. [T6: 88-94]. In the end, the Court, perhaps puzzled by Lieber's zig-zag approach, expressed an unwillingness to address in its instructions the issue whether Count 1 rested on a single or two statements. [T6: 93-94]. Lieber noted his "exception" to that result but did not seek a specific unanimity instruction. [T6: 94].[6]

In the ensuing charge, the Court instructed that the jurors needed to be unanimous generally to convict Lieber on Count 1: "If you are, each of you, convinced beyond a reasonable doubt that the Government has proven each of the elements beyond a reasonable doubt, then you may find the Defendant guilty on Count 1 . . .   It takes 12 of you to agree to convict in order for him to be convicted." [T6: 175]. When instructions were complete, the Court invited objections. [T6: 182]. Lieber then raised several issues, but he did not renew his last-minute oral request for an instruction

---

[6] Just before the charge, the Court confirmed the parties had no objection to the verdict form [T6: 157], which said the following about Count 1: "ON COUNT ONE OF THE SUPERSEDING INDICTMENT (False Statements). ___ GUILTY ___ NOT GUILTY." [ECF 244]. The Court then distributed copies of the verdict form to the jurors so they could refer to it during the charge and during deliberations. [T6: 157]. Lieber never requested a special verdict form for Count 1 or for any other count.

requiring the jury to find both statements charged in Count 1 in order to convict. [T6: 182-186].

Nor did he renew his earlier written request for a specific unanimity instruction with respect to

Count 1, perhaps because he was content with the general unanimity instruction that the Court had

just given. [T6: 182-186]. Instead, when the Court directly inquired of both sides whether they had

any further issues with the instructions, Lieber's counsel replied: "That's all, thanks." [T6: 186].

Lieber now argues that the Court erred in not giving a specific unanimity charge with

respect to Count 1. [ECF 259 at 26-28]. Because Lieber did not preserve this issue by objecting in

the wake of the charge, however, the law is settled that review is at best for plain error. *See* Fed.

R. Crim. P. 30(d); Fed. R. Crim. P. 52(b); *United States v. Pérez-Rodríguez*, 13 F.4th 1, 16 (1st

Cir. 2021) ("It has been the longstanding rule of this circuit to treat a challenge to jury instructions

as forfeited if the defendant fails to object to the instructions after the judge has charged the jury,

regardless of whether he previously brought the matter to the judge's attention.").[7] The fact that

Lieber has now raised the issue in a post-trial motion does not cure the forfeiture. *See United States

v. Kinsella*, 622 F.3d 75, 83 (1st Cir. 2010).

No "obvious" error can be found in the Court's instruction given the mixed state of the

case law. No Supreme Court or First Circuit precedent expressly holds that, when a Section 1001

count charges that a defendant made more than one false statement in the course of a single

interview with government agents, the district court is required to instruct the jury that it must

unanimously agree on a particular statement in order to convict. To be sure, a few First Circuit

cases could be read to lend some support for such a result. *See, e.g.*, *United States v. Brown*, 945

---

[7] *Accord United States v. Velazquez-Fontanez*, 6 F.4th 205, 227 (1st Cir.), *cert. denied*, 142 S. Ct. 500 (2021); *United States v. Melo*, 954 F.3d 334, 347 (1st Cir. 2020); *United States v. Veloz*, 948 F.3d 418, 436 (1st Cir.), *cert. denied*, 141 S. Ct. 438 (2020); *United States v. Rodríguez-Torres*, 939 F.3d 16, 37 (1st Cir. 2019); *United States v. Henry*, 848 F.3d 1, 13 (1st Cir. 2017); *United States v. McPhail*, 831 F.3d 1, 9 (1st Cir. 2016); *United States v. Meadows*, 571 F.3d 131, 146 (1st Cir. 2009); *United States v. Roberson*, 459 F.3d 39, 45 (1st Cir. 2006); *United States v. Wilkinson*, 926 F.2d 22, 26 (1st Cir. 1991).

