1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

3
                                        )
4    UNITED STATES OF AMERICA,          )
                                        )
5            Plaintiff,                 )
                                        )   Criminal Action
6    v.                                 )   No. 1:20-cr-10111-RWZ-1
                                        )
7    CHARLES LIEBER,                    )
                                        )
8            Defendant.                 )
                                        )
9

10

11              BEFORE THE HONORABLE RYA W. ZOBEL
                  UNITED STATES DISTRICT JUDGE
12

13                       MOTION HEARING

14

15                      March 31, 2022
                         2:39 p.m.
16

17          John J. Moakley United States Courthouse
                    Courtroom No. 12
18                  One Courthouse Way
                Boston, Massachusetts 02210
19

20

21

22              Linda Walsh, RPR, CRR
                 Official Court Reporter
23      John J. Moakley United States Courthouse
              One Courthouse Way, Room 5205
24             Boston, Massachusetts 02210
                 lwalshsteno@gmail.com
25

```
 1    APPEARANCES:

 2    On Behalf of the Government:

 3         UNITED STATES ATTORNEY'S OFFICE
           By: AUSA Donald C. Lockhart
 4             AUSA Jason A. Casey
               AUSA James R. Drabick
 5         1 Courthouse Way, Suite 9200
           Boston, Massachusetts 02210
 6         617-748-3264
           jason.casey2@usdoj.gov

 7

 8    On Behalf of the Defendant:

 9         MUKASEY FRENCHMAN LLP
           By: Kenneth A. Caruso, Esq.
10             Marc L. Mukasey, Esq.
           570 Lexington Avenue, Suite 3500
11         New York, New York 10022
           212-466-6400
12         marc.mukasey@mfsllp.com

13

14

15

16

17

18                   Proceedings reported and produced
                       by computer-aided stenography.
19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  This is the United States versus Charles
 3    Lieber.  It's Criminal 20-10111.
 4              Can I please ask counsel to state their name for the
 5    record, please.  Slowly, please.
 6              MR. CASEY:  Good afternoon, Your Honor.
 7              Jason Casey, J.R. Drabick, and to my left, Donald
 8    Lockhart, for the United States.
 9              THE COURT:  I'm sorry.  The last one?
10              MR. CASEY:  Donald Lockhart.
11              THE COURT:  I don't have him on my list.  Oh, yes, I
12    do.
13              MR. MUKASEY:  Good afternoon, Your Honor.
14              Nice to see you.  Marc Mukasey, with my partner, Ken
15    Caruso, for the defendant, Charles Lieber, who's seated between
16    us.
17              MR. CARUSO:  Good afternoon, Your Honor.
18              THE COURT:  Wait a minute.  I'm sorry.  The second
19    counsel's name?
20              MR. CARUSO:  My name is Caruso.  First name is
21    Kenneth, and my last name is Caruso, C-a-r-u-s-o.
22              THE COURT:  I don't see you on my list.  Have you
23    filed an appearance?
24              MR. CARUSO:  Yes, Your Honor, I have, and I'm admitted
25    pro hac vice, for which I thank you.
```

```
 1              THE COURT:  So Mr. Caruso, Mr. Lieber is here.  And
 2      who else needs to be --
 3              MR. MUKASEY:  We're the only people who are going to
 4      do the talking today, Judge.
 5              THE COURT:  Okay.  Well, Mr. Mukasey, it's largely
 6      your motions that we are here for so you can start.  And let me
 7      just -- I guess essentially we have a motion for a new trial
 8      and a motion for -- it's a lot of paper.  A motion for judgment
 9      of acquittal, I guess that's number one.  And second, there's a
10      motion for a new trial; correct?
11              MR. MUKASEY:  You're correct.
12              THE COURT:  And that's in essence it?
13              MR. MUKASEY:  You are correct, Your Honor.  May I
14      proceed?
15              THE COURT:  I will hear you.  And given that I've
16      already dealt with the total of 131 pages of brief, I wonder if
17      it's not possible for counsel both -- each to limit their
18      argument to about 20, 25 minutes.
19              MR. MUKASEY:  I will be two minutes, and I will not
20      repeat what's in the brief.  And I know Mr. Caruso will be
21      concise as well.
22              THE COURT:  But the totality.
23              MR. MUKASEY:  We'll come in under 20 minutes.
24              THE COURT:  No more than 20, 25 minutes.
25              MR. MUKASEY:  Understood, Judge.  And thank you for
```

1  hearing us.

2          THE COURT:  You don't have to thank me for that.

3          MR. MUKASEY:  Well, I appreciate it.

4          Before Mr. Caruso presents the Rule 29 and Rule 33

5  legal arguments, if you'd indulge me for just a moment, I'd

6  like to set out a little bit about how the landscape of this

7  case has really changed --

8          THE COURT:  I know.

9          MR. MUKASEY:  -- since trial.  You will, of course,

10 Judge, recall that Professor Lieber was among the most

11 prominent scientists in the world and obviously a candidate for

12 a Nobel Prize year in and year out, and he was somebody who was

13 doing this at Harvard while he was fighting an incurable form

14 of cancer.

15         And you will recall from the trial, obviously, that

16 Professor Lieber traveled to China on a handful of occasions,

17 just like other professors at Harvard did, just like other

18 professors at virtually every university in the country did and

19 do, and he traveled there for legitimate, lawful purposes,

20 including meeting with students, providing guidance and

21 mentorship to colleagues.  And he usually only spent a matter

22 of hours or a couple of days in China, not weeks, not months,

23 not longer.

24         And there's actually no allegation in the case that he

25 worked for China or that he worked for any particular

university in China.  The only allegation in the case, which we
obviously vigorously dispute, is that he was selected as a
member of a talent program, the Thousand Talents Program,
which, even if it's true, is not illegal, even if you ask the
government.

And I should note parenthetically that Harvard
University knew full well that Professor Lieber was making the
occasional trip to China.  It was never hidden from Harvard.

And if you fast-forward now to 2018, the Attorney
General of the United States at that time announced the Justice
Department program called the China Initiative.  And that was
designed as some sort of effort to counter Chinese espionage in
American businesses and using federal grant awards to aid China
in its espionage-spying activities.  It was meant to prevent
theft of trade secrets, theft of intellectual property, and
national security compromises.

And it was this misguided China Initiative that led to
the questioning of Professor Lieber by the Department of
Defense and by Harvard officials on behalf of the National
Institutes of Health.

THE COURT:  This was before any criminal proceeding?

MR. MUKASEY:  Correct.  This was during questioning on
the Harvard campus by Department of Defense officials and later
by NIH officials, who really gave questions to Harvard to ask
Professor Lieber, or topics, anyway.

1          And you'll recall from the trial that the folks that

2     were asking him questions weren't really positive what they

3     were looking for.  Was it grant fraud, was it espionage, was it

4     some kind of other fraud, was it a violation of conflict of

5     interest rules at Harvard?  It was always very unclear I think

6     both to the questioners and certainly to Professor Lieber.  And

7     obviously --

8          THE COURT:  Excuse me.  When did this questioning take

9     place?

