## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>CHARLES LIEBER, )<br><br>Defendant. ) | Case No. 20-cr-10111-RWZ |

## <u>CHARLES LIEBER'S SENTENCING MEMORANDUM</u>

This Sentencing Memorandum is respectfully submitted on behalf of defendant, Charles M. Lieber, scheduled to be sentenced on April 26, 2023. For the reasons set forth below, the Court should impose a **non-custodial sentence**.

## PRELIMINARY STATEMENT

Charles M. Lieber's life has been defined by his commitment to his family, his students, and to science. Despite his status as a world-renowned scientist, Professor Lieber has led a quiet, simple life. As a thirty-year faculty member of the Harvard University Department of Chemistry and Chemical Biology, he spent over eighty hours per week in the laboratory, committed to his work. When not in the lab, he spent his time with family, helping his children build models, coaching wrestling, and growing giant pumpkins in the back yard. At the present time, he is battling follicular lymphoma, a blood cancer for which there is no cure. *See* Exhibit A, Letter from Dr. Austin I. Kim.

Professor Lieber is profoundly remorseful for the facts and circumstances that have brought him before this Court. He no longer works at Harvard. Travel to China—which amounted, in total, to no more than a couple of weeks—has shattered his entire life. His reputation has been

ruined.  At 64 years old, Professor Lieber prays to be able to live out whatever time he has left, at home.

This case, a product of the Department of Justice's ("DOJ") now discredited China Initiative, led to many erroneous assumptions about Professor Lieber and many misguided interpretations of the charges he faced.  To be clear:

- **Professor Lieber WAS NOT charged with espionage or any espionage-related offenses.**

- **Professor Lieber WAS NOT charged with grant fraud or any offenses related to grant fraud. The validity of Professor Lieber's grants are NOT in dispute in this case.**

- **Professor Lieber's scientific research WAS NOT called into question in this case. There was no theft of trade secrets or intellectual property. There was no corruption of research.**

- **Professor Lieber WAS NOT employed by the Chinese government.**

- **Professor Lieber DID NOT disclose any confidential or proprietary research to the Chinese government or to any Chinese University.**

- **Professor Lieber was convicted of making false statements to U.S. government agents as to whether he had an affiliation with the Chinese "Thousand Talents Program." IT WAS NOT A CRIME to be a member of the Thousand Talents Program, as the government conceded at trial.**

For the last three years, and as described in detail below, Professor Lieber has been largely confined to his home and hospitals, fighting for his life on multiple fronts.  He owes his survival to his loving wife, Jenny, who has supported him and served as his caretaker.  He is also fortunate to have an extended community of supporters who wrote to the Court to shine a light on the brilliant, humble, giving, Charlie Lieber they know.  *See* Exhibit B, Letters in Support of Charles Lieber's Sentencing Memorandum.  Professor Lieber hopes the Court will assess the complete picture of who he is and how he has lived his life and will have mercy on him.

## THE OFFENSE CONDUCT

Counts One and Two of the Superseding Indictment (the "Indictment") charged that Professor Lieber made, or caused to be made, false statements in violation of 18 U.S.C. § 1001(a)(2).  *See* ECF 35.  Specifically, Count One charged that Professor Lieber made a false statement when he:

> told investigators from the DOD's Defense Criminal Investigative Service, that he was never asked to participate in China's Thousand Talents Program, and that he "wasn't sure" how China categorized him, when, in fact, LIEBER had previously been asked by representatives of Wuhan University of Technology ("WUT") in China to participate in China's Thousand Talents Program, and in or about July 2012, signed a three-year contract with WUT entitled "Employment Contract of 'One Thousand Talent' High Level Foreign Expert."

Count Two charged that Professor Lieber:

> caused Harvard University to tell the NIH that LIEBER "[wa]s not and has never been a participant in" China's Thousand Talents Program, when, in fact, [he] had signed a three-year Thousand Talents Agreement with WUT entitled "Employment Contract of 'One Thousand Talent' High Level Foreign Expert" in or about July 2012.

Counts Three and Four charged that Professor Lieber filed a false tax return for tax years 2013 and 2014, respectively, in violation of 26 U.S.C. § 7206(1).  Counts Five and Six charged that he failed to report a foreign bank account for calendar years 2014 and 2015, respectively, in violation of 31 U.S.C. §§ 5314(a) and 5322.

On December 21, 2021, after a six-day jury trial, Professor Lieber was convicted on all Counts.

Professor Lieber now respectfully requests that the Court impose a non-custodial sentence—that is, a sentence of probation or supervised release, with or without a condition of home confinement.  Set forth below is an analysis of Professor Lieber's case under the Advisory

Sentencing Guidelines; the application of 18 U.S.C. § 3553; and four sentencing options that yield non-custodial sentences.

## THE ADVISORY GUIDELINES ANALYSIS

### I.     The Guidelines Calculation Set Forth In The PSR

The PSR[1], applying the 2021 Guidelines Manual, calculated the total offense level as 13, PSR ¶ 64, as follows:

The PSR grouped the Counts in the Indictment into two Groups.  *See* PSR ¶¶ 40-64.  The false statement Counts constitute Group 1.  The other Counts constitute Group 2.

The tax counts, part of Group 2, yield the highest offense level.  As to the tax counts, the PSR states the amount of unreported income as at least $120,000, applies the 28% tax-rate presumption, and calculates the "tax loss" as at least $33,600, which yields a base offense level of 12.  The grouping/multiple count adjustment then increased the combined adjusted offense level by 1 level, from 12 to 13, which became the total offense level.

The PSR recognized that Professor Lieber has zero criminal history points.  PSR ¶ 68.  The Criminal History Category is therefore I.

With a total offense level of 13, and a Criminal History Category of I, the Sentencing Table yields a range of 12-18 months, placing this case in Zone C.  PSR ¶¶ 64, 68.

### II.    Objection: The Tax Loss Amount Of $33,600 Is Not Based On Sufficiently Reliable Information

Professor Lieber hereby objects to the amount of unreported income, and the resulting "tax loss" and base offense level, set forth in ¶ 32 & nn.2 and 3 of the PSR.

---

[1] In this memorandum, all references to the PSR are to the final PSR prepared on April 20, 2023.

**A.      Statement Of Facts Relevant To The Issue Of Tax Loss**

On the day of his arrest, Professor Lieber underwent a lengthy interrogation by two FBI agents, during which Professor Lieber made statements that the government later offered at trial. The government mined Professor Lieber's post-arrest statement and claimed to have found that (a) Professor Lieber made one trip to Wuhan in 2013 and two trips to Wuhan in 2014, and (b) that he received $10,000 or $20,000 in cash "every single time that he went to Wuhan[,]" and "an equal amount" in bank deposits. Trial Tr. 6-110:16-19.

The government packaged that information, and gave it to Revenue Agent Ranahan, as "essentially hypothetical numbers used to see the impact on the tax return of any additional unearned [sic; should be "unreported"] income[.]"  Trial Tr. 5-172:17-20.  Agent Ranahan then testified that "if Dr. Lieber had hypothetically received" the additional income, "his tax liability would have gone up[.]" Trial Tr. 5-174-75.  The government, finally, repackaged that information and testimony—as fact, not hypothetical—and repeated it in summation to the jury.  Trial Tr. 6-110:16-19.

At trial, however, *the amount of income* that Professor Lieber received from Wuhan—as distinct from *the fact* of receipt—was not at issue.  The amount, of course, was not an element of any offense; the jury was not asked to find, and therefore did not find, any dollar amount.

At sentencing, by contrast, the question of amount is squarely presented.  On that issue, the PSR adopts the government's package wholesale, using the highest amounts urged by the government at trial—unreported income of $120,000, and a resulting tax liability of $33,600.[2]

---

[2] Thus, the PSR states: "For the 2013 tax year, Lieber received income of at least $40,000 from WUT. During the 2014 tax year, Lieber received income of at least $80,000 from WUT."  ¶ 32.  "These figures are calculated based on the number of trips to Wuhan per year (one in 2013, two in 2014), multiplied by $40,000 per trip (consisting of $20,000 in cash and an equal amount deposited in his ICBC bank account)." *Id*. n.2.  The PSR then takes that total (at least $120,000), applies the 28% presumption set forth in §

**B.     Argument: The PSR Bases The Amount Of The Tax Loss On Insufficiently Reliable Information**

As demonstrated below, the information supporting the amount of unreported income—derived from equivocal and uncorroborated "guess-times" in Professor Lieber's post-arrest statement—does not have "sufficient indicia of reliability to support its probable accuracy." § 6A1.3(a).  The Court should therefore apply § 2T1.1(a)(2), which yields an offense level of 6.

**1.     The Applicable Law**

Under § 2T1.1(a)(2) of the Guidelines, "the base offense level" for filing a false tax return "is either 6, or a higher number that corresponds to the tax loss."  *United States v. Standard*, 207 F.3d 1136, 1138 (9th Cir. 2000).  "The government bears the burden of proving [any such higher number/tax] loss amount by a preponderance of the evidence."  *United States v. Akoto*, 61 F.4th 36, 45 (1st Cir. 2023); *see United States v. Olbres*, 99 F.3d 28, 32 (1st Cir. 1996); *United States v. Schroeder*, 536 F.3d 746, 752-53 (7th Cir. 2008).

A court need not determine the exact amount of the tax loss.  The court, rather, may "make a reasonable estimate based on the available facts[,]" § 2T1.1 Application Note 1, "provided" that the estimate is "supported by a preponderance of the evidence."  *United States v. Lee*, 892 F.3d 488, 491 (1st Cir. 2018).  In some cases, however, the record does not allow the court to make even a reasonable estimate, in which case the base offense level defaults to 6.  *See, e.g., United States v. Scholl*, 166 F.3d 964, 981 (9th Cir. 1999).

When determining the amount of a tax loss, the court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." § 6A1.3(a).  "But,

---

2T1.1(c)(1)(A), and calculates the "tax loss" as at least $33,600, which, under the Tax Table, § 2T4.1, provides a base offense level of 12.

6

where [as here] an objection has been raised, the mere inclusion in the PSR of factual allegations does not convert facts lacking an adequate evidentiary basis with sufficient indicia of reliability into facts a district court may rely upon at sentencing."  *United States v. Carrion-Melendez*, 26 F.4th 508, 512 (1st Cir. 2018) (internal quotation marks omitted).  A court abuses its discretion when it relies on an insufficiently proven allegation made in a PSR.  *Id*. at 513.

