UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>CHARLES LIEBER, )<br><br>Defendant. ) | Criminal No. 19-cr-10111-RWZ |

## **GOVERNMENT'S SENTENCING MEMORANDUM**

The defendant is before the Court because he lied to government agents in order to purposely obstruct legitimate inquiries into his federal research grants, and because he cheated on his taxes. Over the course of several years, the defendant purposely deceived three separate government agencies about a highly lucrative contract that he negotiated and signed with the Wuhan University of Technology ("WUT"). The contract was part of the Chinese government's "Thousand Talents Program" – a well-documented government program designed to enhance China's scientific and economic development, largely through the recruitment of foreign scientists. The relationship between Lieber and WUT had little to do with legitimate scientific collaboration or discovery but was instead a way for each to burnish their reputation and achieve other goals. For its part, WUT sought to promote Chinese interests through a close association with a preeminent scientist from a world-class institution. Lieber, on the other hand, participated in the Thousand Talents Program (or "TTP") because, as he admitted after his arrest, he "wanted to win a Nobel Prize." Rather than acknowledge and take responsibility for his TTP participation and the significant compensation he derived from it, Lieber chose to conceal it – first from Harvard University and then from the U.S. government.

While Lieber's participation in TTP was not itself illegal, his chronic lies to the U.S. government were.  Lieber purposely—and repeatedly—lied to government agents about his ties to WUT and TTP in response to direct, unambiguous questions; and he purposely concealed from tax authorities the hundreds of thousands of dollars paid to him by WUT.  These crimes—lying to federal agents and tax fraud—are not unique to academia or sponsored research.  They reflect a prolonged and purposeful pattern of deceit and a profound lack of respect for the law.  Lieber's conduct demands weighty punishment.

For his actions, and in light of the considerations described below, the government recommends that Lieber be sentenced to 90 days in prison, one year of supervised release (including 90 days of home confinement), a $150,000 fine, and restitution to the Internal Revenue Service ("IRS") of $33,600.

## I.        Overview of the Offense Conduct [1]

Lieber was a tenured professor in Harvard University's Department of Chemistry and Chemical Biology and became its Chair in July 2015.  His relationship with WUT and the TTP—and his efforts to hide that relationship—were at the heart of his trial.

Lieber's relationship with WUT traces back to 2008, to Lieber's *own lab* at Harvard.  Between 2008 and 2011, Dr. Liqiang Mai was a postdoctoral fellow in the Lieber Research Group.  After leaving Harvard in 2011, Mai became a professor of materials science at WUT.  Once there, he recruited Lieber to become a "Strategic Scientist" at WUT.  The following year in 2012, Lieber agreed to become a "High Level Foreign Expert" in TTP.   As the trial evidence overwhelmingly showed, Lieber's participation in TTP was governed by a three-year contract that Lieber negotiated

---

[1] The government's opposition to the defendant's post-trial Rule 29 and Rule 33 motions contains a more fulsome description of the evidence, complete with cites to relevant exhibits and testimony.  *See* ECF No. 267.  The information in this section is an overview of some aspects of the defendant's conduct that are, in the government's view, most relevant to sentencing.

and signed in July 2012.  Ex. 22.  Among other things, the contract obligated Lieber to perform joint research, publish papers acknowledging WUT, organize conferences, and host WUT students in his lab at Harvard, all under the "regular supervision and review" of WUT.  *Id.*  The purpose of these obligations was clearly spelled out in the contract: to "face the needs of the [Chinese] national strategy" and make WUT "and important influencing base of scientific research, talents cultivation, and international collaboration."  *Id.*  In return, the contract entitled Lieber to a monthly salary of up to $50,000 and other benefits.  *Id.*

Between 2012 and 2015, Lieber satisfied many of his contractual obligations to WUT. Without Harvard's knowledge or permission, Lieber helped establish the "Joint WUT-Harvard Joint Nano Key Laboratory" on WUT's campus and agreed to serve as its co-director.[2]



*Exhibit 164 - Lieber and Others in Front of the WUT-Harvard Joint Nano Key Lab in 2012* [2]

---

[2] The exhibits referenced in this memorandum are to various exhibits admitted during the trial.