F.3d 597, 604 (1st Cir. 2019); *United States v. Phillipos*, 849 F.3d 464, 473 (1st Cir. 2017); *United States v. Newell*, 658 F.3d 1, 26 (1st Cir. 2011). Other First Circuit and extra-circuit opinions, however, convey a different message, particularly given that Section 1001 applies to anyone who knowingly and willfully "makes *any* materially false, fictitious, or fraudulent statement or representation," 18 U.S.C. § 1001(a)(2) (emphasis added). *See, e.g.*, *United States v. Asefi*, 788 Fed. App'x. 449, 451 (9th Cir. 2019); *United States v. LaPlante*, 714 F.3d 641, 646-47 (1st Cir. 2013); *United States v. Verrecchia*, 196 F.3d 294, 297-99 (1st Cir. 1999); *United States v. McCormick*, 72 F.3d 1404, 1409 (9th Cir. 1995); *United States v. Canas*, 595 F.2d 73, 78-79 (1st Cir. 1979); *United States v. Craigue*, 2021 WL 1946441, at *2-4 (D. NH 2021) (collecting cases from this and other circuits). No binding precedent concerning Section 1001 has squarely resolved the issue presented here, whether the issue is framed in terms of duplicity, the unit of prosecution, or specific unanimity. *Id.*[8]

In the absence of controlling authority on point, there can be no obvious error in the Court's failure to give a specific unanimity instruction as to Count 1. *See United States v. Gottesfeld*, 18 F.4th 1, 8 (1st Cir. 2021) (citing rule that there is "no plain error where there [i]s no binding authority on point"); *United States v. Rivera-Morales*, 961 F.3d 1, 13 (1st Cir. 2020) ("[A] criminal defendant generally cannot show that a legal error is clear or obvious in the absence of controlling precedent resolving the disputed issue in his favor."); *United States v. Gonzalez*, 949 F.3d 30, 39 (1st Cir.), *cert. denied*, 141 S. Ct. 327 (2020) ("In the absence of any on-point authority, there is no principled way for us to say that the district court committed a clear or obvious error"); *Newell*, 658 F.3d at 28 (holding that certain charges were duplicitous and that the failure to give a specific

---

[8] Lieber never claimed before trial that Count 1 was duplicitous, so any such challenge is waived. *See* Fed. R. Crim. P. 12(b)(3)(B)(i); *United States v. Simon*, 12 F.4th 1, 46 n.11 (1st Cir. 2021); *United States v. Jackson*, 5 F.4th 676, 682 (7th Cir. 2021); *Brown*, 945 F.3d at 604.

unanimity instruction was error, but concluding: "In light of the presence of some, even if not exactly overwhelming, countervailing authority, and because of the lack of doctrinal clarity in this area—the relevant unit of prosecution under § 666(a)(1)(A), the crucial issue underpinning the appellants' claim, appears not to have been hitherto addressed by this circuit—we cannot say with confidence that any error here was plain"). Lieber thus fails prong two of the plain-error test.

In any event, Lieber also fails prong three because he cannot demonstrate that "there is a reasonable probability that the jurors, if given a specific unanimity instruction [on Count 1], would not have agreed to convict" him on that count. *Brown*, 945 F.3d at 605; *see also United States v. Weiss*, 539 F. App'x 952, 956-57 (11th Cir. 2013). There is simply nothing in the record to suggest that, if the jurors had been told that they needed to reach unanimous agreement as to one or both statements charged in Count 1, they would have acquitted. To the contrary, each statement was supported by solid evidence.

Although in two bare sentences [ECF 259 at 28] Lieber now says a specific unanimity instruction was also required for *all* the remaining counts, this claim fails because: (a) the claim is entirely undeveloped and thus waived; (b) he never requested such instructions at any time, whether in his proposed jury charge, at the charge conference, or following the charge, and thus review is at best for plain error; and (c) he makes no effort to show an "obvious" error here, let alone prejudice and a miscarriage of justice.

### 2.    The willfulness claim

Lieber alleges that the Court failed to instruct on the willfulness element of the FBAR and tax offenses. [ECF 259 at 25]. Although that element was discussed at the charge conference, Lieber made no pertinent requests concerning it. [T6: 87-103]. In the actual charge, the Court instructed multiple times on the willfulness element of both crimes, and defined willfulness for the jury. [T6: 169-180]. After the charge, Lieber's counsel raised other issues but said nothing about

the Court's willfulness instructions. [T6: 182-186]. The record just discussed undercuts any claim of obvious error, and Lieber fails the remaining prongs of the plain-error test.