10          MR. MUKASEY:  It took place in 2018 and 2019.

11          And as you know from the trial, the questioners, the

12     examiners, didn't even bother to write down the answers that

13     Professor Lieber gave.  That was undisputed at the trial.  And

14     shamefully, even when Professor Lieber was being questioned by

15     the Department of Defense and Harvard folks on behalf of the

16     NIH about events that had taken place years earlier,

17     shamefully, Harvard never even provided a lawyer to help

18     Professor Lieber through these complicated --

19          THE COURT:  This was pre the criminal case?

20          MR. MUKASEY:  Prearrest, prearrest.

21          Never provided him a lawyer.  He's being questioned by

22     federal agencies.  They never even provided him a lawyer to

23     help him get through complicated and confusing questions and

24     topics.  And instead, as we saw at the trial, Harvard lawyered

25     in a way they protected themselves and left Professor Lieber

1    for the slaughter.

2         But what did the investigation turn out?  And then I'm

3    going to turn it over to Mr. Caruso to talk about the law.  But

4    what did the investigation turn up by Professor Lieber?  That

5    he was a spy?  No.  That he stole trade secrets?  No.  That he

6    stole intellectual property?  No.  That he was loyal to China?

7    No.  That he worked for China?  No.  None of it.

8         So when the former U.S. Attorney in this district

9    stood up in a conference, a press conference and said that

10   Lieber had contracted for a corrupting level of money with

11   China, well, at trial the government proved no corruption and

12   no amount of money.

13        But here's what really makes this case a manifest

14   injustice.  Over the past two years, cases that have been

15   brought under this China Initiative have turned out to be an

16   embarrassment for the DOJ.  It has left the DOJ with egg on

17   their faces.  There have been acquittals.  There have been

18   judges who set verdicts aside.  And there have been -- or

19   entered judgments of acquittal, and there have been cases that

20   were filed and then simply abandoned by the DOJ.

21        THE COURT:  Did any of them include Internal Revenue

22   charges?

23        MR. MUKASEY:  I can't answer that.  I'm not positive

24   about that.  And obviously, the case here did include Internal

25   Revenue charges.  But the initiation of the case that ended in

1    the Internal Revenue charges came from this same twisted and

2    perverse China Initiative.  And that's why right after our

3    trial, right after our trial the Department of Justice shut

4    down the China Initiative.  And this is a quote from the

5    Assistant Attorney General.  They shut it down because it

6    helped give rise to a harmful perception that the Department of

7    Justice applied a lower standard to investigate and prosecute

8    criminal conduct related to China.  A lower standard.

9          The prosecutor in the first case ever brought under

10   the China Initiative recently said that the program had gone

11   off the rails.  And the former U.S. Attorney who brought this

12   case said that the China Initiative has lost its focus.  Well,

13   that's all well and good, but nobody seems to care here that

14   Professor Lieber remains a victim of this twisted, misguided

15   program.

16         THE COURT:  Excuse me.  Is there any precedent for the

17   reducing or eliminating the charges against those people who

18   had been charged and who had pled guilty or been found guilty?

19   Is there anything that has happened to them apart from

20   Mr. Lieber?

21         MR. MUKASEY:  No, as far as I know.  Those cases

22   were --

23         THE COURT:  So those who ended up with a guilty

24   finding or verdict or whatever seem to be stuck?

25         MR. MUKASEY:  Well, I would suggest that a plea of

1    guilty -- and I don't know all the cases off the top of my

2    head, but I would suggest that a plea of guilty is quite

3    different, and a plea of guilty is an admission.  There was

4    obviously no plea of guilty here, but there were certainly

5    cases that the department initiated, arrested, and then

6    abandoned.  And there was at least one case that was a Rule 29

7    by the judge after the presentation of the government's case.

8              It is solely Dr. Lieber who is a victim at this point

9    of this misguided China Initiative.  And rather than him being

10   collateral damage of a misguided political policy, we think the

11   Court should rectify what is a manifest injustice.  And you can

12   use Rule 29 and Rule 33 to do it because they demand it, and

13   I'll let Mr. Caruso explain why.

14             THE COURT:  Mr. Caruso.

15             MR. CARUSO:  Thank you, Your Honor.  Good afternoon.

16             I'll begin with my Rule 29 argument with respect to

17   Count 2.  Count 2 of the indictment charged Professor Lieber

18   caused Harvard University to make a false statement to the

19   National Institutes of Health.  The alleged false statement --

20   the government did not prove that the statement in question was

21   literally false, which is the government's burden --

22             THE COURT:  Figuratively false?

23             MR. CARUSO:  Sorry, Your Honor?

24             THE COURT:  Was it figuratively false?

25             MR. CARUSO:  No.  Here's the statement.  It's one

1   sentence.  I'll read it out.  Dr. Lieber has represented --

2   "Dr. Lieber has represented that he is not and never has been a

3   participant in China's Thousand People Plan."  The government

4   did not prove that that statement is false, because the

5   statement read in its entirety, as the Court must, says

6   Dr. Lieber has represented this to Harvard, and he did.

7   According to the government, he did make that representation to

8   Harvard.  And so when Harvard sent that to the National

9   Institutes of Health with that qualifier, major qualifier,

10  "Dr. Lieber has represented," the government failed to prove

11  that that statement is false.

12         Now, the government would like to truncate that

13  statement.  They only like the second half of the sentence, but

14  that's not the law.  The government is not allowed to take a

15  statement and break it up and say, well, that part is false.

16  They have to look at the entirety.  Your Honor has to look at

17  the statement in its entirety.  I could read from the case law,

18  but I won't because Your Honor has it in our briefs, but it is

19  misleading.

20         And the government is saddled -- as the First Circuit

21  has phrased, the government is saddled with what was said, not

22  what was meant.  And what was said was a very qualified

23  statement:  "Dr. Lieber has represented that...."  That's true.

24  He did make that representation.  The government can't have it

25  both ways, and it can't look at half of a statement.

1          Let me turn to Count 1.  The indictment charges that

2    Dr. Lieber made the following false statement:  Quote, that he

3    wasn't sure how China categorized him.  He wasn't sure how

4    China categorized him.  But the evidence uniformly showed, at

5    best for the government, what Dr. Lieber said was, he wasn't

6    sure how they categorized him.  They.

7          So this verdict of guilty stands as false, at least

8    for this purpose, with the question whether the government

9    proved that the word "they" meant China.  And there's no proof

10   of that.  There is absolutely no proof that "they" meant China,

11   and the case should not have gone to the jury on that basis.

12         Viewing the evidence in the light most favorable to

13   the government, "they" referred to this talent program that

14   Your Honor heard so much about, the so-called TTP.  Even the

15   government says in its papers in opposition --

16         THE COURT:  Excuse me.  Which part of the indictment

17   are you looking at?

18         MR. CARUSO:  I'm looking at Count 1.  The second --

19         THE COURT:  The introduction?

20         MR. CARUSO:  If Your Honor -- it's page 13.

21         THE COURT:  Got it.

22         MR. CARUSO:  Right.  You look at that, and it says

23   there are two false statements.  One, that he was never asked

24   to participate in China's Thousand Talents Program; and two,

25   and this is what I'm talking about now, that he wasn't sure how

1    China categorized him.  And as I said, the proof showed no such

2    thing.  The proof showed that Dr. Lieber said he wasn't sure

3    how they categorized him.  So who is "they"?  In order to

4    sustain his conviction, the government has to show that "they"

5    meant China.  And I suggest to Your Honor that there is no such

6    evidence at all.