### 2.    The Information In The PSR Is Insufficiently Reliable

At sentencing, we do not dispute that Professor Lieber's post-arrest statement regarding *the receipt of money* was admissible in evidence.  However, his post-arrest statement regarding *the amount of money* from Wuhan lacks sufficient indicia of reliability.  The amount of money he received was not at issue, and was not proven, at trial.  And, as shown below, Professor Lieber's statements about the amount he received were equivocal, ambiguous and tentative, goaded and induced by FBI agents who were all-too-quick to adopt uncertain statements without foundation.  Even now, years after the fact, Professor Lieber's words stand uncorroborated.  They "'reflect the strain and confusion attending [his] predicament rather than a clear recollection of his past.'"  *United States v. Tanco-Baez,* 942 F.3d 7, 17 (1st Cir. 2019) quoting *Smith v. United States,* 348 U.S. 147, 153 (1954)*.*  Thus:

Professor Lieber, when arrested, was a novice in the criminal-justice system—and a vulnerable, cancer-stricken novice at that.  As the Court previously observed, Professor Lieber was in "obvious distress[,] as shown on his face and his actions during this interview[.]"  Sep. 2, 2021 Hearing Tr. at 27:4-6, 20-22 (oral argument on suppression motion).  "[H]e behaved in a peculiar way[,] as somebody who doesn't know what else to do."  *Id.* at. 28:2-3.

The FBI agents exploited Professor Lieber's inexperience and vulnerability.  They did so by means of repeated lulling statements, designed to "insinuate[e]" themselves with Professor

Lieber, Tr. 25:10, and thereby to induce admissions from him.  As the Court previously observed, the agents engaged in "smarminess . . . constantly saying I'm your help[]," and your "friend."  *Id.* at 24:7, 15-16, 23-24; *see also* 26:4-5 ("he said he wants to help him and how he wants to be his friend[]").

Having laid that disingenuous—not to say false—foundation, the agents fed information to Professor Lieber: "It's half cash, half in the bank account[,] so how much would you get in cash because we have acknowledgement that it happened multiple times[.]"  (Trial Ex. 304).

In response, Professor Lieber stated, with obvious equivocation and uncertainty, "So, it must be like 10,000 dollars or 20,000 or something like that . . . It could have been 20,000 or[.]" FBI Agent: "So you you[] received 20,000 dollars in cash and then 20,000 dollars went into the bank account?"  Professor Lieber: "I don't know . . . . I don't know how much honestly[;] as I said you know I could look at my record of travel then I would say ok[,] so it was maybe 10 or 20 thousand dollars each of these times I visited . . . to be honest I'm not sure though . . . maybe I'm just like embarrassed[.]"  *Id.*

The agents, however, did not wait for corroboration from Professor Lieber's travel records. They simply treated his words as fact.  FBI agent: "[U]ltimately where did the 20,000 dollars go?" *Id.*  The PSR now does the same.

The agents continued: "[H]ow many times did this sort of arrangement happen[?]". Professor Lieber: "[H]ow many times that is, I don't know."  *Id.*[3]  These answers, which

---

[3] The interview continued: FBI agent: "If you were to estimate . . . how much total cash do you think?" Professor Lieber: "uh honestly it hard . . . I don't know[,] it's probably um maybe it's more than 50,000 dollars[,] I don't know[.]"  FBI agent: "Is it more than 50,000 dollars?"  Professor Lieber: "I mean I guess its . . . . It could be more than 50,000 but . . . I honestly think it must be less than 100,000 . . . . I blanked out most of this stuff[.]"  Trial Ex. 304.

demonstrate a lack of knowledge, a lack of memory and a lack of certainty, now appear in the PSR as neatly-packaged fact—three trips to Wuhan; $120,000 in income.

Now, more than three years since Professor Lieber made the post-arrest statements, the government *still* has no independent evidence about the amount of money he received. Worse, it appears that government has not even bothered to try to find such evidence, despite the long-standing judicial "realization that sound law enforcement requires police investigations which extend beyond the words of the accused." *Smith*, 348 U.S. at 153.

The agents assured Professor Lieber, during the interview, that "these aren't 'got ya' moments[.]" Trial Ex. 302. That, however, is precisely what they have become. Professor Lieber's actual words "[do] not clearly establish" the accuracy of the figures of the unreported income, or the tax loss, stated in the PSR. *Tanco-Baez,* 942 F.3d at 23. Yet his words have now become "fact," used to drive the Sentencing Guidelines against him.

The Court should sustain Professor Lieber's objection to ¶ 32 & nn.2 and 3 of the PSR. As demonstrated above, the government has not carried its burden of proving that the information supporting the amount of unreported income—derived from Professor Lieber's post-arrest statement—"has sufficient indicia of reliability to support its probable accuracy." § 6A1.3(a). The offense level then defaults to 6, in Zone A.

## III.    The PSR Incorrectly Groups The Counts Into Two Groups

The PSR grouped the Counts into two Groups, assigned 0.5 Units to Group 1, and 1.0 Unit to Group 2, for a total of 1.5 Units, thereby increasing the offense level by 1 level, taking it from 12 to 13. Professor Lieber objects to that grouping of Counts. A correct application of the Guideline at issue, § 3D1.2(d), leads to the conclusion that all the Counts constitute a single Group.

The government has informed us that it agrees with Professor Lieber's objection under § 3D1.2(d), and therefore agrees that all Counts constitute a single group.

A.     Under § 3D1.2(d), All Counts Constitute A Single Group

Section 3D1.2(d) provides, in pertinent part:

> All counts involving substantially the same harm shall be grouped together into a single Group.  Counts involve substantially the same harm within the meaning of this rule . . .
> (d) When the offense level is determined largely on the basis of the total amount of harm or loss[.]
> Offenses covered by the following guidelines are to be grouped under this subsection . . . [§]2B1.1 . . . [§]2S1.3 [and] §2T1.1[.]

Application Note 6 further provides, in pertinent part: "Counts […] are grouped together under subsection (d) if the offenses are of the same general type[…]"

Here, as demonstrated below, all the Counts constitute a single Group.

*First*, "the offense level" for all the offenses "is determined largely on the basis of the total amount of harm or loss[.]"[4]

*Second*, the "[o]ffenses" are "covered by . . . guidelines" identified in the chart set forth in subsection (d).[5]

---

[4] The offense level for false statement is determined under § 2B1.1, which depends heavily on the amount of loss.  *See United States v. Rivera-Ortiz*, 14 F.4th 91, 104 n.4 (1st Cir. 2021) (grouping offenses involving theft and fraud "because the overall offense level was determined on 'the basis of the total amount of harm or loss[]'").  The offense level for filing false tax returns is determined under § 2T1.1(a) and the Tax Table, § 2T4.1, which also depends heavily on the amount of loss.  And the offense level for failing to file reports of a foreign bank account is determined under § 2S1.3(2), which adopts the loss table in § 2B1.1.

[5] Counts One and Two charged false statements, in violation of 18 U.S.C. § 1001(a)(2); those offenses are "covered by" § 2B1.1 of the Guidelines, which is listed in the chart.  Counts Three and Four charged filing false tax returns, in violation of 26 U.S.C. § 7206(1); those offenses are "covered by" § 2T1.1 of the Guidelines, which is listed in the chart.  Counts Five and Six charged failure to file reports of a foreign bank account, in violation of 31 U.S.C. §§ 5312 and 5322(a); those offenses are "covered by" § 2S1.3 of the Guidelines, which is listed in the chart.  Thus, all the "offenses" in this case are "covered by . . . guidelines" listed in § 3D1.2(d).

*Third*, all the offenses "are of the same general type," a phrase that "is to be construed broadly." § 3D1.2 Application Note 7.  Here, all the offenses are *crimen falsi*, in that they all "pertain[] to dishonesty[.]"  *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 507 (1989); *see United States v. Kiendra*, 663 F.2d 349, 353 (1st Cir. 1981) (referring to "crimes of dishonesty— so-called *crimen falsi*").  Put differently, all the offenses, viewed generally and broadly, involve misrepresentation, in the form of either a false statement or a failure to disclose where the law imposed a duty to disclose.  As the government stated before trial, "the crimes alleged in this case arise from the defendant's false statements and material omissions to three federal agencies[.]" ECF 208 at 2.[6]

Accordingly, all the "offenses" in this case "are to be grouped" together, § 3D1.2(d), "into a single Group."  Application Note 1.

## B.   The PSR Misapplies Subsection (d)

The PSR grouped the Counts into two Groups, reasoning as follows: "Since Group 1 [the false statement Counts] and Group 2 [the tax and bank-account reporting Counts] involve separate victims, they do not group together."  PSR ¶ 42.  Subsection (d), however, does not impose a same-victim requirement.  *See United States v. Napoli*, 179 F.3d 1, 9 (2d Cir. 1999).  Indeed, as the Guidelines themselves expressly recognize: "Counts involving different victims . . . are grouped together only as provided in subsection (c) or (d)."  § 3D1.2 Commentary Background; *see also* Application Note 6 ("The defendant is convicted of two counts of theft of social security checks and three counts of theft from the mail, *each from a different victim*.  All five counts are to be grouped together." (emphasis added); *United States v. Tolbert*, 306 F.3d 244, 247 (5th Cir. 2002)

---

[6] *Martin*, 363 F.3d at 44, is distinguishable.  *Martin* held that fraud and tax evasion are not offenses of the same general type.  This case, however, involves neither fraud nor tax evasion.  In this case, furthermore, unlike in *Martin*, the loss tables under § 2B1.1 and § 2T1.1 closely track each other; both tables yield an offense level of 12 for a loss between $15,000 and $40,000.

(holding that subdivision (d) "allows for grouping of factually unrelated counts . . . [T]o keep subsection (d) from being totally subsumed . . . it must address offenses in which (1) the victims are different and (2) the involved behavior is unconnected[]").

Accordingly, the total offense level should be decreased by one level.

## IV.   The Court Should Depart Downward In Light of Professor Lieber's Medical Condition

Paragraph 123 of the PSR provides: "The Probation officer has not identified any factors that would warrant a departure from the applicable sentencing guideline range."  Here, however, the Court should depart downward in light of Professor Lieber's unusual and extraordinary medical condition, which, in combination with his age, distinguishes this case from typical cases covered by the guidelines.