3

Later, again without consulting anyone at Harvard, he committed Harvard to a formal academic exchange program with WUT, enabling WUT students to travel to Harvard to work in Lieber's lab, including on U.S. government-funded projects. Lieber supervised WUT students both in China and at his Harvard lab; he reviewed, commented on, and contributed to various WUT-related articles and studies, including by listing WUT (not Harvard) as his primary affiliation; and he traveled to China to attend various WUT-related events. For his part, Mai periodically informed Lieber that WUT's president and the Chinese government officials overseeing the TTP were reviewing his efforts and were pleased with his results.

And then there was Lieber's TTP compensation package, or what Lieber called the "business" part of the TTP arrangement. The TTP contract entitled Lieber to a monthly salary of up to $50,000. Ex. 22. To receive this money, Lieber opened a bank account at the Wuhan branch of the Industrial and Commercial Bank of China ("ICBC") shortly after he signed the contract. Thereafter, at Lieber's request, WUT paid Lieber half of his salary in cash and half via deposits into Lieber's ICBC account. Documents found at the Lieber's home on the day of his arrest reflect payments to Lieber of nearly $90,000 by WUT on November 8, 2012, the day he opened the account.



*Exhibit 212 - Receipt from WUT Found in the Defendant's Home in Lexington in 2019*

After November 2012 and continuing well into 2015, Lieber received up to $20,000 in cash each time he visited WUT, in $100 bills that were enclosed in brown paper packages.  An equal amount of money was deposited into Lieber's ICBC account during each visit.  According to Lieber, he did not spend the money in his ICBC account, and so the balance grew over time.  As a result, when he checked the balance in 2014 it contained approximately $200,000.  Lieber never reported his WUT salary on his tax returns nor did he report his ICBC account to the government as required by law.  In his interview with the FBI, Lieber acknowledged that this was "obviously illegal."

In 2018, the majority Lieber's research was funded by two government agencies: the Department of Defense ("DOD") and the National Institutes of Health ("NIH").  On April 20, 2018, a DOD Special Agent emailed Lieber to request an interview concerning one of his active DOD grants, and they agreed to meet on April 24.  During the interview, in addition to generally downplaying the nature and extent of his relationship with WUT, Lieber made two demonstrably false statements to Special Agents: (1) that he had never been asked to be a member of the TTP; and (2) that he was "not sure" how China "categorized" him in this regard.  Two days after the interview, Lieber sent the following email to one of his close confidants:

| | |
|---|---|
| **To:** | Ning Gao███████████ |
| **From:** | Lieber, Charles M. |
| **Sent:** | 2018-04-26T10:29:19Z |
| **Importance:** | Normal |
| **Subject:** | CAS link |
| **Received:** | 2018-04-26T10:29:17Z |

;
Dear Ning,
Could you also provide me with the link/info to CAS webpage where I am listed as directing(?) that lab at Wuhan? I lost a lot of sleep worrying about all of these things last night and want to start taking steps to correct sooner than later. I will be careful about what I discuss with Harvard University, and none of this will be shared with government investigators at this time.
Best, Charlie

*Exhibit 93 – Email from the Defendant Two Days after his Interview with DOD*

Several months later, NIH (the other funder of Lieber's research) sent a letter to Harvard requesting information about Lieber's suspected ties to WUT and TTP.  NIH was then worried that Lieber might be "double-dipping" by receiving Chinese funding for the same projects, might have a conflict of commitment, and might have financial conflicts of interest.  Tr. Trans. Day 5 at pp. 84-110.  On December 13, 2018, Harvard officials preparing to respond to NIH previewed for the defendant some of the questions they planned to ask him at a meeting the next day, including: (1) "In 2015 and before, did you receive any compensation for your efforts in helping your former postdoc [*i.e.*, Mai] set up the lab?"; (2) "Have you participated in the Chinese government's Thousand Talents program?"; and (3) "Did you ever receive any grant money or other research support from any foreign government?"  Ex. 104.  When asked during the meeting the next day whether he had participated in the TTP, Lieber denied any such involvement while explaining that "many institutions" had solicited him to join TTP but that he had always declined "because they required him being in China for long periods of time, and he was never willing to do that."  Tr. Trans. Day 2 at p.82.