### 3.   The "financial interest" and "signature authority" claims

Lieber faults the Court for not separately defining the FBAR terms "financial interest" and "signature authority" [ECF 259 at 25-26], even though he never raised this issue at the charge conference [T6: 87-103] or in the aftermath of the instructions [T6: 182-186]. As before, review is at best for plain error. Lieber fails to explain why these easy-to-grasp terms needed any further gloss. *See United States v. Cruz-Diaz*, 550 F.3d 169, 175 (1st Cir. 2008) (no error in failure to define "dangerous weapon"); *United States v. Sabetta*, 373 F.3d 75, 81-82 (1st Cir. 2004) (no plain error in failure to define "knowingly," and noting that "this circuit has generally held that terms a reasonable jury can understand do not need further definition," and citing examples). Still less has he shown an obvious error; indeed, he cites no authority for his position.

But even putting these problems aside, the idea that the jury would have acquitted if it had heard Lieber's proffered definitions [ECF 259 at 26] is fanciful. Under any conceivable definition of the terms, there was overwhelming evidence that Lieber had both an "interest in" and "signature authority" over the ICBC account. Moreover, in the twelve sentences of his closing argument that he devoted to the FBAR charges [T6: 149-150], Lieber never tried to sow doubt on either score, further undermining any notion he was prejudiced. *See United States v. Dubon-Otero*, 292 F.3d 1, 13 n. 18 (1st Cir. 2002) ("Thus, even if we were to find error in the district court's failure to define 'federal program' and 'federal assistance' in its instructions, such error would be harmless.").

### E.   There is no reason to reconsider the ruling denying suppression

In a five-sentence argument, Lieber faults the Court for purportedly failing to address his suppression assertion that "the agent who administered *Miranda* warnings mis-stated [*sic*] the applicable law." [ECF 259 at 28]. Lieber did not make this claim in his suppression memorandum.

[ECF 173]. In his reply, Lieber tersely suggested that "coercion here occurred when the Agent misstated the law by claiming that a request for counsel necessitated another reading of *Miranda*," but this was a skewed reading of the agent's remarks, and Lieber cited no pertinent legal authority. [ECF 184 at 1-2]. Even so, the Court addressed Lieber's broader argument in ruling that the agent appropriately repeated the *Miranda* warnings. [ECF 192 at 7-8]. There is no sign that a fuller treatment of this side issue would have led to suppression, and Lieber's failure to seek reconsideration in the weeks after the Court's ruling effectively concedes the point.

**F.      The "interests of justice" claims are meritless**

**1.      The verdicts were not against the weight of the evidence**

Lieber advances seven reasons why the verdicts were against the weight of the evidence. [ECF 259 at 29-35]. The first four of these grounds [ECF 258 at 29-31] are merely a rehashing of hopeless claims addressed earlier. [*Supra* 16-21].

Lieber's fifth ground, set forth in two sentences, is that there was inconclusive evidence (a) that he participated in the TTP, and (b) concerning how China characterized him in regard to that program. [ECF 259 at 31]. But there was devastating proof on both points, including Lieber's own confession. [*Supra* 3-9]. That there was no live witness testimony from a WUT representative on the subject is of no moment.

As to the sixth ground [ECF 259 at 31], there was powerful and uncontroverted evidence not only that Lieber signed the TTP contract but that he was paid handsomely for his efforts over the three-year period of the engagement. [*Supra* 3-9]. Further, the contract's core terms were spelled out in plain language that any literate person (and surely a Harvard professor) would understand. [*Supra* 4-5; EX18; EX22; EX 23]. That no fully executed version of the contract was recovered, whether because Lieber hid, mislaid, or destroyed his own copy of the final version that he expressly stated he would sign and return to Mai [EX26: 1], signifies nothing.