7           At best for the government, the jury could have

8    inferred that "they" meant this TTP, the talent -- Thousand

9    Talents Program.  But there's absolutely no evidence that

10   allowed the jury to make the next inference, which is necessary

11   to sustain this verdict, that the TTP was China.  It's very

12   interesting that the government promised such proof in its

13   pretrial brief.  The government said that the evidence would

14   show that the TTP was created by the Chinese government in

15   approximately 2008, a promise on which the government did not

16   deliver.  They didn't prove that.  There's no such evidence.

17          Now, they point to evidence that Dr. Lieber believed

18   or thought that the TTP was part of China or sponsored by China

19   or created by China.  My response to that is a very polite so

20   what?  It doesn't matter what he thought.  They failed to prove

21   the fact that China and -- "they" meant China.  Even if "they"

22   meant the TTP, they didn't prove that the TTP was part of

23   China, owned by China, created by China, whatever.  No such

24   proof.  And his state of mind on the point is, in a word,

25   irrelevant.

1          So obviously -- I have to be selective today, Your

2     Honor, because, as you said, there are a lot of pages and a lot

3     of issues that we've raised, so I'm going to be selective.  I

4     wanted to start with those two.  I think they're critically

5     important, and I think the law makes the result very clear.

6          Let me turn now to the Treasury regulation that, at

7     least in some circumstances, requires a U.S. citizen to file a

8     report regarding a foreign bank account.

9          THE COURT:  Counts 5 and 6?

10          MR. CARUSO:  Exactly, Counts 5 and 6.

11          Our position is on Rule 29 that the regulation at

12     issue is void and cannot form the foundation for a conviction.

13     You know, this is an unusual situation when you get to Title

14     31.  Title 31 itself says things are unlawful, but they are not

15     crimes without the underlying regulations, so the government

16     has to cite a statute and then they cite a reg.  The reg here

17     is void because it adds something to the statute.

18     Specifically, the statute says that a U.S. person has to file a

19     report when a person makes a transaction, makes a transaction,

20     with a foreign bank.  Now, there's more.  The government argues

21     some other language, but let me stick with my point for a

22     minute, makes a transaction.

23          And then the regulation says a person has to file a

24     report -- a person having a financial interest in or signature

25     or other authority over a bank account shall report such

1    relationship.  Report a relationship?  What's the

2    statute -- where is the statutory basis for the regulatory

3    requirement to report a relationship?  The statute says you

4    have got to report a transaction.  So I say that this

5    regulation is void because it exceeds the Congressional

6    mandate.  The regulation adds something, and that makes the

7    regulation void.

8          Now, let me just be clear.  I'm not suggesting that

9    the Treasury Department couldn't write -- couldn't write a

10   regulation that satisfies the statute.  They could -- the

11   Treasury could write a regulation that limits itself to the

12   statutory language requiring a U.S. person to file a report

13   when the U.S. person makes a transaction.  The Treasury could

14   do that, but they haven't done that.  They have gone too far

15   because this regulation says you have to file a report for a

16   financial interest and you have got to report the relationship.

17   Clearly, a relationship is a much broader concept than a

18   transaction.  I think the government doesn't even dispute that

19   point.  I don't see how anyone could.  Relationships are far

20   broader than a transaction.

21         If Your Honor -- I've made my point on that, Your

22   Honor, and I'll -- perhaps it might be better if I save some

23   time on that particular issue to respond or rebut.

24         So let me just move on to the last two points really

25   that I want to make, and of course I'll answer questions on all

1    of the issues, if the Court has questions.

2         We have this doctrine -- I call it -- maybe I'm the

3    only person that calls it this -- the Yates/Griffin doctrine.

4    If the government charges a crime on two theories, and one of

5    those -- if the government charges a crime on two theories, the

6    jury returns a general verdict, you don't know which theory the

7    jury agreed on.  And if one of those theories fails as a matter

8    of law, you have to set the verdict aside because the jury

9    might have relied on the legally invalid ground; and therefore,

10   the person gets convicted and goes to prison for conduct that

11   wasn't unlawful.  We don't allow that, obviously.

12        So I believe that the Yates/Griffin doctrine applies

13   here in two as well, more than two but I'll mention two.  Count

14   1, Your Honor, we've read this just five minutes ago or so.

15   Now, I'm talking about the other specification in Count 1, that

16   Lieber was never asked to participate in China's Thousand

17   Talents Program.  Never asked to participate.

18        Excuse me, Your Honor, I misspoke.  I misspoke.

19        I'm sticking with the same line, wasn't sure how China

20   recognized him.  Forgive me.  Wasn't sure how China recognized

21   him, that statement as a matter of law is literally true, and

22   therefore, cannot be the basis for conviction.  Of course,

23   Professor Lieber was not sure how China categorized him because

24   nobody is a mind reader.  No person -- this is a statement by a

25   speaker, Lieber, about the knowledge and state of mind of some

1    other person, China.  No one can know the answer to that.  No

2    one can be sure of someone else's state of mind.  The answer is

3    therefore literally true.  And it cannot be the basis for a

4    conviction.

5         Now, in their papers in opposition, the government

6    says, well, no, no, no, no, these agents weren't asking Lieber

7    about what China thought.  They were asking Lieber about

8    Lieber's own state of mind.  And all I can say to that is they

9    didn't prove that beyond a reasonable doubt.  They didn't prove

10   that beyond a reasonable doubt that this was necessarily the

11   statement of Professor Lieber.  What do you think?  On the

12   contrary, I think it's equally reasonable that this question

13   asked Professor Lieber, how does China categorize you?  What

14   does China think of you?  And the answer to that is nobody can

15   be sure about that.  So if they want to say now that this is a

16   question about Professor Lieber's state of mind, I'll say they

17   didn't prove that beyond a reasonable doubt.

18        And the burden rests upon the government agents to

19   clarify.  Okay?  If in the course of this interview there was

20   some dispute as to whether Professor Lieber was answering a

21   question about China's state of mind or whether he was

22   answering a question about his own state of mind, any ambiguity

23   must be clarified by the government.  It's their burden, not

24   the defendant's, obviously.  And they're stuck with what was

25   said because these agents didn't bother to ask any follow-up

1    questions.

2           So here's where this Yates/Griffin doctrine comes in.

3    We have Count 1 based on two theories, that he was never asked

4    to participate in the Thousand Talents Program and that he

5    wasn't sure how China categorized him.  That second statement

6    fails as a matter of law because under the literal truth

7    doctrine it cannot be the basis for a crime.  The jury brought

8    in a general verdict.  It might have ruled on the first

9    specification, but it might also have accepted the second

10   specification, which is not a crime.  Therefore, the verdict

11   has to be set aside.

12          And my final point, and then I'll heed Your Honor's

13   request that we not take up too much time, and I'll yield to

14   the government with an opportunity, perhaps, for a little bit

15   of a rebuttal.  Staying with this Yates/Griffin doctrine,

16   prosecuting a crime on two theories, general verdict, you don't

17   know whether the jury accepted one or the other.  And so if one

18   theory fails as a matter of law, the verdict has to be set

19   aside and a new trial ordered.