### A.   The Applicable Guidelines

Section 5H1.4 provides, in pertinent part:

> Physical condition . . . may be relevant in determining whether a departure is warranted, if the condition . . . individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward; *e.g.*, in the case of a seriously infirm defendant, home detention may be as sufficient as, and less costly than, imprisonment.

Section 5H1.1 provides, in pertinent part:

> Age . . . may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.  Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration. Physical condition, which may be related to age, is addressed at § 5H1.4.

Under § 5H1.4, "[a] court may find [the requisite] extraordinary impairment when imprisonment would threaten or shorten a defendant's life or when the Bureau of Prisons would be unable to adequately meet the defendant's medical needs." *United States v. Martin*, 363 F.3d 25, 49-50 (1st Cir. 2004) (internal citations omitted). The Court, furthermore, will "read" §§ 5H1.4 (physical condition) and 5H1.1 (age) "together[,]" *United States v. Baron*, 914 F. Supp. 660, 662 (D. Mass. 1995), and will "balance infirmity and cost, allowing for a departure when home detention may be as efficient and less costly than imprisonment." *United States v. Willis*, 322 F. Supp. 2d 76, 82 (D. Mass. 2004).

### B.    Statement Of Facts Relevant To Age And Medical Condition

Professor Lieber is 64 years old. He submitted a letter from his doctor, Austin I. Kim, M.D., of the Lymphoma Program at the Dana-Farber Cancer Institute. *See* Exhibit A. As Dr. Kim explains, Professor Lieber has suffered, for nearly a decade, from a type of blood cancer known as follicular lymphoma, a B-cell non-Hodgkin lymphoma. *Id.* at 1. Over the years, he has received extensive treatments, comprising combinations of chemotherapy, radiation and immunotherapy. *Id.* These treatments have produced severe side effects, such as the development of colitis and hepatitis. We understand that Professor Lieber's body, furthermore, has simply been unable to tolerate certain treatments, which he then had to stop before completion of the intended course.

Follicular lymphoma is incurable. *See* Exhibit A at 1. Thus, over the years, and despite the treatments, Professor Lieber's cancer has relapsed seven times. *Id.* His physician has explained that cancer had spread throughout his body—leading to painful bone lesions in his ribs, hip, spine, jaw and elsewhere.

Professor Lieber's most recent treatment, in October 2022, consisted of "anti-CD chimeric antigen receptor T-cell therapy (CAR T-cell therapy), a personalized engineered immunotherapy,

[which] required a ten [-] day hospitalization for administration and monitoring side effects." Exhibit A at 1.  For more than a month following that hospitalization, Professor Lieber remained under 24-hour care to monitor and report signs or symptoms of Cytokine Release Syndrome or neurological toxicity.

Currently, Professor Lieber is not receiving a course of treatment and is considered in remission.  *See* Exhibit A at 1.  The years of intense chemo/immunotherapy, however, have "severely compromised Professor Lieber's immune system[,]" and he faces "increased risk of infection[.]"  *Id.* at 1.  Dr. Kim refers to studies showing that the immune systems of patients like Professor Lieber "are significantly impaired for at least 12 months after receiving CAR T-cell therapy, putting the patient at risk of more severe and potentially life threatening bacterial and viral respiratory infections, including COVID-19."  *Id.*  Professor Lieber has had the COVID-19 vaccines.  Because of his blood cancer, however, his body has not produced a robust antibody response needed to protect him from the virus.  Dr. Kim advises Professor Lieber to wear a mask indoors and to avoid crowds of people in indoor spaces, particularly those with poor ventilation.  *Id.* at 2.

The question here is not *whether* Professor Lieber will require further treatment; the question is *when*.  According to the medical literature, the October 2022 treatment has a median remission of three years.  *Id.* at 1.  In other words, half of the people with lymphoma will have their cancer return within three years.  According to Dr. Kim, however, Professor Lieber, has not reached median remission time point between any of his recent prior treatments.  Future treatments, furthermore, may well involve treatments that only recently received FDA approval and, based on our communications with Dr. Kim, may not be widely available this time.  And, of course, the probability of death increases with each successive recurrence and treatment.

14

Meanwhile, "for the foreseeable future[,]" Professor Lieber requires quarterly visits to the Dana-Farber clinic for "ongoing follow-up to monitor for continuing response to the therapy and long-term side effects." Exhibit A at 1. We understand that the monitoring includes complete blood count (CBC) and differential labs, comprehensive metabolic panels, lactate dehydrogenase (LDH), immunoglobulin, CD4-T-cell count, magnesium, and thyroid panels (TSH and Free T4). Improper blood-drawing and analysis can yield erroneous results. The monitoring also entails a careful physical exam performed by a specialized oncologist trained in lymphoma (not a general oncologist or a general practitioner).

The monitoring also includes PET and CT scans in the next three to six months, and approximately six months thereafter. *Id.* at 1. We are told that the physicians must balance the timing of the scans against Professor Lieber's physical state and the very real concern that he has received too much radiation, which can cause secondary cancers.

Professor Lieber was taking "preventive antiviral and antibacterial prophylactic medications (acyclovir and trimethoprim/sulfamethoxazole)[.]" Exhibit A at 1. Recently, however, the antibacterial medications had to be stopped because of Professor Lieber's elevated potassium level. This is a rare side effect that can lead to heart attack or stroke. Professor Lieber's "white blood cell count and . . . bacteria fighting immune cells[]" are "significantly below the normal level[.]" Accordingly, it is very possible that he will need "white blood cell growth factor injection[s] . . . to support his immune system." *Id.* at 2. He may also require monthly immune boosting infusions within the first year after his most recent treatment, again to support his immune system. *Id.*

Finally—and critically—Professor Lieber needs to remain in a sterile environment. Accordingly, Professor Lieber has been, and remains, largely confined to his home, leaving only

for medical appointments, brief walks around the neighborhood, and occasional visits to a local farm.  To date, he has strictly adhered to medical recommendations.

### C.      Argument: The Court Should Depart Downward

Professor Lieber suffers from an unusual and extraordinary medical condition, which, in combination with his age, distinguishes this case from typical cases covered by the guidelines. This case involves a "seriously infirm defendant," for whom "home detention" will "be as sufficient as, and less costly than, imprisonment."  § 5H1.4.  The Court should therefore depart downward, for the following reasons.

### 1.      Imprisonment Would Threaten Or Shorten Professor Lieber's Life

"A court may find [the requisite] extraordinary impairment when imprisonment would threaten or shorten a defendant's life[.]"  *Martin*, 363 F.3d at 49.  Here, as Dr. Kim states—without dispute—Professor Lieber's immune system is "severely compromised" and he faces "increased risk of infection[.]"  The federal courts have long recognized that prisoners face enhanced risk of infectious disease.  *See, e.g., United States v. Blarek*, 7 F. Supp. 2d 192, 212 (E.D.N.Y. 1998). More recently, the Covid-19 pandemic led at least one court to go even further: "Prisons are tinderboxes for infectious disease."  *United States v. Rodriguez*, 451 F. Supp. 3d 392, 394 (E.D. Pa. 2020).  "[C]ongregate settings, such as correctional institutions, increase the likelihood of disease and injury for immunocompromised inmates, such as those going through chemotherapy." *United States v. Dimmer*, 2023 WL 1766294, at *5 (D. Alaska Feb. 3, 2023).  That court continued: "Prisons are epicenters for infectious diseases . . . because of the higher background prevalence of infection, the higher levels of risk factors for infection, the unavoidable close contact in often overcrowded, poorly ventilated, and unsanitary facilities, and the poor access to health-care services relative to that in community settings."  *Id*. at *2 n.16 (internal quotation marks omitted).

These concerns apply with full force to Professor Lieber.  In his immuno-compromised condition, he faces grave and increased "risk of more severe and potentially life threatening bacterial and viral respiratory infections," such as COVID-19.  Exhibit A at 1.  According to the CDC, the top risk factors associated with an increased likelihood of severe outcomes from COVID-19 include a compromised immune system and underlying cancer.  *See Underlying Medical Conditions Associated with Higher Risk for Sever COVID-19*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Feb. 9, 2023),  https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html.  Professor Lieber, unfortunately, has both.

Measures necessary to prevent infection, moreover, such as social distancing, frequent disinfection of shared surfaces and frequent use of hand sanitizer, "are impossible or unfeasible in prison."  *Rodriquez*, 451 F. Supp. 3d at 402.  Prison life necessarily includes close quarters and security measures that prevent successful social distancing.  It also includes shared toilets, sinks and showers without disinfection between uses, and communal food preparation, service and dining, without frequent disinfection.

At FMC Devens, for example, the prisoners themselves are responsible for "sanitation."  *See* FMC Devens Admissions & Orientation Handbook at 21 (October 2017), https://www.bop.gov/locations/institutions/dev/DEV_aohandbook.pdf (each inmate is responsible for maintaining sanitary living conditions).  Staff are not required to wear masks.  *See* https://www.saferfederalworkforce.gov/faq/mask-wearing/.  As a result, Professor Lieber's fate may depend on the habits of the *least* sanitary prisoners and staff members.  Exposure to infections in prison surely threatens, and may well shorten, his life.

Professor Lieber's age, considered in combination with his medical condition, confirms the conclusion that the Court should depart downward.  Professor Lieber is 64 years old; in federal

prison he would rank among the oldest inmates. *See Inmate Age, Statistics*, BUREAU OF PRISON STATISTICS (April 8, 2023) https://www.bop.gov/about/statistics/statistics_inmate_age.jsp (only six percent of federal prisoners are age 61 or older; 80% of the population is age 50 or less). And he is a sickly and fragile 64 at that.

In any event, section 5H1.1 "does not speak in terms of *extraordinary* age or *extraordinary* infirmity, but simply "elderly and infirm." *Willis*, 322 F. Supp. 2d at 82; *see id*. at 85 (departure is not "reserved for only those at 'death's door[]'"). Here, Professor Lieber's age certainly exacerbates his infirmity. "Conditions that may be relatively minor or not life threatening in a younger person become life threatening in the older defendant." *Baron*, 914 F. Supp. at 662. For COVID-19, for example, the CDC identifies age, starting at a mere 50 or older, as one of the top risk factors associated with an increased likelihood of severe outcomes. *See Underlying Medical Conditions*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Feb. 9, 2023), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html.