After the meeting, Harvard officials unwittingly compiled Lieber's false answers and other information into a draft letter to NIH.  Ex. 108.  The defendant reviewed and approved the draft without making any substantive changes.  *Id.*  Two days later, Harvard sent the letter to NIH.  It included Lieber's false claim that he "is not and has never been a participant in" TTP.  *Id.*

## II.    Applicable Sentencing Guidelines

The government agrees with the offense level calculation in the Presentence Investigation Report ("PSR") except for the PSR's grouping analysis.  While the PSR separates the six counts of conviction into two distinct groups, PSR ¶¶ 41-42, it is the government's view that all six counts form a single group under § 3D1.2(d) because the offense level for each count "is determined

6

largely on the basis of the total amount of harm or loss ."[3]  The effect of combining the offenses into a single group is two-fold.  First, it eliminates the 1-level enhancement under § 3D1.4.  PSR ¶¶ 58, 60.  And second, it reduces the overall offense level calculated in the PSR from 13 to 12. PSR ¶¶ 59-64.

Grouping aside, the government concurs with the PSR's offense level calculation.  Counts 3, 4, 5 and 6 result in the highest offense level — offense level 12 — because a reasonable estimate of the combined tax loss associated with those offenses is $33,600.  PSR ¶ 50; *see also* § 2T1.1 - Application Note 2 ("In determining the total tax loss attributable to the offense …, all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated.").  There are no upward adjustments due to the Lieber's role in the offense or otherwise, nor is Lieber entitled to a downward adjustment for acceptance of responsibility.  PSR ¶¶ 51-57, 63.  The total offense level, therefore, is 12 and the corresponding Guidelines sentencing range is between 10 and 16 months.

### *Reasonable Estimate of Tax Loss*

A reasonable estimate of the tax loss associated with the Lieber's tax crimes, Counts 3 through 6, is approximately $33,600.  PSR ¶¶ 32, 50.  The defendant objects to this calculation, arguing that it is not based on sufficiently reliable evidence.  This argument has no merit.  The $33,600 loss estimate is supported by overwhelming evidence that includes Lieber's TTP contract, Lieber's emails, bank and payment records found in the Lieber's home, and Lieber's detailed post-arrest statements in which he admitted – in no uncertain terms – to receiving *at least* several

---

[3] Counts 1 and 2 index to Section 2B1.1 of the Guidelines, while the remaining counts index to Section 2T1.1.  PSR ¶¶ 43, 50.  Section 3D1.2(d) of the Guidelines specifically states that "offenses covered" under these two sections (and several others) "are to be grouped under this subsection."

hundred thousand dollars from WUT.  If anything, given the available evidence, the PSR's tax loss estimate is a conservative one.

As a preliminary matter, the court need only make a "reasonable estimate [of tax loss] based on the available facts."  U.S.S.G. § 2T1.1 - Application Note 1.  When determining loss, "[c]ourts can, and frequently do, deal with rough estimates."  *United States v. Rostoff*, 53 F.3d 398, 407 (1st Cir. 1995) (citing cases).  Sentencing judges, therefore, are given "wide berth … in determining what information is, or is not, sufficiently reliable to be used in imposing sentence." *Id.*; *see United States v. Tardiff*, 969 F.2d 1283, 1287 (1st Cir. 1992).  Accordingly, "a party dissatisfied with the sentencing court's quantification of the amount of loss in a particular case must go a long way to demonstrate that the finding is clearly erroneous."  *Id.*

The available evidence here reliably supports the $33,600 loss estimate.  The starting point is the Lieber's TTP contract, which began in mid-2012 and entitled him to a monthly salary of up to $50,000.  Ex. 22; PSR ¶¶ 16-17.  Lieber's contemporaneous emails demonstrate not only that he was paid a significant portion of this salary, but also precisely *how* he was paid.  In one email from October 2012, for example, Lieber told a close contact at WUT, Xiang Fan, that he would like to "open [an] account at ICBC but split the payment with part being deposited to bank account and part in cash...."  Ex. 151.  Numerous subsequent emails between Lieber and Xiang Fan (and others) show that this payment arrangement continued—often at the defendant's insistence—well into 2015. *See, e.g.,* Ex. 52, 168, 169.