As his seventh and final ground, Lieber questions the evidence that he (a) told Harvard that he "was not and ha[d] never been a participant in" the TTP, and (b) understood that Harvard would relay that lie to NIH. [ECF 259 at 31-35]. The proof on both scores, however, was ironclad. [*Supra* 10-12]. Lieber's retail criticisms of this evidence [ECF 259 at 31-35] are strained to say the least; they are jury arguments, and weak ones at that.

### 2.    The Court's evidentiary rulings were sound, and the unwarranted attacks on the Court's trial management fail on plain-error review

Lieber asks the Court to revisit its evidentiary rulings, focusing on its admission of the email exhibits. [ECF 259 at 35-40]. As the record discussed above discloses, however, a substantial volume of that evidence consisted of Lieber's own statements or his adopted admissions, making the evidence admissible under Fed. R. Evid. 801(d)(2)(A) & (B). *See United States v. Sandoval*, 6 F.4th 63, 95 (1st Cir. 2021); *United States v. Duval*, 496 F.3d 64, 76 (1st Cir. 2007). The remaining email exhibits were admissible variously as context for Lieber's responsive statements (*e.g.*, as reciprocal integrated utterances), as state of mind evidence, and as verbal acts. *See Sandoval*, 6 F.4th at 94; *United States v. Pérez-Vásquez*, 6 F.4th 180, 195 n.7 (1st Cir. 2021); *United States v. Walter*, 434 F.3d 30, 33-34 (1st Cir. 2006); *United States v. Cruz-Paulino*, 61 F.3d 986, 996 n.8 (1st Cir. 1995); *United States v. Murphy*, 193 F.3d 1, 5 (1st Cir. 1999); *United States v. McDowell*, 918 F.2d 1004, 1007 (1st Cir. 1990).[9] On top of this, the Court gave multiple limiting instructions—some proposed by Lieber himself—regarding this evidence, both during trial and in its final instructions. [T3: 95; T4: 23-24, 31-32, 36, 49-50, 72, 74; T6: 159-161].

---

[9] The fact that the conversations here were by email rather than in-person does not alter the analysis. *See, e.g.*, *United States v. Browne*, 834 F.3d 403, 416 & n.10 (3d Cir. 2016) (holding that the statements of third parties in "chats" were properly admitted as context for the defendant's statements, and citing *McDowell*); *United States v. Manning*, 738 F.3d 937, 943 (8th Cir. 2014) ("the statements of the unknown parties to the chat conversations with Manning were not hearsay because the statements were not offered for their truth but rather to provide context for Manning's responses"); *United States v. Cooke*, 675 F.3d 1153, 1156 (8th Cir. 2012) (emailed statements of third parties were context for defendant's emailed replies).

Lieber does not specify which particular exhibits were improperly admitted, why they failed to satisfy one or more of the bases for admission just stated, or how he was prejudiced by their introduction. He also ignores the fact that, in many instances, key incriminating exhibits came in without objection or by express agreement. Against this backdrop, there is no basis for finding a miscarriage of justice that would warrant relief under Rule 33.

Finally, Lieber makes scattershot assertions to the effect that the Court was "confused" about the evidence; that it gave "confusing" limiting instructions; that it created a trial environment where "confusion reigned"; that it made remarks to the jury that were "counter-productive"; that it "prodded counsel to move quickly"; and that it urged the jury to deliberate rapidly due to the holiday season. [ECF 259 at 36-40]. These criticisms are wholly undeveloped, and they share a common fault: Lieber failed to raise any concerns along these lines at trial, and he never once lodged any relevant objections. Thus, review is for plain error, and Lieber cannot satisfy the four prongs of the plain-error standard set forth above.

## CONCLUSION

For these reasons, the government respectfully asks the Court to deny the defendant's motions for judgment of acquittal and for a new trial.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:   */s/ Donald C. Lockhart*
Donald C. Lockhart
Jason A. Casey
James R. Drabick

Dated: March 3, 2022          Assistant United States Attorneys

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was filed on March 3, 2022, through the ECF system, which will provide electronic notice to counsel as identified on the notice of Electronic Filing.

*/s/ Donald C. Lockhart*
Donald C. Lockhart
Assistant United States Attorney