20          Now, you come again -- this is back to the language of

21   this regulation.  Counts 5 and 6 the government prosecuted on

22   two theories, that Professor Lieber was required to file a

23   report because, first, he had a financial interest in a bank

24   account in China.  And second, he had signature and other

25   authority over the bank account in China.  That second theory,

1    signature or other authority, doesn't apply in this case.

2         THE COURT:  It doesn't?

3         MR. CARUSO:  It doesn't apply in this case because

4    when you look at the regulation, the signature authority prong

5    applies only to a financial account.  It does not apply to a

6    bank account or a securities account.  It only applies to a

7    financial account.  And I believe this comes through --

8         THE COURT:  Financial accounts?

9         MR. CARUSO:  Yes.

10        THE COURT:  As opposed to a bank account?

11        MR. CARUSO:  Well, the regulation makes three

12   different kinds of accounts.  The regulation says it applies to

13   three types of reportable accounts:  A bank account, a

14   securities account, and an other financial account.  That's

15   something separate, quote, "other financial account."  And

16   there are these three types of accounts separately defined, and

17   therefore, they must be three different things.  Under general

18   rules of construction, each has a definition.  They must be

19   different.

20        And when you look at subsection (e), it says, the

21   government can prove a financial interest in a bank account,

22   securities account, or other financial account, all three.

23        THE COURT:  Are you saying that the indictment itself

24   is incorrect because it has all three in it?

25        MR. CARUSO:  I'm saying the following:

1          That Counts 5 and 6 should not have been submitted to

2     the jury on this signature authority theory because, if I could

3     just finish my thought, (e), financial interest, applies to all

4     three kinds of accounts.  (f), by contrast, where the

5     government relies on the signature or other authority prong,

6     that applies only to a financial account.  It does not apply to

7     a bank account.  A bank account is left off that signature

8     authority prong; therefore, it doesn't apply.

9          So the case went to the jury on two theories,

10    financial interest, signature authority.  The signature

11    authority theory does not apply here.  It fails as a matter of

12    law.  The general verdict, however, may have relied on the

13    legally invalid theory; therefore, the Court should set aside

14    the verdict and order a new trial.

15          THE COURT:  The indictment talks about his having an

16    interest in and signature and other authority over a bank,

17    securities, and other financial account in a foreign country.

18          MR. CARUSO:  It does, yes.

19          THE COURT:  So it takes care of every one of them.

20          MR. CARUSO:  But it doesn't apply.  The government

21    alleges that this signature authority applies to all three

22    types of accounts, but it doesn't.  Under the regulation, the

23    signature authority method of proving --

24          THE COURT:  That's how you read that.  But you could

25    also read it as a whole and then parse it.

1          MR. CARUSO:  Yes.  Well, reading it as a whole, you'll

2     see that all three accounts are separate.  If you read

3     subsection (c) of the regulation, it says the substantive part,

4     subsection (a), applies to three types of reportable accounts,

5     a bank account, a securities account, and an other financial

6     account.

7          Then the government is allowed to prove financial

8     interest in a bank account, securities account, or other

9     financial account, all three.  But with respect to the

10    signature authority prong, that applies only to a financial

11    account.  The regulation leaves out the words "bank account"

12    and "securities account."  And obviously, the inclusion of one

13    means the other two are excluded.  If you've got all three

14    kinds of accounts in subdivision (e) and only one type of

15    account in subdivision (f), then (f) only applies to one.  It

16    doesn't apply to all three.  I don't care what the indictment

17    says.  The indictment is wrong.

18         THE COURT:  Isn't that fairly common indictment

19    language?  I mean, the indictment is like that even though the

20    conduct may be like this.

21         MR. CARUSO:  This is why it has to be parsed down by a

22    legal ruling because they can plead what they want, and

23    they --

24         THE COURT:  I think I understand your argument.

25         MR. CARUSO:  But when you look at the reg, (f),

1  signature prong, only applies to a financial account.  It

2  doesn't apply to a bank account as we had in this case.  And

3  that's the basic first weeks of law school, how you read regs.

4  Right?  You look at language, the language is here, the

5  language is not there; therefore, it doesn't -- basic rules.

6          So those are my main points.  I could go on but I

7  won't, and I'll turn the case over to -- the floor over to the

8  government.

9          THE COURT:  Is that a threat or a promise?

10         MR. CARUSO:  Sorry?

11         THE COURT:  Is that a threat or promise?

12         MR. CARUSO:  I'll take the Fifth.

13         THE COURT:  No, no, no.

14         MR. CARUSO:  Perhaps I can have a little time for

15  rebuttal, if that makes sense.  Thank you, Judge.

16         MR. LOCKHART:  Good afternoon, Your Honor.  Donald

17  Lockhart for the government.

18         I think I'll begin by addressing Mr. Mukasey's opening

19  remarks concerning the Department of Justice's shift away from

20  the China Initiative program to a broader approach and to a

21  system under which we will be taking a more cautious approach

22  toward the prosecution of grant fraud cases.

23         Now, the key point to bear in mind here is that, as

24  Mr. Mukasey emphasized both to this Court and to the jury, this

25  was not a grant fraud prosecution in any way, shape, or form.

1    It was a prosecution of three categories of crimes.

2         Number one, Professor Lieber's lies to two different

3    federal agencies concerning the participation he had in the

4    Chinese talent program called the Thousand Talents Program, his

5    concealment of substantial income from that same program in two

6    separate tax years, and then his concealment of a bank account

7    in China which held roughly half of his salary under the

8    Thousand Talents Program.  And there was overwhelming evidence

9    to support all those charges, including Dr. Lieber's videotaped

10   confession.

11        So there is nothing in the Department of Justice's

12   charge or in the February 23rd remarks of Assistant Attorney

13   General Olsen cited at pages 1 through 2 of the defendant's

14   reply brief which even remotely suggests that this sort of case

15   or one like it would not be done today.  So that's the response

16   to the ten-minute or so opening statement that Mr. Mukasey

17   gave.

18        And I'll shift to the substantive issues presented by

19   the Rule 29 and new trial motions.

20        And I think I'll take them in reverse order because

21   you just heard a fair amount about the FBAR counts and about

22   the regulations and the statutes at issue with respect to those

23   counts.

24        Now, there's a threshold contention that Mr. Caruso

25   has not addressed, which is that the two key legal attacks on

the indictment with respect to the FBAR counts are simply
waived because these are failure to state an offense claims
that under Rule 12 should have been presented in a motion to
dismiss the indictment filed before trial.

One of the claims attacks the CFR provision on which
the FBAR counts was based, and the second FBAR claim says that
the allegation in the indictment does not conform to the CFR
provision itself.  In both cases these are failure to state an
offense claims, and if you look at the defense reply brief,
they don't even dispute that.

Now, what the defense does say in the reply brief,
though not today, is that failure to state an offense claims go
to this Court's subject matter jurisdiction; and therefore, the
defense said they can be raised at any time.  And the defense
cites an Eleventh Circuit case called *McIntosh* for that
proposition.