## 2. The BOP Would Be Unable To Adequately Meet The Medical Needs

"A court may find [the requisite] extraordinary impairment when . . . the Bureau of Prisons would be unable to adequately meet the defendant's needs." *Martin*, 363 F.3d at 49. Here, neither the PSR nor any government submission establishes that the BOP will be able to adequately meet Professor Lieber's extensive, highly-specialized needs.

It is only a matter of time before Professor Lieber will relapse and require the "personalized engineered immunotherapy" available at Dana-Farber. The future may well involve treatments only recently approved by the FDA and not yet widely available. Meanwhile, as described above, Professor Lieber requires quarterly follow-up visits to Dana-Farber for highly-specialized monitoring of his continuing response to the "personalized engineered immunotherapy" and long-

term side effects.  That monitoring requires an oncologist specially trained in lymphoma, who, with the rest of the medical team, must make informed and delicate judgments about Professor Lieber's need for, and ability to tolerate, further radiation.  Professor Lieber also requires specific medications, identified by Dr. Kim, and he may require specific white blood cell growth injections and immune boosting infusions, all to support his immune system.

The PSR does not even suggest that the BOP can provide such treatments, monitoring and medication.  *See, e.g., Martin*, 363 F.3d at 49-50 (affirming downward departure where BOP would not administer particular medication required by patient/prisoner); *Dimmer*, 2023 WL 1766294, at *5 (colon cancer classified as stage 3, spread to lymph nodes; "the Court is not convinced that Dimmer's health will be maintained at . . . FMC Butner while Dimmer is so seriously immunocompromised[]"); *Blarek*, 7 F. Supp. 2d at 212 (granting downward departure where defendant maintained a "special regimen" which "will likely be impossible[]" to maintain in prison).

"Something more than mere boilerplate language [from the BOP] is necessary to assure the court that the BOP can adequately care for [the defendant] given his substantial history of medical difficulty."  *Martin*, 363 F.3d at 50, *citing United States v. Gee*, 226 F.3d 885, 902 (7th Cir. 2000) (refusing to credit "a form letter trumpeting BOP's ability to handle medical conditions of all kinds").  A fortiori, the Court does not have the necessary such assurance where, as here, the government has not even submitted BOP boilerplate.

### 3.    On Balance, The Court Should Depart Downward

The Court—balancing infirmity, combined with age, against cost—should conclude that home confinement here will "be as sufficient as, and less costly than, imprisonment."  § 5H1.4.

Professor Lieber suffers from a terminal illness. He lives at home, largely in isolation. After a long and painful battle, he and his doctors have achieved a temporary, but tenuous, stability, the disruption of which "would threaten or shorten [Professor Lieber's] life." *Martin*, 363 F.3d at 49. He has received, and continues to need, highly specialized—indeed, customized, not to say esoteric—treatments and medications, for which he has long-term relationships with particular doctors at a particular institution, Dana-Farber. On balance, any "need" for imprisonment should not outweigh Professor Lieber's current and continuing need for stability, isolation and a sterile environment.

The issue of costs confirms this conclusion. The cost of imprisonment for a person over age 50 is twice to five times the cost of imprisonment of a person aged 49 or younger. *See Report, Pew Charitable Trusts*, Prison Health Care: Costs and Quality at 27 (Oct. 2017), https://www.pewtrusts.org/-/media/assets/2017/10/sfh_prison_health_care_costs_and_quality_final.pdf. In this case, needless to say, Professor Lieber's extensive and specialized medical needs would raise the cost still higher. Accordingly, there can be no question that home confinement will be far less expensive than imprisonment, which, "as well as being costly . . . is not efficacious particularly where the offender is not as likely to commit future crimes as a younger offender." *Baron*, 914 F. Supp. at 664; *see United States v. Maltese*, 1993 WL 222350, at *10 (N.D. Ill. June 22, 1993) ("defendant [62 years old] requires chemotherapy [for liver cancer] and other medical treatment which is incapacitating and very expensive . . . Given the costs of treating and housing defendant, this court finds that an alternative form of confinement would be equally efficient and less costly than incarceration.").

In sum, "serious medical conditions make [Professor Lieber's] health exceptionally fragile." *Martin*, 363 F.3d at 50. His serious medical condition, in combination with age, "is

20

present to an unusual degree and distinguishes th[is] case from the typical cases covered by the guidelines." § 5H1.4.  The Court should depart downward where, as here, "[t]here is no question that home detention is less expensive and more efficient than incarceration . . . [Professor Lieber] has regular interactions with physicians who are intimately familiar with his situation.  The stress of a felony conviction, and the limitation on his freedom engendered by home detention is significant but nowhere near the impact that uprooting him to a federal prison facility would have." *Baron*, 914 F. Supp. at 664. Finally, there is no "danger that this departure will open an exception through which many defendants will seek to pass.  There are not many defendants like [the instant defendant]." *Willis*, 322 F. Supp. at 85.

## V.     The Court Should Consider Certain Proposed Amendments To The Guidelines

On April 5, 2023, the Sentencing Commission unanimously voted to promulgate a new Guideline, § 4C1.1, effective November 1, 2023.  *See* Adopted Amendments (Effective November 1, 2023), UNITED STATES SENTENCING COMMISSION, https://www.ussc.gov/guidelines/amendments/adopted-amendments-effective-november-1-2023. That new Guideline addresses the case of the so-called "zero-point offender," who—like Professor Lieber—has no criminal history points.  Subsection (a) of that new Guideline provides:

> ADJUSTMENT.—If the defendant meets all of the following criteria:
>
> (1)     the defendant did not receive any criminal history points from Chapter Four, Part A;
> (2)     the defendant did not receive an adjustment under §3A1.4 (Terrorism);
> (3)     the defendant did not use violence or credible threats of violence in connection with the offense;
> (4)     the offense did not result in death or serious bodily injury;
> (5)     the instant offense of conviction is not a sex offense;
> (6)     the defendant did not personally cause substantial financial hardship;

(7)     the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(8)     the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);

(9)     the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and

(10)     the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848;

decrease the offense level determined under Chapters Two and Three by 2 levels.

Professor Lieber and his offenses would meet all ten criteria.  Therefore, under § 4C1.1(a), Professor Lieber would have an offense level of 11, in Zone B.  Section 5C1.1(c)(3) would then authorize the sentence that Professor Lieber seeks here—a "sentence of probation that includes a condition . . . that substitute[s] . . . home detention for imprisonment according to the schedule in subsection (e)[,]" which provides for "[o]ne day of home detention for one day of imprisonment."

Proposed amended Commentary—specifically, a new Application Note 4(A) to § 5C1.1—drives home the Commission's view that zero-point offenders, who would qualify for an adjustment under § 4C1.1(a), generally should not go to prison.  That new Application Note provides: "If the defendant received an adjustment under § 4C1.1 . . . and the defendant's applicable guideline range is in Zone A or B . . . a sentence other than a sentence of imprisonment, in accordance with subsection . . . (c)(3), is generally appropriate."

The Commission identified a solid empirical basis for this general rule against the imprisonment of zero-point offenders.  Specifically, the Commission's data shows that such offenders "have considerably lower recidivism rates than other offenders, including lower recidivism rates than the offenders in Criminal History Category I with one criminal history point."

22

In short, the criminal justice system generally has no need or reason to imprison the zero-point offender because he or she—like Professor Lieber—is so unlikely to reoffend.

The new Guideline and Application Note, of course, have yet to come into effect. Nevertheless, for two reasons, the Court should consider, and give great weight to, those materials, in anticipation of their effectiveness.

First, the new materials provide information relevant to sentencing here. Those materials demonstrate the intent and the current view of the Sentencing Commission.

Second, the Court's reliance on the new materials would ameliorate the unfairness—not to say arbitrariness—faced by a defendant who, like Professor Lieber, seeks a sentence likely to be Guidelines-authorized a mere six months from the date of his sentencing. An administrative agency, such as the Sentencing Commission, must draw lines, which leave some affected individuals unaided. A sentencing court, by contrast, has more discretion and flexibility when deciding individual cases.

## TITLE 18 U.S.C. SECTION 3553(a) FACTORS
## COUNSEL A NON-CUSTODIAL SENTENCE

The Sentencing Guidelines mark only the "starting point and initial benchmark at sentencing." *Kimbrough v. United States*, 552 U.S. 85, 108-9 (2007), citing *Gall v. United States*, 552 U.S. 38, 39 (2007). Ultimately, sentencing is governed by 18 U.S.C. § 3553(a), which provides, in pertinent part: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" § 3553(a)(2), discussed below. Accordingly, after the Court considers the advisory Guidelines calculation, the Court must proceed to an individualized assessment of the case-specific factors, set forth in section 3553(a), to determine whether, "in [this] particular case, a within-Guidelines sentence is 'greater than necessary' to accomplish the goals of sentencing." *Kimbrough*, 552 U.S. 101, quoting 18 U.S.C. § 3553(a).

23

Title 18 U.S.C. § 3553(a) provides:

> The court, in determining the particular sentence to be imposed, shall consider—(1) The nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.(3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range established [under the Sentencing Guidelines] subject to any amendments made to such Guidelines by an act of Congress…; (5) any pertinent policy statement . . . issued by the Sentencing Commission subject to any amendments made to such policy statement by an act of Congress…; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to the victims of the offense.

## Subsection (a)(1)

Subsection (a)(1) requires the court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant[.]"  As part of this analysis, a sentencing court must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented."  *Gall v. United States*, 552 U.S. 38, 50 (2007).  "Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'"  *Pepper*, 562 U.S. at 476 (2011) (citing *Wasman v. United States*, 468 U.S. 559, 564 (1984)).

### Charles Lieber's History And Characteristics

Charles M. Lieber was born in Philadelphia, Pennsylvania on April 9, 1959.  His mother, Marlene Lieber, was a homemaker.  His father, Robert Lieber, was a World War II Army veteran who later spent most of his professional career as an electrical engineer in the missile and service

division of RCA Corporation.  Shortly after Charlie's birth, the family moved to Moorestown, New Jersey, where Charlie lived until he went off to college.