Other evidence in the case is corroborative of the defendant's emails while also providing insight into precisely *how much* the defendant was paid.  During the search of the Lieber's house, for example, agents located Lieber's ICBC account opening forms from November 2012 (just one month after Lieber told Xiang Fan his preferred method of payment).  Ex. 212.  Agents

8

simultaneously discovered the "Charles M. Lieber Subsidy" document depicted above, which shows that WUT paid Lieber more than $90,000 during his November 2012 trip.  *Id.*; PSR ¶ 19. The face of this document is consistent with Lieber's emails: half of the roughly $90,000 was given to the defendant in cash and the other half was deposited into his ICBC account.  *Id.*  Later, investigators obtained Lieber's ICBC debit card, the account numbers of which match the account numbers on Lieber's ICBC account opening forms.  Ex. 230.

While clearly attempting to minimize his conduct, Lieber also made several probative admissions about his WUT compensation to FBI investigators after his arrest.  Lieber admitted, directly or indirectly, that: (1) he joined the TTP in 2012; (2) in his view, "Thousand Talent funding . . . is a big . . . no-no to have" because "you're paid a salary by China and you're also a US faculty"; (3) he nevertheless had been paid such a salary, half of which was deposited into his ICBC account and half of which he received in cash, typically from Mai or Xiang Fan; (4) he had a bank card for the ICBC account; (5) during his estimated four trips to China, he received between $10,000 and $20,000 in cash on each visit, in $100 bills that were enclosed in brown paper packages; (6) he did not declare the cash upon returning to the United States or on his tax returns, which he knew was "obviously illegal"; (7) he did not deposit the cash into a bank account but simply kept it on hand to pay for living expenses; and (8) when he checked his ICBC account in 2014 the balance then stood at about about $200,000.  Ex. 300-307; PSR ¶¶ 21, 31.

In sum, the available evidence reliably shows that WUT deposited at least $200,000 into Lieber's ICBC account between 2012 and 2014 and that WUT also paid Lieber a similar amount in cash.  Considering that "all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan" when calculating loss, *see* U.S.S.G. § 2T1.1 - Application Note 2, it cannot be said that the PSR's conservative estimate of Lieber's unreported

income ($120,000 combined in 2013 and 2014[4]) is overstated or unsupported by the available evidence.   If anything, the PSR might actually *understate* Lieber's unreported income.[5] Considering the available facts and applying the presumed 28% rate on underreported income called for by the Guidelines, *see* U.S.S.G. § 2T1.1(c)(1)(A), $33,600 represents a reasonable and conservative estimate of the loss associated with Lieber's tax crimes.[6]   There is no factual or legal basis to calculate a lower amount.

III.    **The Government's Recommendation**

The government respectfully submits that the relevant factors under § 3553(a) support the imposition of a sentence of incarceration of 90 days, together with one year of supervised release (to include 90 days of home confinement), a $150,000 fine, and restitution to the IRS of $33,600.

*The Nature and Seriousness of the Offenses*

The nature and circumstances of the offenses are serious, and they reflect the profound lack of respect for the law.   This is a quintessential case of lying to federal agents to reap personal benefits.   The defendant's crimes were neither discrete nor aberrational.   They were not the product of a single misguided act or one rash decision, but rather a concerted and sustained effort over a

---

[4] This conservative calculation is based on the number of trips Lieber made to WUT in those two years: one trip to in 2013 and two trips in 2014.  PSR ¶ 32, FN 2, FN 3.  The evidence reasonably establishes that Lieber was paid roughly $40,000 during each of these trips – half in cash and half via deposits into his bank account.  *Id.*  Combined, therefore, the PSR estimates that the unreported income associated with those three trips is approximately $120,000.  Twenty-eight percent of $120,000 is $33,600.  *Id.*

[5] Under Section 1B1.3(b) of the Guidelines, Lieber's unreported income from uncharged tax years (e.g., 2012) is "relevant conduct" for purposes of calculating the offense level for Counts 3 through 6 because the underreporting was caused by Lieber and it was "part of the same course of conduct or common scheme or plan as the offense[s] of conviction."  Consequently, the $90,000 payment to Lieber in November 2012, could easily be included in the Court's loss calculation.  *See* p.4, *supra*; Ex. 212.