Now, Your Honor, what the defense does not say is that
three circuits have roundly condemned the *McIntosh* decision
because it's out of step with Supreme Court authority which
makes very plain that defects or alleged defects in an
indictment do not deprive this Court of subject matter
jurisdiction.  The most recent case on this subject is the
Seventh Circuit's case in *Muresanu*.  It's cited at page 27 of
our brief, and the Seventh Circuit explains why it, the Fifth
and the Tenth Circuit disagree with the Eleventh on this point

1   and why three Supreme Court decisions compel the result that

2   this is not a subject matter jurisdiction issue.

3        So if you want to delve into that issue, I would

4   suggest reading the *Muresanu* decision at page 27 of our brief.

5   I would note that although the First Circuit has not weighed in

6   on this particular circuit split, the First Circuit has cited

7   these same Supreme Court cases for the proposition that there

8   is no subject matter jurisdiction problem merely because a

9   defect in the indictment is alleged, whether it be a matter of

10  law or not.  So that's our threshold contention.

11       These issues are simply waived.  There's been no

12  showing of good cause, and therefore, the Court need not even

13  address them.

14       On the merits, however, I'll turn first to this

15  signature authority claim that Mr. Caruso left off with.  And

16  here we would submit, frankly, that this is just a frivolous

17  claim because you have a CFR provision which plainly says that

18  a citizen must file reports in the case of a financial interest

19  in or signature authority over a bank, securities, or other

20  financial account in a foreign country.  Okay?  So very clear

21  on the face of the statute that if you have either a financial

22  interest in a foreign bank account or signature authority over

23  that account, you have to report it.

24       The defense claim here, Your Honor, is to focus on the

25  CFR provision's definition of signature authority.  In the

1    definition of signature authority in the CFR provision, that

2    definition refers to the generic overarching category,

3    financial account.  And the defense says, ah-ha, well, because

4    there's only a reference to the generic overarching phrase,

5    "financial account," the signature authority provision doesn't

6    apply here.

7          The problem, Your Honor, with that theory is that the

8    CFR provision says "financial interest in or signature

9    authority over a bank, securities, or other financial account."

10   "Other financial account" means that bank accounts and security

11   accounts are themselves financial accounts.  And if you need

12   further evidence of that, you can look at the title of the CFR

13   provision which applies to financial accounts.  So that is our

14   position on the merits with respect to the signature authority

15   claim.  It was properly submitted to the jury.  It was properly

16   charged in the indictment.

17         There's a second FBAR, failure to state an offense

18   claim, that's even a broader attack than this one; and that is

19   the contention that the CFR provision here that was charged in

20   the FBAR counts is out of step, in essence, with the

21   authorizing statute because the CFR provision requires a

22   citizen to report foreign bank accounts, whereas a defense --

23   the defense contends that the statute only requires a citizen

24   to report transactions in those accounts.

25         Now, that construction of the statute makes absolutely

1    no sense, Your Honor.  The defense omits a key portion of the

2    statutory language, which I'll quote for you here.  The Bank

3    Secrecy Act, which is the statute that authorizes this CFR

4    provision, requires a citizen to file an FBAR report when the

5    citizen, quote, "makes a transaction or maintains a relation,"

6    that's the bank account, "for any person with a foreign

7    financial agency."

8          The problem with the defense position, Your Honor, is

9    that the "for any person" language plainly includes the

10    citizen, him or herself.  And so based on that, and based on

11    the broad statutory language, which authorized the Secretary to

12    prescribe a reasonable classification of persons subject to or

13    exempt from a requirement under this section or a regulation

14    under this section, we would submit that the CFR provision is

15    perfectly aligned with the originating statute.  And if you

16    want further proof of that, Your Honor, you can look to the

17    cases cited at page 29 of our brief, scads of them, which

18    uniformly construe the statute exactly in the way that we're

19    saying, to cover bank accounts and not merely reports

20    concerning transactions in those accounts.

21          So that's our position on the merits and on the

22    threshold procedural question concerning the FBAR accounts --

23    the FBAR counts rather.

24          And if the Court has no preference, I'll shift gears

25    and go next to the Count 1 challenges.

1          Count 1, Your Honor, as you'll recall, charged two

2     separate statements.  There is the never-asked-to-participate-

3     in-the-Thousand-Talents-Program statement, and there's the

4     wasn't-sure-how-China-categorized-him statement.  The defense

5     today is taking aim mainly at the second of those two

6     statements, and the defense is making primarily three claims

7     today concerning them.

8          First of all, the defense is saying that because

9     Professor Lieber referred to "they," how do we know that he

10    meant China?  The defense submits that there's no evidence that

11    "they" referred to China.  And the evidence actually is quite

12    plain.  It's Exhibit 323 at page 3.  These are Agent

13    Hochberger's notes of the interview which were admitted

14    substantively by this Court by joint agreement of the parties

15    in which just before Professor Lieber made his statement about

16    how they categorized him, Professor Lieber almost in the same

17    breath, just before making that statement, said that the

18    Thousand Talents Program was a PRC program, a People's Republic

19    of China program.  So in the next breath he's saying he's not

20    sure how they categorized him.

21          Well, a rational trier of fact viewing that evidence

22    in the light most favorable to the government could very

23    clearly understand the "they" to mean China simply on the basis

24    of that one exhibit, but there was a whole realm of broader

25    evidence concerning Professor Lieber's knowledge that the

1    Chinese were behind this program.  Professor Lieber himself in

2    his videotaped confession said that the very essence, the very

3    essence of the Thousand Talents Program was that it was

4    a -- let me get the quote right -- "The very essence of the

5    Thousand Talents Program is that you're paid a salary by

6    China," and that China uses this program to, quote, "seduce

7    people."  Okay?  So although that is primarily state of mind as

8    to Professor Lieber, it also bears on the question of what did

9    he mean when he said "they."

10        Now, there's other evidence we've described in our

11   brief along the same lines.  I'd like to turn to a second claim

12   that's made with respect to this evidence, which is that the

13   government was trying to claim that Professor Lieber knew the

14   state of mind of China, that this statement, wasn't sure how

15   China categorized him, somehow required proof that Professor

16   Lieber could read the minds of Chinese government officials,

17   and that's clearly not the case.

18        The phrase "how China categorized him" clearly allowed

19   us to prove his knowledge of how he was portrayed and

20   categorized by Chinese government officials, and there was rich

21   evidence of that point in the form of multiple emails from

22   Liqiang Mai to Professor Lieber saying, for example, the

23   Chinese government officials who are reviewing your Thousand

24   Talents Program performance are very pleased with the results.

25        And like I said, we also have Professor Lieber's

1    confession that this is a means by which China pays a salary to

2    people, a means by which China seduces people.  And then, of

3    course, the Hochberger notes reflected Professor Lieber saying,

4    as I just said, that this is a PRC program.  It's a People's

5    Republic of China program.  None of these things depended on

6    Professor Lieber's knowing the state of mind of China.

7            So unless the Court has further questions about Count

8    1, I'll move to the second count.  And this count, as you'll

9    recall, is that Professor Lieber caused Harvard University to

10   tell NIH that he was not and had never been a participant in

11   the Thousand Talents Program, when, in fact, he had filed --

12   had signed, rather, a three-year contract under that program in

13   July of 2012.

14           Now, I think it's important to just orient ourselves

15   briefly in the trial evidence.  The trial evidence was

16   overwhelming that Professor Lieber knowingly and willfully lied

17   to Harvard when he falsely denied that he had participated in

18   the Thousand Talents Program.  The evidence was equally

19   overwhelming that Professor Lieber knew that that lie, that

20   that false statement, would be transmitted by Harvard to NIH in

21   the letter that was ultimately sent.