Charlie had two siblings.  His older brother, Lee Lieber, served as the Chief of Police in Moorestown, New Jersey until his retirement in 2022.  His younger sister, Ellen Lieber, was diagnosed at age seven with a brain tumor and endured medical struggles throughout most of her life.  His sister's illness was extraordinarily difficult for the Lieber family.  Marlene was Ellen's caregiver and held the family together but Ellen's treatment was often very aggressive, requiring radiation that led to severe strokes and uncontrollable tantrums.  Ellen Lieber passed away in November 2014.

Professor Lieber had a close relationship with his parents.  As a teenager, he flew model airplanes with his father and brother.  They would attend model airplane competitions, once even reaching the national championship at the Naval Academy.  His mother was an avid gardener. Professor Lieber would help her out with the physical tasks in the garden.  He still gardens today.

In June 1990, Professor Lieber married Jennifer L. Karas.  They met while post-doctoral students at the California Institute of Technology ("CalTech").  They have two children.  The older is a third-year resident in orthopedic surgery at Mt. Sinai Hospital in New York.  The younger is a hairstylist in Philadelphia.  Both children bring great joy to their parents.

Whatever time was not devoted to his career, Professor Lieber spent with his family.  He enjoyed the routine of making breakfast with the kids and reading to them before bed.  He made a point to be involved with their schoolwork.  When Alexander picked up wrestling, a sport that Professor Lieber played in school, Professor Lieber helped Alexander train, fundraised for the team, and volunteered as a coach.  Professor Lieber even transformed the family's living room into a padded gym to help him train.

The Lieber family remains very close.  Around 2007, the younger Lieber child expressed an interest in growing pumpkins after reading a book about giant pumpkins.  Soon, the family started growing pumpkins, with typical Lieber dedication, devotion and scientific approach.  An extravagant and tedious affair, the family grew massive pumpkins right in their yard.  Local competitions followed.  The first pumpkin they took to competition weighed about 1,100 pounds.  In 2014, the family grew a record setting 1,870-pound pumpkin.  *See* Katie Kindelan, *Meet the Harvard Professor Behind a Winning 1,870-Pound Pumpkin*, ABC NEWS (Oct. 13, 2014), https://abcnews.go.com/Lifestyle/meet-massachusetts-man-winning-1870-pound-pumpkin/story?id=26163871.  His family's loving support in these endeavors and others has helped Professor Lieber endure the crippling weight of this case and his illness.

### Professor Lieber's Distinguished Career And Extraordinary Support For His Colleagues And Students

Apart from his family, Professor Lieber's life has been devoted to science.  He attended Franklin and Marshall College, graduating with a B.S. with honors in Chemistry.  After doctoral studies at Stanford University and postdoctoral research at CalTech, he moved to the East Coast in 1987 to become an Assistant Professor at Columbia University.  In 1992 he moved to Harvard University as a full Professor.  Professor Lieber taught and conducted research for almost 30 years at Harvard.  He held a joint appointment in the Department of Chemistry and Chemical Biology and the John A. Paulson School of Engineering and Applied Science.  In 2015 he was named the Chair of the Department of Chemistry and Chemical Biology.  In 2017 he received Harvard's highest faculty honor, named as a University Professor, and the first to hold the Joshua and Beth Friedman University Professor.

Professor Lieber is a leader in this field, called nanoscience, the study and development of structures on the scale of atoms and molecules.  Thoughts, movements, behaviors, and certain

diseases arise from electrical and chemical communication between brain cells.  For example, the ability to recognize a face, read the newspaper, engage in conversation, recall a memory are all made possible by a pattern of neuron activity.  Neurons communicate across tiny gaps between cells—yet techniques for interacting with these cells operate on a larger scale and can interfere with normal brain function.  Professor Lieber hypothesized that smaller technologies that operate on the scale of cells' own communication can provide a better way for scientists to understand and interact with them.

Professor Lieber originated methods for technologies with diameters thousands of times smaller than a human hair.  He has pioneered the application of these materials, including the development of powerful sensors capable of detecting diseases down to the level of a single infectious virus particle, and seamlessly integrating materials into the brain, thereby providing an unprecedented view to monitor and treat neurological and neurodegenerative diseases like Parkinson's.   Professor Lieber's research has groundbreaking prospects for broad-ranging applications from basic research to electronic therapeutics for diseases.

Professor Lieber's work has won world-wide recognition.  He has received a plethora of scientific awards, including the 2017 NIH Director's Pioneer Award; 2013 Willard Gibbs Medal; 2012 Wolf Prize in Chemistry; Fred Kavli Distinguished Lectureship in Nanoscience (2010); Inorganic Nanoscience Award of the ACS Division of Inorganic Chemistry (2009); Einstein Award, Chinese Academy of Sciences (2008); NBIC Research Excellence Award, University of Pennsylvania (2007); Nanotech Briefs Nano 50 Award (2005); ACS Award in the Chemistry of Materials (2004); World Technology Award in Materials (2004 and 2003); Scientific American 50 Award in Nanotechnology and Molecular Electronics (2003); New York Intellectual Property Law Association Inventor of the Year (2003); APS McGroddy Prize for New Materials (2003);

Harrison Howe Award, University of Rochester (2002); MRS Medal (2002); Feynman Prize in Nanotechnology (2001); NSF Creativity Award (1996); ACS Award in Pure Chemistry (1992); and honorary degrees from Franklin & Marshall College, the University of Chicago, and Union College.

Professor Lieber is an elected member of the National Academy of Sciences, the National Academy of Medicine, the American Academy of Arts and Sciences, Fellow of the Materials Research Society and American Chemical Society (Inaugural Class), and member of the American Physical Society, Institute of Electrical and Electronics Engineers, International Society for Optical Engineering and American Association for the Advancement of Science. He was Co-Editor of Nano Letters and has served on the Editorial and Advisory Boards of nearly a dozen science and technology journals. Professor Lieber has published over 410 papers in peer-reviewed journals and was the principal inventor on over 50 patents. In his spare time, he was also active in commercializing nanotechnology, and founded the nanotechnology companies: Nanosys, Inc. in 2001 and the new bio-nanosensor company Vista Therapeutics in 2007.

Professor Lieber is indisputably a genius. A complete list of his academic and professional accomplishments spans almost 40 pages in his *curriculum vitae*. Not listed is the hard work he performed, and sacrifices he made, to achieve this remarkable level of success. Professor Lieber's colleagues and students describe him as a devoted academic who worked long hours on research for decades at Harvard. The following are a just few insights from his former colleagues and students on his work ethic and dedication:

Letter from Professor Ali Javey, a former student, and Professor at the University of California, Berkeley:

> He has dedicated his life to his lab at Harvard, Harvard chemistry department, his students and alumni, and science. When I was at Harvard, Professor Lieber would often work from his office in the

> chemistry department from early morning until midnight and beyond, six days a week. He would respond to emails from his students almost immediately at any hour of the day and night, including holidays, to provide research guidance, advice and suggestions.

Letter from Professor Peidong Yang, a former student, and Professor at the University of California, Berkely:

> Dr. Lieber is a pure scientist. He has devoted all of his time and efforts to the research itself and nothing else. Back in 1993 when I was still a PhD student in his group, he typically worked six-to seven days a week. He would spend days and nights in the lab working with students directly. He has worked closely with each student in guiding their research, designing their experiments, preparing and editing their scientific publications. He would provide extensive guidance in manuscript writing and scientific presentation to each and every student in the group. I have learned from other recent graduates that he maintained this level of crazy working habits even after he was diagnosed cancer years ago. His enthusiasm, passion and devotion towards science has inspired many generations of students and postdocs.

Letter from Professor Gregory Engel, a colleague at the University of Chicago:

> My first impressions of Charlie were as a graduate student when I would arrive in the lab at 7am and often leave well after 9pm. As I would walk down Oxford Street on dark nights and cold mornings, I would pass by the windows to Charlie's basement office and usually see the lights on. Even as I trod home by exhausted from work, I'd admire his dedication – sometimes with a faint wonder of what he might be doing to keep him at work so late. As a student, I took every opportunity to learn from Charlie to see how he ran his group and chose impactful problems.

Following Professor Lieber's conviction in December 2021, he received an outpouring of support from his former students and colleagues who were eager to share with the Court the Charles Lieber they know.  *See* Exhibit B.  Professor Lieber's legacy lives on in the next generation of scientists he has worked with, trained, and continues to mentor to this day.  Many of them have gone on to be professors at prestigious universities and executives at companies all over the world. *See* Exhibit C, Chart of Former Lieber Research Group Members.

The letters from Professor Lieber's colleagues and former students demonstrate his best and true characteristics.   First, Professor Lieber advocated fiercely for others during his time at Harvard:

Letter from Professor Daniel Kahne, a colleague at Harvard University:

> One of the ways I was able to observe Charlie's character was during the time he was Chair of the Chemistry Department. Charlie worked as hard for his faculty as for himself. In particular, he paid close attention to the development of junior faculty and defended them when they needed it. During Charlie's term as Chair, a talented female faculty member came up for tenure. There were many professors in the department who unjustly opposed her promotion. Charlie could have the let mob have its day, but he knew that would have been unfair to this young scientist. This faculty member had more than met the bar for promotion at Harvard. Charlie went around the room where we were discussing her case, looked each faculty member in the eye, and asked them to justify their dissenting vote with supporting scientific evidence. Despite Charlie's efforts with our faculty, the University held up her tenure for several months. Charlie kept the pressure on the University to do the right thing and promote her. We do not disclose what happens in tenure discussions, so I do not think this faculty member realizes that she came very close to being denied tenure and that Charlie was her most vocal supporter. She remains angry at him that her case took longer to resolve than she thought it should. This faculty member couldn't see Charlie's character (which has always bothered me). But Charlie doesn't do what he does for other people because he wants their gratitude. The well-being of the department depended on Charlie absorbing the blame and so he did.