[6] It is worth noting that tax loss of greater than $15,000 is all that's required to sustain the PSR's offense level calculation for Counts 3 through 6.  *See* U.S.S.G. § 2T4.1 (Tax Table).  Given the strong evidence of substantial payments to Lieber, and the fact that loss need only be established by a preponderance, there is no reasonable basis to conclude that the loss is less than $15,000.

period of years to downplay his relationship with WUT, cover up completely his affiliation with the Thousand Talents Program, and secretly line his own pockets.

From the very beginning, Lieber has actively concealed his ties to WUT and the Thousand Talents Program. Between 2012 and 2015, he signed his TTP contract, established the WUT-Harvard joint lab, and otherwise carried out his duties and responsibilities as a TTP participant in secret, without telling any of his Harvard colleagues. It was not until January 2015 that Harvard first caught wind of the "WUT-Harvard" joint lab. PSR ¶ 23. When confronted about the lab by the Dean of Science, Lieber feigned ignorance. *Id.* He told the Dean that WUT had used Harvard's name without his knowledge or consent, and even went out of his way to assure the Dean in a follow-up email that his relationship with WUT was merely for "mutual scientific collaboration." *Id.* Of course, none of this was true. By that point, Lieber had already been paid hundreds of thousands of dollars by WUT (none of which he reported to the IRS); he had helped found the joint lab with WUT and agreed to serve as its co-director; he had authorized the use of Harvard's name in connection with the lab; and, as depicted above, he had visited the lab numerous times. While these lies were not criminal (because they were not directed at a government agent), they provide a window into Lieber's state of mind in 2015: he knew *then* that his affiliation with WUT and the Thousand Talents Program was wrong, hence his continued desire to keep it hidden.

By 2018, Lieber was actively engaged in research funded by the Department of Defense and a prestigious "Pioneer Award" from the National Institutes of Health. While his formal relationship with WUT appears to have subsided by this point, Lieber continued to exchange occasional emails with Mai, and WUT continued to deposit money into Lieber's ICBC account. *See, e.g.,* Ex. 84. On April 24, 2018, Lieber met with two DOD agents in his office at Harvard—an interview that was scheduled days in advance—and answered questions about his suspected ties

to TTP.  As Lieber himself told the FBI shortly after his arrest, he "wasn't completely transparent [with DOD] by any stretch of the imagination."  This was an understatement.  Just as he did with Harvard's Dean of Science three years earlier, the defendant outright lied to the DOD agents, telling them, among other things, that he had "never been asked to be a member of the Thousand Talents Program."  The defendant's email two days after the interview provides even further evidence of his intent to obstruct the DOD inquiry: "I will be careful about what I discuss with Harvard University, and none of this will be shared with government investigators at the time." Ex. 93.

If the defendant was "surprised" by DOD's questions about TTP in April 2018, the same cannot be said of the NIH inquiry several months later.  The focus of NIH's inquiry was clear from the very beginning: NIH was seeking information about the defendant's suspected ties to WUT and TTP.  What's more, the Harvard administrators tasked with crafting Harvard's written response to NIH scheduled an interview with Lieber days in advance, and even shared their questions with Lieber beforehand.  Far from "ambushing" the defendant with unexpected questions about TTP, therefore, Harvard and NIH gave the defendant every opportunity to provide thoughtful, complete, and truthful answers.  They had no reason to suspect that he might lie.  The defendant abused that trust by lying repeatedly to Harvard about, among other things, the nature and extent of his relationship with WUT, the money he had received, and the TTP contract that he had signed.  The defendant doubled down on these lies days later when he reviewed and approved Harvard's written response to NIH, knowing full well that it was replete with the false information he had provided.