22           And the defense here for its contrary conclusion is

23   relying on the literal truth doctrine in a line of First

24   Circuit decisions which invoke that doctrine.  Every one of the

25   First Circuit decisions that Professor Lieber cites for the

literal truth claim that he's making trace back to the Supreme

Court's 1973 decision in the *Bronston* case.  That is the origin

of the literal truth doctrine.  And as we point out in the

brief, that doctrine does not apply here for no fewer than two

separate reasons.

The first reason, Your Honor, is that the *Bronston*

case involved a perjury situation in court testimony by a

witness, and the question of literal truth arose in that

specific procedural context.  The First Circuit has since said

in two cases, cited in our brief, *Boskic* and *Mensah*, that it is

doubtful that the *Bronston* literal truth doctrine applies,

quote, "outside the context of adversarial questioning."  And

here, Your Honor, the situation in the Lieber case is about as

far away as you can possibly imagine from adversarial

questioning, because we have a situation where Professor

Lieber's Harvard colleagues told him that they have received an

inquiry from NIH, the purport of which was, have you been a

member of this talent program?  They then tell him, we're going

to ask you that question in a meeting set for tomorrow.  He

says, fine.  I've taken notes on your question.  I'll meet with

you.  And they do meet.  And during this meeting they ask him

the question they've told him they're going to ask him, "Have

you been a member of this program?"

And he very clearly denies it and goes on at some

length concerning that denial.  Says, for example, that, you

1    know, if I were interested at all in this program, I never

2    would have done it through Wuhan University of Technology.  And

3    you remember the Harvard witness who came here to testify.  She

4    said that Professor Lieber was very clear, very clear in that

5    meeting that he had not been a member of that talent program.

6    So this is not in court adversarial examinations.  This is a

7    conference room at Harvard where he's been told in advance what

8    the question is going to be.

9         And not only that, Your Honor, it actually gets worse

10   for him because then he has the luxury of reviewing the draft

11   letter that Harvard writes to NIH.  He has a final chance to

12   correct this statement.  He doesn't.  You look at the trial

13   evidence.  He did a redline copy of this letter, and he left

14   that damning lie statement intact.

15        So for that reason, and for a second that I'll get

16   into, the *Bronson* literal truth doctrine just simply doesn't

17   apply here.  But there's a second reason as well, Your Honor,

18   and that is under *Bronson* the statement at issue has to be of

19   a particular type.  It has to have three essential ingredients.

20        The first ingredient is that the statement has to be

21   unresponsive to a question.  That's ingredient number one.  The

22   statement also has to be literally true.  And number three, the

23   statement has to be false only by negative implication.

24        Now, the statement here in the letter to NIH does not

25   have those attributes, and for that separate reason, the

1    *Bronston* rule simply doesn't apply here.

2          The defense in its reply brief says, oh, well, we're

3    not really invoking the literal truth doctrine at all.  The

4    defense says that we are claiming that it was not literally

5    false.  So think of this wordplay, Your Honor.  We're not

6    claiming it's literally true.  We're claiming it's not

7    literally false.  That's the flip side of the same coin, Your

8    Honor.  This is at heart a literal truth claim which traces

9    back to *Bronston*.  *Bronston* doesn't apply for two reasons.

10         If the Court has no further questions or no questions

11   on Count 2, I'll just briefly address some statements that were

12   made about the Yates/Griffin doctrine, and this is very brief,

13   Your Honor.  The First Circuit case law is very clear --

14         THE COURT:  Which counts is this for?

15         MR. LOCKHART:  He's actually making Yates/Griffin

16   arguments as to several counts, Your Honor, principally the

17   FBAR counts but I think also the tax counts.  And I'll just

18   give you a -- the brief covers this.  I'll give you a brief

19   global response, which is that the First Circuit has made it

20   very clear that in a case involving a count which charges

21   alternative theories of guilt, and the question is merely one

22   of factual insufficiency, the Yates/Griffin doctrine simply

23   doesn't apply.

24         And at bottom, Your Honor, at bottom, every one of the

25   claims that the defense raises here goes to factual

1    sufficiency.  There is no claim that truly qualifies as a sort

2    of contrary to law claim, and we would submit that the

3    Yates/Griffin doctrine is simply inapplicable for that reason.

4         We would note in that regard that even in the case of

5    the literal truth doctrine, the First Circuit has said in the

6    *Hatch* case and in the *Kehoe* case that the jury decides whether

7    an answer was or was not literally true.  It's a sufficiency

8    question, Your Honor.  So if there's an issue with literal

9    truth, that goes to sufficiency only, and the Yates/Griffin

10   doctrine simply doesn't kick in.

11        If the Court has -- if the Court would indulge me, if

12   I could just speak briefly with my colleagues to see if they

13   have anything.

14        (Pause.)

15        MR. LOCKHART:  Okay.  That's it for me, Your Honor.

16        THE COURT:  They are very wise.

17        MR. LOCKHART:  Yes.  They know you.  Thank you.

18        MR. CARUSO:  Your Honor, please may I just rebut

19   briefly?

20        THE COURT:  I have a question.  Mr. Caruso, the motion

21   deals with all six counts.  Are you in fact arguing that Counts

22   3 and 4 are included in the motion?

23        MR. CARUSO:  Yes, there are several arguments about

24   Counts 3 and 4.

25        THE COURT:  I understand.

1          MR. CARUSO:  Yes.  Yes.

2          Let me start with this suggestion that there's no

3     difference between the doctrine of literal truth and the

4     government's failure to prove literal falsity.  There's a huge

5     difference there.  I mean, the government is just reading these

6     cases far too superficially.

7          The *Reveron* case, First Circuit, 1988, the government

8     must show more than that the statement was unresponsive.  At a

9     bare minimum, the government must -- at a bare minimum, the

10    statement must have been literally false.  It's the

11    government's burden to prove as part of its case, it's the

12    government's burden to --

13         THE COURT:  Which particular statement are you talking

14    about now?

15         MR. CARUSO:  Well, I'm talking now about Count 2, for

16    example, that the statement to Harvard, "Dr. Lieber has

17    represented that he is not and never has been a participant in

18    China's Thousand People Plan."  The government would -- we're

19    not invoking the doctrine of literal truth with respect to

20    Count 2.  We're invoking the government's failure to prove

21    literal falsity.  They're two different things.

22         The *Reveron* case makes it clear that they are

23    different things.  The *Richardson* case, which we cited, makes

24    it clear that those are different doctrines.  The literal truth

25    doctrine -- I actually agree with the government.  The literal

1    truth doctrine applies to adversarial questions.  It,

2    therefore, applies on Count 1, but it doesn't apply on Count 2

3    and we are not invoking it on Count 2.  The government spent, I

4    don't know, a third of its argument acceding to something that

5    I don't argue.  We don't argue the literal truth doctrine on

6    Count 2.

7         We argue that they failed to prove literal falsity.

8    And the reason why they failed to prove literal falsity, he

9    lied to Harvard.  That's not a crime.  Sorry.  It's not a crime

10   to lie to Harvard.  He might get fired, but it's not a crime.