Second, Professor Lieber is a lifelong and dedicated mentor to the students who have worked with him in his lab:

Letter from Professor Ritesh Agarwal, a former student, and Professor at the University of Pennsylvania:

> During my 40 months of closely working with Prof. Lieber while in his group, I always found him to be available to discuss scientific problems of great interest and he always asked us to also think about their potential impact for benefiting human life in addition to academic impact. Despite his very busy schedule, he would always talk to me, sometimes for more than an hour and almost all deep scientific discussion would eventually drift to questions related to

my personal well-being and how to navigate the complex landscape of academia. It is true that Prof Lieber has mentored some of the brightest minds in the world, but he is not the only one who has done so. However, what separates him from other researchers of equal standing is that an exceptionally large number of his students and postdoctoral fellows occupy the highest positions in academia and industry, which I believe is unparalleled in almost all scientific and engineering disciplines. For most younger researchers, it is a dream to obtain a prestigious faculty position in universities so that they can lead their own research groups and bring their own ideas to fruition. However, to secure academic jobs is incredibly difficult and for every one position, typically there are 300-400 highly qualified applicants. So, what distinguishes Prof. Lieber's students from other groups that they have been so successful? The answer lies in Prof. Lieber's unique mentorship style and for deeply caring for all his students, to not only provide them technical training but also spending a lot of time with them to prepare them for the brutal world of academia.

Finally, despite his status as a scientific icon, he is a humble man who put his work and others before himself:

Letter from Professor Adam E. Cohen, a colleague at Harvard University:

Despite Charlie's widely recognized brilliance and success, he is remarkably modest. I interacted with Charlie every few weeks for 13 years, but in this whole time Charlie never mentioned that he was sick with cancer. Indeed, he showed little interest in ever talking about himself. His clothing was always purely functional, he often made self-deprecating jokes, and I never saw him engage in the politicking which can infect academic departments. The only time I saw him brag was when he talked about the giant pumpkins he grew at home!

Letter from Professor Thomas Kempa, a former student, and Professor at John Hopkins University:

[] it is important to realize that at some point an academic becomes defined not by his/her own accomplishments but by the quality and talent of their trainees. Charlie knew this as well as anyone else and this is why he was so tireless in his mentorship of his students. Charlie was certainly at the very top of the scientific community and could have settled into the routine of constant travel and pageantry that often awaits exceptionally successful academics. However, Charlie eschewed these so-called "trappings" and always held regular weekly Friday afternoon meetings with all of his students. These meetings would stretch for hours and were wonderful

> opportunities to take scientific deep-dives and to receive detailed mentorship. As a Professor who regularly holds such meetings on a weekly basis, I can tell you that they are exhilarating but require a great personal sacrifice of time to do properly. Again, Charlie did this because his focus was, as ever, on the science and on his devotion to his students.

Professor Lieber is filled with remorse and shame for the actions that led to this case. His conduct was completely opposed to the integrity with which he has conducted himself as a researcher and scientist throughout his long career. His misdeeds have destroyed his life and career, but his most difficult challenge has been to witness how this case has affected his family, his colleagues and science. This case does not involve the integrity of his scientific work, but the unfortunate reality is that the case has cast a black cloud over a lifetime of world-changing research. Professor Lieber remains hopeful that the Court, in accordance with section 3553(a), will review and consider how he has lived his entire life, not just his conduct in this case.

Furthermore, despite his illness, he hopes to continue to do as much good as he can, by mentoring and collaborating with students, providing input where possible, and serving as a resource for the scientific community. Indeed, even after his arrest, Professor Lieber, at the request of Harvard, continued to mentor students. He spent many hours writing letters of recommendation and meeting with students over phone and video. Even after indictment and being placed on administrative leave, Harvard continued to make requests of Professor Lieber, and Professor Lieber continued to assist Harvard and the Harvard graduate students and postdoctoral fellows. Professor Lieber wrote nearly eighty recommendation letters so that several researchers could apply and secure full-time faculty positions at prestigious institutions in the United States. Professor Lieber also helped two students secure respected postdoctoral positions by having discussions with the students regarding potential advisors and providing letters of reference supporting their applications. Additionally, Professor Lieber worked with former research

students and postdoctoral fellows to complete the writing, revisions, and publication of work that was carried out in his laboratory before the arrest, including seven different papers. Also while on administrative leave, Professor Lieber wrote nomination and/or supporting letters for former group members whom he had previously mentored who were applying for, or being nominated for, national and/or international awards. Each of these letters was personalized for the specific individual (based on their own individual achievements and capabilities) and award.

### Professor Lieber's Age, Medical Condition And Health

Section IV of this memorandum discusses Professor Lieber's age, medical condition and health. Professor Lieber respectfully directs the Court's attention to that discussion.

### Subsection (a)(2)(A)

Subsection (a)(2)(A) provides that the court shall consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." This memorandum elsewhere describes the non-custodial sentence requested in this case, and the reasons supporting that request—based largely on Professor Lieber's severely impaired medical condition, in combination with his age. As demonstrated below, Professor Lieber has already suffered significant punishment. A non-custodial sentence, therefore, would not unduly depreciate the seriousness of the offense or promote disrespect for the law. On the contrary, a non-custodial sentence would impose a sufficient—indeed, a just—punishment.

### The Prosecution of Professor Lieber and Its Collateral Consequences Have Already Resulted In Significant Punishment

The government's prosecution of Professor Lieber has already resulted in significant punishment. Following his arrest on January 28, 2020, Professor Lieber spent two days in custody pending bail on the charges in this case. PSR at 2. Title 18 U.S.C. § 3585(b)(1) provides that "a

defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences as a result of the offense for which the sentence was imposed."  This time in jail should be credited toward any sentence that the Court imposes.  *See United States v. Worthy*, 772 F.3d 42, 50 n.12 (1st Cir. 2014).

For Professor Lieber, moreover, a conviction in itself imposes serious punishment. Professor Lieber has no prior criminal history; the status of "convicted felon" therefore delivers a more significant blow to Professor Lieber.  That status itself is a major punishment in this case— more than sufficient to satisfy the statutory requirements.

Professor Lieber, of course, will suffer the usual "collateral consequences" of a felony conviction, under both state and federal law.  Professor Lieber is losing his right to vote, his right to hold office, his right to sit on a jury and perhaps his ability to obtain various professional licenses.  Most important, however, he is losing his right to apply for federal funding for scientific research.  *See* The System for Award Management Exclusion List, SAM, https://sam.gov/exclusions-new?pirKey=367239&pirValue=1580725029720827 (last visited Apr. 19, 2023) (excluding Charles Lieber from Federal Government contracting and from directly or indirectly receiving the benefits of Federal assistance programs as of February 3, 2020).  A host of sanctions and disqualifications will continue to cripple Professor Lieber for the rest of his life.

**The Devastating Impact On Professor Lieber's Career**

After 30 years at Harvard, Professor Lieber is no longer employed by the university.  He no longer has a laboratory, equipment, research materials, funding, students or salary.  He will never again be awarded a government grant for research.  His reputation is in tatters.  Put simply,

the facts and circumstances that led to this case will never happen again.  Courts around the country have recognized these kinds of consequences as punishment.[7]

**Threats And Public Vitriol**

News of Professor Lieber's arrest spread worldwide.  It appeared throughout the mainstream media, including but not limited to CNN, Fox News, The New York Times, PBS, the Wall Street Journal, the Boston Globe, the BBC, and Bloomberg. *See, e.g.,* Veronica Stracqualursi and Sheena Jones, *Harvard Professor Among Three Charged With Lying About Chinese Government Ties*, CNN (Jan. 28, 2020), https://www.cnn.com/2020/01/28/politics/harvard-professor-chinese-nationals-arrest-espionage/index.html; Ellen Barry, *U.S. Accuses Harvard Scientist of Concealing Chinese Funding*, NYTIMES (Jan. 28, 2020)

---

[7] *See, e.g.*, *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (upholding below-Guidelines sentence in part because district court found that "defendant had suffered atypical punishment such as the loss of his reputation and his company"); *United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (affirming a below-Guidelines sentence in part because defendant suffered loss to his professional reputation and lost his high-paying job); *United States v. Jasen*, 15-CR-00214 (M.D. Fla. Jan. 28, 2016), ECF No. 86 at 53-54 (imposing probation because, in part, "one who makes a mistake in judgment…should be, in my judgment, absent other aggravating circumstances, be able to go on with their life and suffer the humiliating and devastating effects of being prosecuted…which will… harm your reputation, your social status…"); *United States v. Malik*, 424 F. App'x 122, 127 (3d Cir. 2011) (affirming a below-Guidelines sentence in part because the defendant "was punished by the reputational harm he suffered as a result of the criminal action"); *United States v. Redemann*, 295 F. Supp. 2d 887, 894–97 (E.D. Wis. 2003) (downward departure warranted where defendant suffered serious collateral consequences from conviction); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (imposing below-Guideline sentence in part because, "as a consequence of his conviction and sentence, defendant lost a good public-sector job, a factor not considered by the Guidelines."); imposing below-Guidelines sentence and conviction);*United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (imposing below-Guideline sentence in part because, "as a consequence of his conviction and sentence, defendant lost a good public-sector job, a factor not considered by the Guidelines."); *United States v. Anghaie*, 09-CR-0037 (N.D. Fla. Nov. 29, 2011), ECF No. 238 (imposing below-Guidelines sentence and noting that defendants "received significant punishment through financial loss, loss to reputation and career opportunities."); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (in considering justness of sentence, "it is important to consider all other forms of punishment [defendant] has already suffered," including loss of job and damage to his personal and professional reputation); *United States v. Olis*, Criminal No. H-03-217-01, 2006 WL 2716048,at *13 (S.D. Tex. Sept. 22, 2006) (substantial variance warranted in part because "the attendant negative publicity, the loss of his job and accounting and law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct.").

https://www.nytimes.com/2020/01/28/us/charles-lieber-harvard.html;   Alanna   Durkin   Richer,

*Harvard        Professor        Charged        With        Hiding        China        Ties*,        PBS,

https://www.pbs.org/newshour/politics/harvard-professor-charged-with-hiding-china-ties        (Jan.

28, 2020).

Overnight, Professor Lieber and his family were subjected to shocking and unspeakable

harassment.    For example, Professor Lieber has falsely been associated with causing the

Coronavirus outbreak and has been erroneously featured in media reporting "Chinese Biological

Espionage."   Due to the public attention drawn by the DOJ's China Initiative, Professor Lieber

received and continues to receive countless threats, some of which have been reported to the U.S.

Attorney's Office and other law enforcement agencies.    The Liebers received horrific threats

including: "youre [sic] going to get your bullet after the tribunals…"; "YOU F*****G

TRAITOROUS KIKES…"; "I really hope, if you're guilty, that you are bent over, and ass raped

so many times they'll be able to drive a truck through your rectum.   Rot in hell, you traitorous

f***." *See* Exhibit D.

These threats and the public condemnation will punish Professor Lieber for the rest of his

life.