The defendant's crimes caused real harm to the government agencies that sponsored his research.  According to NIH's February 17, 2023, letter to the court, "The ethical obligations

entailed in accepting public funds and in the conduct of research are of the highest order and recipients must consider the use of these funds as a trust.  Great care must be taken to 'do no harm' and to act with integrity. The credibility of the entire enterprise relies on the integrity of each of its participants." Citing the highly competitive nature of NIH grants, the NIH letter concludes that, "Because of Dr. Lieber's false representations, other scientists who did act with integrity were denied the opportunity to conduct high-quality science supported by NIH."  Furthermore, by using Harvard as an unwitting conduit to convey false information, Lieber jeopardized Harvard's partnership with NIH and other funding institutions.  Moreover, by blatantly lying to his two primary funding sources, Lieber showed a disregard for the students, staff members, and administrators who worked under him, many of whom were left scrambling to find work or complete degree programs after Lieber's funding was revoked.

To summarize, the nature and circumstances of the defendant's crimes—including his multiple tax crimes—reflect a deliberate, sustained effort to lie and deceive in order to selfishly pursue his own personal and professional goals.  The nature of these crimes warrants a sentence of incarceration.

### The History and Characteristics of the Defendant

The defendant is a man of extraordinary intellect and privilege.  He holds a doctorate degree in Chemistry from Stanford.  He served on the faculty of one of the most renowned universities in the world, attaining the highest available faculty distinction – University Professor.  He was the director of a prestigious research group bearing his name, and he himself was a world-renowned nano scientist with Nobel Prize aspirations.  Due to his success as a professor, a researcher, and an inventor, the defendant built a sizeable net worth.  For most of his professional career, therefore, he has lived a life of extraordinary privilege.

Notwithstanding his successes, Lieber embarked on a years-long scheme to further his career through lies and deceit, while also lining his pockets courtesy of the Chinese government. Lieber had no reason to commit these crimes. He certainly did not need the money. He participated in TTP, was paid, and then lied about it *not* because he lacked the ability appreciate the wrongfulness of his actions, but rather because of greed and a selfish desire to advance his career – and because he thought he could get away with it. That Lieber would engage in such brazen dishonesty over, and over, and over again, without any apparent regard for the consequences, requires a meaningful sentence of incarceration.

Due consideration must also be given to the defendant's health. As the defendant describes in his sentencing memorandum, he was diagnosed with follicular lymphoma—an incurable, slow growing form of cancer—in approximately 2014. ECF No. 307 at 13. According to internet resources, most individuals diagnosed with this form of cancer live longer than twenty years after diagnosis. *See, e.g., https://my.clevelandclinic.org/health/diseases/22606-follicular-lymphoma*. Lieber's cancer is considered "in remission." ECF No. 307 at 14. According to the defendant's sentencing memorandum, he is not currently receiving any treatment and he does not take any prescription medications. *Id.* at 13-14. Because Lieber's immune system is still considered compromised from treatment he received last year, his doctor has advised him to wear a mask indoors and to avoid large indoor crowds, particularly in areas with poor ventilation. *Id.* As with many forms of cancer (both incurable and otherwise), Lieber receives quarterly checkups to monitor for "continuing response to therapy and long-term side effects." *Id.* at 15.

While the defendant's diagnosis is significant—the government is recommending a below-Guideline sentence in large part because of it—it does not preclude him from serving a period of incarceration. As the PSR notes, the Bureau of Prisons ("BOP") routinely provides care to

prisoners with complex medical issues, including various cancers. *See* https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf. That said, Lieber's cancer is currently in remission. As such, he is not receiving any sort of inpatient or outpatient treatment, and he does not take any prescription medications. While Lieber has no doubt required specialized medical care in the past, he apparently does not require any such care *at present*. There is simply no basis to conclude, therefore, that BOP cannot "adequately meet" Lieber's "highly-specialized needs." ECF No. 307 at 18.