11        THE COURT:  It depends on what is the pass-through of

12   the lie through Harvard to the Feds.

13        MR. CARUSO:  Yes.  But Harvard didn't pass it on.

14   Harvard passed it on with a qualifier.  Harvard didn't say --

15        THE COURT:  But that's a different issue.

16        MR. CARUSO:  Well, that's the government's failure to

17   prove literal falsity.  That's the heart of it.  Right?

18   Harvard did not tell the NIH, "Dr. Lieber is not and never has

19   been a participant."  Harvard told the NIH, "Dr. Lieber has

20   represented that he is not."  That statement is not false.

21   They haven't proved that's false.  There's a huge difference

22   between literal truth and failure to prove falsity.  You have

23   to look at the entire statement.  The government can't rely on

24   half of the sentence.

25        Now, the FBAR accounts -- the FBAR, what they call

 1    FBAR, I find that phrase not very helpful.

 2              THE COURT:  We are now on Counts 5 and 6?

 3              MR. CARUSO:  We are now back on Counts 5 and 6.  They

 4    claim that we waived this argument, but I'm going to suggest,

 5    Your Honor, three reasons -- it's in our brief so I'll be brief

 6    here -- why we didn't waive that.

 7              First of all, we do invoke the law of the Eleventh

 8    Circuit, that a contention that the conduct at issue does not

 9    constitute a crime challenges the Court's jurisdiction.  Now,

10    there is a circuit conflict.  The First Circuit has not dealt

11    with it, as the government correctly pointed out.  We rely on

12    the Eleventh Circuit.  They rely on the Seventh Circuit.  The

13    Court will rely on whatever the Court thinks is a more

14    persuasive authority.

15              THE COURT:  I'll make it up.

16              MR. CARUSO:  Sorry?  I'm still not hearing properly.

17    It's me.

18              Next, let's assume that the motion should have been

19    made -- or wait.  I disagree -- my second point is I disagree

20    with their argument that this issue is untimely raised because

21    this is not the type of issue that could only have been raised

22    pretrial without the need for a trial.  It's possible -- it was

23    possible pretrial that the government could have proved a set

24    of facts on which the regulation would have been valid.  For

25    example, what if Professor Lieber maintained a relationship on

behalf of some other person with a Chinese bank?  No one could
predict pretrial that would not be the government's case.  So
there was every reason to hold a motion.

And assuming further that it should have been raised
earlier, I believe that we clearly have shown good cause for
hearing it now.  What could possibly be better cause than the
following:

An American citizen faces a loss of liberty over
conduct that doesn't constitute a crime.  I think we have good
cause to be heard on that.  I think that's a due process
violation, and I think it's outrageous to think that there's no
good cause to ignore -- to fail to reach an issue that a person
could be going to prison for conduct that's not a crime.

We made this argument orally at the trial.  They were
saying it's untimely.  Now it's not untimely.  It wasn't
untimely then, but it's not untimely now.  So that's my point
with respect to the waiver.

The signature authority, the signature authority.  I
asked the Court to look at the language of the regulation.
Government counsel says they rely on section -- subsection (a),
"Each United States person having a financial interest in or
signature or other authority over a bank, securities or
financial account in a foreign country shall report it."  Read
on, gentlemen.  Read on.  They haven't read the whole thing.
You can't stop with (a).

1          Subdivision (c) says there are three different kinds

2     of accounts, and it defines all three.  And then (e) says

3     financial interest applies to all three accounts.  And (f) says

4     signature authority applies only to other financial accounts.

5     Read the whole reg, everybody.  Please read it.  When you read

6     it, it only hangs together.  If you look at it, there's

7     different definitions.

8          And then the argument that a financial account is an

9     overarching, overarching category.  It's not possible to argue

10    that.  Subdivision (c) defines bank account separately,

11    securities account separately, and other financial account

12    separately.  They are three different things.  They are not

13    overarching, one of which two are below it.  It defies the

14    language and structure of the statute.  I ask -- implore you to

15    read the whole thing, which the government is not doing.

16         Maintains a relationship for some other person --

17         THE COURT:  How many more of these do we have?

18         MR. CARUSO:  I'm sorry, Your Honor?

19         THE COURT:  How many more segments of the argument?

20         MR. CARUSO:  I can stop very shortly if Your Honor

21    would like me to.

22         THE COURT:  Thank you.

23         MR. CARUSO:  All right.  I'll move on with respect to

24    finally this point, that there -- I believe the word was scads

25    of cases according to the government.  Please read them.  Your

1 Honor will see that not a single one holds what they say, not a

2 single one.  They recite the language, but they don't hold what

3 they say and they don't reject what I'm arguing.

4          Very briefly, then, with respect to Count 1.  Whether

5 "they" meant China.  They recognized that they had to prove

6 that "they" meant China.  They charged him with a false

7 statement about how China categorized him.  And they agree, I

8 think they have to agree, the evidence showed "they."

9          So what evidence do they have?  Well, counsel said

10 they have primarily state-of-mind evidence, primarily.

11 Primarily?  It's exclusively.  They didn't call somebody from

12 China and say, yes, we are the Government of China and we set

13 up this TTP program.  And, you know, they didn't link China to

14 the TTP.  All they have are statements from the defendant.

15 That's insufficient.

16          This crime has two elements -- more than two -- two

17 elements, falsity and knowledge of falsity.  Statements of the

18 defendant may go to knowledge of falsity.  But first they have

19 to prove the statement is false.  They have to prove that

20 China -- that he did know how China categorized him, and they

21 haven't proven that.  And they can't prove that out of the

22 defendant's supposed knowledge because this is a fact, what

23 Justice Breyer likes to call a brute fact, and they didn't

24 prove it.  The state-of-mind knowledge takes them nowhere.

25          Counsel said that the indictment allowed the

1    government to prove Lieber's knowledge.  Well, that's

2    interesting.  The government -- sure, maybe the indictment

3    allowed them to prove Lieber's knowledge, but they were

4    required to prove much more than that.  They were required to

5    prove in fact that China and the TTP are the same, "they" meant

6    TTP and "TTP" meant China, and they produced absolutely no

7    evidence of that whatsoever.  The agent testified, I don't know

8    anything about this.  I didn't interview anybody over there.  I

9    don't know whether all these people who communicated with

10    Dr. Lieber had authority to act for any of these people in

11    China.

12         So I think I've made my points, Your Honor, and I

13    think everything else is in the memos.

14         THE COURT:  Thank you very much, but I do have one

15    question.

16         MR. CARUSO:  Yes.

17         THE COURT:  I understand the arguments that you have

18    made with respect to Counts 1, 2, 5, and 6 -- no -- 1, 2, 3,

19    and 4, I think.  Yeah.  No.  I'm sorry.  1, 2, and then the

20    last two, 5 and -- no.  Yeah, 5 and 6.  3 and 4 -- do the

21    arguments you're making apply to 3 -- are they meant to apply

22    to Counts 3 and 4 as well?