### Subsection(a)(2)(B)

According to 18 U.S.C. § 3553(a)(2)(B) an appropriate sentence should "afford adequate

deterrence to criminal conduct[.]"

#### Specific Deterrence

This case has indisputably achieved specific deterrence.   Professor Lieber is no longer

employed.   He no longer has a laboratory, equipment, research materials, funding, students or

salary.  He will never again be awarded a government grant for research.  There is no reason whatsoever to believe that Professor Lieber will re-offend.

### The Government Has Already Achieved Adequate General Deterrence

General deterrence has also been achieved.  This case arose from the DOJ's highly controversial, deeply flawed and now abandoned "China Initiative."  The China Initiative was supposed to reflect, according to the Department of Justice's announcement, "the strategic priority of countering Chinese national security threats and reinforce[] the President's overall national security strategy."  Department of Justice, *Information About The Department Of Justice's China Initiative And A Compilation Of China-Related Prosecutions Since 2018*, https://www.justice.gov/archives/nsd/information-about-department-justice-s-china-initiative-and-compilation-china-related (last visited Apr. 19, 2023).

The China Initiative in fact produced a string of prosecutions, most of them hollow, including the acquittal of Professor Anming Hu on all charges, *see United States v. Anming Hu*, 20-cr-00021-TAV-DCP, Dkt. 101 (E.D. Tenn. Sept. 9, 2021), and the dismissal of all charges against Professor Gang Chen, *see United States v. Gang Chen*, 21-cr-10018-PBS, ECF 94 (D. Mass. Jan. 20, 2022), a case prosecuted by the same U.S. Attorney's office that tried Professor Lieber.  *See infra* p. 44-45.  It should not go unnoticed that MIT consulted with Professor Chen about obtaining counsel.  Harvard, by contrast, did not do the same for Professor Lieber.

The dismissal of Professor Chen's case, mere weeks after the verdicts against Professor Lieber, came amidst a continued and growing call for an end to the China Initiative, and to the accompanying intimidation and harassment of lawful pursuits by academicians.  Prominent among those speaking out was former Massachusetts U.S. Attorney Andrew Lelling, who filed this very case.  Mr. Lelling commented, shortly before Professor Lieber's trial, "I think the point has been

made and, going forward, they should stop.  How many academics do you need?"[8]  Mr. Lelling

added, "If the point was to scare the [expletive] out of the entire academic community, the Initiative

did that. They should change or shut down that portion of the program." *Id.  In other words, the

U.S. Attorney who brought this very case believes that the DOJ has achieved general deterrence.*

Professor Lieber's case has already left a cautionary, deterrent mark on the academic

community.  *See, e.g.*, Natasha Gilbert, *China Initiative's Shadow Looms Large for US Scientists*,

NATURE, (Feb. 27, 2023), https://www.nature.com/articles/d41586-023-00543-x.  Furthermore, a

case like Professor Lieber's is unlikely to happen again.  Since Professor Lieber's relevant conduct,

participation in Chinese talent programs, disclosure of participation, and foreign payments became

highly publicized, particularly within academia.  *See supra*.  At a conference in Washington, D.C.

in the month after his arrest, Mary Sue Coleman, the head of the Association of American

Universities, said that government enforcement [of Professor Lieber] was the "most helpful thing

to convince our faculty" of the seriousness of the threat posed by China.  "When they see a

department chair at Harvard being called to account . . . believe me that has done more to help us

than anything abstract that we could possibly have done," she said.  *See* Paul Basken, U*S hails

success of Lieber arrest in chilling China Times*, TIMES HIGHER EDUCATION (Feb. 7, 2020)

https://www.timeshighereducation.com/news/us-hails-success-lieber-arrest-chilling-china-ties.

Congress has also since asked the FBI to develop a more consistent and effective academic

engagement strategy.  *See* U.S. Department of Justice, Federal Bureau of Investigation, Office of

Private Sector, *Academia Program: Connect to Protect Fact Sheet* (Oct. 26, 2020),

https://www.fbi.gov/file-repository/academia_factsheet_october2020_v4c-1.pdf/view.  The FBI

leadership established a centralized, dedicated team to lead and implement the FBI Academia

---

[8] *See* Chris Villani, *DOJ's China Initiative On Trial As Harvard Prof. Faces Jury*, LAW360 (Dec. 10, 2021), https://www.law360.com/articles/1447748/doj-s-china-initiative-on-trial-as-harvard-prof-faces-jury.

Program.  *Id.*  The FBI Academia Program and FBI field offices now closely coordinate with universities to bring awareness of potential threats associated with foreign academic relationships. *See id.*

In the wake of Professor Lieber's case, NIH has also issued clarifying guidance on several occasions.  These new documents include an NIH Guide Notice, NOT-OD-19-114, Reminders of NIH Policies on Other Support and on Policies Related to Financial Conflicts of Interest and Foreign Components, a series of Frequently Asked Questions on Other Support and Foreign Components, and a blog, Clarifying Long-Standing NIH Policies on Disclosing Other Support. The Public Health Service, of which NIH is a component, has also since promulgated rules for promoting objectivity in research, found at 42 C.F.R. Part 50, Subpart F.  *See* 42 C.F.R. §§ 50.601- 607 (2019).  These rules require universities to have detailed policies in place to gather information on the significant financial interests of all investigators participating in NIH-funded research. NIH's clarified rules set a minimum standard for the reporting of significant financial interests.

Universities around the country are changing their behavior, too.  Some universities have regular meetings with local FBI liaisons.  *See* Nidihi Subbaraman, *Universities are forging ties with the FBI as US cracks down*, NATURE (Mar. 12, 2020), https://www.nature.com/articles/d41586-020-00646-9.  Many universities have made additional resources available to researchers, including web pages, FAQs, updated policies, and trainings. *See id*.  The University of South Alabama went a step further by hiring a retired FBI agent as its director of information technology and risk compliance who speaks one-on-one to faculty members.  *See id*.  Universities are also changing guidelines for travel, imposing restrictions on travel, and asking faculty to take precautions when traveling internationally.  *Id.*

Harvard specifically has hosted subsequent training and webinars for its faculty; implemented a new Outside Activity and Interest Reporting system; and issued a series of educational emails to faculty. *See e.g., Research Administration & Compliance Systems – February 2021 Update*, HARVARD ADMINISTRATIVE NEWS (Feb. 11, 2021), https://admin-enews.eureka.harvard.edu/news/research-administration-compliance-systems-february-2021-update.

In sum, the public is already aware, taking action and more than adequately deterred.

**Subsection(a)(2)(C)**

Section 3553(a)(2)(C) sets forth that an appropriate sentence shall "protect the public from further crimes of the defendant."  Neither the PSR nor the government suggests that Professor Lieber will commit further crimes or that the public needs protection from Professor Lieber.

**Subsection(a)(2)(D)**

Section 3553(a)(2)(D) provides that courts shall consider "the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]"  Professor Lieber needs no further education or training.  He has no history of mental health issues or substance abuse.  He does not need any rehabilitation or correctional treatment.

He does, of course, need medical care.  And, as discussed above in in this memorandum, a non-custodial sentence will best "provide the defendant with needed . . . medical care . . . in the most effective manner[.]"  18 U.S.C. § 3553(a)(2)(D).  Imprisonment, in fact, would needlessly threaten Professor Lieber's health, and threaten or shorten his life.

**Subsection (a)(3)**

Subsection 3553(a)(3) provides that courts shall consider "the kinds of sentences available."  Here, the PSR sets forth in detail the kinds of sentences available in this case.  *See* PSR ¶¶ 107-22.  As urged elsewhere in this memorandum, the Court should impose a non-custodial sentence in this case.

**Subsection (a)(4)**

Section 3553(a)(4)(A) provides that courts shall consider "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]"  This memorandum discusses the issues arising under the advisory Guidelines in sections II – IV.  Professor Lieber respectfully directs the Court's attention to that discussion.

**Subsection (a)(5)**

Section 3353(a)(5) provides that courts shall consider any "pertinent policy statements" of the Sentencing Commission.   The Court should therefore consider the "pertinent policy statements" cited in the discussion of the sentencing guidelines above in this memorandum.

**Subsection(a)(6)**

Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

In this case, at trial, the false statement counts stood as the government's flagship counts. At sentencing however, the dollar amount of the tax counts assumes the greatest significance. Indeed, according to the PSR, the tax counts *double* the base offense level, from 6 (for the false statement counts) to 12 (for the tax counts).

The Court should therefore consider sentences imposed in recent tax cases in this district, a survey of which reveals two main points: (1) Many tax cases have resulted in probationary sentences; and (2) where the court has imposed a prison term, the tax-related misconduct was far more serious than that involved here.  Thus:

**As to probationary sentences:**

In each of the following cases, the defendant faced a guidelines range of 12-18 months—*the same range* set forth in the PSR in this case and was sentenced to a term of probation. *See, e.g., United States v. Ingram*, 18-cr-10018-RWZ, (D. Mass. 2019) (defendant facing a guideline range of 12 to 18 months; sentenced to 36 months' probation with 6 months community confinement).; *United States v. Liberatore*, 16-cr-10211-ADB, (D. Mass. 2017) (defendant facing a guideline range of 12 to 18 months; sentenced to 3 years' probation with 6 months home confinement).

In each of the following cases, the defendant faced a *higher guidelines range* than Professor Lieber faces, and was sentenced to a term of probation. *See, e.g., United States v. Koudanis*, 15-cr-10387-PBS-3, (D. Mass. 2017) (defendant facing a guideline range of 18 to 24 months; sentenced to 1 year probation with home confinement); *United States v. Rapoza*, 18-cr-10316-RGS (D. Mass. 2019) (defendant facing a guideline range of 18 to 24 months; sentenced to 3 years' probation with 6 months of home confinement); *United States v. Moller*, 10-cr-10170-JLT, (D. Mass. 2011) (defendant facing a guideline range of 18 to 24 months; sentenced to 24 months' probation with 6 months home confinement); *United States v. Walsh*, 09-cr-10100-RWZ, (D. Mass. 2010) (defendant facing a guideline range of 18 to 24 months; sentenced to 36 months' probation with 6 months home confinement).