The possibility that Lieber may require advanced treatment at some point in the future is not a basis to conclude that he cannot be safely incarcerated now. By all accounts, Lieber appears to have responded well to his latest treatment. He has not experienced any extraordinary complications. Other than to say that "[i]t is only a matter of time," *id.* at 18, the defendant does not suggest that there is any short-term risk of his cancer reemerging. While it is true that the defendant requires quarterly follow-up visits with his doctor to ensure that his health continues to trend in the right direction, there is no reason that his sentence cannot be structured *around* those visits. For example, the Court can easily order the defendant to report to BOP custody *after* his next checkup (assuming everything goes as expected). If the Court imposes the 90-day sentence requested by the government, the defendant would be released in time for his next quarterly screening. These screenings, therefore, are not an impediment to imposing the government's recommended sentence.

Nor does the defendant's immune compromised condition warrant a non-incarcerative sentence. The public health emergency caused by Covid-19 has, by all accounts, subsided. The national Covid-19 health emergency, for example, is set to expire on May 11, 2023. *See* https://www.hhs.gov/about/news/2023/02/09/fact-sheet-covid-19-public-health-emergency-

transition-roadmap.html.  Massachusetts and many other states intend to terminate their respective public health emergencies that same day.  *See, e.g.,* https://www.mass.gov/news/healey-driscoll-administration-announces-end-of-covid-19-public-health-emergency-in-massachusetts.   Positive Covid-19 tests amongst federal inmates are, not surprisingly, at their lowest levels since before the pandemic.  In fact, as of the date of his filing, most of BOP's Federal Correctional Institutions have zero Covid-19 positive inmates.   *See*  https://www.bop.gov/coronavirus/covid19_statistics.html (consult "Inmates Positive" column).  All of this is to say, Covid-19 is thankfully no longer the risk to immune-compromised individuals that it once was.

At bottom, the question is not whether prison is a less desirable setting for the defendant than his home in Lexington.  The question is whether incarcerating the defendant for 90 days creates a grave and unjustifiable risk to his health.  The answer to that question is "no."  Every day, defendants with varying levels of immune deficiency are sentenced to prison – some who are fortunate like the defendant to have top-notch medical care at the best hospitals in the world, and many others who are less fortunate.  While the defendant's condition is no-doubt worthy of important consideration, it does not in and of itself preclude a sentence of incarceration.  Indeed, the law is full of instances, some of them cited in the defendant's own sentencing memorandum, where sick or medically complicated persons are sentenced to jail despite their condition.  For example, in a case cited by the defendant, *United States v. Blarek*, 7 F. Supp. 192, 212 (E.D.N.Y. 1998), the defendant was HIV positive, a condition described by the sentencing Court as "extraordinary and unpredictable."  Even while recognizing that incarceration may be "detrimental to this defendant's health," the Court departed downward to a sentence of 48 months in prison.  *Id.* at 213-14.  Given the defendant's current health status, the 90-day sentence recommended by the government is eminently reasonable.

### *The Need for Just Punishment, Adequate Deterrence, and to*
### *Avoid Unwarranted Sentence Disparities*

A meaningful sentence of incarceration is necessary to provide just punishment to the defendant.  18 U.S.C. § 3553(a)(2)(A).  While it is true that the defendant has lost his job and, in all likelihood, the privilege of conducting federally funded research as a result of his convictions, these collateral consequences do not warrant a downward departure or variance.  The defendant was only able to commit his crimes because he was entrusted with federal funds by the victims of his crimes.  Having blatantly abused that trust, he has understandably lost the ability to apply for more taxpayer-funded research support.  The notion that the defendant deserves a lesser sentence because he has lost this privilege—a consequence brought about by the very crimes he is being sentenced for—makes little sense.   To be sure, "defendants who abuse a position of trust deserve more severe punishment, not less."  *United States v. Howard*, 28 F.4th 180, 212 (11th Cir. 2022) (rejecting sentence reduction premised on defendant's loss of his medical license because defendant purposely abused that license to commit health care fraud).