23         MR. CARUSO:  The arguments that I make with respect to

24    Counts 5 and 6, namely that the reg is either void --

25         THE COURT:  What does that have to do with the

1    Internal Revenue Code and the filing of income tax returns?

2           MR. CARUSO:  Because it's the same reporting

3    obligation.  The charge is failure to file reports and make

4    disclosures about a foreign bank account, and the tax counts --

5           THE COURT:  It doesn't talk about a bank account.  It

6    talks about income.

7           MR. CARUSO:  I'm sorry, Your Honor.  I didn't hear

8    that.

9           THE COURT:  Counts -- I have to find the right pages.

10   Counts 3 and 4 talk about income, income from WUT.  It doesn't

11   talk about any of the other things that apply to Counts 1, 2

12   and 4 and -- 1, 2, 5, and 6.

13          MR. CARUSO:  Your Honor, our position is that the tax

14   counts fall with 5 and 6, that they are all based on the same

15   ultimate legal foundation, which we say, for the reasons I have

16   laid out with respect to Counts 5 and 6 --

17          THE COURT:  But the argument is not that he got no

18   money.  The argument is that it wasn't reportable to the

19   particular authorities that are the relevant ones in the other

20   four counts, but these are Internal Revenue tax returns, and

21   they only refer to income.  So I'm just wondering whether the

22   argument that I have heard has anything to do with those two

23   counts.

24          MR. CARUSO:  May I just find my copy of the

25   indictment.  Just bear with me for a moment, Your Honor.

1          THE COURT:  I think your assistants want to help you.

2          I'm not arguing with you about it.  I'm simply

3     inquiring.

4          MR. CARUSO:  I understand.  I'm just trying to go back

5     to the language of the indictment to answer Your Honor's

6     question.  Just bear with me.

7          Part of each tax count is -- again, they charged two

8     theories of the crime.  Lieber underreported, failed to report

9     income, but also, item 2, Lieber failed to report that he had

10    an interest in or signature authority over a bank account.

11         THE COURT:  Well, the government would prevail even if

12    only one of these is okay.

13         MR. CARUSO:  No, not if one fails as a matter of law.

14    The --

15         THE COURT:  So in order for the government to prove

16    Professor Lieber guilty on these two income taxes counts, they

17    have to prove both that he failed to report an interest and

18    also that he failed to report income?

19         MR. CARUSO:  If they charge it this way and there's a

20    general verdict, we can't tell which prong the jury relied on.

21    And because the second prong of the tax count --

22         THE COURT:  So it's a failure to be accurate about

23    what the jury had to determine, not that the jury could not

24    have determined simply on the basis of failure to report

25    income?

1          MR. CARUSO:  That is true.  You have got it.  You have

2   got it.  That's exactly right.

3          THE COURT:  Got it.

4          MR. CARUSO:  The Yates/Griffin doctrine, one of these

5   theories fails as a matter of law, and therefore, the general

6   verdict cannot stand.

7          THE COURT:  I think the government disagrees, and

8   since I've just raised the issue, I will allow them two minutes

9   to tell me why this is wrong.  Thank you.

10          MR. LOCKHART:  Thank you.  I appreciate it, Your

11   Honor.

12          Just to orient ourselves, the tax counts were based on

13   two separate theories, one underreporting of income and then,

14   second, in each case --

15          THE COURT:  But doesn't that make his point?

16          MR. CARUSO:  Yes, it does.

17          THE COURT:  I put the question to counsel.

18          MR. CARUSO:  Sorry.  I couldn't help myself.

19          MR. LOCKHART:  As I was saying --

20          THE COURT:  This is not the movie awards; right?

21          MR. CARUSO:  I apologize to the Court and to counsel.

22   I couldn't restrain myself.  It's very rare that the judge says

23   to my adversary you're making his point.

24          THE COURT:  I know.  I know.  We are all hot under the

25   collar.

```
 1              MR. CARUSO:  I'm sorry.  Forgive me.

 2              MR. LOCKHART:  Your Honor, the point is that the tax

 3    counts are making -- they are based on two separate categories.

 4    There's the underreporting of the income, and then there's the

 5    second category which defense counsel has mischaracterized.

 6    The defense has said that the second category underlying the

 7    tax counts in essence imports our FBAR theory, and with it,

 8    their contention that the signature authority problem then

 9    somehow infects that second aspect of the tax count.  That's

10    the argument that they're making here, and there are really two

11    responses to that argument.

12              One, their signature authority argument is meritless

13    for the reasons we've already covered.

14              THE COURT:  Well, apart from that.

15              MR. LOCKHART:  Yes.  And two, the second thing is, the

16    count does not import the FBAR charge.  What the tax return

17    said was at any time during this tax year did you have a

18    financial interest in or signature authority over a financial

19    account such as a bank account located in a foreign country?

20    Simple question.  It doesn't require the FBAR filing.  It's

21    just do you have a foreign bank account?  Answer, in Professor

22    Lieber's case, no, I don't.  Okay?  That's a lie.  That's a

23    false statement.  It doesn't depend in any way, shape, or form

24    on the FBAR filing requirements.

25              THE COURT:  Are you agreeing that the government has
```

 1    to prove both elements of this count?

 2                MR. LOCKHART:  No.

 3                THE COURT:  In that case, why do we go into it?

 4    Because, one, has Lieber underreported and failed to report

 5    income from WUT?

 6                MR. LOCKHART:  That's right.  But what they're

 7    claiming, Your Honor, is that the second of the two theories is

 8    contrary to law, and because we can't know on which theory the

 9    jury picked in convicting on the tax counts that therefore

10    they're entitled to a judgment of acquittal.  Our point to that

11    is that --

12                THE COURT:  I got it.

13                MR. LOCKHART:  Do you see?  Thank you.

14                THE COURT:  Thank you.  Thank you, all.  And thank you

15    for your good briefs, albeit long.  And Ms. Urso -- yes.

16                I understand there was some kind of a disagreement

17    about how the exhibits were -- not disagreement, but we had a

18    lot of correspondence about the exhibit list.  And it turns out

19    that the exhibit list was very properly maintained by the court

20    reporter.  It was not as properly put into the docket because

21    Ms. Urso thought that the court reporter --

22                THE CLERK:  No.  It's the other way around.

23                THE COURT:  Whatever.

24                THE CLERK:  It's other way around.

25                THE COURT:  It's a confusing issue.  But I understand

1  it's being rectified by everybody who has anything ever to do

2  with the list, and it will be fixed properly.  To the extent

3  that there is a motion before me to allow that, it is allowed.

4  So that's it.  I don't think there's anything else we need to

5  do unless anybody has any more comments?

6         MR. CARUSO:  We have nothing further, Judge.  Thank

7  you very much.

8         THE COURT:  Thank you very much, and have a good trip

9  back to New York or wherever you are going.

10         MR. CASEY:  Thank you.

11         (Adjourned, 3:49 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3            I, Linda Walsh, Registered Professional Reporter

4     and Certified Realtime Reporter, in and for the United States

5     District Court for the District of Massachusetts, do hereby

6     certify that the foregoing transcript is a true and correct

7     transcript of the stenographically reported proceedings held in

8     the above-entitled matter, to the best of my skill and ability.

9            Dated this 5th day of April, 2022.

10

11

12                    /s/ Linda Walsh

13                    Linda Walsh, RPR, CRR

14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25