Another case in this category is particularly noteworthy—*United States v. Spinola*, adjudicated by this Court—in which the defendant faced a guidelines range, at the low end, double

that faced by Professor Lieber.   In *Spinola*, 20-cr-10115-RWZ (D. Mass. Jun. 16, 2020), the

defendant was indicted on thirteen counts of aiding the preparation of false tax returns, in violation

of 26 U.S.C. § 7206(2), and one count of filing a false tax return, in violation of 26 U.S.C. §

7206(1).   According to the government, Spinola "was a tax preparer who routinely prepared false

tax returns for his clients to increase their refunds without their knowledge or agreement in the

fraud.   He did this to increase his referrals and business volume.   Thus, on many occasions between

at least 2014 and 2017, Spinola prepared and filed income tax returns for his clients that contained

false and inflated information on the clients'" tax returns.   *U.S. v. Spinola*, 20-cr-10115-RWZ

(ECF 34 at 1).   Spinola, furthermore, was alleged to have caused a total tax loss of $344,553. *Id.*

at 3.

Spinola accepted a plea agreement and his PSR assigned an offense level of 17, with a

corresponding advisory Guidelines Sentencing Range of 24 to 30 months.   *U.S. v. Spinola*, 20-cr-

10115-RWZ (ECF 35 at 4).   The government recommended a sentence of 24 months.   *U.S. v.

Spinola*, 20-cr-10115-RWZ (ECF 34 at 1).   This Court sentenced Spinola to two years' probation,

the first six months in home detention. *U.S. v. Spinola*, 20-cr-10115-RWZ (ECF 38).

**As to a more egregious case:**

A sentence of imprisonment should be reserved for tax cases far more egregious than this

case.   In *United States v. Ronald McPhail*, No. 21-cr-10159-GAO (D. Mass. May 19, 2021), the

defendant pleaded guilty to one count of filing a false tax return, in violation of 26 U.S.C. §

7206(1).   According to the government, "McPhail owed more than $700,000 in income taxes to

the IRS after he failed to report more than $7.1 million in revenues and approximately $2.43

million in income from his roofing and siding business on his federal tax returns for tax years 2014

through 2019.   To conceal his scheme, McPhail allegedly cashed customer checks without first

depositing them and withheld information concerning these checks and other business revenues from his tax preparers." Department of Justice, *New Hampshire Roofing Contractor Charged with Filing a False Tax Return* (May 20, 2021) https://www.justice.gov/usao-ma/pr/new-hampshire-roofing-contractor-charged-filing-false-tax-return.

McPhail's PSR assigned an offense level of 17, with a corresponding advisory Guidelines Sentencing Range of 24 to 30 months. *U.S. v. McPhail*, No 21-cr-10159 (ECF 14 at 1). The court imposed a sentence of imprisonment of 12 months and 1 day, to be followed by 12 months of supervised release. *McPhail*, at ECF 17.

In sum, many tax cases in this district, including cases in which the defendant faced a Guidelines range the same as, or higher than, the Guidelines range faced here, have resulted in probationary sentences. *McPhail* and *Spinola*, moreover, are helpful here by comparison. McPhail went to prison. But compared to Professor Lieber's case, *McPhail* involved far more unreported income, and a far larger tax loss, over a far longer period. Spinola received a sentence of probation with home detention. But, again, compared to Professor Lieber's case, *Spinola* involved a far larger tax loss, over a longer period. Spinola's conduct, unlike Professor Lieber's conduct, also caused numerous other taxpayers (Spinola's clients) to file numerous false tax returns.

Finally, when considering disparities, the Court should consider another "China Initiative" case brought—and then dropped—by the government in this district. That case, *United States v. Gang Chen*, provides a good comparison to a similarly situated defendant.

In *Gang Chen*, No. 21-cr-10018 (D. Mass. Jan. 19, 2021), the defendant was indicted on January 19, 2021, approximately a year after the arrest of Professor Lieber. The charges against Chen were, in some respects, similar to the charges against Professor Lieber—failure to file a report of a foreign bank account, in violation of 18 U.S.C. §§ 5314 and 5322 and 31 C.F.R. §§

1010.350, 1010.306(c)-(d) and 1010.840(b); and false statement, in violation of 18 U.S.C. § 1001(a)(2).  ECF 12.  The indictment charged that Chen maintained bank accounts in China, and that he made a false statement when he answered "no" on his federal income tax return to the question of whether he has "a financial interest in or signature authority over a financial account . . . located in a foreign country[.]"  *Id.* at ¶¶ 13-16.

In other respects, however, the charges against Chen were more serious than those against Professor Lieber.  Chen, the beneficiary of grants from several federal government agencies, *id.* at ¶ 2-3, allegedly made false statements and material omissions on a proposal for funding from the U.S. government.  *Id.* at ¶ 6.  The indictment charged that "had CHEN reported his appointments, contracts and activities involving the PRC and its government, DOE would have inquired further regarding his PRC affiliations, contracts, and activities and may have declined to continue funding the grant."  *Id.* at ¶ 9.  Here, by contrast, the government never charged that Professor Lieber made false statements to seek funding from the U.S. government.

On January 20, 2022, mere weeks after the conclusion of Professor Lieber's trial, the U.S. Attorney's Office moved to dismiss the charges against Professor Chen.  According to the government, as a result of the Office's "continued investigation, the government obtained additional information bearing on the materiality of the defendant's alleged omissions."  ECF 93.  Thus, comparing the two cases: They were similar in some respects but, in other respects, the charges against Chen were more serious.  Chen walked away from his case; Professor Lieber faces sentencing in his.

### **Subsection (a)(7)**

Section 3553(a)(7) provides that the court shall consider "the need to provide restitution to any victims of the offense."  This is the rare case in which the defendant has paid full restitution

before sentencing. ECF 304.  The PSR and government determined that the amount of restitution owed to the Internal Revenue Service is $33,600.  PSR at ¶ 121; ECF 302.  Professor Lieber, while disputing the Guidelines calculation of the unreported income and the resulting tax loss, made a full payment on April 4, 2023, in an effort to demonstrate his contrition and desire to move forward.

************

Professor Lieber accepts responsibility for his actions and hopes that the Court will consider this and all the Section 3553(a) factors in fashioning an appropriate sentence.

### PROFESSOR LIEBER'S
### SENTENCE REQUESTS

Professor Lieber identifies the following sentencing options, to which the Court can add a fine, restitution (which, as noted, Professor Lieber has already paid, in advance of sentence), plus mandatory special assessments.

OPTION I
GUIDELINES SENTENCE
OF PROBATION

As noted, Professor Lieber respectfully objects to the PSR with regard to both its tax loss calculation and its grouping of counts.  The Court, for the reasons set forth in this memorandum, should sustain those objections.  As a result, the offense level for the tax counts should drop to 6, and then remain at 6, grouping all counts into a single group.  That recalculation, in turn, yields a range of 0-6 months, in Zone A.  Under § 5B1.1(a)(1), the Court should then impose a sentence of probation, with a term of one year, under § 5B1.2(a)(1).

46

OPTION II
GUIDELINES SENTENCE
OF PROBATION

If the Court overrules Professor Lieber's objections to the PSR, the Court should nevertheless depart downward based on Professor Lieber's medical condition (under § 5H1.4), in combination with his age (under § 5H1.1).  Specifically, the Court should depart downward by 2 levels to offense level 11 (8 to 14 months), in Zone B.  Then, under § 5B1.1(a)(2), the Court should impose a sentence of probation with a condition of "home detention as provided in subsection (c)(3) of § 5C1.1[.]"  That subsection authorizes "a sentence of probation that includes a condition . . . that substitute[s] . . . home detention for imprisonment according to the schedule in subsection (e)[,]" which substitutes "one day of home detention for one day of imprisonment."  § 5C1.1(e)(3). Specifically, the Court should impose a sentence of 12 months' probation, with a condition of 6 months' home detention as a substitute for 6 months' imprisonment.

OPTION III
NON-GUIDELINES
SENTENCE OF PROBATION

In the further alternative, the Court, after considering the factors set forth in 18 U.S.C. § 3553(a), should impose a non-guidelines sentence of probation, as authorized by § 3561(a), having a term of one year, under § 3561(c)(1) (a term of probation must be "not less than one nor more than five years[]").  The Court should also impose, as a discretionary condition, that the term of probation include a period of 6 months' home detention "as an alternative to incarceration[.]"  § 3563(b)(19) (authorizing condition that defendant "remain at his place of residence during nonworking hours . . . imposed as an alternative to incarceration[]").

OPTION IV
NON-GUIDELINES
SENTENCE OF SUPERVISED RELEASE

In the final alternative, the Court, after considering the factors set forth in 18 U.S.C. § 3553(a), should impose a sentence of imprisonment, *see* §§ 3581(a); 3582(a); to be followed by a term of supervised release, § 3583(a), with home detention as a condition of supervised release and as a substitute for imprisonment. Section 3583(d) allows the Court to order "any condition set forth as a discretionary condition of probation in § 3563(b) [discussed in Option III above] and any other condition it considers to be appropriate;" "to the extent that such condition . . . is consistent with any pertinent policy statements issued by the Sentencing Commission[.]" Here, a condition of home detention as a substitute for imprisonment is consistent with the policy statement set forth in § 5D1.3(e)(2) ("Home detention may be imposed as a condition of supervised release but only as a substitute for imprisonment.") Professor Lieber would receive credit for two days of time served in pretrial detention. *See* § 3585(b)(1) (credit for time served in pre-trial detention). Specifically, the Court should impose a sentence of 6 months' home detention as a substitute for 6 months in prison, to be followed by 12 months' supervised release. With credit for time served, the period of home detention would actually run for 6 months, minus 2 days.

## CONCLUSION

For the foregoing reasons, Professor Lieber respectfully requests that the Court impose a non-custodial sentence.

Dated: New York, New York
      April 21, 2023

Respectfully submitted,

By:  /s/ Marc L. Mukasey
     Marc L. Mukasey (*pro hac admitted*)
     Torrey K. Young (BBO #682550)
     Stephanie Guaba (*pro hac admitted*)
     Kenneth A. Caruso (*pro hac admitted*)

MUKASEY FRENCHMAN LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
(212) 466-6400

*Attorneys for Defendant Charles Lieber*

**CERTIFICATE OF SERVICE**

I, Marc L. Mukasey, hereby certify that on April 20, 2023, this document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Dated: New York, New York      /s/ Marc L. Mukasey
   April 21, 2023       Marc L. Mukasey