The fact that the defendant lost his prominent position at Harvard also does not support his request for a sentence of probation.  To begin with, the natural implication of this argument is that defendants of less means and with "less to lose" receive greater sentences than more prominent defendants of greater socio-economic status.   But "[t]he Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."  *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013); *see* U.S.S.G. § 5H1.10 (stating that socio-economic status is "not relevant in the determination of a sentence").   "[C]hosen profession and status in the community," therefore, are often "decidedly inappropriate" factors to form the basis of a significant departure or variance.  *See United States v. Peppel,* 707 F.3d 627, 641 (6th Cir.

2013) (vacating seven-day sentence for CEO who participated in a multi-million-dollar fraud scheme).

To be sure, Lieber did not commit his crimes out of desperation or necessity or because he lacked the ability appreciate the wrongfulness of his actions. Lieber deliberately *chose* to commit his crimes out of greed and a warped sense of entitlement, despite knowing that they were wrong. If anything, therefore, Lieber is *more* culpable and worthy of incarceration than many other less fortunate defendants who commit similar crimes. *United States v. Stefonek,* 179 F.3d 1030, 1038 (7th Cir.1999) ("Criminals who have the education and training that enables [them] … to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime."); *Kuhlman*, 711 F.3d at 1329.

A sentence of incarceration is also necessary to achieve general deterrence. 18 U.S.C. § 3553(a)(2)(B). To be clear, the government does not seek to deter academics from engaging in ordinary international collaboration. That is not what this case is or has ever been about. This case is about deterring others who, like the defendant, might be inclined to lie to government agents about material facts, or obstruct legitimate administrative or criminal inquiries. The defendant here happens to be a prominent academic who blatantly obstructed two separate grant fraud inquiries and cheated on his taxes. But his crimes are by no means unique to academia or government sponsored research. Lies, obstruction, and tax fraud can (and unfortunately do) occur in many different contexts for a variety of different reasons. A sentence involving *some* amount of incarceration is necessary to provide adequate deterrence to anyone inclined to engage in similar types of deceitful and obstructive behavior, be they a professor at Harvard, a business owner, a blue-collar worker, or an elected official. *Cf. Kuhlman*, 711 F.3d at 1329 ("Because economic and

fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.").

Finally, the government's recommended sentence will not result in "unwarranted sentence disparities amongst defendants convicted of similar conduct." 18 U.S.C. § 3553(a)(5)(b).[7] According to data maintained by the U.S. Sentencing Commission, defendants convicted of similar § 2T1.1 crimes resulting in an offense level of 12 are imprisoned, on average, for 6 months.



*See* https://jsin.ussc.gov/analytics/saw.dll?Dashboard.   Moreover, nearly half of all defendants convicted of similar types of tax crimes are incarcerated.

---

[7] This case is simply not apt for comparison to the *Chen* case or any other "grant fraud" case involving the alleged failure to disclose foreign affiliations in grant-related disclosures. Lieber was not accused or convicted of failing to properly fill out paperwork. He was convicted of lying directly to DOD officials, Harvard officials, and NIH officials, and cheating on his taxes. The defendant's crimes were not a one-time occurrence. They were the product of careful reflection over the course of *years*. Irrespective of the China Initiative, Lieber's crimes are worthy of prosecution and punishment.



*Id.* Notably, these statistics do not involve defendants who, like Lieber, are also convicted of lying to federal agents. Indeed, regardless of what the Guidelines say about them, Lieber's chronic lies are among the most disturbing aspects of his conduct. Based on the above statistics and as a matter of common sense, therefore, individuals who commit this type of tax fraud *and* egregiously lie to government agents are more likely than not to be sentenced to a period of incarceration. Consequently, the government's recommendation of 90 days in prison is not disparate from other cases involving similarly situated defendants.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence the defendant to a term of imprisonment of 90 days, followed by 1 year of supervised release (including 90 days of home confinement), a fine of $150,000, and restitution to the IRS of $33,600.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:      */s/ Jason A. Casey*
         Jason A. Casey
         James R. Drabick
         Assistant United States Attorneys

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was filed on April 23, 2023, through the ECF system, which will provide electronic notice to counsel as identified on the Notice of Electronic Filing.


*/s/ Jason A. Casey*
Jason A. Casey
Assistant U.S. Attorney

21